LAW OFFICES

# SCHMITTINGER AND RODRIGUEZ, P.A.

414 SOUTH STATE STREET
POST OFFICE BOX 497
DOVER, DELAWARE 19901
TELEPHONE 302-674-0140
FAX 302-674-1830

NICHOLAS H. RODRIGUEZ
PAUL H BOSWELL
JOHN J. SCHMITTINGER
DOUGLAS B. CATTS
WILLIAM D. FLETCHER JR
CRAIG T ELIASSEN
WILLIAM W PEPPER SR
CRYSTAL L. CAREY*
SCOTT E. CHAMBERS*
FRED A TOWNSEND III
NOEL E. PRIMOS
DAVID A BOSWELL
WALT F. SCHMITTINGER
R. SCOTT KAPPES
JEFFREY J. CLARK
BETH B. MILLER
KYLE KEMMER
KATHRYN J. GARRISON
MAGNOLIA SOLANO
ERIN K FITZGERALD

'ALSO ADMITTED IN MARYLAND

HAROLD SCHMITTINGER
OF COUNSEL

NEWARK OFFICE
CHRISTIANA EXECUTIVE CAMPUS
220 CONTINENTAL DRIVE, STE 203
NEWARK, DELAWARE 19713
TELEPHONE 302-894-1960
FAX 302-894-1965

REHOBOTH BEACH OFFICE
WACHOVIA BANK BUILDING
18489 COASTAL HIGHWAY, 2ND FLR
REHOBOTH BEACH, DELAWARE 19971
TELEPHONE 302-227-1400
FAX 302-645-1843

ODESSA OFFICE
ODESSA PROFESSIONAL PARK
POST OFFICE BOX 626
ODESSA, DELAWARE 19730
TELEPHONE 302-378-1697
FAX 302-378-1659

May 7, 2007

The Honorable Mary Pat Thynge
United States District Court
844 North King Street
Wilmington, DE 19801

***VIA ELECTRONIC FILING***

RE:  <u>Miller v. Aramark Healthcare Support Services, Inc., et al.</u>
     C.A. No.: 06-534 (MPT)

Dear Magistrate Judge Thynge:

You held a telephone conference with counsel regarding a discovery dispute on May 2, 2007, at 5:00 p.m. At the close of that conference, you ordered counsel to make additional written submissions by Monday, May 7, 2007. This is the additional submission on behalf of Plaintiff.

Since the May 2 teleconference, we have had an opportunity to consult further with our client. Based upon those consultations, it is our belief that Defendants' computer system is capable of printing out a spreadsheet that would provide the information requested in RFP's 2 and 7. This would involve an individual with a higher security clearance (such as Plaintiff's former supervisor, Jonathan Hill) inputting the name of an individual, the type of repair or job (i.e., initial inspections, repair orders/demand calls, preventive maintenance inspections, on-call responses), and the range of dates being requested. The computer system would then print out a spreadsheet with the information requested. We believe that the spreadsheet would indicate the status of the various functions for which information is being requested.

It would be difficult, if not impossible, for Hill to evaluate the performance of his subordinates if this information could not be

May 7, 2007
Page 2

produced by the computer system.  This is borne out by Hill's deposition, excerpts of which are attached hereto.  For example, on page 53 of his deposition, when referring to "competency testing" that he performed on technicians in early 2005, Hill states at line 15, "I picked a random week within the past year that the technician had entered statuses on, and we went through every status of every work order they put in for that week." Thus, it is apparent that Hill was capable of pulling up the designated information for a particular technician.

Similarly, at page 63 of his deposition, when discussing a memo that he issued to technicians in March 2005, Hill states at line 4, "I pulled out a report called Incomplete Work Request by technician.  What that does is every work order that is assigned a particular technician will say technician A.  Every one of their work orders would show up on that document.  If the work orders-- if it indicates on there what piece of equipment is being worked on, what the reported problem was, what the last status that was put down was, the actual age of the entire work order, and the age when the last status was put in place." Furthermore, at pages 79 and 80 of his deposition, Hill testified that work orders were still in existence in electronic form at the time of the deposition (in February 2007) and could be printed out easily.  We believe that the information requested is in existence as part of Defendants' computer files and can be printed out with minimal burden and expense.

