

ATTORNEYS AT LAW

May 7, 2007

VIA ELECTRONIC FILING & HAND DELIVERY

The Honorable Mary Pat Thynge
United States District Court for the District of Delaware
844 North King Street
4th Floor, Room 4209
Wilmington, DE 19801

Christopher A. Selzer
Associate, Business Litigation

Re:    Daniel Miller v. ARAMARK Healthcare Support Services Inc. et al.
       C.A. No. 06-534 (MPT)

McCarter & English, LLP
Citizens Bank Building
919 N. Market Street -18th Floor
Wilmington, DE 19801
T. 302.984.6300
F. 302.984.6399
www.mccarter.com

Dear Judge Thynge:

I write to provide Your Honor with additional information regarding the discovery dispute. Specifically, Your Honor has requested additional information regarding Plaintiff's request for all work order requests, including initial inspections, repair orders, preventative maintenance inspections and on-call responses for Plaintiff from February 2, 2005 to April 15, 2005, and Plaintiff's request for documentation of all preventative maintenance inspections performed by John Ritterhoff from March 1, 2005 to April 15, 2005.

## I.    Plaintiff's Requests Are Irrelevant

BALTIMORE

BOSTON

HARTFORD

NEW YORK

NEWARK

PHILADELPHIA

STAMFORD

WILMINGTON

Plaintiff's counsel claim that they need to obtain these documents to demonstrate three things: (1) the amount of work requested of Plaintiff, (2) the amount of work that Plaintiff completed and (3) that Plaintiff's was unfairly disciplined for certain performance issues. Plaintiff's counsel, however, has failed to demonstrate how these additional documents would show these things or otherwise support any of Plaintiff's claims in this action.

As an initial matter, Plaintiff's counsel cannot establish that Plaintiff was required to work more than other technicians through these documents alone. Without having copies of the same documents for the other Clinical Engineering Technicians, which Plaintiff's counsel did not request, they will have no basis for comparison. Furthermore, the complexity of the equipment worked on by the technicians varies as much as the equipment itself. Declaration of Jonathan Hill dated May 7, 2007 ("Hill Decl.") ¶4, which has been attached hereto as Exhibit A. Currently, there are over 8,000 pieces of medical equipment at Bayhealth Medical Center ("Bayhealth") representing 583 different classifications of medical equipment. Hill Decl. ¶4. The equipment ranges from simple devices (e.g., a suction regulator or an oxygen flow

The Honorable Mary Pat Thynge
May 7, 2007
Page 2

meter) to very complex devices (e.g., a defibrillator), which require a higher level of knowledge and more time to install, inspect and repair. Hill Decl. ¶4. With all the variations of medical devices and equipment problems that can be presented, there is no concrete way to determine whether one technician worked harder than another technician. Hill Decl. ¶4.

Additionally, Plaintiff's disciplinary issues did not involve the quantity of work he completed. Rather, Plaintiff received disciplinary write-ups for failing to properly complete his documentation even after receiving specific instructions on how to do it and for violating Bayhealth's safety policies. See Plaintiff's disciplinary documents, which have been attached hereto as Exhibits B to E. Defendants ultimately terminated Plaintiff's employment because of his documentation problems and two major safety violations (i.e., the improper installation of an emergency stop-switch on a treadmill and the failure to tag or remove a defective defibrillator from the hospital floor). See Memorandum dated 4/15/2005 re. "Termination Discussion with Dan Miller," which has been attached hereto as Exhibit F; Deposition of Jonathan Hill, taken on February 14, 2007 ("Hill Dep.") at 104-06, cited deposition pages are attached hereto as Exhibit H.

Finally, looking at Mr. Ritterhoff's preventative maintenance forms will not establish him as a valid comparator. Plaintiff's counsel cannot tell simply from looking at these forms whether he performed his job incorrectly. Rather, Plaintiff's counsel would need supporting testimony from someone who actually observed a problem with Mr. Ritterhoff's preventative maintenance. For example, you cannot tell from the preventative maintenance form submitted by Plaintiff on April 4, 2005 that he violated Bayhealth's safety policies by failing to either remove this defective defibrillator from the hospital floor or tag it as defective. See Preventative Maintenance form dated 4/4/2005, which has been attached hereto as Exhibit G; Hill Decl. ¶5. Rather, it is Mr. Hill's testimony regarding the discipline that Plaintiff received in connection with this preventative maintenance that establishes his violation of safety policies. See Exhibit E; Hill Dep. at 90-98, 139-40. Similarly, Plaintiff's counsel cannot establish that Mr. Ritterhoff performed his job incorrectly simply by looking at his preventative maintenance forms.

Moreover, only looking at Mr. Ritterhoff's preventative maintenance forms provides an incomplete picture of his work performance. Conducting preventative maintenance is just one part of a technician's job. Technicians must also effectively install new devices and repair defective equipment. Hill Decl. ¶3. Therefore, even if Plaintiff's counsel could identify deficiencies in Mr. Ritterhoff's preventative maintenance forms, this will not given them a full picture of Mr. Ritterhoff's performance as a technician. However, other than his date of birth, his job

The Honorable Mary Pat Thynge
May 7, 2007
Page 3

description, his competency assessment completed in 2004 or 2005, his 2004 performance evaluation and his disciplinary records, Plaintiff's counsel did not request any other documentation or information pertaining to Mr. Ritterhoff. Because Plaintiff was disciplined and ultimately terminated for safety violations and performance deficiencies in areas other than preventative maintenance, Plaintiff's counsel cannot establish Mr. Ritterhoff was similarly situated to Plaintiff based solely on Mr. Ritterhoff's preventative maintenance forms.

## II.    **Plaintiff's Requests Will Pose An Undue Burden on Defendants**

In order to identify all the documented work for Plaintiff and Mr. Ritterhoff, Mr. Hill must conduct an extensive search. He must review all of the work orders entered onto the computer to find ones assigned to either Plaintiff or Mr. Ritterhoff because the technicians did not always enter their name as the assigned employee. Hill Decl. ¶6; see e.g., Exhibit G. Defendants' computer system currently counts 2,287 work orders for the time period of February 1, 2005 to April 15, 2005. Hill Decl. ¶6. Mr. Hill must also conduct a computer search to determine whether a status was entered by either Plaintiff or Mr. Ritterhoff even though the work was not necessarily assigned to that technician. Hill Decl. ¶6. Defendants' computer system currently counts 5,253 statuses for the time period of February 1, 2005 to April 15, 2005. Hill Decl. ¶6. Mr. Hill must also review the equipment files for additional documentation that is not present in the work order. Hill Decl. ¶6. He does not currently know how many equipment files he would need to search because that depends on how many different pieces of equipment the 2,287 work orders pertain to. Hill Decl. ¶6. This is clearly a monumental undertaking. Therefore, even assuming that such documents might be relevant, the burden to Defendants far outweighs whatever little relevance such information allegedly possesses.

Additionally, David Walczak, Bayhealth's Chief Information Officer, informed Mr. Hill that Defendants cannot produce all of the work orders, including initial inspections, repair orders, preventative maintenance inspections and on-call responses for the time period of February 1, 2005 to April 15, 2005. Hill Decl. ¶7. These documents are the property of Bayhealth. Hill Decl. ¶7. Instead, if Plaintiff's counsel wants to obtain these documents, they must subpoena Bayhealth and give its lawyers an opportunity to object to the request. Hill Decl. ¶7.

The Honorable Mary Pat Thynge
May 7, 2007
Page 4

Thank you for your consideration and attention to this matter.

Respectfully,

/s/ Christopher A. Selzer

Christopher A. Selzer (DE Bar ID #4305)

cc:     William D. Fletcher, Jr., Esquire (via e-file)
        Noel E. Primos, Esquire (via e-file)
        Michael P. Kelly, Esquire
        William J. Delany, Esquire
        Anne E. Martinez, Esquire

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,

        Plaintiff,

        v.

ARAMARK HEALTHCARE SUPPORT
SERVICES, INC., ARAMARK CLINICAL
TECHNOLOGY SERVICES, INC., AND
ARAMARK MANAGEMENT SERVICES
LIMITED PARTNERSHIP,

        Defendants.

