## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,

        Plaintiff,

    v.

ARAMARK HEALTHCARE SUPPORT
SERVICES, INC., ARAMARK CLINICAL
TECHNOLOGY SERVICES, INC., AND
ARAMARK MANAGEMENT SERVICES
LIMITED PARTNERSHIP,

        Defendants.

Civil Action No. 06-534-MPT

---

## BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

---

Dated: October 1, 2007

Respectfully submitted,

Michael P. Kelly (D.E. Bar I.D. 2295)
Christopher A. Selzer (D.E. Bar I.D. 4305)
McCarter & English, LLP
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE 19801
Tel. 302.984.6301/6392
Fax. 302.984.2493
mkelly@mccarter.com
cselzer@mccarter.com

William J. Delany  (admitted *pro hac vice*)
Anne E. Martinez  (admitted *pro hac vice* )
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Tel. 215.963.5066/5718
Fax. 215.963.5001
wdelany@morganlewis.com
aemartinez@morganlewis.com

Attorneys for Defendants

**TABLE OF CONTENTS**

I.    NATURE AND STAGE OF THE PROCEEDINGS ............................................. 1

II.   SUMMARY OF ARGUMENT ............................................................................ 1

III.  STATEMENT OF UNDISPUTED FACTS ........................................................ 2

      A.    ARAMARK Clinical Technology Services For The Bayhealth
            Medical System ......................................................................................... 2

      B.    Plaintiff's Employment History ............................................................... 4

      C.    Jonathan Hill Was Brought In To Improve The Bayhealth Account ........ 4

      D.    Plaintiff Takes A Medical Leave of Absence ........................................... 5

      E.    Mr. Hill Made Certain Changes to the Clinical Engineering
            Department ................................................................................................. 6

      F.    Plaintiff Returned to Work ........................................................................ 7

      G.    Plaintiff Disagreed With Mr. Hill's Changes .......................................... 8

            1.    Plaintiff Complained About The Rotation System ........................ 8

            2.    Plaintiff Disagreed With The CE Technician Job
                  Description .................................................................................... 9

      H.    Plaintiff Disagreed With His Initial Denial of Time Off From
            Work ........................................................................................................ 10

      I.    Plaintiff's Disciplinary History and Termination of His
            Employment ............................................................................................. 11

            1.    Plaintiff Was Disciplined On Multiple Occasions For
                  Failure To Complete Proper Documentation. .............................. 11

            2.    Plaintiff Was Disciplined for Improper Installation of New
                  Equipment. ................................................................................... 13

            3.    Plaintiff Was Disciplined for Failing To Remove A
                  Defective Piece of Equipment. .................................................... 14

            4.    Plaintiff's Employment Was Terminated ..................................... 16

IV.   ARGUMENT .................................................................................................... 17

      A.    Standard Of Review ................................................................................ 17

      B.    Defendants Are Entitled To Summary Judgment On Plaintiff's Age
            and Handicap Discrimination Claims. .................................................... 18

            1.    The McDonnell-Douglas Procedural Framework ........................ 18

            2.    Plaintiff Cannot Establish A Prima Facie Case Of
                  Discrimination Under the DHPEPA. ........................................... 21

3.    Plaintiff Cannot Establish A Prima Facie Case Of Age Discrimination..................................................................... 24

4.    Plaintiff Cannot Prove That Defendants' Legitimate, Non-Discriminatory Reasons For His Discipline And Employment Termination Constitute A Pretext For Discrimination..................................................................... 26

     a.    Mr. Hill had legitimate non-discriminatory reasons for making changes at the Bayhealth facilities. ............... 26

     b.    Defendants had legitimate, non-discriminatory reasons for disciplining Plaintiff and terminating his employment..................................................................... 26

5.    Plaintiff Cannot Show That Defendants' Legitimate, Non-Discriminatory Reasons Are Pretext For Intentional Discrimination..................................................................... 27

C.    Defendants Are Entitled To Summary Judgment With Respect To Plaintiff's Hostile Work Environment Claims......................................... 29

1.    Standard For Proving A Hostile Work Environment.................... 31

2.    There Is No Evidence That Mr. Hill Harassed Plaintiff Because of His Age or Alleged Status As A Handicapped Person..................................................................... 31

3.    Plaintiff Also Cannot Establish Severe And Pervasive Harassment To Support His Hostile Work Environment Claim..................................................................... 32

4.    There Is No Evidence That Plaintiff Was Detrimentally Affected By The Alleged Conduct, Or That A Reasonable Person Would Be Detrimentally Affected By Such Conduct. .................................................................. 34

D.    Plaintiff's Claim For Breach Of Good Faith And Fair Dealing Is Not Viable Under Delaware Law. .......................................................... 34

E.    Plaintiff's FMLA Claim Fails As A Matter of Law ............................... 35

1.    Plaintiff Has No Claim For Substantive Rights Under The FMLA Because He Received More FMLA Leave Than That To Which He Was Entitled.................................................. 36

2.    Plaintiff's Retaliation Claim Fails Because There Is No Evidence Of A Causal Link Between Plaintiff's FMLA Leave And Any Adverse Employment Action And, Further, Plaintiff Cannot Rebut Defendants' Legitimate, Nondiscriminatory Reason......................................................... 36

F.    Plaintiff's Slander Per Se Claim Fails As A Matter Of Law ................... 38

V.    CONCLUSION................................................................................ 40

## TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)...................................................................................................18

Andrews v. City of Philadelphia,
895 F.2d 1469 (3d Cir. 1990)..................................................................................32, 34

Baltuskonis v. US Airways, Inc.,
60 F. Supp. 2d 445, 448 (E.D. Pa. 1999))..................................................................37

Billet v. CIGNA Corp.,
940 F.2d 812 (3d Cir. 1991)........................................................................................28

Bruton v. Diamond State Tel. Co.,
623 F. Supp. 939 (D. Del. 1985)................................................................................18

Bullock v. Children's Hosp. of Phila.,
71 F. Supp. 2d 482 (E.D. Pa. 1999)..........................................................................25

Burris v. Richards Paving, Inc.,
461 F. Supp. 2d 244 (D. Del. 2006)......................................................................18, 23

Cardenas v. Massey,
269 F.3d 251 (3d Cir. 2001).......................................................................................31

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)....................................................................................................17

Clayton v. Pa. Dep't of Public Welfare,
No. 4:CV 05-0768, 2007 WL 575677 (M.D. Pa. Feb. 20, 2007) ................................24

Cooper v. Binney & Smith, Inc.,
No. 96-6230, 1998 U.S. Dist. LEXIS 2391 (E.D. Pa. Feb. 26, 1998) .........................34

E.E.O.C. v. Avecia, Inc.,
151 F. App'x 162, 165 (3d Cir. 2005)........................................................................35

Ezold v. Wolf, Block, Schorr and Solis-Cohen,
983 F.2d 509, 545 (3d Cir. 1992)...............................................................................28

Faragher v. City of Boca Raton,
524 U.S. 775 (1998).............................................................................................32, 33

Fuentes v. Perskie,
32 F.3d 759 (3d Cir. 1994)....................................................................................20, 28

Harris v. Forklift Sys., Inc.,
510 U.S. 17 (1993)..................................................................................................31, 33

Hazen Paper Co. v. Biggins,
507 U.S. 604 (1993)................................................................................................18, 24

Johnson v. Campbell,
No. CIV.A.00-510-JJF, 2001 WL 34368406 (D. Del. Mar. 30, 2001)..........................39

Jones v. Sch. Dist. of Phila.,
198 F.3d 403 (3d Cir. 1999)...........................................................................................27

Keller v. Orix Credit Alliance, Inc.,
130 F.3d 1101 (3d Cir. 1998)..........................................................................................28

Kelly v. Drexel Univ.,
94 F.3d 102 (3d Cir. 1996)..............................................................................................23

Krouse v. Am. Sterilizer Co.,
126 F.3d 494 (3d Cir. 1997)............................................................................................20

Kunin v. Sears Roebuck & Co.,
175 F.3d 289 (3d Cir. 1999)............................................................................................31

McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973).........................................................................................................19

Messina v. E.I. Du Pont de Nemours & Co.,
308 F. Supp. 2d 491 (D. Del. 2004)..................................................................................25

Miller v. Aluminum Co. of America,
679 F. Supp. 495 (W.D. Pa. 1988).....................................................................................33

Moon v. Delaware River & Bay Auth.,
No. CIV.A.05-261-JJF, 2006 WL 462551 (D. Del. Feb. 24, 2006) ..................................34

Naghiu v. Inter-Continental Hotels Group, Inc.,
165 F.R.D. 413 (D. Del. 1996) ...........................................................................................17

Nichols v. Bennett Detective & Protective Agency, Inc.,
No. CIV.A.05-55, 2006 WL 1530223 (D. Del. May 31, 2006).....................................18, 39

O'Connor v. Consol. Coin Caterers Corp.,
517 U.S. 308 (1996).............................................................................................................19

Oncale v. Sundowner Offshore Servs., Inc.,
523 U.S. 75 (1998)............................................................................................31, 32

Park v. Georgia Gulf Corp.,
No. CIV.A.91-569, 1992 WL 714968 (D. Del. Sept. 14, 1992)......................................39

Pivorotto v. Innovative Sys., Inc.,
191 F.3d 344 (3d Cir. 1999)...........................................................................................19

Riner v. Nat'l Cash Register,
434 A.2d 375 (Del. 1981) ..............................................................................................24

Rosario v. Ken-Crest Servs.,
No. 04-CV-4737, 2005 WL 1377843 (E.D. Pa. June 6, 2005);
order aff'd by 189 F. App'x 79 (3d Cir. June 5, 2006)...................................................30

Schlifke v. Trans World Enter. Corp.,
Civ. No. 05-620-SLR, 2007 WL 906709 (D. Del. Mar. 27, 2007).........................37, 38

Schoch v. First Fid. Bancorporation,
912 F.2d 654 (3d Cir. 1990)....................................................................................18, 32

Schofield v. Metro. Life Ins. Co.,
No. 3:CV-03-0357, 2006 WL 2660704 (M.D. Pa. Sept. 16, 2006).........................37, 38

Schuster v. Derocili,
775 A.2d 1029 (Del. 2001) ............................................................................................40

Sheldon v. Univ. of Med. & Dentistry of N.J.,
223 F.3d 220 (3d Cir. 2000)...........................................................................................30

Simpson v. Kay Jewelers,
142 F.3d 639 (3d Cir. 1998)....................................................................................20, 24

Sosky v. Int'l Mill Serv., Inc.,
No. 94-2833, 1996 WL 32139 (E.D. Pa. Jan. 25, 1996)................................................31

Spence v. Funk,
396 A.2d 967 (Del. 1978) .........................................................................................38, 39

St. Mary's Honor Ctr. v. Hicks,
509 U.S. 502 (1993).................................................................................................19, 20

Taylor v. Pathmark Stores, Inc.,
177 F.3d 180 (3d Cir. 1999)...........................................................................................23

Testerman v. Chrysler Corp.,
No. CIV.A.95-240-MMS, 1997 WL 820934 (D. Del. Dec. 30, 1997)....................................18, 21

Texas Dep't of Cmty. Affairs v. Burdine,
450 U.S. 248 (1981).......................................................................................................18, 19, 20

Toyota Motor Mfg., Kentucky, Inc. v. Williams,
534 U.S. 184 (2002).......................................................................................................21