The information requested in RFP #2 (work order requests for 2/2/05 to 4/15/05, including the four types of work orders, i.e., initial inspections, repair orders, preventive maintenance inspections, and on-call responses) would show both the types of work that Plaintiff was being asked to perform for that period and the work that he was completing for that period.  We believe that this can help show a pattern of discriminatory activity on the part of Hill.  Specifically, Hill would make up a schedule for a several-month period for the technicians that would indicate what type of work they would be performing for each month--i.e., repair orders/demand calls, initial inspections, or preventive maintenance inspections.  Prior to Plaintiff's return from medical leave in December 2004, the technicians were under a schedule that began in July 2004.  Plaintiff asked Hill if he could be put last in the rotation, which would have had him working at the Milford Bayhealth campus.  Instead, Hill instituted a new assignment schedule beginning February 2, 2005, and started Plaintiff at the Kent campus on demand call/repair orders, the most rigorous of the types of jobs.  In March and April 2005, Plaintiff was scheduled for preventive maintenance and initial inspections at Kent.  We believe that this was because Hill wanted Plaintiff to fail and wanted to be able to watch him closely to make that happen.  (Hill spends the large majority of his time at Kent.)  Indeed, the various disciplinary actions leading up to Plaintiff's termination

May 7, 2007
Page 3

on 4/15 focused on Plaintiff's alleged mistakes in performance while completing these tasks at the Kent campus.

Moreover, with respect to RFP #7, which requests information regarding preventive maintenance inspections ("PM's") by John Ritterhoff in March and April 2005, we believe that this will show that Ritterhoff was not completing these tasks in an acceptable manner. During March and April, Plaintiff and Mr. Ritterhoff were the only two technicians assigned to complete PM's at Kent.

Incidentally, with regard to RFP #5, concerning which Defendants have represented that they have no further responsive documents, we believe that Mr. Hill would be able to print off from the computer system the two assignment schedules for July 1, 2004 through February 1, 2005, and for February 2, 2005 through October 1, 2005, as he had access to this information during Plaintiff's employment. The document provided with the discovery responses, the "Technician Campus Assignments," (included with Plaintiff's original submission of a copy of the discovery responses) is not the correct document. The documents being requested would show to what tasks the technicians were assigned for each month—e.g., that Plaintiff and Mr. Ritterhoff were assigned to PM's for March.

Should the Court require additional information regarding this discovery dispute, Plaintiff's counsel is ready to provide it. Thank you for your consideration of this matter.

Very truly yours,

WILLIAM D. FLETCHER, JR.

NOEL E. PRIMOS

Attachments

cc: William J. Delany, Esq. (via electronic service)
    Michael P. Kelly, Esq. (via electronic service)

53

1    A.    What was involved in the competency
2    assessment is if you take a look over here, the
3    standards, if you were to refer back to Hill 2, under
4    the standards of performance, you would see each one of
5    the categories, quality control, customer relations,
6    vendor relations, record management. And each one of
7    those --
8    Q.    I'm sorry. What page of Hill 2 is that?
9    A.    Page two, starting on page two and going to
10    page three, if you notice that quality control is at the
11    top, under quality control I have listed two separate
12    entries for competency testing; one for physical
13    environment, one for computer entry.
14    Okay. For the computer entry portion of the
15    quality control, I picked a random week within the past
16    year that the technician had entered statuses on, and we
17    went through every status of every work order they put
18    in for that week.
19    We took a look at the quality and content of
20    the status versus the time that they put in it for. And
21    we discussed what truly happened with each one of those
22    work orders so that they could gain a better
23    understanding of what my expectations were and I could
24    know what they knew, which was a prerequisite of even

Anthony Reporting
(302) 674-8884

54

1    beginning this. What I told them was this is an
2    opportunity for me to see what I know and for you to
3    understand what I expect.
4    So the one portion was physical environment.
5    The next one was computer entry. Then there was one for
6    customer and vendor relations in which they were given a
7    copy of a purchase order, a fake purchase order for the
8    facility of a brand new device coming into the facility.
9    I asked them what do they do when they get the device
10    and get the PO.
11    They would fill out an inventory form, which
12    I had them fill out for me. And then I had sheets where
13    I had computer screen images of the assets module within
14    the ISIS program. And they would fill in the blanks of
15    the assets so they could demonstrate to me that they
16    knew exactly how to fill that in as part of that job to
17    demonstrate competency.
18    After that portion, I had them do the new
19    equipment inspection work order, in which we had them go
20    through and complete it to include all of the testing
21    that would be involved with that device to allow it to
22    come into the facility.
23    Following that, I gave them a work order or
24    I gave them a problem that existed with the unit, and I

Anthony Reporting
(302) 674-8884

55

1    asked them to please tell me what exactly it is going to
2    involve for that repair, what do they do. So we would
3    have a discussion about the actual repair to determine
4    what exactly was wrong with the machine.
5    Q.    Now, you are still under customer vendor
6    relations at this point?
7    A.    Customer vendor relations and record
8    management, they both coincide. So we got to that part
9    there where they went through the repair. I took a look
10    at what resources they would reach out to, and then I
11    asked them what other resources could you reach out to,
12    so they clearly understood when they went to do their
13    job, they are not alone in fixing the medical equipment.
14    They have the peers. They have the customer support
15    reps. They have the other resources that they can
16    utilize to do the repairs so that they are not alone.
17    Then I go ahead and we go through the self-
18    development portion, which I proceed to interview them
19    on the policies and procedures manual, have they
20    reviewed it. And we go over, once again, their
21    technician review -- the written standards of
22    performance in the job description to make sure that
23    they clearly understand what is going on with that and
24    if they have any other questions at that time. That