Civil Action No.  06-534-MPT

## Declaration of Jonathan Hill

I, Jonathan Hill, depose and state as follows:

1.      I have been employed by ARAMARK Clinical Technology Services, Inc. or a predecessor since approximately January of 1995 and have worked at the Bayhealth Medical Center ("Bayhealth") since 2004 as the Frontline Manager.

2.      I submit this Declaration in support of Defendants' letter to the Honorable Mary Pat Thynge in the above-captioned matter.  This Declaration also supplements my sworn deposition testimony provided on February 14, 2007.

3.      Bayhealth's Clinical Engineering Technicians have several responsibilities, including the installation, preventive maintenance, and repair of Bayhealth's medical equipment.

4.      The complexity of the equipment worked on by the technicians varies as much as the equipment itself.  Currently, there are over 8,000 pieces of medical equipment at Bayhealth representing 583 different classifications of medical equipment. The equipment ranges from simple devices (e.g., a suction regulator or an oxygen flow meter) to very complex devices (e.g., a defibrillator), which require a higher level of knowledge and more time to install, inspect and

repair. With all the variations of medical devices and equipment problems that can be presented, there is no concrete way to determine whether one technician worked harder than another technician.

5.    I recognize Exhibit G (bates-labeled A00042-43) in support of Defendants' May 7, 2007 Letter to The Honorable Mary Pat Thynge as a true and correct copy of the Preventative Maintenance form that Daniel Miller submitted on or about April 4, 2005 regarding the defective defibrillator that he discovered in the Intermediate Care Unit.

6.    In order to identify all of the documented work completed by Mr. Miller and Mr. Ritterhoff, I must review all of the work orders entered onto the computer to find ones assigned to either Plaintiff or Mr. Ritterhoff because the technicians did not always enter their name as the assigned employee. Our computer system currently counts 2,287 work orders for the time period of February 1, 2005 to April 15, 2005. I must also conduct a computer search to determine whether a status was entered by either Mr. Miller or Mr. Ritterhoff even though the work was not necessarily assigned to that technician. Our computer system currently counts 5,253 statuses for the time period of February 1, 2005 to April 15, 2005. I must also review the equipment files for additional documentation that is not present in the work order. I do not know how many equipment files I would need to search because that depends on how many different pieces of equipment the work orders pertain to.

7.    David Walczak, Bayhealth's Chief Information Officer, informed me that Defendants cannot produce all of the work order requests, including initial inspections, repair orders, preventative maintenance inspections and on-call responses for the time period of February 1, 2005 to April 15, 2005. These documents are the property of Bayhealth.

Accordingly, if Mr. Miller's attorneys want to obtain these documents, they must subpoena

Bayhealth and give its lawyers an opportunity to object to the request.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing

information is true and correct, based upon my knowledge, information and belief.

DATED:  May 7, 2007

JONATHAN HILL

Exhibit B

 **ARAMARK**

**Hourly Performance Plan Form**


EXHIBIT

Hill  4
Caa 2/14/07

☒ Coaching Discussion   ☐ Counseling Discussion   ☐ Formal Warning

☐ Follow-up Discussion   ☐ Suspension Notice (Fact finding Only, Do not complete the 2ⁿᵈ and 3ʳᵈ boxes)

Name: _DAN MILLER_        Social Security #: _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_

Position: _Clinical Engineer_    Comp. Name: _ARAMARK@buffer LTH # 7517_

**Your Conduct / performance requires improvement for the following reasons: (Describe the performance issue and reasons improvement is required, use additional paper if necessary)**
- ASSETS Added To The Computer System Need To Be Accurate and Follow Same FORMAT As Instructed During Competency Testing.

**The expected level of performance / conduct is:**
- WHEN ASSETS are CHanged, UpDated or Added, THere needs To Be accuracy and Completeness in your ENTRIES. Leaving INFORMATION OUT OR IN A Questionable STATUS Delays Record Review + WORKFLOW.

**The following solution(s) have been agreed upon to correct the conduct / performance:**
- VERIFY INFORMATION IS Accurate + IN PROPER Place in Records
- VERIFY Completeness of Documentation (BOTH Paper + Computer)

Date Solution(s) will be implemented: _3/4/05_ Jun        Completed: _3/4/05_ Jun

Potential consequence in continuing current behavior is: _FURTHER Disciplinary Action._

A follow-up to discuss your progress will be held on: _N/A_

_Daniel Miller_  3/4/05        _Garith Curtis_  3/2/05
Employee's Signature    Date          Manager's Signature    Date

_____
Human Resources / Other (if applicable)    Date

Note: Employee's signature on this form indicates that this situation has been discussed. It doesn't necessarily mean the employee agrees.

No Class Training of T.S.T.S

Miller 6

A00035

'517

00016301

## ASSET INVENTORY DETAIL
### BAY HEALTH
### ARAMARK

**ntification**

| | |
|---|---|
| t Number: | 469914 |
| al Number: | US00103118 |
| em: | DEFIBRILLATORS |
| et: | M4735A |

| | |
|---|---|
| Common Name: | DEFIBRILLATOR/MONITOR |
| Service: | CEM |
| Class: | DEFIB./MON., BATT. PWRD.-11-129A |
| Manufacturer: | AGILENT TECHNOLOGIES (PHILIPS MEDICAL SYSTEMS) |

**ation**

| | |
|---|---|
| e: | KGH |
| ding: | Kent General Hospital |
| r: | 3 WEST |
| m: | |

**PM**

| | |
|---|---|
| Base Month: | 6/2003 |
| Shutdown Months: | 000000000000 |
| Priority: | Urgent |
| Printer: | |
| Link Group: | |
| Shop: | CTS BIOMEDICAL |

**PM Indicators**

| | |
|---|---|
| Indicator - 1 | |
| Indicator - 2 | |
| Indicator - 3 | |
| Frequency: | |
| Frequency: | |
| Frequency: | |

**Miscellaneous**

| | |
|---|---|
| Inventory Date: | 12/6/2001 |
| Installation Date: | 10/15/2001 |
| Storage Date: | |

**Warranty**

| | |
|---|---|
| Disposal Date: | 2/28/2005 |
| Labor Start: | |
| Labor End: | 10/15/2006 |
| Material Start: | |
| Material End: | 10/15/2006 |

**Financial**

| | |
|---|---|
| Purchase Price: | |
| CMI Allocation Cost: | $8,000.00 |
| Cost Center: | 11-6120 - 3W MED/SURG |
| Note: | |

**Personnel**

| | |
|---|---|
| Employee: | |
| Contact 1: | |
| Contact 2: | |

**k Factor**

| | |
|---|---|
| ip Type: | Medical |
| ction: | 8   Critical - Therapeutic |
| : | 7   Death or Serious Injury |
| ory: | 1   0 - 1 |
| l Risk: | 16 |
| : | Tier 1 (High Risk) |
| Schedule: | Regular |

**Defined**

(iSAMM contract) Status: PC   (iSAMM contract) Gless: 00   Mfg: AGILENT Model: M47
(iSAMM contract) Hours: 85   iSAMM Service Rep ID: 135

A00036

11:47AM

## INITIAL INCOMING INSPECTION & EQUIPMENT EDIT FORM
*Non*

**SECTION I**

**ACTS #** 848021

☐ System ID
Old ID: _____
Hosp. Asset #: 18127

☒ = Addition To Inventory
☐ = Edit/Change To Inventory
☐ = Delete From Inventory

10338I Jull

SERIAL NO.: US0010381

COMMON NAME: Bi-Phasic defibrillator

MANUFACTURER: Philips Medical

MODEL NO.: M4735A

COST CENTER: 11-6120

PURCHASE PRICE: Exchanged Repair

INVENTORY DATE: 02-28-05

INSTALLATION DATE: __/__/__

| WARRANTY INFO: | WRTY: LABOR START 10-15-01 | WRTY: LABOR END 10-15-06 |
|---|---|---|
| | WRTY: MATERIALS START 10-15-01 | WRTY: MATERIALS STOP 10-15-06 |

**LOCATION:**

ZONE: KGH

BUILDING: Kent General Hospital

FLOOR: 3rd

DEPARTMENT: 3 EAST Med/Surg.