Waite v. Blair, Inc.,
937 F. Supp. 460 (W.D. Pa. 1995).................................................................................34

Walton v. Mental Health Ass'n of Southeastern Pa.,
168 F.3d 661 (3d Cir. 1999)............................................................................................31

Washington v. State of Delaware,
No. CIV.A.01-217, 2003 WL 21697403 (D. Del. July 17, 2003) .................................22

Watkins v. Children's Hosp. of Phila.,
No. CIV.A.97-1510, 1997 WL 793518 (E.D. Pa. Dec. 3, 1997) ...................................19

Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Edu.,
437 F. Supp. 2d 235 (D. Del. 2006)................................................................................35

Williams v. Philadelphia Housing Auth. Police Dep't,
380 F.3d 751 (3d Cir. 2004).............................................................................................38

## STATUTES

29 C.F.R. § 825.216(a)..................................................................................................35

29 C.F.R. § 825.220(c)..................................................................................................35

29 U.S.C. § 2612(a) ......................................................................................................35

29 U.S.C. § 2612(a)(1)..................................................................................................36

29 U.S.C. § 2615(a)(1),(2).............................................................................................34

19 Del. C. 19, § 711 (2006) ..........................................................................................24

19 Del. C. § 722 ............................................................................................................21

19 Del. C. § 724 ............................................................................................................21

# RULES

Fed. R. Evid. 802 ...............................................................................................................30

# MISCELLANEOUS

Restatement (Second) of Torts § 558 (1977) ................................................................38

## I.   NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Daniel Miller ("Plaintiff") filed the instant Complaint against Defendants ARAMARK Healthcare Support Services, Inc., ARAMARK Clinical Technology Services, Inc., and ARAMARK Management Services Limited Partnership (collectively "Defendants"),[1] asserting claims of discrimination and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2617(a)(1), age discrimination under Del. Code Ann. tit. 19, § 710 et seq (2006), handicap discrimination under Del. Code Ann. tit. 19, § 720 et seq (2006), breach of the covenant of good faith and fair dealing, and slander. Discovery is closed. Defendants move for summary judgment because there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law.

## II.   SUMMARY OF ARGUMENT

1.   Plaintiff is a former ARAMARK Clinical Engineering Technician ("CE Technician") in the Clinical Engineering Department for Milford Memorial Hospital ("Milford Memorial") and Kent General Hospital ("Kent General"), which are part of the Bayhealth Medical Center. CE Technicians are responsible for, among other things, inspecting and repairing hospital equipment. The duties of a CE Technician implicate significant concerns for patient safety and hospital accreditation, which requires Defendants to closely scrutinize each technician's performance, competence and adherence to regulations.

---

[1]   Plaintiff was employed by ARAMARK Management Services, LP. As such, this is the proper corporate defendant. ARAMARK Healthcare Support Services, LLC (formerly ARAMARK Healthcare Supports Services, Inc.) and ARAMARK Clinical Technology Services, LLC (formerly ARAMARK Clinical Technology Services, Inc.) are affiliates of ARAMARK Management Services but did not employ Plaintiff. As a result, these two latter entities are improperly named as corporate defendants and should be dismissed from the case. However, in an abundance of caution, this Motion is submitted on behalf of all three corporate Defendants.

2.    Prior to July 2004, Defendants' Bayhealth account was experiencing difficulty and ARAMARK was in danger of losing the account. Defendants brought in a new manager to address the problems and clean up the account. Plaintiff took a medical leave of absence one month after this new manager assumed responsibility for the account. While Plaintiff was out on leave, this new manager began tackling the problems of the account by implementing a number of departmental changes.

3.    When Plaintiff returned to work, he reacted negatively to these changes and responded by blatantly ignoring his manager's directives as well as Bayhealth policies. Despite repeated corrective actions, Plaintiff continued to defy his manager's instructions, instead choosing to violate Bayhealth policies. Plaintiff's actions put both the patients' safety and the hospital's accreditation at risk. Ultimately, Defendants determined that Plaintiff did not perform his job safely enough and they terminated his employment.

4.    This lawsuit, in which Plaintiff asserts a raft of federal and state law claims alleging discrimination and retaliation based on his age, alleged status as a handicapped person and receipt of FMLA leave, reflects nothing more than Plaintiff's continued inability or unwillingness to acknowledge that Defendants had legitimate concerns about Plaintiff's performance, competence and resistance to change. Instead of accepting responsibility for his actions, Plaintiff projects blame onto others and makes unsupported allegations of discrimination and retaliation. As shown below, Plaintiff's claims are entirely without merit and Defendants are entitled to summary judgment.

III.     **STATEMENT OF UNDISPUTED FACTS**

    A.     **ARAMARK Clinical Technology Services For The Bayhealth Medical System**

    ARAMARK provides clinical equipment maintenance services for the Clinical Engineering Departments at to the Bayhealth Medical System, which includes both the Milford Memorial Hospital in Milford, Delaware and Kent General Hospital in Dover, Delaware. (Affidavit of Jonathan Hill "Hill Aff.", attached hereto as Exhibit A, at ¶4). ARAMARK employs CE Technicians to purchase, inventory, service and maintain the medical equipment at these hospitals. (Hill Aff. ¶5).

    CE Technicians are a vital component of the healthcare delivery system. (Hill Aff. ¶6). Their responsibilities generally include the installation of equipment, ongoing inspections, preventive maintenance ("PM"),[2] and repair of hospital's medical equipment. (Id.). The type of work can vary greatly, and includes work on safety sensitive equipment such as blood pressure monitors, infusion pumps, or defibrillators. CE Technicians also have administrative responsibilities, including maintaining work orders (which record work performed on a piece of medical equipment), equipment maintenance history records, PM requests and inventory records. (Id. ¶7). They must adhere to all of the requirements of pertinent regulatory agencies such as the Joint Commission on the Accreditation of Healthcare Organizations ("JCAHO").[3] (Id. ¶8).CE Technicians must work carefully and maintain accurate records, because their errors can result in injury and even death, wasted

---

[2]    Accreditation rules require certain equipment to receive inspections over a particular period of time and then the hospital is audited on that function. (Hill Aff. ¶8).

[3]    JCAHO is currently referred to as the Joint Commission. It is a private organization that performs the inspections necessary for a hospital to maintain its accreditation to receive Medicare and Medicaid reimbursements. (Hill Aff. ¶8).

funds, and can negatively impact the hospital's adherence to regulations and accreditation rules, and ultimately can jeopardize a portion of the hospital's funding source. (Id. ¶10).

In July of 2004, ARAMARK had two CE Technicians and one radiology technician stationed at Milford Memorial, and three CE Technicians and one radiology technician stationed at Kent General. (Deposition of Jonathan Hill, taken on February 14, 2007 ("Hill Dep.") at 28-29, A-11, 12).

### B.     Plaintiff's Employment History

In the early 1990s, Plaintiff began working in Milford Memorial Hospital as a Senior Biomedical Equipment Technician. (Deposition of Plaintiff, taken on February 5, 2007 ("Pl. Dep.") at 16, 21, A-80, 82). In 1997, Kent General merged with Milford Memorial thereby forming the Bayhealth Medical Center. (Pl. Dep. at 18, A-81). In October, 2002, after outsourcing and acquisitions, ARAMARK purchased the entity performing the Clinical Engineering Services for Bayhealth. (Pl. Dep. at 27, 33, 45, A-85, 90, 94). Plaintiff thereafter remained assigned to Milford Memorial as an employee of ARAMARK Clinical Technology Services, Inc., a division of ARAMARK Healthcare Support Services, Inc. (Pl. Dep. at 45, A-94; Hill Dep. at 26, A-84; Hill Aff. ¶2). His job title was Clinical Engineering Technician, the position he held until his discharge on April 15, 2005. (Pl. Dep. at 88-89, 168, A-115-16, 166).

### C.     Jonathan Hill Was Brought In To Improve The Bayhealth Account.

Prior to July 2004, the Bayhealth Clinical Engineering Department was experiencing difficulty. (Hill Dep. at 31-33, A-14-16). It was having trouble completing recordkeeping and preventative maintenance functions, as well as tracking Hospital equipment. (Id.). Moreover, equipment repairs were not being completed in a timely fashion, thereby preventing the medical staff from having certain pieces of equipment to

treat their patients. (Id.). Additionally, during an inspection, the State discovered that some of the equipment had old inspection stickers. (Pl. Dep. at 103, A-123). According to Plaintiff, Bayhealth was experiencing challenges meeting the PM requirements of JCAHO thereby threatening the hospital's accreditation. (Pl. Dep. at 103, 104, A-123-24).

Recognizing that it was in danger of losing its contract with Bayhealth, ARAMARK assigned Jonathan Hill to the Bayhealth account with the directive to improve the performance of the department and turn the account around. (Hill Dep. at 11, 13, 31-32, A-2, 4, 14-15). Bayhealth agreed to a one-year extension of the contract provided that Mr. Hill would manage the account and that he would effectuate a turn-around, given that Mr. Hill was an experienced manager. (Hill Dep. at 32, A-15). On July 1, 2004, Mr. Hill became the Front Line Manager for the Bayhealth facilities, including Kent General and Milford Memorial. (Pl. Dep. at 54, 80, A-95, 111; Hill Dep. at 11-12, A-2, 3; Deposition of J. Thomas Cuthbertson, taken on February 14, 2007 ("Cuthbertson Dep."), at 3-4, A-185-86). Tom Cuthbertson, the District Manager, supervised Mr. Hill. (Hill Dep. at 11, 112-14, A-2, 67-69; Cuthbertson Dep. at 3-4, A-185-86).

## D.    Plaintiff Takes A Medical Leave of Absence.

Mr. Hill first met Plaintiff on July 1, 2004, when Mr. Hill met all of the technicians at Bayhealth. (Pl. Dep. at 80, A-111; Hill Dep. at 12, 14, A-3, 5). During their first meeting, Plaintiff explained that he needed to have surgery because he had cancer.[4] (Hill Dep. at 14, A-5). Although Plaintiff's medical leave began five weeks later, Mr. Hill supervised Plaintiff for only a total of three weeks prior to Plaintiff's medical leave because Mr. Hill was out of work on military duty for two weeks in July of 2004. (Pl. Dep. at 80,

---

[4]    Mr. Hill had no involvement in approving Plaintiff's medical leave. (Hill Dep. at 14, 16, A-5, 6).

A-111; Hill Dep. at 12-13, A-3-4). During those three weeks when Mr. Hill supervised

Plaintiff, Mr. Hill assessed Plaintiff's performance as fair, although Mr. Hill did notice

some performance issues that he later addressed in Plaintiff's annual performance review.

(Hill Dep. at 13, 14, A-4, 5).

From August 6, 2004 until December 10, 2004, Plaintiff was out on an approved

FMLA medical leave of absence. (Pl. Dep. at 55-56, 80, A-96-97, 111; Hill Dep. at 17, A-

7). During that period, he received short-term disability benefits. (Id.). While out on

leave, Plaintiff had surgery to remove part of his tongue and jaw, and to replace part of his

jaw with a portion of bone from his leg. (Pl. Dep. at 57-59, A-98-100). During that same

leave period, Plaintiff also had a second surgery on his leg. (Pl. Dep. at 59, A-100; Hill

Dep. at 26-27, A-9-10). According to Plaintiff, these surgeries resulted in a "temporary

speech impediment", "difficulty walking" and a disfigurement of his neck. (Compl. ¶¶ 19,

23; Pl. Dep. at 179, A-175). During his leave, Plaintiff called Mr. Hill a few times to

update him on his condition and to request an extension of his leave for the second surgery

on his leg, which ARAMARK approved. (Pl. Dep. at 64, 81-83, A-101, 112-114; Hill Dep.

at 25-27, A-8-10).