Anthony Reporting
(302) 674-8884

56

1    way, we ensure they are all reviewed on an annual basis.
2    Then I give them questions on safety. I ask
3    them about the codes that can be happening out on the
4    floor, such as like a code blue or a code pink and make
5    them answer the questions as to what those involve, do
6    they know how to operate a fire extinguisher, making
7    sure that they clearly understand all the safety rules,
8    asking them about their PPE and SHS sheets, to make sure
9    they have a complete understanding and knowledge of
10    that.
11    Q.    Now, when you have been describing these
12    different activities that occurred during the competency
13    assessment, it sounds as if in more than one of these
14    areas, you were asking questions of the employee,
15    basically having an interview with the employee, right?
16    A.    Correct.
17    Q.    Even when you were referring to customer
18    vendor relations, I think you said you would ask
19    questions, maybe record management, maybe quality
20    control computer entry. But I notice over here, under
21    computer assessment method, there are only three of the
22    items that indicate interview.
23    A.    Right.
24    Q.    Can you explain that?

Anthony Reporting
(302) 674-8884

61

1  needs to be documents, because they failed to do
2  something that was of a nature that didn't quite
3  necessarily needed to be written up, but it needs to be
4  noted in his file.
5  BY MR PRIMOS:
6      Q.    Okay. Do you know if that is the procedure
7  with other Aramark managers besides yourself? In other
8  words, where they try to make some kind of a written
9  record of verbal reprimands?
10     A.    I know that in Aramark, every manager is
11 required to document. To what extent they document, I
12 don't know.
13     Q.    So in other words, every manager is required
14 to document verbal coachings?
15         MR. DELANY: Objection
16         THE WITNESS:  To my knowledge, if it's of a
17 severe enough nature, yes.
18 BY MR. PRIMOS:
19     Q.    Do you know how many instances there were of
20 disciplinary action by you against Mr. Miller after he
21 came back from leave?
22     A.    There were a few. The exact number, I do
23 not know. I would have to review his file to tell you.
24     Q.    Do you know whether Mr. Miller had ever been

Anthony Reporting
(302) 674-8884

62

1  disciplined before -- in other words before you
2  supervised him -- while he was employed by Aramark?
3      A.    I did not fully review his file to know
4  whether or not he was disciplined or not.
5      Q.    If there were previous disciplines, would
6  they be contained in his personnel file?
7      A.    They would be contained in his personnel
8  file, yes.
9      Q.    I'm just going to go ahead and give you
10 several documents here.
11         (Hill Exhibits Number 4 through 9 were
12 marked for identification and attached to the record.)
13         (Following a discussion off the record:)
14 BY MR PRIMOS:
15     Q.    Now, I would like you to look at the
16 exhibits that have been marked as Hill Exhibits 4
17 through 9  Now, it appears to me this represents six
18 different instances of discipline that you imposed on
19 Mr. Miller after he came back from his leave  Would you
20 agree with that, Mr. Hill?
21     A.    No.
22     Q.    Okay. Can you explain why you don't agree
23 with that?
24     A.    Hill 5, this memoranda was given out to

Anthony Reporting
(302) 674-8884

63

1  everyone. This was a memorandum that part of the
2  problem was is the follow-up on the documentation, as we
3  have discussed earlier.
4          So what I did was I pulled out a report
5  called Incomplete Work Request by technician. What that
6  does is every work order that is assigned to a
7  particular technician will say technician A. Every one
8  of their work orders would show up on that document. If
9  the work orders -- if it indicates on there what piece
10 of equipment is being worked on, what the reported
11 problem was, what the last status that was put down was,
12 the actual age of the entire work order, and the age of
13 when the last status was put in place.
14         When I first started using that report, I
15 was trying to get the technicians to return it to me
16 within a reasonable time frame so I could go ahead and
17 review it with them to make sure they not only followed
18 up on those particular work orders, but that they
19 actually had a status in the system that was worth
20 something.
21         For instance, if it was out for repair at
22 the facility, I wanted them to go ahead and indicate
23 that it was out for repair at the facility and that they
24 actually did communicate to the customer that it was

Anthony Reporting
(302) 674-8884

64

1  still out at the facility and the estimated time of
2  return. So the customer would know there was no reason
3  to call us to find out the status, because they already
4  knew what it was and they had an expectation of when
5  they could get it back. So then they could utilize what
6  they had to do in order to go ahead and continue to
7  treat the patient.
8          I had difficulty getting these returned. So
9  I wrote out a memorandum in which I asked each
10 technician to read through it, go over it, make sure
11 they understand it, and sign it and return it to me so
12 that they knew I expected it back no later than
13 Wednesday of the week I handed it out.
14     Q.    So you did not consider this to
15 be disciplinary document that --
16     A.    No, it was not. It was a performance
17 expectation that I wanted to make sure was clear to
18 everyone. And everyone received one, and everyone
19 signed one.
20     Q.    Okay  But other than Hill 5, every other
21 one of these represents a disciplinary action against
22 Mr. Miller, correct?
23     A.    That is correct.
24     Q.    I would like you to focus first on Hill 4.