OWNERSHIP
☒ HOSPITAL
☐ CONTRACTED
☐ LEASE/LOAN/RENTAL
☐ OTHER

☐ ASSET IS UNDER AN OEM SERVICE CONTRACT

**DELETE:**
DISPOSAL DATE: __/__/__

**SCO:**

SYSTEM: Defibrillator

CLASS: Defib/Mon. Batt. Pwrd 11-129A

OBJECT: M4735A (Philips Medical)

CAPITAL PURCHASE ORDER # _____

ADDITIONAL NOTES OR COMMENTS: Changed Asset Tag (Bayhealth) From CTS 469914

**SUGGESTED TIER LEVEL:**
TIER 1 ___ TIER 2 ___ TIER 3 ___

BASE MONTH _____

☐ ANNUAL  ☐ MONTHLY  ☐ SEMI-ANNUAL  ☐ QUARTERLY  ☐ OTHER _____

**LEASED EQUIPMENT:**    START DATE: __/__

**DURATION:** _____   ___ DAY(S) ___ MONTH(S) ___ WEEK(S) ___ YEAR(S)

Notes: OUTPUTS
50 = 50 Joules
100 = 85 Joules
200 = 198 Joules
AED 150 = AED 148

| JAL INSP | GROUND RES Ω | NP (OFF) μA | NPNG (OFF) μA | NP (ON) μA | NPNG (ON) μA | MAX LEAD LEAKAGE μA | LEAD ISO. μA |
|---|---|---|---|---|---|---|---|
| OK | .08 | 0 | 164 | .1 | 158 | | |

## SECTION II

1. Does the device appear to be undamaged?
   - ☑ Yes:    Proceed to step 2.
   - ☐ No:    Do not accept for use and contact seller for corrective action.

2. Is the device electrically operated by 120 VAC?
   - ☑ Yes:    Proceed to step 3.
   - ☐ No:    Proceed to step 6.

3. Has the device been evaluated by a qualified testing laboratory?
   Refer to hospital policy and state administrative code or policy, if applicable.
   - ☑ Yes:    Proceed to step 4.
   - ☐ No:    Do not accept for use and contact seller for corrective action.

4. Visually inspect power cord, plug, and strain relief's. Refer to NFPA 99 chapter 9.
   - ☑ Pass: Proceed to step 5.
   - ☐ Fail:    Do not accept for use and contact seller for corrective action.

5. Does the device pass electrical safety inspections? Refer to NFPA 99 Chapter 9.
   - ☑ Yes:    Document results in Section II and proceed to step 6.
   - ☐ No:    Do not accept for use and contact seller for corrective action.

6. Does the unit seem to be operating properly? Refer to manufacturer specifications.
   - ☑ Yes:    Proceed to step 7.
   - ☑ No:    Do not accept for use and contact seller for corrective action.

7. Have all accessories been included in shipment?
   - ☐ Yes:    Proceed to step 8.
   - ☐ No:    Do not accept for use and contact seller for corrective action.

8. If ownership is loan, demo, rental, or other, how long will the device be in the hospital?
   If hospital owned or leased, proceed to step 9.
   - ☐ Less than 6 months:  Write the serial number in the equipment ID field in Section I and proceed to step 15.
   - ☑ 6 months or greater:  Proceed to step 9.

9. Have (2) two operator, (2) two service manuals, **OPERATING & DIAGNOSTIC SOFTWARE** been included in shipment?
   - ☐ Yes:    Proceed to step 10.— **SOFTWARE COPIES SHOULD BE RETAINED IN CLINICAL TECHNOLOGY SERVICES.**
   - ☑ No:    This is basis for non-acceptance. Evaluate literature needs. If adequate proceed to step 10.
   Otherwise do not accept for use and contact seller for corrective action.

10. Has technical service training and operator training been provided for the device?
    - ☐ Yes:    Proceed to step 11.
    - ☑ No:    This is basis for non-acceptance. Evaluate educational needs. If training is adequate proceed to step 11.
    Otherwise do not accept for use and contact seller for corrective action.

11. Will the device be included in the ACTS Planned Maintenance Program? Refer to Table I for inclusion criteria. (Note: All equipment items that are the responsibility of ACTS will be inventoried. The risk assessment determines inclusion in the PM program only.)
    - ☑ Yes:    Proceed to step 14.
    - ☐ No:    Proceed to step 15.

12. Assign a planned maintenance standard and inspection frequency to the device. Complete the remaining applicable fields in Section I and proceed to step 15.

13. Complete Section II; inventory the device and sign below.

    Approved by: _Daniel Miller_     Date: _3/1/2005_

A00038

007517

00016301

**ASSET INVENTORY DETAIL**
BAY HEALTH
ARAMARK

**Identification**
Asset Number: 848021
Serial Number: US0010381
System: DEFIBRILLATORS
Object: M4735A

**Location**
Zone: KGH
Building: Kent General Hospital
Floor: 3 rd
Area: 3 West
Room:

**Risk Factor**
Equip Type: Medical
Function: 9 Life Support
Risk: 7 Death or Serious Injury
History: 1 0 - 1
Total Risk: 17
Tier: Tier 1 (High Risk)
PM Schedule: Regular

**User Defined**

18177

Common Name: Bi-Phasic Defibrillator
Service: CEM
Class: DEFIB./MON., BATT. PWRD.-11-129A
Manufacturer: AGILENT TECHNOLOGIES (PHILIPS MEDICAL SYSTEMS)

**PM**
Base Month: 2/2005
Shutdown Month: 00000000000

Priority: Urgent
Printer:
Link Group:
Shop:

**PM Indicators**
Indicator - 1
Indicator - 2
Indicator - 3
Frequency:
Frequency:
Frequency:

**Miscellaneous**
Inventory Date:
Installation Date:
Storage Date:

**Warranty**
Disposal Date:
Labor Start: 10/15/2001
Labor End: 10/15/2006
Material Start: 10/15/2001
Material End: 10/15/2006

**Financial**
Purchase Price:
CMI Allocation Cost:
Cost Center: 11-6120 - 3W MED/SURG

Note:

**Personnel**
Employee:
Contact 1:
Contact 2:



1/2/2005    10:56AM

A00039

007517

00016301

## ASSET INVENTORY DETAIL
### BAY HEALTH
### ARAMARK

### Identification
| | |
|---|---|
| Asset Number: | 848232 |
| Serial Number: | 040802702 |
| System: | PHYSIOLOGIC MONITORING SYSTEMS |
| Object: | 3420Y |

| | | | |
|---|---|---|---|
| Common Name: | Pulse ox, Finger unit | | |
| Service: | CEM | | |
| Class: | OXIMETER, PULSE-17-148A | | |
| Manufacturer: | BCI INTERNATIONAL | | |

### Location
| | |
|---|---|
| Zone: | KGH |
| Building: | Kent General Hospital |
| Floor: | 1 st |
| Area: | Rapid Admission |
| Room: | |

### PM
| | |
|---|---|
| Base Month: | 2/2005 |
| Shutdown Months: | 000000000000 |
| Priority: | |
| Printer: | Routine |
| Link Group: | |
| Shop: | |

### PM Indicators
| | |
|---|---|
| Indicator - 1 | |
| Indicator - 2 | |
| Indicator - 3 | |
| Frequency: | |
| Frequency: | |
| Frequency: | |

### Miscellaneous
| | |
|---|---|
| Inventory Date: | 2/24/2005 |
| Installation | 2/24/2005 |
| Storage Date: | |

### Warranty
| | |
|---|---|
| Disposal Date: | |
| Labor Start: | 2/24/2005 |
| Labor End: | 2/24/2006 |
| Material Start: | 2/24/2005 |
| Material End: | 2/24/2006 |

### Risk Factor
| | |
|---|---|
| Equip Type: | Medical |
| Function: | 5    Essential - Diagnostic |
| Risk: | 5    Inappropriate Therapy, Misdiagn |
| History: | 1    0 - 1 |
| Total Risk: | 11 |
| Tier: | Tier 2 (Medium Risk) |
| PM Schedule: | Regular |

### Financial
| | |
|---|---|
| Purchase Price: | $320.00 |
| CMI Allocation Cost: | |
| Cost Center: | 11-6160 - RAPID ADMISSIONS UNIT |

Note:

### Personnel
| | |
|---|---|
| Employee: | |
| Contact 1: | |
| Contact 2: | |

### User Defined
85740

/2005    10:10AM

A00040

Exhibit C

# Memorandum

**Date:** 3/16/2005

**To:** Memorandum for File

**Cc:** Tom Cuthbertson, District Manager; Thomas Lodge, Director, HR

**From:** Jonathan Hill, Director, Clinical Engineering

**RE:** Dan Miller and Documentation Issues

This is a memorandum for record describing the Verbal Counseling given to Dan Miller on this date.