### E.    Mr. Hill Made Certain Changes to the Clinical Engineering Department.

Understandably, Mr. Hill needed to change the processes and procedures of

Bayhealth's Clinical Engineering Department in order to improve service and turn the

account around. As a result, Mr. Hill made a number of changes during that time that

Plaintiff was out on his medical leave. For example, after learning that the technicians

were assigned permanently to one of the two hospitals (either Kent or Milford), and that

work and documentation were performed differently at each of the two hospitals, Mr. Hill

implemented a rotation system whereby technicians would rotate between the two

hospitals. (Hill Dep. at 29-30, A-12-13). The purpose of this rotation system was to

improve uniformity in the Bayhealth Medical Center, and also to improve the skills of the

technicians. (Id.)

Mr. Hill also learned that there were no job descriptions for the technicians. As a

result, he distributed a written job description and standards of performance for the CE

Technicians, which he had developed when he worked at another hospital, so that the CE

Technicians would clearly understand their responsibilities and his performance

expectations. (Pl. Dep. at 123-24, 129, 130, 140, A-139-40, 142-43, 150; Hill Dep. at 37-

38, 40-41, A-19-20, 21-22; A-190-92). Mr. Hill also required all of the CE Technicians to

complete a competency test, which tested several categories of performance, including

quality control, customer relations, vendor relations and record management.[5] (Pl. Dep. at

90-91, 100-01, A-117-18; Hill Dep. at 52-54, A-32-33, Ex. 190-92). Finally, Mr. Hill

started using a new computer inventory system (called "ISIS Pro"), because the old

inventory system had led to inaccurate inventory systems. (Hill Dep. at 134-37, A-70-73).

Mr. Hill trained the technicians on this system and included it as part of their competency

testing. (Pl. Dep. at 145-46, A-153-54; Hill Dep. at 136, A-72).

**F.**     **Plaintiff Returned to Work.**

In mid-December, 2004, Plaintiff returned to work, but still experienced some

minor lingering effects from his surgeries. (Hill Dep. at 47, A-28). For example, Plaintiff

used a cane for the first few days, but then was able to walk without it. (Pl. Dep. at 67, 69-

---

[5] Plaintiff successfully completed his competency testing in January of 2004. (Pl. Dep. at 101, A-122; Hill Dep. at 51-52, 57-58, A-31-32, A-36-37; A-193). In fact, he had one of the highest scores. (Hill Dep. at 59, A-38).

70, A-103, 104-05). Although Plaintiff needed to hold the banister while climbing stairs, he could move about. (Pl. Dep. at 69-71, A-104-06). For a period of time, he also could not raise his left arm higher than his shoulder. (Pl. Dep. at 91, 92, A-118-18). Plaintiff also had difficulty pronouncing certain words and he could not speak for long periods of time without salivating, but he did not obtain any speech therapy and he could converse with people if he spoke slowly. (Pl. Dep. at 93, 130-31, A-120, 143-44). Plaintiff could still work, grocery shop and clean. (Pl. Dep. at 75-77, A-108-10).

Initially, Plaintiff only worked half days, three days a week, while he continued receiving treatments on his leg. (Pl. Dep. at 66, 70, 105, 120, A-102, 105, 125, 137; Hill Dep. at 47, 49, A-28, 29). During that time, Mr. Hill allowed Plaintiff to sit at a desk and had other technicians bring equipment to Plaintiff for repair and inspection, rather than requiring Plaintiff to make "on-floor" calls. (Pl. Dep. at 106, A-126; Hill Dep. at 44-45, A-25-26). After one month, at Plaintiff's request, his doctor cleared him to return to his full duties and Plaintiff informed ARAMARK that he could come off light duty. (Pl. Dep. at 105-09, 121, A-125-29, 138; Hill Dep. at 45, 50-51, A-26, 30-31). Plaintiff did not inform anyone that he had any restrictions on his ability to work, and he admits that no one requested that he perform work that he was physically incapable of performing. (Pl. Dep. at 110, 121, A-130, 138; Hill Dep. at 47, A-28).

### G. Plaintiff Disagreed With Mr. Hill's Changes.

Despite Plaintiff's recognition that the Bayhealth had problems that needed to be addressed, Plaintiff reacted poorly to the changes implemented by Mr. Hill. (Pl. Dep. at 44, 103, 104, A-93, 123-24). Although Mr. Hill's changes applied to all of the technicians, Plaintiff inexplicably believed that Mr. Hill made these changes to harass him. (Pl. Dep. at 140, A-150).

1.    **Plaintiff Complained About The Rotation System.**

When the new rotation schedule came out in February, 2005, Plaintiff complained

that Mr. Hill scheduled him as the last person to rotate to Milford Memorial.[6]  (Pl. Dep. at

108, A-128).  Mr. Hill explained to Plaintiff that whenever someone is out on leave, Mr.

Hill places them at the end of the next rotation.  (Pl. Dep. at 109, A-129).

Plaintiff was also upset because he believed that his February assignment required

him to take on demand calls for the hospital by himself.  (Pl. Dep. at 109-10, 134-35, A-

129-30, A-147-48).  He felt that Mr. Hill tried to make his job difficult by not assigning

someone to assist him.  (Pl. Dep. at 134-35, 182, A-147-48, 177).  However, Plaintiff never

asked for help.  (Pl. Dep. at 135-36, A-148-49).  Plaintiff had also informed ARAMARK

that he could come off of light duty as of February 1, and he never told anyone that he had

restrictions on his ability to work or that he had difficulty completing his tasks.  (Pl. Dep. at

109-10, A-129-30).  In fact, Plaintiff never complained about his physical work or that he

experienced leg pains as a result of his work.  (Pl. Dep. at 111, A-131).

2.    **Plaintiff Disagreed With The CE Technician Job Description.**

Plaintiff also disagreed with the CE Technician job description because he believed

that it did not accurately reflect the position.  (Pl. Dep. at 123-24, A-139-40).  Although it

is undisputed that Mr. Hill developed this job description at his prior job (well before he

even met Plaintiff), Plaintiff speculates that Mr. Hill developed it to target Plaintiff.  (Pl.

Dep. at 140, A-150; Hill Dep. at 38, A-38).  For example, Plaintiff speculates that Mr. Hill

created the third physical requirement (i.e., that technicians have the "ability to

communicate and be understood under normal circumstances") for Plaintiff's benefit

---

[6]    Milford Memorial is located six miles from Plaintiff's home, and Kent General is located twenty-one
miles from Plaintiff's home, a negligible increase in Plaintiff's commute.  (Pl. Dep. at 33, A-90.)

because Mr. Hill supposedly commented to someone after talking to Plaintiff in September, 2004 that "[Plaintiff] can't even communicate." (Pl. Dep. at 64, 130-31, A-101, 143-44; A-190-93.) It is undisputed, however, that this requirement does not specifically require verbal communication, but rather allows communication by e-mail, note or other means. (Hill Dep. at 43, A-24). Moreover, Mr. Hill never disciplined or took any adverse employment action against Plaintiff because of an inability to communicate. (Pl. Dep. at 131-33, A-144-46).

Plaintiff also disagreed with the physical requirements requiring the "sufficient use of hands, arms, legs and feet to accomplish the job" and the ability to "safely manage items weighing up to 50 pounds." (Pl. Dep. at 124, A-140; A-190-93). However, Mr. Hill made allowances for technicians, like Plaintiff, while they worked on transitional duty. (Hill Dep. at 44, A-25; see also Pl. Dep. 106, A-126). Importantly, Mr. Hill never criticized Plaintiff's ability to do his job because of Plaintiff's use of his arms, hands, legs or feet or because of Plaintiff's ability to manage items weighing up to 50 pounds. (Pl. Dep. at 133-34, A-146-47).

**H.    Plaintiff Disagreed With His Initial Denial of Time Off From Work.**

Plaintiff was also upset because Mr. Hill initially denied Plaintiff's request for two days off in April. (Pl. Dep. at 114, A-132). Plaintiff, however, had not specified that he needed time off for a doctor's appointment. (Pl. Dep. at 114-16, A-132-34; Cuthbertson Dep. at 23, A-188). Plaintiff later approached Mr. Cuthbertson, the District Manager, and explained that he needed time off for a doctor's appointment. (Pl. Dep. at 118-19, A-135-36; Cuthbertson Dep. at 22, A-187). Mr. Cuthbertson told Plaintiff that, as he understood it, a couple of employees requested the same time off and that it caused a scheduling conflict. (Pl. Dep. at 119, A-136; Cuthbertson Dep. at 22-23, A-187-88). However,

10

because Plaintiff informed Mr. Cuthbertson that he needed the time off for medical reasons, Mr. Hill and Mr. Cuthbertson revised the schedule so that Plaintiff could have time off for his appointment. (Id.).

**I.    Plaintiff's Disciplinary History and Termination of His Employment.**

    **1.    Plaintiff Was Disciplined On Multiple Occasions For Failure To Complete Proper Documentation.**

After Plaintiff returned to work in December, 2004, and after Mr. Hill had the opportunity to observe Plaintiff's work performance more fully, Mr. Hill quickly discovered Plaintiff's performance deficiencies. Consequently, Plaintiff was disciplined for several serious performance problems, including problems with regard to documentation. Whenever a technician completes paperwork for a particular device, such as an inspection form, purchase order or work order, the technician places it in a bin. (Hill Dep. at 70, A-41). Technicians must submit complete and accurate paperwork. (Id.). In a hospital setting, it is especially critical that technicians maintain accurate and complete records. (Hill Aff. ¶10). As detailed below, Plaintiff, however, submitted incomplete paperwork.

First, on March 4, 2004, Mr. Hill issued Plaintiff a written "coaching discussion" for not including certain information about an asset on the computer system. (Pl. Dep. at 141-42, A-151-52; Hill Dep. at 64-65, A-39-40; A-194). More specifically, Mr. Hill discovered that Plaintiff entered the incorrect serial number for a particular defibrillator on an initial incoming inspection and equipment edit form. (Pl. Dep. at 145, A-153; Hill Dep. at 65, 71-72, A-65, 42-43). Plaintiff also failed to fill in several of the information fields, including the installation date, suggested tier level, base month and recommended frequency of inspection. (Pl. Dep. at 142, 147, A-152, 155; Hill Dep. at 73, 141, A-44, 76;

A-196). Omitting important information, as Plaintiff did, can delay necessary inspection and tracking of the piece of equipment. (Hill Dep. at 72-73, A-43-44; A-194).