Anthony Reporting
(302) 674-8884

77

1  action is taken based on noncompliance of some
2  technicians.
3        Who were the technicians that you were
4  referring to?
5        A.    It was everybody but Ted.
6        Q.    Everybody but Ted?
7        A.    Ted would religiously return it on Monday.
8  Everybody else got tied up with, you know, getting their
9  work done and everything else. They didn't fully
10  understand the report. So I put this out as an
11  education for everybody so that they could clearly
12  understand what was needed to be done.
13        Q.    Now, you indicated that Ted would
14  religiously return this on Monday. But I thought the
15  memo was instructing them to return it by Friday -- I'm
16  sorry, by Wednesday.
17        A.    Correct.
18        Q.    Well, why was Ted returning it on Monday?
19        A.    Because Ted does that; Ted takes that report
20  and -- He finds it very useful to himself. From the get
21  go, he didn't like the ISIS program. But he liked the
22  fact that he had a list of work orders in front of him
23  and everything he was working on. And he would sit
24  there and do his statuses and then get them back to me.

Anthony Reporting
(302) 674-8884

78

1  That is what he does. Ted doesn't like to let things
2  hang. And I wrote some technicians, because I didn't
3  want to say everyone. It wasn't everyone.
4        Q.    So Ted was returning them on Monday, but you
5  were only requiring that they be returned by Wednesday?
6        A.    Right.
7        Q.    If you could refer to Hill 6 --
8        A.    Sure.
9        Q.    -- this indicates another disciplinary
10  incident involving Mr Miller. And in this document,
11  you make reference to three work orders by number, 5088,
12  4873, and 4871
13        A.    Yes.
14        Q.    Are those work orders still in existence?
15        A.    Of course.
16        Q.    They are?
17        A.    Yes.
18        Q.    Is there a paper record kept of them?
19        A.    No.
20        Q.    What kind of record is kept --
21        A.    In this particular instance -- There is an
22  electronic record. In this particular instance, for
23  October, he had opened up work orders that should not
24  have been opened up, or if they had been opened up, he

Anthony Reporting
(302) 674-8884

79

1  took excessive time for it in order to track his time.
2        One of the things that was a problem when I
3  first got to BayHealth was the fact that there wasn't
4  sufficient documentation of technicians' time. It is
5  actually a requirement to have a certain percentage of
6  the day documented. And I made it clear to everybody
7  that my expectation was 90 percent. So everybody was
8  expected to document at least 405 minutes of their time
9  every day on a work order.
10        Q.    Now, you said that these work orders are
11  still in existence.
12        A.    They are electronic.
13        Q.    I am sorry?
14        A.    They are electronic.
15        Q.    They are electronic  Are they still in the
16  same form that they were in March of 2005 when you were
17  addressing certain concerns about them to Mr Miller?
18        A.    Yes.
19        Q.    They are still in the same form?
20        A.    Yes.
21        Q.    So in other words, you were bringing to his
22  attention that these work orders were missing assets,
23  right?
24        A.    Correct. I gave out in the October team

Anthony Reporting
(302) 674-8884

80

1  meeting that I wanted the technicians to come to me when
2  they are not working on an asset but are required to
3  open up a work order. I needed them to explain to me
4  why they needed to do it.
5        Q.    So these three work orders that are still in
6  electronic form in the system are still missing assets
7  to this day, correct?
8        A.    Yes.
9        Q.    Can they be printed out easily?
10        A.    Yeah.
11        MR PRIMOS: I'm going to request those.
12        THE WITNESS: The technicians are there to
13  work on assets, and that is what I wanted them to focus
14  on because of the repair delays
15  BY MR. PRIMOS:
16        Q.    And then, if you could look at the top of
17  the second page of Hill 6, there is a reference to two
18  work orders, one of which you opened and one of which
19  Mr Miller opened. And you indicate that Mr. Miller
20  assigned the wrong asset number in the work order that
21  he opened  Is that work order still in existence?
22        A.    Yes.
23        Q.    And does it still have the wrong asset
24  number?

Anthony Reporting
(302) 674-8884