Background – When Dan Miller returned from Short Term Disability in early December he was given copies of all Team Meeting Minutes during his absence (September 2004 – December 2004). I asked him to read through them and if there were any questions he needed to bring them to my attention. I checked back with Dan each week in December to assess whether he had read the minutes and had any questions. Each time Dan mentioned he was reading them and did not have any questions.

The counseling started with my asking the question if he read through the team meeting minutes. He stated that he had. In October's minutes a directive was given that any work order without an asset needs to be brought to my attention for discussion and approval. I asked him about work orders 5088, 4873 and 4871. Dan explained he had a computer access problem. I talked with him and he stated that sometimes the computer would not let him access ISIS. I explained that this issue is unrelated and it should have been brought to my attention sooner. Aramark computer problems and payroll problems are to be addressed by me and not on a work order. I further explained that even though he was on the phone for these issues, he could have been productive by working on equipment. I talked to him about the 5.5 hours he took for Mandatory Testing. This is excessive and again should not be addressed on a work order.

In November's minutes a directive was given that each technician needs to identify proper work order type and pertinent information needs to be entered on a work order. Use of "Other" as a work order type is to be limited. On the same three work orders mentioned above the work order type should not have been other but Administrative – undefined. Two of the work orders (4873, 4871) were missing the cost center, employee and location with 4873 missing the priority entry. Dan explained that he needed to account for his time. I continued to say that was true with only 90% of his time needing to be on work orders. That left 45 minutes during each day he could have used to accomplish these tasks without having to put that time on a work order. I discussed that the issue here was that the wrong type of work order was selected and that all applicable entries needed to be in each work order.

In December's minutes was a discussion of Rounds work orders and explained that rounds needed to be conducted daily (Maximum time peer day one hour) with one work order for each month. In work order 5895, Dan took up to 2.5 hours to do rounds. During this entry and another totaling 1.5 hours, he stated that he entered work orders into the system for equipment that was dropped off at the shop. I explained that this time should have been split amongst the work orders opened and not a collective time entry on a rounds work order. Dan agreed.

The discussion turned to assigning proper assets to work orders. There was a video tower that was reported by the Operating Room as not taking pictures. Dan responded to the call. Instead of addressing the issue in the OR, Dan brought the video tower to the shop. The tower sat in the shop for over an hour before I

Created on 3/1/2005            Confidential

1

EXHIBIT

_Hill 6_

_care 2/14/02_

_Miller 8_

A00044

Memorandum For Record: Dan Miller about Documentation Issues

addressed the issue. After verifying the symptom, I determined that the source cable for picture taking was disconnected from the camera controller. The repair took 5 minutes and I delivered the tower back to the OR. I asked Dan if he opened a work order and he did not. I told him not to worry about it that I would open the work order (5943). I found out two weeks later (Feb. 28th) that Dan did open a work order (5956) and he assigned asset number 292997 which was the video monitor and not the actual device that had failed. I explained that Dan should not have taken 30 minutes on the work order (work performed did not match time taken) nor assigned that asset number to the work order as it was not the device that had the problem. Dan Agreed.

I did have these discussions with Dan to address these issues.

Jonathan Hill, Director, Clinical Engineering

A00045

Exhibit D



# ARAMARK

## Hourly Performance Plan Form

☐ Coaching Discussion   **X Counseling Discussion**   ☐ Formal Warning

☐ Follow-up Discussion   ☐ Suspension Notice (Fact finding Only, Do not complete the 2nd and 3rd boxes)

Name: _Dan Miller_   Social Security #: _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_

Position: _CE Technician_   Comp. Name: _Bayhealth Medical Center_ # _7517_

---

Your Conduct / performance requires improvement for the following reasons: (Describe the performance issue and reasons improvement is required, use additional paper if necessary)

- Failure to remain with and follow-up on vendor's work during install of new stress machine.
- Leaving work-site without reporting to Director on status of install.
- Failure to identify safety deficiencies during install and taking immediate action.
- Failure to keep customer updated on status of install.
- Reference: Work Orders 5958, 6052, 6061 & 6062

---

The expected level of performance / conduct is:

Quality Control — The technician inspects all vendor completed maintenance to ensure work requested was accomplished
Customer Relations - The technician develops a personal, sincere interest in the clinical equipment users' equipment problems.
Customer Relations - The technician responds to critical service problems immediately and personally follows through until the problem is resolved. He provides feedback to the individual concerned and changes problems into opportunities.
Vendor Relations - The technician monitors the performance of the vendors assigned and reports the findings to the manager.
Technical Knowledge - The technician recognizes, can identify, and set immediate objectives to correct maintenance and safety deficiencies.

---

The following solution(s) have been agreed upon to correct the conduct / performance:

When an installation occurs whether with an outside vendor or not, the install must reach a logical stopping point. If other work is interfering with the active participation of an assignment, you need to coordinate appropriately for coverage. If problems arise, you need to notify me immediately so a resolution can be achieved. When an install of a device has a safety feature not being installed properly, you need to correct this deficiency immediately. You should never leave a customer with a vendor without the customer's expressed knowledge of your leaving and estimated time of return. Finally, you should open proper work orders for the actions taken (i.e. not an inspection and a new equipment work order for the same job. This is not a first occurrence.

---

Date Solution(s) will be implemented: _March 24, 2005_   Completed: _____

Potential consequence in continuing current behavior is: _Further Disciplinary Action up to and including Termination_

---

A follow-up to discuss your progress will be held on: _April 25, 2005_

_Employee Refused To Sign_
Employee's Signature                          Date

Manager's Signature _Scott Irwin 3/24/05_   Date

_Shawn Moxley 3/24/05 witness_

Human Resources / Other (if applicable)   Date

Note: Employee's signature on this form indicates that this situation has been discussed. It doesn't necessarily mean the employee agrees.

Miller 9

EXHIBIT
Hill 7
____ 7/4/07

A00049

Exhibit E



## ARAMARK

### Hourly Performance Plan Form

EXHIBIT
Hill 8
CORA 2/14/07

X Coaching Discussion ☐ Counseling Discussion ☐ Formal Warning

☐ Follow-up Discussion ☐ Suspension Notice (Fact finding Only, Do not complete the 2nd and 3rd boxes)

Name: Dan Miller                              Social Security #:      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

Position:      CE Technician                  Comp. Name:   Bayhealth Medical Center # 7517

Your Conduct / performance requires improvement for the following reasons: (Describe the performance issue and reasons improvement is required, use additional paper if necessary)

During a PM inspection of a Defibrillator w/Pacing (Life Support) device you discovered that no audio tones, AED instructions and Alarms not working. This unit should have been pulled from the floor immediately upon notification to the Charge Nurse. The acquisition of a replacement item is the responsibility of the department. Users who refuse to release equipment when safety issues are involved should be reported to Risk Management and the Director of Clinical Engineering immediately.

The expected level of performance / conduct is:

Quality Control - The technician performs assigned clinical equipment electrical safety inspections. Any deficiencies are given immediate attention.

Technical Knowledge - The technician recognizes, can identify, and set immediate objectives to correct maintenance and safety deficiencies.

The following solution(s) have been agreed upon to correct the conduct / performance:

You need to realize the severity of this issue. The device was discovered with the top and bottom case having a gap which indicated some abuse issue had occurred. You need to understand that Bayhealth has policies in regards to safety issues and your responsibilities under those policies. In addition you need to conform to the Standards of Performance as listed above.

Date Solution(s) will be implemented:   4/5/2005                    Completed:    4/5/2005

Potential consequence in continuing current behavior is:      Further Disciplinary Action

A follow-up to discuss your progress will be held on:                N/A

_Employee Refuses To Sign_
Employee's Signature            Date

_Jonathn Watson_  4/5/2005
Manager's Signature            Date

_Shawn Money_   4/5/05  Witness
Human Resources / Other (if applicable)    Date

Note: Employee's signature on this form indicates that this situation has been discussed. It doesn't necessarily mean the employee agrees.