This corrective action also addressed Plaintiff's failure to complete documentation correctly even after receiving specific instructions about how to do so. (Hill Dep. at 142, A-77). The areas that Plaintiff failed to complete (i.e., the installation date, the suggested tier level, the base month and the recommended frequency) were the same categories of information that Mr. Hill specifically addressed with Plaintiff during Plaintiff's competency testing. (Pl. Dep. at 142, 147, A-152, 155; Hill Dep. at 73, 141, A-44, 76; A-196; A-210-217). Accordingly, Mr. Hill concluded that Plaintiff knew how to complete the forms properly, but that he just refused to do so. (Hill Dep. at 142-43, a-77-78). Rather than accepting responsibility for his mistakes, Plaintiff blames his performance deficiencies on his belief that he received insufficient training on the ISIS Pro computer inventory system. (Pl. Dep. at 145-46, A-153-54). However, Plaintiff never requested any additional training on that system. (Id.).

Less than two weeks later, on March 16, 2005, Mr. Hill verbally counseled Plaintiff for more documentation issues and other problems. (Pl. Dep. at 151, A-156; Hill Dep. at 78, A-45; A-200-01). As part of this counseling, Mr. Hill noted that Plaintiff assigned the wrong asset number on certain work orders and failed to fill in important information. (Hill Dep. at 80, A-46; A-200-01). Although written minutes from a November meeting, which Plaintiff claimed he reviewed, directed technicians to enter certain information on work orders, Plaintiff simply did not follow this directive. (Id.). Plaintiff again blamed his performance deficiencies on his alleged lack of training with the ISIS Pro system. (Pl. Dep. at 151, A-156). Again, however, Plaintiff never requested more training on the ISIS

system and he never indicated to anyone that he did not know how to use this system. (Pl. Dep. at 153-54, A-157-58).

### 2. Plaintiff Was Disciplined for Improper Installation of New Equipment.

On March 24, 2005, Mr. Hill counseled Plaintiff for failing to follow proper protocol for the installation of new equipment. (Hill Dep. at 81, 90, A-47, 52; A-202]). Plaintiff had been assigned to assist with installation of a new treadmill and stress test system,[7] which included setting it up the equipment in accordance with the manufacturer's instructions and ensuring that it functioned properly. (Hill Aff. ¶12). The operator's keyboard has an emergency stop-switch, but the treadmill manufacturer also offered an optional second stop-switch to be mounted on the bar in front of the treadmill for the patient's use. (Hill Aff. ¶14; Pl. Dep. at 164; A-163). The service manual specifically instructed that if this optional second stop-switch was installed, that it should be mounted only on the front of the machine. (Hill Aff. ¶12, A-203). The Nuclear Medicine supervisor and the EKG supervisor decided, however, that they did not want to install the optional stop-switch because of the increased risk of nuclear spills if patients were able to activate the stop-switch. (Hill Aff. ¶15) However, not only was this stop-switch installed, but, contrary to the manufacturer's recommended specifications, it was installed on the sidebar, creating an unsafe condition and the chance of a spill of nuclear material. (Pl. Dep. at 160-61, A-160-61; Hill Dep. at 87-88, A-50-51). After personally observing the location of the

---

[7] This treadmill is used to administer stress tests in which a patient walks on the treadmill while medical staff monitors the patient's heart rate, breathing, blood pressure and electrocardiogram to determine how well the patient's heart handles exercise. In the case of a thallium stress test, the patient has an intravenous (IV) line through which a small amount of a radioactive substance is injected into the bloodstream at the peak of exercise in order to obtain images showing how well blood flows to the heart muscle. (Hill Aff. ¶13).

stop-switch, Mr. Hill removed the switch and corrected the install.  (Pl. Dep. at 163, A-162; Hill Dep. at 90, A-52).

Plaintiff blamed this incident on the fact that he had two simultaneous installations. (Pl. Dep. at 155, A-159).  However, Mr. Hill testified that "[i]n the field of biomedical equipment repair, we have several items on our plate which we need to juggle" and that "all the technicians in the shop have several things that they need to accomplish." (Hill Dep. at 83, A-48).  During competency testing, Mr. Hill specifically addressed the need for technicians to utilize their resources and ask for assistance when they needed it, so Mr. Hill thought Plaintiff should asked for help with these installations if Plaintiff needed it.  (Hill Dep. at 83-84, A-48-49).  Plaintiff, however, never asked for help.  (Pl. Dep. at 163, A-162).

### 3.    Plaintiff Was Disciplined for Failing To Remove A Defective Piece of Equipment.

On April 5, 2005, in another incident in which Plaintiff showed an utter disregard for patient safety, Mr. Hill counseled Plaintiff for his failure to remove a defective defibrillator with pacing (life support) device from the hospital floor.  (Pl. Dep. at 164, A-163; Hill Dep. at 90-92, A-52-54; A-41).  Plaintiff had been inspecting defibrillators as part of preventative maintenance in the Intermediate Care Unit ("IMC") when he "found audio tones, AED instructions and alarm tones not working" on one of the defibrillators.  (Pl. Dep. at 164, A-163; A-204-05). According to the "lock out, tag out" procedures outlined in the Equipment Service Guidelines:

> Defective equipment that exhibits deficiencies that preclude safe or effective use shall be identified as such and removed from service.  If for any reason the equipment cannot be removed from service: A. Affix a placard to the unit to warn potential users that the equipment is defective and must be used with caution. . . . B. Take the necessary steps to ensure

that the equipment is safe as possible until such time that it
can be removed from service and repaired or replaced.

(Hill Dep. at 93-94, A-55-56; A-207). Plaintiff, however, did not make any effort to fix the

defibrillator and he also did not remove the device or tag it as defective. (Pl. Dep. at 165,

A-164; Hill Dep. at 92, 139, A-54, 74). Instead, Plaintiff allowed the unit to sit active on

the hospital floor (where it could be unwittingly used by hospital staff for patient care)

while he spent at least thirty minutes searching other areas of the hospital for a replacement

defibrillator. (Pl. Dep. at 165, 166, A-164, 166; Hill Dep. at 92, 139, A-54, 74). This

created a serious safety issue for the facility, patients and staff because there was no

indication on the equipment that the unit was defective. (Hill Dep. at 97, A-59). If used, it

would not have provided any audio tone to alert the medical staff to a cardiac condition nor

would it have provided necessary voice prompts for its automatic defibrillator. (Hill Aff.

¶17).

After unsuccessfully searching for a new device, Plaintiff had to leave for the day,

and inexplicably failed to correct the problem. Rather, he informed John Ritterhoff,

another CE Technician, and Mr. Hill that the IMC had a defective defibrillator but that the

Charge Nurse would not allow Plaintiff to remove it from the floor. (Pl. Dep. at 166, A-

165; Hill Dep. at 95-96, 98, A-57-58, 60). Mr. Hill immediately went to inspect the

defibrillator and, in addition to the problems reported by Plaintiff, Mr. Hill discovered a

large gap in the back of the device, which created an electrical shock hazard. (Pl. Dep. at

166, A-165; Hill Dep. at 96-97, A-58-59). Mr. Hill immediately notified the Charge Nurse

that he had to remove the unit in order to repair it. (Hill Dep. at 95, A-57). The nurses still

had use of the IMC's other two defibrillators, and also could have used the nearby units

from the Intensive Care Unit, if they needed emergency defibrillation assistance. (Id.). Mr. Hill immediately repaired and returned the unit to the IMC within one hour. (Id.).

Although Mr. Hill ultimately resolved the situation, Plaintiff showed very poor judgment in the way he handled the situation. (Hill Dep. at 96, A-58). Plaintiff had received training in repairing defibrillators and passed his competency test in January regarding the "lock out, tag out" procedure, but he made no attempt to either repair the unit or tag the defibrillator as defective. (Hill Aff. ¶18). Mr. Hill testified that "Bayhealth has policies with regard to safety issues and he has responsibilities under those policies. He should have pull[ed] the defib from the floor, yes. But if he wasn't pulling it from the floor, he should have tagged it." (Hill Dep. at 93, A-55; see also A-207). Therefore, by not removing the defibrillator or indicating that it was not functioning, Plaintiff violated the Standards of Performance and Bayhealth's safety policies. (Hill Aff. ¶19). The length of time that Plaintiff allowed the unit to sit on the floor added to the gravity of the situation. (Hill Dep. at 139-40, A-74-75).

### 4.    Plaintiff's Employment Was Terminated.

Mr. Hill discussed with Mr. Cuthbertson and Tom Lodge, the Human Resources Director, the two safety incidents (i.e., the installation of the treadmill stop-switch and defective defibrillator) and two subsequent discrepancies that Mr. Hill discovered regarding work Plaintiff performed on defibrillator preventative maintenance work orders. (Hill Dep. at 105-06, 111, A-62-63, 66). Mr. Hill expressed his concern that, based on these safety violations and discrepancies, Plaintiff did not perform his job safely enough to work for ARAMARK any longer. (Hill Dep. at 106, A-63). At the end of the conversation, all agreed that it was necessary to terminate Plaintiff's employment. (Id.). Mr. Lodge then drafted a severance letter. (Hill Dep. at 106, 109, A-63, 64). On April 15, 2005, Mr. Hill

informed Plaintiff that ARAMARK decided to terminate Plaintiff's employment, and

presented him with the severance letter. (Pl. Dep. at 55, 168, A-96, 166; Hill Dep. at 104-

05, A-61-62; A-208-09). Plaintiff, however, refused to sign the severance letter. (Hill Dep.

at 110, A-65). Plaintiff claims that as he was leaving, Mr. Hill said that, in his opinion,

Plaintiff had the capabilities of a technician with only five years of experience, rather than

twenty-five years of experience. (Pl. Dep. at 169-70, 200, A-167-68, 181).

## IV.    ARGUMENT

### A.    Standard Of Review

Federal Rule of Civil Procedure 56 mandates the entry of judgment against a party

who fails to offer admissible evidence sufficient to establish every element essential to that

party's case and on which that party bears the burden of proof. Celotex Corp. v. Catrett,

477 U.S. 317, 322, 327 (1986) (noting that summary judgment "is properly regarded not as

a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a

whole, which are designed 'to secure the just, speedy and inexpensive determination of

every action.'"). Although the defendant bears the initial responsibility of asserting the

basis for its motion, the defendant is not required to negate the plaintiff's claims. Rather,

the defendant must only point out that there is an absence of evidence to support the

plaintiff's case or, alternatively, offer affirmative evidence that demonstrates that the

plaintiff cannot prove his case. Naghiu v. Inter-Continental Hotels Group, Inc., 165 F.R.D.

413, 418 (D. Del. 1996).

After the defendant demonstrates a lack of evidence to support the non-moving

party's claims, the plaintiff must present competent evidence designating "specific facts

showing that there is a genuine issue for trial." Celotex , 477 U.S. at 324 (citation omitted).

Although the court must view all evidence in a light favorable to the plaintiff, the mere

existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477

U.S. 242, 247-48 (1986). Rather, a dispute must exist over a <u>material</u> fact. <u>Id.</u> To survive

a motion for summary judgment, therefore, the plaintiff must come forward with specific,

admissible and credible evidence supporting each element essential to his case; mere

conclusory allegations or denials are not enough. <u>Schoch v. First Fid. Bancorporation</u>, 912

F.2d 654, 657 (3d Cir. 1990). Speculation, without proof, is insufficient. <u>Bruton v.</u>

<u>Diamond State Tel. Co.</u>, 623 F. Supp. 939, 943 (D. Del. 1985). Applying this standard,

Plaintiff's claims fail as a matter of law.