Miller 10            A00041

Exhibit F

# Memorandum

**Date:** 4/15/2005

**To:** Tom Cuthbertson, District Manager

**Cc:** Tom Lodge, HR Director

**From:** Jonathan W. Hill, Director of Clinical Engineering

**RE:** Termination Discussion with Dan Miller

---

I started the discussion by going over the Incomplete Work Request by Technician Assigned report dated 4/11/2005. We discussed how a work order should be statused (On Hold vs. Service), the estimated time of repair, the updating of the user with any delays in the repair process and that parts need to be put on work orders in the materials section.

The discussion turned to six preventive maintenance work orders that had various problems as well (6964, 7045, 7099, 7103, 7106 & 7124). They all related to Defibrillators (Tier 1 devices with 3 of them having pacing capabilities). Two had problems in which the parts that were installed were not applied to the work order. Three of the work orders had no output values listed for the PM checks and four did not have any alarm checks. I explained that this is unacceptable work and actions like this cannot be tolerated.

I then presented the letter to Dan. He stated that he was shocked by this and found the process unfair. Dan further stated that he had not been informed about problems with his statuses or about the need to put parts on the work orders. I explained that these are items that someone with his years of experience should have no problem with. I further explained that we have had conversations in which I pointed out discrepancies and asked him if he understood what I was asking. I reminded him that he acknowledged the problems in the past and would correct them.

I then asked for his badge, pager, keys and pocket pc. His badge was turned into security along with a bottle of percocet found in the bottom of his toolbox.

Jonathan W. Hill

FLM, Aramark CTS



EXHIBIT

Hill 9

Caa 2/14/07

Miller 11

A00046

Exhibit G

**Request: 7105**                    **Preventive - Asset**

Orig. Date: 4/4/2005

WR Status: In Progress (4/4/2005 11:34:59 AM)

| | |
|---|---|
| Shop: CTS BIOMEDICAL | Priority: Life Support |
| Employee: | Due Date: 4/30/2005 |
| Cost Center: 11-6245 - KGH Emergency Department | Contact: Debbie Eberly |
| Location: Kent General Hospital  Floor:   Room: | Reference: |
| Problem: | Tier: 1 |

## Description

**System-Generated Preventive Maintenance**

System:   **DEFIBRILLATORS**
Class:    **DEFIB./MON., BATT. PWRD.-11-129A**
Object:   **M4735A**
Manufacturer:  **AGILENT TECHNOLOGIES (PHILIPS MEDICAL SYSTEMS)**

Asset ID: **469907**
Common Name: DEFIBRILLATOR/MONITOR WITH PACING
Cost Center: KGH  Emergency Department
Building: Kent General Hospital
Floor:
Area: ER
Room: None
Risk Factors: Death or Serious Injury (7) /Critical - Therapeutic (8) /0 - 1 (1) Total = 16

Serial Number:  **US00103180**
Warranty End:  10/15/2006
Indicators    Previous    Current

## Status History

| Status | Date | Employee | Shift | Repair | Regular Time | Travel Time | Over Time |
|---|---|---|---|---|---|---|---|
| Repair Description | | | | | | | |
| In Progress | 4/4/2005 | | | | 1 Hrs 30 Min | 0 Hrs 0 Min | 0 Hrs 0 Min |

During PM found audio tones, AED instructions, and alarms tones not working. Searched several units for simuliar Unit - has a pacer feature that is needed and Gretchen refuses to give defib up, turned situation over to J. Ritterhoff since I had to leave for day shortly . Contacted Philips ordered replacement overnite.

|  | Totals: | 1 Hrs 30 Min | 0 Hrs 0 Min | 0 Hrs 0 Min |
|---|---|---|---|---|

## Procedures

☐  REMOVE INSTRUMENT FROM AC POWER SOURCE. ALL TESTS ARE TO BE PERFORMED ON BATTERY POWER.          Every 6 months

CLEAN AND INSPECT ALL EXTERNAL SURFACES, HARDWARE AND CONNECTORS FOR DAMAGE.

CLEAN AND INSPECT EXTERNAL COMPONENTS: THE LENGTH OF PADDLE CABLE ASSY, POWER CORD, AND PATIENT CABLES.

**PERFORMANCE DATA**
INDICATED VS. ACTUAL

———— - ————
———— - ————
———— - ————
———— - ————
———— - ————

CHECK ALL SWITCHES, KNOBS, CONTROLS AND INDICATORS FOR PROPER RANGE AND MECHANICAL OPERATION.

INSPECT POWER CORD, STRAIN RELIEF AND PLUG FOR DAMAGE OR DETERIORATION.

VERIFY CORRECT FUSE SIZE.

INSPECT PADDLES FOR PITS, POLISH WITH EMERY CLOTH IF PITS ARE PRESENT.

CLEAN AND INSPECT PADDLE ASSEMBLY FOR WEAR, DETERIORATION CRACKS, SPLITS AND PHYSICAL DAMAGE.

INSPECT APEX PADDLE FOR PUSH TO CHARGE BUTTON AND CHARGE INDICATOR OPERATION.  USE TO STORE 200 JOULES.  DISCHARGE THE 200 JOULES INTO INTERNAL TEST LOAD NOTING ILLUMINATION OF TEST LOAD DISPLAY.

WITH AN OHMMETER, CHECK CONTINUITY BETWEEN EACH PADDLE AND ASSOCIATED CONNECTOR.

SELECT AND STORE FIVE (5) ENERGY LEVELS: 50,100,200,300 & MAX. RESPECTIVELY.  DISCHARGE AND RECORD STORED ENERGY INTO AN DEFIB ANALYZER AND VERIFY FOR PLUS OR MINUS 25 PER CENT TOLERANCES.

A00042

**Preventive - Asset**                              *Page 2*

WR Status: In Progress (4/4/2005 11:34:59 AM)

POWER UNIT AND CHECK ALL LAMPS AND PILOT LIGHTS.

AFTER 9TH DISCHARGE, RECORD CHARGING TIME FOR MAX SETTING AND VERIFY AT 10 PLUS OR MINUS 2 SECONDS. IF NOT, REPLACE BATTERIES.

CHECK AND RECORD CHARGING TIME TO MAXIMUM ENERGY IN SECONDS.

CHECK FOR PROPER INTERNAL DISCHARGE OF STORED ENERGY.

VERIFY SYNC OPERATION. ATTEMPT DISCHARGE ON AND OFF 'R' WAVE NOTE BRIGHT SPOT MARKER ON CRT TRACE.

NOTE: ALL CALIBRATIONS ADJUSTMENTS ARE EXPLAINED IN SERVICE MANUALS.

MEASURE VARIOUS OUPUT ENERGIES, RECORD ON APPROPRIATE LABEL AND ATTACH LABEL IN CONSPICUOUS LOCATION.

MEASURE AND RECORD OUTPUT ENERGY AFTER REMAINING AT MAXIMUM WATTS SECOND FOR ONE MINUTE.

MEASURE AND RECORD ENERGY OUTPUT OF TENTH REPEATED DISCHARGE AT MAXIUMUM SETTING.

☐ TEST SYNCHRONOUS FUNCTION WITH A HEART SIMULATOR AND CONNECTED TO A MONITOR. TEST ALL AVAILABLE POWER SUPPLY VOLTAGES. NOTE -USE EXTREME CAUTION WHILE MEASURING HIGH VOLTAGE CHARGING POWER SUPPLY.                              *Annually*

☐ PERFORM ANNUAL CALIBRATION IN ACCORDANCE WITH MANUFACTURER'S INSTRUCTIONS. DISASSEMBLE AND REMOVE ALL DUST AND FOREIGN MATERIALS.                              *Every 6 months*

DISASSEMBLE, REMOVE DUST WITH DRY AIR AND BRUSH. CLEAN ALL PRINTED CIRCUIT BOARDS, CONNECTORS AND RECEPTACLES.

VISUALLY INSPECT ALL INTERNAL PARTS FOR SIGNS OF WEAR, DETERIORATION, CORROSION, BREAKAGE, ABUSE OR OVERHEATING.

VERIFY PROPER OUTPUT WAVEFORM USING AN OSCILLOSCOPE. A PERMANENT RECORD MAY BE OBTAINED USING A POLAROID CAMERA OR STRIP CHART RECORDER.