**B.    Defendants Are Entitled To Summary Judgment On Plaintiff's Age**
**and Handicap Discrimination Claims.**

**1.    <u>The McDonnell-Douglas Procedural Framework</u>**

It is well-established that the plaintiff bears the ultimate burden of proving

intentional discrimination by a preponderance of the evidence.[8] See <u>Texas Dep't. of Cmty.</u>

<u>Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). A plaintiff must prove that the alleged

impermissible consideration was a determinative factor in the adverse employment action

about which the plaintiff complains. See <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610

(1993) ("Whatever the employer's decisionmaking process, a disparate treatment claim

cannot succeed unless the employee's protected trait actually played a role in that process

and had a determinative influence on the outcome.").

---

[8]    This analysis also applies to claims under the Delaware Discrimination in Employment Act ("DDEA"). <u>Nichols v. Bennett Detective & Protective Agency, Inc.</u>, No. CIV.A.05-55, 2006 WL 1530223, at *4 (D. Del. May 31, 2006) (ruling that claims brought under the DDEA must be evaluated according to the McDonnell Douglas burden shifting analysis). This court should also apply the <u>McDonnell Douglas</u> burden-shifting analysis to Plaintiff's claims brought under the DHPEPA. See <u>Burris v. Richards Paving, Inc.</u> 461 F. Supp. 2d 244, 248 (D. Del. 2006) (applying <u>McDonnell Douglas</u> burden shifting analysis to ADA claims of disability discrimination); <u>Testerman v. Chrysler Corp.</u>, No. CIV.A.95-240-MMS, 1997 WL 820934, at *11 (D. Del. Dec. 30, 1997) (holding that plaintiff's claim under the DHPEPA is governed by the same legal standards as ADA claims).

Where, as here, there is no direct evidence of discrimination, the burden of proof is governed by the framework erected by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and clarified in St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). Under that framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination by a preponderance of the evidence by demonstrating the following: (1) he is a member of a protected class; (2) he was qualified for the position at issue; (3) he suffered an adverse employment action; and (4) there is adequate evidence to create an inference of unlawful discrimination. See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996); Pivorotto v. Innovative Sys., Inc., 191 F.3d 344, 356 (3d Cir. 1999). The fourth prong may be satisfied by showing that the employer treated the plaintiff less favorably than similarly-situated employees outside the protected class. See, e.g., Watkins v. Children's Hosp. of Phila., No. CIV.A.97-1510, 1997 WL 793518 (E.D. Pa. Dec. 3, 1997) (granting summary judgment in race discrimination case where nurses outside the protected class not similarly situated to plaintiff since they only violated rules once and plaintiff violated rules twice).

If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the employer, who must merely articulate a legitimate, non-discriminatory reason for its employment decision. See Burdine, 450 U.S. at 254. Once the employer has articulated a legitimate business reason for the decision, any presumption of discrimination drops from the case, and the plaintiff then must satisfy the ultimate burden of proving discrimination. See id. at 256.

The ultimate burden of persuasion remains at all times with the plaintiff, who must prove by a preponderance of the evidence that the business reason proffered by the defendant is pretextual and that the defendant intentionally discriminated against the

19

plaintiff. See Hicks, 509 U.S. at 515-16; Burdine, 450 U.S. at 252-53. The plaintiff must

establish not only that the articulated reason was "fabricated," but that discrimination was

"the real reason" for the adverse employment decision. See Hicks, 509 U.S. at 515-16;

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Therefore, once a defendant has

articulated a legitimate, non-discriminatory reason for the adverse employment decision, a

plaintiff may defeat summary judgment only by pointing to evidence "from which a fact

finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons;

or (2) believe that an invidious discriminatory reason was more likely than not a motivating

or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. The plaintiff

cannot simply show that the employer's decision was wrong or mistaken. Instead, the

plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its

actions that a reasonable fact finder could rationally find them unworthy of credence." Id.

at 765.

Applying this standard, the Third Circuit has repeatedly recognized the

appropriateness of granting a defendant's summary judgment motion in employment

discrimination litigation where the plaintiff cannot demonstrate that he can carry his burden

of proof at trial. See, e.g., Simpson v. Kay Jewelers, 142 F.3d 639 (3d Cir. 1998) (age

discrimination claims properly dismissed on summary judgment where plaintiff failed to

adduce evidence sufficient to show pretext despite plaintiff's disagreement with employer's

reason for discharging her); Krouse v. Am. Sterilizer Co., 126 F.3d 494 (3d Cir. 1997)

(affirming summary judgment on claims of age and disability discrimination where

plaintiff did not offer sufficient evidence from which a trier of fact could conclude that

employer's articulated reasons for its treatment of plaintiff were a mere pretext for unlawful discrimination).

Here, the undisputed material facts conclusively establish that Plaintiff cannot meet his burden of proving that his age or alleged status as a handicapped person motivated any of Defendants' decisions. Because Plaintiff has no direct evidence of discrimination, and because he cannot show that Defendants' reasons for the decisions that affected his employment were pretextual, Plaintiff cannot survive summary judgment on these claims.

### 2. Plaintiff Cannot Establish A <u>Prima Facie</u> Case Of <u>Discrimination Under the DHPEPA.</u>

Plaintiff alleges that Defendants intentionally discriminated against him based on his alleged status as a handicapped person in violation of the Delaware Handicapped Persons Employment Protections Act ("DHPEPA"). 19 Del. C. § 724. Because the DHPEPA's definition of a "handicapped person" mirrors the definition of a "disabled person" under the Americans with Disabilities Act ("ADA"), Plaintiff's discrimination claim under the DHPEPA is governed by the same legal standards. <u>See</u> <u>Testerman</u>, 1997 WL 820934, at *11. As a threshold matter, the undisputed factual evidence clearly demonstrates that Plaintiff is not handicapped under the DHPEPA.

To prove a <u>prima facie</u> case of discrimination based on his alleged status as a handicapped person, Plaintiff must first establish that he was a "handicapped person." To do this, Plaintiff must show that he: "(a) has a physical or mental impairment which substantially limits one or more major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment." 19 Del. C. § 722. In <u>Toyota Motor Mfg. v. Williams</u>, the Supreme Court held that in order to be substantially limited in a major life activity, an individual must have an impairment that "prevents or

severely restricts the individual from doing activities that are of central importance to most people's daily lives." 534 U.S. 184, 198 (2002). Furthermore, the impairment must have a "permanent or long-term impact." Id. at 196.

Plaintiff's testimony conclusively establishes that, as a matter of law, his physical impairments, namely his speech impediment and difficulty walking, have not substantially limited in him in any of his major life activities. These impairments were not permanent injuries, but rather Plaintiff only suffered from a "temporary speech impediment" and only used a cane for "a very short period, a day or two." (Compl. ¶ 23; Pl. Dep. at 69, A-104). Accordingly, these impairment do not constitute substantially limiting conditions. See Washington v. State of Delaware, No. CIV.A.01-217, 2003 WL 21697403, at *2 (D. Del. July 17, 2003) (granting defendants' summary judgment motion on plaintiff's disability discrimination claim because plaintiff admitted that her injury is temporary and "[t]emporary impairments or conditions are not covered by the ADA because, by definition, they do not substantially limit a major life activity."). Furthermore, by the end of December, 2004, the record clearly establishes that Plaintiff's physical condition did not prevent or severely restrict him from engaging in any activity of central importance to daily life, such as driving, working, walking, talking, cleaning and grocery shopping. (Pl. Dep. at 55, 67, 69, 71, 75-77, 93, 105-06, A-96, 103-104, 106, 108-10, 120, 125-26).

To the extent Plaintiff claims that he had lingering impairments after he returned to work, Plaintiff has not presented any evidence that these conditions substantially limited any major life activity. First, the surgery on Plaintiff's leg did not substantially limit his ability to walk so as to render him handicapped within the meaning of the DHPEPA. At most, Plaintiff had a limited ability to walk long distances, stand for extended periods of time without resting, and climb stairs without holding the railing. (Pl. Dep. at 69-71, A-

104-106). However, this does not constitute a substantial limitation of a major life activity. See Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 186-87 (3d Cir. 1999) (plaintiff's need to rest during a fifty minute stretch of walking or standing did not constitute a disability); Kelly v. Drexel Univ., 94 F.3d 102, 106, 108 (3d Cir. 1996) (holding that employee, who suffered a hip injury causing him to limp, was not substantially limited in major life activity of walking where it merely prevented him from walking more than a mile and required him to slowly climb stairs while holding a handrail, but did not require him to use a cane or crutches). Accordingly, this court should find that the surgery on Plaintiff's leg did not substantially impair any major life activity.

Second, Plaintiff's temporary speech impediment did not substantially limit him in the major life activity of speaking, so as to render him handicapped within the meaning of the DHPEPA. Although Plaintiff may have experienced difficulty pronouncing certain words and increased salivation, there is no evidence that he could not effectively communicate with others. (Pl. Dep. at 93, 130-31, A-120, 143-44). Accordingly, this court should find that Plaintiff's speech impediment has not substantially impaired any major life activity. See Burris v. Richards Paving, Inc., 461 F. Supp. 2d 244, 249-50 (D. Del. 2006) (holding that plaintiff's loss of his larynx, which caused a diminution in the volume of his voice and a difficulty pronouncing certain words, neither rendered him unable to speak nor significantly restricted his speech as compared to an average person, and, therefore, did not substantially limit his ability to engage in the major life activity of speaking).

The record clearly establishes that Plaintiff's physical impairments do not substantially limit any of his major life activities, and, therefore, do not rise to the level of handicap, as defined by the DHPEPA. Accordingly, his DHPEPA claims must fail.

### 3.   Plaintiff Cannot Establish A Prima Facie Case Of Age Discrimination.

Section 711 of the Delaware Code prohibits employment discrimination on the basis of age. Del. Code. Ann. tit. 19, § 711 (2006). In order to establish a prima facie case of age discrimination in violation of the state statute, the plaintiff must prove: (1) that he was within the protected age group; (2) that he was qualified for position in question; (3) that he was discharged or otherwise suffered an adverse employment action; and (4) in the case of a demotion or discharge, that he was replaced by a younger person or by a person outside the protected age group. See Del. Code Ann. tit. 19, § 711 (2006); Simpson v. Kay Jewelers, 142 F.3d 639, 644 n.5 (3d Cir. 1998); Riner v. Nat'l Cash Register, 434 A.2d 375, 376-77 (Del. 1981). In this regard, the plaintiff must prove that age was a determinative factor in the adverse employment action about which he complains. Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993) ("Whatever the employer's decision making process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.").

Here, Plaintiff cannot establish a prima facie case of age discrimination because Plaintiff has failed to show that he was treated less favorably than any similarly situated younger individuals. To the extent Plaintiff relies on the departmental changes made by Mr. Hill to support his age discrimination claim, this claim must fail because these changes applied to all CE Technicians. See Clayton v. Pa. Dep't of Public Welfare, No. 4:CV 05-0768, 2007 WL 575677, at *9 (M.D. Pa. Feb. 20, 2007) (granting summary judgment in defendants' favor on physician's claim that his work schedule changes were either discriminatory or retaliatory where "[t]he new schedule applied to all medical and

24

psychiatric doctors at the hospital and also applied to all social workers and management employees including personnel staff.").