New Materials:              Qty    Cost     Total Cost

Completed By: _____          Sign Off By: _____

Response Date: ___/___/___          Completed Date: ___/___/___

Response Time: _____:_____          Completed Time: _____:_____

Duration: _____          Rpr Code: _____

Misc.

A00043

Exhibit H

89

1   correct this deficiency immediately.

2           So in other words, you are instructing

3   Mr. Miller that he needs to correct the safety

4   deficiency. But is it your testimony that he actually

5   created the safety deficiency himself by installing the

6   device?

7       A.   He told me so.

8       Q.   Is there a reason you did not indicate that

9   in this form?

10          MR. DELANY: Objection to the form of the

11  question.

12  BY MR. PRIMOS:

13      Q.   Let me just --

14      A.   Well, that is my writing style.

15      Q.   Well, let me ask you this question,

16  Mr. Hill. Is there any indication in this form that

17  Mr. Miller is the one who installed the switch

18  improperly?

19      A.   The only thing I have in here is that he

20  needs to ensure that it is installed correctly --

21      Q.   Okay.

22      A.   -- which is meant by the wording in that

23  statement.

24      Q.   And where is that indicated?

Anthony Reporting

(302) 674-8884

90

1       A.   The wording of the statement, when an

2   install of a device has a safety feature not being

3   installed properly, you need to correct this deficiency

4   immediately. It is his responsibility to do that. It

5   is his responsibility to ensure that the entire device

6   is safe and fully functional prior to leaving the work

7   site. It is his responsibility to communicate with the

8   appropriate people during the install that everything

9   was done accurately and correctly, and he failed to do

10  that.

11          It took me three additional days' work to go

12  ahead and do what he was supposed to do because he did

13  not do it appropriately the first time.

14      Q.   Now, if you could refer to Hill 8, which is

15  the next disciplinary incident, this refers to a

16  disciplinary incident that you addressed on April 5,

17  2005, correct?

18      A.   Yes.

19      Q.   And that is your signature toward the

20  bottom, correct?

21      A.   Yes.

22      Q.   And Mr. Miller refused to sign the form,

23  correct?

24      A.   Yes.

Anthony Reporting

(302) 674-8884

91

1       Q.   Now, I noticed that in both Hill 8 and

2   Hill 7, Sharon Money signed the form, as well. Is there

3   a reason she signed those forms?

4       A.   She was outside my door when they were

5   given.

6       Q.   But is there a reason why she signed the

7   form as a witness?

8       A.   Just a secondary person who was there who

9   had heard the conversation and could testify to the fact

10  that he refused to sign.

11      Q.   But in other words --

12          (Following a discussion off the record:)

13  BY MR. PRIMOS:

14      Q.   If you refer to Hill 4, neither Ms. Money

15  nor any other person signed that form as a witness,

16  correct?

17      A.   Because Dan Miller signed it.

18      Q.   So in other words, the reason for her

19  signing it was because Dan Miller refused to sign it?

20      A.   Exactly. At least there was somebody there

21  that could testify to the fact that that conversation

22  took place.

23      Q.   I understand. Now, this incident hard to do

24  with a defibrillator, correct?

Anthony Reporting

(302) 674-8884

92

1       A.   Correct.

2       Q.   And your complaint with Mr. Miller with

3   regard to this incident was that the unit should have

4   been pulled from the floor, and it was not, correct?

5       A.   No.

6       Q.   That was not your complaint with Mr. Miller?

7       A.   My complaint with Mr. Miller was, number

8   one, he did not pull it from the floor. Number two, if

9   he was not going to pull it from the floor, he was

10  supposed to tag it as defective. He knew at that point

11  in time that defibrillator was not fully operational.

12  And he left it on the floor for an hour and a half

13  without actually indicating to anybody else that it was

14  defective by putting that lockout tag-out sign on it.

15      Q.   But there is no indication --

16          MR. DELANY: Are you done with your answer?

17          THE WITNESS: Yes.

18  BY MR. PRIMOS:

19      Q.   But there is no indication on this form with

20  regard to tagging the item, correct?

21      A.   That was put into the substance of the

22  conversation, which under the following solutions have

23  been agreed upon, was that he needs to understand that

24  BayHealth has policies with regard to safety issues and

Anthony Reporting

(302) 674-8884

93

1  he has responsibilities under those policies.

2          He should have pull the defib from the

3  floor, yes. But if he wasn't pulling it from the floor,

4  he should have tagged it.

5      Q.    But you would agree that the tagging issue

6  is not identified in this form, correct?

7      A.    It is referred to down below.

8      Q.    And where is it referred to?

9      A.    In the statement which I just read, which is

10  you need to understand that BayHealth has policies with

11  regard to safety issues and your responsibilities under

12  these policies.

13          (Hill Exhibit Number 11 was marked for

14  identification and attached to the record.)

15  BY MR. PRIMOS:

16      Q.    Mr. Hill, this is an excerpt from the

17  Aramark Policy Manual, correct, that has been marked as

18  Hill Number 11?

19      A.    Yes.

20      Q.    Does this policy apply to the incident in

21  question?

22      A.    It should.

23      Q.    What do you mean it should?

24      A.    Yes. There are definite aspects in this

Anthony Reporting
(302) 674-8884

94

1  policy that does apply to this.

2      Q.    And what aspects in particular apply to this

3  incident?

4      A.    Understand the protocol, number four,

5  defective equipment that exhibits deficiencies that

6  preclude safe or defective use shall be identified as

7  such and removed from service.

8      Q.    And then it goes on to state that: If for

9  any reason the equipment cannot be removed from service,

10  there are certain steps to be taken? Correct?

11      A.    Absolutely. And the first one is A, which

12  is affix a placard to the unit to warn potential users

13  that the equipment is defective and must be used with

14  caution. The placard must also be dated and include an

15  ACTS department contact name and phone number.

16          That is what is known as a defective tag,

17  and that placard was not placed on the device. The

18  device was left there for normal use.

19      Q.    Right. Is it your understanding that in

20  reference to this particular incident, the equipment in

21  question could not be removed?

22      A.    It should have been removed.

23      Q.    Well, what we just read about the placard

24  applies in a circumstance where the equipment could not

Anthony Reporting
(302) 674-8884

95

1  be removed, correct?

2      A.    According to Dan Miller, he says the

3  equipment could not be removed. I disagree with that

4  assessment.

5      Q.    And why do you disagree with that

6  assessment?

7      A.    I disagree with that assessment because I

8  went talked to the charge nurse, which is what you are

9  suppose to do to notify them that there is defective

10  equipment in your area, and she let me take it.

11      Q.    What was the name of that charge nurse?

12      A.    The first name Gretchen, and the last name I

13  do not know.

14      Q.    Is it Gretchen Larrimore?

15      A.    It could be, yes.

16      Q.    Did Mr. Miller tell you that she had told

17  him that the equipment could not be taken from the

18  floor?

19      A.    Dan Miller, during my subsequent

20  investigation later, told me that she said that. But I

21  was not able to confirm that with her.

22      Q.    Why did you go to the floor and remove the

23  equipment?

24      A.    Because I was down there in the shop

Anthony Reporting
(302) 674-8884

96

1  discussing an issue with John Ritterhoff when Dan came

2  in. Dan said there is a defibrillator up in the

3  intermediate care unit that has no sounds on it, and

4  he's got to go. And he grabbed his coat and left.

5          I immediately went up to the floor, because

6  you can't leave a defibrillator like that on the floor.

7  There was no defective tag on it. I found the case had

8  been separated in the back by approximately one quarter

9  of an inch across the back side, which left an even

10  increased hazard up there in the work area.

11          So I went and I talked with Gretchen. I

12  showed her the device. I pulled it from the floor. I

13  affected repair on it and got it back up there within an

14  hour. And then I proceeded to investigate the entire

15  incident.

16      Q.    So in other words, Mr. Miller did make you

17  aware of the situation, correct, before he left?

18      A.    Correct.

19      Q.    So the situation was handled appropriately

20  ultimately after he informed you of the situation,

21  correct?

22      A.    But it should have been handled

23  appropriately long before that.