Moreover, Plaintiff cannot show that he was treated less favorably than younger employees with regards to his discipline.[9] "To show that employees are similarly situated, the plaintiff has the burden to show that they were subject to the same standards and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Messina v. E.I. Du Pont de Nemours & Co., 308 F. Supp. 2d 491, 497 (D. Del. 2004) (internal quotation omitted). None of the other technicians are similarly situated to Plaintiff because there is no evidence that they engaged in the same conduct. In particular, there is no evidence that any other technician submitted incomplete paperwork after completing training and competency testing on proper documentation or that any other technician violated similar safety standards. See Messina, 308 F. Supp. 2d 491, 497 (D. Del. 2004) (comparator was not similarly situated where comparator's alleged conduct occurred before safety rule was adopted while plaintiff's conduct occurred after rule was adopted and training regarding the rule had occurred, and where comparator, unlike plaintiff, did not expose himself or other employees to a hazardous situation); Bullock v. Children's Hosp. of Phila., 71 F. Supp. 2d 482, 489 (E.D. Pa. 1999) (comparators were not similarly situated where there was no allegation they had same performance deficiencies for which plaintiff's employment was terminated). As the other technicians are not similarly situated to Plaintiff, he cannot establish the fourth prong of his prima facie case and his age discrimination claims, therefore, fail as a matter of law.

---

[9]    Plaintiff does not believe that he was terminated because of his age. (Pl. Dep. at 174, A-171).

4. **Plaintiff Cannot Prove That Defendants' Legitimate, Non-Discriminatory Reasons For His Discipline And Employment Termination Constitute A Pretext For Discrimination.**

a. **Mr. Hill had legitimate non-discriminatory reasons for making changes at the Bayhealth facilities.**

Plaintiff contends that a number of decisions made by Mr. Hill, decisions that undisputedly applied to all technicians, were somehow directed at Plaintiff because of his alleged disability and age. Even if Plaintiff could establish a prima facie case of age or disability discrimination, Defendants clearly met their obligation of proffering a legitimate, nondiscriminatory reason for implementing changes at the Bayhealth account. Before Mr. Hill arrived at the Bayhealth account, it was experiencing difficulty that put ARAMARK at risk of losing the account. (Pl. Dep. at 44, 103, 104, A-25, 123-24; Hill Dep. at 31-32, 34-35, A-14-15, 17-18). Mr. Hill was hired, and Bayhealth extended the ARAMARK contract for one year, with the express directive that the performance of the account would be turned around. (Hill Dep. at 11, 13, 31-32, A-2, 4, 14-15). Understandably, Mr. Hill had to make changes in order to correct these problems, including implementing a rotation system, competency testing, a job description with standards of performance and a new inventory system. See Section III.F. Plaintiff cannot sustain his naked allegation that these changes were made to target him because these changes applied to all CE Technicians.

b. **Defendants had legitimate, non-discriminatory reasons for disciplining Plaintiff and terminating his employment.**

Defendants legitimately disciplined and ultimately terminated Plaintiff for failing to submit accurate documentation and engaging in unsafe practices. As a CE Technician, Plaintiff worked in a field in which safety is of paramount importance. Poor work performance and failure to follow established procedures can lead to serious consequences

26

that jeopardize the safety of both patients and staff, and that can affect the hospital's accreditation. Here, it is undisputed that Plaintiff repeatedly failed to submit accurate documentation for various pieces of medical equipment even after receiving training on how to properly complete these forms. (See, e.g., Pl. Dep. at 142, A-152; Hill Dep. at 73, 141-42, A-44, 76-77; Ex. [Miller 6] at A00037). Because accreditation organizations like JCAHO review equipment records to determine whether the Biomedical Department conducted routine preventive maintenance and safety inspections, failing to keep accurate records can jeopardize the hospital's accreditation. (Hill Aff. ¶10). It is also undisputed that Plaintiff failed to correct an improperly installed emergency stop-switch and left a defective life support device on the hospital floor without tagging it as defective, both of which created serious safety hazards. (Pl. Dep. at 160-61, 165, A-160-61, 164; Hill Dep. at 87-88, 92, 96-97, 139, A-50-51, 54, 58-59, 74). Plaintiff also cannot dispute the defects in the other PMs for defibrillators that Mr. Hill discovered. (Hill Dep. at 106, A-63). Defendants had genuine concerns about whether Plaintiff performed his job safely enough to continue working for ARAMARK. (Hill Dep. at 106, A-63). For these reasons, Defendants legitimately disciplined Plaintiff and ultimately terminated his employment.

**5.    Plaintiff Cannot Show That Defendants' Legitimate, Non-Discriminatory Reasons Are Pretext For Intentional Discrimination.**

Plaintiff's disparate treatment claim must fail because he cannot point to any evidence to rebut Defendants' legitimate non-discriminatory reasons for the alleged adverse actions. There is simply no evidence from which a factfinder could determine Defendants' stated reasons for their actions are false and that the real reason for their decisions was alleged age or handicap discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413 (3d Cir. 1999) (affirming granting of summary judgment of employer).

27

To establish pretext and avoid summary judgment, Plaintiff must point to evidence that would allow a fact finder to reasonably infer that Defendants' reasons were either a post-hoc fabrication or otherwise did not actually motivate the employment action. See Fuentes, 32 F.3d at 764. Plaintiff's disagreement with Mr. Hill's departmental changes, his discipline and employment termination cannot establish that Defendants' legitimate, non-discriminatory reasons were pretextual. Id. at 765; see also Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991) (plaintiff's "view of his performance is not at issue; what matters is the perception of the decision maker.") (emphasis added). Plaintiff "must show, not merely that [Defendants'] proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1998) (emphasis added).

Applying this standard, Plaintiff cannot establish pretext. Given the hospital's safety sensitive environment, he simply has no basis for attacking Defendants' non-discriminatory business justifications for their actions. Without any such evidence, Plaintiff will understandably cite to an alleged statement made by Mr. Hill in an attempt to support a finding of pretext, wherein Mr. Hill supposedly commented in September, 2004 that "[Plaintiff] can't even communicate." (Pl. Dep. at 64, 130-31, A-101, 143-44; Ex. [Miller 5]). Plaintiff also testified that Ms. Money, a secretary, said that Plaintiff was "slow" and "pitiful at doing the job", and that Plaintiff appeared to be drinking on the job from the way Plaintiff walked. (Pl. Dep. at 174, 185-86, 200-01, A-171, 179-180, 181-82). Comments unrelated to alleged adverse employment actions or made by non-decisionmakers should be considered stray remarks and are not evidence of discrimination. Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are

rarely given great weight, particularly if they were made temporally remote from the date of decision."). Thus, these comments cannot establish pretext. Mr. Hill's comment (albeit denied) does not evidence any discrimination, as Plaintiff was not disciplined or terminated for any alleged inability to communicate. Moreover, this comment cannot be linked to any adverse employment actions because Mr. Hill allegedly it made it more than five months before Plaintiff's first coaching discussion and subsequent employment termination. Similarly, the alleged comments made by Ms. Money, who undisputedly did not have any decision-making authority over Plaintiff, do not establish pretext. Accordingly, Plaintiff cannot establish that the proffered reasons for the decisions at issue were pretextual and the Court should grant summary judgment to Defendants on Plaintiff's disparate treatment claims.

**C.    Defendants Are Entitled To Summary Judgment With Respect To Plaintiff's Hostile Work Environment Claims.**

Plaintiff claims that he was subjected to a hostile work environment due to his age and his alleged status as a handicapped person. The only allegations upon which Plaintiff appears to rely in attempting to assert a claim for hostile work environment harassment are:

- Plaintiff saw Ms. Money, a secretary, whisper in the ear of one of his co-workers when she looked at Plaintiff. (Pl. Dep. at 178-79, A-174-75).

- Steve McVicker, another co-worker, told Plaintiff that he overheard Ms. Money comment on how slow Plaintiff was and how pitiful Plaintiff was at doing his job. (Pl. Dep. at 174-75, 201, A-171-72, 182).

- Greg Wilson, another co-worker, told Plaintiff that Ms. Money said that Plaintiff seemed like he was drunk based on the way that Plaintiff walked. (Pl. Dep. at 174-75, 185-86, A-171-72, 179-80).

- Upon termination, Mr. Hill said that, in his opinion, Plaintiff had the capabilities of a technician with only five years of experience, not twenty-five years of experience. (Pl. Dep. at 169-70, 200, A-167-68, 181).

- In February, 2005, Mr. Hill assigned Plaintiff to handle demand calls for Kent General without an assistant. (Pl. Dep. at 109-10, 134-35, 182, A-129-30, 147-48, 177).

29

Whether viewed independently or collectively, these incidents do not establish intentional age or handicap discrimination or rise to the level of a hostile work environment.[10]

### 1.    Standard For Proving A Hostile Work Environment

To establish a prima facie case of hostile work environment, a plaintiff must show: (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same protected class in that position; and (5) the existence of respondeat superior liability.[11] Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999), cert. denied, 528 U.S. 964 (1999). It is not enough for a plaintiff to show that he, subjectively, believed his work environment to be hostile; rather, he must show that a reasonable person would have found it so. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). A plaintiff also cannot simply show that his work environment was hostile in general; rather, he must show that his work environment was hostile because of his age or disability. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81

---

[10]    As a threshold matter, Plaintiff learned about Ms. Money's comments secondhand. (Pl. Dep. at 174-75, 185-86, 201, A-171-72, 179-80, 182). These alleged remarks constitute inadmissible hearsay because they are statements made outside of these proceedings, which Plaintiff is offering for their truth. See Fed. R. Evid. 802 (barring the admission of out-of-court statements offered to prove the truth asserted therein). At the summary judgment stage, a court may not consider hearsay that would be inadmissible at trial. See Sheldon v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 226 n.7 (3d Cir. 2000) (co-worker's statement could not be considered on summary judgment motion because it was of "doubtful admissibility"); Rosario v. Ken-Crest Servs., No. 04-CV-4737, 2005 WL 1377843, at *3 (E.D. Pa. June 6, 2005) (granting summary judgment for employer on plaintiff's discrimination claim, holding that "hearsay evidence cannot be considered to defeat a summary judgment motion"), order aff'd by 2006 WL 1525297 (3d Cir. June 5, 2006). Thus, the only statement which can even possibly support Plaintiff's claim from a pure evidentiary standpoint is Mr. Hill's alleged statement after Plaintiff's employment termination.

[11]    It is proper to look to Title VII standards when discerning the success of a disability discrimination claim based on hostile work environment. Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661, 666-67 (3d Cir. 1999). Furthermore, this analysis is also applicable to claims of age discrimination. Sosky v. Int'l Mill Serv., Inc., No. 94-2833, 1996 WL 32139, at *9 (E.D. Pa. Jan. 25, 1996), aff'd, 103 F.3d 114 (3d Cir. 1996).

(1998).  Against these standards, no rational trier of fact could conclude that Mr. Hill or

Plaintiff's co-workers subjected Plaintiff to an actionable hostile work environment.

> **2.    There Is No Evidence That Mr. Hill Harassed Plaintiff Because of His Age or Alleged Status As A Handicapped Person.**

Plaintiff's hostile work environment must fail because there is absolutely no

evidence that anyone harassed Plaintiff "because of" his age or alleged status as a

handicapped person.  Oncale, 523 U.S. at 81.  First, the comments allegedly criticizing

Plaintiff's work performance do not contain any reference to either his age or alleged

handicaps.  Second, Plaintiff similarly cannot demonstrate that Mr. Hill assigned Plaintiff's

February work because of Plaintiff's age or alleged handicaps.  Third, Plaintiff has no

evidence that Ms. Money was talking about him when she allegedly whispered to one of

their co-workers and looked at Plaintiff, nor does Plaintiff know the substance of Ms.