24      Q.    What do you mean long before?

Anthony Reporting
(302) 674-8884

97

1    A.    From the minute he -- The first step in any
2 preventative maintenance procedure is to look at the
3 physical condition of a device. When I investigated
4 with Dan Miller about the defibrillator, he said he did
5 not notice that gap in the case. A gap in the case can
6 allow fluids to infiltrate into the device, creating an
7 electrical shock hazard for both the patient and the
8 user.
9        And then he told me when he was looking for
10 a replacement form, which was not necessary, for it is
11 the intermediate care unit in which one end of the
12 floor were two crash carts that were available for use
13 and the ICU on the other side, which had three crash
14 carts. All he had to do was tell Gretchen that she
15 could use either one of those and communicate to her
16 nurses so they had appropriate coverage in the area and
17 then remove the defibrillator immediately.
18        He chose to walk around and look for another
19 defibrillator and left that defibrillator there with no
20 note, no nothing on it. And that created a safety issue
21 for the facility, patients, staff. It was
22 inappropriately handled from the get go. It sat there
23 for an hour and a half being inappropriately handled,
24 and it should have been addressed immediately.

98

1    Q.    So the period of time that transpired
2 between Mr. When Mr. Miller initially discovered the
3 problem and when he informed you was an hour and a half;
4 is that correct?
5    A.    Yes, according to his own testimony.
6        (Hill Exhibit Number 12 was marked for
7 identification and attached to the record.)
8 BY MR. PRIMOS:
9    Q.    Mr. Hill, looking at what has been marked as
10 Hill Exhibit Number 12, this is a response written by
11 Mr. Miller regarding the defibrillator incident. Your
12 attorney is already in position of this.
13        I would like you to look at the second
14 sentence of this document. It says: With 23 years of
15 in-hospital biomedical equipment servicing, I was always
16 instructed never remove an operation critical life
17 support item from a crash cart without a working
18 replacement.
19        Whether or not Mr. Miller was instructed of
20 that, as you obviously wouldn't know about all of his
21 experience, but is that an appropriate statement,
22 that --
23    A.    No.
24    Q.    -- an operation critical life support item

99

1 from a crash cart without a working replacement.
2    A.    There is insufficient information there to
3 go with. That is too broad and vague of a statement to
4 rely on.
5    Q.    What is the insufficient information?
6    A.    The insufficient information relies on what
7 exactly you are trying to accomplish with that
8 particular device. Okay. It's a defibrillator, for
9 instance, on a crash cart. Okay. If you are up there
10 doing a preventative maintenance on a defibrillator and
11 you need to remove it from the crash cart and you know
12 you are going to have it for a finite period of time and
13 the nurses are made aware and they are able to go ahead
14 and ensure that there was appropriate coverage for the
15 area, then yes, it can be removed.
16        But it all goes back to the communication
17 issue. If you went up there and just took the
18 defibrillator and walked off and didn't tell anybody,
19 this would be an accurate statement. But as long as you
20 adequately communicate with the other caregivers in the
21 medical facility, there is no reason why that piece of
22 equipment couldn't be pulled for regular preventative
23 maintenance.
24        If it's a corrective, if it was broken and

100

1 had to be repaired, of course, it had to be removed.
2 But again, there is appropriate coverage for those
3 areas. You have to communicate. You have to ensure
4 that it's there.
5    Q.    Now, if you could look at the third
6 paragraph of Hill 12, the third sentence, Mr. Miller,
7 states -- and this is the following day, after the
8 incident occurred; in other words, the following day
9 after you removed the defibrillator from the floor.
10        It says: Later the morning -- I think it
11 should be that morning -- later that morning Mr. Hill
12 could be heard screaming to someone on the phone with
13 his door closed -- he know the level of safety
14 called/required in any incident, and this was not the
15 way he was trained and so on to defend a point.
16        Is it true that you were screaming to
17 someone on the phone, something along these lines about
18 he knows the level of safety required?
19    A.    No. As a matter of fact, I find a lot of
20 this statement totally erroneous.
21    Q.    Is it true that you had a conversation with
22 someone over the phone where you indicated that
23 something along the lines of he knew the level of safety
24 required?

101

1    A.    No.  I've never utilized those words in that
2  sequence before.
3    Q.    Did you have any conversation with anyone
4  the following day -- in other words, the day after you
5  removed the defibrillator -- did you have any telephone
6  conversation with anyone about the incident?
7    A.    No telephone conversation on the day after
8  with anyone regarding the incident; I did have a
9  face-to-face conversation with Daniel Miller.
10    Q.    Now, if you go on there in the third
11  paragraph, it says:  Later at lunch, John Ritterhoff
12  from remarked that everyone heard his conversation.
13        In other words, your conversation.  He
14  remarked -- in other words, you remarked -- he was
15  speaking to his superior, Tom Cuthbertson (area
16  manager).
17        MR. DELANY:  Objection to the form of the
18  question.  I don't agree with your interpretation that
19  he remarked refers to Jonathan Hill.
20        MR. PRIMOS:  Okay.  Well, I agree.  It could
21  refer to John.
22        MR. DELANY:  It could refer to Ritterhoff.
23        MR. PRIMOS:  Yes, right.  It could refer to
24  John Ritterhoff.  I'm sorry.  That is what I meant.

Anthony Reporting
(302) 674-8884

102

1  BY MR. PRIMOS:
2    Q.    Do you recall this conversation occurring at
3  lunch?
4        MR. DELANY:  What conversation --
5  BY MR. PRIMOS:
6    Q.    In other words, the conversation where John
7  Ritterhoff was saying everyone heard your conversation
8  on the phone?
9    A.    No.  I mean I have lunch with the guys most
10  every day.
11    Q.    And you don't recall this conversation?
12    A.    No.
13    Q.    Did you have a discussion with John
14  Cuthbertson on the phone about this defibrillator
15  incident?
16        MR. DELANY:  At any time?
17  BY MR. PRIMOS:
18    Q.    At any time.
19    A.    Yes, I could have, yes.  I would say yes.
20    Q.    Did you have a discussion with Tom
21  Cuthbertson on the phone about this defibrillator
22  incident the day after the defibrillator was removed?
23    A.    I answered that; no.
24    Q.    You didn't.  Do you recall when your

Anthony Reporting
(302) 674-8884

103

1  conversation with Mr. Cuthbertson occurred?
2    A.    No.
3    Q.    Was it within a week of the incident?
4    A.    Most likely, yes.
5    Q.    And what occurred during that conversation?
6    A.    I discussed with Tom Cuthbertson regularly
7  any disciplinary that I give to the technicians to make
8  sure that he is fully aware of what happened and what
9  disciplinary I'm going to write up for him.
10    Q.    In this discussion with Mr. Cuthbertson, did
11  he try to talk you out of giving Mr. Miller a write-up?
12    A.    No.
13    Q.    In that discussion with Mr. Cuthbertson, did
14  you say anything similar to what is indicated here?  He
15  knows the level of safety required.  This was not the
16  way he was trained.  Did you say anything similar to
17  that in your discussion with Mr. Cuthbertson?
18    A.    No, no.
19    Q.    Now, looking at the last paragraph on Hill
20  12, it says:  I was subsequently called into his office
21  why I did not perform as he believed he would in the
22  same situation.  Then it says:  Given my disciplinary
23  action to sign, which I refused.  And then it says:  He
24  then began to speak hypothetically -- if he had a job

Anthony Reporting
(302) 674-8884

104

1  where he was experiencing anxiety for harassment and
2  unfair treatment, he would not let it jeopardize his
3  health.  He would resign and find another job elsewhere.
4  He would live off family, even risk being -- I think
5  that should be destitute -- but not work under those
6  conditions.
7        Did you have a conversation along those
8  lines with Mr. Miller?
9    A.    No.
10    Q.    Was anyone else present during your
11  conversation with Mr. Miller about the incident?
12    A.    Sharon Money was right outside my door, and
13  my door was open.
14    Q.    But did she hear the entire conversation?
15    A.    Yes.  Her desk sits right outside my door.
16    Q.    Did anyone else witness the conversation,
17  other than Ms. Money?
18    A.    To my knowledge, no.
19        MR. PRIMOS:  I think this may be a good
20  stopping point.
21        (Following a luncheon recess:)
22  BY MR. PRIMOS:
23    Q.    I guess the next thing I would like you to
24  refer to, Mr. Hill, is Hill 9.  Now, first of all, is

Anthony Reporting
(302) 674-8884

105

1   that your signature toward the bottom of the page? I'm

2   sorry. I'll let you look. Is that your signature

3   toward the bottom of the page, Mr. Hill?