Money's statement, if any.  (Pl. Dep. at 179, A-175).  Therefore, Plaintiff can offer nothing

more than his subjective belief and conclusory allegations to support his hostile work

environment claim, which is insufficient to defeat summary judgment.  See Schoch v. First

Fidelity Bancorp., 912 F.2d 654, 657 (3d Cir. 1990) (affirming summary judgment where

plaintiff did not present specific, admissible evidence to support each element of her case;

conclusory allegations were not enough).

> **3.    Plaintiff Also Cannot Establish Severe And Pervasive Harassment To Support His Hostile Work Environment Claim.**

Even if Plaintiff could demonstrate that the alleged comments and February work

assignment occurred "because of" his age or alleged status as a handicapped person (which

he cannot), Plaintiff cannot establish the second prong of his hostile work environment

claim– i.e., that the conduct was sufficiently "pervasive and regular" to rise to the level of

an actionable hostile work environment. <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469,
1482 (3d Cir. 1990); <u>see also</u> <u>Oncale</u>, 523 U.S. at 78 (referring to standard as "severe or
pervasive").

 The Supreme Court has made clear that the standard for judging hostility in the
workplace is "demanding," in order to "ensure that Title VII does not become a general
civility code." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (quoting <u>Oncale</u>,
523 U.S. at 80). It is only "[w]hen the workplace is permeated with discriminatory
intimidation, ridicule, and insult that is sufficiently severe or pervasive as to alter the
conditions of the victim's employment and create an abusive working environment" that
liability for an employer can attach. <u>Oncale</u>, 523 U.S. at 78 (quoting <u>Harris</u>, 510 U.S. at
21). Simple teasing, offhand comments, and isolated incidents (unless extremely serious)
will not amount to discriminatory changes in the terms and conditions of employment.
<u>Faragher</u>, 524 U.S. at 788.

 It is clear that none of the alleged incidents are pervasive and regular enough to
create an objectively hostile or offensive working environment. First, the alleged incidents
were not frequent; Plaintiff's allegations amount to three comments made by a co-worker
to someone else, one incident in which a co-worker looked at Plaintiff while talking to
someone else, one comment made <u>after</u> Plaintiff's termination as Plaintiff was leaving, and
one incident in which Mr. Hill assigned Plaintiff to take all demand calls. Second, the
alleged incidents were not severe as evidenced by the fact that Plaintiff <u>never</u> found it
necessary to complain to management about <u>any</u> of these incidents. Even considered
together, Plaintiff's allegations fall far short – objectively – of a workplace so "permeated
with discriminatory intimidation, ridicule and insult" that it altered the conditions of
Plaintiff's employment and created an "abusive working environment." <u>Harris</u>, 510 U.S. at

21; see e.g., Miller v. Aluminum Co. of America, 679 F. Supp. 495, 502 (W.D. Pa. 1988),

aff'd, 856 F. 2d 184 (3d Cir. 1988) ("Snubs and unjust criticisms of one's work are not

poisonous enough to create an actionable hostile work environment.").

    Accordingly, Plaintiff cannot carry his burden of coming forward with specific

facts upon which a reasonable jury could find that the terms and conditions of his

employment were altered and that Plaintiff suffered a hostile and abusive working

environment. The Court should, therefore, grant summary judgment in Defendants' favor

on Plaintiff's hostile work environment claims.

### 4. There Is No Evidence That Plaintiff Was Detrimentally Affected By The Alleged Conduct, Or That A Reasonable Person Would Be Detrimentally Affected By Such Conduct.

    Nor can Plaintiff establish the third or fourth prongs of his hostile work

environment claim. Andrews, 895 F.2d at 1482. There is no evidence that Plaintiff was

detrimentally affected by the alleged harassment. Further, Plaintiff simply cannot establish

that a reasonable person in his shoes plainly would not have been detrimentally affected by

the alleged comments and incidents. E.g., Cooper v. Binney & Smith, Inc., No. 96-6230,

1998 U.S. Dist. LEXIS 2391, at *3-4 (E.D. Pa. Feb. 26, 1998) (granting summary

judgment to employer on hostile work environment claim, where plaintiff was told of

supervisor's racial slurs but never heard them himself and plaintiff provided no evidence to

support his suspicion that white co-workers who made mistakes were treated differently

than black employees); Waite v. Blair, Inc., 937 F. Supp. 460, 469 (W.D. Pa. 1995)

(granting summary judgment on hostile work environment claim where plaintiff's "over-

sensitivity to the rough and tumble of the workplace" was unreasonable).

As established above, Plaintiff simply cannot satisfy the necessary elements of his hostile work environment claim. Accordingly, the Court should grant Defendants summary judgment with respect to that claim.

> **D.    Plaintiff's Claim For Breach Of Good Faith And Fair Dealing Is Not Viable Under Delaware Law.**

Plaintiff purports to bring a claim for "breach of the covenant of good faith and fair dealing" under Delaware law. However, the Court should grant summary judgment on this claim because the "Delaware Discrimination in Employment Act ["the Act"] . . . precludes" such a claim. Moon v. Delaware River & Bay Auth., No. CIV.A.05-261-JJF, 2006 WL 462551, at *4 (D. Del. Feb. 24, 2006). Indeed, the Delaware Legislature has expressly "confirm[ed]" and "reestablish[ed]" that the Act is the "exclusive and sole remedy for employment discrimination claims." S.B. 154, 142nd Gen. Assemb. (Del. 2004); see also E.E.O.C. v. Avecia, Inc., 151 F. App'x 162, 165 (3d Cir. 2005) (stating that "it is clear that the 2004 Amendment is meant to be retroactive"); Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ., 437 F. Supp. 2d 235, 247 (D. Del. 2006) (holding that the employee cannot assert a claim for breach of covenant of good faith and fair dealing "where the Delaware state statute provides the exclusive remedy" for employment discrimination claims). Thus, Plaintiff's good faith and fair dealing claim fails as a matter of law and this Court should enter summary judgment in Defendants' favor on Count II of Plaintiff's Complaint.

> **E.    Plaintiff's FMLA Claim Fails As A Matter of Law.**

The FMLA provides that eligible employees may take up to twelve workweeks of unpaid family and medical leave during any 12-month period for, inter alia, caring for the employee's own "serious health condition." See 29 U.S.C. § 2612(a). The FMLA also

contains a "non-retaliation" provision, prohibiting an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided," and prohibits "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful." Id. § 2615(a)(1),(2). Thus, an employer may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c). FMLA regulations, however, expressly reserve the right to discipline an employee and make employment decisions as if the employee had never taken leave: "An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a).

1.    **Plaintiff Has No Claim For Substantive Rights Under The FMLA Because He Received More FMLA Leave Than That To Which He Was Entitled.**

Plaintiff cannot claim that he was denied any substantive rights under the FMLA. Plaintiff began his FMLA leave on August 6, 2004, concurrent with his short-term disability leave. (Pl. Dep. at 55-56, 80, A-96-97, 111; Hill Dep. at 17, A-7). The statutory FMLA leave to which Plaintiff was entitled ended on October 28, 2004, i.e., 12 weeks after his leave began. See 29 U.S.C. § 2612(a)(1) ("an eligible employee shall be entitled to a total of 12 work-weeks of leave"). Plaintiff, however, did not return to work until December 10, 2004, approximately 18 weeks after his leave commenced. (Pl. Dep. at 55-56, A-96-97). Because Plaintiff received the full 12 weeks of leave, and six additional gratuitous weeks of leave, he cannot sustain any claim for denial of substantive FMLA rights.[12]

---

[12] Furthermore, to the extent that Plaintiff relies on the initial denial of time off to attend a doctor's appointment in April, 2005, after his return to work, his claim must fail because it is undisputed that

35

2.    **Plaintiff's Retaliation Claim Fails Because There Is No Evidence Of A Causal Link Between Plaintiff's FMLA Leave And Any Adverse Employment Action And, Further, Plaintiff Cannot Rebut Defendants' Legitimate, Nondiscriminatory Reason.**

With regard to Plaintiff's retaliation claim, Plaintiff cannot establish the requisite causal link between his disciplinary write-ups and his employment termination, and his taking FMLA leave. His conclusory allegations of retaliation, without more, are insufficient to establish the requisite causal link. Further, the Company had a legitimate business reason for disciplining him and terminating his employment, and he cannot establish that these reasons are merely a pretext for discrimination.

This Court analyzes retaliation claims under the FMLA according to the same legal framework as Title VII claims. Schlifke v. Trans World Entm't Corp., Civ. No. 05-620-SLR, 2007 WL 906709, at *5 (D. Del. Mar. 27, 2007). Thus, Plaintiff must first establish a prima facie case of retaliation by showing: (1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment action; and (3) there was a causal connection between his protected activity and the adverse employment action. Id. Then, if Defendants assert a legitimate business reason for their decision, Plaintiff's claim should be dismissed unless he presents specific, credible evidence that Defendants' "proffered reasons were not its true reasons, but were merely a pretext for its illegal action." Id. (quoting Baltuskonis v. US Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999)).

Plaintiff testified that he believes he received disciplinary write-ups and that ultimately Defendants terminated his employment because of his FMLA leave. (Pl. Dep. at 173, 184, A-170, 178). However, Plaintiff did not provide any facts to support this

---

Plaintiff did not initially inform his supervisor that the leave was necessary for medical reasons, and when he finally did so, he was granted the requested time off. (Pl. Dep. at 114-19, A-132-36).

contention.  In fact, the only thing he pointed to in support of his retaliation claim is that he

"feel[s] like [he] was retaliated for coming back to work at ARAMARK from medical

leave of absence."  (Pl. Dep. at 173, A-170).  In other words, Plaintiff has presented no

facts, beyond conjecture, in support of his retaliation claim, which is insufficient to defeat

summary judgment.  Schofield v. Metro. Life Ins. Co., No. 3:CV-03-0357, 2006 WL

2660704, at *7 (M.D. Pa. Sept. 16, 2006) (granting summary judgment to defendant on

plaintiff's FMLA retaliation claim because "[plaintiff] presented no evidence from which a

fact-finder could conclude that [defendant's] articulated reasons for its actions were tied to

his FMLA leave.").

Moreover, there is absolutely no evidence to suggest that his discharge was causally

connected to his leave of absence.  "Courts are hesitant to infer a causal connection

between an alleged retaliatory action and the taking of FMLA leave based on temporal

proximity alone."  Schofield, 2006 WL 2660704, at *6.  Accordingly, "the timing of the

alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal

link will be inferred."  Williams v. Philadelphia Housing Auth. Police Dep't., 380 F.3d

751, 760 (3d Cir. 2004), cert. denied, 544 U.S. 961 (2005) (citations omitted).  Defendants

disciplined Plaintiff in March of 2005 and terminated his employment on April 15, 2005,

which was over seven months after his FMLA-approved leave began.  Plaintiff simply

cannot establish any temporal proximity between his request for leave and his discipline

and discharge.  See Schofield, 2006 WL 2660704, at *6 (holding that the timing for a

causal link typically requires that the alleged retaliatory action occurred within days of the

protected activity).  As such, his claim must fail.