4        A.    Yes, it is.

5        Q.    And this appears to be a memo that was sent

6   by you to Tom Cuthbertson, correct?

7        A.    Yes.

8        Q.    And you were memorializing your termination

9   discussion with Mr. Miller, correct?

10       A.    Yes.

11       Q.    Now, prior to your having this meeting with

12  Mr. Miller -- Well, I'm sorry. Strike that. The memo

13  is dated 4/15/2005. Is that the same date that your

14  termination discussion with Mr. Miller was held?

15       A.    Yes.

16       Q.    And prior to your having this termination

17  discussion with Mr. Miller, had you previously had

18  discussions with Mr. Cuthbertson about terminating

19  Mr. Miller?

20       A.    I had talked to Mr. Cuthbertson and Tom

21  Lodge two days prior to this.

22       Q.    So that would have been the 13th of April?

23       A.    Yes.

24       Q.    And can you tell me what occurred during

Anthony Reporting
(302) 674-8884

106

1   that discussion?

2        A.    I had called -- I had sent them both an

3   e-mail in reference to requesting a teleconference. And

4   I had discussed with them about the two safety

5   incidences with Dan Miller and subsequently, following

6   that, some discrepancies I had found with other

7   defibrillators on the floor. And these work orders

8   referenced those defibrillator preventative maintenance

9   work orders.

10             And I told them that when -- with the two

11  safety violations and all of these discrepancies, he did

12  not -- he was not safe enough to have working for us any

13  longer.

14       Q.    And what was their response?

15       A.    Well, they had asked to -- they had already

16  known about the two previous safety violations. And we

17  discussed those six particular work orders. And at the

18  end of the conversation, they agreed that, you know,

19  termination had to be done. So Tom Lodge drafted a

20  letter for Tom Cuthbertson. And on that day, I

21  presented it to him.

22       Q.    Now, what we are looking at here, Hill

23  Exhibit Number 9, that was not the letter that was

24  drafted, correct?

Anthony Reporting
(302) 674-8884

107

1        A.    No.

2        Q.    And it is not the letter that you presented

3   to Mr. Miller?

4        A.    That's correct.

5        Q.    These six work orders that are referenced in

6   Hill 9 by number, are they still in existence?

7        A.    Yes.

8        Q.    Are they in electronic format?

9        A.    Yes. I am required to maintain a record of

10  all devices, from cradle to grave; in other words, once

11  they come into the facility until they leave and then

12  the subsequent years after that. So yes, all of these

13  do exist on our computer system.

14       Q.    When you say the subsequent years after

15  that, you are required to maintain these records for a

16  period of time, even after the equipment has left --

17       A.    Absolutely.

18       Q.    -- the facility?

19       A.    Absolutely, absolutely.

20       Q.    Is it a set period of time?

21       A.    It is depending on whether or not the

22  particular device has patient sensitive information

23  contained in it. For those items, I am required to keep

24  those records for six years.

Anthony Reporting
(302) 674-8884

108

1        Q.    Would these work orders have patients'

2   sensitive information in them?

3        A.    No, they are not. They are defibrillators.

4   They don't record any patient information within them.

5        Q.    So how do you know that all of these work

6   orders are still in existence? Isn't it possible that

7   some of these defibrillators may no longer be in the

8   facility?

9        A.    Even if they weren't in the facility, the

10  time frame -- For instance, this is April 2005. It's

11  less than two years. I usually keep records for five.

12             MR. PRIMOS: Okay. I may be requesting

13  those, as well.

14  BY MR. PRIMOS:

15       Q.    Now, in the third paragraph of Hill 9, where

16  you say, I then presented the letter to Dan, that refers

17  to the letter that I believe you said Mr. Lodge had

18  drafted?

19       A.    Yes. It's a letter of termination.

20             (Hill Exhibit Number 13 was marked for

21  identification and attached to the record.)

22  BY MR. PRIMOS:

23       Q.    Mr. Hill, I have just handed you what has

24  been marked as Hill Exhibit Number 13. Is this the

Anthony Reporting
(302) 674-8884

137

1  the importance of getting this accomplished correctly.

2      Q.    And when would you say that Mr. Ritterhoff

3  was at a point where this was no longer a problem for

4  him individually?

5      A.    Well, what had happened was is in August,

6  when we got the ISIS Pro system in there, I was already

7  highly familiar with the program. So I sat

8  Mr. Ritterhoff and I sat Sterling Townsend and I sat

9  Greg Wilson down in front of the computer system. And I

10  demonstrated for them that the items I could find with

11  no problem at all that were totally screwed up. They

12  had no idea it was that bad. They had no idea how

13  horrible it was. And they were like: Oh, my goodness,

14  I can't believe this has been going on. That was the

15  statement that was given to me.

16          It was from that time on that they truly

17  realized this was important stuff and it has to get

18  accomplished.

19      Q.    But my question is: At what point was it no

20  longer a problem for Mr. Ritterhoff, as far as

21  identifying equipment and placing it into the system?

22      A.    As far as a specific date, I have no idea.

23  I just know that when we brought in ISIS Pro and very

24  shortly after my meeting with those individual, who were

Anthony Reporting
(302) 674-8884

---

138

1  the senior technicians in the shop or the ones that had

2  the most time behind them, that we actually took a look

3  at this. And it was very shortly after that I noticed

4  there were no problems with those particular gentlemen

5  or any others.

6      Q.    So you would say the fall of '04?

7      A.    That would be a fair assessment.

8      Q.    Okay. Who is Neil Newlin? Does that name

9  ring a bell.

10      A.    Yes.

11      Q.    Who is that?

12      A.    He's a general repair technician.

13      Q.    Who does he work for?

14      A.    He works for Aramark.

15      Q.    In the Kent location?

16      A.    Yes.

17      Q.    And how long has he been in employed there?

18      A.    He's been there since November.

19      Q.    Since November?

20      A.    Yes.

21      Q.    Of '06?

22      A.    Yes.

23      Q.    Were you the one that made the decision to

24  hire him?

Anthony Reporting
(302) 674-8884

---

139

1      A.    It was a group decision. He does not work

2  as a biomed technician. He works as a general repair

3  technician.

4      Q.    What does mean?

5      A.    He takes care of the smaller items that are

6  repetitive.

7      Q.    Do you know what his age is?

8      A.    He's in his 40s.

9      Q.    In his 40s?

10      A.    Yes.

11          MR. PRIMOS: I have no further questions.

12  BY MR. DELANY:

13      Q.    On the issue of defibrillator, do you recall

14  your testimony in that area?

15      A.    Yes.

16      Q.    Okay. You had testified that Mr. Miller

17  failed to -- I believe you used the words tag out the

18  machine when he left it on the floor?

19      A.    Correct.

20      Q.    Did it matter to you whether it was an hour

21  and a half or some other period of time that he left

22  that machine on the floor untagged?

23      A.    He never should have left the machine

24  without putting a tag on the device.

Anthony Reporting
(302) 674-8884

---

140

1      Q.    So the time that he was gone and left the

2  machine without a tag, is that relevant to you?

3      A.    Absolutely, that is the reason he was

4  written up.

5      Q.    But the length of the time?

6      A.    The length of the time only adds to the

7  gravity of the situation.

8      Q.    You referenced the personnel files that were

9  there prior to your arriving at the BayHealth system.

10  Do you remember your testimony?

11      A.    Yes.

12      Q.    You have no direct knowledge of how those

13  files were maintained prior to your arrival, correct?

14      A.    No, I do not.

15      Q.    And whether or not things have been moved

16  and purged from your files prior to your arrival, you

17  have no direct knowledge of that, do you?

18      A.    I have no direct knowledge.

19      Q.    I'm just referring you to Hill 4 --

20      A.    Yes.

21      Q.    -- to the write-up of Mr. Miller on

22  March 2nd of '05.

23      A.    Right. The original write-up was March 2nd,

24  but it was actually delivered on March 4th.

Anthony Reporting
(302) 674-8884