Further, for the reasons previously discussed above, Defendants had legitimate

business reasons for disciplining Plaintiff and ultimately terminating his employment, i.e.,

performance deficiencies and safety violations. <u>See</u> Section IV.B.4. Plaintiff has failed to

rebut these legitimate reasons through proof of pretext. <u>See</u> <u>Schlifke</u>, 2007 WL 906709, at

*6 (granting summary judgment in favor of defendant on FMLA retaliation claim where

plaintiff failed to rebut defendant's documented legitimate reasons for terminating

plaintiff). Thus, his retaliation claim fails as a matter of law and this Court should enter

summary judgment in Defendants' favor on Count I of Plaintiff's Complaint.

      F.    **<u>Plaintiff's Slander Per Se Claim Fails As A Matter Of Law.</u>**

      Under Delaware law, "[d]efamation consists of the twin torts of libel and slander; in

the shortest terms, libel is written defamation, and slander is oral defamation." <u>Spence v.</u>

<u>Funk</u>, 396 A.2d 967, 970 (Del. 1978); Restatement (Second) of Torts § 558 (1977). To

establish a claim for slander, a plaintiff must prove: (1) a defamatory statement of fact that

is false; (2) publication to a third party; and (3) special damages except in the case of

slander <u>per se</u>. <u>See generally</u> <u>Johnson v. Campbell</u>, No. CIV.A.00-510-JJF, 2001 WL

34368406, at *5 (D. Del. Mar. 30, 2001); <u>Park v. Georgia Gulf Corp.</u>, No. CIV.A.91-569,

1992 WL 714968, at *10 (D. Del. Sept. 14, 1992). Slander <u>per se</u> is actionable without

proof of special damages. <u>Johnson</u>, 2001 WL 34368406, at *5; <u>Spence</u>, 396 A.2d at 970.

In broad terms, these are statements which: (1) malign one in a trade, business or

profession; (2) impute a crime; (3) imply that one has a loathsome disease; or (4) impute

unchastity to a woman. <u>Johnson</u>, 2001 WL 34368406, at *5; <u>Spence</u>, 396 A.2d at 970.

      Plaintiff has offered no evidence to establish any of the above elements necessary

for his defamation claim. Plaintiff's slander claim based on Ms. Money's alleged

comments that Plaintiff was pitiful at doing his job and that Plaintiff appeared to be

drinking on the job from the way he walked must fail because Plaintiff has no evidence to

support his claim. (Pl. Dep. at 174, 185-86, 200-01, A-171, 179-80, 181-82). As

previously explained, Ms. Money's comments constitute inadmissible hearsay and cannot

be considered on a motion for summary judgment. <u>See</u> <u>Nichols v. Bennett Detective &</u>

<u>Protective Agency, Inc.</u>, No. CIV.A.05-55, 2006 WL 1530223, at *10 (D. Del. May 31,

2006) (granting summary judgment on slander claim because plaintiff only had double

hearsay testimony to support her claim that defendant's agent said she could not do her

job). Accordingly, his slander <u>per se</u> claim based on Ms. Money's alleged comments

cannot survive summary judgment.

    Plaintiff's claim based on Mr. Hill's alleged statement to him that Plaintiff only has

the abilities of a technician with five year of experience must also fail because it is not

defamatory and it lacks publication. (Pl. Dep. at 200-01, A-181-82). Although Mr. Hill's

statement reflects his opinion of Plaintiff's work performance, it does not "malign"

Plaintiff in his profession. Moreover, Plaintiff admits that Mr. Hill made this comment

directly to him and Plaintiff does not know whether anyone else heard this comment. (Pl.

Dep. at 202, A-183). <u>See</u> <u>Schuster v. Derocili</u>, 775 A.2d 1029, 1040 (Del. 2001) (affirming

grant of summary judgment on slander <u>per se</u> claim because statement regarding plaintiff's

substandard work lacked publication where it was only made in front of plaintiff and her

supervisors). Thus, Plaintiff's slander claim fails as a matter of law and this Court should

enter summary judgment in Defendants' favor on Count IV of Plaintiff's Complaint.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, there are no genuine disputes of material fact and the Court should grant Defendants' motion for summary judgment as to all of Plaintiff's claims.

Respectfully submitted,

/s/Michael P. Kelly
Michael P. Kelly (D.E. Bar I.D. 2295)
Christopher A. Selzer (D.E. Bar I.D. 4305)
McCarter & English, LLP
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE 19801
Tel. 302.984.6301/6392
Fax. 302.984.2493
mkelly@mccarter.com
cselzer@mccarter.com

William J. Delany (admitted *pro hac vice*)
Anne E. Martinez (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Tel. 215.963.5066/5718
Fax. 215.963.5001
wdelany@morganlewis.com
aemartinez@morganlewis.com
Attorneys for Defendants

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DANIEL MILLER,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ARAMARK HEALTHCARE SUPPORT<br>SERVICES, INC., ARAMARK CLINICAL<br>TECHNOLOGY SERVICES, INC., AND<br>ARAMARK MANAGEMENT SERVICES<br>LIMITED PARTNERSHIP,<br><br>　　　　　Defendants. | Civil Action No.  06-534-MPT |

I, Jonathan Hill, depose and state as follows:

1.　　　I have been employed by ARAMARK Management Services, LP or a predecessor ("ARAMARK") since approximately 1995 and have worked for ARAMARK's Bayhealth Account since July 1, 2004.  Since July 1, 2004, I have held the position of Front Line Manager.

2.　　　ARAMARK Clinical Technology Services, LLC (formerly ARAMARK Clinical Technology Services, Inc.) and ARAMARK Healthcare Support Services, LLC, (formerly ARAMARK Healthcare Support Services, Inc.) are affiliates of ARAMARK Management Services, LP.

3.　　　I submit this Affidavit in support of Defendants' Motion for Summary Judgment in the above-captioned matter.  This Affidavit supplements my sworn deposition testimony provided on February 14, 2007.

4.　　　ARAMARK provides clinical equipment maintenance services for the Clinical Engineering Departments at the Bayhealth Medical Center, which is comprised of

both Milford Memorial Hospital in Milford, Delaware and Kent General Hospital in Dover, Delaware.

5.      ARAMARK employs CE Technicians to purchase, inventory, service and maintain the medical equipment at these hospitals.

6.      CE Technicians are a vital component of the healthcare delivery system. The responsibilities of a CE Technician generally include the installation, inspection, preventive maintenance ("PM"), and repair of hospital's medical equipment, including blood pressure monitors, infusion pumps, or defibrillators.

7.      CE Technicians also have administrative responsibilities, including maintaining work orders (which record work performed on a piece of medical equipment), equipment maintenance history records, PM requests and inventory records.

8.      They must adhere to all of the requirements of pertinent regulatory agencies such as the Joint Commission on the Accreditation of Healthcare Organizations ("JCAHO"). JCAHO is currently referred to as the Joint Commission.  Accreditation rules require certain equipment to receive inspection over a particular period of time, and organizations like JCAHO inspect a hospital's compliance with the requirements.  Failure to adhere to the accreditation requirements can result in disqualification of a hospital for Medicare and Medicaid funding.

9.      Accreditation organizations like JCAHO review equipment records to determine whether the Biomedical Department conducted routine preventive maintenance and safety inspections, so failing to keep accurate records can jeopardize the hospital's accreditation.

10.    CE Technicians must work carefully and keep accurate documentation, because their errors can result in injury and even death, wasted funds, and can negatively impact the hospital's adherence to regulations and accreditation rules, and ultimately can jeopardize a portion of the hospital's funding source.

11.    I recognize Exhibit A-210-217 in the Appendix as true and correct copies of pages from the competency test given to Plaintiff in January of 2005.

12.    On March 24, 2005, Plaintiff Daniel Miller ("Plaintiff") had been assigned to assist with installation of a new treadmill and stress test system, which included setting it up in accordance with the manufacturer's instructions and ensuring that it functioned properly. A copy of the manufacturer's installation instructions are set forth at page A-203 in the Appendix.

13.    This treadmill is used to administer stress tests in which a patient walks on the treadmill while medical staff monitors the patient's heart rate, breathing, blood pressure and electrocardiogram to determine how well the patient's heart handles exercise. In the case of a thallium stress test, the patient has an intravenous (IV) line through which a small amount of a radioactive substance is injected into the bloodstream at the peak of exercise in order to obtain images showing how well blood flows to the heart muscle.

14.    The operator's keyboard for this stress test system has an emergency stop-switch, but the treadmill manufacturer also offered an optional second stop-switch to be mounted on the bar in front of the treadmill for the patient's use.

15.    The Nuclear Medicine supervisor and the EKG supervisor decided that they did not want to install the optional stop-switch because of the increased risk of nuclear spills if patients were able to activate the stop-switch.

16.    On April 5, 2005, Plaintiff discovered a defective defibrillator with no working audio tones, AED instructions or alarm tones.

17.    If that defibrillator had been used, it would not have provided any audio tone to alert the medical staff to a cardiac condition nor would it have provided necessary voice prompts for its automatic defibrillator.

18.    Plaintiff received training in repairing defibrillators and passed his competency test in January regarding the "lock out, tag out" procedure, but he made no attempt to either repair the defibrillator or tag it as defective.

19.    By not removing the defibrillator or indicating that it was not functioning, Plaintiff violated the Standards of Performance and Bayhealth's safety policies.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct, based upon my knowledge, information and belief.

DATED:  September 30, 2007              JONATHAN HILL

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DANIEL MILLER,<br><br>       Plaintiff,<br><br>     v.<br><br>ARAMARK HEALTHCARE SUPPORT<br>SERVICES, INC., ARAMARK CLINICAL<br>TECHNOLOGY SERVICES, INC., AND<br>ARAMARK MANAGEMENT SERVICES<br>LIMITED PARTNERSHIP,<br><br>       Defendants. | Civil Action No.  06-534-MPT |

### ORDER

Now, this _____ day of _____, 2007, having considered Defendants'

Motion for Summary Judgment and any opposition thereto, it is hereby **ORDERED** that

the Motion is **GRANTED**.  It is further **ORDERED** that Plaintiff's Complaint is

**DISMISSED WITH PREJUDICE**.

SO ORDERED BY THE COURT:

_____
Thynge, U.S.D.M.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| DANIEL MILLER,<br><br>       Plaintiff,<br><br>    v.<br><br>ARAMARK HEALTHCARE SUPPORT<br>SERVICES, INC., ARAMARK CLINICAL<br>TECHNOLOGY SERVICES, INC., AND<br>ARAMARK MANAGEMENT SERVICES<br>LIMITED PARTNERSHIP,<br><br>       Defendants. | Civil Action No.  06-534-MPT |

**CERTIFICATE OF ELECTRONIC SERVICE**

I hereby certify that on October 1, 2007, I electronically filed the attached **Opening Brief In Support Of Defendants Aramark Healthcare Support Services, Inc., Aramark Clinical Technology Services, Inc., And Aramark Management Services Limited Partnership's Motion For Summary Judgment** with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

**William D. Fletcher, Jr.**
Schmittinger & Rodriguez, P.A.
414 S State Street
P.O. Box 497
Dover, DE 19903
(302) 674-0140
wfletcher@schmittrod.com

Respectfully submitted,

/s/ Michael P. Kelly
Michael P. Kelly, (D.E. Bar I.D. 2295)