**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DANIEL MILLER,<br><br>        Plaintiff,<br><br>    v.<br><br>ARAMARK HEALTHCARE SUPPORT SERVICES, INC., ARAMARK CLINICAL TECHNOLOGY SERVICES, INC., AND ARAMARK MANAGEMENT SERVICES LIMITED PARTNERSHIP,<br><br>        Defendants. | Civil Action No.  06-534-MPT |

---

**APPENDIX IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

Dated: October 1, 2007

Respectfully submitted,

Michael P. Kelly (D.E. Bar I.D. 2295)
Christopher A. Selzer (D.E. Bar I.D. 4305)
McCarter & English, LLP
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE 19801
Tel. 302.984.6301/6392
Fax. 302.984.2493
mkelly@mccarter.com
cselzer@mccarter.com

William J. Delany  (admitted *pro hac vice*)
Anne E. Martinez  (admitted *pro hac vice* )
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Tel. 215.963.5066/5718
Fax. 215.963.5001
wdelany@morganlewis.com
aemartinez@morganlewis.com

Attorneys for Defendants

## INDEX

Excerpts from the Deposition of Jonathan Hill,
dated February 14, 2007 ........................................................................... A1 - A78

Excerpts from the Deposition of Daniel Miller,
dated February 5, 2007 ........................................................................ A79 - A183

Excerpts from the Deposition of J. Thomas Cuthbertson,
dated February 14, 2007 .................................................................... A184 - A189

Job Description and Standards of Performance-Clinical
Equipment Technician ........................................................................ A190 - A192

Competency Assessment dated January 24, 2005 ..................................................... A193

Hourly Performance Plan Form dated March 4, 2005
- Coaching Discussion ........................................................................ A194-A199

Memorandum to File from Jonathan Hill re: Dan Miller and
Documentation Issues dated March 16, 2005 ..................................... A200 - A201

Hourly Performance Plan Form dated March 24, 2005
- Counseling Discussion .................................................................... A202 - A203

Preventative Asset Form dated April 4, 2005 ................................................. A204 - A205

Hourly Performance Plan Form dated April 5, 2005
- Coaching Discussion ...................................................................... A206

ACTS Policy Manual - Equipment Service Guidelines - July 2003........................... A207

Memorandum to Tom Cuthbertson from Jonathan Hill re: Termination
Discussion with Dan Miller dated April 15, 2005 .............................. A208 - A209

Excerpt for the Competency Test given to Plaintiff in January, 2005 ............ A210 - A217

MEI 6806074v.1

A-1

Excerpts from the Deposition of Jonathan Hill
dated February 14, 2007

COPY  1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                          )
        Plaintiff,                      )
                                        )
            v.                          )  C.A. No.
                                        )  06-534
ARAMARK HEALTHCARE SUPPORT SERVICES,    )
INC., a domestic corporation, and       )
ARAMARK CLINICAL TECHNOLOGY SERVICES,   )
INC., a domestic corporation, and       )
ARAMARK MANAGEMENT SERVICES LIMITED     )
PARTNERSHIP,                            )
        Defendants.                     )

            Deposition of **JONATHAN HILL**, taken
before Cheryl A. Anthony, Court Reporter, in the offices
of Schmittinger & Rodriguez, 414 South State Street,
Dover Delaware, on Wednesday, February 14, 2007,
beginning at 10:00 a.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        MORGAN, LEWIS & BOCKUS
        BY:  WILLIAM DELANY, ESQUIRE
        1701 Market Street
        Philadelphia, Pennsylvania  19103
        Attorney for Defendants.

ALSO PRESENT:
        MS. LINDSEY O'NEAL, Paralegal,
        Schmittinger & Rodriguez.

        **ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

        **ANTHONY REPORTING**
        **PO Box 234**
        **Dover, Delaware  19903**
        **(302)674-8884**

11

1          Q.      When did you move from Connecticut?

2          A.      I moved from Connecticut on June 30, 2004 to

3    assume a position as front line manager at the account

4    here in Delaware for July 1st.

5          Q.      And around that time, you also moved your

6    residence to Delaware?

7          A.      Within a couple of months after that, yes.

8          Q.      And just to clarify, have you ever been

9    terminated from a job?

10         A.      No.

11         Q.      And have any discrimination complaints ever

12   been made against you at any of your employments --

13         A.      No.

14         Q.      -- other than this one?

15         A.      Other than this one, yes.

16         Q.      Have you ever been convicted of a crime?

17         A.      No.

18         Q.      Okay.  Let's talk about your employment here

19   in Delaware since June of 2004.  What was the exact date

20   that you started?

21         A.      July 1st is when I started.

22         Q.      Okay.  Were you responsible for the Kent

23   Campus and the Milford Campus of BayHealth?

24         A.      I was responsible for all the BayHealth

12

1  facilities, to include Kent and Milford.

2      Q.    Okay.  How many total were there at the

3  time, BayHealth facilities?

4      A.    I believe that they were the two hospitals,

5  and they had 14 outlying clinics.  They had, you know,

6  places in Middletown and Smyrna, Milford, Milton,

7  Harrington.

8      Q.    When did you first have contact with Daniel

9  Miller?

10     A.    I first had contact with Daniel Miller

11 July 1st.

12     Q.    You actually met him personally on that

13 date?

14     A.    I met him personally, yes.  I met all the

15 technicians personally that day.

16     Q.    Now, was Mr. Miller working down at the

17 Milford Hospital Campus at that time?

18     A.    Yes, he was.

19     Q.    Do you recall how long it was that

20 Mr. Miller worked after you started at BayHealth or

21 started at Aramark here in Delaware?  How long after

22 that was it that Mr. Miller went out on medical leave?

23 Do you recall?

24     A.    Yes.  It was five weeks.

13

1        Q.      Five weeks.  Okay.  During that initial

2   five-week period, what was your assessment of

3   Mr. Miller's capabilities?

4        A.      I didn't have the full five weeks.  When I

5   came to BayHealth in July of 2004, I worked there for

6   two weeks.  And then I was on military duty in Lithuania

7   for two weeks, and then I came back for one more week

8   prior to Dan going out for his surgery.

9        Q.      So during the three weeks --

10       A.      Right.

11       Q.      -- that you supervised him basically before

12  he went out, what was your assessment of his

13  capabilities?

14       A.      My assessment of his capabilities was, with

15  the minimal exposure, he was a fair technician.  I took

16  into -- One of the first things that I did when I got

17  there was sit down and had a talk with all the

18  technicians.  I went through work orders.  I went

19  through computer histories.

20              And my main role and function was to do an

21  assessment of the account as a whole.  So I spent what

22  time I could with the technicians, and the rest of the

23  time I spent on the computer system and talking with the

24  people on the floor.

14

1          So overall, my assessment was fair.  I

2   noticed problems, but I addressed them when I did his

3   annual review later that year.

4          Q.     Do you recall what problems it was that you

5   noticed in those three weeks?

6          A.     I would have to specifically take a look at

7   what I did on the annual review.

8          Q.     But it would be indicated on the annual

9   review?

10         A.     It was indicated on the annual review.

11         Q.     Do you recall what the circumstances were

12   surrounding Mr. Miller's leave?  In other words, why he

13   had to take medical leave?

14         A.     On July 1st, when I went over to the Milford

15   Campus and had an opportunity to talk with the

16   technicians.  The very first thing Dan told me was that

17   he would need to go out for surgery for cancer.

18         Q.     Did he tell you anything else about his

19   condition?

20         A.     No.

21         Q.     Did you find out anything else about

22   Mr. Miller's condition and the reasons for his taking

23   leave?

24         A.     I was satisfied with the fact that he had

16

1       A.     Yes.

2       Q.     Were you involved in the approval of

3  Mr. Miller's leave or approving his request for leave?

4       A.     Not in the approving of his time off, no;

5  but what I did was I helped facilitate the fact that all

6  the paperwork was done appropriately so that he could

7  take the time off and could receive his pay, yes.

8       Q.     Whose decision was it to grant Mr. Miller

9  the leave that he needed?

10      A.     I don't know.

11      Q.     Was it someone located here in Delaware, or

12  was it someone located in another Aramark location?

13      A.     Typically, when somebody goes out on

14  short-term disability, we have a safety and loss

15  prevention department that basically goes ahead and

16  ensures that everything is taken care of as far as the

17  time frame when he is out, that his short-term

18  disability is taken care of with Aetna.  And as far as

19  decisions as to how long he would be out, those were

20  medical decisions made by his practitioners, talking

21  with Aetna.

22      Q.     But what office of Aramark processed

23  Mr. Miller's request for leave?

24      A.     I would -- I don't know.  I would say

17

1    benefits.   If I had to choose a department, I would say

2    benefits.

3            Q.    Do you know where the benefits office is

4    located?

5            A.    No, I do not.

6            Q.    But they are not in Delaware?

7            A.    No.

8            Q.    Where is Aramark's central office?

9            A.    The corporate offices are located in

10   Philadelphia.

11           Q.    And would that be where the benefits office

12   would be located?

13           A.    Besides Philadelphia, I know there's another

14   office in Chicago.   And for a time frame when I was

15   working for ServiceMaster, our benefits were handled out

16   of Chicago, but they could have been moved to

17   Philadelphia.

18           Q.    Now, the leave that Mr. Miller took -- You

19   talked about short-term disability, but was his leave

20   considered to be FMLA leave, as well?

21           A.    Yes.

22           (Hill Exhibit Number 1 was marked for

23   identification and attached to the record.)

24

25

1    agreed upon tasks and whatnot prior to the beginning of

2    the year.  So when Daniel and I were talking on the

3    phone, I pointed out to him about this process.  And I

4    wanted to make sure that he understood what was going on

5    and that he had an opportunity to physically see this

6    for himself and to take a copy with him.

7              I asked Daniel if he would swing by, because

8    at the time he was going up to Christiana for care.  And

9    I said if he would like to come by, let me know when he

10   is going for one of his appointments, and I'll have him

11   do it.  We will sit down together and do it.

12             The actual preliminary stuff here on the CMP

13   was done over the telephone.  But the day he came in on

14   the 18th to review all of the documents is when he

15   actually came by the office.  And I did not force him

16   to.  I asked him if he would do that.

17        Q.    Do you remember the date of that telephone

18   conversation?

19        A.    It was the 11th.

20        Q.    The 11th of November?

21        A.    Yes.

22        Q.    Was that the only telephone conversation you

23   had with Mr. Miller while he was out on leave?

24        A.    There were two or three times that we had

26

1    telephone conversations.  He wanted to update me on what

2    was happening with his condition, and I thanked him very

3    much for calling me and letting me know what's going on.

4    I explained to him if there was anything I could do, to

5    let me know.

6         Q.    Do you mean there were maybe two other

7    conversations where he was updating you on his

8    condition?

9              MR. DELANY:  Objection to form.

10             THE WITNESS:  I remember two others, yes.

11   BY MR. PRIMOS:

12        Q.    Two others?

13        A.    Yes.

14        Q.    Do you remember when the other conversation

15   took place?

16        A.    It was sometime in October.  I don't

17   remember a date.

18        Q.    Do you remember what Mr. Miller told you at

19   that time?

20        A.    We talked a little bit about what was

21   happening with his leg and the fact that he would have

22   to go in for follow-up on that.

23        Q.    What specifically was happening with his

24   leg?

27

1      A.    Some sort of infection had got into -- where

2  they had done the bone grafting, there was an infection

3  in there of some kind, and it had to get cleaned out.

4      Q.    And did Mr. Miller indicate to you that his

5  leave was going to have to be extended because of that?

6      A.    Yes, he did.  And I told him that would be

7  fine.  All he needs to do is to make sure that his

8  medical people communicated with Aetna.  And if he had

9  any problems, give me a call and I would be happy to

10 talk to them, which we did.  I called up Aetna and

11 explained to them what was going on and the fact that he

12 needed to be out longer.

13     Q.    Now, before you received that phone call

14 from Mr. Miller, when did you expect him back?

15     A.    I was waiting on him and his medical team to

16 give me notification as to when he could come back.

17     Q.    So you had no idea before that phone call

18 when he would be coming back?

19     A.    No.  I knew he was out.  And whenever

20 somebody is out sick, I rely on them to give me a call

21 and let me know when they are coming back.

22     Q.    How did you cover Mr. Miller's position

23 while he was out?

24           MR. DELANY:  Objection to form.

28

1          THE WITNESS:  I utilized the staff that was

2     currently there.  One of the precepts to my taking the

3     position at BayHealth was to determine the staffing

4     level and whether or not it was appropriate.

5     BY MR. PRIMOS:

6          Q.    And what did you determine?

7          A.    Going through there and taking a look at it,

8     I determined that the staffing level was appropriate,

9     that there would need to be additional focus on the

10    completion of work.

11         Q.    Now, did you determine that the staffing

12    level was appropriate before you lost Mr. Miller for

13    that period or after?  In other words, was the staffing

14    level appropriate with him or without him?

15         MR. DELANY:  Objection to form.

16         THE WITNESS:  That determination was made

17    with Dan Miller being there.

18    BY MR. PRIMOS:

19         Q.    So does that mean that with Dan Miller out,

20    the staffing level was less than appropriate?

21         A.    Yes, it was.

22         Q.    Okay.  Before Mr. Miller went out, he was at

23    the Milford Campus, right?

24         A.    Right.  At the time when I arrived at

29

1    BayHealth, there were three technicians stationed at

2    Milford, two biomed, one radiology.  And at Kent there

3    were three biomed and one radiology.

4         Q.    Who were the two biomeds stationed at

5    Milford when you arrived?

6         A.    Dan Miller and Greg Wilson.

7         Q.    Who was the radiology person at Milford?

8         A.    Ted Layman.

9         Q.    After Mr. Miller went out, who did you have

10   stationed at Milford?

11        A.    I started a rotationary basis of the

12   technicians.

13        Q.    Did you leave Mr. Wilson down there?

14        A.    For a short time frame, until the

15   technicians started to rotate, yes.

16        Q.    And then after this rotation started, did

17   you have Mr. Wilson rotating up to Kent?

18        A.    Correct.

19        Q.    Can you tell me about this rotation?  How

20   was it set up?

21        A.    Certainly.  I set it up basically how I had

22   done it at the last two accounts that I had worked at.

23   Rotation of the technicians started with technician A

24   being at Milford.  Technician A would work there for a

30

1    month by themselves, and then technician B would go over

2    to Milford and work with technician A for a time frame.

3              Initially, we started with two weeks.  There

4    was a low level of communication in the shop, so I had

5    to increase it to a month.  But what was supposed to

6    happen is technician B would be there for two weeks

7    working with technician A, and then technician A would

8    rotate back over to Kent.  And then this technician

9    would finish out that month, work one month by

10   themselves and then start again, where technician C

11   would come over.

12        Q.    Did this rotation also apply to the

13   radiology technicians?

14        A.    At the time I could not rotate the radiology

15   technicians.

16        Q.    Why was that?

17        A.    There were only two of them.  There was no

18   way I could have an overlapping time for them to be able

19   to communicate everything that was going on.

20        Q.    Can you list for me all of the biomedical

21   technicians who were at Milford during the time that

22   Mr. Miller was out on leave?

23        A.    I would have to take the rotationary

24   schedule.  But I can tell you that everyone had an

31

1  opportunity to rotate over to Milford prior to Dan

2  Miller's termination.

3       Q.     Was there any effort to hire some type of

4  temporary help while Mr. Miller was out to help cover

5  that gap?

6            MR. DELANY:  Objection to form.

7            THE WITNESS:  No.

8  BY MR. PRIMOS:

9       Q.     And why was that?

10      A.     Because part of the problem was the fact

11  that the work was there.  It wasn't getting completed.

12  What we needed to do was work on getting everybody more

13  efficient at doing their job.  In order to do that, I

14  worked out there on the floor with the technicians, both

15  in a demonstrative form and isolated from them to go

16  ahead and make sure the work got accomplished.

17      Q.     So you are saying there was a problem when

18  you arrived with the work being completed?

19      A.     There were several problems at BayHealth.

20  And I was tasked when I got here to develop a game plan

21  and fix the account.

22      Q.     The problem, could it be traced to more than

23  one of the technicians?

24            MR. DELANY:  Objection to form.

32

1          THE WITNESS:   The problems that existed were

2    partially individual, partially group, partially work

3    process.   There were several things that had to get

4    cleared up.   When I got there on July 1, 2004, the

5    contract was ending.   What happened was BayHealth agreed

6    to give us a one-year extension on our contract,

7    provided I was hired and I was able to fix the problems.

8    BY MR. PRIMOS:

9          Q.    When you say partially individual --

10         A.    Right.

11         Q.    -- as far as the problems, are you referring

12    to certain individuals?

13         A.    I was referring to the fact -- For example,

14    in this annual review -- as long as we've got it in

15    front of us -- if you take a look here under the people

16    knowledge, it says there that there's been failure to

17    update on some repairs.

18          Some individuals had problems updating their

19    customers as to what was exactly going on with their

20    equipment.   Their equipment would sit in their shops for

21    periods of time, which were unsatisfactory to the actual

22    users out on the floor, because they were unable to have

23    that piece of equipment available to either treat or

24    diagnose a patient.   So some of the problems had to do

33

1    with communications with the customers.

2              Other ones had to do with -- if you take a

3    look under initiative and interest, for example, it has

4    down there that minor equipment, such as suction

5    regulators, had work orders opened, but then they just

6    sat on the shelf.  Okay.  So again, we have a problem

7    with not only communicating, but it is actually doing

8    the work that was actually opened in the computer

9    system.

10        Q.    And that, again, was a problem with some

11   individuals?  I notice you say, under number three,

12   referring to Mr. Miller, quote, he is not guilty at this

13   alone of this type of infraction?

14        A.    Exactly, which goes back to my playing out

15   that this was a fair evaluation.

16        Q.    Going back to the entry under people

17   knowledge -- and we are looking at what is Bates stamp

18   A00081, and this is page two of Hill 1 -- going back to

19   number two, people knowledge and the failure to update

20   the customer on some repairs, what individuals were

21   guilty of that infraction?

22              MR. DELANY:  Objection to the form of the

23   question.

24              THE WITNESS:  I couldn't tell you at this

34

1    time.  I don't remember about any of -- I could go back

2    a little later, but I don't know.

3    BY MR. PRIMOS:

4        Q.    But there were others besides Mr. Miller?

5        A.    Which is as I stated in the document, yes.

6        Q.    Well, actually, that one doesn't indicate --

7    that particular one, people knowledge, doesn't indicate

8    in the evaluation that others had made this same

9    mistake.  It does indicate that under the initiative and

10   interest entry.

11       A.    Okay.

12       Q.    But it doesn't indicate that there were

13   others who had been guilty of failing to update

14   customers and repairs.

15       A.    And it could have been just him.

16             MR. DELANY:  Objection to the form of the

17   question.

18   BY MR. PRIMOS:

19       Q.    But you testified earlier that it wasn't

20   him, right?

21             MR. DELANY:  Objection to form.

22   BY MR. PRIMOS:

23       Q.    It wasn't just him?

24       A.    What I'm telling you is that there were

1    several problems that could be worked out at the

2    facility.  Looking here, looking at the document that is

3    in front of me, where I put down the not following up

4    with the repairs, where I put down that he is guilty

5    alone of this type of infraction --

6         Q.    No, it doesn't say that he's guilty --

7         A.    If I say that he's not guilty alone about

8    this type of infraction, then he is not.

9         Q.    Right.

10        A.    Up here where I said that he has failed to

11   update on some repairs, I don't say either way.  So I

12   really can't answer your question, because at this time,

13   I don't remember that.

14        Q.    Okay.  Well, going the initiative and

15   interest entry, where you say in writing that Mr. Miller

16   is not guilty alone of this type of infraction -- in

17   other words, having work orders opened and no follow-up

18   to those repairs -- what other individuals were guilty

19   of that type of infraction besides Mr. Miller?

20        A.    I don't have that -- I don't have their

21   annual reviews in front of me.  I can't tell you.  I

22   don't recall.

23        Q.    Was Mr. Wilson guilty of that type of

24   infraction?

37

```
 1            MR. DELANY:  That request is not related to

 2    a pending request.  So I would ask that you make that

 3    request in writing, pursuant to the Rules of Federal

 4    Procedure, and we will respond.

 5            MR. PRIMOS:  Okay.  But as far as the

 6    earlier item we noted, the half year --

 7            MR. DELANY:  I'll follow up on that.

 8            MR. PRIMOS:  -- evaluation, you will follow

 9    up on that?  Okay.

10    BY MR. PRIMOS:

11        Q.    Mr. Hill, I would like to show you another

12    document that was marked last week as Miller 5.  We will

13    just mark it as Hill 2 to your deposition.

14            (Hill Exhibit Number 2 was marked for

15    identification and attached to the record.)

16    BY MR. PRIMOS:

17        Q.    Do you recognize this document?

18        A.    Yes, I do.

19        Q.    And let me just ask you:  Did you have any

20    involvement in the drafting of this document?

21        A.    Yes.

22        Q.    Did you draft it?

23        A.    Yes.

24        Q.    And when did you do that?
```

38

1          A.     I drafted it in Connecticut in 2000.  But

2     the one with Dan Miller's name on it wasn't drafted for

3     Dan until he came back in January of 2005.

4          Q.     In January.  But other than the indication

5     of Mr. Miller's name there next to employee name and, of

6     course, the BayHealth Medical Center indication at the

7     top, is it exactly the same as the one you developed in

8     Connecticut?

9          A.     No.  There were slight changes made to it.

10         Q.     What were the slight changes made to it?

11         A.     It refers back to the record management

12    portion on the fourth line underneath of the

13    satisfactory performance has been attained when the

14    technician uses the web portal to ensure that repair

15    parts ordered and received is kept current as

16    applicable.

17              At the time when I drafted this, I was still

18    part of ServiceMaster, and we had no web portal.

19         Q.     Any other changes from the one you had

20    drafted in Connecticut?

21         A.     The position title was originally biomedical

22    technician.  But when I came here in July of 2004, the

23    department name was changed to clinical engineering.  So

24    I changed it to clinical equipment technician, instead

40

1          Q.     Okay.  I will just ask for you to get that

2     to your attorney.

3                MR. PRIMOS:  Are you going to ask for a

4     formal request for that?

5                MR. DELANY:  Yes.

6                MR. PRIMOS:  Okay.

7     BY MR. PRIMOS:

8          Q.     You said that this particular one or this

9     one we are looking at here was, I think you said,

10    developed or written up or something for Mr. Miller --

11         A.     No.

12         Q.     -- in January?

13         A.     No, that is not correct.

14         Q.     What was your testimony?

15               MR. DELANY:  Objection to the form of the

16    question.

17    BY MR. PRIMOS:

18         Q.     You made some reference to Daniel Miller in

19    January.

20         A.     That is correct.  This job description in

21    standards of performance, in January of 2004, when I met

22    with all the technicians, I was told by each and every

23    one of them that they did not have a job description nor

24    did they know of any standards of performance that they

41

1    were to follow.  And they needed to have that.  So I

2    told them that there was one I developed, and I would be

3    happy to sit down with each one of them and go over it

4    line by line.

5              I was not able to meet with Dan Miller prior

6    to his going out for surgery.  But when he came back, I

7    was able to sit down with him and go over this

8    particular document for Dan Miller with him.

9         Q.    Is this document that we are looking at

10   here, Hill 2, the same exact document as was given to

11   other individuals in the department, with the exception

12   of the name Daniel Miller?

13        A.    Every technician got the same one.  Their

14   name was changed for the particular individual, and the

15   position title was changed for the imaging people.

16   Other than that, the same, exact document was given to

17   each technician.  They were all told to read through it.

18   I went over line by line with them to make sure that

19   they knew what each line meant and understood it.  And

20   none of them said anything was wrong with the document

21   at the time that we reviewed it individually.

22        Q.    Did Mr. Miller indicate anything was wrong

23   with it?

24        A.    No.  He did not indicate anything was wrong

42

1    with it, and he did sign one.

2        Q.    Do you know where the signed copy is?

3        A.    It has disappeared from his file.

4        Q.    When did it disappear?

5        A.    It was there when I terminated him.  It was

6    not there after the break-in.

7        Q.    Now, looking at some of the particular

8    entries, under physical requirements, number three,

9    ability to communicate and be understood under normal

10   circumstances.  Can you explain what you meant by the

11   phrase understand normal circumstances?

12       A.    If I come up and talk to you, can you talk

13   to me?  Can we communicate?  That's all.

14       Q.    When you drafted this in Connecticut, was

15   that in response to a particular problem that you had

16   been noticing in the field?

17       A.    No.

18       Q.    Was it in response to you noticing that the

19   people you were supervising were unable to communicate

20   with people?

21       A.    No.

22       Q.    Why is it important to be able to

23   communicate and be understood under normal

24   circumstances?

43

1          A.    Well, like we discussed earlier, you have to

2    notify those people who utilize that medical equipment

3    that you are currently working on of the status of the

4    device, if it's waiting for repair, if it's out to the

5    vendor.

6          Q.    So are you talking then about communication

7    with basically the customer, BayHealth?

8          A.    Exactly.

9          Q.    Were you also referring to communication

10   within the department?

11         A.    Absolutely.

12         Q.    In your view, was the ability to verbally

13   communicate important, as opposed to using other means

14   of communication?

15         A.    I have down here the ability to communicate,

16   however you need to communicate for yourself.

17         Q.    So in other words, you didn't necessarily

18   have to have verbal communication?

19         A.    No, could have sent an e-mail, could have

20   sent a note.

21         Q.    Now, under number four of physical

22   requirements, you have sufficient use of hands, arms,

23   legs and feet to accomplish the job.

24              Was there a reason why you were focusing on

44

1    those parts of the body in particular, as opposed to

2    other parts of the body, say, the eyes?  The ears?  I

3    mean why did you choose those particular parts of the

4    body?

5                    MR. DELANY:  Objection to the form of the

6    question.

7                    THE WITNESS:  You don't use your heart to

8    fix a piece of medical equipment.  These are the items

9    that you have got to have the ability to go get your

10   parts, whatever.  If it has to be -- I was mainly

11   referring to the locomotion of the human body.  That's

12   it.

13   BY MR. PRIMOS:

14        Q.    Going and getting the equipment and bringing

15   it back?

16        A.    Right.  But I have made allowances for

17   technicians who have had problems, like during

18   transitional periods where I have brought stuff to the

19   technician.

20        Q.    What kinds of problems are you referring to?

21        A.    Well, as long as we are talking about

22   Daniel Miller, Daniel Miller, when he came back for

23   transitional duty, the first thing we had him do is sit

24   in a chair and a bench.

45

1          Q.    Sit in a chair?

2          A.    Yes, sitting in the normal working stool

3    that he normally would work in, so he wouldn't have to

4    put any strain on his leg.  If he needed something, we

5    went and got it.  We are all working together as team.

6    Whatever he needed to do work on, we were there for him,

7    until he came to a point where he felt that he could go

8    out and do it on his own.

9          Q.    Number five, ability to safely manage items

10   weighing up to 50 pounds.  Now, I assume you are talking

11   about the ability to pick up and carry equipment?

12         A.    No.

13               MR. DELANY:  Objection to the form of the

14   question.

15               THE WITNESS:  Safely manage; I mean if the

16   piece of equipment is 40 pounds and you know you can't

17   pick it up, then you make sure that you have a second

18   person to help you.  It is safely managing it so that

19   you don't hurt yourself.

20   BY MR. PRIMOS:

21         Q.    So in other words, it is your testimony that

22   you weren't saying here that the individual had to be

23   able to safely manage these items by herself or himself.

24   It is just that the individual has to be able to manage

46

1    these items with assistance or without assistance?  Is

2    that what you were saying?

3                    MR. DELANY:  Objection to the form of the

4    question.

5                    THE WITNESS:  I'm saying that they have to

6    have the ability to safely manage weights up to 50

7    pounds.  If it requires that you have to bring one

8    person over, if you have to bring four people over to

9    pick it up or move it or whatever, then yes.  It could

10   be one.  It could be five.  It doesn't matter.  I just

11   want to you keep in mind that you are able to safely

12   manage 50 pounds.

13   BY MR. PRIMOS:

14       Q.    When you developed these physical

15   requirements as part of the job description, were you

16   referring to some other source in doing that, or did you

17   just come up with these on your own?

18       A.     Well, what I did was I took -- I went to the

19   human resources department of the hospital that I was

20   working in at the time.  I polled the field for what

21   people had down for their job requirements.  And I saw

22   that there were a lot of them that had physical

23   requirements.  So I put physical requirements in here.

24   And I put in what I felt was fair for any technician to

47

1    be able to handle.

2        Q.    At some point did you tell Mr. Miller that

3    you had attempted to have something similar with

4    relation to job requirements approved by Aramark, and

5    they had rejected that?

6        A.    No.

7        Q.    You never told Mr. Miller that?

8        A.    No.

9        Q.    When Mr. Miller returned from his medical

10   leave -- Well, first of all, do you recall when he

11   returned from his medical leave?

12       A.    Mid December.

13       Q.    Mid December.  Were there any physical

14   restrictions on Mr. Miller when he returned?

15       A.    He was to work three days a week, half a

16   day, with minimal movement throughout the hospital,

17   because he was still having treatments to his leg.

18       Q.    Any other physical restrictions that you

19   recall?

20       A.    None that he mentioned to me.

21       Q.    Now, did he just verbally relate those

22   restrictions to you?

23       A.    I gave him a transitional duty sheet for him

24   to take back to his director.  He failed to return it.

49

1    a transitional duty list, but he never returned it.   All

2    he told me was that half a day, four hours a day, don't

3    walk around too much, don't lift too much.

4         Q.    And you said three days a week?

5         A.    Three days a week.

6         Q.    Did you ever ask Mr. Miller for that

7    document again after you initially gave it to him?

8         A.    I asked him one time.

9         Q.    What was his response?

10        A.    He said he never gave it to his doctor.

11        Q.    Did you ask him why he never gave it to his

12   doctor?

13        A.    None of my business was his response to that

14   question.

15        Q.    Do you remember when that conversation took

16   place?

17        A.    It was during the first week he was back.

18        Q.    So you gave it to him the first day he came

19   back.   And then within a week, you asked him for it, and

20   he said none of your business?

21        A.    I had asked him on that Friday.   He had come

22   back on a Monday, and I had asked him on Friday.

23        Q.    The following Friday?

24        A.    Right, because I knew or at least he told me

50

1   that he would be seeing his doctor during the week.  So

2   when he came in on Friday, I asked him if he had given

3   it to his doctor and if he had a form he needs.  And he

4   said no.  And I asked him why, and he said he never gave

5   it to him.

6       Q.    Now, you indicated that at some point after

7   Mr. Miller returned, you discussed Hill 2 with him.

8       A.    That's correct.

9       Q.    The job description?

10      A.    That's correct.

11      Q.    And that was not until January?

12      A.    It was late December, early January.  I did

13  not try to rush him into anything.  I think he got off

14  transitional duty like on December 28th.  So it could

15  have been just prior to the first of the year.  But it

16  was right there in that last week of December, first

17  week of January.

18      Q.    So when you said he got off transitional

19  duty --

20      A.    Right.  His doctor had cleared him for full

21  duty.

22      Q.    How were you made aware of that?

23      A.    Aetna told me.

24      Q.    Did you see any documentation of it?

51

1     A.    Aetna had sent me documentation saying that

2    his short-term disability had ended and that his

3    transitional duty was done.

4     Q.    So how long was Mr. Miller on transitional

5    duty?

6     A.    Two weeks.

7     Q.    Do you recall what specifically was said in

8    your conversation with Mr. Miller about Hill 2?

9     A.    We went over each of the different

10    categories which are labeled on the document.  And when

11    we went through there, I read each and every one of

12    them.  He really had no questions on any of them, and he

13    had no objections to any of them.

14     Q.    Now, at some point I believe Mr. Miller

15    performed a competency assessment, correct?

16     A.    Yes.

17     (Hill Exhibit Number 3 was marked for

18    identification and attached to the record.)

19    BY MR. PRIMOS:

20     Q.    I'm going to show you this document I'm

21    marking as Hill Exhibit Number 3.  I'm showing you a

22    document that was marked as Miller Exhibit Number 4 last

23    week.  Is this the record of the competency record that

24    was prepared for Mr. Miller?

52

1        A.      It's not the whole thing.

2        Q.      What parts are we missing here?

3        A.      The actual documentation that I had him fill

4    out that was attached to this for the entire competency.

5        Q.      Now, underneath the column that says

6    validated by, that is your signature, correct, or your

7    initials, correct?

8        A.      My initials are in the column validated by,

9    yes.

10       Q.      Okay.  So you were indicating that you were

11   validating these particular items; is that correct?

12       A.      That's correct.

13       Q.      Was the competency assessment itself

14   actually performed on January 24, 2005?

15       A.      Daniel Miller's was prepared on

16   January 24th.

17       Q.      Daniel Miller's, as opposed to --

18       A.      Every technician went through a competency

19   test, and each one had a separate test day.

20       Q.      So Daniel Miller's was performed on

21   January 24th?

22       A.      That's correct.

23       Q.      First of all, tell me what was involved with

24   this competency assessment.

53

1          A.     What was involved in the competency

2    assessment is if you take a look over here, the

3    standards, if you were to refer back to Hill 2, under

4    the standards of performance, you would see each one of

5    the categories, quality control, customer relations,

6    vendor relations, record management.  And each one of

7    those --

8          Q.     I'm sorry.  What page of Hill 2 is that?

9          A.     Page two, starting on page two and going to

10   page three, if you notice that quality control is at the

11   top, under quality control I have listed two separate

12   entries for competency testing; one for physical

13   environment, one for computer entry.

14          Okay.  For the computer entry portion of the

15   quality control, I picked a random week within the past

16   year that the technician had entered statuses on, and we

17   went through every status of every work order they put

18   in for that week.

19          We took a look at the quality and content of

20   the status versus the time that they put in it for.  And

21   we discussed what truly happened with each one of those

22   work orders so that they could gain a better

23   understanding of what my expectations were and I could

24   know what they knew, which was a prerequisite of even

54

1    beginning this.  What I told them was this is an

2    opportunity for me to see what I know and for you to

3    understand what I expect.

4              So the one portion was physical environment.

5    The next one was computer entry.  Then there was one for

6    customer and vendor relations in which they were given a

7    copy of a purchase order, a fake purchase order for the

8    facility of a brand new device coming into the facility.

9    I asked them what do they do when they get the device

10   and get the PO.

11             They would fill out an inventory form, which

12   I had them fill out for me.  And then I had sheets where

13   I had computer screen images of the assets module within

14   the ISIS program.  And they would fill in the blanks of

15   the assets so they could demonstrate to me that they

16   knew exactly how to fill that in as part of that job to

17   demonstrate competency.

18             After that portion, I had them do the new

19   equipment inspection work order, in which we had them go

20   through and complete it to include all of the testing

21   that would be involved with that device to allow it to

22   come into the facility.

23             Following that, I gave them a work order or

24   ,I gave them a problem that existed with the unit, and I

56

1    way, we ensure they are all reviewed on an annual basis.

2        Then I give them questions on safety. I ask

3    them about the codes that can be happening out on the

4    floor, such as like a code blue or a code pink and make

5    them answer the questions as to what those involve, do

6    they know how to operate a fire extinguisher, making

7    sure that they clearly understand all the safety rules,

8    asking them about their PPE and SHS sheets, to make sure

9    they have a complete understanding and knowledge of

10   that.

11       Q.    Now, when you have been describing these

12   different activities that occurred during the competency

13   assessment, it sounds as if in more than one of these

14   areas, you were asking questions of the employee,

15   basically having an interview with the employee, right?

16       A.    Correct.

17       Q.    Even when you were referring to customer

18   vendor relations, I think you said you would ask

19   questions, maybe record management, maybe quality

20   control computer entry. But I notice over here, under

21   computer assessment method, there are only three of the

22   items that indicate interview.

23       A.    Right.

24       Q.    Can you explain that?

57

1          A.    Because the primary assessment method was

2    the interview.

3          Q.    Do you mean for those individual items?

4          A.    For those individual items.  There is no

5    reason for me not to ask them questions about what they

6    are actually demonstrating.  I wanted to get an idea

7    about how they were going ahead and approaching a

8    particular problem or how they were looking at

9    something.  It is a totally interactive scenario.

10               But the primary method for doing those was

11   an actual interview in which the questions were written

12   out and the appropriate answers were available.  How do

13   you respond to an on-call situation, for example?

14         Q.    Now, when you look under initial assessment,

15   level of proficiency --

16         A.    Correct.

17         Q.    -- did you fill out those blanks with the

18   Xs?

19         A.    Yes, I did.

20         Q.    And so did you determine that in five of the

21   seven categories assessed, that Mr. Miller was at the

22   highest level available?

23         A.    Yes, he was.

24         Q.    And the areas where he was in the third

58

1    level, rather than the highest level, were quality

2    control, computer entry, and record management?

3            A.    Correct.

4            Q.    Did you discuss with Mr. Miller any

5    suggestions for how to improve in those areas at that

6    time?

7                  MR. DELANY:   Which areas, Noel?

8    BY MR. PRIMOS:

9            Q.    In other words, quality control and records

10    management where he did not receive the highest score.

11            A.    As I said, it was an interactive scenario

12    that occurred in my office.   For instance, under the

13    computer entry, we talked about the way he was

14    annotating information on the computer system.   At the

15    time I noticed that he had a problem with putting down

16    values for tests that were specifically conducted on

17    medical equipment.

18                  So I told him that, you know, he really

19    needs to put the values that are associated with that

20    device so he could demonstrate that that test was

21    actually performed and those outputs were actually

22    recorded.

23            Q.    Now, you indicated that around this time,

24    the other technicians underwent a competency assessment,

59

1    as well?

2        A.    Everyone?

3        Q.    Everyone?

4        A.    Including the imaging techs.

5        Q.    Did anyone receive what I will call a

6    perfect score; in other words, all fours?

7        A.    No.

8        Q.    Did anyone receive a lower assessment than

9    Mr. Miller?  In other words, he has five fours and two

10   threes.  Did anyone receive a lower assessment than he

11   did?

12       A.    Yes.

13       Q.    Do you recall specifically who?

14       A.    No, at this time.  But I do remember he was

15   one of the highest scores for competency.

16            (Ms. Lindsey O'Neal left the deposition

17   room.)

18            (Following a discussion off the record:)

19            (The last two questions and the last two

20   answers were read.)

21   BY MR. PRIMOS:

22       Q.    Mr. Hill, in Mr. Miller's personnel file,

23   there are records of certain disciplinary actions that

24   you took against him during his employment, correct?

64

1    still out at the facility and the estimated time of

2    return.  So the customer would know there was no reason

3    to call us to find out the status, because they already

4    knew what it was and they had an expectation of when

5    they could get it back.  So then they could utilize what

6    they had to do in order to go ahead and continue to

7    treat the patient.

8           I had difficulty getting these returned.  So

9    I wrote out a memorandum in which I asked each

10   technician to read through it, go over it, make sure

11   they understand it, and sign it and return it to me so

12   that they knew I expected it back no later than

13   Wednesday of the week I handed it out.

14          Q.    So you did not consider this to

15   be disciplinary document that --

16          A.    No, it was not.  It was a performance

17   expectation that I wanted to make sure was clear to

18   everyone.  And everyone received one, and everyone

19   signed one.

20          Q.    Okay.  But other than Hill 5, every other

21   one of these represents a disciplinary action against

22   Mr. Miller, correct?

23          A.    That is correct.

24          Q.    I would like you to focus first on Hill 4.

65

1    Now, that is your signature there above the words

2    manager's signature, correct?

3         A.    That is correct.

4         Q.    When did you actually give this to

5    Mr. Miller?  Was that on March 4th?

6         A.    That is correct.

7         Q.    And what prompted you issuing this

8    discipline to Mr. Miller?

9         A.    His failure to adequately add an asset to

10   the computer system.

11        Q.    How did you discover that?

12        A.    I discovered it when I was running reports

13   on life safety devices, and I noticed that the serial

14   number was not correct for what it should be for a

15   defibrillator.

16        Q.    Now, at this time was Mr. Miller working at

17   Kent General?

18        A.    That is correct.

19        Q.    Did Mr. Miller work at the Kent General

20   location the entire time between his return from leave

21   and his termination?

22        A.    That is correct.

23        Q.    So he did not return to Milford during that

24   period, correct?

70

1          A.      I don't think so.

2          Q.      You don't think so.  Why do you not think

3     so?

4          A.      The technicians have -- They don't submit

5     them to Ms. Money.  They submit them to me.  That's an

6     inaccurate statement to begin with.  Second of all,

7     there is no second technician rank at this time.  When I

8     came there, all the biomeds claimed:  Well, I'm a B med

9     II, I'm a B med III, and I'm a senior technician.  But

10    no one could demonstrate to me what each of those titles

11    meant, which is why when we refer back to the job

12    description and standards of performance, it says

13    clinical engineering technician, period.  Okay.  There

14    was no definition for ranks.

15          It wasn't until March of 2005 that I

16    received from Aramark CTS the actual ranking for what

17    would be a B med I, a B med II, a B med III, a B med

18    supervisor, and the same thing for imaging.  It wasn't

19    until that time that anybody was given a rank.

20          Whenever the paperwork is accomplished,

21    there is a bin that the paperwork goes into.  There is a

22    bin for anything relating to an asset, which includes

23    the inspection forms and work orders.  There is a bin

24    for shipping and receiving memos.  There is a bin for

71

1    POs.  Okay.  When they go in that bin, they are expected

2    to be complete.  I don't go through that bin.  Sharon

3    takes those documents, and she files them away.

4         Q.    Well, if you could turn to page three of

5    Hill 10 --

6         A.    Sure.

7         Q.    -- do you see about two-thirds of the way

8    down in the typed text, it says in the -- do you see

9    where it starts in the two and a half months since my

10   return?  Do you see that about two-thirds of the way

11   down?

12        A.    Yes, I do.

13        Q.    It says:  In the two and a half months since

14   my return, I observed Sharon Money, administrative

15   assistant, and Jonathan Hill, manager, return incomplete

16   paperwork to all technicians and engineers.

17             Is that a true statement?

18        A.    No.  I don't understand this statement about

19   incomplete paperwork.  What is incomplete paperwork?  Is

20   there a definition for that?

21        Q.    Well, there is not in this document.

22        A.    Right.

23        Q.    Would you agree that in Hill 4, you were

24   disciplining Mr. Miller for submitting incomplete

72

1    paperwork?

2         A.    When he returned this -- When he turned in

3    this initial incoming inspection and equipment edit

4    form, like I said, I was running a report on life safety

5    equipment.  When I was running the report on life safety

6    equipment, or even non life safety equipment, I

7    typically include in that report the asset number, the

8    common name, and also the serial number.

9              Looking at the listing, I noticed that the

10   serial number looked erroneous, because it was not the

11   proper serial number for what a defibrillator should be,

12   which is why above the serial number on the document, it

13   has my initials next to it that shows that it should

14   have been US00, and where it begins with 103, there is

15   actually an extra three in there.

16             When I pulled the file in which this

17   document was filed into, I noticed these things that

18   were missing.  I went to Dan Miller to ask him about

19   these particular items.  And he said:  Don't bother me.

20        Q.    Well, let me ask you this question,

21   Mr. Hill.  Looking at the first page of Hill 4 --

22        A.    The first page?

23        Q.    -- it says, about the center of the page,

24   under the expected level of performance/conduct, the

73

1    second sentence:  Leaving information out or in a

2    questionable status delays record review and work flow.

3              Would you agree that one of the things you

4    were addressing with Mr. Miller was the subject of

5    leaving information out.  Would you agree?  Yes or no?

6         A.    Yes.

7         Q.    And in fact, had you not circled certain

8    blank areas on the form, which is the third page of Hill

9    4 --

10        A.    Yes.

11        Q.    Isn't it true that those are your circles

12   around those entries?  Correct?

13        A.    Yes.

14        Q.    So going back to Hill 10, the third page,

15   when Mr. Miller makes the statement that you had

16   returned incomplete paperwork to all technicians and

17   engineers, had you returned paperwork to all technicians

18   and engineers where items were left out in a similar

19   fashion to what was the case with this form that is the

20   third page of Hill 4?

21        A.    I don't understand the question.  What are

22   you asking?

23        Q.    Had you returned paperwork to technicians

24   and engineers where items were left out as they were in

78

1    That is what he does.  Ted doesn't like to let things

2    hang.  And I wrote some technicians, because I didn't

3    want to say everyone.  It wasn't everyone.

4        Q.    So Ted was returning them on Monday, but you

5    were only requiring that they be returned by Wednesday?

6        A.    Right.

7        Q.    If you could refer to Hill 6 --

8        A.    Sure.

9        Q.    -- this indicates another disciplinary

10   incident involving Mr. Miller.  And in this document,

11   you make reference to three work orders by number, 5088,

12   4873, and 4871.

13       A.    Yes.

14       Q.    Are those work orders still in existence?

15       A.    Of course.

16       Q.    They are?

17       A.    Yes.

18       Q.    Is there a paper record kept of them?

19       A.    No.

20       Q.    What kind of record is kept --

21       A.    In this particular instance -- There is an

22   electronic record.  In this particular instance, for

23   October, he had opened up work orders that should not

24   have been opened up, or if they had been opened up, he

80

1    meeting that I wanted the technicians to come to me when

2    they are not working on an asset but are required to

3    open up a work order.  I needed them to explain to me

4    why they needed to do it.

5          Q.    So these three work orders that are still in

6    electronic form in the system are still missing assets

7    to this day, correct?

8          A.    Yes.

9          Q.    Can they be printed out easily?

10         A.    Yeah.

11         MR. PRIMOS:  I'm going to request those.

12         THE WITNESS:  The technicians are there to

13    work on assets, and that is what I wanted them to focus

14    on because of the repair delays.

15    BY MR. PRIMOS:

16         Q.    And then, if you could look at the top of

17    the second page of Hill 6, there is a reference to two

18    work orders, one of which you opened and one of which

19    Mr. Miller opened.  And you indicate that Mr. Miller

20    assigned the wrong asset number in the work order that

21    he opened.  Is that work order still in existence?

22         A.    Yes.

23         Q.    And does it still have the wrong asset

24    number?

81

1          A.    Yes.

2                (Following a discussion off the record:)

3    BY MR. PRIMOS:

4          Q.    If you could, turn to Hill Exhibit Number 7,

5    Mr. Hill.

6          A.    7?

7          Q.    Now, this refers to another disciplinary

8    incident that you addressed on March 24, 2005, correct?

9          A.    Yes.

10         Q.    And it indicates that Mr. Miller refused to

11   sign this disciplinary document, correct?

12         A.    Yes.

13         Q.    But that is your signature at the bottom of

14   Hill Exhibit 7?

15         A.    Yes.

16         Q.    Looking at the third box -- There are three

17   boxes in the center of the page.  In the third box going

18   down the page, beginning with the words the following

19   solutions, do you see that, Mr. Hill?

20         A.    Yes.

21         Q.    If you could look at the second sentence of

22   the main body of the text, it says:  If other work is

23   interfering with the active participation of an

24   assignment, you need to coordinate appropriately for

83

1    lines that Mr. Miller testified to?

2         A.    I remember that Daniel Miller's statement

3    was incorrect, yes.

4         Q.    What was incorrect about his statement?

5         A.    In the field of biomedical equipment repair,

6    we have several items on our plate which we need to

7    juggle.  A technician could find himself one day with

8    working on a centrifuge and then going to a

9    defibrillator and taking a look at an electrical

10   surgical unit, not only the PM on the infusion pump, but

11   then also verifying the accuracy of the suction

12   regulator.  We have a -- It's a constant flow.  It's

13   like a river, and this river never stops.  Sometimes it

14   goes slower.  Sometimes it hits white water rapids.

15        What we need to do is we need to go ahead

16   and assess what is currently going on.  And once again,

17   we get back to during the competency testing about

18   utilizing resources.  Daniel Miller, John Ritterhoff,

19   all the technicians in the shop have several things that

20   they need to accomplish, and they need to adjust their

21   priorities on what they are working on at particular

22   times.  It is not unheard of for a technician to ask

23   somebody else for help.

24        Dan Miller admitted in his statement last

84

1   week that he did not ask for help.  We were all busy.

2   There was nobody standing around in that shop.  We were

3   all doing something.

4          So I took objection to that portion of it,

5   and I think it was an entirely inaccurate statement on

6   his part.

7       Q.    Is it your testimony, Mr. Hill, that

8   Mr. Miller should have asked a coworker, another

9   technician, on his own for help or that he should have

10  come to you and asked for help?

11         MR. DELANY:  Objection to the form of the

12  question.

13         THE WITNESS:  He could have done either.

14  BY MR. PRIMOS:

15      Q.    Either would have been acceptable to you?

16      A.    Absolutely, because we are all working there

17  as a team to accomplish the same goal.

18      Q.    How did you obtain information about this

19  particular incident involving the stress machine?

20      A.    I was sitting in my office working on

21  reports.  I was approached by John Ritterhoff, who said:

22  I have a situation I need to let you know about.  I

23  said:  Okay.  What do you want to talk about?  He said:

24  I was at the smoking area, commonly referred to as the

87

1    representative and Jennifer Rapp, did you talk to anyone

2    else about the incident?

3        A.    I talked to GE technical support about the

4    actual installation of the emergency stop switch, and I

5    talked with Dan Miller himself to get his version of the

6    story.  And I talked with Heather.

7        Q.    Who is Heather?

8        A.    The supervisor for nuclear medicine.

9        Q.    Would she have been Jennifer Rapp's

10   supervisor?

11       A.    No.  Jennifer Rapp was the supervisor for

12   EKG, and Heather was the supervisor for nuclear

13   medicine.  I did the follow-up that Dan was supposed to

14   do.

15       Q.    Now, in the top box on Hill 7, you refer to

16   failure to identify safety deficiencies.  What were the

17   safety deficiencies you were referring to?

18       A.    Inappropriate installation of the stop

19   switch.

20       Q.    In what way was the stop switch

21   inappropriately installed?

22       A.    It was not installed according to the

23   manufacturer's recommended specifications.

24       Q.    Do you remember specifically what was wrong

88

1    with the installation?

2         A.    It was installed in the wrong spot.

3         Q.    Where was it installed?

4         A.    It was installed on one of the risers on the

5    side of the treadmill instead of on the wooden bar at

6    the front of the treadmill.

7         Q.    And whose decision was it to install it at

8    that location?

9         A.    Dan Miller's.

10        Q.    He instructed the vendor to install it at

11   that location?

12        A.    No.  Dan installed it.

13        Q.    Oh, he installed it?

14        A.    He told me he installed it.

15        Q.    Okay.  And what specifically was Jennifer's

16   complaint?  What was she upset about?

17        A.    I would have to review her e-mail.

18        Q.    Now, if you could look again down at the

19   third box, it says when an install of a device has a

20   safety feature -- Do you see that at about the center of

21   that text?

22        A.    Yes.

23        Q.    When an install of a device has a safety

24   feature not being installed properly, you need to

90

1    A.    The wording of the statement, when an

2    install of a device has a safety feature not being

3    installed properly, you need to correct this deficiency

4    immediately.  It is his responsibility to do that.  It

5    is his responsibility to ensure that the entire device

6    is safe and fully functional prior to leaving the work

7    site.  It is his responsibility to communicate with the

8    appropriate people during the install that everything

9    was done accurately and correctly, and he failed to do

10   that.

11        It took me three additional days' work to go

12   ahead and do what he was supposed to do because he did

13   not do it appropriately the first time.

14   Q.    Now, if you could refer to Hill 8, which is

15   the next disciplinary incident, this refers to a

16   disciplinary incident that you addressed on April 5,

17   2005, correct?

18   A.    Yes.

19   Q.    And that is your signature toward the

20   bottom, correct?

21   A.    Yes.

22   Q.    And Mr. Miller refused to sign the form,

23   correct?

24   A.    Yes.

91

1          Q.    Now, I noticed that in both Hill 8 and

2    Hill 7, Sharon Money signed the form, as well.  Is there

3    a reason she signed those forms?

4          A.    She was outside my door when they were

5    given.

6          Q.    But is there a reason why she signed the

7    form as a witness?

8          A.    Just a secondary person who was there who

9    had heard the conversation and could testify to the fact

10   that he refused to sign.

11         Q.    But in other words --

12               (Following a discussion off the record:)

13   BY MR. PRIMOS:

14         Q.    If you refer to Hill 4, neither Ms. Money

15   nor any other person signed that form as a witness,

16   correct?

17         A.    Because Dan Miller signed it.

18         Q.    So in other words, the reason for her

19   signing it was because Dan Miller refused to sign it?

20         A.    Exactly.  At least there was somebody there

21   that could testify to the fact that that conversation

22   took place.

23         Q.    I understand.  Now, this incident hard to do

24   with a defibrillator, correct?

92

1        A.      Correct.

2        Q.      And your complaint with Mr. Miller with

3   regard to this incident was that the unit should have

4   been pulled from the floor, and it was not, correct?

5        A.      No.

6        Q.      That was not your complaint with Mr. Miller?

7        A.      My complaint with Mr. Miller was, number

8   one, he did not pull it from the floor.  Number two, if

9   he was not going to pull it from the floor, he was

10  supposed to tag it as defective.  He knew at that point

11  in time that defibrillator was not fully operational.

12  And he left it on the floor for an hour and a half

13  without actually indicating to anybody else that it was

14  defective by putting that lockout tag-out sign on it.

15       Q.      But there is no indication --

16               MR. DELANY:  Are you done with your answer?

17               THE WITNESS:  Yes.

18  BY MR. PRIMOS:

19       Q.      But there is no indication on this form with

20  regard to tagging the item, correct?

21       A.      That was put into the substance of the

22  conversation, which under the following solutions have

23  been agreed upon, was that he needs to understand that

24  BayHealth has policies with regard to safety issues and

93

1    he has responsibilities under those policies.

2            He should have pull the defib from the

3    floor, yes.  But if he wasn't pulling it from the floor,

4    he should have tagged it.

5        Q.    But you would agree that the tagging issue

6    is not identified in this form, correct?

7        A.    It is referred to down below.

8        Q.    And where is it referred to?

9        A.    In the statement which I just read, which is

10   you need to understand that BayHealth has policies with

11   regard to safety issues and your responsibilities under

12   these policies.

13           (Hill Exhibit Number 11 was marked for

14   identification and attached to the record.)

15   BY MR. PRIMOS:

16       Q.    Mr. Hill, this is an excerpt from the

17   Aramark Policy Manual, correct, that has been marked as

18   Hill Number 11?

19       A.    Yes.

20       Q.    Does this policy apply to the incident in

21   question?

22       A.    It should.

23       Q.    What do you mean it should?

24       A.    Yes.  There are definite aspects in this

94

1    policy that does apply to this.

2         Q.    And what aspects in particular apply to this

3    incident?

4         A.    Understand the protocol, number four,

5    defective equipment that exhibits deficiencies that

6    preclude safe or defective use shall be identified as

7    such and removed from service.

8         Q.    And then it goes on to state that:  If for

9    any reason the equipment cannot be removed from service,

10   there are certain steps to be taken?  Correct?

11        A.    Absolutely.  And the first one is A, which

12   is affix a placard to the unit to warn potential users

13   that the equipment is defective and must be used with

14   caution.  The placard must also be dated and include an

15   ACTS department contact name and phone number.

16             That is what is known as a defective tag,

17   and that placard was not placed on the device.  The

18   device was left there for normal use.

19        Q.    Right.  Is it your understanding that in

20   reference to this particular incident, the equipment in

21   question could not be removed?

22        A.    It should have been removed.

23        Q.    Well, what we just read about the placard

24   applies in a circumstance where the equipment could not

95

1    be removed, correct?

2         A.    According to Dan Miller, he says the

3    equipment could not be removed.  I disagree with that

4    assessment.

5         Q.    And why do you disagree with that

6    assessment?

7         A.    I disagree with that assessment because I

8    went talked to the charge nurse, which is what you are

9    suppose to do to notify them that there is defective

10   equipment in your area, and she let me take it.

11        Q.    What was the name of that charge nurse?

12        A.    The first name Gretchen, and the last name I

13   do not know.

14        Q.    Is it Gretchen Larrimore?

15        A.    It could be, yes.

16        Q.    Did Mr. Miller tell you that she had told

17   him that the equipment could not be taken from the

18   floor?

19        A.    Dan Miller, during my subsequent

20   investigation later, told me that she said that.  But I

21   was not able to confirm that with her.

22        Q.    Why did you go to the floor and remove the

23   equipment?

24        A.    Because I was down there in the shop

96

1    discussing an issue with John Ritterhoff when Dan came

2    in.  Dan said there is a defibrillator up in the

3    intermediate care unit that has no sounds on it, and

4    he's got to go.  And he grabbed his coat and left.

5             I immediately went up to the floor, because

6    you can't leave a defibrillator like that on the floor.

7    There was no defective tag on it.  I found the case had

8    been separated in the back by approximately one quarter

9    of an inch across the back side, which left an even

10   increased hazard up there in the work area.

11            So I went and I talked with Gretchen.  I

12   showed her the device.  I pulled it from the floor.  I

13   affected repair on it and got it back up there within an

14   hour.  And then I proceeded to investigate the entire

15   incident.

16       Q.    So in other words, Mr. Miller did make you

17   aware of the situation, correct, before he left?

18       A.    Correct.

19       Q.    So the situation was handled appropriately

20   ultimately after he informed you of the situation,

21   correct?

22       A.    But it should have been handled

23   appropriately long before that.

24       Q.    What do you mean long before?

97

1        A.      From the minute he -- The first step in any

2   preventative maintenance procedure is to look at the

3   physical condition of a device.  When I investigated

4   with Dan Miller about the defibrillator, he said he did

5   not notice that gap in the case.  A gap in the case can

6   allow fluids to infiltrate into the device, creating an

7   electrical shock hazard for both the patient and the

8   user.

9              And then he told me when he was looking for

10  a replacement form, which was not necessary, for it is

11  the intermediate care unit in which on one end of the

12  floor were two crash carts that were available for use

13  and the ICU on the other side, which had three crash

14  carts.  All he had to do was tell Gretchen that she

15  could use either one of those and communicate to her

16  nurses so they had appropriate coverage in the area and

17  then remove the defibrillator immediately.

18             He chose to walk around and look for another

19  defibrillator and left that defibrillator there with no

20  note, no nothing on it.  And that created a safety issue

21  for the facility, patients, staff.  It was

22  inappropriately handled from the get go.  It sat there

23  for an hour and a half being inappropriately handled,

24  and it should have been addressed immediately.

98

1          Q.     So the period of time that transpired

2    between Mr. When Mr. Miller initially discovered the

3    problem and when he informed you was an hour and a half;

4    is that correct?

5          A.     Yes, according to his own testimony.

6               (Hill Exhibit Number 12 was marked for

7    identification and attached to the record.)

8    BY MR. PRIMOS:

9          Q.     Mr. Hill, looking at what has been marked as

10   Hill Exhibit Number 12, this is a response written by

11   Mr. Miller regarding the defibrillator incident.   Your

12   attorney is already in position of this.

13               I would like you to look at the second

14   sentence of this document.   It says:   With 23 years of

15   in-hospital biomedical equipment servicing, I was always

16   instructed never remove an operation critical life

17   support item from a crash cart without a working

18   replacement.

19          ~      Whether or not Mr. Miller was instructed of

20   that, as you obviously wouldn't know about all of his

21   experience, but is that an appropriate statement,

22   that --

23          A.     No.

24          Q.     -- an operation critical life support item

104

1   where he was experiencing anxiety for harassment and

2   unfair treatment, he would not let it jeopardize his

3   health.  He would resign and find another job elsewhere.

4   He would live off family, even risk being -- I think

5   that should be destitute -- but not work under those

6   conditions.

7           Did you have a conversation along those

8   lines with Mr. Miller?

9       A.    No.

10      Q.    Was anyone else present during your

11  conversation with Mr. Miller about the incident?

12      A.    Sharon Money was right outside my door, and

13  my door was open.

14      Q.    But did she hear the entire conversation?

15      A.    Yes.  Her desk sits right outside my door.

16      Q.    Did anyone else witness the conversation,

17  other than Ms. Money?

18      A.    To my knowledge, no.

19          MR. PRIMOS:  I think this may be a good

20  stopping point.

21          (Following a luncheon recess:)

22  BY MR. PRIMOS:

23      Q.    I guess the next thing I would like you to

24  refer to, Mr. Hill, is Hill 9.  Now, first of all, is

105

1   that your signature toward the bottom of the page?  I'm

2   sorry.  I'll let you look.  Is that your signature

3   toward the bottom of the page, Mr. Hill?

4        A.    Yes, it is.

5        Q.    And this appears to be a memo that was sent

6   by you to Tom Cuthbertson, correct?

7        A.    Yes.

8        Q.    And you were memorializing your termination

9   discussion with Mr. Miller, correct?

10       A.    Yes.

11       Q.    Now, prior to your having this meeting with

12  Mr. Miller -- Well, I'm sorry.  Strike that.  The memo

13  is dated 4/15/2005.  Is that the same date that your

14  termination discussion with Mr. Miller was held?

15       A.    Yes.

16       Q.    And prior to your having this termination

17  discussion with Mr. Miller, had you previously had

18  discussions with Mr. Cuthbertson about terminating

19  Mr. Miller?

20       A.    I had talked to Mr. Cuthbertson and Tom

21  Lodge two days prior to this.

22       Q.    So that would have been the 13th of April?

23       A.    Yes.

24       Q.    And can you tell me what occurred during

106

1   that discussion?

2        A.    I had called -- I had sent them both an

3   e-mail in reference to requesting a teleconference.    And

4   I had discussed with them about the two safety

5   incidences with Dan Miller and subsequently, following

6   that, some discrepancies I had found with other

7   defibrillators on the floor.    And these work orders

8   referenced those defibrillator preventative maintenance

9   work orders.

10           And I told them that when -- with the two

11  safety violations and all of these discrepancies, he did

12  not -- he was not safe enough to have working for us any

13  longer.

14       Q.    And what was their response?

15       A.    Well, they had asked to -- they had already

16  known about the two previous safety violations.    And we

17  discussed those six particular work orders.    And at the

18  end of the conversation, they agreed that, you know,

19  termination had to be done.    So Tom Lodge drafted a

20  letter for Tom Cuthbertson.    And on that day, I

21  presented it to him.

22       Q.    Now, what we are looking at here, Hill

23  Exhibit Number 9, that was not the letter that was

24  drafted, correct?

109

1    termination that you referred to?

2        A.    Yes.

3        Q.    If you could turn to the last page, isn't it

4    true this letter was never signed by Mr. Miller?

5        A.    That is correct.

6        Q.    Did you have any involvement in the drafting

7    of this letter?

8        A.    No, I did not.

9        Q.    As far as you are aware, was Tom Lodge the

10   only person involved in the drafting of this letter?

11       A.    To my knowledge, yes.

12       Q.    And the letter itself does not address the

13   perceived performance problems, does it?

14       A.    No, it does not.

15       Q.    Now, paragraph two or numbered paragraph two

16   of the letter refers to certain severance payments,

17   correct?

18       A.    Yes.

19       Q.    Now, as far as you are aware, those were

20   never paid to Mr. Miller, correct, because he did not

21   accept the agreement?

22            MR. DELANY:   Objection.

23   BY MR. PRIMOS:

24       Q.    Let me ask it this way.   Were the severance

110

1    payments made to Mr. Miller?

2          MR. DELANY:  Let me then again object.

3    Noel, did you read the whole paragraph?

4    BY MR. PRIMOS:

5          Q.    Okay.  So the paragraph indicates there were

6    certain severance pay that were to be received for two

7    weeks.  And if he signed the letter, there would be

8    additional severance pay.  Is that your understanding of

9    arrangement with Mr. Miller?

10         A.    Yes.  When I got the letter and read it,

11   that is as far as I understood.

12         Q.    So as far as you understood, he did receive

13   the two weeks' of severance pay?

14               THE WITNESS:  Yes.

15               MR. PRIMOS:  Thank you for pointing that

16   out.

17               (Hill Exhibit Number 14 was marked for

18   identification and attached to the record.)

19   BY MR. PRIMOS:

20         Q.    Mr. Hill, looking at what has been marked as

21   Hill Exhibit 14, this is the position statement that was

22   submitted to the Department of Labor on behalf of

23   Aramark.  Were you involved at all in the drafting of

24   this position statement?

111

1          A.      Yes, I was.

2          Q.      And what was your involvement?

3          A.      When we received notice of this and we were

4    asked to provide a position statement, I sat down with

5    Jim Valeri, who was at the time the manager for human

6    resources for the region.

7              And he had -- we went over each allegation,

8    one by one.  And he asked me specifics about how many

9    employees I had.  He asked me about certain

10   circumstances, like the date and times of specific

11   disciplinaries.  He asked me about -- just basically

12   going down the list.  And he drafted the letter, and

13   that was it.

14         Q.      Now, at the time the position statement was

15   drafted, was Tom Lodge still employed by Aramark?

16         A.      Yes.  Tom Lodge is the human resources

17   director.  He's Jim Valeri's boss.

18         Q.      He's Jim Valeri's boss.  Okay.  And Jim

19   Valeri's title is regional human resources manager?

20         A.      Right.

21         Q.      Does that mean he is the regional HR manager

22   for the part of region that you are a part of here in

23   Delaware?

24         A.      Jim Valeri was the human resources manager

112

1    for the region at that time.  When I came down here, we

2    were part of the Mid-Atlantic Region.  And a year later,

3    they combined the Mid-Atlantic and the Northeast, where

4    Jim Valeri and Tom Lodge worked.  And then about a year

5    later, they put us back in the Mid-Atlantic, which took

6    us out from underneath of Jim Valeri and Tom Lodge.

7         Q.    So I'm trying to get this in my mind.

8    During the period of time that Mr. Miller was being

9    supervised by you --

10        A.    Right.

11        Q.    -- what region was Delaware part of?

12        A.    When I came down here, we were part of

13   Mid-Atlantic.  By the end of the fall, we were part of

14   Northeast.

15        Q.    You are talking about the fall of '04?

16        A.    The fall of '04, yes.  And we were part of

17   the Northeast Region throughout the time frame that Dan

18   Miller finished up his employment with Aramark.

19        Q.    And the Northeast includes how many states?

20   Do you know?

21        A.    It includes the six states that are part of

22   New England, New York, New Jersey, Eastern Pennsylvania,

23   and at the time Maryland and Delaware.

24        Q.    Now, Tom Cuthbertson, his title is district

113

1    manager?

2        A.    Correct.

3        Q.    What district does that refer to?

4        A.    There is not a specific district name.

5    Aramark has district managers who are responsible for

6    certain geographical areas.  So Tom had coverage for

7    Delaware, and he had some accounts in New Jersey, some

8    accounts in Pennsylvania, and some accounts in New York

9    City.  That is where he basically covered.  That was his

10   region.  That was his district.

11       Q.    His district.  So during the period of time

12   that you were supervising Daniel Miller, Tom Cuthbertson

13   was your immediate supervisor; is that correct?

14       A.    From the time frame I came down here in July

15   of 2004 up until the fall of 2004, my district manager

16   was Shawn Jones.

17       Q.    Now, when you say up until the fall --

18       A.    Right, around the August, September time

19   frame they did an initial meet-and-greet with Tom

20   Cuthbertson coming into the role.  But Tom Cuthbertson

21   did not actually assume the role until around the

22   November, December time frame.  But I originally started

23   under Shawn Jones, and then I was put under Tom

24   Cuthbertson for the remainder of the employment, and

114

1    from therefore, worked --

2         Q.    And is Tom Cuthbertson your immediate

3    supervisor today?

4         A.    Yes, he is.

5         Q.    And you indicated that at some point your --

6    you said your accounts; is that correct?

7         A.    Yes.

8         Q.    -- your accounts were taken out of the

9    Northeast and put back just in the Mid-Atlantic,

10   correct?

11        A.    Correct.

12        Q.    Did Tom Cuthbertson go with the accounts?

13   In other words, you indicated that Tom Cuthbertson had

14   some accounts in New York City, I think you said some in

15   New Jersey, some in Pennsylvania, Delaware.  If Delaware

16   is now part of the Mid-Atlantic, that would seem to span

17   the Mid-Atlantic and the Northeast?

18        A.    Correct.  What occurred is that the

19   Mid-Atlantic Region was dissolved, and that area was

20   moved into the Northeast Region for a period of about a

21   year.  And then when they made another reshuffling, they

22   recreated the Mid-Atlantic Region and accounts changed.

23   So the district managers who had some of the Northeast

24   and some of the Mid-Atlantic, they were either moved to

134

1        A.      Let me answer it this way.  When I initially

2    got there to BayHealth, one of the problems was that

3    nobody was really -- I don't want to say nobody.  But I

4    want to say that there were problems with everybody in

5    regards to getting equipment into the system.  And the

6    first, initial problem was the fact of the computer

7    program they were using, which was ISAM.  That is

8    I-S-A-M.

9            During 2003, right after Aramark had

10   purchased Premier, they had taken a look at Premier's

11   CTS and ServiceMaster's CEM.  And they took a look at

12   what works best and what doesn't.  And they made certain

13   decisions.  Some things they went the Premier way, and

14   some things they went the ServiceMaster way.

15           The ISAM program, because they were at two

16   separate campuses, even though they were on the same

17   network, had independent inventories.  The inventory

18   that was kept at Milford was totally isolated from the

19   inventory at Kent.  They could be reviewed.  Nobody did.

20   So a device for a typical two or more hospital system

21   could have easily transferred from one hospital to

22   another.  The first hospital may or may not notice it's

23   gone, may or may not delete it from their inventory, and

24   it may or may not show up in the other one.  It was

135

1    convoluted.

2                One of my first directions was back in

3    January of 2004, when they got their computer technology

4    refreshed, they were supposed to get the ISIS Pro

5    program.  And they failed to do it, because they had

6    another issues to resolve.

7                So one of my first directives in getting

8    there in July of 2004 was to go ahead and bring in ISIS

9    Pro.  I refused to do that initially, for at least the

10   first month, because I was going to spend the first two

11   weeks in Lithuania, away from the account.  To bring in

12   a new computer program and walk out the door for two

13   weeks was not going to be a pretty picture, because it

14   would totally fail.

15               So I waited until I after came back from

16   Lithuania.  I brought in ISIS Pro, and it was when we

17   converged those two inventories together that the whole

18   problem really illuminated.  That is when we began

19   classes which involved the actual inputting of

20   information into the system.  That's when I first

21   reviewed this document here -- I'm referring to Hill

22   Number 4 --

23        Q.    Hill 4?

24        A.    -- page A00037, the initial incoming

136

1    inspection and equipment edit form.  That's when I first

2    decided that this was a highly, highly valuable form,

3    because I had never dealt with a -- I have dealt with

4    facilities that had equipment inventory problems.  But

5    until I got here, I never really knew what an equipment

6    inventory problem was.  It was that much above all the

7    rest.

8             So we went over this form.  We made sure

9    everybody understood it.  At the time Dan Miller was

10   out.  But when he came back, this was one of the things

11   I went over with him.  And it was one of the items that

12   was part of the competency testing, to ensure that

13   everybody understood what they were supposed to do and

14   understood what my expectation was to get this

15   accomplished.

16            So when I got there, during that first,

17   initial two weeks, when I was doing my assessment of the

18   facility, I saw all kinds of problems with people

19   putting equipment into the system.

20        Q.    And that would include Mr. Ritterhoff?

21        A.    And that would include everybody.  And that

22   was one of the issues that I was told to rectify.  And

23   that is what I worked toward, was to get everybody on

24   the same sheet of music and to make sure they understood

137

1    the importance of getting this accomplished correctly.

2        Q.    And when would you say that Mr. Ritterhoff

3    was at a point where this was no longer a problem for

4    him individually?

5        A.    Well, what had happened was is in August,

6    when we got the ISIS Pro system in there, I was already

7    highly familiar with the program.  So I sat

8    Mr. Ritterhoff and I sat Sterling Townsend and I sat

9    Greg Wilson down in front of the computer system.  And I

10   demonstrated for them that the items I could find with

11   no problem at all that were totally screwed up.  They

12   had no idea it was that bad.  They had no idea how

13   horrible it was.  And they were like:  Oh, my goodness,

14   I can't believe this has been going on.  That was the

15   statement that was given to me.

16           It was from that time on that they truly

17   realized this was important stuff and it has to get

18   accomplished.

19       Q.    But my question is:  At what point was it no

20   longer a problem for Mr. Ritterhoff, as far as

21   identifying equipment and placing it into the system?

22       A.    As far as a specific date, I have no idea.

23   I just know that when we brought in ISIS Pro and very

24   shortly after my meeting with those individual, who were

139

1          A.     It was a group decision.  He does not work

2     as a biomed technician.  He works as a general repair

3     technician.

4          Q.     What does mean?

5          A.     He takes care of the smaller items that are

6     repetitive.

7          Q.     Do you know what his age is?

8          A.     He's in his 40s.

9          Q.     In his 40s?

10         A.     Yes.

11                MR. PRIMOS:  I have no further questions.

12    BY MR. DELANY:

13         Q.     On the issue of defibrillator, do you recall

14    your testimony in that area?

15         A.     Yes.

16         Q.     Okay.  You had testified that Mr. Miller

17    failed to -- I believe you used the words tag out the

18    machine when he left it on the floor?

19         A.     Correct.

20         Q.     Did it matter to you whether it was an hour

21    and a half or some other period of time that he left

22    that machine on the floor untagged?

23         A.     He never should have left the machine

24    without putting a tag on the device.

140

1      Q.    So the time that he was gone and left the

2  machine without a tag, is that relevant to you?

3      A.    Absolutely, that is the reason he was

4  written up.

5      Q.    But the length of the time?

6      A.    The length of the time only adds to the

7  gravity of the situation.

8      Q.    You referenced the personnel files that were

9  there prior to your arriving at the BayHealth system.

10  Do you remember your testimony?

11      A.    Yes.

12      Q.    You have no direct knowledge of how those

13  files were maintained prior to your arrival, correct?

14      A.    No, I do not.

15      Q.    And whether or not things have been moved

16  and purged from your files prior to your arrival, you

17  have no direct knowledge of that, do you?

18      A.    I have no direct knowledge.

19      Q.    I'm just referring you to Hill 4 --

20      A.    Yes.

21      Q.    -- to the write-up of Mr. Miller on

22  March 2nd of '05.

23      A.    Right.  The original write-up was March 2nd,

24  but it was actually delivered on March 4th.

141

1          Q.    I am sorry.  March 4th of '05?

2          A.    Yes.

3          Q.    Just read, if you would, the first box

4     there.

5          A.    Assets added to the computer system need to

6     be accurate and follow same format as instructed during

7     competency testing.

8          Q.    And what was that referring to?

9          A.    It was referring to the fact that on this

10    particular defibrillator, the --

11         Q.    And you are referring to A00037?

12         A.    That is correct.  On that document I have

13    circled the installation date, the suggested tier level,

14    the base month, and the recommended frequency.  That was

15    for the same blocks that I circled on the documentation

16    that went along with the competency testing.

17         Q.    And you had already instructed him

18    specifically on those issues?

19         A.    That is correct.  It was during this

20    competency testing that I gave him specific instructions

21    that they were to be filled out.

22         Q.    All right.  So the performance documentation

23    you are referring to there, is the issue solely that he

24    wasn't doing his documentation correctly, or was it that

142

1    he wasn't doing it correctly after specific instructions

2    as to how to do it?

3        A.    It was both, because on the installing date,

4    if you take a look at it here, the actual inventory date

5    of this device, even though the warranty started on

6    10/01, it was actually inventoried on 2/28/05, to be

7    precise.

8            What this indicates is a defibrillator

9    coming from Phillips Medical, when it was initially

10   purchased, which was on October 15th of '01, it had

11   gotten exchanged by another one.  The warranty dates do

12   not change, but the inventory and installation date can.

13   So having been inventoried on 2/28/05, he should have

14   known when he took it to the floor and installed it on

15   the crash cart.  And therefore, he should have put the

16   installation date.  He knew what it was.  And based on

17   what we did on the competency testing, he just refused

18   to do it.

19       Q.    You, in fact, identified that exact issue on

20   the competency testing; is that correct?

21       A.    Yes, I did.

22       Q.    And at the time that you gave him this

23   corrective action, was it your belief that he had had

24   sufficient instruction as to how to properly complete

143

1    the forms?

2         A.    Yes.

3              MR. DELANY:  That is all I have.

4              MR. PRIMOS:  Nothing further.

5              (Presentation, reading, and signature of the

6    deposition were waived.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

A-79

Excerpts from the Deposition of Daniel Miller
dated February 5, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


DANIEL MILLER,                    :    CIVIL ACTION
                Plaintiff,        :
                                  :
                                  :    ORIGINAL
                                  :
        vs.                       :
                                  :
                                  :
                                  :
                                  :
ARAMARK HEALTHCARE SUPPORT        :
SERVICES, INC., et al.,           :
                Defendants.       :    NO. 06-534 (KAJ)

                    ----------
            Monday, February 5, 2007
                    ----------


    Deposition of **DANIEL J. MILLER**, taken pursuant to

notice at the law offices of Schmittinger & Rodriguez,

P.A., 414 South State Street, Dover, Delaware, on the

above date, beginning at approximately 10:00 a.m.,

before Charles P. Carmody, Registered Professional

Reporter and Notary Public.


------------------------------------------
            **CHARLES P. CARMODY & ASSOCIATES**
                Court Reporting Services
            768 North Bethlehem Pike, Suite 107
                    P.O. Box 525
                Ambler, Pennsylvania  19002
        (215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                                            16

1    A.        After that, I came down -- well, I did side

2    jobs, you know, repairing VCRs and other electronic

3    stuff.

4              And then I wanted to get back into the biomed

5    field.  And I started looking for jobs outside of the

6    Philadelphia area, because of the congestion.

7              And I came down to Milford Hospital and

8    interviewed down there for a job.  The job wasn't

9    exactly with Milford Hospital.  It was a department

10   created from Nanticoke Hospital by the director of

11   maintenance and the supervisor of the biomedical

12   department at Nanticoke Hospital.

13             There had been some conflicts with the

14   employees of a company called Mace (ph), that had

15   worked at -- were contracted to do the biomedical work

16   at Milford Hospital.

17             And it got into the newspapers and stuff.

18   And the hospital wanted to -- they terminated their

19   contract.

20             So, Nanticoke took the advantage of, you

21   know, saying, we'll run a program for you for so much

22   money.

23             And I was hired on to be -- manage that

24   department site.

**A-80**

DANIEL MILLER                                    18

1      employment; is that correct?

2      A.      Yes.

3      Q.      How long did you work for Nanticoke for?

4      A.      For the Nanticoke subsidary?

5      Q.      Yes.

6      A.      Until it was purchased by Kent General

7      Hospital under the name Bayhealth.  Bayhealth is the

8      overall umbrella name they gave for their organization.

9      Q.      When was that, approximately.

10     A.      July of '97.

11             I was demoted from being a supervisor to --

12     not a senior biomed.  I was demoted below that.

13             I was demoted to a biomedical grade two at

14     the auspices of Linda Ritterhoff, saying that there

15     were no senior biomeds in her department.

16             And I was going to be demoted down to it, and

17     she was promoted up to a manager by Dave Walczak.

18             And that was announced in a meeting that he

19     had a conference with all his people under his

20     umbrella.

21     Q.      Let's just go back.

22             Just taking from Toy R Us forward, what was

23     the reason for your departure from Toys R Us?

24     A.      Wages.

1          I think I could produce one, maybe two or

2    three a week, you know.  It was so tedious.  And the --

3    and there was a -- there were some that were -- you

4    just couldn't get to tune.  They were impossible to get

5    to work right.

6          So, I brown bag them.  I put them off to the

7    side.  And the contract was coming to an end.  And I

8    think I had gotten to about 160 units completed.

9          And the owner of the company just, you know,

10   found out that I had -- that these were not able to be

11   tuned.  And he got very upset about it.  And I was

12   terminated.

13   Q.        Before the Nanticoke Milford site that you

14   worked at was bought by Kent and became Bayhealth, what

15   was your position just prior to that?

16   A.        Supervisor.  And I managed a site -- well,

17   actually, I was working for Milford at that time.

18          Milford Hospital had -- Nanticoke had pulled

19   out of the deal, I guess, about ten months before they

20   merged with Kent General.

21          And I was promoted from a senior tech at that

22   time, to a supervisor.

23   Q.        At the time that Nanticoke pulled out of

24   Milford, you received that promotion?

DANIEL MILLER                                          25

1     A.        When the merger happened.

2     Q.        That's when the merger happened?

3     A.        Yes.

4     Q.        As a result of the merger, did you beginning

5     reporting to Linda Ritterhoff?

6     A.        Actually, I was reporting to Dave Walczak.

7     He was the director.

8     Q.        Did there come a time when you started

9     reporting to Linda Ritterhoff?

10    A.        After he promoted her to manager and demoted

11    me.

12    Q.        When was that?

13    A.        Possibly -- as close as I recall, it was

14    August.  August or September of the same year.

15    Q.        Who was the individual that made those

16    decisions?

17    A.        David Walczak.

18    Q.        He had been your supervisor prior to that?

19    A.        He had been the director of Kent General

20    Hospital since before 1980.

21    Q.        But how long was he your supervisor then?

22             For one month?

23    A.        Month and a half, yes.

24    Q.        You were, in your words, demoted?

**A-83**

1    A.        By supervisor, you mean superior?

2    Q.        Yes.

3    A.        Okay.

4    Q.        Is he the one you reported to directly after

5    the merger?

6    A.        After the merger, he would have been the one

7    I reported to directly, but I had nothing to report to.

8    Q.        I believe you said you were demoted from a

9    supervisor to a Biomed Grade 2?

10   A.        Yes.

11   Q.        Did you agree with that decision, the

12   decision to demote you from supervisor to a Biomed

13   Grade 2?

14   A.        No.

15   Q.        Were you given a rationale for that decision?

16   A.        Yes.

17   Q.        What was the rationale?

18   A.        That there were no biomed threes in her

19   department, and it would be unfair to the other

20   technicians who all were biomeds two, to have me as a

21   biomed three, when some of them had more education than

22   I did.  Formal education.

23   Q.        How long was Linda Ritterhoff your

24   supervisor?

1    A.        For Bayhealth, or Premier?

2    Q.        For either.

3    A.        Okay.  From '97, '98, until about September

4    of '99.  From July 1st of '97, to September 1st or 2nd

5    of '99.

6    Q.        Just so we're clear, and I don't want to over

7    emphasize this, but I think you said you started

8    reporting to her in August of '97.

9    A.        I thought you meant how long was she a

10   supervisor.

11   Q.        How long did she supervise you?

12   A.        Oh.  She supervised me from the time that he

13   promoted her, until September of '99 -- or '98.  I'm

14   sorry.  '98.  September of '98 it was when Premier came

15   in.

16             Then she was a supervisor with Premier for

17   one year.  So, it was '99.

18   Q.        So you say Premier came in, in 1998.  And she

19   remained your supervisor after Premier acquired --

20   A.        Yes.

21   Q.        -- your group, through September of '99; is

22   that correct?

23   A.        Yes.

24   Q.        During the period that Ritterhoff was your

DANIEL MILLER                                    28

1    supervisor, and I'm talking about the entire period

2    even after Premier comes in, okay?

3    A.        Um-hum.

4    Q.        So, August of '97, through September of '99,

5    are you with me?

6    A.        Yeah.

7    Q.        Did your position, the title of your

8    position, change at any point during that period?

9    A.        No, not that I can recall.

10   Q.        Where did you work during that period of

11   time?

12   A.        I worked at Milford Hospital for a time until

13   she started a practice of rotating people between

14   Milford Hospital and Kent General Hospital.

15   Q.        Let's talk about that for a minute.

16             When did she start that rotation system?

17   A.        I don't recall the exact date or month.

18   Q.        She started as your supervisor in August of

19   '97, correct?

20   A.        Right.

21   Q.        How long had she been your supervisor when

22   she implemented a rotation?

23   A.        Well, I would say close to the time that she

24   had became my supervisor.

DANIEL MILLER                                    29

1    Q.        Is it fair to say within approximately two to

2    three months?

3    A.        Either -- yeah.  Within two months, yes.

4    Q.        For how long did that rotation system remain

5    in place while Linda Ritterhoff was your supervisor?

6    A.        That remained in place until she was

7    terminated, or she resigned.  I don't know the -- I

8    don't know the facts on what happened with her.

9    Q.        Describe that rotation for me.  What I'm

10   interested in is, how often were you in Milford, how

11   often were you at Kent?

12             How did it work?

13   A.        She went through a rotation of each person

14   going down there by themselves for a period of time,

15   and then coming up to Kent General for a period of

16   time.

17             And she rotated through all the employees.

18   Q.        By down there, do you mean the Milford --

19   A.        Milford Hospital, yes.

20   Q.        During this time period, how often were you

21   at Kent?

22   A.        I think maybe -- maybe -- I was down there, I

23   believe, two rotation.  So, I was at Kent, I would say,

24   75 percent of the time.

**A-87**

DANIEL MILLER                                    30

1    Q.        When you were at Milford, what was the period

2    of rotation that you would rotate to Milford?

3    A.        I forget if it was -- I think it was more

4    than a month.  It might have been two months, but I

5    forget the amount of time it was.

6    Q.        Did Ms. Ritterhoff give a rationale for why

7    she implemented the rotation system?

8    A.        She said to familiar -- at that time, there

9    were different types -- different manufacturers of

10   equipment between the two hospitals.

11             Milford had bought from certain

12   manufacturers, while Milford was still its own entity.

13   And Kent General had bought from other manufacturers

14   while it was its own entity.

15             So, different styles of equipment doing the

16   same function, but they were different manufacturers.

17             And she said that was to familiarize

18   everybody with, you know, the equipment at both

19   campuses.

20   Q.        Did you agree with that rationale?

21   A.        No.  At the time, no.

22   Q.        Why not?

23   A.        Because I think it was just to spite me.

24   Because she had repeated to me, you didn't hire my

DANIEL MILLER                              31

1    husband, and Dave Walczak said it would have been all

2    right to hire him.

3            And I responded to her that it wasn't up to

4    me.  It was a decision made by Ed Muir, who was my

5    superior.

6    Q.        At the time that she was your supervisor and

7    this rotation system was in place, how many other

8    biomed techs like yourself were there?

9    A.        Five.  I would have been the sixth one.

10   Q.        So including yourself, there were six?

11   A.        Yes.

12   Q.        Were all six required to rotate in the

13   rotation system?

14   A.        Yes.

15   Q.        Did everybody rotate at the same rate?

16   A.        I believe so, yes.

17           But there were times when one person was

18   x-ray or imaging, but we all did imaging to some

19   degree, which was x-ray repair of the equipment and

20   stuff.

21           And at one time -- towards the end of her

22   tenure there, she stopped rotating the one imaging guy

23   because there had been a -- a problem with, you know,

24   him and personnel at that campus.

DANIEL MILLER                                    33

1    Q.        -- knowledge gained through either self

2    taught or on the job?

3    A.        Yes.

4    Q.        There came a period of time when Premier

5    acquired your group; is that correct?

6              The technicians?

7    A.        Yes.

8    Q.        You began to be employed by Premier, correct?

9    A.        Yes.

10   Q.        That was in the September '98 time frame?

11   A.        Yes.

12   Q.        For a one-year period, you reported to Linda

13   Ritterhoff while you were working for Premier, correct?

14   A.        Yes.

15   Q.        Then, I believe you said that she resigned?

16   A.        I might want to amend that.

17             For a time, I did work down at Nanticoke,

18   which was another Premier account.  And they were

19   closing the account down.

20             I worked down there.  And I reported to a

21   gentleman down there who was the supervisor of that

22   site.

23             That was only for maybe a month period.

24   Q.        Was that part of a rotation, or was it just a

**A-90**

DANIEL MILLER                                    41

1    putting glue on it and tacking it back down, yeah.

2              But I said to her, now, who does that sound

3    like?  Put names to people.  There was a fellow there

4    that put names to everybody.  And he was the one that

5    had the stalking problem.

6              And I said, does it sound like him?  Does it

7    sound like something he would do?  Did this come from

8    him?

9              And she just tore it up and said, never mind.

10   And she threw it away, and that was it.

11   Q.        Was there any other occasion where you were

12   given any warnings by Ms. Ritterhoff?

13   A.        No.

14             Not that I recall, should I say.

15   Q.        Did you, while she was your supervisor,

16   express disagreement to anyone about the rotation

17   system that she had implemented?

18   A.        I expressed to people, and people expressed

19   to me.

20   Q.        Let me be a little bit more precise.

21             Did you complain to anyone in management,

22   about the rotation system?

23   A.        In management, I don't recall if I had spoken

24   to Walczak about it or not.

A-91

DANIEL MILLER                                    42

1       Q.          Sitting here today, do you have any specific

2    recollection of having complained to anyone?

3       A.          No, I -- I don't recall at this time, whether

4    I had or had not.

5       Q.          After Ms. Ritterhoff resigned, who becomes

6    your supervisor at that point?

7       A.          Shawn Jones.

8       Q.          Where was Mr. Jones located?

9                   Where was he located physically?

10                  Kent, Milford?

11      A.          No, he was at Premier.

12                  I had met Mr. Jones first down at Nanticoke

13   during that shutdown operation.  And he informed me

14   that he had been chosen to replace Linda Ritterhoff.

15                  And that's how I found out Linda -- Linda

16   Ritterhoff was leaving.

17      Q.          Then after he replaces Linda Ritterhoff,

18   where is he physically located?

19      A.          At Kent General.

20      Q.          After he becomes your supervisor, what

21   happens to the rotation system?

22      A.          He ended it, because it had problems.

23      Q.          You say you reported to him while you worked

24   at Nanticoke for that one-month period?

DANIEL MILLER                                    44

1       site though.

2              Q.        Do you know if he ever managed multiple sites

3       at once?

4              A.        I'm not aware of that.

5              Q.        After how long becoming your supervisor, did

6       he end the rotation system?

7              A.        One month, month and a half maybe, at the

8       most.

9              Q.        We talked about the fact that Ritterhoff had

10      ended as your supervisor in September of '99?

11             A.        Yes.

12             Q.        Did Shawn Jones immediately become your

13      supervisor thereafter?

14             A.        Yes.

15             Q.        So September of '99, through when, was he

16      your supervisor?

17             A.        Until -- that's kind of blurry, because there

18      was an incident with the State, that the State found

19      out that the job wasn't being done as it was supposed

20      to be.

21                     The job wasn't being completed according to

22      State law, you know.  And in the contract, what was

23      specified to be done, wasn't done.

24                     And at that point -- wait a second.  This is

DANIEL MILLER                                    45

1    before that.  Hold on.

2              That -- he was my supervisor until Aramark.

3    Aramark was -- purchased Premier.  At that point, he

4    was promoted to a regional manager.

5              So, that would have been October of 2002.

6    Q.        In October of 2002, who becomes your

7    supervisor at that point?

8    A.        Terry Parrish.

9    Q.        Going back to September of 1999, you said the

10   rotation system was eliminated after approximately a

11   month.

12             Where did you begin reporting at that point?

13   A.        Milford Hospital.

14   Q.        Mr. Jones, his office was up at Kent,

15   correct?

16   A.        Yes.

17   Q.        Who, in your group, was at Milford during

18   that time period?

19   A.        Myself and an imaging engineer by the name of

20   Alan.  And I, at this moment, can't recall his last

21   name.

22   Q.        When you say, imaging engineer, is that the

23   same as an x-ray engineer?

24   A.        Yes, x-ray repair person.

**A-94**

DANIEL MILLER                          54

1    him, you know, in that type of form, I'm sure.

2    Q.        Well, in this e-mail, he's complaining to you

3    that on the 20th, he's learned through his own

4    initiative, that you were behind in your completion

5    rate, correct?

6    A.        Yes.

7    Q.        That you, in fact, hadn't told him that you

8    were significantly behind in your completion rate,

9    correct?

10   A.        I did not run numbers to know what my

11   completion rate was.

12   Q.        That's what he's complaining to you about --

13   A.        Yeah.

14   Q.        -- correct?

15   A.        Yes, I guess that's what this thing states.

16   Q.        But you don't agree with it, correct?

17   A.        I don't agree with it, because there's so

18   many variables.

19   Q.        Mr. Hill became your supervisor, you said,

20   beginning of July of 2004, correct?

21   A.        Yes.  That time frame -- in that time frame,

22   yes.

23   Q.        He remained your supervisor until the time

24   that your employment terminated, correct?

**A-95**

DANIEL MILLER                                    55

```
 1       A.        Yes.

 2       Q.        Was it Mr. Hill who informed you that your

 3   employment was terminated?

 4       A.        Yes.

 5                 I was aware of it before, and -- I was aware

 6   that something was going on, more or less.

 7       Q.        But it was Mr. Hill that informed you,

 8   correct?

 9       A.        Yes.

10       Q.        There was a period of time where you took a

11   leave of absence for medical reasons, correct?

12       A.        Yes.

13       Q.        When did you take a leave of absence?

14       A.        August 6th it began.

15       Q.        When did you return to work?

16       A.        In about the -- one and a half weeks into

17   December in -- of that year.  I don't know the exact

18   date offhand.

19       Q.        Approximately, December 10th of 2004?

20       A.        10th, 13th.  In that area, yes.

21       Q.        That was, approximately, a four-month leave

22   of absence?

23       A.        There was -- I had to use up my sick time

24   also.
```

**A-96**

DANIEL MILLER                                              56

1             Do you count that in as leave of absence, or

2        is that separate?

3        Q.       For purposes of my question, I'll count that

4        in.

5        A.       Okay.

6        Q.       You were out for, approximately, four months?

7        A.       Yeah.

8        Q.       Aramark granted you that leave of absence,

9        correct?

10       A.       Yes.

11       Q.       Now, the reason for your leave was what?

12       A.       Cancer.

13       Q.       When were you diagnosed as having cancer?

14       A.       I believe it was towards the end of June,

15       2004.

16       Q.       What was the diagnosis?

17       A.       Squamous cell carcinoma?

18       Q.       One more time?

19       A.       I can't pronounce it too well.

20                Squamous cell carcinoma.

21                     (Whereupon, a discussion was held

22           off the record.)

23       BY MR. DELANY:

24       Q.       Have you been diagnosed as having cancer at

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                                            57

1       any other point in your life?

2       A.        No.

3       Q.        Have you been diagnosed as having cancer

4       since?

5       A.         Well, let me rephrase that.

6                  I was diagnosed as having pre-cancerous

7       lesions by a dermatologist.

8       Q.        For purposes of ease of reference so that

9       neither of us have to repeat that phrase during the

10      course of this deposition, we're just going to refer to

11      your conditions that you experienced at least as of

12      June of 2004, as cancer, okay?

13      A.        Yes.

14      Q.        What was the diagnosis specifically?

15                 By that, I mean what was the plan of action

16      when you were diagnosed as having cancer?

17      A.         A radical fibula flap, dissection of the jaw,

18      removal of -- partial removal of the mandible, all

19      teeth included, removal of the leg bone.  The fibula

20      bone itself -- partial removal of that, I mean.  Ten to

21      twelve inches of that.  Resection that, opening up the

22      jaw, and placing that in there.

23      Q.        If I can sort of put this into layman's terms

24      if I'm understanding you correctly, there was a section

DANIEL MILLER

1    of your jaw where the cancer was located; is that

2    correct?

3    A.        The cancer was within a one centimeter of the

4    bone.  And -- and it was early Stage II.  And for all

5    practical purposes, it had to be removed because they

6    were unaware of whether it had -- if cancer had gotten

7    into the bone.

8    Q.        So, this was actually in your jaw area?

9    A.        It was in my mouth.

10   Q.        In your mouth, okay.

11   A.        That's initially in my mouth where it was

12   observed.

13   Q.        The plan of action was to extract a portion

14   of your jaw --

15   A.        Sure.

16   Q.        -- and mouth area?

17   A.        Mouth area.  Lymph nodes, and remove my --

18   ten inches of my fibula bone and place that in the jaw.

19   Do vascular surgery to feed the tissue there and flap

20   the tissues over the bone.

21           And that was -- that was basically it.

22   Q.        The fibula was a portion of your leg,

23   correct?

24   A.        It's one of the bones in your shins, correct.

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                                            59

1      Q.        That was for purpose of rebuilding your jaw?

2      A.        Reconstruction, yes.

3      Q.        During the period that you were on leave from

4      August of 2004, through December of 2004, did you have

5      the medical procedure that you referred to?

6      A.        Yes.

7      Q.        It took place during that time period?

8      A.        Yes.

9      Q.        Was that procedure successful in eradicating

10     the cancer in your mouth and jaw area?

11     A.        Removal of the cancer in my mouth, my lower

12     -- lower -- the floor of my mouth also because cancer

13     had spread.

14               It spread to the floor of my mouth, the back

15     of my tongue, and those portions were also removed.

16     Q.        Was the cancer completely removed during that

17     time period?

18     A.        During that time period, yes, the cancer was

19     removed.

20     Q.        Did you require any surgery after your return

21     in December of 2004?

22     A.        I required surgery prior -- a second surgery

23     prior to my return.

24     Q.        Let's focus on after your return.

**A-100**

DANIEL MILLER                          64

1    I never met the first -- I met the first surgeon only

2    once, but Hernandez was the one I dealt with.  And he

3    observed that my leg was not healing properly.

4             And towards the middle, the third week of, I

5    guess, around September, the third -- second, third

6    week of September, he told me he wanted me to go to a

7    wound center because my leg if it doesn't start

8    healing, they may have to amputate it.

9             So, at that point, I called Jonathan Hill and

10   I informed him, you know, that, you know, this is

11   getting worse and, you know, I won't be coming back as

12   I planned on the 18th or 19th of October.  And that I

13   probably will have to go in for additional surgery.

14            And at that point, I started going to the

15   Christiana Care Wound Center.  And they started

16   attempting to get the wound to close and heal, but it

17   was found out that there was multiple microbiological

18   agents in there.  Really rare ones.

19            So, they put me on a regiment of intravenous

20   -- heavy doses of antibiotics that could only be

21   administered through IVs.

22            And I went in for surgery.  I had the

23   surgery.  They grafted skin from my -- another portion

24   of my body and closed the wound by stretching the skin

DANIEL MILLER                                    66

1              And they were hesitant for a while.  And they

2    said, okay, what type of work are you doing?  And I

3    said, well, I'd be sitting at a bench repairing

4    equipment.

5              And they said, okay, we'll let you go back to

6    work.  And I'm still on the regiment of, you know,

7    drugs, but I don't think I was on the IVs any longer.

8    I was just doing pills at this time, for antibiotics.

9    Q.        So by the time you go back to work, the IV

10   antibiotics had terminated?

11   A.        Yes.

12   Q.        So from a procedure standpoint when you

13   returned to work, the only thing that you're doing at

14   that point, is taking oral medication; is that correct?

15   A.        I was taking oral medication, but I may have

16   still been taking a nightly dose.  I don't recall.

17             When you brought that up, I don't recall if

18   they cut me back to one antibiotic at night.  Because

19   something in my mind says there was something else that

20   was going on at nights.

21   Q.        But that was just an oral medication,

22   correct?

23             It was a pill you would take?

24   A.        I was given pills, but I'd have to look at

DANIEL MILLER                                    67

1    the documents now to recall whether I was completely

2    off the intravenous -- I mean, I had intravenous two

3    times a day, but I know I was only -- I was taken off

4    one of them, because one of them would have had to have

5    been in the morning.  I was in work, you know.

6              But I may have still had one at night.  I'm

7    not -- I don't recall if there was still one at night.

8    Q.        Do you know the period when you were taken

9    off the intravenous antibiotics?

10   A.        I'd have to research, you know.

11   Q.        By the end of January, were you off them?

12   A.        I was off them -- I'm sure I was off them by

13   Christmas.  I was on pills by Christmas, yes.  The

14   third week of December.

15             She was still doing tests and -- of my blood

16   up until -- I remember them being done around

17   Christmas.  They were still doing blood tests on me.

18   Q.        At the time you had come back to work, the

19   December 10th of 2004 time frame, what impacts of the

20   procedures that you had were you still experiencing at

21   that time?

22   A.        I was still using a cane to walk, because my

23   legs were still sore.  I stopped using the cane after a

24   certain period.  I forget what period that was.

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                              69

1    Q.        After April of '05, did the pain in your jaw

2    subside?

3    A.        The discomfort in the jaw subsided, yes.

4    Q.        You had referenced the fact that when you

5    came back to work, you were using a cane?

6    A.        I used a cane when I came back to work, at

7    times.  I think I only used it a few days though.

8              I used it when I came back from my interview,

9    I remember.  And I think I only used it for a very

10   short period, a day or two, you know, because dragging

11   a cane around is -- getting in and out of the car, you

12   know, dragging the cane around, I just didn't want it

13   around me any more.  I felt like I was an invalid.

14   Q.        After a couple of days, were you able to walk

15   without the cane?

16   A.        Yes.

17             I was able to walk without the cane, but the

18   cane took the load off the leg, you know.

19   Q.        Once you stopped using the cane after a

20   couple of days, were you able to walk around?

21   A.        I was able to move about, yes.  I couldn't

22   run, dance, or do anything of that nature.

23   Q.        Understood.

24             But you were able to get around, correct?

1      A.        Yes.

2      Q.        Did the condition with your leg improve?

3      A.        It didn't improve.  Over time it started

4      getting worse again, you know, the muscles by the donor

5      site, from using the leg and work, yeah.

6                But that wasn't until a month later.  Because

7      the first month, all that I did was basically sit in a

8      chair at a desk.  I wasn't all about the hospital doing

9      things.

10     Q.        Describe, though, the recovery of your leg.

11               Just explain to me how after your return to

12     work, what was the situation with your leg?

13     A.        The leg was all right when I wasn't in

14     motion.  But when I was in motion, the pain would start

15     coming.

16     Q.        What would you do about the pain?

17     A.        I would take aspirin.  I'd take Aleve, you

18     know.  And then try to find a men's room and sit in a

19     stall for a while and rest.  Stuff like that.

20     Q.        With taking the aspirin and sitting, were you

21     able to address the situation?

22     A.        For a moment or two.  But as soon as I got

23     back up and started walking again, it would return.

24     Q.        How long did that last?

DANIEL MILLER                                        71

1        A.          That lasted for months.

2        Q.          How many months?

3        A.          Until, I would say, the end of April.  A good

4        two weeks after I left, where I was sitting a lot, it

5        decreased a lot and started feeling better than.

6        Q.          I didn't follow that.

7        A.          It ended towards the end of April of '04,

8        beginning of May, because I wasn't putting any weight

9        on it any longer.

10       Q.          April of '05?

11       A.          '05.  Yes, '05.

12       Q.          Other than the couple days of using the cane

13       when you first came back, did you need any other

14       assistance to walk?

15       A.          Holding onto the banister going up the

16       stairs, normal things like that.

17       Q.          Anything beyond that?

18       A.          Not that I recall, no.

19       Q.          Were there any other medical issues you were

20       experiencing other than what we've already discussed,

21       after your return to work?

22       A.          Yes.

23       Q.          What were they?

24       A.          Headaches, for one.  Loss of appetite.

**A-106**

DANIEL MILLER                                     73

1      condition that you had?

2              We talked about the fact that you had some

3      issues with your leg after you returned to work.

4      A.        Right.

5      Q.        And that you had occasions where you had some

6      discomfort in your jaw --

7      A.        Um-hum.

8      Q.        -- and you took aspirin for it, correct?

9      A.        Yes.

10     Q.        Was there anything else related to the cancer

11     condition that you experienced, after your return to

12     work?

13     A.        Not -- not that -- as I returned to work,

14     there was conditions prevalent there of, you know, you

15     know, pain, you know, in my jaw and stuff.  They slowly

16     went away, as I said, right?

17             But then other conditions are creeping in.

18     Q.        If I'm understanding you right, those other

19     conditions were unrelated to the cancer procedure.

20     A.        Yes.

21     Q.        We'll talk about those in a minute.  I just

22     want to make sure we've exhausted the conditions that

23     related to the circumstance of cancer that you

24     experienced and the procedure that you underwent.

A-107

DANIEL MILLER                                    75

1    you returned to work, to the end of April of '05, what

2    frequency did you have pain in your leg?

3    A.        The pain in my leg was most severe in

4    February.  And I had frequencies of it if I was

5    standing on it for long periods of time in March.

6              And I had it again in April, but not with the

7    severity of February or March.

8    Q.        So in February, describe for me the severity.

9              What would happen, and how would you address

10   it?

11   A.        You know what a charley-horse feels like?

12   Q.        Yes.

13   A.        Okay.  That's the pain I felt, you know.  It

14   just wouldn't go away.  So, I had to take medication

15   for it, those pills, and try to just hide, you know,

16   not hide, but more or less try to relax some place, sit

17   some place where, you know, the pain would -- until the

18   pills started working.

19   Q.        Were you still able to work during that time

20   period?

21   A.        I had to work because I was the only one

22   assigned to the assignment.

23   Q.        So, you were still able to work, correct?

24   A.        Yes, I had to suffer through it.

**A-108**

DANIEL MILLER

1    Q.        Were you able to do other things in your

2    personal life?

3    A.        For instance?

4    Q.        Were you able to go to the supermarket?

5    A.        Yeah, I could go to the supermarket, but it

6    was on a short basis.  Maybe an hour.  I wasn't doing

7    it eight hours a day.

8    Q.        Was there anything that you were able to do

9    before, that you were unable to do in February of 2005,

10   because of your leg?

11   A.        I don't recall of classifying anything like

12   that, you know.  Could I do this, can I do that, you

13   know, I don't recall doing that.

14   Q.        Is there anything you can think of today that

15   you were not able to do in February of '05, that you

16   did before that?

17   A.        I'm not an athlete, active person.  So, you

18   know, it's work and home, work and home, you know.

19            And at home I, you know, I couldn't, of

20   course, clean as much as I did before, you know.  I

21   would just sit down when it, you know, started to

22   bother me.

23   Q.        This is at home, you're talking about?

24   A.        Yes.

DANIEL MILLER                                    77

1    Q.        Were you able to clean at home in February --

2    A.        Yeah, I could clean for two hours straight,

3    you know what I mean, but no longer could do that.

4    Q.        But were you able to clean at home?

5    A.        Yes.  With breaks in between and stuff, yes.

6    Q.        How about March?

7              Did the condition improve in March?

8    A.        It improved slightly, but it was still there.

9    Q.        But you were still able to work in March,

10   correct?

11   A.        Yes, I was -- I was at work in March.

12   Q.        You were still able to clean at home in

13   March?

14   A.        I was cleaning at home in March, yes.

15   Q.        There was nothing that you can think of today

16   that, in March, that was different in what you could

17   do, than what you could do before you had the

18   procedure?

19   A.        Yes, there was some things that I couldn't

20   do.  Now that it comes to mind, I used to take my dog

21   for walks at a place for dog training down in lower

22   Kent County on Paradise Alley -- Paradise Alley Road --

23   Lane there, I think it is.

24              And it's a big oval type thing in the woods

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                                    80

1    Q.        That was July 1st of 2004, correct?

2    A.        July of 2004.

3    Q.        You went out on leave August 6th of 2004?

4    A.        Yes.

5    Q.        So, Mr. Hill had been your supervisor for

6    approximately one month before you went on a leave of

7    absence?

8    A.        Yes.

9    Q.        During that time period, were you working at

10   the Milford location?

11   A.        I worked there for years, yes.

12   Q.        But I just want to focus on that one month --

13   A.        I was solely at the Milford location that

14   month, yes.

15   Q.        Where was Mr. Hill located primarily?

16   A.        At the Kent location.

17   Q.        During that one-month period, what frequency

18   did you interact with Mr. Hill?

19   A.        I met him once.

20   Q.        Where did you meet him?

21   A.        In the department.  Shawn Jones brought him

22   down and introduced him.

23   Q.        Other than that one meeting, did you have any

24   interaction with Mr. Hill during that one-month period?

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                                    81

1     A.        No, not that I recall.

2     Q.        The next interaction --

3     A.        My -- you got to understand my mind was on,

4     hey, you might have terminal cancer, you know, you

5     might be gone in three months.  You don't know.

6               So, -- but to my recollection, no.

7     Q.        Then you go out on a medical leave of

8     absence?

9     A.        Yes.

10    Q.        When is the next interaction you have with

11    Mr. Hill?

12    A.        When I called him on the phone to relate the

13    message that I would probably need to extend -- I was

14    looking into extending my leave to cover possible

15    needed surgery.

16    Q.        Did you talk to anyone other than Mr. Hill,

17    about needing to extend the leave?

18    A.        Not -- family, friends, you know, anybody I

19    talked to.

20    Q.        Let me be clear, though.

21              Did you talk to anyone else at Aramark, or

22    was calling Mr. Hill and discussing it with him

23    sufficient to address the problem?

24    A.        You mean in upper management?

**A-112**

DANIEL MILLER                                    82

1    Q.        Yes, or human resources.  I just want to know

2    if you called anyone else to --

3    A.        Yeah, I had to contact somebody about it.  I

4    recall that.  I had to contact somebody and tell them I

5    need a leave of absence -- extended leave of absence.

6              And then I had to contact Aetna, I believe.

7    And I got letters from Aetna okaying it, but I don't

8    recall who they were, you know, at this point.

9    Q.        But the need to extend your leave of absence

10   was approved by Aramark ultimately, correct?

11   A.        Yes.

12   Q.        When you had that conversation with Mr. Hill

13   that you would need to extend your leave of absence,

14   what did you say to him, what did he say to you?

15   A.        I tried to communicate with him.  I had a

16   problem with communication because, you know, my mouth

17   was all swollen and, you know, to this day, my tongue

18   is tied to the side of my mouth, you know.

19   Q.        You were speaking by way of example there.  I

20   think what you're trying to say is --

21   A.        I tried to talk to him.  I explained to him

22   at the time, I could only talk for maybe two or three

23   minutes.  Then I'll get very exhausted with my mouth.

24              Do you understand that?

**A-113**

DANIEL MILLER                                        83

1              He said, yes.

2                    Then I explained to him what was going on,

3       that I would be needing additional time, that I had

4       developed an infection in my leg and I probably need

5       surgery, you know, and extend it.

6       Q.        Did he agree to extend it?

7       A.        He had no power on it.  I believe the Aramark

8       upper people were the ones that were doing it.

9                    I was just informing him because the policy

10      said every four weeks you got to inform your immediate

11      boss what was going on.

12      Q.        Did he say anything to you in that --

13      A.        No.  He wished me the best and stuff like

14      that.

15      Q.        Have you had any recurrence of the cancer?

16      A.        No -- of the cancer we spoke of, right?

17      Q.        Yes.

18      A.        No.

19      Q.        Have you experienced any other cancer since

20      this circumstance?

21      A.        I was leery about the other -- during my

22      employment, I was leery about the skin cancer since I

23      had pre-cancerous things and -- well, the definite time

24      when they told me you -- that the cancer had not

DANIEL MILLER                                        88

1    technicians, a newer one, was only, you know, one year

2    there.  And I felt it would be unfair to send him down

3    there all by himself.

4             And he said, well, in my opinion, you swim or

5    you sink.  You swim or you're out, you know, you don't

6    work here no more.

7             And that was his attitude, you know, about --

8    he didn't directly say it about me, or directly say it

9    about the person I was talking about, but that -- he

10   explained that was his attitude.

11            And that's about what we discussed.

12   Q.       At this point in time, you were called a CE

13   tech, correct?

14   A.       A CE tech, yes.  Some people referred to

15   it -- well, do you want me to describe the whole

16   difference?

17            Years ago it was called a biomedical.  And

18   biomedical is not actually clinical in the hospital.

19            So, they changed -- the society -- Amy

20   started pushing for the name change from biomedical

21   engineering technician to biomedical equipment and to

22   clinical equipment.  And the society pushed for this

23   change.  And it got adapted.

24            Even when I came down to Milford Hospital

DANIEL MILLER                                           89

1    when I first came there, they made up a sign that said

2    biomedical engineering.

3              And my boss, Wilson, at the time, got all

4    upset because he wanted clinical engineering instead.

5    Q.        But at the time that Mr. Hill was your

6    supervisor, you were called a CE tech, correct?

7    A.        Yes.

8    Q.        Did he inform you at the evaluation meeting,

9    that he was going to be implementing a rotation system?

10   A.        Yes.

11   Q.        So, was it going to be you and the other CE

12   techs that were going to be rotating between Kent and

13   Milford?

14   A.        Yes, he designated that it would be rotating

15   CE techs.  He didn't say anything about the imaging

16   techs at that time.

17   Q.        Other than the imaging techs, that rotation

18   system was applicable to all of the CE techs, correct?

19   A.        All of the personnel other than imaging techs

20   at that time, was only CE techs, yes.

21   Q.        How many imaging techs were there?

22   A.        Let me count.

23              Four or five.  I -- I can't recall the exact

24   number now right at this minute.

                                                      **A-116**

DANIEL MILLER

1      Q.       How many CE techs were there, including

2   yourself?

3      A.       Oh, how many imaging techs; did you say?

4      Q.       Yes.  Let's go back to that first.

5               How many imaging --

6      A.       Okay.  Imaging techs, there was one at each

7   site.

8      Q.       So, a total of two?

9      A.       Two, yes.

10      Q.       CE techs including yourself, there were four

11   to five?

12      A.       Four to five, yes.

13      Q.       The proficiency testing that he indicated

14   during the performance review that he was going to

15   implement, was that going to be applicable to all of

16   the CE techs?

17      A.       Yes.

18      Q.       Was he going to do proficiency testing for

19   the imaging techs as well?

20      A.       He didn't discuss that with me.

21               He had scheduled it prior to me coming back.

22   And then he didn't schedule it.  And then he

23   rescheduled it.

24               It seems like it was ongoing until I came

1    back.  So when I came back, it started.

2        Q.        It started for everybody, correct?

3        A.        Yes.

4                        MR. DELANY:  Let's go off the

5        record for a minute.

6                        (Whereupon, a recess was taken for

7        lunch.)

8                        (Whereupon, a discussion was held

9        off the record.)

10   BY MR. DELANY:

11       Q.        Mr. Miller, we're back on the record.  You

12   indicated off the record, that there was something that

13   you wanted to clarify about your prior testimony?

14       A.        Yes.

15       Q.        Why don't you go ahead and clarify.

16       A.        Earlier today when you asked me was there any

17   other ailments from the surgery that lingered on, there

18   was.

19                My left arm could not be raised out from my

20   side all the way to the top of my head like my right

21   arm.  It only goes up so far.

22       Q.        You're demonstrating, and it looks like your

23   left arm can only go slightly above your shoulder?

24       A.        Yes.

DANIEL MILLER                                    92

1    Q.        But your right arm can go all the way up --

2    A.        All the way up to the top.

3              MR. PRIMOS:  If I can just clarify

4    for the record, I thought the question was any

5    pain-related problems, because Mr. Miller has

6    also indicated some problems having to do with

7    his speech, his tongue and so forth.

8              So, I don't know what your original

9    question was when you --

10             MR. DELANY:  Sure.  Let me clarify

11   just so it's clear.

12   BY MR. DELANY:

13   Q.        Back to the question, what I wanted to know

14   is after you came back to work, whether there was any

15   lingering effects from the condition in the surgery

16   that you had.

17             We talked about your leg.  We talked about

18   some discomfort in your jaw.

19   A.        Um-hum.

20   Q.        We talked about now your indication about

21   your left arm and your ability to raise it.

22   A.        Right.

23   Q.        Was there anything else?

24   A.        And my speech.

DANIEL MILLER                                      93

1    Q.        What was --

2    A.        That wasn't pain, but it was speech.

3    Q.        With respect to your speech, what impact did

4    your condition or the remedy for your condition have on

5    your speech?

6    A.        Certain words I've learned that I cannot

7    pronounce properly.  And I have difficulty speaking for

8    long periods of time without salivating.

9              And I brought this to my doctor's attention

10   and -- well, he said that he believed I really didn't

11   need speech therapy.  I wasn't that far into, you know,

12   a bad speech problem.

13   Q.        Did you, in fact, obtain any speech therapy?

14   A.        No.

15   Q.        You're able to converse with people?

16   A.        If I speak slowly, yes.

17   Q.        With those points of clarification, were

18   there any other --

19   A.        There were other problems I had, but they

20   developed after my return to work.  And I believe that

21   they were more work related.

22   Q.        I just want to make sure we've closed out the

23   issues that resulted from your condition or the

24   surgeries related to that condition.

**A-120**

1                         (Whereupon, a discussion was held

2              off the record.)

3       BY MR. DELANY:

4       Q.         The copies you have at home, were they in

5       color, colored paper?

6       A.         I don't -- I don't recall.

7                  I was just glancing through it.  I didn't

8       know it was an evaluation, you know.

9       Q.         Well, we'll just ask you to look for it.  And

10      if you have it, give it to your lawyer and we'll get it

11      that way, okay?

12      A.         Okay.

13      Q.         That's all we have on that one.

14                 You referred to the fact that Mr. Hill

15      indicated to you that he was going to implement some,

16      I'll call it, competency testing?

17      A.         Yes.

18      Q.         I believe you referred to it as proficiency

19      testing?

20      A.         Yes.

21      Q.         We're talking about the same thing, correct?

22      A.         Yes.

23      Q.         I'm going to refer to it as a competency

24      assessment, okay?

DANIEL MILLER                                    101

1        A.        Yes.

2        Q.        Mr. Hill, in fact, did implement that

3   practice for everybody, correct?

4                  We talked about that already?

5        A.        Yes.

6        Q.        By everybody, let me be more precise.

7                  For the CE techs?

8        A.        Yes.

9        Q.        You took the competency assessment, correct?

10       A.        Yes.

11       Q.        You passed it, correct?

12       A.        According to Mr. Hill.

13                          (Whereupon, a discussion was held

14            off the record.)

15                          (Whereupon, Exhibit Miller-4 was

16            marked for identification.)

17                          THE WITNESS:  He was coaching me

18            throughout it, as I was taking it.

19   BY MR. DELANY:

20       Q.        What do you mean by that?

21       A.        Well, you know, Dan, what this will do, what

22   that will do, you know, just trying to get me through

23   it.

24       Q.        Was he trying to help you through it?

1    Q.        So, the answer is no?

2    A.        No.

3    Q.        Do you have an understanding as to whether

4    JCAHO had the requirements regarding their completion

5    of the PMs?

6    A.        That's why Bayhealth got in trouble.  They

7    weren't completing what was required to be completed.

8              Yes, I was aware that that was part of --

9    they had a set amount that had to be completed.

10   Q.        When you say they got in trouble, what are

11   you referring to?

12   A.        When Terry Parrish was in charge.  And from

13   what I understand -- I was down at Milford once again.

14             The only communication I had about it was

15   from John Ritterhoff, that there was just too, too many

16   instruments for the small staff to inspect and we had

17   to do something about it.  And I said I wasn't getting

18   involved.

19             Then the next thing I heard was JCAHO -- not

20   JCAHO.  The State was going through the hospital, and

21   they found a lot of old stickers that were years old,

22   on a lot of equipment.

23             And they called Mr. Parrish in to interview

24   him on why.  And Mr. Parrish called Mr. Ritterhoff in

1       to explain to them.

2                   And, you know, they found that they were in

3       violation.  The hospital was in violation.  And that's

4       all I heard.

5                   And then -- well, I heard that Shawn Jones

6       mentioned to me that the PM completion as you showed me

7       this morning -- well, I think it was 23 percent -- or I

8       forget the percentage now, but the whole hospital when

9       they caught them, was at 27 or 28 percent completion

10      for the year or something like that.  And the hospital

11      that I was working in was at 87 percent completion.

12                  So, I was, myself, was doing a better job

13      than all those fellows up there.

14      Q.          But that's one of the things that the State

15      looks at, correct?

16      A.          Yes.

17      Q.          The PM completion?

18      A.          Oh, yes.

19                  That was a long, drawn out answer.  I'm

20      sorry.

21      Q.          When you came back to work in December of

22      '04, were you released to work full time?

23      A.          Could you clarify for me?

24      Q.          Sure.  Let me ask it this way:

DANIEL MILLER                          105

1          When you were released to work in December of

2     '04, did you have any restrictions?

3          Did your doctor put any restrictions on your

4     ability to return to work?

5     A.          Light duty.

6     Q.          How was that communicated to Aramark?

7     A.          I -- I don't recall at this time, if I gave

8     Jonathan Hill a note or -- I don't recall at this time,

9     but it was communicated.

10    Q.          What was communicated as far as light duty?

11    A.          bench work, I believe it was supposed to be.

12    In a sitting position, you know.

13    Q.          For how long were you supposed to be doing

14    bench work?

15    A.          Well, the restriction was kind of lifted at

16    my request to the doctor, because I felt the other

17    technicians were getting upset that I wasn't doing my

18    share.

19          Plus, I wanted to -- I felt at the time,

20    that, you know, I was able to do, you know, more work,

21    you know, move around more.

22    Q.          The bench work that you're referring to, how

23    long did you do that for?

24    A.          At that time period?

1    Q.        Yes.

2    A.        Approximately one month.

3             I did one -- go out -- I did one field

4    service call up to Wilmington, a site in Wilmington,

5    which was a, you know, I drove my car up there.

6             And I -- I -- I may have, you know, did

7    small, maybe incidental movement throughout the

8    hospital to assist somebody, but 90 percent of the time

9    I was at the bench.

10   Q.        If I'm understanding the bench duty

11   correctly, people would bring the equipment to you to

12   work on?

13   A.        No, no.

14            I would get up -- the equipment would be in

15   the shop itself.  And I'd get up and pick it off the

16   shelf and work on it.

17   Q.        But you didn't have to go out into the floors

18   to get the equipment?

19   A.        No.

20   Q.        The other techs brought it to you?

21   A.        Right.  They would bring it down, yes --

22   well, it was all backed up.  It was piled up.  So, they

23   didn't have to bring me anymore.

24   Q.        So, you were able to work directly in the

1      shop?

2      A.       Yes.

3      Q.       Isn't it true that Mr. Hill told you that you

4      should do that as long as you needed to, so that you

5      could get better?

6      A.       No, I don't recall that.

7      Q.       No discussions like that at all?

8      A.       No, I don't recall it.

9      Q.       You indicated that you asked to be taken off

10     of the bench duty work.

11             Who did you have that discussion with?

12     A.       I didn't have the discussion with anybody in

13     the shop.  I asked my doctor if, you know, I -- first I

14     asked one doctor, and they said no.

15             Then I asked another doctor, and they said,

16     well, let's see what the first doctor says.  And the

17     first doctor says, well, as long as you're only doing

18     bench duty, you know, it's okay.  I'll take you off

19     light duty.  And that was it.

20             That was between the plastic surgeon and the

21     bacteriologist -- immunologist, I guess you would call

22     it.

23     Q.       What did you communicate to Aramark regarding

24     your ability to work?

1    A.        I communicated that my doctor said that it

2    was all right for me to move on to, you know, other

3    work, but at the bench level.

4    Q.        So, you indicated that you --

5    A.        I could go up and pick up the equipment and

6    bring it down, you know, not pick it up or wheel it

7    down, know what I mean, on a cart or something.

8    Q.        Is that what you did?

9    A.        Yes.

10   Q.        How long --

11   A.        Until -- until February when the rules come

12   out.

13   Q.        When what?

14   A.        The scheduling came out.  Jonathan drew up a

15   schedule.  His rotation schedule.

16   Q.        What happened at that point?

17   A.        I confronted Jonathan about the rotation

18   schedule.  I had been out since August, and everybody

19   -- each technician had rotated down to Milford.  And it

20   was coming up to the last technician.  And I said, why

21   ain't I on there?

22             He said, well, I put you at last.  I -- he

23   said -- he stated that when somebody comes back from

24   being out on leave or something like -- something to

DANIEL MILLER                                    109

1          that order, that they go to the end of the line.

2                    I said, well, the end of the line is now.

3          It's the end of the rotation.

4                    He said, no, I mean the next rotation.

5                    So, I was put at the end of the following

6          rotation, and not at the first -- or just way back

7          there seven months away.

8          Q.        So, you worked up at Kent then?

9          A.        Yes.

10         Q.        When did you no longer work just on bench

11         duty?

12         A.        February 1st.

13         Q.        Why was that?

14         A.        Jonathan scheduled me to take all the man

15         calls for the whole hospital.

16         Q.        Did you indicate to Mr. Hill or to Aramark,

17         that you were able to come back without restriction?

18         A.        I indicated I could come off light duty, yes,

19         but I didn't indicate that I was completely healed.

20                    I understood that -- I understood that light

21         duty was a step up.  What I was supposed to be a step

22         up from, you know, but not the whole hospital on just

23         one person.

24                    Whereas in that January month, the person who

DANIEL MILLER                                    110

1        was on rotation got assistance when Jonathan would

2        assign someone to help them.

3                    No one was assigned to me.

4        Q.        This was at Kent?

5        A.        Kent, yes.

6        Q.        Did you indicate to anyone at that point,

7        that you had restrictions on your ability to work?

8        A.        No.

9        Q.        Did you complain to anybody that you were

10       having difficulty completing any of your tasks?

11       A.        I -- I didn't complain to Jonathan.  I

12       complained to individuals other than Jonathan that, you

13       know, it's too much for me.

14                    But Jonathan had this policy you sink or you

15       swim, or you're out, you know.  So, I wasn't going to

16       complain to you.

17       Q.        The other people you indicated you complained

18       to, were they coworkers?

19       A.        Yes.

20       Q.        Did you complain to Mr. Hill at any point

21       after your return, that you were having any difficulty

22       at work?

23       A.        After my return, did I -- could you clarify

24       that a little bit better, please?

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                                    111

1       Q.          Sure.  Let me just repeat it.

2                   After you returned to work --

3       A.          Um-hum.

4       Q.          -- did you ever complain to Mr. Hill that you

5       were having any difficulty completing your work?

6       A.          Yes.

7       Q.          When was that?

8       A.          In paperwork, not in physical work.

9       Q.          When was that?

10      A.          In March.

11      Q.          So, the physical work you never complained

12      that you had any difficulty with that, correct?

13      A.          No.  I didn't want him to know.

14      Q.          You never indicated to Mr. Hill that you were

15      having any pain in your legs as a result of work; isn't

16      that correct?

17      A.          No, I didn't indicate to him about anything.

18      Q.          What was the paperwork issue in March?

19      A.          The paperwork issue is what he wrote me up

20      for.  He documented me for disciplinary action.

21      Q.          What did you complain to him about in that

22      regard?

23      A.          He complained that I was not completing all

24      the parts of an initial inspection form that he said

A-131

1    A.        Yes, because the paperwork was -- the other

2    fellows who turned in paperwork, was given their

3    paperwork back.

4             My paperwork was held as a prosecutionary

5    weapon against me.

6    Q.        You indicated that you complained to Mr. Hill

7    about refusing time off?

8    A.        Yes.

9    Q.        What did you complain to him about?

10   A.        Why can't I have it off?

11            And he said, for disciplinary reasons.

12   Q.        What was the date that you needed off?

13   A.        I needed off April 1st, and April 4th.

14   Q.        What did you tell him was the reason that you

15   needed the time off?

16   A.        I had to -- there was no declaration policy

17   that I had to give a reason.

18   Q.        I'm not suggesting that there is.  I just

19   want to know if you did give a reason.

20   A.        I don't recall if I -- we were having --

21   well, he was -- he was in there on a Saturday, waiting

22   for me to come in on call, watching a movie.

23            When I opened the door, he turned the movie

24   off and acting like he was working.  And he asked me

DANIEL MILLER                    115

1    what I was doing there.

2              But he already knew why I was there, because

3    he had a system set up that when I was called, the

4    person placing the call from Charlotte to headquarters

5    would call him.

6              So, he knew I had to show up.  If I didn't

7    show up, I would have been written up disciplinarily.

8              I had turned paperwork in approximately days

9    before this.  And he had never came to me and said

10   anything to me about it, what he was going to do with

11   it.

12             I was under the understanding from people in

13   the shop, that he was going on a cruise.  And he didn't

14   let me know anything about my paperwork, whether I had

15   the two days off or not.

16             So, I went to the office and we discussed it.

17   And he, at that point, gave me the reason that it was

18   for disciplinary actions for the way I handled

19   something a month earlier.

20   Q.        Did you give him any reason for why you

21   needed these two days off?

22   A.        I may have mentioned for health reasons, but

23   I'm not positive.  I'm not going to say whether I

24   didn't or I didn't.

1          But he changed his attitude toward the end of

2    the conversation.  He said, I may change my mind.  And

3    that it, more or less, it wasn't written in stone.

4          And then I went about, you know, solving the

5    problem that I was called in for.  And he packed up and

6    he left.

7          And I thought he was just going out to his

8    car, he would come back and say something to me, and I

9    didn't see him for another week.  A whole week and --

10   well, eight days I guess it was.

11   Q.        Sitting here today, do you have any specific

12   recollection of telling Mr. Hill why you needed off on

13   those days?

14   A.        It was none of his business, you know -- why

15   I did, or why I didn't?

16   Q.        Do you have any recollection that you told

17   him why you needed off?

18   A.        I don't have any recollection if I told him

19   why I needed off, because I was informed that, you

20   know, like, you didn't have to tell people your

21   business.

22          It was also HIPAA or whatever.  You don't

23   have to tell them, you know.  I have a physical problem

24   and I have to take care of it.

1    she approached her brother-in-law, John

2    Ritterhoff, and said, Jonathan said not to give

3    this paperwork to him until Thursday.

4            John Ritterhoff, who Jonathan had made

5    acting manager for the week, said, give it to him

6    now.

7            So, Sharon Money came down and give me --

8    gave me the paperwork that stated I was being

9    denied time off for disciplinary reasons.

10   BY MR. DELANY:

11   Q.        Back to my question.

12           You ultimately were able to take off the time

13   you needed, correct?

14   A.        Okay.  On Tuesday, I became aware that vice

15   presidents from Aramark were coming to the hospital to

16   try and secure a contract signature off Mr. Walczak.

17           And they came.  And I had a chance to get in

18   private with Tom Cuthbertson.  And I approached him and

19   showed him the letter, the refusal notice.  And he

20   said, this is not company policy.

21           And I presented him with a doctor's

22   appointment card that I located that weekend.  And he

23   asked me if I had shown it to Mr. Hill.  And I said,

24   no.

DANIEL MILLER                                    119

1              And then he asked me, well, do know, you

2       know, Jonathan has to, you know, man this hospital and

3       everybody's got to be here.  If somebody is off, he

4       can't give you the day off.  And he started approaching

5       it like that.

6              And he said, could you -- could you possibly

7       come in Friday, you know, and, you know, whatever you

8       were doing Friday, transfer it, because this says you

9       have a doctor's appointment on Monday?

10             And I said, yes, I can do that.

11             And then he approached me and he asked me,

12      well, how about if you come in Monday morning?  And

13      this says you have a doctor's appointment, you know, at

14      three o'clock, you know, and leave at 12:00.

15             And I said, yes, I can do that.  And so, I

16      eventually got a half a day off out of it.

17      Q.        You were able to meet your doctor's

18      appointment, correct?

19      A.        Yes.

20      Q.        I just need to get a little bit more precise

21      on when you came back to work, what was communicated to

22      Aramark about any restriction that you had?

23      A.        I don't have that -- I haven't reviewed that

24      paperwork.

**A-136**

DANIEL MILLER                                              120

1    Q.        When you first got back, did you submit

2    paperwork to Aramark that indicated what you were able

3    to do?

4    A.        At this time, I don't recall.  I really,

5    honestly, don't recall.

6    Q.        You first came back, I think you indicated,

7    for a month, and you were on bench duty?

8    A.        Yes, for about a month -- well, the first

9    week of December to the first week of January.

10   Q.        That entire time period you remained on bench

11   duty?

12   A.        Well, other than I explained that I did take

13   a ride up to Wilmington.  There was a high school up

14   there that had some equipment that I checked.  I recall

15   that.

16             And I may have went off with a technician to

17   give him assistance and a hand once or twice.

18             I don't recall, you know, everything I did

19   every second of the day.

20   Q.        Those were all your decisions to go out from

21   the bench duty area, correct?

22             In other words, no one ever made you go out

23   and perform work that you were unable to perform?

24   A.        No.  No, I don't recall that, no.

DANIEL MILLER                                    121

1    Q.        Then after the first 30 days, what did you

2    communicate to Aramark as far as your ability to work

3    at that time?

4    A.        The first 30 days, did I communicate to

5    Aramark?

6    Q.        After the first 30 days.

7              We talked about the fact that you were on

8    bench duty --

9    A.        Right.

10   Q.        -- for the first 30 days.

11   A.        Right.

12   Q.        Then what did you communicate after that as

13   far as your ability to work?

14   A.        I didn't communicate to Aramark, other than

15   with a doctor's paper release.  Just that.

16   Q.        What did that say?

17             Did that say you were able to return to work?

18   A.        I don't recall exactly what was written on

19   it.

20   Q.        Are you aware of the communication of any

21   restrictions after the first 30 days?

22   A.        I'm not aware of what was written on it.

23   Q.        Who did you give that to, that document?

24   A.        I may have put it in Jonathan's -- he had a

DANIEL MILLER                                    123

1    Q.        Just to confirm, after you returned to work,

2    you never communicated at all to Mr. Hill any problems

3    you had performing the work you were performing?

4    A.        I don't recall at this time.  You're spanning

5    a month now -- several months.

6    Q.        Do you have any specific recollection of any

7    instance where you did that?

8    A.        I don't recall.

9                        (Whereupon, a discussion was held

10        off the record at this time.)

11                        (Whereupon, Exhibit Miller-5 was

12        marked for identification.)

13   BY MR. DELANY:

14   Q.        I present you with Exhibit 5, which is a

15   Bayhealth Medical Center job description and Standards

16   of Performance For Clinical Engineer Department.  And

17   the position title is clinical equipment technician.

18             Have you had the opportunity to look at that

19   document?

20   A.        Yes.

21   Q.        Does it accurately reflect the job

22   description and the standards of performance for the

23   clinical equipment technician?

24   A.        Developed by who?

**A-139**

DANIEL MILLER                                    124

1              The ACTS, or developed by Jonathan Hill?

2       Q.       Well, it's the description developed by

3    Mr. Hill, correct?

4       A.       Correct.

5       Q.       Is there anything about it that you think is

6    inaccurate as it relates to the position of CE tech?

7       A.       Yes.

8       Q.       What issues do you have with the description?

9       A.       "Ability to manage items weighing up to 50

10   pounds," for one.

11      Q.       What about that inaccurately reflects the

12   position?

13      A.       I've seen these before and I've dealt with

14   them, and it's usually 35 to 40 pounds.  And it says --

15   normally says, "lift."

16              "Manage" could mean you're walking up a

17   ladder with a 50-pound sack on your shoulders.  Also,

18   sufficient use of arms, legs -- I mean, arms, hands,

19   legs and feet to accomplish tasks.

20              And at Bayhealth, we had a person called

21   Titus.  He worked there under Shawn Jones.  He was born

22   with one leg.  So, I never heard of that one before.

23              "Ability to communicate and be understood

24   under normal circumstances."  I never seen that one

A-140

1    before.

2    Q.        Just taking each one of those --

3    A.        There's several other things in here that --

4    Q.        Well, what other ones do you view as

5    inaccurately describing the position or its

6    requirements?

7    A.        No.  I'll take that remark back.

8    Q.        So, we've covered all those with which you

9    have a disagreement?

10    A.        I'll have to review them all.  Excuse me a

11    second.

12            Is this applicable to today, or only at the

13    time frame that I was employed?

14    Q.        This was presented to you when you returned

15    to employment, correct?

16    A.        This was given to me and demanded that I sign

17    it, or else.

18    Q.        You, in fact, refused to sign, correct?

19    A.        I believe I did sign it.  I don't recall, but

20    I -- or else, I, you know, I didn't know what it was

21    about, the or else.

22            I may have signed it, but I may not have

23    signed it.  But I didn't like somebody telling me, or

24    else.

1        technicians with the money to buy Clinical Engineering

2        Magazine.   That's about $250 a year for six issues.

3                        I used to receive it when I worked with

4        Milford Hospital.   That's why I know the price of it.

5                        Unless Jonathan has it ordered, I'm not aware

6        of that.   I've never seen it down there when I worked

7        there at Kent General.

8                        This one under, technical knowledge, it

9        reads, the technician recognizes, can identify and set

10       immediate objectives to correct maintenance and safety

11       deficiencies.

12                       I have a problem with that one as Jonathan

13       Hill has used it.   It's to his discretion.   If he feels

14       it's a safety issue, it's a safety issue.

15                       I have nothing with the safety portion.   I

16       have no complaints about the safety portion of it.

17       Q.          This is a description and standards of

18       performance that was applicable to all CE techs,

19       correct?

20       A.          At the time, yes.

21                       I don't recall my name being at the top of

22       it, but I might have gotten it, because I did receive a

23       copy from Jonathan.   I don't remember.

24                       It might have been a pre-copy or something

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                                      130

1      like that.

2          Q.         But it's the same format and same information

3      on it, correct?

4          A.         Yes.

5          Q.         It was applicable to all the CE techs?

6          A.         Right.

7                    And some of the techs failed a lot of these

8      categories and were not reprimanded for them at all.

9          Q.         Under the "Physical Requirements," "ability

10     to communicate and be understood under normal

11     circumstances."

12                   Do you see that?

13         A.         Yes.

14         Q.         What issue do you have with that as it

15     relates to a clinical equipment technician's role?

16         A.         That personnel relayed messages that they

17     couldn't understand me prior to -- this was developed

18     -- the date of development is not here anywhere on this

19     document.

20                   It was just -- I got it when everybody else

21     got it when I got back to work.  So when I had my first

22     conversation with Jonathan on the phone about returning

23     to work, and I had told him I can only speak for a few

24     minutes, you know, because my mouth gets bad -- I mean

DANIEL MILLER                              131

1    my mouth gets sore and I have difficulty speaking,

2    Jonathan relayed to another individual in the

3    department.

4          The individual had stated he has a little bit

5    of a problem talking, doesn't he?

6          And Jonathan, he can't even communicate, you

7    know, was his response to that person.

8          So, I feel that was directly put in there for

9    my benefit or against me.

10   Q.       You were never at any time at Aramark,

11   disciplined or provided any kind of an adverse

12   employment action because of your ability to

13   communicate or be understood by others; isn't that

14   correct?

15   A.       Was I ever adversely hurt by Aramark because

16   of my speech problem?

17   Q.       Yes.

18   A.       I don't recall.

19   Q.       There's no specific instance that you recall

20   sitting here today, where Mr. Hill disciplined you in

21   any way because of your ability to communicate with

22   others?

23   A.       No.

24   Q.       Was there any specific instance where

A-144

DANIEL MILLER                                    132

1      Mr. Hill took any negative employment action against

2      you because of your ability to use your arms, hands,

3      legs and feet to accomplish the job?

4      A.        That, I don't recall.  That, I don't recall.

5      Q.        Sitting here today, you're not aware of any,

6      correct?

7      A.        No.  I said I don't recall.

8      Q.        So, you're not aware of any, correct?

9      A.        I'm not aware of it at this moment, no.

10               It might come to me in ten minutes, you know.

11     Q.        Well, I can only ask you about what you

12     know --

13     A.        Yes.

14     Q.        -- and you can only testify about what you

15     know.

16               If at any point during the deposition like we

17     did earlier today, you have knowledge of something that

18     causes you to modify an answer, then you should

19     indicate that, okay?

20     A.        Okay.

21     Q.        Was there any occasion where you were

22     disciplined by anyone at Aramark because of your

23     ability to safely manage items weighing up to 50

24     pounds?

**A-145**

DANIEL MILLER                                      133

1    A.        By this -- now, you asked me this about

2    discipline several times.  Does that mean -- you're

3    talking about in writing, right, that they wrote me up

4    for that?

5    Q.        In any respect.

6    A.        Well, I'm talking about in writing.  I

7    received nothing in writing for any of those

8    categories, that I was incapable of doing it, you know.

9              But there were insinuations and stuff as it

10   relates to these.

11   Q.        What were the insinuations as it relates

12   to --

13   A.        I don't know.

14   Q.        Let me get the entire question out before you

15   begin to answer.

16             Were there any verbal communication from

17   Mr. Hill that you had, that you were unable to do your

18   job because of inability to communicate and be

19   understood under normal circumstances?

20   A.        I don't recall any verbal communication from

21   Mr. Hill, saying I could not do my job because of

22   verbal problems or speech problems.

23   Q.        He never gave you any verbal indication that

24   there was a problem with the ability to do your job

DANIEL MILLER                                              134

1  because of the use of your arms, hands, legs or feet

2  either; isn't that correct?

3  A.        He made it -- I don't recall at this time,

4  but he certainly made it difficult for me by assigning

5  me a task that was previously done by two people.  And

6  just tore -- tore my self steam down and hurt me for

7  about a month.

8  Q.        But he never communicated to you either

9  verbally or in writing, that there was any problem

10  about your ability to do your job because of the use of

11  the arms, legs, feet, or hands, correct?

12  A.        No.  I do not recall him ever doing that.

13  Q.        He never communicated to you verbally, any

14  problem with your ability to do your job as it relates

15  to the ability to safely manage items weighing up to

16  50 pounds, correct?

17  A.        I don't recall at this time.

18  Q.        Focusing on your allegation that Mr. Hill

19  assigned you to a job that was previously performed by

20  two people --

21  A.        I didn't say -- I said previously before him,

22  but with assistance.  A second person would be added at

23  times.

24  Q.        When were you assigned to that task and who

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                                    135

1    were the other individuals who performed the task with

2    the assistance of someone else?

3    A.        In January when I first came back, I seen --

4    I observed other technicians who needed help.  And

5    Jonathan would assign them help.

6              When I took the position on demand call in

7    February, no help was forthcoming even though Jonathan

8    seen I was overburdened with work.  There's a board

9    there that tells the shop just what's out there, what

10   has to be done.

11             Now, this is the first time I'm back at Kent.

12   I do not know the system.  I worked for five years at

13   Milford on my own.  And I don't know if he's supposed

14   to assign you or you're supposed to ask.

15             And there were other times when he told me to

16   make -- get other people to work, where I'm not a

17   supervisor.

18   Q.        Did you ever ask for help?

19   A.        No.  I didn't want to fail.

20   Q.        Do you know if --

21   A.        I didn't -- I didn't want to fail.  I didn't

22   want to look like a cripple and I couldn't do the job.

23   Q.        The individuals who you indicated had

24   assistance, do you know if they asked for help in

DANIEL MILLER                                    136

1    getting the work done?

2    A.        I don't know.

3    Q.        Who were the individuals that you observed

4    performing that task, who had assistance?

5    A.        The three remaining people up there with

6    Jon -- with Jonathan, Sterling Townsend assisted.  John

7    Ritterhoff assisted.  And Bill McClemment.

8              At one time or another, they assisted each

9    other.

10   Q.        Can you identify when?

11   A.        I think one time it was the Steris autoclave,

12   which is the sterilizer.  And he assigned somebody to

13   help him with it.

14   Q.        Who was the --

15   A.        And that's the one that sticks in my mind.

16   Q.        Who was working on it, and who provided

17   assistance?

18   A.        I don't recall.  He just told me, you go help

19   him.

20   Q.        Who said, "you go help him"?

21   A.        Jonathan.

22             And I can't recall now who -- who the two

23   guys were, but that's one instance I remember.

24   Q.        What was said to Mr. Hill, and what did he

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                                        140

1    asked you to stop lifting something because it was

2    heavier than one should be safely moving on their own?

3    A.        No.

4    Q.        Exhibit 5, the position description, do you

5    believe that this position description was developed to

6    target you?

7    A.        Yes.

8    Q.        The entire position description, or just

9    portions of it?

10   A.        It was presented at my return, to technicians

11   in the shop there.  And it wasn't presented prior to

12   that.

13            So, it would seem obvious that at my return,

14   it was developed.

15   Q.        Do you have any knowledge of when it was

16   developed?

17   A.        No.  There's no date on it.

18            But more than one technician -- more than

19   myself had -- was given it that day.

20            It changes though.

21                    MR. DELANY:  Why don't we take five

22        minutes.

23                    MR. PRIMOS:  All right.

24                    (Whereupon, a discussion was held

1          off the record.)

2                      (Whereupon, a recess was taken at

3          this time.)

4      BY MR. DELANY:

5      Q.          Mr. Miller, you had indicated, I believe,

6      later in March, that there were some incidents with

7      Mr. Hill regarding documentation.

8      A.          Yes.

9      Q.          Paperwork, I think you said.

10     A.          Yes.

11     Q.          What were those issues?

12     A.          Well, disciplinary write-ups.

13                     (Whereupon, a discussion was held

14         off the record.)

15                     (Whereupon, Exhibit Miller-6 was

16         marked for identification.)

17     BY MR. DELANY:

18     Q.          I present you with a several-page exhibit,

19     and I'll ask you to take a look at that, okay?

20     A.          Okay.

21     Q.          Mr. Hill, if you look at the first page, it

22     says at the top, hourly performance plan form.  And

23     then it's checked off, coaching discussion.

24     A.          Yes.

1      Q.        Then there's the signature of Mr. Hill at the

2      bottom of that page, and your signature to the left of

3      it; is that accurate?

4      A.        Yes.

5      Q.        Is this at least one of the disciplines that

6      you're referring to?

7      A.        Yes.

8      Q.        Is there anything about this discipline that

9      you felt was inaccurate or unfair in any way?

10     A.        Obviously, this is -- I signed this only as a

11     coaching document.  And I did express at the time, that

12     -- if you look at the warranty date on it, right, the

13     warranty date is 10/15.

14     Q.        Which page are you --

15     A.        The third page.

16     Q.        So at the bottom it says, A 00037 on the

17     bottom of it?

18     A.        Right.

19               Now he has circled, installation date.

20     Additional comments on the same page, change asset

21     biomed from CTS, right?

22               That means the asset tag was changed.

23     Warranty started 10/5/01 and ended 10/5/06.  There is

24     no possible way of me pulling out an installation date

DANIEL MILLER                                    145

1    Q.        So, it was not completed correctly; you'll

2    agree with that?

3    A.        Yes, I agree with that.

4                    (Whereupon, a discussion was held

5        off the record.)

6    BY MR. DELANY:

7    Q.        If you go with me to A 0039, the areas that

8    are circled all indicate areas that should have been

9    filled in, correct?

10   A.        I don't understand the question.

11             This is -- you must understand I was trained

12   on a totally different system.  I was trained on ISAM

13   (ph), which was a system by Premier.

14             And when Jonathan Hill came to work for a

15   Premier account, which was Bayhealth, he brought this

16   system in that he was trained in.

17             And I received -- the training I received was

18   a very short period by Mr. Hill, for a matter of ten to

19   15 minutes flashing through memories and screens and

20   stuff.

21             The training I received from Aramark, was a

22   half a day at Bayhealth, and a whole -- and a half a

23   day down at Charlotte, North Carolina in their format

24   for their program.

1          So I've been, you know, new to this.  I

2     didn't know all these items.

3     Q.          Wasn't that system one of the items that was

4     covered during the competency test that you passed?

5     A.          Two questions, three questions, maybe.  That

6     was it.  The competency test was created by Jonathan

7     Hill, to show that everybody passed it.

8     Q.          You passed it, correct?

9     A.          I passed it, of course.  I said he helped me

10    with it.  In the middle of it, I had problems, and he

11    helped me.

12          He said, it's easy.

13    Q.          Did you ever ask anybody for additional

14    training on the system?

15    A.          None was ever offered.

16    Q.          So the answer to my question is, no?

17    A.          Correct.  I never requested additional

18    training.  I was aware of none existed.

19    Q.          Did you ever indicate to Mr. Hill, that you

20    needed more training on the system?

21    A.          Yes, possibly at one time, but that was later

22    on, I think, you know.  I indicated that I had problems

23    with the system, and I had problems with his

24    development of a PDA system that he also used.

**A-154**

DANIEL MILLER                                    147

1      Q.        But did you ever indicate to Mr. Hill, that

2  you needed more training on the system?

3      A.        I don't recall at this time.

4      Q.        You'll agree with me going back to A 00039,

5  that there are, in fact, fields that are circled that

6  should have been filled in.

7      A.        Well, on the defibrillator, I wasn't aware he

8  put it in a patient's room.  The shop, base month,

9  shop, I don't know what that stands for.  It's

10  something I'm not aware of.

11          Inventory date, installation date, sure, I'm

12  aware of them.

13      Q.        They're not filled in, correct?

14      A.        Well, this is all the same unit, right?

15      Q.        Correct.

16      A.        So, why didn't the computer automatically

17  fill them in?

18      Q.        You did not fill them in, correct?

19      A.        No, I did not fill them in.  And I don't even

20  remember this format.

21          I just turned my paperwork in to his

22  administrative assistant, and she does the remainder of

23  the paperwork, as far as I remember.

24          I would turn in pages 37 and 38.  I never

A-155

1      my ability.

2                      (Whereupon, a discussion was held

3            off the record.)

4                      (Whereupon, Exhibit Miller-8 was

5            marked for identification.)

6      BY MR. DELANY:

7      Q.        Do you recall having this counseling session

8      with Mr. Hill that's reflected?

9      A.        This just goes to show that I had problems

10     with the computer, the ISIS system.  That's all that it

11     shows me, that I had many problems with it.

12                  And at this point, this memorandum should

13     have showed him that I needed further training on it.

14                  The part here about the video tower, I kind

15     of recall that.  But in the video tower, it's a large

16     console with six -- maybe six pieces of -- pieces of

17     equipment in it, light source, video recorder, numerous

18     pieces of equipment -- well, it looks like the back of

19     your stereo, if you know what I mean.  It's all full of

20     cabling.

21                  And instead of doing it right in the OR, I

22     preferred to take it down to the shop to do as I've

23     done it -- that's the way I done it at Milford

24     Hospital.

1              I recall the tower incident, yes.  I recall

2     that portion.  He got very upset that I moved it all

3     the way from the ER down to the biomed shop.

4     Q.        I may have mixed up my names when I asked the

5     question before, but Mr. Hill disagreed with the way

6     you handled the situation, correct?

7     A.        Mr. Hill --

8     Q.        Yes.

9     A.        -- disagreed with the way I handled this.

10    Q.        Just to confirm, you never requested of

11    Mr. Hill any additional assistance on working with the

12    ISIS system?

13    A.        There was no assistance to be had.  He gave

14    -- he gave it to me.  He said, this is -- that's it.

15    And he walked away.

16              So, he was the one that gave me the training.

17    Q.        Back to my question.

18              You never asked him for any additional

19    assistance in learning the system, did you?

20    A.        No.

21              Matter of fact, at the time he was showing it

22    to me, he seemed aggravated that I wasn't picking it up

23    (snap, snap) like that.

24    Q.        When you had difficulty on the system, what

DANIEL MILLER                                          154

1          did you do?

2          A.          I started taking my time.  The other

3    technicians had six months of -- they all had problems

4    with the system at one point or another, but -- I guess

5    I had problems with it too.

6                      And I would muff my way through it trying to

7    figure it out.

8          Q.          What do you --

9          A.          This part -- this screen looks like something

10   I can work with.  This menu, let me try this.  Let me

11   try that.

12         Q.          Did you ever indicate to anybody that you

13   were unable to do it and didn't think you were doing it

14   correctly?

15         A.          I felt I was doing it correctly.

16         Q.          You'll agree that Mr. Hill indicated to you

17   that he didn't think you were doing it correctly; isn't

18   that right?

19         A.          He felt I wasn't doing it correctly at this

20   point, at this memo here.

21         Q.          Do you recall an incident relating to the

22   install of a stress machine?

23         A.          Yes.

24                      (Whereupon, a discussion was held

1          off the record.)

2                         (Whereupon, Exhibit Miller-9 was

3          marked for identification.)

4     BY MR. DELANY:

5     Q.        Do you remember a guy by the name of Lenny

6     being there from GE, doing the install?

7     A.        Yes.

8     Q.        What do you recall of the incident?

9     A.        This was one of two simultaneous ongoing

10    incidents that day.  There was also a gentleman from

11    Kendall, who had a blood warmer.

12                   And I was told -- earlier in the week I had

13    made an appointment.  I was told that the install would

14    take place on a Tuesday.

15                   Then at two o'clock on Tuesday, I was told,

16    no, it's going to be on Wednesday or Thursday.  I

17    forget, but it was changed.

18                   And the day of the install at one o'clock,

19    Sharon Money came over to me.  I was about to go

20    upstairs to do the install.

21                   Sharon Money came over to me and said, we

22    have an urgent -- ASAP you have to go up to the OR.

23    There's a gentlemen up there with a blood warmer for a

24    bypass machine that has to be checked in.  You got to

1    Jonathan was gone.  I don't know.  It was around

2    four o'clock now.

3            Jonathan, you know, the lights were out in

4    his office.  His door was -- I forget if he closed it

5    at that time or he left it open.  I don't recall, but

6    he wasn't there.  And I was the only one in the shop.

7            So, I worked with him a while.  Went back

8    upstairs to the guy with the treadmill.  And he

9    explained why things wouldn't interface right.  It was

10   a different computer than the computer on the other

11   system, right.

12           So, he had this emergency button to stop the

13   treadmill in case of an accident.  It's basically a

14   button to stop the treadmill if the patient falls, so

15   their fingers don't go into the runners and the rollers

16   and get torn off.  And it's for the operator to use.

17   The console is on the other side of the room, so they

18   won't have to run over -- take time out to run to the

19   other side of the room.

20           So, the -- on the other unit in the other

21   room, the button was on the rising rail.  So, they put

22   the button on the rising rail, you know, as it was in

23   the other -- as it was in the same -- same exact unit

24   down in Milford.  The button was on the rising rail.

**A-160**

DANIEL MILLER                                    161

1              And Jonathan found that in his world, this is

2       a safety issue.  It should be up by the patient's

3       hands.

4              When a treadmill slows down, normally when

5       you slow it down by the program, it slows down from

6       like, let's say, four miles, three miles, two miles,

7       one mile an hour.

8              But when you hit that emergency stop, it goes

9       from four miles to stop within about ten second.

10             Now if the person is at a full run and you --

11      they hit that button, they'll got right over that rail,

12      you know.

13             So, the -- in no place in any hospital, is a

14      patient supposed to be operating a piece of equipment

15      other than a television and a bed, you know.

16             So, that was in the wrong spot for me.  I

17      said, I believe it's in the wrong spot, Jonathan, you

18      know.

19             So, he had a problem with it.  And he said,

20      just put it on the rail.  So, we moved it to the rail.

21             And he said, the other one, take it off the

22      side rail, put it on the top rail.  He said, I called

23      the company.  And that the company will not commit to

24      anything.

A-161

DANIEL MILLER                                            163

1    Q.        Did Mr. Hill provide you with a copy of

2    Exhibit 9?

3    A.        Exhibit 9, yes.

4    Q.        Did you ask anyone else for any help on that

5    day, either dealing with this install or the other

6    install?

7    A.        He was standing right there.  He seen it.

8    The guys were standing right there.

9    Q.        Did you ask anyone for any help?

10   A.        No.

11             In other words, they seen me running myself

12   ragged, and they were enjoying every part -- every bit

13   of it.

14   Q.        Where is the other treadmill located that

15   you're referring to that has the stop switch installed

16   on the riser?

17   A.        In the -- in the room across the hall.  And

18   there was one in Milford.  Jonathan called down to

19   Milford, and told the technician down there, also, to

20   change the location of the switch.

21   Q.        Were the switches ultimately taken off; do

22   you know?

23   A.        Yes.

24   Q.        Do you know why that is?

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

1        A.        Because they're -- basically, they weren't

2    really needed because the instrument -- the control

3    console was within, I guess, two feet of the treadmill,

4    three feet of the treadmill.

5              Actually, the person could have reached over

6    and hit the treadmill.  But if the person was standing

7    there taking a BP -- well, I'm not going to speculate,

8    but it was close enough that, you know, it wasn't

9    needed for the purpose it was designed for.

10                        (Whereupon, a discussion was held

11            off the record at this time.)

12                        (Whereupon, Exhibit Miller-10 was

13            marked for identification.)

14    BY MR. DELANY:

15        Q.        Then in April of 2005, are you familiar with

16    an incident regarding a defibrillator?

17        A.        Yes.

18        Q.        Describe that incident.

19        A.        I was doing PMs and found a defibrillator

20    that had a problem.  I went to the nurse manager's

21    office.  And she was not there that day.

22              And I went to the charge nurse.  And she

23    said, you cannot take the defibrillator until you find

24    me a replacement one, which is the standard operating

DANIEL MILLER                                              165

1       -- as I've been taught throughout the years, you never

2       take a critical piece of equipment that has not have

3       had a major failure on a patient, without replacing it,

4       in other words.

5       Q.       Did you make any effort to fix the equipment

6       at the location?

7       A.       No.

8               I wanted it removed.  I wanted it out of

9       there.  Because although it passed the -- its essential

10      test, I wanted it fully checked over.

11      Q.       Did you mark it as defective or sign it out

12      in any way or mark it out?

13      A.       I wasn't about to leave it there long enough

14      for that.

15      Q.       How long did you leave it there for?

16      A.       Approximately, I guess, from the time I found

17      it, maybe about 30 minutes I looked for a

18      defibrillator.

19              Went downstairs and searched a few

20      departments.  Asked people if they had defibrillators.

21              She was aware of the problem.  She said the

22      problem had been there for three months with that

23      defibrillator.

24              And with these rounds that Jonathan had

DANIEL MILLER                                          166

1    started, in three months nobody had found the problem,

2    but I found it during the inspection.

3    Q.        How did Mr. Hill become involved?

4    A.        I was -- it was the day I had been granted

5    off for my doctor's appointment.  And me and John

6    Ritterhoff were standing in the shop discussing our

7    alternatives and what we were going to do about it.

8              And I told John I searched for a

9    defibrillator and she's giving me a hard time.  She's

10   with a patient right now.  I don't want to, you know,

11   aggravate the patient or anything.

12             And John said, I'll take care of it, you

13   know.  Just make a phone call to the manufacturer and

14   order a replacement one in.

15             And I went over to the phone, picked up the

16   phone, and Jonathan went running out the door and he

17   came back with the defibrillator.

18             He said, that's how you do it.  You just take

19   it.

20             I said, I've never been taught that you just

21   take it, unless it's -- unless it's been used -- unless

22   a patient incident was involved.

23             And I contacted them, ordered the

24   defibrillator, and I left for the day.  John Ritterhoff

DANIEL MILLER                    168

1                    (Whereupon, a discussion was held

2            off the record.)

3                    (Whereupon, Exhibit Miller-11 was

4            marked for identification.)

5    BY MR. DELANY:

6    Q.        Mr. Miller, I think you can just look at the

7    same page.

8    A.        Yes, it's the same.

9    Q.        The document reflects the termination

10    discussion on April 15th of 2005?

11    A.        Yes.

12    Q.        Do you recall that discussion?

13    A.        Yes.

14    Q.        The matters identified on the memo that were

15    discussed, is that what was discussed at the meeting?

16    A.        I believe he elaborated a little bit more on

17    parts, ordering parts in the parts room and stuff like

18    that.

19                But basically after that, it was, you know,

20    he returned it to a discussion to the problems with the

21    repair orders.

22    Q.        He informed you in that meeting, that your

23    employment was terminated?

24    A.        Yes.

DANIEL MILLER                                  169

1       Q.        He indicates that you indicated that you were

2   shocked by that and found the process unfair?

3       A.        Yes.

4       Q.        What did you say to him in that regard?

5       A.        That I don't recall anything about the

6   documents, that it was unfair, that I was using

7   equipment I was not trained on.

8       Q.        Did you dispute any of the areas where he had

9   identified errors?

10      A.        Yes.

11      Q.        Which areas?

12      A.        I would have to see the printouts of the --

13  he just -- he lined them up like this.  So, each one

14  was only partial.

15              And the top one I showed him, it showed that

16  I had not done the output measurements, right.

17              And in the printout, it says -- where it

18  would say, measurements of output were 10, 20, 30,

19  whatever, it says, measurements of out, and it stops

20  right there.  The "put" part of the word wasn't even

21  there as if it was removed.

22              And he said he had no comment, there was

23  nothing you could do, to get my stuff and leave.

24              Then on the way out, he commented to me, to

DANIEL MILLER                                                    170

1     harass me just one more time, he said, you have the

2     capability not of a 25-year-old technician, but of a

3     five-year-old technician.

4                    And I walked out.

5                         MR. DELANY:  Let's take a break for

6              about five minutes or so.

7                         (Whereupon, a recess was taken at

8              this time.)

9     BY MR. DELANY:

10    Q.        Other than what we've covered today, are

11    there any other circumstances in which you feel that

12    you were treated unfairly at Aramark or treated

13    differently, either because of your age or your

14    disability, or because you had taken a medical leave of

15    absence?

16    A.        I feel I was --

17              Do you mean treated unfairly?  Yes.  One

18    point is when it came to the assignment of on-call

19    status, everybody was to have one on-call holiday for a

20    year.

21              And when Jonathan developed the yearly

22    schedule, he placed me on call for my birthday and for

23    the day after Thanksgiving, which is a normal holiday

24    for Aramark, and also for Easter.

1    religion, it is a holiday.  And my church is 80 miles

2    away.  So, I couldn't attend my church that day.

3    Q.        Anything else?

4              Any other instance that you believe you were

5    treated unfairly?

6    A.        I was treated unfairly, basically, I felt,

7    for my age.  Because what happened was, I observed that

8    there was another fellow there -- John Ritterhoff had

9    all gray hair when I returned.  And all of a sudden in

10   the middle of February, he died his hair jet black when

11   things started happening to me.

12             I don't know what that's worth, but I felt

13   something was going on then that I didn't know about.

14             But I didn't know if he had a new girlfriend,

15   or he felt the aged look was a bad thing to be in that

16   department.

17   Q.        Is that the only reason you believe that you

18   may have been discriminated against based on your age?

19   A.        No, because -- because I do look much older

20   than I am.

21   Q.        But do you believe --

22   A.        I didn't --

23   Q.        I'm sorry.

24   A.        I'm sorry.  Go ahead.

A-169

DANIEL MILLER                                    173

1    Q.        Do you believe that you were treated

2    differently in any way because of your age?

3    A.        Yes, I do.

4    Q.        In what way?

5    A.        That I was given -- how do I say this --

6    unfair treatment where other people were given much

7    better preferable treatment than I was.

8    Q.        In what respect were you given unfair

9    treatment?

10   A.        Where I was written -- documented for work

11   orders, where they had work orders.  And their work

12   orders were turned in and sent right back to them.

13            My work orders were turned in and I was

14   written up.

15   Q.        Are those the circumstances we discussed

16   already today?

17   A.        Yes.

18   Q.        Anything beyond that?

19   A.        I feel like I was retaliated for coming back

20   to work at Aramark from medical leave of absence.

21   Q.        But just as it relates to your age, is there

22   any other reason you believe you were treated

23   differently because of your age?

24   A.        Because of my look of my age, yes.  Everybody

DANIEL MILLER                                    174

1    else in the department was under 50.

2    Q.        Understood.

3              What I'm asking is, how do you believe that

4    impacted you at work?

5              You talked about the fact that you believe

6    that you were treated differently as far as write-ups.

7    A.        Right.

8    Q.        Do you believe you were terminated because of

9    your age?

10   A.        No.

11   Q.        Other than the write-ups for the

12   documentation, do you believe that there was any other

13   manner in which you were treated differently because of

14   your age?

15   A.        There were other matters that I was treated

16   differently because of my age.  Remarks were made about

17   me.  How slow I was.  How pitiful I was doing the job.

18   That I seemed like I was drunk at times, and things

19   like that.

20   Q.        Well, let's just talk about those.

21             Who indicated that you were slow in doing

22   your job?

23   A.        It was just hearsay from other sources.

24   Q.        It's not something you heard directly?

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

DANIEL MILLER                                          175

1     A.        No.

2               It was repeated to me.

3     Q.        By whom?

4     A.        Steve Mc Vickers.

5     Q.        What did he say?

6     A.        He said that Sharon Money had repeated to him

7     that I was pitiful, you know, in doing my job.  And

8     that I should have never come back to my job.  That I

9     should have went on to long-term disability.

10    Q.        Did you want to say something else?

11    A.        No.

12    Q.        Who is Sharon Money?

13    A.        Money, she was the assistant administrator.

14    Q.        She was a coworker of yours?

15    A.        Yes.

16              And there was one time I think I heard -- I

17    know I heard on the telephone.  The way the shop was

18    set up when I was there, her desk was right outside

19    Jonathan's door.

20              It was -- it's right in the door.  It was to

21    the right of his door.  And there was a 90-degree turn

22    about ten feet from her desk that went down to an exit

23    way.

24              And I happened to be down that hallway when

DANIEL MILLER                                    177

1       conversation.

2               I didn't know who she was talking about

3       getting rid of until she said, we can't -- it's

4       difficult getting rid of him, because he has the

5       ultrasound training.

6               That was that.

7       Q.      Do you have any recollection of anything else

8       that was said?

9       A.      At that conversation?

10      Q.      Yes.

11      A.      No.

12      Q.      Any other reason you believe you were treated

13      differently because of your age?

14      A.      Not that I can recall at this time.

15      Q.      You're also contending that you were treated

16      differently because of a disability?

17      A.      Yes.

18      Q.      What disability are you referring to?

19      A.      My facial features and the way I talk and

20      stuff.

21      Q.      All related to the cancer condition you had

22      and the procedures you underwent to remediate that

23      condition?

24              Is that what you're referring to?

DANIEL MILLER                                      178

1        A.        Yes.

2        Q.        Let me ask it another way.  I didn't ask that

3    the best way I could have.

4                  Are you referring to your cancer and the

5    treatment that followed?

6        A.        Yes, the way I looked.  The way I looked from

7    the cancer, left me deformed in the neck.  And some --

8    I had a -- some problems speaking and stuff.

9        Q.        Are you claiming you were discriminated

10    against because of any other disability, or is that the

11    one you're focused on?

12       A.        The medical disability, the disfigurement,

13    the age.  I'm not claiming anything for religion

14    because I think that was just a role of the dice, you

15    know.

16                  It just happened that way.

17       Q.        Are you referring to the holidays?

18       A.        The holidays falling that way.  I thought

19    about it a lot.  And, you know, I don't think he

20    malicely {sic} did that to me, you know.

21       Q.        Discrimination related to the disability, in

22    what way are you contending you were treated

23    differently?

24                  The write-ups that we talked about earlier

DANIEL MILLER                                          179

1    today?

2    A.        Most -- most of the -- the write-ups and the

3    attitude that I was treated -- the way I was treated,

4    the offishness that everybody treated me with.  Sharon

5    Money coming up to Bill McClemment and whispering in

6    his ear and looking at me, you know, as if she was

7    talking about me.

8              That was going on daily just about, you know.

9    Q.        Did you hear --

10   A.        I couldn't hear the whispers, no.  It was a

11   whisper.

12             And I was told to, you know, that things

13   would happen to me once I got back, you know,

14   basically.

15   Q.        Who told you that?

16   A.        I really don't want to say at this point.

17   Q.        I'm going to have to ask you who told you

18   that?

19   A.        Now, or in court?

20   Q.        Now.

21   A.        Sterling Townsend and -- but he -- but he

22   more or less coaxed it out of me.  He didn't say it,

23   but he said this and that and led me to say these

24   words, and led me to say another few words.

DANIEL MILLER                                    180

1             And he coaxed it out of me.  And he said,

2      yeah, that's it.  And that was it.

3      Q.        What did he say to you, and what did you say

4      to him?

5      A.        Basically, that my work orders were not --

6      incomplete work orders of mine were not to be returned

7      to me, but work orders turned in by John Ritterhoff to

8      his sister-in-law, would be returned to him, you know,

9      and to watch myself.

10             That's the -- basically, the conversation.

11     My work orders would be returned, you know, held

12     against me, more or less.

13     Q.        Did you believe that Ritterhoff was getting

14     more preferential treatment because of who his sister

15     was or --

16     A.        His sister-in-law.

17     Q.        His sister-in-law?

18     A.        Yes.  Oh, yes.  Yes, sure.

19     Q.        Why is that?

20     A.        You can tell the way they buddied up and all.

21     They, you know, there was like slurry sex talk and

22     jokes and stuff.  And they would come in late all the

23     time and nothing would be said to them.

24             And, you know, they came in together every

**A-176**

DANIEL MILLER                                     182

1              The way the workload was dished out was --

2       the workload was dished out in February.  Jonathan did

3       not really harass me in February, because it seemed

4       like they were going to try to work me to death to

5       quit.

6              And when that didn't succeed, the first

7       write-up was scheduled for March 2nd, which changed to

8       March 1st, which we reviewed today -- March 4th, I

9       mean.  And it just went on from there.

10             And every week -- not all the write-ups are

11      here, by the way.  You're missing two of them, I

12      believe.

13             But every week, one week after the next,

14      there was a reason to write me up until I was out of

15      there.

16      Q.        What were the two that I'm missing?

17      A.        I believe you're missing -- you got the one

18      for the 4th.  There's one for the week after the 4th,

19      and the one for the week after that because there was

20      -- there was three write-ups for paperwork, I believe.

21             Then there was the write-up for the

22      treadmill.  Then he attempted to write -- he attempted,

23      I believe, to terminate me over the defibrillator,

24      because he got in a big argument with his boss, Tom, in

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

1          I didn't notice it at that time, but later on

2     in that day I looked down.  And in the corner, there's

3     a screen tab where it tells you the user's name.  And

4     my name was no longer there.  It said, Jonathan Hill.

5          And I went over to everybody else's computer,

6     but all their computers had their names on it.

7          So, I don't know what was going on with my

8     computer.

9     Q.        Were you at the computer all day?

10    A.        Was I at the computer all day?

11    Q.        Yes.

12    A.        I signed off again, then signed on again, and

13    it still came up, Jonathan Hill.

14    Q.        Any other reason you believe you were treated

15    differently because of your disability?

16         Do you believe your termination was because

17    of your disability or the leave that you took?

18    A.        Yes.

19    Q.        Anything other than what we've talked about?

20    A.        Not that I recall at this time.

21    Q.        You have a claim in your complaint for

22    slander?

23    A.        Yes.

24    Q.        Do you understand what that means, generally?

DANIEL MILLER                                           185

1     A.         Yeah.  Somebody said something against you.

2     Q.         Right.

3                Without getting too legal as to what that

4     claim might amount to, what's the factual basis for

5     that claim?

6     A.         That claim was about the employees saying I

7     was drunk, when actually it was my leg was hurting and

8     I was walking with a funny walk with my leg.

9                She said I was drunk.  I spoke about that

10    earlier.

11    Q.         Who was the employee that said you were drunk

12    or, I guess, that you looked drunk?

13    A.         Yeah.  Walking like he's drunk, yeah.

14    Q.         Who said that?

15    A.         Sharon Money.

16    Q.         Who did she say that to?

17    A.         Greg Wilson.

18    Q.         When?

19    A.         Greg Wilson was the one who heard it.  He

20    would know more about that.

21    Q.         When did you learn that it was said?

22    A.         I don't recall.

23    Q.         Was it after your employment terminated, or

24    before?

DANIEL MILLER                                    186

1    A.        I -- I believe it was after my termination,

2    yes.  Because I would have confronted her, I believe,

3    if I had still been there, about it.

4    Q.        What did he say to you that she said?

5    A.        She just made a statement to him that he's

6    been -- looks like he's been drinking.  By the way he's

7    walking, I think he's drinking.

8              And Greg responded, he's a teetotaler.  He

9    doesn't drink.

10   Q.        Who was Greg, I'm sorry?

11   A.        Greg Wilson.

12   Q.        Who was he?

13   A.        He was a technician there.

14             This had to have occurred sometime in early

15   January or late December, because Greg Wilson went down

16   to Milford in, I think, the middle of January.

17   Q.        After your employment terminated with

18   Aramark, where did you work?

19   A.        I had no work for six months -- no, six --

20   eight and a half months.  Nine months, maybe.

21   Q.        Did you receive unemployment during that

22   period of time?

23   A.        Yes, I did.

24   Q.        Did you search for other employment during

1    claim that Mr. Delany was asking you about, you

2    indicated that that had to do with someone accusing you

3    or saying that you were drunk.

4    A.        Yes.

5                    MR. DELANY:  Objection to the form

6         of the question.

7    BY MR. PRIMOS:

8    Q.        Mr. Miller, were there also any incidents

9    regarding people making allegations about your work

10   performance?

11                   MR. DELANY:  Objection to the form

12        of the question.

13                   THE WITNESS:  Yes.  I stated that

14        they said I was pitiful as a technician.  And

15        also what Mr. --

16   BY MR. PRIMOS:

17   Q.        Who stated that?

18   A.        Sharon Money.

19   Q.        I'm sorry, you were about to say something.

20   A.        Also, that -- well, my leaving -- after my

21   termination, the statement that Mr. Hill said to me

22   about my abilities, in his opinion, were that of a

23   technician with five years experience, and not that of

24   a technician with 25 years experience in biomed.

DANIEL MILLER                                        201

1        And they're the two that I recount at this

2   moment -- recall at this moment.

3                    MR. PRIMOS:  No further questions.

4                    MR. DELANY:  Very quick follow-up.

5

6                    **EXAMINATION**

7

8   BY MR. DELANY:

9        Q.        The statement that you indicated that you

10  were pitiful, you learned that from a third party,

11  correct?

12                  You did not hear that statement directly?

13       A.        Yes, I heard that from a third party.

14       Q.        Who was that individual?

15       A.        That individual, I believe, was

16  Steve McVickers?

17       Q.        Mr. McVickers said that Ms. Money --

18       A.        Had made the comment.

19       Q.        To him?

20       A.        Not to him, to other people, and he overheard

21  it.

22       Q.        Do you know to whom she --

23       A.        I don't.

24       Q.        The statement that you attributed to

DANIEL MILLER                                    202

1          Mr. Hill, that was a statement that he said to you?

2          A.          Directly to me, yes.

3          Q.          Was anyone else there when he made that

4          statement?

5          A.          Sharon Money.

6          Q.          Do you know if she heard it?

7          A.          She was about three feet away.

8          Q.          Did you make any observation as to whether or

9          not she heard the statement?

10         A.          I believe I had my back away from him walking

11         toward my desk, and I just kept on walking.

12                          MR. DELANY:  All right.  That's all

13             I have.

14                          MR. PRIMOS:  Nothing further.

15             Thank you.

16                          THE WITNESS:  Thank you.

17                          (Whereupon, the deposition ended at

18             5:03 p.m.)

19

20

21

22

23

24

CHARLES P. CARMODY & ASSOCIATES
(215) 646-2599 * deposition1@comcast.net

A-184

Excerpts from the Deposition of J. Thomas
Cuthbertson taken on February 14, 2007

COPY                    1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                          )
        Plaintiff,                      )
                                        )
        v.                              ) C.A. No.
                                        )  06-534
ARAMARK HEALTHCARE SUPPORT SERVICES, )
INC., a domestic corporation, and      )
ARAMARK CLINICAL TECHNOLOGY SERVICES,)
INC., a domestic corporation, and      )
ARAMARK MANAGEMENT SERVICES LIMITED    )
PARTNERSHIP,                           )
        Defendants.                     )

        Deposition of **JOHN THOMAS CUTHBERTSON**, taken
before Cheryl A. Anthony, Court Reporter, in the offices
of Schmittinger & Rodriguez, 414 South State Street,
Dover Delaware, on Wednesday, February 14, 2007,
beginning at 3:25 p.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        MORGAN, LEWIS & BOCKUS
        BY:  WILLIAM DELANY, ESQUIRE
        1701 Market Street
        Philadelphia, Pennsylvania  19103
        Attorney for Defendants.

**ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

3

1          A.      With Aramark HealthCare.

2          Q.      And what is your primary location, office

3     location?

4          A.      I actually work out of my home office in the

5     Philadelphia area.

6          Q.      What is your title?

7          A.      District manager.

8          Q.      How long have you been employed by Aramark?

9          A.      18 years.

10         Q.      And have you been working out of your home

11    in the Philly area for those entire 18 years?

12         A.      No.  I worked out of an office in the

13    Plymouth Meeting -- I'm sorry, the King of Prussia

14    office, Greater Philadelphia area, but not always my

15    home.  At some point I had been in an office.

16         Q.      How long have you been a district manager?

17         A.      Recently, two years and for five years

18    before that, and there was a finance role in between for

19    a couple of years.

20         Q.      So most recently for two years?

21         A.      Two years.

22         Q.      Now, can you be more specific on the month

23    and year that you started this most recent period?

24         A.      The transition began in I want to say in

4

1    October of 2004, and January of 2005 is when I

2    officially took over.

3         Q.    And then you said the intervening how many

4    years you were in a finance position?

5         A.    I was ten years in an accounting finance

6    role, and then I was five years as a district manager,

7    two years as a finance role again, and then the last

8    year as a district manager.

9         Q.    When you were in the finance role, were you

10   working out of a office at that point?

11        A.    I was.

12        Q.    And you say that was in King of Prussia?

13        A.    King of Prussia area.

14        Q.    Now, this most recent period, how many, I

15   guess, accounts have you been responsible for at any one

16   time?

17        A.    It's varied at -- right now it's at 11, and

18   it's been at high as 18.

19        Q.    And BayHealth would be one of those

20   accounts?

21        A.    That is currently one of my accounts, yes.

22        Q.    Can you just briefly tell me your

23   educational degrees and the years that you received

24   them?

22

1   BY MR. PRIMOS:

2       Q.    Have you had a chance to review those,

3   Mr. Cuthbertson?

4       A.    I have.

5       Q.    I would like you to focus on the third

6   paragraph.  Now, Mr. Miller is alleging in this document

7   that he requested time off, and it was indicated that he

8   would not receive it due to disciplinary action.

9           Then in the third paragraph on the first

10  page of Hill Exhibit 16, he describes a conversation

11  between himself and you.  Do you recall that

12  conversation?

13      A.    I do.

14      Q.    Okay.  Is this an accurate statement of what

15  occurred in that conversation?

16      A.    Not completely.

17      Q.    Okay.  Can you tell me what actually

18  occurred?

19      A.    He had approached me in the restroom and had

20  asked me if I had a minute.  And he said that he had

21  asked for some time off, and he was denied the time off.

22  And I had explained to him, as I understood it, that

23  there were several employees -- not several, but a

24  couple of employees off at the same time, and that would

23

1  have caused a scheduling conflict.  I remember him

2  saying:  I need off for medical reasons.  So I said:

3  Okay.  Well, did Jonathan understand it was for medical

4  reasons?  Did you share that with him?  He said:  No, I

5  did not.  I said:  I am sure if you had, we would have

6  worked something out to give you that time off.  So I

7  said:  Follow up with Jonathan, and I'm sure we will be

8  able to work it out.  That was the last we discussed

9  that.

10       Q.    Okay.  So when he says here that he

11  approached you and informed of you his request for time

12  off and showed you the manager's notation at the bottom

13  of the request and a copy of the doctor's appointment

14  card, which are pages two and three, did he show you

15  those things?

16       A.    He did not.

17       Q.    Okay.  Did you inform Mr. Miller that what

18  Mr. Hill had done was not a policy of the Aramark

19  Corporation?

20       A.    I did not.

21       Q.    Did you tell Mr. Miller that you would

22  discuss the situation with Mr. Hill?

23       A.    No.  I asked Mr. Miller to let Mr. Hill know

24  that if it was for medical reasons, he should share that

24

1  with him.

2      Q.    Do you know whether he did share it with

3  him?

4      A.    I believe he did, after our discussion.

5      Q.    And what is your basis for believing that he

6  did discuss it with him?

7      A.    As I recall, we then changed the schedule

8  around so that he could be off for that medical visit.

9      Q.    Now, why were you involved in changing the

10 schedule?

11     A.    I was not involved, Jonathan was.

12     Q.    How did you know that the schedule was

13 changed?

14     A.    Because Jonathan let me know after they

15 resolved the issue.

16     Q.    How did he let you know?

17     A.    A phone call.

18         MR. PRIMOS:  No further questions.

19         MR. DELANY:  Nothing.

20         (Presentation, reading, and signature of the

21 deposition were waived.)

22

23

24

A-189

A-190

# Job Description and Standards of Performance – Clinical Equipment Technician

# BAYHEALTH MEDICAL CENTER
## JOB DESCRIPTION AND STANDARDS OF PERFORMANCE
### CLINICAL ENGINEERING DEPARTMENT

**POSITION TITLE:**    Clinical Equipment Technician

**Employee Name:**    Daniel Miller

**DEPARTMENT:**    Clinical Engineering

**SUPERVISED BY:**    Clinical Engineering Manager

General Elements:

1.  Must have one of the following:
    - a.) Associates Degree in Electronics
    - b.) Associates Degree in Engineering
    - c.) Military Training equivalent in electronics/troubleshooting

2.  Ability to do the work of the position without more than normal supervision.

3.  Ability to instruct others in the performance of tasks.

General Clinical Equipment:

1.  Knowledge of electronics and its fundamentals as applied to the medical field to include:
    AC, DC and RF theory, semiconductor devices, computer logic and instrumentation

2.  Experience servicing a variety of diagnostic and therapeutic equipment/systems.

3.  Ability to demonstrate the proper use of test equipment for medical devices (including analyzers, oscilloscopes, meters, simulators, etc.....)

4.  Ability to use hand tools including soldering techniques.

5.  Knowledge and observance of personal safety precautions.

6.  Knowledge of equipment functions, safety parameters and calibration procedures.

7.  Ability to demonstrate and perform preventive maintenance and calibration on most clinical equipment.

8.  Ability to demonstrate and perform corrective maintenance on most clinical equipment.

9.  Knowledge of current clinical equipment safety regulations.

10. Ability to interpret instructions, diagrams, schematics, etc....

11. Ability to perform environmental and equipment electrical safety inspections.

12. Knowledge of the terminology associated with clinical equipment.

Physical Requirements:

1.  Good distance vision in both eyes and the ability to read, without strain, printed material the size of typewritten characters are required, glasses permitted.

2.  Ability to hear the conversational voice, with or without a hearing aid, is required.

3.  Ability to communicate and be understood under normal circumstances.

4.  Sufficient use of arms, hands, legs and feet to accomplish the job.

5.  Ability to safely manage items weighing up to 50 lbs.



DEFENDANT'S EXHIBIT
Miller-5
05/05/07    CR
PENGAD 800-831-6989

Page 1 of 3

A00030

**BAYHEALTH MEDICAL CENTER**
**JOB DESCRIPTION AND STANDARDS OF PERFORMANCE**
**CLINICAL ENGINEERING DEPARTMENT**

## QUALITY CONTROL

Satisfactory performance has been attained when:

The technician follows up daily on all outstanding equipment maintenance as is assigned by the manager or requested from the user.

The technician follows up at least weekly on all assigned work orders (awaiting parts, vendor repair, etc.......).

The technician inspects all vendor completed maintenance to ensure work requested was accomplished.

The technician performs assigned clinical equipment electrical safety inspections. Any deficiencies are given immediate attention.

The technician's desk, shelves, drawers, and storeroom are neat and orderly.

## CUSTOMER RELATIONS

Satisfactory performance has been attained when:

The technician develops a personal, sincere interest in the clinical equipment users' equipment problems.

The technician knows and recognizes the names of key people associated with the facility (department heads, supervisors, etc.....).

The technician responds to critical service problems immediately and personally follows through until the problem is resolved. He provides feedback to the individual concerned and changes problems into opportunities.

Minor and major complaints come to the technician or manager before coming to the attention of facility administration.

## VENDOR RELATIONS

Satisfactory performance has been attained when:

The technician monitors the performance of the vendors assigned and reports the findings to the manager.

The technician knows and recognizes the names of key people associated with assigned vendor organizations.

The technician keeps the best interest of the facility foremost in all vendor relations.

## RECORD MANAGEMENT

Satisfactory performance has been attained when:

Records are maintained daily for all service requests, completed projects, and safety inspections.

All records and forms are submitted to the manager by the designated time.

The equipment history files are kept current.

The technician uses the Web Portal to ensure that repair parts ordered and received is kept current as applicable.

A00031

**BAYHEALTH MEDICAL CENTER**
**JOB DESCRIPTION AND STANDARDS OF PERFORMANCE**
**CLINICAL ENGINEERING DEPARTMENT**

## SELF-DEVELOPMENT

Satisfactory performance has been attained when:

The technician reviews all applicable policy manuals annually.

The technician reads at least one management or CEM-related book every year.

The technician reviews and updates the written standards of performance with the manager annually and takes positive, corrective action on deficiencies.

## TECHNICAL KNOWLEDGE

Satisfactory performance has been attained when:

The technician reads applicable publications monthly pertaining to Medical Electronics and Clinical Engineering.

The technician knows and can explain the correct use of all test equipment used and the current electrical safety limits.

The technician recognizes, can identify, and set immediate objectives to correct maintenance and safety deficiencies.

The technician can read and understand technical manuals to include schematics & circuit description.

## SAFETY

Satisfactory performance has been attained when:

The technician attends and participates in Safety Tool Kit training annually.

The technician demonstrates a familiarity with facility emergency codes.

The technician completes all annual mandatory facility training.


`Signature of Employee`   _____

`Printed Name`   _____

`Date`   _____

A-193

Competency Assessment
dated January 24, 2005

**DEPARTMENT:** Clinical Engineering, Bayhealth

**COMPETENCY ASSESSMENT**

**EMPLOYEE NAME:** DANIEL MILLER

**JOB TITLE:** CE TECHNICIAN

**KEY:**

**STANDARD**
Specific skills and knowledge required to perform the job based on established criteria.

**LEVEL OF PROFICIENCY**
1. Little or no experience.
2. Some experience (may require practice/assistance)
3. Competent and can perform independently
4. Competent, performs independently and able to assess competency of others
NA Not applicable

**LEARNING OPTIONS**
A. Review policy
B. Practice with supervision
C. Review video
D. Other (specify)
E. None required

**ASSESSMENT METHOD**
A. Demonstration
B. Post-test
C. Interview

DEFENDANT'S EXHIBIT

PENGAD 800-631-6989

| STANDARD | Initial Assessment (Level of Proficiency) | | | | | Validated By | Date | Selected Learning Option | Follow-up Assessment (Level of Proficiency) | | | | | Assess-ment Method | Vali-dated By | Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | NA | | | | 1 | 2 | 3 | 4 | NA | | | |
| Quality Control (Physical Environment) (Reference Standards of Performance) | | | | X | | DMB | 1-24-05 | | | | | | | A | | |
| Quality Control (Computer entry) (Reference Standards of Performance) | | | X | | | DMB | 1-24-05 | | | | | | | A/C | | |
| Customer/Vendor Relations (Reference Standards of Performance) | | | | X | | DMB | 1-24-05 | | | | | | | A | | |
| Record Management (Reference Standards of Performance) | | | X | | | DMB | 1-24-05 | | | | | | | B | | |
| Self Development (Reference Standards of Performance) | | | | X | | DMB | 1-24-05 | | | | | | | C | | |
| Technical Knowledge (Reference Standards of Performance) | | | | X | | DMB | 1-24-05 | | | | | | | A | | |
| Safety (Reference Standards of Performance) | | | | X | | DMB | 1-24-05 | | | | | | | C | | |

VALIDATOR'S SIGNATURE _____ DATE 1-24-05

EMPLOYEE'S SIGNATURE _____ DATE 1-24-05

A-193

A00067

A-194

Hourly Performance Plan Form
dated March 4, 2005 – Coaching Discussion



## ARAMARK
### Hourly Performance Plan Form

DEFENDANT'S
EXHIBIT
Miller-6
08/05/07

☑ Coaching Discussion ☐ Counseling Discussion ☐ Formal Warning

☐ Follow-up Discussion ☐ Suspension Notice (Fact finding Only, Do not complete the 2nd and 3rd boxes)

Name: __DAN MILLER__      Social Security #: __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__

Position: __Clinical Engineer__   Comp. Name: __ARAMARK @ Butler #7517__

Your Conduct / performance requires improvement for the following reasons: (Describe the performance issue and reasons improvement is required, use additional paper if necessary)
- ASSETS Added To The Computer System Need To Be Accurate and Follow Same Format As Instructed During Competency Testing.

The expected level of performance / conduct is:
- When Assets are Changed, Updated or Added, There Needs To Be Accuracy and Completeness in Your Entries. Leaving Information Out Or In A Questionable Status Delays Record Review & Workflow.

The following solution(s) have been agreed upon to correct the conduct / performance:
- Verify Information is Accurate & IN Proper Places in Records
- Verify Completeness of Documentation (Both Paper & Computer)

Date Solution(s) will be implemented: __3/4/05__      Completed: __3/4/05__

Potential consequence in continuing current behavior is: __Further Disciplinary Action.__

A follow-up to discuss your progress will be held on: __N/A__

__Daniel Miller__ 3/4/05     __Kenneth Wiley__ 3/2/05
Employee's Signature    Date      Manager's Signature    Date

_____
Human Resources / Other (if applicable)    Date

Note: Employee's signature on this form indicates that this situation has been discussed. It doesn't necessarily mean the employee agrees.

No Class Training of T.S.T.S

00016301

ASSET INVENTORY DETAIL
BAY HEALTH
ARAMARK

7517

**Identification**
Asset Number: 469914
Serial Number: US00103118
Item: DEFIBRILLATORS
Project: M4735A

**Location**
Site: KGH
Building: Kent General Hospital
Area: 3 WEST
Room:

**Risk Factor**
Equip Type: Medical
Function: 8    Critical - Therapeutic
Risk: 7    Death or Serious Injury
History: 16
Clinical Risk: 1    0 - 1
Schedule: Regular    Tier 1 (High Risk)

**Defined**

Common Name: DEFIBRILLATOR/MONITOR
Service: CEM
Class: DEFIB /MON., BATT. PWRD. -11-129A
Manufacturer: AGILENT TECHNOLOGIES (PHILIPS MEDICAL SYSTEMS)

**PM**
Base Month: 6/2003
Shutdown Months: 000000000000

Priority: Urgent
Printer:
Link Group:
Shop: CTS BIOMEDICAL

**PM Indicators**
Indicator - 1
Indicator - 2
Indicator - 3
Frequency:
Frequency:
Frequency:

**Financial**
Purchase Price: $8,000.00
CMI Allocation Cost:
Cost Center: 11-6120 - 3W MED/SURG

Note:

**Miscellaneous**
Inventory Date: 12/6/2001
Installation Date: 10/15/2001
Storage Date:

**Warranty**
Disposal Date: 2/28/2005
Labor Start:
Labor End: 10/15/2006
Material Start:
Material End: 10/15/2006

**Personnel**
Employee:
Contact 1:
Contact 2:

(iSAMM contract) Status: PC    (iSAMM contract) Class: 00    Mfg: AGILENT Model: M47
(iSAMM contract) Hours: 85    iSAMM Service Rep ID: 135

A-195

A00036

# INITIAL INCOMING INSPECTION & EQUIPMENT EDIT FORM

**SECTION I**

ACTS # _848021_

☐ System ID
Old ID: _____
Hosp. Asset #: _18177_

☒ = Addition To Inventory
☐ = Edit/Change To Inventory
☐ = Deletes From Inventory

_103381 John_

SERIAL NO.: _US0010381_

COMMON NAME: _Bi-Phasic defibrillator_

MANUFACTURER: _Philips Medical_

MODEL NO.: _M4735A_

COST CENTER: _11-6120_

LOCATION:

ZONE: _KGH_

BUILDING: _Kent General Hospital_

FLOOR: _3rd_

DEPARTMENT: _3 EAST Med/Surg._

SCO:

SYSTEM: _Defibrillator_

CLASS: _Defib/Mon. Batt. Pwrd 11-129A_

OBJECT: _M4735A (Philips Medical)_

PURCHASE PRICE: $ _Exchanged Repair_

INVENTORY DATE: _02-28-05_

INSTALLATION DATE: __/__/__

WARRANTY INFO:

WRTY: LABOR START _10-15-01_

WRTY: LABOR END _10-15-06_

WRTY: MATERIALS START _10-15-01_

WRTY: MATERIALS STOP _10-15-06_

OWNERSHIP
☒ HOSPITAL
☐ CONTRACTED
☐ LEASE/LOAN/RENTAL
☐ OTHER

☐ ASSET IS UNDER AN OEM SERVICE CONTRACT

DELETE:

DISPOSAL DATE: __/__/__

CAPITAL PURCHASE ORDER # _____

ADDITIONAL NOTES OR COMMENTS: _Changed Asset Tag (Bayhealth) From CTS 469914_

SUGGESTED TIER LEVEL: TIER 1___ TIER 2___ TIER 3___

BASE MONTH _____

☐ ANNUAL   ☐ MONTHLY   ☐ SEMI-ANNUAL   ☐ QUARTERLY   ☐ OTHER ___

LEASED EQUIPMENT:   START DATE: _/_/_

DURATION: _____   ___DAY(S)  ___MONTH(S)  ___WEEK(S)  ___YEAR(S)

Notes _OUTPUTS_

_50 = 50 Joules_
_100 = 89 Joules_
_200 = 198 Joules_
_AED 150 = AED 14A_

| IAL INSP | GROUND RES Ω | NP (OFF) µA | NPNG (OFF) µA | NP (ON) µA | NPNG (ON) µA | MAX LEAD LEAKAGE µA | LEAD ISO. µA |
|---|---|---|---|---|---|---|---|
| OK | .08 | 0 | 164 | .1 | 158 | | |

A-196                    A00037

## SECTION II

1. Does the device appear to be undamaged?
   - ☑ Yes:    Proceed to step 2.
   - ☐ No:    Do not accept for use and contact seller for corrective action.

2. Is the device electrically operated by 120 VAC?
   - ☑ Yes:    Proceed to step 3.
   - ☐ No:    Proceed to step 6.

3. Has the device been evaluated by a qualified testing laboratory?
   Refer to hospital policy and state administrative code or policy, if applicable.
   - ☑ Yes:    Proceed to step 4.
   - ☐ No:    Do not accept for use and contact seller for corrective action.

4. Visually inspect power cord, plug, and strain relief's. Refer to NFPA 99 chapter 9.
   - ☑ Pass:    Proceed to step 5.
   - ☐ Fail:    Do not accept for use and contact seller for corrective action.

5. Does the device pass electrical safety inspections?  Refer to NFPA 99 Chapter 9.
   - ☑ Yes:    Document results in Section II and proceed to step 6.
   - ☐ No:    Do not accept for use and contact seller for corrective action.

6. Does the unit seem to be operating properly?  Refer to manufacturer specifications.
   - ☑ Yes:    Proceed to step 7.
   - ☑ No:    Do not accept for use and contact seller for corrective action.

7. Have all accessories been included in shipment?
   - ☐ Yes:    Proceed to step 8.
   - ☐ No:    Do not accept for use and contact seller for corrective action.

8. If ownership is loan, demo, rental, or other, how long will the device be in the hospital?
   If hospital owned or leased, proceed to step 9.
   - ☐ Less than 6 months:  Write the serial number in the equipment ID field in Section I and proceed to step 15.
   - ☑ 6 months or greater:  Proceed to step 9.

9. Have (2) two operator, (2) two service manuals, **OPERATING & DIAGNOSTIC SOFTWARE** been included in shipment?
   - ☐ Yes:    Proceed to step 10.— **SOFTWARE COPIES SHOULD BE RETAINED IN CLINICAL TECHNOLOGY SERVICES.**
   - ☑ No:    This is basis for non-acceptance. Evaluate literature needs. If adequate proceed to step 10.
   Otherwise do not accept for use and contact seller for corrective action.

0. Has technical service training and operator training been provided for the device?
   - ☐ Yes:    Proceed to step 11.
   - ☑ No:    This is basis for non-acceptance. Evaluate educational needs. If training is adequate proceed to step 11.
   Otherwise do not accept for use and contact seller for corrective action.

11. Will the device be included in the ACTS Planned Maintenance Program? Refer to Table I for inclusion criteria. (Note: All equipment items that are the responsibility of ACTS will be inventoried. The risk assessment determines inclusion in the PM program only.)
    - ☑ Yes:    Proceed to step 14.
    - ☐ No:    Proceed to step 15.

12. Assign a planned maintenance standard and inspection frequency to the device. Complete the remaining applicable fields in Section I and proceed to step 15.

13. Complete Section II; inventory the device and sign below.

    Approved by: _Janis Miller_____    Date: _3/1/2005_

00016301

## ASSET INVENTORY DETAIL
### BAY HEALTH
### ARAMARK

**Identification**
Asset Number: 848021
Serial Number: US0010381
System: DEFIBRILLATORS
Object: M4735A

Common Name: Bi-Phasic Defibrillator
Service: CEM
Class: DEFIB./MON., BATT. PWRD.-11-I29A
Manufacturer: AGILENT TECHNOLOGIES (PHILIPS MEDICAL SYSTEMS)

**Location**
Zone: KGH
Building: Kent General Hospital
Floor: 3 rd
Area: 3 West
Room:

**PM**
Base Month: 2/2005
Shutdown Months: 000000000000
Priority: Urgent
Printer:
Link Group:
Shop:

**PM Indicators**
Indicator - 1
Indicator - 2
Indicator - 3
Frequency:
Frequency:
Frequency:

**Miscellaneous**
Inventory Date:
Installation:
Storage Date:

**Warranty**
Disposal Date:
Labor Start: 10/15/2001
Labor End: 10/15/2006
Material Start: 10/15/2001
Material End: 10/15/2006

**Financial**
Purchase Price:
CMI Allocation Cost:
Cost Center: 11-6120 - 3W MED/SURG
Note:

**Personnel**
Employee:
Contact 1:
Contact 2:

**Risk Factor**
Equip Type: Medical
Function: 9    Life Support
Risk: 7    Death or Serious Injury
History: 1    0 - 1
Total Risk: 17
Tier: Tier 1 (High Risk)
PM Schedule: Regular

**User Defined**

007517

18177

A-198

/2/2005    10:56AM

A00039

00016301

A00040

007517

# ASSET INVENTORY DETAIL
## BAY HEALTH
## ARAMARK

### Identification
Asset Number: 848232
Serial Number: 040802702
System: PHYSIOLOGIC MONITORING SYSTEMS
Object: 3420Y

### Location
Zone: KGH
Building: Kent General Hospital
Floor: 1 st
Area: Rapid Admission
Room:

### Risk Factor
Equip Type: Medical
Function: 5    Essential - Diagnostic
Risk: 5    Inappropriate Therapy, Misdiagn
History: 1    0 - 1
Total Risk: 11
Tier: Tier 2 (Medium Risk)
PM Schedule: Regular

### User Defined
85740

Common Name: Pulse ox, Finger unit
Service: CEM
Class: OXIMETER, PULSE-17-148A
Manufacturer: BCI INTERNATIONAL

### PM
Base Month: 2/2005
Shutdown Months: 00000000000

Priority: Routine
Printer:
Link Group:
Shop:

### PM Indicators
Indicator - 1
Indicator - 2
Indicator - 3
Frequency:
Frequency:

### Financial
Purchase Price:
CM1 Allocation Cost: $320.00
Cost Center: 11-6160 - RAPID ADMISSIONS UNIT

Note:

### Miscellaneous
Inventory Date: 2/24/2005
Installation: 2/24/2005
Storage Date:

### Warranty
Disposal Date:
Labor Start: 2/24/2005
Labor End: 2/24/2006
Material Start: 2/24/2005
Material End: 2/24/2006

### Personnel
Employee:
Contact 1:
Contact 2:

A-199

3/2/2005    10:10AM

A-200

Memorandum to File from Jonathan Hill re:
Dan Miller and Documentation Issues
dated March 16, 2005

# Memorandum



**Date:** 3/16/2005

**To:** Memorandum for File

**Cc:** Tom Cuthbertson, District Manager; Thomas Lodge, Director, HR

**From:** Jonathan Hill, Director, Clinical Engineering

**RE:** Dan Miller and Documentation Issues

This is a memorandum for record describing the Verbal Counseling given to Dan Miller on this date.

Background – When Dan Miller returned from Short Term Disability in early December he was given copies of all Team Meeting Minutes during his absence (September 2004 – December 2004). I asked him to read through them and if there were any questions he needed to bring them to my attention. I checked back with Dan each week in December to assess whether he had read the minutes and had any questions. Each time Dan mentioned he was reading them and did not have any questions.

The counseling started with my asking the question if he read through the team meeting minutes. He stated that he had. In October's minutes a directive was given that any work order without an asset needs to be brought to my attention for discussion and approval. I asked him about work orders 5088, 4873 and 4871. Dan explained he had a computer access problem. I talked with him and he stated that sometimes the computer would not let him access ISIS. I explained that this issue is unrelated and it should have been brought to my attention sooner. Aramark computer problems and payroll problems are to be addressed by me and not on a work order. I further explained that even though he was on the phone for these issues, he could have been productive by working on equipment. I talked to him about the 5.5 hours he took for Mandatory Testing. This is excessive and again should not be addressed on a work order.

In November's minutes a directive was given that each technician needs to identify proper work order type and pertinent information needs to be entered on a work order. Use of "Other" as a work order type is to be limited. On the same three work orders mentioned above the work order type should not have been other but Administrative – undefined. Two of the work orders (4873, 4871) were missing the cost center, employee and location with 4873 missing the priority entry. Dan explained that he needed to account for his time. I continued to say that was true with only 90% of his time needing to be on work orders. That left 45 minutes during each day he could have used to accomplish these tasks without having to put that time on a work order. I discussed that the issue here was that the wrong type of work order was selected and that all applicable entries needed to be in each work order.

In December's minutes was a discussion of Rounds work orders and explained that rounds needed to be conducted daily (Maximum time peer day one hour) with one work order for each month. In work order 5895, Dan took up to 2.5 hours to do rounds. During this entry and another totaling 1.5 hours, he stated that he entered work orders into the system for equipment that was dropped off at the shop. I explained that this time should have been split amongst the work orders opened and not a collective time entry on a rounds work order. Dan agreed.

The discussion turned to assigning proper assets to work orders. There was a video tower that was reported by the Operating Room as not taking pictures. Dan responded to the call. Instead of addressing the issue in the OR, Dan brought the video tower to the shop. The tower sat in the shop for over an hour before I

Created on 3/1/2005                    Confidential

1

Memorandum For Record: Dan Miller about Documentation Issues

addressed the issue. After verifying the symptom, I determined that the source cable for picture taking was disconnected from the camera controller. The repair took 5 minutes and I delivered the tower back to the OR. I asked Dan if he opened a work order and he did not. I told him not to worry about it that I would open the work order (5943). I found out two weeks later (Feb. 28th) that Dan did open a work order (5956) and he assigned asset number 292997 which was the video monitor and not the actual device that had failed. I explained that Dan should not have taken 30 minutes on the work order (work performed did not match time taken) nor assigned that asset number to the work order as it was not the device that had the problem. Dan Agreed.

I did have these discussions with Dan to address these issues.

Jonathan Hill, Director, Clinical Engineering

A-202

Hourly Performance Plan Form
dated March 24, 2005 – Counseling Discussion



## ARAMARK

### Hourly Performance Plan Form

DEFENDANT'S
EXHIBIT
Miller-9
02/08/07

☐ Coaching Discussion    X Counseling Discussion    ☐ Formal Warning

☐ Follow-up Discussion    ☐ Suspension Notice (Fact finding Only, Do not complete the 2ⁿᵈ and 3ʳᵈ boxes)

Name: __Dan  Miller__    Social Security #: _____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_____

Position: _____CE Technician_____    Comp. Name: __Bayhealth Medical Center__ # 7517

---

**Your Conduct / performance requires improvement for the following reasons: (Describe the performance issue and reasons improvement is required, use additional paper if necessary)**

- Failure to remain with and follow-up on vendor's work during install of new stress machine.
- Leaving work-site without reporting to Director on status of install.
- Failure to identify safety deficiencies during install and taking immediate action.
- Failure to keep customer updated on status of install.
- Reference:  Work Orders 5958, 6052, 6061 & 6062

---

**The expected level of performance / conduct is:**

Quality Control – The technician inspects all vendor completed maintenance to ensure work requested was accomplished
Customer Relations – The technician develops a personal, sincere interest in the clinical equipment users' equipment problems.
Customer Relations – The technician responds to critical service problems immediately and personally follows through until the problem is resolved.  He provides feedback to the individual concerned and changes problems into opportunities.
Vendor Relations – The technician monitors the performance of the vendors assigned and reports the findings to the manager.
Technical Knowledge – The technician recognizes, can identify, and set immediate objectives to correct maintenance and safety deficiencies.

---

**The following solution(s) have been agreed upon to correct the conduct / performance:**

When an installation occurs whether with an outside vendor or not, the install must reach a logical stopping point.
If other work is interfering with the active participation of an assignment, you need to coordinate appropriately for coverage. If problems arise, you need to notify me immediately so a resolution can be achieved. When an install of a device has a safety feature not being installed properly, you need to correct this deficiency immediately. You should never leave a customer with a vendor without the customer's expressed knowledge of your leaving and estimated time of return. Finally, you should open proper work orders for the actions taken (i.e. not an inspection and a new equipment work order for the same job. This is not a first occurrence.

---

Date Solution(s) will be implemented: ____March 24, 2005____    Completed: _____

Potential consequence in continuing current behavior is: ___Further Disciplinary Action up to and including Termination___

A follow-up to discuss your progress will be held on: ____April 25, 2005____

*Employee Refused To Sign*
Employee's Signature                Date                Manager's Signature        3/24/05        Date

_Shawn McConay_  3/24/05  witness

Human Resources / Other (if applicable)        Date

Note: Employee's signature on this form indicates that this situation has been discussed.  It doesn't necessarily mean the nployee agrees.

A-203

Installation Guide – Series 2000 Treadmill

Equipment Overview: Preparation for Use

6. Attach the side rails to the front rail with the mated T-brackets. Tighten the two T-bracket bolts with the Allen wrench.

7. Reassemble the shroud back.



Align the side rails to the predrilled guide holes in the front rails.

## Emergency Stop Switch

1. Attach the two clamp pieces to the assembled, latching emergency stop switch.



2. Position the clamps around the treadmill front handrail and secure with the supplied screw and nut.

3. Connect the cable from the emergency stop switch to the mating connector on the treadmill's rear connector panel.

4. Use the cord clips to attach the cable along the front handrail.

A00617

A-203

A-204

Preventive Asset Form dated April 4, 2005

**Request: 7105**                    **Preventive - Asset**

Orig. Date: 4/4/2005 | WR Status: In Progress (4/4/2005 11:34:59 AM)

Shop: CTS BIOMEDICAL | Priority: Life Support
Employee: | Due Date: 4/30/2005
Cost Center: 11-6245 - KGH Emergency Department | Contact: Debbie Eberly
Location: Kent General Hospital  Floor:  Room: | Reference:
Problem: | Tier: 1

## Description

**System-Generated Preventive Maintenance**

System: DEFIBRILLATORS
Class: DEFIB./MON., BATT. PWRD.-11-129A
Object: M4735A
Manufacturer: AGILENT TECHNOLOGIES (PHILIPS MEDICAL SYSTEMS)

**Asset ID: 469907**
Common Name: DEFIBRILLATOR/MONITOR WITH PACING
Cost Center: KGH  Emergency Department
Building: Kent General Hospital
Floor:
Area: ER
Room: None
Risk Factors: Death or Serious Injury (7) /Critical - Therapeutic (8) /0 - 1 (1) Total = 16

Serial Number: US00103180
Warranty End: 10/15/2006
Indicators    Previous    Current

## Status History

| Status | Date | Employee | Shift | Repair | Regular Time | Travel Time | Over Time |
|--------|------|----------|-------|--------|--------------|-------------|-----------|
| | Repair Description | | | | | | |
| In Progress | 4/4/2005 | | | | 1 Hrs 30 Min | 0 Hrs 0 Min | 0 Hrs 0 Min |

During PM found audio tones, AED instructions, and alarms tones not working. Searched several units for simuliar Unit - has a pacer feature that is needed and Gretchen refuses to give defib up, turned situation over to J. Ritterhoff since I had to leave for day shortly . Contacted Philips ordered replacement overnite.

Totals: 1 Hrs 30 Min    0 Hrs 0 Min    0 Hrs 0 Min

## Procedures

☐ REMOVE INSTRUMENT FROM AC POWER SOURCE. ALL TESTS ARE TO BE PERFORMED ON BATTERY POWER.    Every 6 months

CLEAN AND INSPECT ALL EXTERNAL SURFACES, HARDWARE AND CONNECTORS FOR DAMAGE.

CLEAN AND INSPECT EXTERNAL COMPONENTS: THE LENGTH OF PADDLE CABLE ASSY, POWER CORD, AND PATIENT CABLES.

**PERFORMANCE DATA**
INDICATED VS. ACTUAL
————— - —————
————— - —————
————— - —————
————— - —————
————— - —————
————— - —————

CHECK ALL SWITCHES, KNOBS, CONTROLS AND INDICATORS FOR PROPER RANGE AND MECHANICAL OPERATION.

INSPECT POWER CORD, STRAIN RELIEF AND PLUG FOR DAMAGE OR DETERIORATION.

VERIFY CORRECT FUSE SIZE.

INSPECT PADDLES FOR PITS, POLISH WITH EMERY CLOTH IF PITS ARE PRESENT.

CLEAN AND INSPECT PADDLE ASSEMBLY FOR WEAR, DETERIORATION CRACKS, SPLITS AND PHYSICAL DAMAGE.

INSPECT APEX PADDLE FOR PUSH TO CHARGE BUTTON AND CHARGE INDICATOR OPERATION. USE TO STORE 200 JOULES. DISCHARGE THE 200 JOULES INTO INTERNAL TEST LOAD NOTING ILLUMINATION OF TEST LOAD DISPLAY.

WITH AN OHMMETER, CHECK CONTINUITY BETWEEN EACH PADDLE AND ASSOCIATED CONNECTOR.

SELECT AND STORE FIVE (5) ENERGY LEVELS: 50,100,200,300 & MAX. RESPECTIVELY. DISCHARGE AND RECORD STORED ENERGY INTO AN DEFIB ANALYZER AND VERIFY FOR PLUS OR MINUS 25 PER CENT TOLERANCES.

**Request: 7105**                     *Preventive - Asset*                     **Page 2**

Orig. Date: 4/4/2005                                    WR Status: In Progress (4/4/2005 11:34:59 AM)

POWER UNIT AND CHECK ALL LAMPS AND PILOT LIGHTS.

AFTER 9TH DISCHARGE, RECORD CHARGING TIME FOR MAX SETTING AND VERIFY AT 10 PLUS OR MINUS 2 SECONDS. IF NOT, REPLACE BATTERIES.

CHECK AND RECORD CHARGING TIME TO MAXIMUM ENERGY IN SECONDS.

CHECK FOR PROPER INTERNAL DISCHARGE OF STORED ENERGY.

VERIFY SYNC OPERATION.  ATTEMPT DISCHARGE ON AND OFF 'R' WAVE NOTE BRIGHT SPOT MARKER ON CRT TRACE.

NOTE:  ALL CALIBRATIONS ADJUSTMENTS ARE EXPLAINED IN SERVICE MANUALS.

MEASURE VARIOUS OUPUT ENERGIES, RECORD ON APPROPRIATE LABEL AND ATTACH LABEL IN CONSPICUOUS LOCATION.

MEASURE AND RECORD OUTPUT ENERGY AFTER REMAINING AT MAXIMUM WATTS SECOND FOR ONE MINUTE.

MEASURE AND RECORD ENERGY OUTPUT OF TENTH REPEATED DISCHARGE AT MAXIMUM SETTING.

TEST SYNCHRONOUS FUNCTION WITH A HEART SIMULATOR AND CONNECTED TO A MONITOR.
☐ TEST ALL AVAILABLE POWER SUPPLY VOLTAGES. NOTE -USE EXTREME CAUTION WHILE MEASURING HIGH VOLTAGE CHARGING POWER SUPPLY.                     Annually

PERFORM ANNUAL CALIBRATION IN ACCORDANCE WITH MANUFACTURER'S INSTRUCTIONS.
☐ DISASSEMBLE AND REMOVE ALL DUST AND FOREIGN MATERIALS.                     Every 6 months

DISASSEMBLE, REMOVE DUST WITH DRY AIR AND BRUSH.  CLEAN ALL PRINTED CIRCUIT BOARDS, CONNECTORS AND RECEPTACLES.

VISUALLY INSPECT ALL INTERNAL PARTS FOR SIGNS OF WEAR, DETERIORATION, CORROSION, BREAKAGE, ABUSE OR OVERHEATING.

VERIFY PROPER OUTPUT WAVEFORM USING AN OSCILLOSCOPE. A PERMANENT RECORD MAY BE OBTAINED USING A POLAROID CAMERA OR STRIP CHART RECORDER.

New Materials:        Qty    Cost      Total Cost

Misc.

Completed By: _____        Sign Off By: _____

Response Date: ___/___/___        Completed Date: ___/___/___

Response Time: _____:_____        Completed Time: _____:_____

Duration: _____        Rpr Code: _____

A00043

A-205

A-206

Hourly Performance Plan Form
dated April 5, 2005 – Coaching Discussion

 **ARAMARK**

## Hourly Performance Plan Form


DEFENDANT'S
EXHIBIT
Miller - 10
04/05/07   CA

**X** Coaching Discussion  ☐ Counseling Discussion  ☐ Formal Warning

☐ Follow-up Discussion  ☐ Suspension Notice (Fact finding Only, Do not complete the 2nd and 3rd boxes)

Name:  Dan Miller

Social Security #:  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

Position:  CE Technician

Comp. Name:  Bayhealth Medical Center  # 7517

---

Your Conduct / performance requires improvement for the following reasons: (Describe the performance issue and reasons improvement is required, use additional paper if necessary)

During a PM inspection of a Defibrillator w/Pacing (Life Support) device you discovered that no audio tones, AED instructions and Alarms not working. This unit should have been pulled from the floor immediately upon notification to the Charge Nurse. The acquisition of a replacement item is the responsibility of the department. Users who refuse to release equipment when safety issues are involved should be reported to Risk Management and the Director of Clinical Engineering immediately.

---

The expected level of performance / conduct is:

Quality Control - The technician performs assigned clinical equipment electrical safety inspections. Any deficiencies are given immediate attention.

Technical Knowledge - The technician recognizes, can identify, and set immediate objectives to correct maintenance and safety deficiencies.

---

The following solution(s) have been agreed upon to correct the conduct / performance:

You need to realize the severity of this issue. The device was discovered with the top and bottom case having a gap which indicated some abuse issue had occurred. You need to understand that Bayhealth has policies in regards to safety issues and your responsibilities under those policies. In addition you need to conform to the Standards of Performance as listed above.

---

Date Solution(s) will be implemented:  4/5/2005

Completed:  4/5/2005

Potential consequence in continuing current behavior is:  Further Disciplinary Action

A follow-up to discuss your progress will be held on: _____ N/A

Employee Refuses To Sign
_____
Employee's Signature          Date

_____   4/5/2005
Manager's Signature          Date

_____
Human Resources / Other (if applicable)   Date

Sharon Money   4/5/05  Witness

Note: Employee's signature on this form indicates that this situation has been discussed. It doesn't necessarily mean the employee agrees.

A-207

ACTS Policy Manual - Equipment Service
Guidelines – July 2003



**EQUIPMENT SERVICE GUIDELINES**

**ACTS Policy Manual**

Policy Number 400.17
Revision: JUL.- 03.
Page 1 of 3

## POLICY

*The ACTS department shall follow ARAMARK's established guidelines for performance of electrical safety testing, operational verification, and planned and corrective maintenance actions.*

## OBJECTIVE

To provide guidelines for the testing and inspection of the equipment covered by the ACTS contract.

## PROTOCOL

1. All electrical safety inspections will be made using an electrical safety analyzer. Tests will be performed in accordance with the operating instructions for the instrument.

2. All maintenance and calibration services will be performed so as to maintain the equipment within the manufacturer's specifications.

3. Equipment shall undergo a functional test. An electrical safety test will be performed if the repair compromises the electrical integrity of the device being tested. These tests shall be documented.

4. Defective equipment that exhibits deficiencies that preclude safe or effective use shall be identified as such and removed from service. If for any reason the equipment cannot be removed from service:
   A. Affix a placard to the unit to warn potential users that the equipment is defective and must be used with caution. The placard must also be dated and include an ACTS department contact name and phone number.
   B. Take the necessary steps to ensure that the equipment is as safe as possible until such time that it can be removed from service and repaired or replaced.
   C. Notify the department manager.

   Note: Any equipment that may have been involved in a patient incident should be immediately sequestered for the hospital's risk management. (refer to ARAMARK CTS **Equipment Incident Management** Policy) Clinical staff should be encouraged to immediately disclose pertinent information to the ACTS Manager as well as the hospital's risk management personnel.

*. This is The only section of Policy that states an item must be removed from area as Clinical Technician leaves area. When a patient injury has occured*

EXHIBIT

Hill    11

A-207

A-208

Memorandum to Tom Cuthbertson from
Jonathan Hill re: Termination Discussion with
Dan Miller dated April 15, 2005

# Memorandum

**Date:** 4/15/2005

**To:** Tom Cuthbertson, District Manager

**Cc:** Tom Lodge, HR Director

**From:** Jonathan W. Hill, Director of Clinical Engineering

**RE:** Termination Discussion with Dan Miller

---

I started the discussion by going over the Incomplete Work Request by Technician Assigned report dated 4/11/2005. We discussed how a work order should be statused (On Hold vs. Service), the estimated time of repair, the updating of the user with any delays in the repair process and that parts need to be put on work orders in the materials section.

The discussion turned to six preventive maintenance work orders that had various problems as well (6964, 7045, 7099, 7103, 7106 & 7124). They all related to Defibrillators (Tier 1 devices with 3 of them having pacing capabilities). Two had problems in which the parts that were installed were not applied to the work order. Three of the work orders had no output values listed for the PM checks and four did not have any alarm checks. I explained that this is unacceptable work and actions like this cannot be tolerated.

I then presented the letter to Dan. He stated that he was shocked by this and found the process unfair. Dan further stated that he had not been informed about problems with his statuses or about the need to put parts on the work orders. I explained that these are items that someone with his years of experience should have no problem with. I further explained that we have had conversations in which I pointed out discrepancies and asked him if he understood what I was asking. I reminded him that he acknowledged the problems in the past and would correct them.

I then asked for his badge, pager, keys and pocket pc. His badge was turned into security along with a bottle of percocet found in the bottom of his toolbox.

Jonathan W. Hill

FLM, Aramark CTS



DEFENDANT'S
EXHIBIT

Miller - 11

# Memorandum

**Date:** 4/15/2005

**To:** Tom Cuthbertson, District Manager

**Cc:** Tom Lodge, HR Director

**From:** Jonathan W. Hill, Director of Clinical Engineering

**RE:** Termination Discussion with Dan Miller

---

I started the discussion by going over the Incomplete Work Request by Technician Assigned report dated 4/11/2005. We discussed how a work order should be statused (On Hold vs. Service), the estimated time of repair, the updating of the user with any delays in the repair process and that parts need to be put on work orders in the materials section.

The discussion turned to six preventive maintenance work orders that had various problems as well (6964, 7045, 7099, 7103, 7106 & 7124). They all related to Defibrillators (Tier 1 devices with 3 of them having pacing capabilities). Two had problems in which the parts that were installed were not applied to the work order. Three of the work orders had no output values listed for the PM checks and four did not have any alarm checks. I explained that this is unacceptable work and actions like this cannot be tolerated.

I then presented the letter to Dan. He stated that he was shocked by this and found the process unfair. Dan further stated that he had not been informed about problems with his statuses or about the need to put parts on the work orders. I explained that these are items that someone with his years of experience should have no problem with. I further explained that we have had conversations in which I pointed out discrepancies and asked him if he understood what I was asking. I reminded him that he acknowledged the problems in the past and would correct them.

I then asked for his badge, pager, keys and pocket pc. His badge was turned into security along with a bottle of percocet found in the bottom of his toolbox.

*Jonathan W. Hill*

Jonathan W. Hill

FLM, Aramark CTS

A-209                    A00047

A-210

Excerpt from the Competency Test given to
Plaintiff in January, 2005

Record Management

Below are screens you will see using the ISISPRO Software. Read the information provided below and fill in the blanks on the screen as accurately and completely as possible:

1) The 3rd floor Blood Bank has just received in a new Cell Washer. It arrived Today and Karen Walker, the Blood Bank Supervisor, is very interested in getting it into service ASAP. The next CTS number in sequence is 555555.



A00070



A00071



Record Management

Below are screens you will see using the ISISPRO Software. Read the information provided below and fill in the blanks on the screen as accurately and completely as possible as possible:

2) The work order for the Cell Washer (from question 1) is below. Fill out appropriately using the following information:



| Ground Cord Resistance | 0.1 Ohms |
| Chassis Leakage Current | 24.7 uA |
| Decant Speed | 793 rpm |
| Running Speed (Set 3500) | 3496 rpm |





A00074

Record Management

Below are screens you will see using the ISISPRO Software. Read the information provided below and fill in the blanks on each screen as accurately and completely as possible as possible: (*Note: not all screens may be used but are provided for your use*).

3) You receive a call from the Blood Bank saying that the cell washer (from question 1) is not functioning properly. Upon further questioning you discover that the device is not decanting. Using the screens below, determine how the repair is to be carried out and what steps should be taken to correct the problem.



A00075



A00076



A00077

A-217

<u>Miller v. Aramark Healthcare Support Services, Inc. et al</u>
**Docket No.: 06534**

# Unreported Cases – Part 1

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 34368406 (D.Del.)
**(Cite as: 2001 WL 34368406 (D.Del.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Steven Gregory JOHNSON, Plaintiff,
v.
Eric CAMPBELL, et al., Defendants.
**No. Civ.A. 00-510-JJF.**

March 30, 2001.
Victor F. Battaglia and Philip B. Bartoshesky, of
Biggs and Battaglia, Wilmington, Delaware, for
Plaintiff.

Dawn R. Courtney and Norman H. Brooks, of
Marks, O'Neill, O'Brien & Courtney, P.C.,
Wilmington, Delaware, for Defendants Campbell and
Town of Dewey Beach.

Carol J. Antoff and Louis J. Rizzo, Jr., of Reger &
Rizzo, Wilmington, Delaware, for Defendants Ocean
Breeze, LLC and Price.

*MEMORANDUM OPINION*

FARNAN, J.

**\*1** Presently before the Court is a Motion for
Summary Judgment (D.I.55) filed by Defendants
Ocean Breeze, LLC and Christine Price
("Defendants"). For the reasons stated below, the
Court will deny Defendants' Motion for Summary
Judgment (D.I.55).

BACKGROUND
Plaintiff Steven Gregory Johnson ("Plaintiff") filed
this action on May 22, 2000, seeking compensatory
and punitive damages against: Defendant Ocean
Breeze, LLC, which operates a motel in Dewey
Beach, Delaware, known as Sea Esta III; against
Christine Price, an employee and agent of Ocean
Breeze, LLC (collectively "the Ocean Breeze
Defendants"); against the Township of Dewey Beach,
Delaware; and against a police officer employed by
Dewey Beach, Erik Campbell (collectively "the
Dewey Beach Defendants").

Claims against the Ocean Breeze Defendants are
premised upon 42 U .S.C. § 1981 and § 2000a and

assert that Ocean Breeze Defendants impaired
Plaintiff's ability to enjoy the benefits of a contractual
relationship between Plaintiff and the motel. Plaintiff
also asserts a state law defamation claim against
Defendant Price.

Plaintiff, who is a 43 year old black male, has been
employed as a teacher and student advisor at William
Penn High School since 1995. From 1995 until this
year, Plaintiff was the Head Coach of the William
Penn Boys Varsity Basketball Program. (D.I.65, B-
19).

The incident that is the subject matter of this lawsuit
took place over the Christmas/New Year holiday in
1999. The William Penn Basketball team was a
participant in the annual Slam Dunk to the Beach
Tournament in Dewey Beach, Delaware. William
Penn was scheduled to play on December 28 and
December 30, 1999. (D.I.65, B-21). Arrangements
were made by the Tournament's sponsors to have the
William Penn team stay at the Sea Esta III Motel in
Dewey Beach. (D.I.65, B-20). The motel is owned
and operated by Defendant Ocean Breeze, LLC.
(D.I.57, Exh. B).

The team arrived at the Sea Esta III Motel on the
evening of December 27th and checked into the
motel. (D.I.65, B-23). The team played a game on
December 28th and returned home to the Wilmington
area after the game. Plaintiff gave the motel their
travel arrangements and schedule. (D.I.65, B-24-26).
The team returned on the evening of December 29,
1999.

After giving the team some brief instructions,
Plaintiff then walked to a gas station for a cup of
coffee and returned to the motel office lobby. (D.I.65,
B-27-30, B-46-48). Defendant Christine Price
("Price") was working as the desk clerk at the motel
that night. (D.I. 57, Exh. D, at 14). Price is a retired
State Police Officer. (D.I.65, B-112). Plaintiff
indicated to Price that he was a motel guest. (D.I.65,
B-122, 124-125). Defendants contend that Plaintiff
did not identify himself as a motel guest. (D.I. 57,
Exh. I, at 49). There was a brief exchange of
pleasantries and both Plaintiff and Defendant, for a
short time, watched a television show. Although
Plaintiff spoke sparingly, Price acknowledged that
Plaintiff was polite and courteous. (D.I.65, B-124-
125). After finishing his coffee, Plaintiff picked up

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

one of the free newspapers that was in the office lobby and left the office.

**\*2** According to Plaintiff, he did not want to go up to his room yet, so he went and sat in the team van to read the newspaper. (D.I.65, B-31-32, B-60-63). After a few minutes, Plaintiff was joined in the school van by Assistant Coach Abblitt and they discussed team related matters. (D.I.65, B-73-76).

Just after Plaintiff left, Price telephoned her husband and asked him to call the Dewey Beach Police Department and request that Sergeant Berry walk around the Sea Esta III Motel premises. (D.I. 57, Exh. E, at 42). Price claims that she did that because Plaintiff's behavior made her nervous. (D.I.65, B-127, 131).

Earlier in 1999, Price had been robbed while working the desk at the Sea Esta III Motel. (D.I. 57, Exh. E, at 36). In this robbery, a man entered the office, engaged Price in a short conversation then left the office at which time another man entered, the first man returned and the two robbed her. (D.I. 57, Exh. E, at 37-39).

After the call from Price's husband, Sgt. George Berry and Defendant Campbell of the Dewey Beach Police responded to the suspicious person complaint. Price repeated to Sgt. Berry what she had told her husband. Sgt. Berry told Officer Campbell why Price said she thought Plaintiff was suspicious. (D.I.65, B-98, B-132, 133). Price did not tell the officers that Plaintiff was a motel guest and Officer Campbell concluded that he was not a motel guest. (D.I.65, B-89-92, 99). Due to Price's statements to the police, Officer Campbell considered Plaintiff to be a trespasser on the motel's grounds. (D.I.65, B-109-110).

Sgt. Berry and Officer Campbell then went looking for the person Price described. Officer Campbell saw Plaintiff sitting in the school van and approached the van. Campbell told Plaintiff that he was being detained and demanded identification. (D.I.65, B-100-101). Plaintiff initially disputed Officer Campbell's right to demand identification and asked why he was being questioned. Eventually, Officer Campbell told Plaintiff that Price had reported "suspiciousness" about Plaintiff. (D.I.65, B-103).

During this exchange, Mr. Abblitt, who is white, left the passenger side of the van and approached Officer Campbell. Mr. Abblitt told Officer Campbell that they were basketball coaches registered at the motel.

According to Plaintiff, Officer Campbell completely ignored Abblitt and would not speak to him. (D.I.65, B-44, B-80-83).

Plaintiff gave Officer Campbell his Delaware driver's license and the officer attempted to make some verification of the license over his radio. At this point, Plaintiff used profanity toward Officer Campbell. Officer Campbell then placed Plaintiff under arrest for disorderly conduct in using profane language in public. (D.I.65, B-42-43).

At some point after Officer Campbell approached the school van, a number of the William Penn team members came out from their rooms and witnessed much of the incident. Team members saw their coach arrested, handcuffed and led to the police station. (D.I.65, B-53, 84-85). Though told by team members, whom Price knew were guests, that their coach had been arrested, Price did not contact the Dewey Beach Police to inform them that Plaintiff was a motel guest. (D.I.65, B-138).

**\*3** Plaintiff was taken to the Dewey Beach Police Station across the street, but he was not charged with any offense and was released in less than an hour by Sgt. Berry. (D.I.65, B-93-94).

STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted if the Court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, " 'courts are to resolve any doubts as to the existence of genuine issues of fact against the moving parties." ' Hollinger v. Wagner Mining Equipment Co., 667 F.2d 402, 405 (3d Cir.1981) (citations omitted). Furthermore, any reasonable inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. Spain v. Gallegos, 26 F.3d 439, 446 (3d Cir.1994) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir.1993)). Moreover, the Court of Appeals for the Third Circuit has instructed that the summary judgment standard is to be applied in an even more stringent fashion where the movant bears the burden of proof on the issue being considered. National State Bank v. Federal Reserve Bank, 979 F.2d 1579, 1582 (3d Cir.1992).

DISCUSSION

I. Plaintiff's Claim Under 42 U.S.C. § 1981.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34368406 (D.Del.)
**(Cite as: 2001 WL 34368406 (D.Del.))**

Page 3

Section 1981 claims are analyzed under the burden-shifting framework developed in Title VII cases including *McDonnell Douglas Corp v. Green,* 411 U.S. 792 (1973), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993). Accordingly, Plaintiff must first establish a prima facie case of discrimination by demonstrating that:(1) Plaintiff is a member of a racial minority; (2) Defendants intended to discriminate against Plaintiff on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in Section 1981. *Lewis v. J.C. Penney Co.,* 948 F.Supp. 367, 371 (D.Del.1996). Upon a prima facie showing by Plaintiff, the burden shifts to Defendants to assert a "legitimate, nondiscriminatory" reason for their actions, which Plaintiff may rebut with evidence of pretext. *See McDonnell Douglas,* 411 U .S. at 802.

In support of their Motion for Summary Judgment, Defendants contend that Plaintiff fails to establish his prima facie case. Defendants concede that Plaintiff is a member of a racial minority. Defendants, however, contend that Plaintiff fails to show: (1) an intent to discriminate on the basis of race and (2) that Plaintiff suffered discrimination concerning one of the activities enumerated in Section 1981.

A. *Intent to Discriminate*

Defendants assert that Plaintiff has alleged no specific facts which suggest an intent to discriminate on the basis of race.

Upon viewing the evidence in a light most favorable to Plaintiff, the Court concludes that Plaintiff has offered sufficient evidence to support an inference of intentional discrimination on the part of Defendants. There is evidence in the record that Defendant Price caused the Dewey Beach Police to investigate Plaintiff. The description of Plaintiff given to the police by Price focused partly on the fact that Plaintiff is a black male. Thus, by Defendant Price's own description, Plaintiff's race played a part in her decision to have him investigated. Thus, the Court concludes that Plaintiff has made a prima facie showing of intentional discrimination.

B. *Whether the Discrimination Concerned an Activity Enumerated in Section 1981.*

**\*4** Defendants also contend that Plaintiff has not established that the discrimination concerned one or more of the activities enumerated in Section 1981.

Section 1981 prohibits race-based discrimination in the making and enforcement of contracts. 42 U.S.C. § 1981(a). Section 1981, as amended by the Civil Rights Act of 1991, provides that:

> [A]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Id.* The coverage of the statute "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). These rights are protected from encroachment by both private and state actors. *See* 42 U.S.C. § 1981(c).

For purposes of this motion, Defendants do not dispute the allegation that Plaintiff had a contractual relationship with Defendant Ocean Breeze, LLC, in that Ocean Breeze, LLC did agree to provide Sea Esta III motel rooms to participants in the Slam Dunk to the Beach Tournament, i.e., Plaintiff was a third-party beneficiary to the contract between Defendant Ocean Breeze, LLC and the organizers of the Slam Dunk to the Beach Tournament. Instead, Defendants contend that Plaintiff's contractual rights were not adversely affected by Defendants.

In this case, Plaintiff and his team were actually guests of the motel and used the rooms on the night of December 27, 1999. They then returned to their homes in New Castle County where they spent the night of December 28, 1999. On December 29, 1999, they returned to the same motel rooms. The contractual relationship did not change in the interim. Thus, the Court concludes that Plaintiff was entitled to enjoy the benefits of the contractual relationship between Ocean Breeze, LLC and the organizers of the basketball tournament. There is evidence in the record that Plaintiff's benefits under this contract were interfered with when he was stopped, investigated and arrested by police. It is undisputed that Defendant Price caused the Dewey Beach Police to investigate Plaintiff. Upon viewing the evidence in a light most favorable to Plaintiff, the Court finds that the discrimination concerned an activity enumerated in Section 1981, namely, the making and enforcement of a contract. Therefore, the Court concludes that Plaintiff has established a prima facie case under Section 1981.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2001 WL 34368406 (D.Del.)
**(Cite as: 2001 WL 34368406 (D.Del.))**

 Once Plaintiff has established a prima facie case, the burden shifts to Defendants "to articulate some legitimate nondiscriminatory reason" for their actions. *McDonnell Douglas,* 411 U.S. at 802. If Defendant carries this burden, the presumption of discrimination drops from the case, and Plaintiff must "cast sufficient doubt" upon the proffered reasons with evidence of pretext. *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996).

 **\*5** Although Defendants' Memorandum of Law in Support of their Motion for Summary Judgment (D.I.56) does not follow the burden-shifting framework, it appears to the Court that Defendants have cited "legitimate" reasons for their actions. Defendants contend that the reason the police were called in was due to Plaintiff's behavior in the motel lobby, not his color or his race. (D.I. 57, Exh. E, at 26, 28, 33, 36-37, 42). Plaintiff has countered with testimony that his behavior provided no justification for calling in the police. (D .I. 65, B-66-67). Thus, Plaintiff has offered evidence that Defendants' legitimate reasons are merely a pretext. Courts have concluded that "[t]he ultimate determination of 'whether there was intentional discrimination against a protected class is considered a question of fact." ' *Hampton v. Dillard Department Stores, Inc.,* 18 F.Supp.2d 1256, 1265 (D. Kansas 1998) (quoting *EEOC v. Flasher,* 986 F.2d 1312, 1317 (10th Cir.1992)). Upon viewing the viewing the evidence in a light most favorable to Plaintiff, the Court concludes that a genuine issue of material facts exists as to whether Defendants intended to discriminate against Plaintiff on the basis of race in violation of Section 1981. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's Section 1981 claim will be denied.

 II. Plaintiff's Claim Under 42 U.S.C. § 2000a.

 Defendants move for summary judgment on Plaintiff's claim under 42 U.S.C. § 2000a. Plaintiff concedes, however, that after discovery, it appears that Plaintiff does not have a claim for injunctive relief, which is the sole remedy under Section 2000a. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's Section 2000a claim will be denied as moot.

 III. Plaintiff's Claim for Defamation.

 Defendant Price moves for summary judgment on Plaintiff's claim for defamation.

 Under Delaware law, "[d]efamation consists of the twin torts of libel and slander; in the shortest terms, libel is written defamation, and slander is oral defamation." *Spence v. Funk,* 396 A.2d 967, 970 (Del.1978). To establish a claim for slander, a plaintiff must prove: (1) a defamatory statement of fact that is false; (2) publication to a third party; and (3) special damages except in the case of slander per se. *See id.* There are four categories of defamation, commonly called slander per se, which are actionable without proof of special damages. *Id.* In broad terms, these are statements which: (1) malign one in a trade, business or profession; (2) impute a crime; (3) imply that one has a loathsome disease; or (4) impute unchastity to a woman. *Id.*

 Plaintiff asserts that Defendant Price made false statements that imputed a crime to him. Plaintiff offers evidence that Defendant Price made statements that Plaintiff was a trespasser on the motel's property and that Plaintiff was acting in a suspicious manner. (D.I.65, B-96, 97, 101, 109). Price did not tell the officers that Plaintiff was a motel guest and Officer Campbell concluded that he was not a motel guest. (D.I.65, B-89-92, 99). Defendant Campbell understood Defendant Price's statements as indicating Plaintiff committed the crime of trespass. (D.I. 65, at B-109-110). According to the *Restatement (Second) of Torts,* "[i]t is not necessary that the charge be made in technical language. It is enough that the language used imputes to the other a criminal offense." *Restatement (Second) of Torts,* § 571, comment (c). Defendant Price contends that her statements were truthful and that she merely told her husband and police that Plaintiff's behavior was making her nervous. (D.I. 57, Exh. E, at 34-35, 44).

 **\*6** Viewing the evidence in a light most favorable to Plaintiff, the Court concludes that disputed issues of material fact exist as to whether the statements made by Defendant Price imputed a crime to Plaintiff, i.e., whether those statements are actionable as slander per se. Therefore, Defendants' Motion for Summary Judgment on Plaintiff's claim for defamation will be denied.

CONCLUSION
 For the reasons discussed, Defendants' Motion for Summary Judgment (D.I.55) will be denied.

 An appropriate Order will be entered.

 Not Reported in F.Supp.2d, 2001 WL 34368406 (D.Del.)

 END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)
**(Cite as: 2006 WL 462551 (D.Del.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Howard L. MOON, Jr., Plaintiff,
v.
THE DELAWARE RIVER AND BAY
AUTHORITY, Defendant.
**No. Civ.A. 05-261JJF.**

Feb. 24, 2006.

Jeffrey K. Martin, and Lori A. Brewington, of
Margolis Edelstein, Wilmington, Delaware, for
Plaintiff.

William W. Bowser, and Adria B. Martinelli, of
Young Conaway Stargatt & Taylor, LLP,
Wilmington, Delaware, for Defendant.

*MEMORANDUM OPINION*

FARNAN, J.

*1 Pending before the Court is Defendant's Motion
For Partial Judgment On The Pleadings (D.I.4).
Because both parties submitted matters outside the
pleadings with their briefing, the Court, pursuant to
Fed.R.Civ.P. 12(c), will treat the Motion as one for
summary judgment under Rule 56. The Court
concludes that Plaintiff has had reasonable
opportunity to present all material pertinent to such a
motion because Plaintiff's Answering Brief treats
Defendant's Motion as one for summary judgment.
(*see* D.I. 8 at 8.) For the reasons discussed, the Court
will grant the Motion in part and deny it in part.

BACKGROUND
At all relevant times, and at least up to the time of
filing his Complaint, Plaintiff was employed by
Defendant, The Delaware River and Bay Authority
("DRBA"). Plaintiff brings this action under Title VII
of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)
*et seq.*, alleging four causes of action: (1) retaliation
for filing complaints with the EEOC, (2) racial
discrimination resulting in deprivation of equal
employment opportunities, (3) racial discrimination
resulting in failure to promote, and (4) breach of the
implied covenant of good faith and fair dealing. As
part of his first cause of action, Plaintiff alleges that

DRBA "denied Plaintiff the opportunity for
promotions despite his qualifications," (D.I. 1 at ¶
48(a)), and "forced Plaintiff to work in a hostile work
environment," (*Id.* at ¶ 48(b)). As part of his third
cause of action, Plaintiff again alleges that DRBA
"denied Plaintiff numerous opportunities for career
advancement despite his qualifications." (*Id.* at ¶ 57.)
Plaintiff alleges multiple instances in which DRBA
unfairly failed to promote him, including failure to
promote him to Chief Operating Officer ("COO") in
November, 2002.

By its Motion, DRBA requests the Court to dismiss
Plaintiff's claims with regard to hostile work
environment and DRBA's failure to promote him to
COO, because those claims were not raised in the
charges Plaintiff filed with the EEOC. In addition,
DRBA contends that Plaintiff's claim with regard to
DRBA's failure to promote him to COO is time
barred. DRBA further contends that Plaintiff's fourth
cause of action, breach of the implied covenant of
good faith and fair dealing, is barred by Delaware
statute and that the covenant is inapplicable because
Plaintiff's employment was not terminated.

DISCUSSION
1. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that a
party is entitled to summary judgment where "the
pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if
any, show that there is no genuine issue of material
fact and that the moving party is entitled to judgment
as a matter of law." Fed.R.Civ.P. 56(c).

In determining whether there is a triable dispute of
material fact, a court must review all of the evidence
and construe all inferences in the light most favorable
to the non-moving party. *Valhal Corp. v. Sullivan
Assocs., Inc.*, 44 F.3d 195, 200 (3d Cir.1995).
However, a court should not make credibility
determinations or weigh the evidence. *Reeves v.
Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150
(2000). To properly consider all of the evidence
without making credibility determinations or
weighing the evidence, a "court should give credence
to the evidence favoring the [non-moving party] as
well as that 'evidence supporting the moving party
that is uncontradicted and unimpeached, at least to
the extent that that evidence comes from disinterested

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)
**(Cite as: 2006 WL 462551 (D.Del.))**

witnesses." ' *Id.* at 151.

**\*2** To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586- 87 (1986). However, the mere existence of some evidence in support of the non-moving party will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the non-moving party on that issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Thus, if the evidence is "merely colorable, or is not significantly probative," summary judgment may be granted. *Id.*

II.    Whether    Plaintiff    Failed    To    Exhaust Administrative Remedies With Respect To Certain Claims

DRBA contends that the Court should dismiss Plaintiff's claims of hostile work environment and failure to promote him to COO because Plaintiff did not specifically raise those claims in the charges he filed with the EEOC. (D.I. 5 at 9.) In response, Plaintiff contends that those claims should not be dismissed because they are within the scope of the EEOC charges and a reasonable investigation of the charges would have revealed them. (D.I. 8 at 11.) Plaintiff further contends that he provided information relating to those claims to the EEOC, (*Id.* at 3, 14), that the EEOC investigator neglected to include that information in the charges, (*Id.*), and that Plaintiff should not be penalized because of the EEOC's negligent omission, (*Id.* at 12).

Before initiating a lawsuit under Title VII, a plaintiff must first file charges of discrimination with the EEOC and be granted a right-to-sue letter. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798 (1973). The purpose of this requirement is to provide the EEOC the chance to "investigate, mediate and take remedial action with respect to a charge of discrimination." *Tillman v. The Pepsi Bottling Group, Inc.,* 2005 U.S. Dist. LEXIS 18891, 17 (D.Del.2005) (citing *Ostapowicz v. Johnson Bronze Co.,* 541 F.2d 394, 398 (3d Cir.1976)). A court should construe these formalities in a general fashion, because "[s]uch technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." *Love v.*

*Pullman,* 404 U.S. 522, 526-27 (1972). Therefore, the ambit of a civil complaint, once a right-to-sue letter is issued by the EEOC, is " 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of a charge of discrimination,' regardless of the actual scope of the EEOC investigation." *Ebert v. Office of Information Systems,* 1998 U.S. Dist. LEXIS 9100, 12, (D.Del.1998) (citing *Hicks v. ABT Assoc., Inc.,* 572 F.2d 960, 966 (3d Cir.1978) (quoting *Ostapowicz v. Johnston Bronze Co.,* 541 F.2d 394, 398-99 (3d Cir.1976), cert. denied, 429 U.S. 1041 (1977))).

**\*3** More specifically, "the relevant test for determining whether plaintiff must exhaust her administrative remedies, therefore, is 'whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." ' *Tillman v. The Pepsi Bottling Group, Inc.,* 2005 U.S. Dist. LEXIS 18891, 17-18 (D.Del.2005) (citing *Waiters v. Parsons,* 729 F.2d 233 (3d Cir.1984); *Ostapowicz,* 541 F.2d at 398-99; *Flesch v. E. Pa. Psychiatric Inst.,* 434 F.Supp. 963, 970 (E.D.Pa.1977); *Howze v. Jones & Laughlin Steel Corp.,* 750 F.2d 1208, 1212 (3d Cir.1984)). In addition, courts have allowed claims not specifically mentioned in the prior EEOC charge "where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint." *Ebert v. Office Of Information Systems,* 1998 U.S. Dist. LEXIS 9100 (D.Del.1998) (citing *Howze,* 750 F.2d at 1212; *Ostapowicz,* 541 F.2d at 398-99).

With respect to Plaintiff's claim that DRBA unlawfully discriminated in failing to promote him to COO, the Court concludes that there is a close nexus between that claim and the six incidents of failure to promote specified in Plaintiff's initial EEOC charge. (*see* D.I. 6 at A1.) The Court further concludes that a reasonable investigation of that charge would have encompassed that claim within its scope. Therefore, the Court will deny DRBA's Motion with respect to Plaintiff's claim that DRBA unlawfully discriminated in failing to promote him to COO.

With respect to Plaintiff's claim of hostile work environment, the Court concludes that there is not a close nexus between that claim and the facts specified in Plaintiff's EEOC charges. Neither of the charges alleges any fact related to claims of a hostile work environment. Nor do they allege any fact from which a hostile work environment could reasonably be inferred. Thus, the Court further concludes that a reasonable investigation of the charges would not

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)
**(Cite as: 2006 WL 462551 (D.Del.))**

have encompassed that claim within its scope. Therefore, the Court will grant DRBA's Motion with respect to Plaintiff's claim of hostile work environment.

III. Whether Plaintiff's Claim That DRBA Unlawfully Discriminated In Failing To Promote Him To COO Is Time Barred

DRBA contends that Plaintiff's claim that DRBA unfairly failed to promote him to COO is barred by 42 U.S.C. § 2000e-5(e)(1), which provides that, where, as here, the person filing a Title VII employment discrimination charge has initiated proceedings with a state agency, the charge must be filed with the EEOC within 300 days after the alleged unlawful employment practice occurred. Plaintiff claims that he was unlawfully denied promotion to COO in November, 2002. His initial EEOC charge was filed on April 6, 2004. Plaintiff's Answering Brief (D.I.8) does not respond to this contention.

Because DRBA's failure to promote Plaintiff to COO occurred more than 300 days before Plaintiff filed his initial EEOC charge, Plaintiff's claim with respect to that incident is time barred unless Plaintiff can demonstrate that DRBA's failure to promote him is part of a continuing violation. *Rush v Scott Specialty Gasses, Inc.,* 113 F.3d 476, 481 (3d Cir.1997). "The continuing violation theory allows a 'plaintiff [to] pursue a Title VII claim for discriminatory conduct that began prior to the filing period if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination of the defendant." ' *Id.* (quoting *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995)). To do this, Plaintiff must first show that DRBA committed at least one discriminatory act within the 300 day period. *Id.* at 481 (citing *West,* 45 F.3d at 754). Plaintiff must also show that the prior discriminatory act was not an isolated incident, but part of a continuing pattern of discrimination. *Id.* "A plaintiff satisfying these requirements may present evidence and recover damages for the entire continuing violation, and the 300-day filing period will not act as a bar." *Id.*

**\*4** Reviewing the evidence and construing all inferences in the light most favorable to Plaintiff, the Court concludes that Plaintiff has adequately alleged that DRBA's failure to promote him to COO was part of a continuing violation. Plaintiff alleges at least five other incidents of failure to promote, four of which are clearly within the 300 day period. (D.I. 8 at 2-3.) Moreover, the high degree of similarity between the alleged incidents, and their recurring nature

demonstrate that DRBA's failure to promote Plaintiff to COO was part of a continuing pattern of discrimination. Therefore, the Court concludes that Plaintiff's claim that DRBA unlawfully failed to promote him to COO is not time barred.

IV. Whether Plaintiff States A Claim Under The Implied Covenant of Good Faith and Fair Dealing

DRBA contends that Plaintiff's fourth cause of action, that DRBA breached the implied covenant of good faith and fair dealing, should be dismissed because DRBA never terminated Plaintiff's employment. Plaintiff's Answering Brief (D.I.8) does not respond to this contention.

Under Delaware law, the covenant of good faith and fair dealing is recognized as a very narrow exception to the presumption of at-will employment. *E.I. DuPont de Nemours and Co. v. Pressman,* 679 A.2d 436, 441 (Del.1996). In order to bring a valid cause of action under the covenant of good faith and fair dealing, a plaintiff must show that his claim falls into one of four exclusive categories:

"(i) where the termination violated public policy;
(ii) where the employer misrepresented an important fact and the employee relied 'thereon either to accept a new position or remain in a present one;'
(iii) where the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to the employee's past service; and (iv) where the employer falsified or manipulated employment records to create fictitious grounds for termination."

*Lord v. Souder,* 748 A.2d 393, 400 (Del.2000) (quoting *Pressman,* 679 A.2d at 442-44).

Here, Plaintiff cannot contend that his claim falls within category i or iv because DRBA did not terminate Plaintiff's employment. Plaintiff does not contend that his claim falls within category ii or iv. Therefore, the Court concludes that Plaintiff's fourth cause of action, breach of the implied covenant of good faith and fair dealing, fails to state a claim upon which relief can be granted.

In addition, the Delaware Discrimination in Employment Act, 19 Del. C. Chapter 7, precludes Plaintiff from bringing his fourth cause of action. In July, 2004, the Act was amended to provide that "[t]his subchapter shall afford the sole remedy for claims alleging a violation of this chapter to the exclusion of all other remedies." 19 Del. C. § 712(b). Moreover, the General Assembly's synopsis of the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)
**(Cite as: 2006 WL 462551 (D.Del.))**

Page 4

amendments to the Act states that:

> This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in *Schuster v. Derocili,* 775 A.2d 1029 (2001).

**\*5** S.B. 154, 142d Gen. Ass. (Del.2004). Accordingly, The Court will grant DRBA's Motion with respect to Plaintiff's fourth cause of action.

CONCLUSION

In sum, for the reasons discussed, the Court will grant DRBA's Motion with respect to Plaintiff's claim of hostile work environment and Plaintiff's fourth cause of action, breach of the implied covenant of good faith and fair dealing. The Court will deny DRBA's Motion with respect to Plaintiff's claim that DRBA unlawfully failed to promote him to COO in November, 2002.

An appropriate order will be entered.

*ORDER*

At Wilmington, this *24* day of February, 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendant's Motion For Partial Judgment On The Pleadings (D.I.4) is *GRANTED* with respect to Plaintiff's claim of hostile work environment and Plaintiff's fourth cause of action, breach of the implied covenant of good faith and fair dealing;

2. Defendant's Motion For Partial Judgment On The Pleadings (D.I.4) is *DENIED* with respect to Plaintiff's claim that Defendant unlawfully failed to promote him to COO in November, 2002.

Not Reported in F.Supp.2d, 2006 WL 462551 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: 2006 WL 1530223 (D.Del.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Robin D. NICHOLS, Plaintiff,
v.
BENNETT DETECTIVE & PROTECTIVE
AGENCY, INC., a Delaware corporation, and
Allen's Family Foods, Inc., a Delaware corporation,
Defendants.
**No. Civ.A. 05-55-KAJ.**

May 31, 2006.
William D. Fletcher, Jr., Noel E. Primos,
Schmittinger and Rodriguez, P.A., Dover, Delaware,
for Plaintiff.

Roger D. Landon, Philip T. Edwards, Murphy
Spadaro & Landon, Wilmington, Delaware, for
Defendant Bennett Detective & Protective Agency,
Inc.

Matthew F. Boyer, Connolly Bove Lodge & Hutz,
Wilmington, Delaware, for Defendant Allen's Family
Foods, Inc.

Arthur M. Brewer, Laura A. Pierson Scheinberg,
Shawe & Rosenthal, LLP, Baltimore, Maryland, of
counsel.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

*1 Before me are two Motions for Summary
Judgment, one filed by defendant Bennett Detective
& Protective Agency, Inc. ("Bennett") (Docket Item
["D.I."] 43), and the other filed by defendant Allen's
Family Foods, Inc. ("Allen") (D.I.45). [FN1] The
complaint, filed by plaintiff Robin D. Nichols,
alleges that Bennett discriminated against her on the
basis of her race and sex, in violation of the Delaware
Discrimination Act ("DDA"), 19 Del. C. § 710, et
seq. (D.I. 1, Ex. A at ¶ ¶ 24-25), and that both
Defendants discriminated against her on the basis of
her race, in violation of 42 U.S.C. § 1981 (id. at ¶ ¶
27-28). Nichols also alleges that Allen tortiously

interfered with her contract with Bennett (id. at ¶ ¶
30-31), and that an agent of Allen, Raymond Miller,
made false statements about her that constitute
slander per se (id. at ¶ ¶ 33-38).

FN1. Bennett and Allen will be referred to
collectively herein as "Defendants."

Nichols initially filed her complaint in the Delaware
Superior Court, but the case was removed to this
court pursuant to 28 U.S.C. § 1441. [FN2]
Jurisdiction over the § 1981 claim is appropriate
under 28 U.S.C. § 1331. Supplemental jurisdiction
over all other claims is proper under 28 U.S.C. §
1367. For the reasons that follow, the Motions for
Summary Judgment will be granted.

FN2. The Notice of Removal was filed only
by Bennett, a failing because all defendants
must join a petition for removal. Hanrick v.
Hanrick, 153 U.S. 192, 196 (1894) ("the suit
could not be removed by one of several
plaintiffs or defendants"). However, "a
motion to remand the case on the basis of
any defect other than lack of subject matter
jurisdiction must be made within 30 days
after the filing of the motion of removal." 28
U.S.C. § 1447(c); see also Roe v.
O'Donohue, 38 F.3d 298, 301-02 (7th
Cir.1994), overruled on other grounds by
Murphy Bros., Inc. v. Michetti Pipe
Stringing, Inc., 526 U.S. 344 (1999) (finding
that where only one defendant filed a notice
of removal, removal was improper, but
where plaintiff did not move to remand
within 30 days, remand was improper).
Thus, jurisdiction can properly be exercised
in this case.

II. BACKGROUND [FN3]

FN3. The following rendition of background
information does not constitute findings of
fact and is cast in the light most favorable to
the non-moving party.

Bennett is a security business that contracts with
various companies, including Allen, to provide
security guards and related services. (Deposition of
Wayne Keller, [FN4] D.I. 47, Ex. 7 at 7:11-17.)
Bennett's contract with Allen provides that Bennett

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: 2006 WL 1530223 (D.Del.))**

will supply security officers at Allen's plants in Harbeson, Delaware, and Cordova, Maryland. (D.I. 47, Ex. 2 at A003.) The contract further provides that "[i]t is mutually understood that Bennett is an independent contractor and that all guards employed by Bennett to perform the services as herein provided are and shall be employees of Bennett and not employees of [Allen]." (*Id.* at A004.))

> FN4. Wayne Keller is the Vice-President at Bennett. (Keller Deposition, D.I. 47, Ex. 7 at 4:14.)

Nichols, an African-American female, worked as a Bennett security guard at Allen's Harbeson plant from July 30, 2001 until December 13, 2003. (Keller Deposition, D.I. 47, Ex. 7 at 29:4-12.) On beginning her employment with Bennett, Nichols signed a document entitled "Condition of Employment," which provided that "Bennett Security has the right to move any security officer to another job site at any time." (D.I. 47, Ex. 1 at A001.) On December 11, 2003, Nichols, who served as a supervisor of other guards, had an altercation with Joseph Joshua Whiteman, one of her subordinates. (Nichols Deposition, D.I. 47, Ex. 4 at 39:21-40:9.) Nichols had received a call from Raymond Miller [FN5] asking her to send Whiteman to see him. (*Id.* at 39:24-40:2.) According to Nichols, when she told Whiteman to go see Miller, Whiteman argued with her and then pushed her. (*Id.* at 40:3-22.) Nichols pushed him back, and the two continued to push each other back and forth until Whiteman pushed Nichols into a file cabinet and CB radio. (*Id.* at 40:22-41:3.)

> FN5. Raymond Miller is the manager of human resources for Allen's Harbeson, Delaware plant. (Miller Deposition, D.I. 47, Ex. 5 at 4:16-20.)

**\*2** Eventually, Whiteman went to speak with Miller, at which point Nichols called the police to report her altercation with Whiteman. (*Id.* at 41:7-9.) Although Nichols informed her superiors at Bennett, Mark Habicht [FN6] and Wayne Keller, that she had called the police, she did not inform Miller. (*Id.* at 47:19-21.) When the police arrived, Nichols knocked at Miller's office door to inform Whiteman that the police were there and wanted to speak to him. [FN7] (*Id.* at 41:9-19.) The police took a statement from Whiteman. (*Id.* at 41:19-22.) Whiteman later apologized to Nichols, and no charges were filed. (*Id.* at 42:7-17.)

> FN6. Mark Habicht is the Vice-President of

Operations at Bennett. (D.I. 47, Ex. 6 at 5:22-24.)

> FN7. Miller asserts that he was alone in his office when he was informed that the State Police were on the premises. (Miller Deposition, D.I. 47, Ex. 5 at 10:16-19.) Miller testified that when he heard about the incident, he went to the security post and spoke to both Nichols and a state trooper about the incident. (*Id.* at 11:10-12:13.) The discrepancy between Miller's and Nichols's recollection in that regard is not material to the outcome of the motions for summary judgment.

Later that same day, Miller called Habicht to discuss the incident. Habicht recalled that Miller stated,

> I called out to the guardhouse a couple of times and [Nichols] answered the phone and there was yelling in the background and then she slammed the phone down. And I called back and she did the same thing ... I can't have that out there ... Enough is enough, she's got to go.

(Habicht Deposition, D.I. 47, Ex. 6 at 20:8-15.) The next day, Habicht and Keller went to meet with Miller. (*Id.* at 22:6-18.) Miller "reiterated the fact that [Nichols] had to go, that he couldn't have that kind of activity going on in his plant, it was too disruptive." (*Id.* at 23:15-19.) [FN8] Miller had previously requested the transfer of two other Bennett security guards, David Leggins, a black male, and Daniel Steele, a white male. (Habicht Deposition, D.I. 44, Ex. A at 41:3-42:24.)

> FN8. There is a dispute between Allen and Bennett as to who initially suggested that Nichols be transferred. Keller confirms Habicht's testimony, stating that it was Miller who initially suggested that Nichols be transferred. (Keller Deposition, D.I. 47, Ex. 7 at 16:23-17:2.) Miller, however, testified that Keller and Habicht suggested the transfer, and that he simply agreed. (Miller Deposition, D.I. 49, Appendix at B38-39, 39:10- 12, 39:24-40:9.) Miller claims that he was upset that the police were called because it "created kind of a disruptive environment. And when you hear about these things out of the blue, you don't know if some act of violence may have taken place or exactly what, if somebody got hurt on the job. You just don't know. And so that was my concern." (Miller Deposition, D.I. 47, Ex. 5 at 15:4-10.) The source of the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: 2006 WL 1530223 (D.Del.))**

suggestion that Nichols be transferred, however, is not material, as it has no bearing on the outcome of the motions for summary judgment. *See infra* note 11 and accompanying text.

Miller, Habicht, and Keller agreed that, to avoid further disruption, Nichols could finish her work week, but that she would not return to the plant the following week. (Keller Deposition, D.I. 47 at 22:4-8.) On December 15, Nichols received a message from Bennett telling her not to return to work at Allen the next day. (Nichols deposition, D.I. 47, Ex. 4 at 42:18-23.) Bennett replaced Nichols at the Harbeson Plant with another African-American woman. (D.I. 44, Ex. A at 43-44.)

Bennett did not immediately have another job for her to go to. (D .I. 47, Ex. 4 at 101:24-102:1.) Within days, Bennett offered Nichols a thirty-two hour a week job working at another customer's site, and she was set to start training for that position around December 19, 2003. (Keller Deposition, D.I. 47, Ex. 7 at 32:21-24.) However, she called out sick the first day of training, and, because the customer needed someone to start immediately, Bennett put another officer in that position. (*Id.* at 33:19-34:4.) On December 23 and 24, Nichols filled in for another officer at yet another location, and she worked there again on December 29. (*Id.* at 35:3-22.) When the security guard for whom she was filling in returned to work on December 29, however, Bennett was once more without a position for Nichols. (Nichols Deposition, D.I. 47, Ex. 4 at 106:19-107:1.) On January 5, 2004, Nichols called Bennett and informed them that she was going to resign in two weeks. (*Id.* at 107:15-18.) Nichols last day of employment at Bennett was January 19, 2004. (*Id.* at 29:2-15.)

**\*3** While Nichols says that she cannot "say for a fact" that Whiteman told his version of the incident to Allen employees (*id.* at 54:24-55:4), she nevertheless alleges that someone at Allen questioned Whiteman about the December 11 incident but that no one ever allowed her to tell her side of the story. (*Id.* at 53:24-54:2.) Miller claims, however, that he spoke only to Nichols about the incident, and that he never spoke to Whiteman about it. (Miller Deposition, D.I. 47, Ex. 5 at 11:22-12:24.)

Nichols also alleges that, at some point in the days after the incident, she had a conversation with Valerie Brittingham, an Allen employee who worked for Miller. According to Nichols, their conversation was as follows:

[Brittingham said] What in the world happened? ... [Whiteman] talk[ed] to Mr. Miller, and Mr. Miller is down there telling everybody that everything was your [Nichols's] fault, and like, you know, I wasn't capable of doing my job. And I was: Well, why in the world would Mr. Miller say something like that about me? And she was like: Well, you know, he's a racist.

(*Id.* at 58:1-12.) [FN9]

> FN9. Brittingham recalls things differently. She testified at her deposition that she never talked to Nichols about the incident, and that she never told Nichols that Miller was a racist. (Brittingham Deposition, D.I. 47, Ex. 8 at 10:24-11:13.)

On January 19, 2004, Nichols began training to become a certified nursing assistant ("CNA"). (Nichols Deposition, D.I. 47, Ex. 4 at 108:15-18.) During the period of her training, Nichols was paid seven dollars an hour, and when her training was completed, she was paid about nine dollars and thirty-five cents an hour (*id.* at 109:4-19), which was more than the seven dollars an hour she made at Bennett (*id.* at 122:8-16). Nichols worked as a CNA until May 2004. (*Id.* At 20-24.) Nichols subsequently worked as a school bus driver from September 2004 until April 2005, and as a security guard for Allied Security for about two weeks in April 2005. (*Id.* at 110:1-113:14.) She has been unemployed since leaving the job at Allied Security. (*Id.* at 113:15- 17.)

III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Celotex v. Catrett, 477 U.S. 317, 323 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita Elec. Indus. Co. v. Zenith*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                              Page 4
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: 2006 WL 1530223 (D.Del.))**

*Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting
Fed.R.Civ.P. 56(e)). The court will "view the
underlying facts and all reasonable inferences
therefrom in the light most favorable to the party
opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63
F.3d 231, 236 (3d Cir.1995). However, a court should
not make credibility determinations or weigh the
evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,*
530 U.S. 133, 150 (2000).

1V. DISCUSSION

A. Discrimination in Violation of 42 U.S.C. § 1981
and the Delaware Discrimination Act

*\*4* Nichols has alleged that both Bennett and Allen
discriminated against her based on her race, in
violation of § 1981, and that Bennett also
discriminated against her based on her race and sex,
in violation of the DDA. [FN10] Claims under 42
U.S.C. § 1981 and claims under the DDA, 19 *Del. C.*
§ 710 et seq., both must be evaluated according to
the burden-shifting analysis set forth by the United
States Supreme Court in *McDonnell Douglas Corp.*
*v. Green,* 411 U.S. 792 (1973). *Jones v. Sch. Dist. of*
*Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999)
("disparate treatment race discrimination claims
under Title VII[and] section 1981 ... require
application of the familiar burden-shifting framework
the Supreme Court articulated in *McDonnell Douglas*
*Corp. v. Green*" ); *Giles v. Family Court of*
*Delaware,* 411 A.2d 599, 602 (Del.1980) (applying
*McDonnell Douglas* burden-shifting to claim under
the DDA). That analysis proceeds in three steps.
First, the plaintiff "must carry the initial burden ... of
establishing a prima facie case of ... discrimination."
*McDonnell Douglas,* 411 U.S. at 802. "The burden
then must shift to the [defendant] to articulate some
legitimate, nondiscriminatory reason for the
[plaintiff]'s rejection ." *Id.* The burden then shifts
again to the plaintiff "to show that [the defendant's]
stated reason for respondent's rejection was in fact
pretext." *Id.* at 804.

> FN10. In her Answering Brief to Allen's
> Motion for Summary Judgment, Nichols
> asserts, apparently for the first time, a claim
> against Allen for discrimination under the
> DDA. (D.I. 49 at 13-14.) However, Nichols
> cannot assert a claim against Allen under the
> DDA for a number of reasons. First, she did
> not assert such a claim in her complaint.
> (D.I. 1 at ¶¶ 23-25 ("Defendant Bennett
> discriminated against Plaintiff with regard to
> the terms and conditions of her employment

on the basis of her race and sex in violation
of 19 *Del. C.* § 710 et seq.").) Second, Allen
asserts, and Nichols has presented no
evidence to the contrary, that Nichols never
filed a claim of discrimination with the
Delaware Department of Labor, a necessary
prerequisite to filing a complaint under the
DDA. 19 *Del.Code* § 712(b). Finally, even
had she filed a claim of discrimination,
Nichols cannot make a claim under § 711(a)
of the DDA against Allen, because such
claims are cognizable only against an
"employer." *See* 19 *Del.Code* § 711(a).
Although Nichols argues that Allen was her
"joint employer" because Allen exercised
control over aspects of her employment and
because she interacted on a daily basis with
Miller, her argument is contradicted by
Allen's contract with Bennett, which
provided that "[i]t is mutually understood
that Bennett is an independent contractor
and that all guards employed by Bennett to
perform the services as herein provided are
and shall be employees of Bennett and not
employees of [Allen]." (D.I. 47, Ex. 2 at
A004.) Accordingly, Nichols has not and
cannot state a claim of discrimination
against Allen under the DDA, 19 *Del. C.* §
711(a).

1. § 1981 Claims

42 U.S.C. § 1981 provides that:
  All persons within the jurisdiction of the United
  States shall have the same right in every State and
  Territory to make and enforce contracts, to sue, be
  parties, give evidence, and to the full and equal
  benefit of all laws and proceedings for the security
  of persons and property as is enjoyed by white
  citizens, and shall be subject to like punishment,
  pains, penalties, taxes, licenses, and exactions of
  every kind, and to no other.

To establish a prima facie case of racial
discrimination under 42 U.S.C. § 1981, Nichols must
show "(1) that [she] is a member of a racial minority;
(2) intent to discriminate on the basis of race by the
defendant; and (3) discrimination concerning one or
more of the activities enumerated in the statute[,]
which includes the right to make and enforce
contracts[.]" *Brown v. Philip Morris Inc.,* 250 F.3d
789, 797 (3d Cir.2001); *see also Pryor v. Nat'l*
*Collegiate Athletic Ass'n,* 288 F.3d 548, 569 (3d
Cir.2002). The United States Court of Appeals for the
Third Circuit has also stated that "the elements of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
(Cite as: 2006 WL 1530223 (D.Del.))

employment discrimination under Title VII are identical to the elements of a section 1981 claim." *Schurr v. Resorts Int'l Hotel, Inc.,* 196 F.3d 486, 499 (3d Cir.1999). Those elements are (1) that the plaintiff is a member of a protected class; (2) that she is qualified for the position; (3) that she suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination. *Jones,* 198 F.3d at 410-11. It appears that the Third Circuit applies the first standard where there is a claim under § 1981, but not an accompanying claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. *See Brown,* 250 F.3d at 797; *Pryor,* 288 F.3d at 569. However, it appears that Court applies the second standard when there is an accompanying Title VII claim. *Jones,* 198 F.3d at 411-12; *Schurr,* 196 F.3d at 499. Because Nichols has not made a claim under Title VII here, I will use the standard set out in *Brown* and *Pryor.*

**\*5** A claim under § 1981 requires proof of purposeful or intentional discrimination. *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 391 (1982) ("We conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination."). Additionally, proof of "discrimination concerning one or more of the activities enumerated in the statute" is required to establish a claim under § 1981. *Brown v. Philip Morris Inc.,* 250 F.3d 789, 797 (3d Cir.2001). The statute defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

a. Allen

Nichols appears to base her allegation that Allen discriminated against her under § 1981 on her assertion that Miller requested she be transferred. [FN11] Nichols cannot show, however, that Allen discriminated against her under § 1981, as Nichols has not shown that Allen's actions interfered with any contract she may have had with Bennett. Nichols's "Condition of Employment" agreement with Bennett provided that Bennett "has the right to move any security officer to another job site at any time." (D.I. 47, Ex. 1 at A001.) Assuming that Miller requested that she be moved, that did not interfere with the performance, modification, or termination of her employment relationship with Bennett. Even if one were to characterize that relationship as being

governed by a contract, it specifically provided for her transfer. (D.I. 47, Ex. 1 at A001 ("Bennett Security has the right to move any security officer to another job site at any time.").) Miller's request that she be transferred could not constitute an interference with the enjoyment of the benefits, privileges, terms or conditions of her contractual relationship since she had no right to remain at Allen. Hence, Nichols fails to establish the third prong of the three-part test for the establishment of a prima facie case.

> FN11. Nichols asserts that the disagreement over whether Miller requested that she be transferred, or whether Keller and Habicht suggested it, creates a genuine issue of material fact that precludes summary judgment. However, as I hope will be clear from the analysis here, determining who suggested that Nichols be transferred is not relevant to the outcome of this motion, and thus, there is no genuine issue of material fact.

Even if Nichols could establish a prima facie case, however, summary judgment for Allen would still be appropriate. Had Nichols established a prima facie case of discrimination, the burden would shift to Allen to establish a legitimate, non-discriminatory reason for requesting her transfer. *See McDonnell Douglas Corp.,* 411 U.S. at 802. Allen asserts that Miller requested Nichols's transfer not because of her race, but "because of the disruptive environment Ms. Nichols's call to the police caused and her failure to notify [Miller] of the call." (D.I. 46 at 14.) Miller's statements to Keller and Habicht that "[Nichols] had to go, that he couldn't have that kind of activity going on in his plant, it was too disruptive" support Allen's assertion that Miller requested Nichols's transfer because she was disruptive. (Habicht Deposition, D.I. 47, Ex. 6 at 23:15-19.) Nichols bears the burden of showing that this explanation is merely a pretext for discrimination. *See McDonnell Douglas Corp.,* 411 U.S. at 804.

**\*6** However, Nichols has come forward with no evidence to meet that burden. In support of her claims, Nichols relies heavily on her own testimony that Brittingham told her that Miller is a racist who "[told] everybody that everything was [Nichols's] fault, and ... [that she] wasn't capable of doing [her] job." (Nichols Deposition, D.I. 47, Ex. 4 at 58:1-12.) Assuming that Nichols version of that conversation were true, [FN12] Nichols's testimony about what Brittingham told her is hearsay and cannot be

Not Reported in F.Supp.2d                                                                      Page 6
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: 2006 WL 1530223 (D.Del.))**

considered on a motion for summary judgment. *Philbin v. Trans Union Corp.,* 101 F.3d 957, 961 (3d Cir.1996) ("the hearsay statement ... is not capable of being admissible at trial, and could not be considered on a motion for summary judgment") (internal citations and quotation marks omitted). Thus, even viewing the facts in the light most favorable to Nichols, I may not consider that hearsay testimony.

> FN12. Again, Nichols's testimony in that regard is flatly contradicted by Brittingham's own testimony. (*Supra* note 9.)

The only admissible evidence in the record that can be stretched to connect Nichols's transfer, or Miller's other actions, to her race is the fact that Whiteman, who is a white man, was not transferred while Nichols, an African-American woman, was. Previously, however, Bennett, at Miller's request, transferred Daniel Steele, a white man, and David Leggins, a black man from Allen. Thus, the sole fact that Nichols was transferred while Whiteman was not is insufficient to rebut Allen's proffered reason for requesting Nichols transfer. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 646 (3d Cir.1998) ("a black plaintiff cannot establish racial discrimination by singling out one white person who was treated more favorably when there were other white persons who were treated less favorably than other black persons"). Therefore, Allen's Motion for Summary Judgment on Nichols's claim of discrimination under 42 U.S.C. § 1981 would be granted, even if Nichols had provided a prima facie case of discrimination.

b. Bennett

Again, viewing the facts in the light most favorable to Nichols, it still appears that Bennett did nothing more than transfer Nichols to placate an angry client. The transfer, however, raises more complicated issues with respect to Bennett than it does with respect to Allen. Allen said it wanted her off its site. It said nothing about, and had no input into, what happened to her next. Bennett did have that control, and though it had the right to transfer Nichols, and worked to find her a new position, it did not find her one right away, and the two positions it offered her were part-time positions. Thus, Nichols's transfer, while not an interference with any contractual right Nichols had, could be seen as an adverse employment action. *See infra* section IV.A.2.

Nevertheless, Nichols cannot show that her transfer was evidence of an intent to discriminate on the basis

of race on the part of Bennett. In fact, in her deposition, Nichols stated that she did not believe that Keller or Habicht intended to discriminate against her on the basis of her race. (D.I. 47, Ex. 4 at 116:5-14.)  [FN13] Again, the only connection between Nichols race and her transfer is that she was transferred while Whiteman was not. However, Bennett had, in the past, transferred at least two other employees at Miller's request, a white man and a black man. Moreover, Bennett replaced Nichols with another African-American woman. (D.I. 44, Ex. A at 43-44.) Thus, Nichols has not shown that Bennett intended to discriminate against her on the basis of her race. *Lin v. Rohm and Haas Co.,* 293 F.Supp.2d 505, 518 (E.D.Pa.2003) (finding insufficient evidence of intent to discriminate where the defendant identified employees outside of the protected class that were treated similarly to plaintiff). Consequently, Nichols has failed to make out a prima facie case of discrimination against Bennett, and Bennett's Motion for Summary Judgment will be granted as to Nichols's claims under § 1981.

> FN13. Nichols testified as follows:
> Q: Do you believe that Bennett's actions in this matter against you were actions based on their intent to discriminate [against] you on the basis of your race?
> A: Do you mean Mark [Habicht] and Wayne [Keller] or by--
> Q: I mean Bennett, the company.
> A: The company?
> Q: Yes.
> A: Other than Josh [Whiteman] at the time-- I don't think Mark [Habicht] and Wayne [Keller]; but Josh [Whiteman] my coworker that I had the incident from or with. (D.I. 47, Ex. 4 at 116:5-14.)

*7 Even if Nichols had made out a prima facie case of discrimination, however, Nichols cannot show that Bennett's stated reason for transferring her was a pretext for discrimination. Bennett asserts that Nichols, by calling the police to the plant after her altercation with Whiteman, caused a disruption that caused a potential breakdown in Bennett's client relationship with Allen. (D.I. 44 at 17.) Therefore, in order to maintain that relationship, it was necessary to transfer Nichols. (*Id.*) Nichols has come forward with no evidence to show that that explanation was a pretext for discrimination. Again, the only evidence that connects her transfer to her race is that Whiteman was not transferred, while Nichols was, and again, that fact alone is not sufficient to rebut Bennett's non-discriminatory reason for transferring

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
**(Cite as: 2006 WL 1530223 (D.Del.))**

Nichols. *See Simpson,* 142 F.3d 639, 646. Therefore, summary judgment will be granted to Bennett on Nichols's claim under § 1981.

2. DDA Claim Against Bennett

 To establish a prima facie case of discrimination under the DDA, a plaintiff must establish the same elements as are required for a claim under Title VII. *Giles,* 411 A.2d at 601-02 ("While the *McDonnell Douglas* test was developed in the context of Title VII cases, in our view it is appropriate for a § 711(a) action [under the DDA] as well, because the language of the Delaware statute is substantially the same as the Title VII language defining an unlawful employment practice."). Those elements are (1) that the plaintiff is a member of a protected class; (2) that she is qualified for the position; (3) that she suffered an adverse employment action; (4) under circumstances that give rise to an inference of unlawful discrimination. *Jones,* 198 F.3d at 410-11. The precise elements to be proven, however, will vary with the facts of the case. *McDonnell Douglas,* 411 U.S. at 802 n. 13 (1973) ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.")

 Nichols alleges that Bennett discriminated against her on the basis of her race and sex in violation of the DDA. (D.I. 1 at ¶¶ 24-25.) At least for the purposes of this motion, Bennett does not dispute that Nichols is a member of a protected class, and that she was qualified for her position. (D.I. 44 at 16- 21.) However, Bennett asserts that Nichols cannot establish a prima facie case of discrimination under the DDA, 19 *Del. C.* § 711(a), because she did not suffer an adverse employment action, and because there can be no inference of discrimination because her position was filled by an African American woman. (D.I. 44 at 10-15.) Additionally, Bennett asserts that even if Nichols can establish a prima facie case of discrimination, her claims must fail because she cannot show that Bennett's legitimate, non-discriminatory reason for transferring her was pretextual. (*Id.* at 16-21.)

 **\*8** An "adverse employment action is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir.2001). A job transfer can be considered an adverse employment action. *Torre v. Casio, Inc.,* 42 F.3d 825, 831 n. 7 (3d Cir.1994) ("It is clear,

however, that a transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action"). As already noted, *supra* at section IV.A.1.b., Nichols's transfer could be viewed as an adverse employment action. [FN14] When Bennett transferred Nichols, it did not immediately have another position for her. (Nichols deposition, D.I. 47, Ex. 4 at 101:24-102:1.) Further, both of the positions it offered her were part-time positions (Keller Deposition, D.I. 47, Ex. 7 at 32:21-35:22), while her position at Allen was full-time. Thus, for the purposes of this motion, Nichols has provided sufficient evidence to raise a material issue of fact as to whether she suffered an adverse employment action.

>     FN14. I emphasize that, at this stage, I am
>     required to view these circumstances in the
>     light most favorable to Nichols.

 But Bennett also contends that the circumstances of Nichols's transfer cannot give rise to an inference of discrimination. (D.I. 44 at 15.) Nichols was transferred from Allen after an altercation with Whiteman, which, viewing the facts in the light most favorable to her, was caused by Whiteman. (Nichols Deposition, D.I. 47, Ex. 4 at 40:3-41:3.) Whiteman was not disciplined after this incident, while Nichols, a black female, was transferred and reassigned only to part-time positions. (Habicht Deposition, D.I. 47, Ex. 6 at 29:2-5.) While these circumstances may not be sufficient to show that a business explanation was merely a pretext for discrimination, they may be sufficient at the prima facie stage of the analysis to allow a reasonable jury to infer that unlawful discrimination took place. *See Simpson,* 142 F.3d at 646 (finding that an "inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group ... may be acceptable at the prima facie stage of the analysis").

 However, even assuming that Nichols could make out a prima facie case, for the reasons enumerated *supra* in section IV.A.1.b., Nichols cannot show that Bennett's legitimate, non-discriminatory reason for transferring her was a pretext for discrimination. This is true as to discrimination on the basis of both her race and her sex, as Bennett replaced her with an African-American woman and had previously transferred a white male and a black male from Allen. Therefore, summary judgment will be granted to Bennett on Nichols's DDA claim. [FN15]

>     FN15. It is noteworthy that Nichols actually

Not Reported in F.Supp.2d                                                                                                          Page 8
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
(Cite as: 2006 WL 1530223 (D.Del.))

resigned her position at Bennett. To establish that her transfer was actually a constructive discharge, Nichols

> must be able to show that [her] former employer deliberately made [her] working conditions intolerable, and thereby forced [her] to quit. Demotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal. However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.

*James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 378 (4th Cir.2004) (internal citations and quotations omitted). Nichols argues only that the fact that no full-time position was made available to her after her transfer was "a sufficiently undesirable and abhorrent action to cause a reasonable person to feel compelled to terminate her employment." (D.I. 51 at 12.) In her briefing, Nichols has brought nothing to my attention to show that her transfer was "essentially a career-ending action or a harbinger of dismissal" or that the discrimination she experienced made her work situation intolerable.

B. Tortious Interference with Contract

Allen has also moved for summary judgment on Nichols's claims that Allen tortiously interfered with Nichols's contract with Bennett. (D.I. 46 at 14-17.) A plaintiff alleging a claim for tortious interference with contract must prove: "(1) a valid contract; (2) about which the defendants have knowledge; (3) an intentional act by the defendants that is a significant factor in causing the breach of the contract; (4) done without justification; and (5) which causes injury." *Gill v. Delaware Park, LLC,* 294 F.Supp.2d 638, 645 (D.Del.2003).

*9 Allen asserts that Nichols cannot make out any of the elements of a prima facie case of tortious interference with contract. Allen claims that Nichols did not have a contract with Bennett, that, even if she did, Miller did not know about it, that Miller committed no intentional act to interfere with any contract, that Miller was justified, and that Nichols was not injured. (D.I. 46 at 14-17.) Nichols claims that she did have a contract with Bennett, even though she was an employee at will, that Miller's

actions in asking for her transfer were not justified, and that Miller's demand that she be transferred interfered with her otherwise healthy employment relationship with Bennett. (D.I. 49 at 14-17.) [FN16]

> FN16. Nichols also appears to assert that her tortious interference claim can be maintained because at-will employees are entitled to good faith and fair dealing in their employment relationships, and that the claim is sustainable under 42 U.S.C. § 1981. (*Id.* at 17-18.) However, Nichols has not pleaded a claim for breach of the covenant of good faith and fair dealing. Additionally, she cannot make out a claim for tortious interference with contract based on § 1981 alone; she must establish all of the elements of the tortious interference claim. Thus, neither of those arguments provide a reason to deny summary judgment. Furthermore, she cannot sustain her § 1981 claims against Allen or Bennett and, therefore, even if § 1981 provided a legal basis to make a tortious interference claim, that claim could not be made against Allen here.

The Delaware Supreme Court has not addressed the issue of whether an at-will employee can make a claim of tortious interference with contract. *Nelson v. Fleet Nat. Bank,* 949 F.Supp. 254, 261 (D.Del.1996). However, this court has previously predicted that "the Supreme Court of Delaware would hold an action for tortious interference with contract may be maintained in conjunction with an at-will employment contract." *Id.* Thus, Nichols's action is not subject to summary judgment simply because she is an at-will employee.

However, in *Nelson,* although the employees were employees at-will, they apparently had some sort of employment contract. *Id.* (noting that the plaintiff's manager presented her "with a less favorable employment contract than her previous one, and threatened to fire her if she did not sign it"). To make out a claim that Allen, through Miller, tortiously interfered with her employment contract with Bennett, Nichols must show both that she had some such contract with Bennett and that Allen was aware of that contract. *Gill v. Delaware Park, LLC,* 294 F.Supp.2d at 645. [FN17]

> FN17. Both Nichols and Keller testified that she had no such contract. (D.I. 47, Ex. 4 at 62:1-5; *id.,* Ex. 7 at 39:16-19.)

At that last point, at least, Nichols suffers a failure of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)
(Cite as: 2006 WL 1530223 (D.Del.))

Page 9

proof. Even if Nichols could show that the "Condition of Employment" document she signed (D.I.47, Ex. 1) amounts to an employment contract, she has put forward no facts to show that Miller, or anyone else at Allen, was aware of the "Conditions of Employment." Moreover, Nichols has provided no evidence that Miller committed an intentional act that was a significant factor in causing a breach of her contract with Bennett. The "Conditions of Employment" document explicitly states that "Bennett Security has the right to move any security officer to another job site at any time." (*Id.* at A001 .) Thus, even if this document is considered an employment contract, Miller's request that Nichols be transferred did not cause a breach of that contract, since such a transfer was explicitly allowed by the contract.

Furthermore, Nichols has presented no evidence that she was injured by her transfer, as is required to make out a claim of tortious interference with contact. After being transferred, Nichols resigned from Bennett, and immediately started a new job making more money than she had made while working for Bennett. Nichols leaves it to speculation that she suffered a loss during the brief period between her transfer and resignation. For all of these reasons, summary judgment will be granted to Allen on Nichols's tortious interference with contract claim.

C. Defamation

*10 To establish a cause of action for defamation in Delaware, a plaintiff must show that defendant made a "false and defamatory statement of fact concerning the plaintiff ... in an unprivileged publication to a third party. But a statement is not defamatory unless it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Ramunno v. Cawley,* 705 A.2d 1029, 1035 (Del.1998) (internal quotation marks omitted). "[T]he general rule is that oral defamation is not actionable without special damages." *Spence v. Funk,* 396 A.2d 967, 970 (Del.1978). However, where the defamatory oral statement "(1) malign[s] one in a trade, business or profession, (2) impute[s] a crime, (3) impl[ies] that one has a loathsome disease, or (4) impute[s] unchastity to a woman," a cause of action for slander can be maintained without proof of special damages. *Id.*

Here, Nichols alleges that Miller told people that she could not do her job and blamed her for the incident with Whiteman, thus maligning her in her business or profession. (D.I. 49 at 18-19.) However, Nichols's only evidence of Miller's alleged statements is her own hearsay testimony about what Brittingham told her. (*Id.*) As was stated above, that hearsay is inadmissible and cannot be considered in support of her motion. *Philbin,* 101 F.3d at 961. Therefore, Nichols has no evidence to support her claim of slander, and summary judgment on this claim will be granted to Allen.

V. CONCLUSION

Accordingly, Bennett's Motion for Summary Judgment (D.I.43) and Allen's Motion for Summary Judgment (D.I.45) will be granted. An appropriate order will follow.

*ORDER*

For the reasons set forth in the Memorandum Opinion issued in this matter today,

IT IS HEREBY ORDERED that the Motion for Summary Judgment filed by defendant Bennett Detective & Protective Agency, Inc., (D.I.43), and the Motion for Summary Judgment filed by defendant Allen's Family Foods, Inc., (D.I.45), are GRANTED.

Not Reported in F.Supp.2d, 2006 WL 1530223 (D.Del.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.                                                          Page 1
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: 1992 WL 714968 (D.Del.))**

[>
Only the Westlaw citation is currently available.


United States District Court, D. Delaware.
Harold PARK, Plaintiff,
v.
GEORGIA GULF CORPORATION, Alfred Fituossi,
and William H. Baker, Defendants.
**Civ. A. No. 91-569 (RRM).**

Sept. 14, 1992.
David Staats, of Law Office of Lawrence F.
Hartnett, Hockessin, DE, for plaintiff.

Ralph K. Durstein, III, of Prickett, Jones, Elliott,
Kristol & Schnee, Wilmington, W. Lyman Dillon
and Deborah A. Sudbury, of Jones, Day, Reavis & Pogue,
Atlanta, GA, for defendants.


MEMORANDUM OPINION

McKELVIE, District Judge.

*1 The plaintiff in this case, Harold Park,
commenced this action against defendants Georgia
Gulf Corporation ("Georgia Gulf"), Alfred Fituossi
("Fituossi"), and William Baker ("Baker"). Mr.
Fituossi and Mr. Baker are employees of Georgia
Gulf. The plaintiff alleges numerous complaints all
relating to his discharge from the employ of Georgia
Gulf. Most importantly, he alleges that Georgia Gulf
fired him notwithstanding an oral contract in which
Georgia Gulf promised not to fire the plaintiff in
return for plaintiff's information concerning plant
morale and safety. Plaintiff also alleges, *inter alia,*
that his discharge was improper under his
employment contract, and that his superior, Fituossi,
defamed him, ultimately leading to the plaintiff's
dismissal. The defendants' motion for summary
judgment is now before the court.

*FACTS*
In 1975, Harold Park took a job as a maintenance
supervisor with Diamond Shamrock Corporation. In
1978, following a shutdown of the plant where Mr.
Park had been employed, Diamond Shamrock
transferred Mr. Park to its polyvinyl chloride
("PVC") plant in Delaware City, Delaware, where
Mr. Park became a construction supervisor. In the
next year, Mr. Park became a maintenance supervisor

at the PVC plant.

In 1982, Diamond Shamrock sold the PVC plant to
Ethyl Corporation. In 1983, Ethyl Corporation sold
the plant to Georgia Pacific Corporation. In late
1984 and early 1985, Georgia Gulf acquired the plant
from Georgia Pacific Corporation. On July 29,
1986, Mr. Park and Georgia Gulf entered into an
"Employee Confidential Information and Invention
Agreement." The agreement opened with the
following language:
    WHEREAS, the Employee desires to be employed
    by the Corporation, or, if now employed, that such
    employment shall continue, NOW THEREFORE,
    in consideration of such employment, the
    Corporation and the Employee agree as follows....
Docket Item ("D.I. 73"), at A-205a. The balance of
the agreement discussed proprietary rights to new
inventions, disclosure, etc.

Georgia Gulf also promulgated an Operating Policy
Manual. The manual, while containing provisions
for involuntary terminations, specifically maintained
that Georgia Gulf could terminate an employee at any
time, regardless of cause. D.I. 64, at A-321.

Mr. Park received raises in each year from 1980--
1989. At least two of Mr. Park's supervisor's
recalled Mr. Park's satisfactory performance on the
job.

In 1987, Georgia Gulf transferred David DiPiero
("DiPiero") to the Delaware City Plant, where he
soon became Plant Manager. Prior to becoming
Plant Manager, Mr. DiPiero became aware of
problems involving Mr. Park. In one instance, Mr.
Park had gotten into an altercation with the (then)
Plant Manager. Mr. Park asked not to go to an
out of town training seminar. After he became Plant
Manager, however, Mr. DiPiero had Mr. Park report
directly to him.

In October of 1988, Mr. DiPiero hired defendant Mr.
Fituossi as Maintenance Superintendent. Mr.
Fituossi had never worked in a PVC plant. Mr. Park
now reported to Mr. Fituossi. From the outset, Mr.
Fituossi and Mr. Park did not get along. Mr. Fituossi
closely supervised Mr. Park; Mr. Park thought Mr.
Fituossi did not respect his ability to do his job.

*2 Much of the enmity arose from an incident that

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                 Page 2
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: 1992 WL 714968 (D.Del.))**

occurred soon after Mr. Fituossi's hiring. In that incident, Mr. Fituossi challenged Mr. Park to a contest to see who could find the cheapest motor for a certain part of the plant. Mr. Fituossi found the cheaper motor, but it was not enclosed as required by regulation. Mr. Fituossi thereupon ordered maintenance to modify the motor in order to enclose it. The maintenance staff, supervised by Mr. Park, refused to make such modifications, citing potential safety problems. Mr. Park and Mr. Fituossi argued about the incident. Mr. Fituossi then rescinded his order to install the motor.

Mr. Park believes this incident touched-off a vendetta on the part of Mr. Fituossi against Mr. Park. Mr. Park cites several instances of unfair treatment, including: taking authority from Mr. Park's hands; disparaging Mr. Park's competence and intellect in front of Mr. Park's coworkers; misrepresenting his job performance to DiPiero (*e.g.*, Mr. Baker remarking that Mr. Park was "disruptive, abusive, he spends all his time on the telephone or visiting, playing cards, and I can't work with him." D.I. 72, at A-65); placing Mr. Park in a corner and making him do his book work standing up; and disallowing Mr. Park access to a telephone. Noting his failure to improve Mr. Park's performance (for example, Fituossi took Mr. Park to a seminar course for Maintenance Supervisors), Mr. Fituossi reassigned Mr. Park from Maintenance Supervisor to Construction Supervisor, and further deprived him--according to Mr. Park--of the manpower needed to do his job.

Mr. Park complained to Mr. DiPiero, but Mr. DiPiero took no action. Mr. DiPiero told him he needed to improve his job performance and "get with the program." He had received poor evaluations from two supervisors in 1988, a reduced bonus in 1989, and no raise in 1990. Believing he might soon be fired, Mr. Park then acquiesced in his wife's desire to move to her hometown in West Virginia. Mr. Park and his wife then purchased a home and business there.

On August 23, 1990, Mr. Park was instructed to drive two Georgia Gulf executives, Adolph Peterson (head of Georgia Gulf's Corporate Engineering Department) and defendant Mr. Baker (Division Manager), to the airport in Philadelphia. At the airport, Mr. Park asked Mr. Baker if he could speak without getting into trouble. Mr. Baker said, "You will not get into trouble." Mr. Park then related that the morale in the plant work force was extremely low and that the safety situation is "beyond belief."

When Mr. Baker asked Mr. Park what the problem was, Mr. Park said, "Well, I'll probably get fired for telling you this...." Mr. Baker said, "No, you won't get fired." Mr. Park subsequently told of the difficulties he had been having with Mr. Fituossi, blaming Mr. Fituossi for the morale problems.

On August 25, 1990, Mr. Park began a scheduled vacation. During Mr. Park's vacation, Mr. DiPiero spoke to Mr. Baker and informed him that all efforts to abate the disruption Mr. Park had been causing at the plant had failed. On September 4, 1990, Mr. DiPiero fired Mr. Park. Mr. Park avers that Mr. DiPiero told him he was fired for failing to attend a supervising seminar. On submissions to the Delaware Unemployment Commission, Georgia Gulf stated that Mr. Park had been discharged for incompetency. Sometime after the decision to fire Mr. Park had been made and implemented, probably in mid-September, Mr. Baker informed Mr. DiPiero about the conversation at the airport.

### DISCUSSION

**\*3** Summary judgment is appropriate when the evidence offered demonstrates that there is no genuine issue of material fact in dispute and no jury could reasonably find by a preponderance of the evidence that the non-moving party is entitled to judgment in its favor. *Anderson v. Liberty Lobby, 477 U.S. 242, 250-52 (1986).* The moving party bears the burden of demonstrating a lack of a genuine issue of fact; accordingly, courts must read the record in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).* If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).*

*1. Breach of Oral Contract with Mr. Baker*

Plaintiff claims that he reached an oral agreement with Mr. Baker at the airport, in which Mr. Park agreed to supply information in return for a promise not to be fired for disclosing such information. Consequently, Mr. Park claims his dismissal approximately two weeks later breached that oral agreement. In the alternative, plaintiff argues his dismissal was improper under the doctrine of promissory estoppel. Defendants respond that 1) the parties did not make an oral contract; 2) even if they did, it was too indefinite to be enforced; and 3)

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: 1992 WL 714968 (D.Del.))**

because Mr. DiPiero had already decided to fire Mr. Park at the time he received word from Mr. Baker concerning the conversation at the airport, Georgia Gulf did not breach the oral agreement, or break its promise to Mr. Park.

### A. *Validity of the contract made at the airport*

In Delaware, as in other jurisdictions, the essential elements of a contract are offer, acceptance, and consideration. Additionally, the essential terms of a contract must be reasonably certain and definite. *Gleason v. Ney,* No. 78-C-MR-110 (Del.Ch.Ct. Aug. 25, 1991); *In re Radiology Assoc., Inc.* 1990 WL 67839, *1, 1990 Del.Ch. LEXIS 58, *2 (Del.Ch.Ct. May 16, 1990); *Hindes v. Wilmington Poetry Society,* 138 A.2d 501, 503 (Del.Ch.Ct.1958); *see also Leeds v. First Allied Connecticut Corp.,* 521 A.2d 1095, 1097 (Del.Ch.Ct.1986). Finally, the intent of the parties as seen from an objective perspective determines whether a contract exists. *Leeds,* 521 A.2d at 1097; *Norse Petroleum A/S v. LVO International, Inc.,* 389 A.2d 771, 775 (Del.Super.Ct.1978).

Defendants, highlighting statements by Mr. Park that his goal in initiating the conversation with Mr. Baker was to "get away from Mr. Fituossi" rather than obtain a contract guaranteeing his job security, argue that Mr. Baker and Mr. Park never intended to form a contract. Yet, in the instant case, all of the elements of a contract are present. Mr. Park offered to speak freely in exchange for an assurance that he would not be fired for so doing. In reassuring Mr. Park that he would not be fired, Mr. Baker accepted the offer on behalf of Georgia Gulf. Because an objective observer could reasonably conclude that a contract had formed, Mr. Park's after the fact statements concerning his (subjective) intention at the time of the conversation are irrelevant.

**\*4** Defendants additionally argue, however, that even if Mr. Baker accepted Mr. Park's offer, any contract formed thereby was too indefinite to be legally enforceable. In particular, they contend Mr. Baker's statement that plaintiff would not get into trouble and Mr. Park's response that Mr. Fituossi was responsible for low morale at the plant are not definite and material terms. Those statements might indeed have been vague, but the consideration exchanged between the parties was not. A reasonable observer could find that if anything was clear, it was that the parties agreed that Mr. Park would not be fired for providing information, no matter how vague such information might have been.

### B. *Breach*

Though the plaintiff may be able to show that a contract existed, he is not automatically entitled to recovery. He must also show that the contract was in fact breached. Correspondingly, the plaintiff argues that Georgia Gulf fired him as a result of the remarks he made to Mr. Baker at the airport. The defendant responds that because Mr. DiPiero had been determined to fire Mr. Park before he had heard of the incident at the airport, whatever contract was made at the airport was not implicated in Mr. Park's discharge.

The plaintiff cannot show that he was fired as a result of his conversation with Mr. Baker. First, there is no direct proof of a causal connection between the decision to fire Mr. Park and the conversation at the airport. Mr. Baker and Mr. DiPiero each denied under oath that they discussed the conversation at the airport prior to Mr. Park's dismissal. For example, Mr. DiPiero testified as follows:

> The Court: During the period from August 23, 1990 to September 4, 1990 ... the time of the termination of Mr. Park ... did you speak with Mr. Baker about Mr. Park?
>
> Mr. DiPiero: Yes, I did.
>
> The Court: What was said?
>
> Mr. DiPiero: I told Mr. Baker that I made a decision, based upon information from Mr. Fituossi and Mr. Pearce, that during the course of his remedial program that we found out that he was just not going to work out, he was becoming disruptive.
>
> A number of people came to me during the week he was on vacation and told me about his disruptive nature. I told Mr. Baker that we had planned to try to work it out with him, but it just wasn't going to work out. We needed to terminate him immediately, because of his disruptive nature.
>
> The Court: Up to the time that you made that decision, had Mr. Baker talked to you about the conversation he had with Mr. Park at the Airport?
>
> Mr. DiPiero: No, he didn't.

Excerpted Transcript of Oral Argument, D.I. 81, at 3; *see also* Deposition of William Baker, D.I. 64, at A-437-38. Additionally, there are no memoranda recording a conversation between Mr. Baker and Mr. DiPiero on the subject of the conversation at the airport; nor have Mr. Baker or Mr. DiPiero admitted to others that Mr. Baker told Mr. DiPiero of the conversation at the airport any time before Mr. Park's dismissal.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: 1992 WL 714968 (D.Del.))**

**\*5** Mr. Park relies instead on indirect proof of the aforementioned causal link. He notes: (1) Mr. Baker and Mr. DiPiero had spoken on the telephone after the conversation at the airport but before Mr. Park was fired; and (2) that Mr. Ronald Pearce told Mr. Park that on the Thursday preceding the Tuesday he was fired Mr. DiPiero had a lengthy conversation with Mr. Baker after which he came out of his office yelling, "Where is Harold? I want him out of the plant. I want him up here right now. I want him out of the plant today." Deposition of Harold Park, D.I. 73, at A-139-40. As shown above, Mr. Baker and Mr. DiPiero admit the former allegation.

The second allegation is not supported by any facts; nor are there facts from which a jury might reasonably infer the truth of the allegation. Mr. Pearce denies ever having told Mr. Park about an incident win which Mr. DiPiero stormed out of his office screaming about Mr. Park. *See* Deposition of Ronald P. Pearce, D.I. 87, at 34-35. Additionally, Mr. Pearce denies the incident ever happened. Mr. Pearce testified in his deposition he did not learn of the conversation between Mr. DiPiero and Mr. Baker until after Mr. Park had been fired, and that he learned of the conversation through second-hand sources:

> Q: Now, are you aware that Mr. Park talked to Mr. Baker at the Philadelphia Airport sometime prior to his discharge?
> A: I know that Mr. Park talked with Mr. Baker, but when, I couldn't be sure. Because that would be second, thirdhand knowledge. Mr. Park never told me that he spoke--
> Q: So Mr. Park never told you that he had spoken with Mr. Baker?
> A: No.
> Q: Did someone else tell you that Mr. Park had spoken with Mr. Baker?
> A: Yes, I had heard that Mr. Park and Mr. Baker had had a conversation.
> Q: Do you recall when you first heard that?
> A: Not really.
> Q: Do you recall from whom you heard that?
> A: I heard it several times, okay. And, you know, it was like from, you know, several different individuals. So, I don't recall who I heard it from first.
> Q: Do you recall if the first time you heard that was before or after Mr. Park was discharged?
> A: Oh, it was after.
> *Id.* at 22-23.

Even if Mr. Pearce had told Mr. Park of such an incident, and even if the incident had occurred, there would remain no proof that Mr. Baker told Mr. DiPiero about the conversation at the airport; one would have to infer such a conclusion. In this case, therefore, because there is not a sufficient factual basis from which a jury could reasonably draw the inference, the inference cannot be drawn. The fact that Mr. Baker and Mr. DiPiero spoke after the conversation at the airport but before Mr. Park's termination is not a sufficient factual basis to support an inference that those two events were causally connected. Indeed, the evidence points squarely to a different conclusion, supported by a firm foundation in fact; namely, that the conversation at the airport did not have any impact on the termination of Mr. Park.

**\*6** Additionally, Mr. Park's statements concerning Mr. Pearce's observations are not admissible. Mr. Park does not claim to be an eyewitness of the events described above; rather, he claims that Ron Pearce, an employee relations associate at the time of the events in question, related them to him sometime after his dismissal. Deposition of Harold Park, D.I. 73, at 139. Hearsay evidence is not admissible on a motion for summary judgment. *Hauser v. Fox Theaters Management Corp.,* 845 F.2d 1225, 1230 (3d Cir.1988). As such, Mr. Park's testimony as to what Ron Pearce may have observed is hearsay and does not deserve weight in rebutting the defendants' case for summary judgment.

No reasonable jury could conclude that a breach of contract had occurred. As a consequence, as there is no evidence any promise was broken, the plaintiff's claims of promissory estoppel also must fail.

## II. *Employment Contract*

Plaintiff asserts that his dismissal violated not only the oral contract made at the airport, but also his employment contract. While the defendants claim Mr. Park's employment was at-will and could be terminated for any reason, Mr. Park responds that various contractual provisions and actions taken by Georgia Gulf modified the employment relationship, allowing Georgia Gulf to dismiss him only for cause.

In Delaware, absent an explicit agreement for a specific duration, employment is considered at-will. *Merrill v. Crothall-American, Inc.,* 1990 WL 251400, 1990 Del.Super. LEXIS 457 (Del.Super.Ct. Dec 12, 1990) *modified* 606 A.2d 96 (Del.1992) (affirming Superior Court's judgment as to status of employment contract); *Mann v. Cargill Poultry, Inc.,* 1990 WL

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: 1992 WL 714968 (D.Del.))**

Page 5

91102, *4, 1990 Del.Super. LEXIS 225, *10 (Del.Super.Ct. June 13, 1990). An employer and employee may modify an at-will employment relationship by subsequent contractual restriction on the right of discharge. *Haney v. Laub,* 312 A.2d 330, 332 (Del.Super.Ct.1973). Such modification may occur through a course of conduct giving rise to an implied agreement. *Mann,* 1990 WL 91102, at *4, 1990 Del.Super. LEXIS 225, at *10 (Del.Super. June 13, 1990). Any modification requires, however, clear and explicit language or clearly affirmative conduct on the part of the employer. *Id.; Emory v. Nanticoke Homes, Inc.,* No. 82C-MR-14, Ridgely, J. (Del.Super.Ct. July 19, 1985); *Avallone v. Wilmington Medical Center, Inc.,* 553 F.Supp. 931 (D.Del.1982); *see also Heideck v. Kent General Hosp., Inc.,* 446 A.2d 1095 (Del.Super.1982).

A. *Invention and Confidential Information Agreement*

Mr. Park offers several pieces of evidence to support his argument that his at-will status had been modified. Mr. Park principally relies, however, on language in the Employee Confidential Information and Invention Agreement." The agreement contained, *inter alia,* the following term:

> WHEREAS, the Employee desires to be employed by the Corporation, or, if now employed, that such employment shall continue, NOW THEREFORE, in consideration of such employment, the Corporation and the Employee agree as follows....

**\*7** Accordingly, Mr. Park contends that in return for Mr. Park's promise to keep certain information confidential, Georgia Gulf agreed that his employment would continue, thereby modifying the at-will relationship. In support of this argument, Mr. Park cites *Haney, supra,* in which the Delaware Superior Court determined that an employer modified an at-will employment relationship by promulgating a stock-option agreement which provided that the agreement would terminate upon the death of the employee, or the employee's termination for cause.

Mr. Park's argument is without merit. The agreement contains no clear indications that Mr. Park's at-will status had been modified; Mr. Park did receive the consideration of continued employment--however, such employment was to continue at-will. *Haney* is not authority to the contrary. The stock-option plan in *Haney,* unlike the Confidential Information and Invention Agreement, contained specific provisions discussing termination for cause. In a similar fashion, courts interpreting Delaware law

have held that the promulgation of and agreement to non-compete covenants does not modify at-will status. *See Research & Trading Corp. v. Powell,* 468 A.2d 1301, 1305 (Del.Ch.Ct.1983), *Hammermill Paper Co. v. Palese,* No. 83-7128, (Del.Ch.Ct. June 14, 1983).

B. *Course of Conduct*

Mr. Park next supports his modification claim with evidence that Georgia Gulf had engaged in a course of conduct modifying the employment relationship; specifically, that Georgia Gulf terminated employees only for cause per the provisions of the Operating Policy Manual. Mr. Park also refers to the following testimony of Mr. DiPiero:

> A. All employees, to my understanding, are at-will employees.
> Q. At the PVC plant?
> A. At Georgia Gulf.
> Q. Okay. Which includes the PVC plant?
> A. Which is included in that, that's certainly true, yes.
> Q. And is it the policy of Georgia Gulf that such employees can be discharged for any reason; a good reason, a bad reason, or no reason?
> A. I'm really not familiar with the at-will clause. I know at will.
> Q. What does at will mean?
> A. At will to me?
> Q. Yes.
> A. That's my impression of what at will is. It means that for cause someone can be discharged.
> Q. I see. And do you know what Georgia Gulf's policy is?
> A. I'm sorry, I don't understand the question.
> Q. Do you know what Georgia Gulf's policy is regarding at-will employees?
> A. I'm not really familiar with the policy. My understanding of at will is just what I've said before, that there is an agreement that and people have an understanding that they are at-will employees.
> D.I. 73, at A-61a-b.

This claim also fails to pass muster under Delaware law. Although the Operating Policy Manual contained provisions describing termination for cause, the Manual clearly provided elsewhere that the employment relationship was to remain at-will. The Manual provides:

> **\*8** [I]t is the policy of Georgia Gulf that the employment and compensation of any employee can be terminated with or without cause, at any time, at the option of the employee or at the option

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: 1992 WL 714968 (D.Del.))**

Page 6

of the company.

In light of Delaware's requirement that any modification of the at-will relationship must be clear and explicit, the Court finds that as a matter of law Georgia Gulf's actions in dismissing other employees for cause (pursuant to the Manual) do not rise to the level of a contractual modification. *See Heideck, supra* (unilateral expression of policy in employee handbook does not modify at-will employment status). Moreover, Mr. DiPiero's views as to the meaning of "at-will" are irrelevant. The term has a legal, objectively determinable meaning which no reasonable juror could find to have been modified by Georgia Gulf's conduct, especially in light of the Manual provision specifying that any employee could be terminated without cause.

*C. Airport conversation*

Finally, Mr. Park asserts that the conversation at the airport, if not a contract concerning an exchange of information in return for freedom from retaliation for providing that information, was instead an agreement to modify the at-will status of Mr. Park. The Court finds that, as the conversation makes no express or implied reference to the term of Mr. Park's employment, this claim must also fail. The conversation and agreement at the airport modified Mr. Park's at-will status only to the extent Georgia Gulf could not discharge Mr. Park in retaliation for any comments made during the conversation.

Because Mr. Park was an "at-will" employee and could be terminated without cause, the Court need not address whether Georgia Gulf breached its employment contract with Mr. Park by terminating him without cause.

III. *Breach of Implied Covenant of Good Faith and Fair Dealing*

Mr. Park alleges two breaches of the implied covenant of good faith and fair dealing. First, he claims that Georgia Gulf breached the implied covenant of good faith and fair dealing by firing him for bringing to Georgia Gulf's attention the violation of OSHA regulations that would have ensued from the installation of an unshielded motor. He apparently asserts not that Georgia Gulf fired him directly for informing Georgia Gulf of possible safety violations; rather, he complains that by informing Georgia Gulf of the safety problems he facilitated Mr. Fituossi's vendetta against him, which in turn was the direct cause of his termination. Second, he claims that Georgia Gulf breached the covenant by

inducing him to provide information on plant morale and subsequently firing him.

Delaware recognizes that every employment contract includes an implied covenant of good faith and fair dealing. *Merrill,* 606 A.2d at 101; *Manchester v. Narragansett Capital, Inc.,* 1989 WL 125190, *8, 1989 Del Ch. LEXIS 141, *26; *Katz v. Oak Industries Inc.,* 508 A.2d 873 (Del.Ch.Ct.1986). Bad faith or malice in termination of the employment relation may constitute a breach of the implied covenant. *Narragansett,* 1989 WL 125190 at *9, 1989 Del.Ch. LEXIS at *29 (no breach of implied covenant where employee fired in order for others to increase control over assets and activities of corporations and divert proceeds of employee's salary); *Fortune v. National Cash Register Co.,* 364 N.E.2d 1251 (Mass.1977) (discharge of salesman to avoid paying bonus breaches implied covenant); *Monge v. Beebe Rubber Co.,* 316 A.2d 549 (N.H.1974) (termination for refusal to date foreman breaches implied covenant).

**\*9** The Court cannot accept plaintiffs first theory, which would allow him to bootstrap the indirect cause of his discharge--*i.e.,* the reporting of a potential safety problem and refusal to install an unsafe motor--to the putative direct cause of his discharge--*i.e.,* Mr. Fituossi's vendetta--for the purposes of alleging a discharge in bad faith and violation of public policy. The discharge of an employee pursuant to the complaints of a coworker does not constitute bad faith.

To the extent plaintiff does complain [FN1] he was directly discharged for reporting the potential safety violation and refusing to install the unsafe motor, plaintiff again fails to state a claim. Plaintiff proffers no evidence that he was fired for that reason. Moreover, no jury could rationally infer Mr. Park was fired because of his complaint from circumstantial evidence. Mr. Park's discharge occurred two years after his complaints concerning the unsafe motor.

Mr. Park's second theory, which asserts a breach of the covenant of fair dealing pursuant to Georgia Gulf's failure to honor its promise not to fire Mr. Park for speaking frankly with Georgia Gulf executives, essentially restates the breach of contract and promissory estoppel claims addressed in Part I, *supra.* This claim is redundant and necessitates no further discussion.

IV. *Mr. Fituossi's Intentional Infliction of Emotional*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: 1992 WL 714968 (D.Del.))**

Page 7

*Distress*

Mr. Park alleges that Mr. Fituossi, in conducting his vendetta against Mr. Park, intentionally inflicted emotional distress upon him. Delaware indeed recognizes the tort of intentional infliction of emotional distress. *See, e.g., Mattern v. Hudson,* 532 A.2d 85 (Del.Super.Ct.1987) (citing the Restatement (2d) of Torts § 46(1) (1965). To recover damages for intentional infliction of emotional distress, however, the plaintiff must show some physical injury. *See Rizzo v. E.I. duPont de Nemours & Co.,* No. 86C-JL-36, slip op. at 7-8 (Del.Super.1989); *Merganthaler v. Asbestos Corp.,* 480 A.2d 647, 651 (Del.Super.Ct.1984). Mr. Park has failed to establish that Mr. Fituossi caused any of his physical ailments (these include a nine-year-old high blood pressure condition, headaches probably caused by arthritis, and shoulder pain). The Court need not determine, therefore, whether a jury could find that Mr. Fituossi's behavior was sufficiently outrageous to allow recovery under this cause of action.

**V.** *Tortious Interference with Contract (Mr. Fituossi)*

Mr. Park contends that Mr. Fituossi tortiously interfered with Mr. Park's employment contract with Georgia Gulf. Delaware recognizes a cause of action for tortious interference with contractual relations. *Bobson v. Gulfstream Marketing, Ltd.,* No. 89C-NO11, slip op. at 6-7 (Del.Super.Ct. Mar. 27, 1992) (citing *Irwin & Leighton v. W.M. Anderson Co.,* 532 A.2d 983 (Del.Ch.Ct.1987)). Where the contract ostensibly interfered with is an at-will employment contract, however, the cause of action for tortious interference with contract does not lie. *Rizzo,* slip op. at 3-5. As determined above, Mr. Park was an at-will employee. Consequently, defendants are entitled to summary judgment as to this claim.

**VI.** *Negligent Hiring of Mr. Fituossi*

**\*10** Mr. Park claims that Georgia Gulf negligently failed to adequately investigate Mr. Fituossi's background and negligently retained Mr. Fituossi in the position of Maintenance Supervisor. Under Delaware law, a plaintiff can seek a remedy for negligent hiring and retention where the employer knew or had reason to know or in the exercise of reasonable care should have known that an employee has an undue tendency to cause harm. *A.R. Anthony & Sons v. All-State Investigation Security Agency,* No. 82C-AP-18, slip op. at 3-4 (Del.Super.Ct. Sept.

27, 1983). This tort usually involves serious harm. *See, e.g., Hitchens v. Cannon & Cannon, Inc.,* 1988 WL 130414, N1988 Del.Super., LEXIS 433 (Del.Super.Ct. Nov. 21, 1988) (no negligent hire where crane operator causes severe physical injury to plaintiff); *Draper v. Olivere Paving & Construction Co.,* 181 A.2d 565 (Del.1962) (no negligent hire where employee slashed plaintiff's face); *A.R. Anthony & Sons, supra* (issue of fact as to whether employer negligently hired arsonist); *Knerr v. Gilpin,* 1988 WL 40009, 1988 Del.Super. LEXIS 138 (Del.Super.Ct. Apr. 8, 1988) (issue of fact whether employer negligently hired employee who assaulted plaintiff). Nothing in Mr. Fituossi's employment history indicates he might have caused serious harm as the employee of Georgia Gulf. Consequently, as a matter of law, Georgia Gulf did not negligently hire Mr. Fituossi.

The plaintiff has failed to apprise the Court of any authority in support of a cause of action for negligent retention of an employee. This Court leaves to Delaware courts responsibility for determining whether such a cause of action exists. Assuming it does exist, however, the Court assumes its characteristics would resemble those of the cause of action for negligent hiring. Accordingly, the Court finds Georgia Gulf did not negligently retain Mr. Fituossi as an employee. There is no evidence that Mr. Fituossi caused any serious harm (as noted above, Mr. Park did not suffer any physical harm), or that Georgia Gulf knew or should have known that Mr. Fituossi was causing serious--or any--harm.

**VII.** *Defamation*

Mr. Park states two causes of action for defamation: one against Mr. Fituossi, the other against Georgia Gulf.

**A.** *Mr. Fituossi' statements*

First, Mr. Park asserts that various comments made by Mr. Fituossi defamed him. Specifically, Mr. Fituossi told Mr. Park's coworkers that Mr. Park "wasn't very intelligent, wasn't very bright, didn't know what he was doing, that he is incompetent; that Mr. Park 'didn't know the job' and 'didn't know nothing.' " (Plaintiff's Brief, D.I. 71, at 36). Mr. Fituossi also told Mr. DiPiero that "Park has a very low intellect, extraordinarily low. Very poor comprehension skills. He is unable to listen. He cannot write well, he cannot read, he cannot follow instructions." *Id.* at 37. Defendants contend that the alleged statements were privileged and/or opinions.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                     Page 8
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: 1992 WL 714968 (D.Del.))**

In Delaware, four categories of libel are actionable *per se*, without any proof of special damages; those categories include statements which: 1) malign one in one's trade, business, or profession; 2) impute a crime; 3) imply that one has a loathsome disease; or 4) impute unchastity to a woman. *Battista v. Chrysler Corp.*, 454 A.2d 286, 290 (Del.Super.Ct.1982); *Spence v. Funk*, 396 A.2d 967 (Del.1978). In this case, the allegedly defamatory statements fall into the first category.

**\*11** A conditional or qualified privilege can extend to statements actionable *per se* if made between persons sharing a common interest for the protection of which those statements were made. *Battista*, 454 A.2d at 291; *Pierce v. Burns*, 185 A.2d 477 (Del.1982); Restatement (2d) of Torts § 593 (1965). This privilege reaches coemployees when the statements relate to the plaintiff's ability to perform his job. *See Battista*, 454 A.2d at 291 (employer-employee relationship covered by privilege where defamatory remarks relate to job performance); *Pierce, supra; Burr v. Atlantic Aviation Corp.*, 348 A.2d 179 (Del.1975). Because all of the allegedly defamatory statements relate to Mr. Park's ability to perform his job, all of the allegedly defamatory statements fall within the privilege.

The privilege is subject to forfeit, however, if it is abused 1) by excessive or improper publication; 2) by the use of the occasion for a purpose not embraced within the privilege; or 3) by making a statement which the speaker knows to be false. *Battista*, 454 A.2d at 291; *Pierce, supra*. The privilege must be exercised in good faith and without malice. *Battista*, 454 A.2d at 291; *Short v. News-Journal Co.*, 205 A.2d 6, 8 (Del.Super.Ct.1965). Consequently, a finding that the privilege applies negates the presumption of malice and shifts to the plaintiff the burden of showing actual malice; absent a finding of express malice, the privilege remains applicable to defeat the action. *Battista*, 454 A.2d at 291. The question whether the privilege has been abused through actual malice is ordinarily one of fact. *Id.*

Mr. Park argues that Mr. Fituossi forfeits the privilege under any of the three foregoing rationales. First, he argues that Mr. Fituossi's constant repetition of the allegedly defamatory statements amounts to excessive publication. The Court rejects this argument. In *Battista*, the Delaware Superior Court held that no excessive or improper publication occurred where the defendant confined his comments to the attention of the defendant's employees. In this

case, all of the allegedly defamatory statements were communicated to coworkers; hence, Mr. Fituossi's comments were not excessive or improper.

Second, Mr. Park argues that because Mr. Fituossi's comments were designed to serve a personal vendetta and not to advance Georgia Gulf's business, the statements were used for a purpose falling outside the scope of the privilege. This argument also fails. Mr. Park admits that the vendetta was caused by an incident at work. All of the comments were made in work place and related to Mr. Park's ability to work effectively. Consequently, even if Mr. Fituossi's vendetta had taken on personal overtones, no reasonable juror could find that Mr. Fituossi's purposes in making the allegedly defamatory remarks were not sufficiently related to the working environment to fall within the privilege.

Finally, Mr. Park argues that Mr. Fituossi knew he made false statements. As in *Battista*, however, Mr. Park has not alleged any facts that indicate Mr. Fituossi *knew* he was making false statements. Essentially, Mr. Park cannot show that these statements are false because they are not statements that are independently verifiable; the statements are, as the Court makes clear below, opinions.

**\*12** Statements of opinion, as opposed to fact, are protected by the First Amendment and are not actionable as defamatory. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). The distinction between fact and opinion is a question of law. *Riley v. Moyed*, 529 A.2d 248, 251 (Del.1987). In order to determine whether a statement is fact or opinion, courts must examine the statements from the perspective of the ordinary reader or listener. *See id.* Delaware has adopted a four-part test, first expounded in *Ollman v. Evans*, 750 F.2d 970, 979-85 (D.C.Cir.1984) (*en banc* ), to facilitate the aforementioned objective test:
> First, the Court should analyze the common usage or meaning of the challenged language. Second, the Court should determine whether the statement can be objectively verified as true or false. Third, the Court should consider the full context of the statement. Finally, the Court should consider the broader social context into which the statement fits. *Id.* at 251-52 (citations omitted).

Applying the four-part test, the Court finds that the allegedly defamatory statements are opinions. As noted above, few, if any, of the statements are objectively verifiable. The statements that may be objectively verifiable, such as those concerning Mr. Park's intelligence and ability to read and write, taken

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: 1992 WL 714968 (D.Del.))**

in context, were part of, and amounted to, a broad assertion that Mr. Park was generally incompetent. Statements regarding one's competence are not ordinarily considered factual, are only subjectively verifiable in most cases, and taken in their full and social contexts, are opinions. *Cf. Slawik v. News-Journal Co.,* 428 A.2d 15 (Del.1981) (publisher's statement that a former county officer had abused his office is opinion).

### B. *Georgia Gulf's statements*

In Mr. Park's second defamation complaint, he alleges that Georgia Gulf defamed him by certifying to the Unemployment Commission that Mr. Park had been discharged for incompetence. This claim also lacks merit. Any report submitted at the request of an agency, court or official is privileged. *See Segars v. Alexander,* No. 85C-My-138 (Del.Super.Ct. Apr. 2, 1986) *aff'd* 516 A.2d 483 (Del.1986). Employer communications to state unemployment commissions fall within this privilege. *See Russell v. Keyes Fibre Co.,* 771 F.Supp. 951 (N.D.Ind.1991) (employer's statement to unemployment agency conditionally privileged); *Adler v. American Standard Corp.,* 538 F.Supp. 572 (D.Md.1982); *Sugarman v. RCA Corp.,* 639 F.Supp. 780 (M.D.Pa.1985). Correspondingly, Georgia Gulf's statement to the Unemployment Commission was plainly privileged.

### VIII. *ERISA Claims*

Plaintiff claims Georgia Gulf denied him of benefits he was entitled to under the Salaried Employee Retirement Plan (SERP) and the Savings and Capital Growth Plan (401(k) plan). These claims are governed by the Employee Retirement Security Income Act (ERISA). 29 U.S.C. § § 1001-1381 (1988). In order to state a claim under ERISA, the plaintiff must exhaust his administrative remedies. *Wolf v. National Shopmen Pension Fund,* 728 F.2d 182, 185 (3d Cir.1984). The plaintiff need not exhaust his administrative remedies, however, if such remedies would be futile or if the plaintiff has been denied meaningful access to administrative procedures. *Vogel v. Independence Federal Savings Bank,* 728 F.Supp. 1210, 1223 (D.Md.1990). *Lieske v. Morlock,* 570 F.Supp. 1426, 1429 (N.D.Ill.1983).

\*13 The plaintiff complains that neither Georgia Gulf nor any plan administrator apprised Mr. Park of his rights under either plan, and that Georgia Gulf failed to comply with requests for plan documents for the retirement plans. Even if true, these facts are not sufficient to allow the Court to excuse Mr. Park from

the exhaustion requirement. First, it is not clear that any party to this suit has failed to uphold its duties under ERISA. Second, such facts do not indicate that exhaustion of administrative remedies has been meaning fully denied or would be futile.

### IX. *Negligent Discharge*

Plaintiff claims that Delaware law allows an action for negligent discharge of at-will employees. Plaintiff relies on language from *Merrill:*

> Nothing [in this opinion] is to be construed as limiting an employer's freedom to terminate an at-will employment contract for its own legitimate business, or even highly subjective, reasons. Such a contract is still terminable for any reason not motivated by bad faith.

*Merrill,* 606 A.2d at 103. Consequently, Mr. Park argues that even at-will employees must be terminated for some reason--even if highly subjective-- and may not be terminated for reasons of bad faith.

As this Court reads the above language and Delaware law, at-will employees may be discharged for any reason--or lack of reason--so long as the discharge does not violate public policy. In other words, terminations motivated by bad-faith include only those breaches that also violate the covenant of good-faith and fair dealing. Any other reading would essentially force employers to recognize in every employment contract an implied contractual pledge to provide cause for every discharge, thus obscuring, if not mutilating, the concept of at-will employment. Consequently, because the Court has held that Mr. Park's claim for breach of the covenant of good-faith and fair dealing lacks merit, this claim also must fail.

### X. *Vacation Pay*

Mr. Park claims Georgia Gulf breached its employment contract when by compensating him for eleven rather than 29 days of accrued vacation time. This claim depends upon the terms of the Georgia Gulf Operating Policy Manual. According to the Manual, Mr. Park was entitled (as an employee with more than 10 but less than eighteen years of service) to two days of vacation for every month worked in the calendar year, up to a maximum of twenty. D.I. 64 at A-333. Such vacation time became "earned" on December 31 of each calendar year. *Id.* Only regular, full-time employees were entitled to receive vacation time. *Id.* Furthermore, the Manual provided that any vacation time accrued

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 714968 (D.Del.)
**(Cite as: 1992 WL 714968 (D.Del.))**

Page 10

must be taken during the calendar year to which the vacation time applied; otherwise the employee forfeited that time. D.I. 64, at A-332.

At the time of Mr. Park's termination in August 1990, he had accrued sixteen days vacation for that calendar year. Since he was terminated before December 31, 1990, Mr. Park did not "earn" any vacation time for 1990. Consequently, Mr. Park's employment contract entitled him to compensation for vacation time remaining from the previous year, 1989. Mr. Park had 11 days of uncompensated vacation time remaining from 1989. D.I. 64 at A-465. Because Mr. Park received compensation for these 11 days, he is not entitled to further vacation time.

> FN1. It is not clear from plaintiff's brief whether plaintiff wishes to pursue this line of reasoning.

Not Reported in F.Supp., 1992 WL 714968 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1377843 (E.D.Pa.)
**(Cite as: 2005 WL 1377843 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Beatrice ROSARIO Plaintiff,
v.
KEN-CREST SERVICES Defendant
**No. 04-CV-4737.**

June 6, 2005.

John J. Robinson, Robinson Pall and Pall, Upper
Darby, PA, for Plaintiff.

Christine D. Steere, Salmon Ricchezza Singer &
Turchi LLP, Philadelphia, PA, for Defendant.

*MEMORANDUM AND ORDER*

JOYNER, J.

**\*1** This employment discrimination case is now
before the Court for resolution of the Defendant's
Motion for Summary Judgment. For the reasons
which follow, the Motion is Granted.

*Factual Background*
By this lawsuit, Plaintiff Beatrice Rosario alleges
that she was terminated from her position as a
Community Home Supervisor with Ken-Crest
Services because of her race (black) and national
origin (Liberian). Up until Plaintiff was terminated
on September 15, 2003, she had been employed with
Ken-Crest for approximately eleven and one-half
years and had been promoted from Direct Caregiver
to Community Home Supervisor.

For its part, Defendant disputes that Plaintiff was
terminated because of her race and/or national origin,
arguing instead that she was terminated because she
abused a resident. Defendant asserts that Plaintiff was
terminated after an internal investigation confirmed
that Plaintiff struck a resident during a Ken-Crest
social function.

*Standards Governing Summary Judgment Motions*
In deciding a motion for summary judgment under
Fed.R.Civ.P. 56(c), a court must determine "whether
there is a genuine issue of material fact and, if not,
whether the moving party is entitled to judgment as a

matter of law." *Medical Protective Co. v. Watkins,*
198 F.3d 100, 103 (3d Cir.1999) (internal citation
omitted). Indeed, Rule 56(c) provides that summary
judgment is properly rendered:
> [I]f the pleadings, depositions, answers to
> interrogatories, and admissions on file, together
> with the affidavits, if any, show that there is no
> genuine issue as to any material fact and that the
> moving party is entitled to a judgment as a matter
> of law. A summary judgment, interlocutory in
> character, may be rendered on the issue of liability
> alone although there is a genuine issue as to the
> amount of damages.
Stated more succiently, summary judgment is
appropriate only when it is demonstrated that there is
no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of
law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-32,
106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, all
facts must be viewed and all reasonable inferences
must be drawn in favor of the non-moving party.
*Troy Chemical Corp. v. Teamsters Union Local No.
408,* 37 F.3d 123, 125-26 (3d Cir.1994); *Oritani
Savings & Loan Assn. v. Fidelity & Deposit Co. of
Md.,* 989 F.2d 635, 638 (3d Cir.1993). An issue of
material fact is said to be genuine "if the evidence is
such that a reasonable jury could return a verdict for
the nonmoving party." *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d
202 (1986).

In *Celotex Corp. v. Catrett, supra,* the Supreme
Court articulated the allocation of burdens between a
moving and nonmoving party in a motion for
summary judgment. Specifically, the Court in that
case held that the movant had the initial burden of
showing the court the absence of a genuine issue of
material fact, but that this did not require the movant
to support the motion with affidavits or other
materials that negated the opponent's claim. *Celotex,*
477 U.S. at 323. The Court also held that Rule 56(e)
requires the nonmoving party to "go beyond the
pleadings and by her own affidavits, or by the
'depositions, answers to interrogatories, and
admissions on file,' designate 'specific facts showing
that there is a genuine issue for trial." ' *Id. at 324*
(quoting Fed.R.Civ.P. 56(e)). This does not mean that
the nonmoving party must produce evidence in a
form that would be admissible at trial in order to

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1377843 (E.D.Pa.)
**(Cite as: 2005 WL 1377843 (E.D.Pa.))**

Page 2

avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose its own witnesses. Rather, Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the required showing that a genuine issue of material fact exists. *Id. See also Morgan v. Havir Mfg., Co.,* 887 F.Supp. 759 (E.D.Pa.1994); *McGrath v. City of Phila.,* 864 F.Supp. 466, 472-73 (E.D.Pa.1994).

*Discussion*
A. The McDonnell Douglas Framework

**\*2** Discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.,* as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a), are analyzed under the framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting framework, a plaintiff must first establish a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Once a *prima facie* case is established, the burden shifts to the defendant to produce a legitimate non-discriminatory reason for the plaintiff's discharge. *Reeves,* 530 U.S. at 143. Once a legitimate non-discriminatory reason is offered, the plaintiff must produce sufficient evidence for a reasonable fact-finder to conclude by a preponderance of the evidence that the non-discriminatory reason offered by the employer was merely a "pretext" for unlawful discrimination. *Id.*

Absent direct evidence of discrimination, a plaintiff alleging wrongful termination based on race or national origin discrimination under Title VII and 42 U.S.C. § 1981 [FN1] must establish that: (1) she is a member of a protected class, (2) she is qualified for the position in question, (3) she suffered an adverse employment action, and (4) either non-members of the protected class were treated more favorably than the plaintiff, or the circumstances of the plaintiff's termination give rise to an inference of racial discrimination. *McDonnell Douglas,* 411 U.S. at 802; *Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 318-19 (3d Cir.2000); *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 356 (3d Cir.1999).

FN1. The *McDonnell Douglas* standard is used to analyze employment discrimination

claims under both Title VII and 42 U.S.C. § 1981. *Pamintuan v. Nanticoke Memorial Hosp.,* 192 F.3d 378, 385 (3d Cir.1999); *Stewart v. Rutgers, The State Univ.,* 120 F.3d 426, 432 (3d Cir.1997). Accordingly, the proof required for a plaintiff to prevail under 42 U.S.C. § 1981 is identical to that required in a Title VII case. *See Harris v. SmithKline Beechman,* 27 F.Supp.2d 569, 576 (E.D.Pa.1998) (applying the same analysis to race discrimination claims under Title VII and 42 U .S.C. § 1981); *Lewis v. Univ. of Pitt.,* 725 F.2d 910, 915 n. 5 (3d Cir.1983) (explaining that a 42 U.S.C. § 1981 claim "requires the same elements of proof as a Title VII action").

B. Plaintiff Has Failed to Establish a *Prima Facie* Case

Plaintiff in this action fails to establish a *prima facie* case of discrimination. Although Plaintiff has shown that, as an African-American Liberian, she is a member of a protected class; that she is presumptively qualified for the position in question, given that she had held it for nearly twelve years; and that she suffered an adverse employment action by having been terminated; Plaintiff does not satisfy the fourth prong of the *McDonnell Douglas* standard. Specifically, she fails to demonstrate that either non-members of the protected class were treated more favorably, or that the circumstances of her termination raise an inference of discrimination.

The events leading to Plaintiff's discharge began when Answad Hopewell, a black Case Manager, levied a complaint against Plaintiff for abusing a Ken-Crest resident. (Rosario Depo. p. 71-72). In response to the allegation, Pauline Baker, a black Ken-Crest employee, conducted an investigation. *Id.* at 78. After Sandra Brown, a black Community Home Supervisor, confirmed the abuse allegation, Plaintiff was discharged. *Id.* at 53, 111. Following her termination, Plaintiff appealed but her termination was upheld by Harry Peck, a black Director of Residential Services. *Id.* at 147-48. Accordingly, Plaintiff's own recollection of the events leading to her termination is not sufficient to raise an inference of discrimination.

**\*3** Plaintiff attempts to substantiate her discrimination claim by alleging that she was "harassed" by two coworkers, both black females, who aked Plaintiff about her financial status. *Id.* at 114-15. However, Plaintiff provides no evidence to

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1377843 (E.D.Pa.)
(Cite as: 2005 WL 1377843 (E.D.Pa.))

Page 3

support her belief that her coworkers asked these questions due to her race and/or national origin. *Id.* at 119. Furthermore, Plaintiff failed to allege either coworker's "harassment" in the EEOC Charge of Discrimination, and thus any claims arising out of those actions are waived.

Similarly, Plaintiff alleges that a coworker told her that Answad Hopewell, an African-American case manager, referred to another case manager as "the guy down there who employes all the Africans." *Id.* at 106. However, Plaintiff incorrectly relies exclusively on this hearsay evidence as proof that Hopewell was "personally biased" against her. *Id.* Furthermore, even if this Court viewed Hopewell's comment as displaying bias against Africans, hearsay evidence cannot be considered to defeat a summary judgment motion. *See Blackburn v. United Parcel Serv.,* 179 F.3d 81, 95 (3d Cir.1999) (explaining that hearsay evidence usually should not be considered on a summary judgment motion).

Plaintiff likewise fails to show that non-members of the protected class were treated more favorably. Although Plaintiff alleges that on two occasions during the course of her employment she was denied promotions, Plaintiff admits that she never applied for either position. *Id.* at 17, 23. Moreover, Ken-Crest hired a black female to fill the Program Director position that Plaintiff felt she deserved. *Id.* at 17.

C. Plaintiff Has Failed to Offer Sufficient Evidence for a Reasonable Fact-Finder to Conclude that Defendant's Reason for Plaintiff's Discharge Was Pretextual

Even if Plaintiff's evidence was sufficient to establish a *prima facie* case of discrimination, Defendant has articulated a legitimate non-discriminatory reason for Plaintiff's discharge. Defendant asserts that Plaintiff's termination resulted from abuse of a mentally disabled resident. (Ans., ¶ 14). Hopewell's report of Plaintiff's abusive action was confimed by a Ken-Crest employee who witnessed the incident. (Brown Depo. p. 16). Moreover, an internal investigation confirmed Plaintiff's abusive action, and upper-level officials upheld Plaintiff's termination. (Rosario Depo. p. 78, 147-48). Because Ken-Crest articulates a legitimate reason for Plaintiff's termination, any presumption of discrimination from Plaintiff's *prima facie* case disappears. Accordingly, Plaintiff must "cast sufficient doubt upon the employer's proffered reasons to permit a reasonable fact-finder to conclude that the reasons are incredible." *Sheridan v. E.I.*

*DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir.1996).

Plaintiff in this action fails to present evidence to refute Ken-Crest's legitimate reason for her termination. *See Jalil v. Avdel Corp.,* 873 F.2d 701, 707 (3d Cir.1989) (finding that a defendant is entitled to summary judgment in a Title VII and 42 U.S.C. § 1981 action if the plaintiff cannot produce sufficient evidence of pretext to rebut the asserted nondiscriminatory reasons for the employment decision). As this Court found Plaintiff unable to establish a *prima facie* case, Plaintiff clearly lacks any ability to prove that she was wrongfully discharged as a result of racial discrimination. *See Reeves,* 530 U.S. at 133 (noting that employer would be entitled to summary judgment if the record conclusively revealed some other nondiscriminatory reason or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue).

D. Conclusion

*4 Plaintiff in this action fails to establish a *prima facie* case of discrimination based on her race and/or national origin. Even if Plaintiff's evidence was sufficient to establish a *prima facie* case, Plaintiff does not offer adequate evidence from which a reasonable fact-finder could conclude that Defendant's reason for Plaintiff's discharge was pretextual. Accordingly, this Court concludes that Defendant's Motion for Summary Judgment is properly granted on all Counts of Plaintiff's Complaint.

An order follows.

*ORDER*
AND NOW, this 6th day of June, 2005, upon consideration of Defendant Ken-Crest Services's Motion for Summary Judgment (Document No. 7), and Plaintiff's response thereto (Document No. 9), it is hereby ORDERED that the Motion is GRANTED and Judgment as a matter of law is hereby entered in favor of the Defendant and against the Plaintiff in no amount.

Not Reported in F.Supp.2d, 2005 WL 1377843 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

479 F.Supp.2d 445                                                                    Page 1
479 F.Supp.2d 445, 2007 WL 906709 (D.Del.)
**(Cite as: 479 F.Supp.2d 445, 2007 WL 906709 (D.Del.))**

United States District Court,
D. Delaware.
Kristie Marie SCHLIFKE, Plaintiff,
v.
TRANS WORLD ENTERTAINMENT
CORPORATION (d/b/a Coconuts Music and
Movies),
Defendant.
**Civ. No. 05-620-SLR.**

March 27, 2007.

**Background:**    Former employee sued former
employer, claiming sex discrimination in violation of
Title VII, violations of the Pregnancy Discrimination
Act, the Delaware Discrimination in Employment
Act (DDEA), the Family and Medical Leave Act of
1993 (FMLA), and that the employer engaged in the
intentional infliction of emotional distress. Employer
moved for summary judgment.

  **Holdings:**    The District Court, Sue L. Robinson,
Chief Judge, held that:
  (1) employee was not treated differently than any
similarly situated person outside of her protected
class;
  (2) proffered legitimate explanations for terminating
the employee were not a pretext for discrimination or
retaliation; and
  (3) calling employee the in to close a store on one of
two days that she was scheduled for bed rest did not
rise to the level of outrageousness required to support
a claim of intentional infliction of emotional distress.
  Motion granted.

West Headnotes

**[1] Civil Rights ☜1172**
78k1172 Most Cited Cases

**[1] Civil Rights ☜1176**
78k1176 Most Cited Cases
Employee terminated one day after beginning her
maternity leave was not treated differently than any
similarly situated person outside of her protected
class, so as to support a gender and pregnancy
discrimination claim under Title VII and the
Pregnancy Discrimination Act, despite her
conclusory assertions that a male manager in another
store was not terminated despite having a similarly

poor shrink rating.   Pregnancy Discrimination Act, §
1(k),42 U.S.C.A. §
2000e(k); Civil Rights Act of 1964, § 701 et seq., 42
U.S.C.A. § 2000e et seq.

**[2] Civil Rights ☜1171**
78k1171 Most Cited Cases

**[2] Civil Rights ☜1176**
78k1176 Most Cited Cases
Employer's proffered legitimate explanations for
terminating an employee one day after she began her
maternity leave were not a pretext for gender or
pregnancy discrimination under Title VII and the
Pregnancy Discrimination Act, despite her claim that
the store she managed was understaffed and had
inadequate security measures which led to her
unacceptable shrinkage rates; before she provided
notification of her pregnancy, she had received a
failing inventory score and a failing customer service
evaluation, just one month later she received an
additional failing customer service evaluation, a poor
performance review, and another poor inventory
result.  Pregnancy Discrimination Act, §  1(k), 42
U.S.C.A. §  2000e(k); Civil Rights Act of 1964, §
701 et seq., 42 U.S.C.A. § 2000e et seq.

**[3] Labor and Employment ☜365**
231Hk365 Most Cited Cases
To prevail on a claim under the Family and Medical
Leave Act (FMLA), plaintiff must establish a prima
facie case of retaliation by showing:  (1) plaintiff
availed herself of a protected right under the FMLA;
(2) plaintiff suffered an adverse employment action;
and (3) there was a causal connection between the
employee's protected activity and the employer's
adverse employment action. Family and Medical
Leave Act of 1993, § 2, 29 U.S.C.A. § 2601.

**[4] Labor and Employment ☜389(2)**
231Hk389(2) Most Cited Cases
After employee establishes a prima facie case under
the Family and Medical Leave Act (FMLA), the
burden shifts to the employer to articulate a
legitimate, nondiscriminatory reason for its adverse
employment action.  Family and Medical Leave Act
of 1993, § 2, 29 U.S.C.A. § 2601.

**[5] Labor and Employment ☜389(2)**
231Hk389(2) Most Cited Cases
If a legitimate non-discriminatory reason is provided

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

479 F.Supp.2d 445
479 F.Supp.2d 445, 2007 WL 906709 (D.Del.)
**(Cite as: 479 F.Supp.2d 445, 2007 WL 906709 (D.Del.))**

Page 2

for an adverse employment action, Family and Medical Leave Act (FMLA) plaintiff must present evidence to show that the defendant's proffered reasons were not its true reasons, but were merely a pretext for its illegal action. Family and Medical Leave Act of 1993, § 2, 29 U.S.C.A. § 2601.

**[6] Federal Civil Procedure ☜2497.1**
170Ak2497.1 Most Cited Cases
To survive summary judgment where an employer has offered a legitimate non-discriminatory reason for an adverse employment action, a Family and Medical Leave Act (FMLA) plaintiff must either discredit the employer's proffered reasons or adduce evidence that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. Family and Medical Leave Act of 1993, § 2, 29 U.S.C.A. § 2601.

**[7] Labor and Employment ☜368**
231Hk368 Most Cited Cases
Employee terminated one day after beginning her maternity leave was not fired in retaliation for her attempt to exercise her rights under the Family and Medical Leave Act (FMLA), despite claim that, upon learning that she was pregnant, her supervisor abandoned her; there was no evidence that employer took, or failed to take, any action because of the employee's pregnancy. Family and Medical Leave Act of 1993, § 2, 29 U.S.C.A. § 2601.

**[8] Labor and Employment ☜389(2)**
231Hk389(2) Most Cited Cases
Timing alone will not give rise to an inference of retaliation violating the Family and Medical Leave Act (FMLA). Family and Medical Leave Act of 1993, § 2, 29 U.S.C.A. § 2601.

**[9] Labor and Employment ☜368**
231Hk368 Most Cited Cases
Employer's proffered legitimate explanations for terminating an employee one day after she began her maternity leave were not a pretext for retaliation in violation of the Family and Medical Leave Act (FMLA); reasons included two poor inventory results, two poor customer service ratings, and a negative performance evaluation. Family and Medical Leave Act of 1993, § 2, 29 U.S.C.A. § 2601.

**[10] Damages ☜57.22**
115k57.22 Most Cited Cases

Under Delaware law, liability exists for intentional infliction of emotional distress where the conduct is outrageous and extreme in character; the conduct must be so severe that no reasonable man could be expected to endure it.

**[11] Damages ☜57.22**
115k57.22 Most Cited Cases
Under Delaware law, courts presented with a claim of intentional infliction of emotional distress are to consider both intensity and duration in deciding whether the conduct at issue has reached the requisite level of being outrageous and extreme in character.

**[12] Damages ☜57.57**
115k57.57 Most Cited Cases
Calling employee in to close a store on one of two days that she was scheduled for bed rest did not rise to the level of outrageousness required to support a claim of intentional infliction of emotional distress under Delaware law.

*446 Joseph J. Longobardi, III, Esquire of Longobardi Law Office, Wilmington, DE, for Plaintiff.

*447 Jennifer Gimler Brady, Esquire and Sarah E. DiLuzio, Esquire of Potter Anderson & Corroon, LLP, Wilmington, DE, of counsel, Tyler A. Brown, Esquire of Jackson Lewis, LLP, Vienna, VA, for Defendant.

**MEMORANDUM OPINION**

SUE L. ROBINSON, Chief Judge.

**I. INTRODUCTION**

**\*\*1** Plaintiff Kristie Marie Schlifke filed the action at bar against her former employer, Trans World Entertainment Corporation [FN1] ("defendant"), on August 23, 2005. (D.I. 1) Plaintiff's complaint alleges sex discrimination actionable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § § 2000e et seq. She likewise alleges violations of the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k); the Delaware Discrimination in Employment Act ("DDEA"), 19 Del. C. § § 710 et seq.; the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § § 2601 et seq.; and claims that defendant engaged in the intentional infliction of emotional distress. (D.I. 1 at ¶ ¶ 23-32) Plaintiff requests compensatory damages, special damages,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

479 F.Supp.2d 445                                                                    Page 3
479 F.Supp.2d 445, 2007 WL 906709 (D.Del.)
**(Cite as: 479 F.Supp.2d 445, 2007 WL 906709 (D.Del.))**

attorney's fees, and costs. (*Id.* at 5)

> FN1. Plaintiff's complaint names two
> defendants, "Coconuts Music and Movies"
> and "Trans World Entertainment
> Corporation." (D.I. 1 at ¶ 1) Defendant
> avers that Trans World Entertainment
> Corporation is its proper name, and that it
> merely does business under the name
> "Coconuts Music and Movies." (D.I. 17 at
> 1)

Presently before the court is defendant's motion for
summary judgment. (D.I. 16) The court has
jurisdiction over the matters at bar pursuant to 28
U.S.C. § 1331, 28 U.S.C. § 1367, and 42 U.S.C. §
2000e-5(f).

## II. BACKGROUND

On March 11, 2002, defendant hired plaintiff as the
manager of the Coconuts Music and Movies retail
store ("Coconuts") in Wilmington, Delaware. (D.I. 2
at ¶ 9) One of the essential responsibilities of a store
manager is to "[p]rotect all corporate assets by
following Loss Prevention guidelines." (D.I. 18 at
A1) The store had been a target for shoplifters before
plaintiff took over as manager and, subsequent to her
arrival, was robbed twice at gunpoint. (D.I. 17 at 16;
D.I. 22 at 3)

Prior to plaintiff's arrival, the Wilmington store was
within the Target Store Program ("Target Program").
(D.I. 18 at A86) Company policy states that a store
within the Target Program is one which is not
meeting company expectations for maintaining low
shrinkage rates. (*Id.* at A16) According to defendant,
the term "shrink" describes loss of cash or product
which decreases the store's profitability. (D.I. 17 at
4) Under Target Program policy, failure by the store
manager to maintain shrinkage goals is grounds for
"severe" discipline. (D.I. 18 at A18)

Defendant avers that in April 2002, shortly after
plaintiff completed training and began employment,
it conducted a regularly-scheduled inventory of her
store. (*Id.* at A42) The shrink goal was -1.6%. (*Id.*)
The inventory revealed that the actual shrink
percentage for the store was -6%. (*Id.*) However,
defendant states that plaintiff was not disciplined for
the results of this inventory because she had only
recently started managing the store. (*Id.*)

On July 30, 2002, defendant conducted a customer
service assessment of plaintiff's store. (*Id.* A21)
Defendant seeks a minimum score of 70%. (*Id.*) The
assessment of plaintiffs store resulted in a score of
only 40%. (*Id.*) In response to the store's poor
performance, defendant issued a written warning to
plaintiff on August 13, 2002. (*Id.*)

**\*448** The next store inventory, the first one for
which plaintiff was responsible, took place in August
2002. (*Id.* at A23) The result of this inventory
indicated that the store's shrink rating had risen to -
8.3%. (*Id.*) Plaintiff was given a written warning for
this negative rating; [FN2] however, she did not
receive the warning until November 5, 2002. (*Id.*)
Defendant states that its practice is to wait until the
inventory results are finalized before issuing a
warning, although preliminary results are available
shortly after the inventory is taken. (D.I. 17 at 6) On
November 5th, plaintiff also received a poor
performance review. [FN3] (D.I. 18 at A24- A31)
Five days later, defendant conducted another
customer service assessment and the store was rated
55%, still below the acceptable rate. (D.I. 18 at A83-
A84)

> FN2. Company policy states that, "[a]ny
> Store Manager whose shrinkage in their
> store exceeds an acceptable level (0.5% over
> goal) will be issued a written warning and
> will be placed on probation pending the
> outcome of the next consecutive inventory.
> A high shrinkage result on the next
> inventory will result in severe disciplinary
> action up to and including termination."
> (D.I. 18 at A18)

> FN3. In fact, plaintiff achieved a "meets
> expectations" score for only three
> performance objectives. She was rated
> "below expectations sometimes" for five
> objectives and "below expectations
> consistently" for two objectives. (D.I. 18 at
> A24-A31)

**\*\*2** In October 2002, prior to receipt of the final
results from the August 2002 inventory and her
performance review, plaintiff informed her
supervisor, Rob Burke ("Burke"), that she was
pregnant. (D.I. 23 at B5) Due to complications
during plaintiff's pregnancy, she was placed on a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

479 F.Supp.2d 445                                                                                                                    Page 4
479 F.Supp.2d 445, 2007 WL 906709 (D.Del.)
**(Cite as: 479 F.Supp.2d 445, 2007 WL 906709 (D.Del.))**

restricted work schedule by her physician. (*Id.* at B8) The restrictions limited her schedule to 40 hours of work per week. (*Id.*) Plaintiff avers that, because defendant kept the store understaffed, she was required to work 50 to 60 hours per week. (*Id.* at B6; D.I. 22 at 3)

In January 2003, plaintiff was put on bed rest for two days. (D.I. 18 at A40; D.I. 23 at B7) Despite this, Burke called plaintiff and required her to be present at store closing on one of those days because an assistant manager had been terminated and store rules required that at least one manager be present for closing. (D.I. 18 at A40) Plaintiff states that she was scolded by Burke in front of her staff on that day, causing her humiliation. (D.I. 23 at B9) Defendant reprimanded Burke for his actions and placed him on written warning. (D.I. 18 at A40) Plaintiff alleges that she was told by fellow employees that defendant would not permit her to go on maternity leave and would be "getting rid" of her. (D.I. 22 at 3-4; D.I. 23 at B14-B15) However, those employees were not deposed in the case at bar and no evidence of record corroborates what plaintiff claims she was told.

The store was robbed twice at gunpoint in January 2003. (D.I. 17 at 16; D.I. 22 at 3) After those incidents, defendant placed security guards within the store. (D.I. 18 at A38-A39) The next regularly-scheduled inventory took place in February 2003. (*Id.* at A81) This time the shrink rating was -10.7%. [FN4] (*Id.* at A88) Again, the results were not considered final for several months, until late April or early May. (*Id.* at A88-A89)

> FN4. There is no evidence of record that the shrink rating was adjusted in light of the gunpoint robberies.

Plaintiff avers that she first learned defendant was soliciting candidates to replace her in April 2003. [FN5] (D.I. 22 at 3) *449 Plaintiff had intended to begin maternity leave in June of that year but, due to medical complications, she informed Burke that she would be leaving beginning May 4, 2003. (D.I. 23 at B15-B17) Plaintiff was terminated on May 5, 2003. (D.I. 18 at A89)

> FN5. Plaintiff has attached a posting from the website *Monster.com* seeking a manager for the Coconuts store in Wilmington; however, the posting is not dated. (D.I. 23

at B26)

Plaintiff avers that she was trained by a male manager in the Philadelphia store  [FN6] who, despite having had a similar string of bad inventories and managing a store that was part of the Target Program, was not terminated. [FN7] (D.I. 23 at B1) She further claims the company did not provide her with Cobra health benefits or comply with her request for information on obtaining Cobra benefits. (*Id.* at B18-B19) Defendant claims that any failure to provide information on Cobra benefits was an administrative error. (D.I. 27 at 1-2)

> FN6. Plaintiff is unsure of the manager's last name and could not recall his first name with certainty, believing it to be Darryl or Darrow. (D.I. 23 at B1)

> FN7. Additionally, plaintiff argues in her answering brief that she requested shrinkage reports for all stores within the district during the period of her employment and that, while defendant indicated they would be provided for the years 2002 and 2003, those reports were not produced. (D.I. 22 at 4; D.I. 26 at 2) Defendant replies that these documents are unavailable due to the company's standard document retention policy. (D.I. 26 at 2) Plaintiff did not file a motion to compel the information.

Plaintiff filed a complaint with the Delaware Department of Labor and received her right to sue letter on December 30, 2004. (D.I. 18 at A37) She then filed the lawsuit presently before the court.

**III. STANDARD OF REVIEW**

**\*\*3** A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

479 F.Supp.2d 445                                                                        Page 5
479 F.Supp.2d 445, 2007 WL 906709 (D.Del.)
**(Cite as: 479 F.Supp.2d 445, 2007 WL 906709 (D.Del.))**

conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995)* (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita, 475 U.S. at 587, 106 S.Ct. 1348* (quoting *Fed.R.Civ.P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995).* The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265(1986).*

**\*450** With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus., 814 F.Supp. 1209, 1215 (D.Del.1993)* (quoting *Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir.1987)*).

## IV. DISCUSSION

### A. Sex Discrimination Under Title VII [FN8]

> FN8. Plaintiffs filing claims under the DDEA "shall elect a Delaware or federal forum to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A charging party is barred by this election of remedies from filing cases in both [State] Superior Court and the federal

forum." *19 Del. C. § 714(c).* This court has held that a plaintiff who files claims under Title VII is precluded from concomitantly pursuing state law claims under the DDEA, pursuant to *19 Del. C. § 714(c). Wilcoxon v. Red Clay Consol. Sch. Dist., 437 F.Supp.2d 235, 246-47 (D.Del.2006).* Plaintiff, having elected to prosecute her sex discrimination claim under Title VII, is barred from simultaneously seeking remedies provided by the DDEA.

Claims of discrimination brought pursuant to Title VII are analyzed under a burden-shifting framework, the particulars of which depend on whether the suit is characterized as a "pretext" suit or a "mixed motives" suit. Since review of the record does not reveal any direct evidence of gender discrimination and plaintiff does not purport to assert such a claim, the court will analyze the claim using the burden-shifting framework for "pretext" suits set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Krouse v. Am. Sterlizer Co., 126 F.3d 494, 500 (3d Cir.1997).*

**\*\*4** Under this framework, plaintiff must establish a prima facie case of gender discrimination under Title VII. In order to state such a case, plaintiff must prove that: (1) she is a member of a protected class; (2) she suffered some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly situated person who is not of the protected class is treated differently. *Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir.1999).*

Once a prima facie case has been established, the burden shifts to the defendant to provide "some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817.* If defendant carries this burden, the presumption of discrimination drops from the case, and plaintiff must "cast sufficient doubt" upon defendant's proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. *See Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir.1996)* (en banc).

[1] Though plaintiff is a member of a protected class and her termination constituted an adverse employment action, she has failed to establish a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

*Westlaw.*

479 F.Supp.2d 445                                                                                                              Page 6
479 F.Supp.2d 445, 2007 WL 906709 (D.Del.)
**(Cite as: 479 F.Supp.2d 445, 2007 WL 906709 (D.Del.))**

prima facie case because she has adduced no evidence that defendant treated employees who were not members of the protected class differently. The only proof plaintiff provides with regard to the third *McDonnell Douglas* prong comes from her own conclusory assertions that a male manager in another store was not terminated despite having a similarly poor shrink rating. She cannot provide this man's name and did not conduct any discovery on this **\*451** point. While plaintiff also asserts certain co-workers told her she would be terminated because of her pregnancy, plaintiff has proffered no actual evidence to that effect. In discovery, plaintiff requested documents related to the termination of other managers within plaintiff's district; she states that said documents were not produced by defendant. Plaintiff, however, did not file a motion to compel the information and defendant indicates the documents were destroyed according to its standard document retention policy. Because no testimony or documentary evidence of record exists which might establish an inference that plaintiff was treated differently than other similarly situated individuals who were not members of her protected class, the court finds that plaintiff has failed to make out a prima facie case of discrimination under Title VII.

[2] Even if plaintiff had established a prima facie case, defendant has provided numerous legitimate reasons for her discharge. Before plaintiff provided notification of her pregnancy, she had received a failing inventory score and a failing customer service evaluation. Just one month later, she received an additional failing customer service evaluation, a poor performance review, and another poor inventory result. Plaintiff's proof of pretext is that the Wilmington store was understaffed and had inadequate security measures which led to her unacceptable shrinkage rates. However, plaintiff has not provided proof that this situation was unique to the Wilmington store. She has also failed to proffer any evidence that defendant provided better staffing and security to male managers. Consequently, plaintiff is unable to rebut defendant's legitimate explanation for its decision to fire her.

**B. Pregnancy Discrimination Act**

**\*\*5** The Pregnancy Discrimination Act ("PDA") passed as part of a 1978 amendment to Title VII. That amendment makes clear that a prohibition on discrimination "because of sex" encompasses

discrimination based on pregnancy or childbirth. *See* 42 U.S.C. § 2000e(k). As a result, employers must treat pregnant women the same as others who are similarly unable to work. *See In Re Carnegie Ctr. Assocs.,* 129 F.3d 290, 294 (3d Cir.1997). If an employer takes an adverse employment action against a pregnant woman because of her pregnancy, then the employer has committed unlawful discrimination. *See id.* The Third Circuit has cautioned, however, that "[t]he PDA is a shield against discrimination, not a sword in the hands of a pregnant employee." *Id.* at 297. Plaintiff, therefore, must be able to show that defendant treated her differently than other disabled employees. *See id.*

The court finds that plaintiff has not established that she was terminated due to her pregnancy. While it is true that plaintiff was terminated one day after beginning her maternity leave, there exists ample evidence of record that plaintiff was not performing to her employer's expectations (namely, her poor performance review, failing customer service evaluations, and inability to meet goals related to inventory). Plaintiff had received a written warning for poor performance before she even announced her pregnancy in October 2002. Plaintiff has not put forth any evidence that other employees who were similarly unable to work were given special accommodation which she did not receive.

**C. FMLA Retaliation Claim**

[3][4][5][6] Plaintiff claims that defendant fired her in retaliation for her attempt to exercise her rights under the FMLA. (D.I. 1 at ¶ 30; D.I. 22 at 1) Retaliation claims **\*452** under the FMLA are analyzed under the burden shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Bearley v. Friendly Ice Cream Corp.,* 322 F.Supp.2d 563, 571 (M.D.Pa.2004); *Baltuskonis v. U.S. Airways, Inc.,* 60 F.Supp.2d 445, 448 (E.D.Pa.1999); *see also Lepore v. Lanvision Sys., Inc.,* 113 Fed. Appx. 449, 452 (3d Cir.2004). *McDonnell Douglas* sets forth a three-step analysis for retaliation claims. First, the plaintiff must establish a prima facie case of retaliation. A prima facie case of retaliation under the FMLA is established by showing: (1) plaintiff availed herself of a protected right under the FMLA; (2) plaintiff suffered an adverse employment action; and (3) there was a causal connection between the employee's protected activity and the employer's

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

479 F.Supp.2d 445                                                                                        Page 7
479 F.Supp.2d 445, 2007 WL 906709 (D.Del.)
**(Cite as: 479 F.Supp.2d 445, 2007 WL 906709 (D.Del.))**

adverse employment action. *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135 (3d Cir.2004); *Bearley*, 322 F.Supp.2d at 571; *Baltuskonis*, 60 F.Supp.2d at 448. "After establishing a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action." *Bearley*, 322 F.Supp.2d at 571; *see also Baltuskonis*, 60 F.Supp.2d at 448. "Finally, if a legitimate non-discriminatory reason is provided, the plaintiff must present evidence to show that the defendant's proffered reasons were not its true reasons, but were merely a pretext for its illegal action." *Baltuskonis*, 60 F.Supp.2d at 448; *see also Bearley*, 322 F.Supp.2d at 571. In order to survive summary judgment, a plaintiff must "either (i) discredit[ ] the [defendant's] proffered reasons ..., or (ii) adduc [e] evidence ... that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Torre v. Casio*, 42 F.3d 825, 830 (3d Cir.1994) (discussing *McDonnell Douglas* burden shifting in an Age Discrimination in Employment Act ("ADEA") case).

**\*\*6** [7][8] Plaintiff has failed to make out a prima facie case of retaliation. Specifically, plaintiff has failed to produce evidence to establish causation. It is true that there is close temporal proximity between plaintiff's taking maternity leave and her termination. *See Jalil v. Avdel Corp.*, 873 F.2d 701 (3d Cir.1989). However, timing alone will not give rise to an inference of retaliation. *See Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir.1991). The court must examine the record as a whole in determining causation. Plaintiff argues that, upon learning that she was pregnant, her supervisor abandoned her. To support her claim of abandonment, she maintains that the store was not properly staffed and there was inadequate security. However, there is no evidence that defendant took, or failed to take, action because of plaintiff's pregnancy.

[9] Even if plaintiff had established a prima facie case, defendant has raised and documented multiple, legitimate reasons for terminating plaintiff. Those reasons include two poor inventory results, two poor customer service ratings, and a negative performance evaluation. Plaintiff has failed to rebut these legitimate reasons through proof of pretext. The only statements implying pretext come from plaintiff's assertions that one other male manager also had poor inventory control results and was not similarly disciplined. Those allegations are unsupported by the

record. Furthermore, even if one other manager was not terminated for poor inventory control, plaintiff also had two poor customer service evaluations and a negative performance review, supporting defendant's assertion that it fired plaintiff **\*453** for poor performance. [FN9]

> FN9. Plaintiff points out in her statement of facts that there are inconsistencies in defendant's responses to discovery. (D.I. 22 at 5) In its response to interrogatories, defendant indicated that no other manager in the district had been fired for poor shrink results. Subsequently, in an affidavit, the Director of Associate Relations, Deb Markowitz-Best, indicated that one other male manager within plaintiffs district had been terminated for poor shrink results. (D.I. 23 at B29; D.I. 18 at A89) Even if there is an inconsistency on this point, it does not cast sufficient doubt on the myriad of other legitimate reasons for plaintiff's termination to allow plaintiff to meet her heavy burden of establishing pretext.

**D. Intentional Infliction of Emotional Distress**

[10][11] The tort of intentional infliction of emotional distress is recognized under Delaware law. *See Barker v. Huang*, 610 A.2d 1341 (Del.1992) (citing *Mattern v. Hudson*, 532 A.2d 85 (Del.Super.1987)). Liability exists where the conduct is outrageous and extreme in character. *See Mattern*, 532 A.2d at 86. The conduct must be so severe that "no reasonable man could be expected to endure it." *Id.* Courts are to consider both intensity and duration in deciding whether the conduct has reached this level. *See id.*

[12] While plaintiff has alleged intentional infliction of emotional distress in her complaint, she has not addressed the matter in her brief opposing summary judgment. Therefore, the court surmises that the distress she claims relates both to the store's staffing and security issues as well as being called in to work while on bed rest. In terms of staffing and security, such business practices may be difficult for employees but can hardly be said to constitute conduct so severe that "no reasonable [person] could be expected to endure it." When considering the intensity and duration of the incident in which plaintiff was called in to close the store on one of two

Westlaw.

479 F.Supp.2d 445                                                                                    Page 8
479 F.Supp.2d 445, 2007 WL 906709 (D.Del.)
**(Cite as: 479 F.Supp.2d 445,  2007 WL 906709 (D.Del.))**

days that she was scheduled for bed rest, it does not
appear to the court that this conduct rises to the level
of outrageousness.

## V. CONCLUSION

  **7 For the reasons stated, defendant's motion for
summary judgment (D.I. 16) is granted.    An
appropriate order will issue.

### ORDER

  At Wilmington 27th day of March, consistent with
the memorandum opinion issued this same date;

  IT IS ORDERED  that  defendant's  motion  for
summary judgment (D.I. 16) is granted.  The Clerk of
Court is instructed to enter judgment in favor of
defendant and against plaintiff.

  479 F.Supp.2d 445, 2007 WL 906709 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**Miller v. Aramark Healthcare Support Services, Inc. et al**
**Docket No.: 06534**

# Unreported Cases – Part 2

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 2660704 (M.D.Pa.)
**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

C

Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Robert SCHOFIELD, Plaintiff
v.
METROPOLITAN LIFE INSURANCE
COMPANY, Robert Pidich, Defendants.
**No. 3:CV-03-0357.**

Sept. 15, 2006.
Peter G. Loftus, Loftus Law Firm, P.C., Waverly,
PA, for Plaintiff.

Mark A. Saloman, Proskauer Rose LLP, Newark,
NJ, Thomas B. Helbig, Scanlon, Howley & Doherty,
Scranton, PA, for Defendants.

*MEMORANDUM*

THOMAS I. VANASKIE, District Judge.

*\*1* Plaintiff Robert Schofield initiated this action
against his former employer, Metropolitan Life
Insurance Company ("MetLife"), and three of
MetLife's employees--Robert Pidich, Rose C.
Johnston, and Kellee Tinsley-- complaining of
improper handling of his leave of absence during the
winter of 2001 and his ensuing separation from
employment in May of 2002. This Court previously
dismissed Plaintiff's claims against Ms. Johnston and
Ms. Tinsley, as well as claims of intentional infliction
of emotional distress, wrongful discharge, and
violation of the Employee Retirement Income
Security Act ("ERISA"), *29 U.S.C. § 1001, et seq.*
*Schofield v. Metropolitan Life Ins. Co.,* No. 3:CV-03-
0357 (Dkt. Entry 45) (M.D.Pa. Dec. 16, 2003).

Remaining Defendants MetLife and Mr. Pidich have
moved for summary judgment on Mr. Schofield's
claims under the Age Discrimination in Employment
Act ("ADEA"), *29 U.S.C. § 621, et seq.* (Count I);
the Americans with Disabilities Act ("ADA"), *42
U.S.C. § 12101,* et seq. (Count II); the Pennsylvania
Human Relations Act ("PHRA"), *43 Pa.C.S.A. §
951,* et seq. (Count III); and the Family Medical
Leave Act ("FMLA"), *29 U.S.C. § 2601, et seq.*
(Count IV). [FN1] Because Mr. Schofield does not
present sufficient evidence from which a fact-finder

could conclude that his position changed following
his return from FMLA leave or that his leave was a
factor behind MetLife's actions that led to his
voluntary resignation, his FMLA claim must fail.
Likewise, Mr. Schofield has failed to present
sufficient evidence that his voluntary resignation
constituted an adverse employment action by
MetLife or that MetLife acted with discriminatory
animus in order to prevail on his discrimination
claims. Consequently, MetLife's motion for summary
judgment will be granted.

> FN1. For purposes of convenience, the
> remaining Defendants, MetLife and Mr.
> Pidich, will be collectively referred to as
> MetLife in this opinion, as they moved
> together for summary judgment.

*I. BACKGROUND*

MetLife operates an information technology center
in Clarks Summit, Pennsylvania. (Defs.' Statement of
Material Facts ("S.M.F.") (Dkt. Entry 71-2) ¶ 1.) The
facility employs about forty project managers to
manage various software projects. (*Id.* ¶ 2.)

In 1997, Mr. Schofield became a project manager at
the facility. (*Id.*) In this position, he was responsible
for hiring, managing, evaluating, and terminating a
team of programmers, system consultants, and other
information technology professionals. (*Id.* ¶ 3.)
Kellee Tinsley was a highly regarded member of his
team. (*Id.* ¶¶ 5-6.) Mr. Schofield reported directly to
MetLife Director Robert Pidich. (*Id.* ¶ 4.)

Mr. Schofield began experiencing severe anxiety and
depression in 2001. (Pl.'s Counter Statement of
Material Facts ("C.S.M.F.") (Dkt. Entry 71-2) ¶ 17.)
Due to his illness, he missed work for most of the
month of December 2001. (Mr. Schofield's Dep., Pl.'s
Br. Opp. Ex. A (Dkt. Entry 72-2) at 149-150.) Mr.
Schofield was eventually placed on disability leave
effective January 2, 2002. (Defs.' S.M.F. ¶ 17.) On
January 18, 2002, Mr. Schofield attempted suicide.
(Pl.'s C.S.M.F. ¶ 20.)

*\*2* On April 1, 2002, Mr. Schofield returned to his
project manager position. (Defs.' S.M.F. ¶¶ 25-26.)
Ms. Tinsley and Mr. Pidich agreed to cover for Mr.
Schofield if he needed to leave work temporarily due
to his illness. (*Id.* ¶ 28.) During April and May, Mr.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2660704 (M.D.Pa.)

**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

Page 2

Schofield occasionally missed work due to his illness. (*Id.* ¶ ¶  31-37.) Mr. Pidich continued to consider Mr. Schofield one of the best managers at the facility. (*Id.* ¶  38 .)

Mr. Schofield and Ms. Tinsley had a friendly relationship. (*Id.* ¶  39.) Mr. Schofield, however, felt that Ms. Tinsley became temperamental after she was promoted to a project manager position in 2001. (*Id.* ¶  40.) According to Mr. Schofield, she subsequently became upset over trivial matters and often snapped at him, only to later apologize. (*Id.* ¶   43; Pl.'s C.S.M.F. ¶ ¶  40, 43.)

During a conversation between Mr. Schofield and Ms. Tinsley on April 15, 2002, Mr. Schofield noted that he had seen her smoking cigarettes at a colleague's wedding. (Defs.' S.M.F. ¶   41.) Ms. Tinsley became upset and told Mr. Schofield to "mind his own business." (*Id.* ¶  42.)

On April 26, 2002, Ms. Tinsley sent an email to Mr. Schofield stating that she "did not mean to snap" at him and may have been "a little harsh" with him. (Ms. Tinsley's April 26, 2002 email, Saloman Cert. Ex. 13 (Dkt. Entry 57-5).) Mr. Schofield wrote a lengthy response to Ms. Tinsley's email in which he attempted to explain how her reaction made him feel and why he mentioned her smoking. (Mr. Schofield's April 26, 2002 email, Defs.' Br. Ex. 13 (Dkt. Entry 57-5).) In the email, he stated that he had "a very strong attachment and affection" for Ms. Tinsley and that she came "second only to [his] wife." (*Id.*)

During a conversation on April 29, 2002, Ms. Tinsley informed Mr. Schofield that she did not want to be treated differently based on his personal affection for her. (Defs.' S.M.F. ¶  49.) Mr. Schofield continued to send Ms. Tinsley emails unrelated to work. (*Id.* ¶ ¶  51, 54.)

On May 2, 2002, Mr. Schofield sent Ms. Tinsley another email titled, "All or nothing." (Mr. Schofield's April 26, 2002 email, Defs.' Br. Ex. 17 (Dkt. Entry 57-6).) It began with the following prefatory statements in bold print:

> Don't read this if you are involved in something important. Wait till you have some free time to deal with it.

(*Id.*) Mr. Schofield expressed confusion as to why she had declined his offers to come with her husband to his house for a social visit. (*Id.*) He also expressed gratitude for her "help, patience and consideration" with his illness, but cautioned that his recovery was not complete and cryptically stated that "Option 'B' is

still a serious consideration."  [FN2] (*Id.*) Mr. Schofield further wrote:

> FN2. According to Mr. Schofield and his wife, "Option 'B' " meant he would take time off from MetLife or retire. (Defs.' S.M.F. ¶ ¶  57-58.) Ms. Tinsley and Mr. Pidich, however, believed "Option 'B' " meant Mr. Schofield might attempt suicide again. (*Id.* ¶  59.)

> I have been very open about how I have come to regard you. I would like to know how you see me. Sorry to put this on you but I'm sure you can understand I can't stand not knowing the whole picture and being able to make sense out of it. That usually gets me in trouble but that's the way it is.
> **\*3** (*Id.*)

After reading Mr. Schofield's email, Ms. Tinsley became upset and left work. (Defs.' S.M.F. ¶  62.) She feared that Mr. Schofield was a threat to her safety. (*Id.*) She contacted MetLife's Human Resources Generalist, Rose Johnston, and complained about Mr. Schofield's actions. (*Id.* ¶ ¶  64-66.) Mr. Pidich also reported Ms. Tinsley's concerns to Human Resources and Mark Davis, a MetLife Vice President, (*Id.* ¶  67.) Ms. Johnston accepted Ms. Tinsley's complaint of harassment and hostile work environment, and undertook to investigate the complaint. (*Id.* ¶  68.)

Mr. Schofield inquired of Mr. Pidich about Ms. Tinsley's absence from work on Friday, May 3rd. (*Id.* ¶  70.) When Mr. Schofield pressed Mr. Pidich as to whether Ms. Tinsley was ill, Mr. Pidich told him to "just let it go...." (*Id.* ¶  71.) Mr. Schofield, rather than accepting this advice, sent Ms. Tinsley an email to her home. (Defs.' Br. Ex. 19 (Dkt. Entry 57-6).) He sent her another email on May 6, 2002, entitled "Please read this!" (Defs.' Br. Ex. 20 (Dkt. Entry 57-6).) In this email, Mr. Schofield said:

> If you want *I'll resign so you don't have to work with me anymore.* No matter what, you don't deserve to be upset because of me. Talk to me, please!
> (*Id.* (emphasis added).)

On May 7, 2002, Ms. Johnston met with Mr. Schofield and Mark Davis to discuss the complaint. (Defs.' S.M.F. ¶  77.) Mr. Schofield admits that Ms. Johnston made clear that the discussion had nothing to do with the possible termination of his employment. (*Id.*) Mr. Schofield, however, interrupted the meeting shortly after it was

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2660704 (M.D.Pa.)
**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

Page 3

commenced, saying "Let me save you some time. I cannot deal with this right now. I'm out of here." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 200.) He put his security pass down on the table in the conference room and went home. (*Id.* at 200-01.) Mr. Davis believed that Mr. Schofield had just quit. (Davis Aff., Dkt. Entry 76-1, at ¶ 9.)

Ms. Johnston also interpreted Mr. Schofield's actions as indicating that that he had resigned. (Ms. Johnston's Dep., Defs.' Br. Ex. 12 (Dkt. Entry 57-5) at 33.) She began processing Mr. Schofield's resignation that same day. (*Id.* at 36; Letter dated May 7, 2002, Defs.' Br. Ex. 21 (Dkt. Entry 57-6).)

Mr. Schofield contacted Ms. Johnston the next day and wished to discuss the situation further. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 215.) On May 9, 2002, Mr. Schofield met with Ms. Johnston and Mr. Pidich. (Defs.' S.M.F. ¶ 88.) The three of them explored options for reinstating Mr. Schofield. (*Id.* ¶ 93.) Ms. Johnston and Mr. Pidich informed Mr. Schofield that he could be reinstated only if he limited his interaction with Ms. Tinsley, which would likely have required Mr. Schofield to be transferred to another team. (*Id.*) Mr. Schofield left the meeting without reaching an agreement for reinstatement. [FN3] (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 223-26.)

> FN3. Mr. Schofield says he left the meeting after Ms. Johnston asked him to sign a paper saying the emails he sent were inappropriate. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 223-26.) Ms. Johnston denies she made this request. (Ms. Johnston's Dep., Defs.' Br. Ex. 12 (Dkt. Entry 57-5) at 59-60.)

**\*4** Later that day, Mr. Schofield, Ms. Johnston, and Mr. Pidich had a telephone conference during which Mr. Schofield requested unconditional reinstatement until Ms. Tinsley decided whether to return to MetLife, and if she did return, that Ms. Tinsley be placed on "special assignment" while Mr. Schofield and MetLife explored a retirement package. (Defs.' S.M.F. ¶ 99.) This was the last meeting between MetLife and Mr. Schofield concerning the possibility of his reinstatement.

On February 26, 2003, Mr. Schofield filed a complaint in this Court, asserting employment discrimination (Counts I, II, and II), violation of the FMLA (Count IV), violation of ERISA (Count V),

intentional infliction of emotional distress (also labeled as Count V), and wrongful discharge (Count VI). (Compl. (Dkt. Entry 1).) This Court previously dismissed Mr. Schofield's ERISA, intentional infliction of emotional distress, and wrongful discharge claims. *Schofield v. Metropolitan Life Ins. Co.,* No. 3:CV-03-0357 (Dkt. Entry 45) (M.D.Pa. Dec. 16, 2003). Defendants have moved for summary judgment on all remaining claims. (Dkt. Entry 53.) The Motion has been fully briefed and is now ripe for decision.

## II. DISCUSSION

MetLife argues it is entitled to summary judgment on Mr. Schofield's FMLA claim because he has failed to show a violation of the Act as he was returned to his project manager position following his leave of absence. MetLife also claims that Mr. Schofield did not suffer an adverse employment decision because he voluntarily resigned and that, in any event, he has failed to demonstrate that age or disability discrimination played a role in his separation from employment.

### A. Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(C).* A fact is "material" if proof of its existence or nonexistence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).* An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to nonmoving party. *Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir.1982).* The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party may present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. *Anderson, 477 U.S. at 256-57.* Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment. *Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir.1990).* Summary judgment is to be entered "after adequate

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                   Page 4
Not Reported in F.Supp.2d, 2006 WL 2660704 (M.D.Pa.)
**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).*

**B. The FMLA Claim**

**\*5** The FMLA grants eligible employees 12 weeks of leave in a 1-year period for certain events, including a disabling health problem. *29 U.S.C. § 2612(a)(1).* Upon return from such leave, "the employer must reinstate the employee to his or her former position or an equivalent." *Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (2002)* (citing *29 U.S.C. § 2614(a)(1).*

Mr. Schofield claims that MetLife violated the FMLA by not returning him to his previous position or an equivalent position when he returned from his medical leave on April 1, 2002. (Compl. (Dkt. Entry 1) ¶ 89.) MetLife has moved for summary judgment on this claim, asserting that Mr. Schofield was returned to his previous position of project manager. (Defs.' Br. (Dkt. Entry 54) at 3- 4.) The evidence does indeed establish that Mr. Schofield was returned to his previous position upon his return from his FMLA leave. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 266-67.) [FN4]

> FN4. MetLife submitted the following deposition testimony by Mr. Schofield:
> Q: Now, when you returned from the conclusion of your FMLA leave, you were returned to the same project manager position that you held prior to you leaving in December or January, right?
> A: Yes.
> Q: And the duties and responsibilities were the same as when you left as when you returned?
> A: Yes.
> *(Id.)*

Mr. Schofield nonetheless maintains that MetLife violated the FMLA. He bases his argument on a conversation he had with Mr. Pidich in March 2002, in which Mr. Pidich told him that he "probably won't be coming back [to his] project manager position .... because of [his] illness." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 271.) Instead, Mr. Schofield would be retained as a consultant and another person would take over his project manager position. [FN5]

> FN5. It is likely that Mr. Pidich was offering Mr. Schofield the consultant position as a less stressful alternative to the project manager position to accommodate Mr. Schofield's severe anxiety.

Regardless of what was said, Mr. Schofield was returned to his project manager position following his medical leave of absence. A request, offer, or threat to change positions is not an adverse employment action to warrant recovery under the FMLA. *See Ajayi v. Aramark Business Services, Inc., 336 F.3d 520, 531 (7th Cir.2003)* ("An unfulfilled threat, which results in no material harm, is not [a] materially adverse [employment action]"). This argument, consequently, has no merit.

Mr. Schofield alternatively argues that "there was a definite plan, scheme and design to release him or assign him to another job and replace him" after he was returned to his project manager position. (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 9.) Specifically, Mr. Schofield alleges that MetLife's handling of Ms. Tinsley's harassment complaint was connected to his medical leave. Consequently, Mr. Schofield appears to be pursuing a retaliation claim under the FMLA.

An employer may not use the taking of FMLA leave as a negative factor in employment decisions. *Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir.2004).* In order to succeed on a retaliation claim under the FMLA, a plaintiff must show that (1) he took leave under the Act, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave. *Id.* MetLife argues that Mr. Schofield has failed to present sufficient evidence from which a fact-finder could determine that MetLife's handling of Ms. Tinsley's complaint was causally connected to his leave. [FN6] (Defs.' Reply Br. (Dkt. Entry 76-1) at 3- 4.)

> FN6. MetLife also challenges whether Mr. Schofield suffered an adverse employment action, arguing that he voluntarily resigned. Indeed, an employee cannot claim that he suffered an adverse employment action under the FMLA when he voluntarily resigns. *See Hammon v. DHL Airways, Inc., 165 F.3d 441, 447 (6th Cir 1999).* Because this Court finds it clear that Mr. Schofield's asserted adverse employment action was not connected to his leave, this Court will deny his claim under the FMLA without

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

determining whether he suffered a sufficiently adverse retaliatory act. It should be noted that actionable retaliatory conduct is *not* synonymous with an adverse employment action for purposes of a discrimination claim. See *Moore v. City of Philadelphia, 461 F.3d 331, 2006 WL 2492256, at \*7-8 (3d Cir.2006).*

**\*6** Mr. Schofield asserts that a causal connection was established based on the short duration of time (a little more than one month) between his return from leave and MetLife's handling of Ms. Tinsley's harassment claim, which led to his departure from MetLife. Courts are hesitant to infer a causal connection between an alleged retaliatory action and the taking of FMLA leave based on temporal proximity alone. See *Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir.2001)* ("With one exception, we have never held that timing alone can be sufficient to establish causation.") Consequently, most Courts require that the timing of the alleged retaliatory action to be "unusually suggestive of retaliatory motive before a causal link will be inferred." *Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 760 (3d Cir.2004)* (citing *Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 n. 9 (3d Cir.2003); see also Washco v. Federal Express Corp., 402 F.Supp.2d 547, 559 (E.D.Pa.2005).*

This typically requires that the alleged retaliatory action occurred within days of the protected activity. For instance, in *Jalil v. Avdel Corp.,* two days between the protected activity and the alleged retaliation was found to be sufficient to support an inference of a causal connection. *873 F.2d 701, 708 (3d Cir.1989); but see Weston, 251 F.3d at 431 n. 5* (distinguishing Jalil as being "limited to the unusually suggestive facts of the case"). In contrast, a ten day separation between the protected activity and the alleged retaliation was not sufficient to support an inference of a causal connection in *Newman v. Dollar Bank, No. Civ.A. 04-1163, 2006 WL 895089, at \*6 (W.D.Pa. March 31, 2006).*

In this case, over a month elapsed between the time Mr. Schofield returned from his medical leave and the alleged retaliatory action. In *Williams,* the Court advised that "where 'the temporal proximity is not so close as to be unduly suggestive,' ... 'timing plus other evidence may be an appropriate test.' " *380 F.3d at 760* (quoting *Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir.2003)).* Williams involved a two month separation between the alleged retaliatory

action and the protected conduct. *Id.* The *Williams* Court ultimately determined that the plaintiff did not establish a causal connection because he did not put forth any other evidence suggesting a retaliatory animus, and the defendant's alternative explanation for plaintiff's termination was "quite compelling." *Id.*

Similarly, Mr. Schofield has failed to put forth any other evidence suggesting a connection between MetLife's handling of Ms. Tinsley's harassment claim and his medical leave. In fact, MetLife was accommodating to Mr. Schofield's request for medical leave, as Mr. Pidich and Ms. Tinsley offered to cover for him if he felt he needed additional time off after he returned from his FMLA leave. (Defs.' S.M.F. ¶ 28.)

**\*7** Moreover, Mr. Schofield has presented no evidence to challenge MetLife's articulated non-retaliatory reason for investigating Ms. Tinsley's harassment complaint. There is no dispute that Mr. Schofield engaged in a series of communications that resulted in Ms. Tinsley asserting a harassment complaint. [FN7] MetLife had an obligation to investigate Ms. Tinsley's complaint against Mr. Schofield. MetLife also had a legitimate basis for requesting that Mr. Schofield limit his interaction with Ms. Tinsley during the investigation. [FN8] Other than his own conclusory allegations, Mr. Schofield has presented no evidence from which a fact-finder could conclude that MetLife's articulated reasons for its actions were tied to his FMLA leave. MetLife's motion for summary judgment, therefore, will be granted on this claim.

> FN7. Mr. Schofield does argue that Ms. Tinsley's reaction was unjustified. Regardless of whether Ms. Tinsley's reaction was appropriate or not, MetLife had a reasonable basis to investigate the complaint. See *Andy v. United Parcel Service, Inc., 111 Fed. Appx. 670 (3d Cir.2004)* (It is "the perception of the decision maker, which is 'what matters.' ").

> FN8. MetLife asked Mr. Schofield to switch teams rather than Ms. Tinsley because it was MetLife's policy that an accuser's position cannot be altered while resolving a harassment claim. (Mr. Pidich's Dep., Pl.'s Br. Opp. Ex. D (Dkt. Entry 73-2) at 57.)

**C. The Discrimination Claims**

MetLife has also moved for summary judgment on

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2660704 (M.D.Pa.)
(Cite as: 2006 WL 2660704 (M.D.Pa.))

Page 6

Mr. Schofield's claims that MetLife unlawfully terminated his employment based on his age or disability. In employment discrimination cases, the Third Circuit has applied a slightly modified version of the *McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),* burden shifting framework. *See, e.g., Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir.1999)* (analyzing an ADA claim); *Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir.1997) (en banc)* (analyzing an ADEA claim); *Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir.1995)* (analyzing an ADEA claim). Under this scheme, the plaintiff must first present sufficient evidence to establish a *prima facie* case of discrimination. A plaintiff establishes a *prima facie* case of discrimination by showing that: (1) he was a member of a protected class (i.e., was over forty years old under the ADEA or was disabled under the ADA); (2) he was qualified for the position in question; (3) he suffered an adverse employment decision, such as discharge; and (4) the adverse decision occurred under circumstances giving rise to an inference of discrimination. *See Sarullo v. U.S. Postal Service, 352 F.3d 789, 797 (3d Cir.2003); Taylor, 184 F.3d at 306; Sempier, 45 F.3d at 728.*

If the plaintiff is able to show a *prima facie* case of discrimination, "the burden of production (but not the burden of persuasion) shifts to the defendant." *Keller, 130 F.3d at 1108.* The defendant must then offer evidence that is sufficient to support a finding that it had a legitimate, non-discriminatory reason for the discharge. *Id.* If the defendant fails to do so, judgment must be entered for the plaintiff.

If the defendant offers evidence of a legitimate, non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff. To survive summary judgment, the plaintiff must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir.1994).*

**8** MetLife argues that Mr. Schofield did not suffer an adverse employment decision because he voluntarily resigned. (Defs.' Br. (Dkt. Entry 54) at 5-10 (citing, *inter alia, Acosta v. Catholic Health Initiatives, Inc., No. CIV.A. 02-1750, 2003 WL 176978, at *15 (E.D.Pa. Jan. 24, 2003)* (holding that an employee's voluntary resignation after an evaluation did not constitute an adverse employment

action).) Mr. Schofield denies that he resigned. According to him, he left the meeting because he was upset, confused, and embarrassed by Ms. Tinsley's harassment allegations and the manner in which MetLife confronted him with the allegations. He could not handle discussing the issue at that time. He asserts that he intended to come back to work when the problems got straightened out. (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 10-11.)

As MetLife observes, Plaintiff's undisclosed intention that he was not quitting his job or his belief as to how his actions should have been perceived by others attending the meeting of May 7, 2002, is not controlling. It is the perception of the employer that matters. *See Andy v. United Parcel Service, Inc., 111 Fed. Appx. 670, 671 (3d Cir.2004).* In this case, Mr. Schofield's statement--"Let me save you some time. I cannot deal with this right now. I'm out of here." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 200)--coupled with his action of turning in his identification card, certainly indicated that he had indeed resigned. Clearly, it was not unreasonable for either Ms. Johnston or Mr. Davis to have regarded Mr. Schofield's statement and action as indicating that he had quit. Both his words, "I'll save you some time.... I'm out of here," and his action, turning in his identification card, manifested an intent to resign. *See Hammon v. DHL Airways, Inc., 165 F.3d 441, 448 (6th Cir.1999)* (noting that an employee resigns when he "express[es] an intention to resign" and "take[s] some action to demonstrate that he is relinquishing his position"); *Gauden v. Borough of Roscoe, 470 A.2d 191, 193 (Pa.Commw.Ct.1984)* (same, based on Pennsylvania law). His undisclosed intention to return to employment when the matter was somehow resolved does not alter the perception of the MetLife decision maker, "which is 'what matters.'  [FN9]' " *Andy, 111 Fed. Appx. at 671.*

> FN9. Significantly, Ms. Johnston immediately began processing Mr. Schofield's resignation after the meeting, indicating that her perception was that Mr. Schofield had resigned. Moreover, it was Mr. Schofield--not MetLife--which initiated reinstatement talks, further signifying that MetLife believed Mr. Schofield had resigned.

An employee who voluntarily resigns cannot show that he or she has suffered an adverse employment decision at the hands of the employer. *See, e.g., Hammon, 165 F.3d at 448; Iadanza v. Bell Atlantic Network Services, Inc., No. CIV.A. 96-2789, 1998*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2660704 (M.D.Pa.)
**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

Page 7

*WL 122249, at \*4-5 (E.D.Pa. March 10, 1998), aff'd, 191 F.3d 445 (3d Cir.1999); Sherrod v. Philadelphia Gas Works, 209 F.Supp.2d 443, 449-50 (E.D.Pa.2002); Acosta v. Catholic Health Initiatives, Inc., No. CIV.A. 02-1750, 2003 WL 176978, at \*15 (E.D.Pa. Jan. 24, 2003).* Because Mr. Schofield has failed to present evidence sufficient to cast doubt on the assertion of the MetLife decision makers (Johnston and Davis) that they regarded his action as signifying an intention to resign, MetLife is entitled to judgment in its favor.

**\*9** MetLife did not act improperly either, when it did not accept Mr. Schofield's decision to rescind his resignation. Failure to accept a previous employee's rescission of his voluntary resignation is not an adverse employment action for the simple reason that the employment relationship has ended *See MacLean v. City of St. Petersburg, 194 F.Supp.2d 1290, 1300 (M.D.Fla.2002).* Mr. Schofield has failed to show a genuine dispute of fact material to the question of whether MetLife subjected him to an adverse employment action, and, on this ground alone, MetLife is entitled to judgment in its favor.

Even if there was a genuine dispute material to the question of whether Plaintiff had been discharged, as opposed to voluntarily quitting, he has failed to produce evidence from which a fact-finder could reasonably disbelieve MetLife's proffered reasons for its actions, or believe that an invidious discriminatory reason was more likely than not a motivating cause of MetLife's actions.

Plaintiff claims that he suffered adverse employment actions when MetLife: (1) mistakenly processed his resignation, which had the effect of terminating his employment, and (2) conditioned his reinstatement on limiting his contact with Ms. Tinsley, perhaps requiring him to transfer to another team. MetLife asserts that it had legitimate, non-discriminatory reasons for its actions. Specifically, it was attempting to respond to Ms. Tinsley's complaint against him.

MetLife has presented sufficient evidence to support its assertion. After receiving a complaint from Ms. Tinsley about Mr. Schofield's behavior, MetLife's Human Resources Generalist, Rose Johnston, initiated an investigation. (Defs.' S.M.F. ¶ 68.) Ms. Johnston met with Mr. Schofield and MetLife Vice President, Mark Davis, to discuss the complaint on May 7, 2002. (Defs.' S.M.F. ¶ 77.) Shortly after the meeting began, Mr. Schofield interrupted, "I'll save you some time. I cannot deal with this right now. I'm out of here." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex.

A (Dkt. Entry 72-3) at 200.) He put his security pass down and went home. (*Id.* at 200-01.)

Ms. Johnston thought Mr. Schofield intended to resign by his actions. (Ms. Johnston's Dep., Defs.' Br. Ex. 12 (Dkt. Entry 57-5) at 333.) She therefore initiated MetLife's resignation procedures. (*Id.* at 36; Letter dated May 7, 2002, Defs.' Br. Ex. 21 (Dkt. Entry 57-6).)

Mr. Schofield contacted Ms. Johnston the next day and wished to discuss the situation further. On May 9, 2002, Mr. Schofield met with Ms. Johnston and Mr. Pidich and explored options for reinstatement. (Defs.' S.M.F. ¶ 88.) Ms. Johnston and Mr. Pidich felt it would be necessary to limit Mr. Schofield's interaction with Ms. Tinsley given her ongoing complaint. An agreement could not be reached for reinstating Mr. Schofield.

Mr. Schofield fails to present any evidence that casts serious doubt on MetLife's proffered reasons for its actions. He attempts to undermine MetLife's rationale by arguing that Ms. Tinsley's reaction was unreasonable. (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 15-16.) But regardless of whether Ms. Tinsley had a reasonable basis for her complaint or not, MetLife had an obligation to investigate the claims. [FN10] Indeed, MetLife had a basis for taking the complaint seriously, as Ms. Tinsley was missing work out of fear of Mr. Schofield. (Ms. Johnston's Dep., Defs.' Br. Ex. 13 (Dkt. Entry 57-5) at 18-27; Ms. Tinsley's Dep., Defs.' Br. Ex. 15 (Dkt. Entry 57-6) at 41-50).) Mr. Schofield has not presented sufficient evidence from which a fact-finder could reasonably infer that MetLife's proffered reasons "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir.1994)* (setting forth the evidentiary standard for a plaintiff to survive summary judgment).

FN10. Even if MetLife's decision to investigate Ms. Tinsley's complaint was mistaken, it does not demonstrate that MetLife discriminated against Mr. Schofield. *See Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir.1994)* ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

**\*10** Support for this conclusion is found in *Andy v. United Parcel Service,* where the plaintiff also attempted to attack the validity of the defendant's proffered legitimate, non-discriminatory reason for terminating him--namely, the plaintiff engaged in an inappropriate relationship at work. *2003 WL 22697194.* The Court cautioned that "the issue of whether or not Defendants held a mistaken belief regarding Plaintiff's relationship with Alison plays no role in the decision of this Court." *Id. at \*9* (citing *Fuentes, 32 F.3d at 765).* Instead, the Court focused on whether the perceptions of the defendant's managers indicated a discriminatory animus. *Id.* The plaintiff, though, failed to cast "doubt on his supervisors' contention that they acted only pursuant to the perceived existence of an inappropriate relationship ." *Id.* Consequently, the Court concluded that the defendant had a legitimate reason to be concerned about the relationship and granted summary judgment in its favor. *Id. at \*13-14.*

An identical conclusion is compelled here. Regardless of Mr. Schofield's undisclosed intentions with respect to his communications with Ms. Tinsley, she certainly had grounds to complain to MetLife and it had a legitimate basis for addressing her complaint. Moreover, the fact that it suggested conditions for his reinstatement by limiting his access to Ms. Tinsley belies any assertion that age or disability bias animated some convoluted scheme to remove Mr. Schofield from MetLife's payroll.

Significantly, Plaintiff has not pointed to any evidence of a similarly situated younger or non-disabled person who was treated more favorably. The mere fact that his employment relationship ended and he is in a protected class is not sufficient to raise an inference of discrimination where, as here, the employment relationship was terminated as an incident to an inquiry concerning emails that seriously disturbed a co-worker, and Plaintiff can point to no evidence that some other person who had engaged in similar behavior was Plaintiff was treated more favorably. *Id.* at \*12.

Mr. Schofield nonetheless argues that age or disability discrimination was more likely than not a motivating factor in MetLife's actions due to remarks he attributes to MetLife employees. In support of his age discrimination argument, Mr. Schofield states that Mr. Pidich told him that MetLife "was targeting employees over 50 for termination like other large corporations." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 261-64; Pl.'s Br. Opp.

(Dkt. Entry 71-1) at 12.) Mr. Schofield also asserts his own perception that MetLife was disproportionately terminating employees over fifty. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 262-64.) Mr. Pidich, who no longer works for MetLife, did not "remember specifically saying" that MetLife was targeting employees over fifty, though he did not believe the evidence pointed to such a conclusion. (Mr. Pidich's Dep., Defs.' Br. Ex. 5 (Dkt. Entry 57-4) at 69.) Mr. Schofield did not point to any other relevant evidence of age discrimination in his brief. [FN11]

> FN11. Mr. Schofield also cited an affidavit of a MetLife employee from a different state for the conclusion that MetLife "had a program to reduce ratings of older employees to justify their termination." (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 13.) Mr. Schofield fails to show how these conclusory allegations of a scheme to reduce the ratings of older employees in New Jersey are relevant to his case. Mr. Schofield was not terminated for a low rating, he was investigated for harassing a co-worker. This other employee's affidavit fails to show that age was a motivating factor in the decision to investigate Ms. Tinsley's complaint against Mr. Schofield.

**\*11** This is insufficient evidence to support a finding of age discrimination. "Stray remarks by non-decision makers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir.1992); see also Bullock v. Children's Hosp. of Philadelphia, 71 F.Supp.2d 482, 486 (E.D.Pa.1999)* ("As a general matter, comments, even by a decision-maker, will not constitute direct evidence of discrimination, unless they are related to the decisional process itself.") Mr. Pidich's statement is not connected to Mr. Schofield's abrupt departure from the MetLife office.

While Mr. Pidich was involved in the discussions to reinstate Mr. Schofield, Mr. Pidich's alleged statement fails to establish that age was a motivating factor in the discussion. Significantly, Mr. Schofield's statement does not even indicate that Mr. Pidich had a bias against older workers. Instead, the statement appears to be complaining about such conduct. Indeed, Mr. Pidich was over fifty (50) years of age at the time.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2660704 (M.D.Pa.)
**(Cite as: 2006 WL 2660704 (M.D.Pa.))**

Page 9

Mr. Pidich and Ms. Johnston required that Mr. Schofield limit his contact with Ms. Tinsley to conform to MetLife's policy to separate employees involved in a harassment complaint. (Mr. Pidich's Dep., Pl .'s Br. Opp. Ex. D (Dkt. Entry 73- 2) at 57; Johnston Aff. (Dkt. Entry 56) ¶ 2.) Mr. Schofield fails to present sufficient evidence from which a fact-finder could conclude that age was more likely than not a motivating factor behind MetLife's actions. Consequently, summary judgment is appropriate against Mr. Schofield for his age discrimination claim.

Similarly, Mr. Schofield attempts to support his disability discrimination argument by pointing to an alleged statement by Mr. Pidich that everything was Mr. Schofield's fault "because [he] was sick." (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 283-84, Pl.'s Br. Opp. (Dkt. Entry 71-1) at 13-14.) Again, Mr. Pidich was not involved in the decision to process Mr. Schofield's resignation, so this statement does not constitute evidence of disability discrimination in that decision.

Moreover, the evidence actually indicates that Mr. Pidich was supportive of Mr. Schofield's disability. Mr. Pidich offered to cover for Mr. Schofield if he needed time off after coming back from his medical leave. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-2) at 195.) He also continuously praised Mr. Schofield's work product.

Mr. Schofield again fails to present sufficient evidence from which a fact-finder could conclude that discrimination played a role in MetLife's actions. Rather, the evidence supports MetLife's articulated reasons for its actions--it was simply investigating Ms. Tinsley's complaint against Mr. Schofield. Consequently, Mr. Schofield's discrimination claims will be dismissed. [FN12]

> FN12. Mr. Schofield also asserted a claim for disability discrimination under the PHRA. The analytical framework of an action under the PHRA is essentially identical to that of a claim under the ADA. See *Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir.2002); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir.1996).* Accordingly, the analysis of Mr. Schofield's ADA claim is equally applicable to his claim of disability discrimination under the PHRA.

## III. CONCLUSION

*12 For the reasons set forth above, Defendant's motion for summary judgment (Dkt. Entry 53) will be granted. An appropriate Order follows.

### ORDER

**NOW, THIS 15th DAY OF SEPTEMBER, 2006,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendants' motion for summary judgment (Dkt. Entry 53) is **GRANTED.**

2. The Clerk of Court is directed to enter judgment in favor of the remaining Defendants, and to mark this matter **CLOSED.**

Not Reported in F.Supp.2d, 2006 WL 2660704 (M.D.Pa.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

C

United States District Court,
D. Delaware.
Gordon W. TESTERMAN, Plaintiff,
v.
CHRYSLER CORPORATION, a Delaware
corporation, Defendant.
**No. CIV.A. 95-240 MMS.**

Dec. 30, 1997.

David A. Boswell, Esq., of Schmittinger &
Rodriguez, P.A., Wilmington, Delaware; attorneys
for plaintiff.

Laurence V. Cronin, Esq., of Smith, Katzenstein &
Furlow, Wilmington, Delaware; Of Counsel: John
D. Dunbar, Esq., and Kelly S. May, Esq., of Daniels
& Kaplan, P.C., Kansas City, Missouri; attorneys for
defendant.

OPINION

SCHWARTZ, Senior District J.

INTRODUCTION

**\*1** On April 18, 1995, Gordon Testerman filed a
complaint against his former employer, Chrysler
Corp., alleging violation of the Americans with
Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA),
and the Delaware Handicapped Persons Employment
Protections Act (DHPEPA), Del. Stat. Ann. tit. 19, §
720 et. seq. (1995), breach of a collective bargaining
agreement, and intentional infliction of emotional
distress, all arising out of his termination from
Chrysler. On March 28, 1997, Testerman filed a
motion for summary judgment on his ADA claim and
Chrysler filed a motion for summary judgment on all
four of Testerman's claims. Testerman's answering
brief conceded his inability to pursue either the
breach of the collective bargaining agreement claim
or the intentional infliction of emotional distress
claim. Consequently, Chrysler's motion for
summary judgment on these two claims will be
granted without discussion. Cross motions on the
ADA claim and Chrysler's motion on the DHPEPA
claim remain. This Court has jurisdiction pursuant to
28 U.S.C. § 1331, federal question jurisdiction. For
the reasons stated below, both defendant's and
plaintiff's motions for summary judgment will be
granted in part and denied in part.

STATEMENT OF FACTS

Testerman began working for Chrysler at the
Newark, Delaware, assembly plant in 1971. Since
the inception of Testerman's employment with
Chrysler, he has suffered from a back sprain, for
which Chrysler assigned him PQX (physically
qualified with restrictions) codes. These codes
indicated that Testerman should not be assigned
duties which required lifting or carrying over twenty
pounds or demanded more than intermittent twisting,
stooping, or squatting. [FN1] In addition to his back
problems, Testerman has battled with alcoholism
since before his employment with Chrysler.
Although the parties dispute the degree of
Testerman's drinking problem, he received in-patient
alcohol treatment in the mid-1970's, the mid-1980's,
and 1992, and received probation and/or jail time for
several Driving While Intoxicated ("DWI"),
including one in 1987 and one in 1992. Chrysler had
a record of the 1985 and 1992 in-patient treatments;
however, it is not clear which supervisors knew about
his alcoholism.

In the late 1980s, Testerman's physical and mental
health began to deteriorate. In 1987, Testerman
claims he began to experience bouts of depression,
for which he received therapy several times,
including during the years 1988, 1989, 1991 and
1992. He was diagnosed with depression in 1992
and was prescribed related medications. Chrysler
was aware that Testerman was receiving
psychological services in 1987 and at other times
supervisors showed some evidence that they were
cognizant of Testerman's negative mood and
difficulty relating to others. The parties disagree,
however, about the degree to which individual
supervisors, particularly the one who fired
Testerman, knew of the depression.

In 1988, Testerman was diagnosed with Type I
diabetes. Both Chrysler's and the Veterans
Administration's medical records show the diabetes
caused fatigue, frequency of urination, excessive
thirst, and some loss of sensation in his lower
extremities. Testerman was hospitalized for diabetes
related conditions twice in 1988. Chrysler
periodically monitored Testerman's blood sugar level
and sent him home for diabetes related problems
(e.g., high blood sugar level) on several occasions.
These medical problems caused Testerman to take
frequent breaks and to miss work on a few occasions.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                                    Page 2
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

**\*2** Despite these problems, Testerman proved able to fulfill his duties as a finesse sealer. At oral argument, defendant conceded Testerman was able to perform the "essential functions" of his job. His job consisted of applying sealer to sheet metal seams in cars as they passed down the assembly line. Some conflicts were created, however, over Testerman's increasingly frequent breaks and absences from work. There is some disagreement over the extent to which different supervisors considered Testerman's breaks and absences disruptive to the assembly line, the degree to which co-workers complained, and whether supervisors criticized and harassed Testerman about his medical problems. There is also a dispute over how much the breaks and absences were due to the diabetes and the degree to which Testerman's supervisors were informed about Testerman's reasons for them. Further, some of the co-workers complaints revolved not around Testerman's breaks but rather around his tendency to "work back" on the line and disrupt other employees. "Working back on the line" means that he would occasionally perform his duties in the adjacent worker's station in the assembly line in order to get ahead on the cars coming down the line.

During this period of deterioration, Chrysler terminated Testerman twice, in September of 1987 and February of 1989, for unexcused absences from work. After both dismissals, the union negotiated with defendant and obtained plaintiff's reinstatement based on plaintiff's consent to a "Last Chance Agreement" (LCA). Both the first and second LCAs required a few years of model behavior, including virtually no absences and no evidence of inferior work, under penalty of reprimand or discharge. In addition, the second LCA contained a random substance abuse urine test provision which Chrysler imposed on at least two occasions, once in 1989 and another time in 1991. On August 9, 1993, supervisors counseled Testerman for violation of his second LCA, specifically for violation of Conduct Rule 9 regarding inferior work and excessive scrap.

In July and August 1993, Chrysler underwent a "changeover," during which the assembly line shut down and line workers took on different jobs to assist with the transition. These jobs required sanitation work, from which Testerman was excluded because Chrysler's supervisors determined he could not participate as a result of his PQX codes. Testerman argues there were light duty jobs available to him but Chrysler was unwilling to make the effort to accommodate Testerman's needs. Testerman had

been assigned tasks during changeovers in the past when he had the same restrictions.

On August 16, 1993, Testerman filed an informal complaint regarding his exclusion from employment during the changeover period. On August 20, 1993, while Testerman was subject to the provisions of the second Last Chance Agreement, defendant terminated plaintiff, allegedly because he inadequately sealed a series of cars, thereby violating the Agreement. Although the supervisor's report supports this contention, Chrysler's subsequent written response to the union's resulting grievance said plaintiff had violated the LCA because he had been away from his work area during the time these cars went down the line and he missed the jobs. Plaintiff asserts that, as the management's second response indicates, he was not at the workstation at the time but rather at the infirmary. As a result, another employee had been filling in for Testerman and had done the inferior scrap work. Defendant claims plaintiff was not at the infirmary at the time the cars passed his station but argues that, even if he was, defendant reasonably believed at the time that Testerman had completed the inferior work. As indicated above, there is contradictory evidence, including assembly line time sheets and infirmary records, over plaintiff's responsibility for the errors and defendant's knowledge of another employee's potential role in the errors. Defendant alleges plaintiff was terminated based on a legitimate belief that plaintiff was responsible for these errors. Testerman alleges defendant knew he was not responsible and used the event to justify a termination that was actually based on his disabilities.

**\*3** The union, on Testerman's behalf, filed a grievance alleging that the discharge was "unjust." The claim was submitted to arbitration, pursuant to the Collective Bargaining Agreement (CBA) between the local union and defendant, and the arbitrator found plaintiff had been properly discharged. Plaintiff then filed a complaint with the EEOC alleging violation of the ADA and the DHPEPA. Plaintiff received a right to sue letter and filed a complaint with this court.

## STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, the Court shall grant summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine only if a reasonable jury could return a verdict for the nonmoving party. *Id.* When considering a motion for summary judgment, the Court must "view all facts and inferences in the light most favorable to the party opposing the motion." *Stephens v. Kerrigan,* 122 F.3d 171, 176-177 (3d Cir.1997).

The Supreme Court has clarified that the moving party must "bear the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After such a demonstration has been made, however, the nonmoving party must go beyond the pleadings and, based on the same types of evidence, must demonstrate "specific facts showing that there is a genuine issue for trial." Id. at 324. The nonmoving party cannot rest on his allegations without "any significant probative evidence tending to support the complaint." *Anderson,* 477 U.S. at 249 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

On cross motions for summary judgment, the same standard and burdens apply. *See Peters Township School District v. Hartford Accident and Indemnity Co.,* 833 F.2d 32, 34 (3d Cir.1987); *Appelmans v. City of Philadelphia,* 826 F.2d 214, 216 (3d Cir.1987). Further, when presented with cross motions for summary judgment, the Court must consider the motions separately. *See Williams v. Philadelphia Hous. Auth.,* 834 F.Supp. 794, 797 (E.D.Pa.1993), *aff'd mem.,* 27 F.3d 560 (3d Cir.1994).

## DISCUSSION

Chrysler contends the mandatory arbitration provision of the collective bargaining agreement (CBA) in which Testerman participates precludes Testerman from pursuing ADA and DHPEPA remedies. Alternatively, Chrysler argues Testerman is not disabled under the ADA and, therefore, has no colorable claim to assert. Testerman rejects both of these arguments, which the Court will address in turn.

I. Impact of the Collective Bargaining Agreement

**\*4** Chrysler argues Testerman had an opportunity to resolve his disability discrimination claim through the union's pursuit of an "unjust discharge" complaint on his behalf. Consequently, Chrysler contends the arbitrator's judgment is a final and binding resolution of the discrimination claim. [FN2] In the alternative, Chrysler argues that even if the unjust discharge complaint did not incorporate the discrimination claim, Testerman is required to pursue arbitration as the exclusive means of resolving this dispute. Chrysler argues the Third Circuit Court of Appeals case *Orlando v. Interstate Container Corp.,* 100 F.3d 296 (3d Cir.1996), and the Fourth Circuit Court of Appeals case *Austin v. Owens-Brockway Glass Container, Inc.,* 78 F.3d 875 (4th Cir.), *cert. denied,*-- U.S.--, 519 U.S. 980, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996), compel judgment in Chrysler's favor. The Court disagrees.

The first of the two seminal Supreme Court cases on the applicability of mandatory arbitration provisions to statutory discrimination claims is *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). In *Alexander,* a black employee brought a Title VII suit after the union arbitrated his claim pursuant to a CBA and he received an adverse judgment. *Id.* at 38-43. The employer asserted that the employee's prior submission of the claim to final arbitration [FN3] precluded the Title VII suit. *Id.* at 38.

The Court held the employee had not foreclosed his right to a trial de novo on his Title VII claim by submitting his complaint to final arbitration under the nondiscrimination clause of a collective-bargaining agreement. *Id.* at 59-60. One of the Court's primary bases for its decision was that the employee was constrained by the CBA because he could not individually compel arbitration and pursue his claim with the company. 415 U.S. at 51. The Court distinguished a union's waiver of rights relating to collective activity, such as the right to strike, from a union's waiver of individual rights. The Court explained that a union's waiver of rights relating to collective activity is acceptable because

[t]hese rights are conferred on employees collectively to foster the processes of bargaining and properly may be exercised or relinquished by the union as collective-bargaining agent to obtain economic benefits for union members. Title VII, on the other hand, ... concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                          Page 4
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. *Id.* [FN4]

The Court also relied heavily on the differences between the nature of contractual rights and statutory rights. *Id.* at 49-40. [FN5] The Court stated that the arbitrator's "source of authority is the collective-bargaining agreement, and he must interpret and apply that agreement.... He has no general authority to invoke public laws that conflict with the bargain...." *Id.* at 53. [FN6] Although the CBA in *Alexander* had a clause prohibiting the discriminatory application of the CBA, *id.* at 39, [FN7] the Court concluded the arbitrator had authority to resolve only questions of contractual rights. [FN8] This was true even though the anti-discrimination contractual rights were similar to or duplicative of the statutory anti-discrimination rights. 415 U.S. at 52-54. Further, the Court determined Congress did not intend for judicial remedies under Title VII to be prospectively waivable, *id.* at 47- 49, and the arbitration process was an inadequate forum for the resolution of such claims. *Id.* at 56-60.

**\*5** Subsequently, in *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court revisited limitations imposed by CBAs on the adjudication of statutory claims. The Court addressed whether, under the Federal Arbitration Act (FAA), an employee could be compelled to submit his Age Discrimination in Employment Act claim to mandatory arbitration pursuant to an individual agreement to arbitrate. [FN9] *Id.* at 23. The Court held that he could be so compelled. *Id.* First, the Court noted the FAA's " 'liberal federal policy favoring arbitration agreements." ' Second, the Court reasoned that "having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* at 26 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473, U.S. 614, 625 (1985)). The Court concluded the ADEA's language and legislative history did not explicitly or implicitly preclude a waiver of a judicial forum for an ADEA claim. 500 U.S. at 26-29. The Court recognized, however, that "all statutory claims may not be appropriate for arbitration." *Id.* at 26. Third, the *Gilmer* Court construed the New York Stock

Exchange (N.Y.SE) registration application language as broad enough to encompass statutory claims. *Id.* at 23, 35.

The *Gilmer* Court distinguished Alexander and its progeny [FN10] in three fundamental ways:
First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved ... whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, ... an important concern [for the Alexander Court] was the tension between collective representation and individual statutory rights, a concern not applicable here. Finally, those cases were not decided under the FAA, which reflects a liberal federal policy favoring arbitration agreements.
*Id.* at 35 (internal quotations omitted). The *Gilmer* Court also discussed that the NYSE's arbitration proceedings involved in that case addressed many of *Alexander's* concerns over the adequacy of arbitration procedures in resolving statutory claims. *Id.* at 30-33.

Based on *Alexander* and *Gilmer,* The Third Circuit Court of Appeals has recently rendered a decision that controls the instant issue--*Martin v. Dana Corp.,* No. 96-1746 (3d Cir. filed Dec. 16, 1997). [FN11] Because the Third Circuit Court of Appeals decided that Martin did not have an individual right to "grieve a matter or take it to arbitration, absent union consent," the court decided *Alexander* controlled and Martin retained the ability to pursue his Title VII claim in court. No. 96-1746, at 5. This holding is particularly noteworthy because the CBA at issue in *Martin* clearly covered statutory claims. [FN12] By placing controlling weight on the fact that a union "cannot prospectively waive an employee's rights under Title VII" as long as the employee has no independent power to arbitrate, the court implicitly concluded that this distinguishing factor between *Gilmer* and *Alexander* can trump the other critical factor--the language of the CBA regarding contractual versus statutory claims. *See Gilmer,* 500 U.S. at 35.

**\*6** Turning to the Agreement between Testerman

Not Reported in F.Supp.                                                                                        Page 5
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

and Chrysler, the three factors that distinguish *Alexander* from *Gilmer* will be considered. First, the defendant has not invoked the FAA in its argument. [FN13] Second, both parties agree the collective bargaining agreement does not provide Testerman with an individual right to compel arbitration but rather mandates reliance on the union for such action. This second factor alone, according to *Martin,* compels judgment in Testerman's favor.

However, this case proves even stronger for Testerman than that confronting the plaintiff in *Martin* because, unlike the CBA in *Martin,* the language of the CBA in the case at bar does not include the mandatory arbitration of statutory discrimination claims. Throughout the portions of the CBA provided in the record, the Agreement only refers generally to "grievances" and never speaks of statutory claims. On the contrary, various provisions demonstrate the Agreement only covers contract claims. Similar to the language in the *Alexander* CBA that was limited to contract claims, [FN14] the Chrysler CBA states that the Appeal Board "shall not have authority to add to, subtract from, or modify any of the terms of the agreement ...." D.I. 56 at 30. [FN15] Similarly, the provision pertaining to law suits states that the Union "shall have the right to assert and press against the Corporation in any judicial or adjudicatory proceeding any claim or action asserting a violation of *the Agreement." Id.* at 29-30 (emphasis added).

In addition, the Agreement includes information about a Special Arbitration Program, which deals with "a limited number of certain discharge and discipline credibility issues." *Id.* at 50. The letter pertaining to this special program explains that "grievances which involve any contract interpretation" [FN16] shall not be subject to the Special Arbitration Program but rather will be left to the standard arbitration procedures. This language strongly suggests these contract based grievances are the only claims remaining for the regular arbitration program to resolve.

Although defendant presented at oral argument language of the CBA stating the CBA will not be applied discriminatorily, [FN17] defendant's belated submission is unavailing. *Alexander* made clear such clauses will be construed as addressing only contract-based discrimination claims, regardless of how similar these claims may be to statutorily based ones. 415 U.S. at 52-54. [FN18] This finding is compelled, among other reasons articulated in *Alexander,* because the non-discrimination policy addresses how

*the Agreement* will be applied. Even without this holding in *Alexander,* however, the presented anti-discrimination clause would not alter the Court's findings. Instead, the additional sections of the CBA confirm the Court's interpretation.

Immediately after the anti-discrimination clause, the CBA states that any employee who claims, "in violation of this [anti-discrimination] principle, he has been denied rights guaranteed by *this Agreement* may complain as provided in the grievance procedure." [FN19] (emphasis added). This sentence indicates the anti-discrimination protections refer only to the remaining contractual terms of the Agreement rather than to additional statutory protections. This interpretation is supported by language at the end of the section, which states the "grievance and arbitration procedure shall be the exclusive *contractual* procedure for remedying such claims." Further, a letter contained in the CBA elaborates upon this provision and states the CBA provides the "*contractual* grievance and arbitration procedure for the resolution of alleged violations of the [anti-discrimination] principle." (emphasis added).

*7 Finally, with respect to the ADA claim, the non-discrimination clause referred to "handicapped" individuals, reflecting that it was drafted prior to the implementation of the Americans with Disabilities Act. [FN20] Consequently, neither the defendant nor the beneficiaries could have understood the protections of the ADA to be included in the CBA.

In light of the above analysis, it is apparent this case falls, like *Martin,* under the *Alexander* line of cases, not those adhering to *Gilmer.* The defendant has not articulated any significant difference between the situation presented to the Supreme Court in *Alexander* and the case at bar which would compel a different result. Although defendant argues alternatively that Testerman either has arbitrated his claim and is bound by the judgment or has not arbitrated his claim and must do so, plaintiff's right to bring the instant suit remains whether or not the discrimination claim has actually been submitted to arbitration. *Alexander,* 415 U.S. at 52; *Martin,* No. 96-1746 at 3, 8; *Bristentine v. Stone & Webster Engineering Corp.,* 117 F.3d 519, 524 (11th Cir.1997); *Varner v. National Super Markets, Inc.,* 94 F.3d 1209, 1213 (8th Cir.1996); *Nieves,* 961 F.Supp. at 792. Testerman has exhausted his contractual claims under the collective bargaining agreement entered into by his union and Chrysler. He has retained an independent right to pursue his

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
(Cite as: 1997 WL 820934 (D.Del.))

statutory claims.    The defendant's motion for summary judgment on the grounds that plaintiff's ADA and DHPEPA claims are precluded by the collective bargaining agreement is denied.

II. ADA Claims

The ADA prohibits discrimination against a "qualified individual with a disability." 42 U.S.C. § 12112(a).    A disability is: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;    (B) a record of such an impairment;    or (C) being regarded as having such an impairment.    Id. § 12102(2). "Physical or mental impairment" means "[a]ny physiological disorder, or condition ... affecting one or more of the following body systems: neurological, musculoskeletal, ... hemic and lymphatic, ...and endocrine;    or ... [a]ny mental or psychological disorder, such as ... emotional or mental illness ...." 29 C.F.R. § 1630.2(h).

A. An Impairment that Substantially Limits One or More Major Life Activities

At oral argument, Chrysler conceded that Testerman's back injury, alcoholism, and diabetes were impairments from which Testerman suffered. However, although Chrysler does not dispute depression is a mental illness qualifying as a mental impairment, it denies Testerman suffered from depression.    In addition, Chrysler argues none of these conditions substantially limited a major life activity.

Testerman engaged in ongoing treatment for depression from 1988 through 1992, including therapy and medication, and was evaluated as having depression in 1992, which was determined to be long-standing.    In 1995, Testerman was again diagnosed with moderate to severe depression. While this latter diagnosis cannot establish as a matter of law that Testerman suffered from depression immediately prior to termination, it more than suffices to raise a genuine factual dispute about whether the depression he suffered from in 1992 had been successfully treated in the late summer of 1993. Therefore, for purposes of the present summary judgment motion, the Court will analyze Testerman's claim of depression as though he suffered from the impairment at the time of his termination. Consequently, regarding Testerman's status as a "disabled" individual under the ADA, only the dispute over the existence of a substantial limitation on a major life activity remains.

*8 "Major life activities" are defined in the EEOC regulations and include    "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).    The EEOC also has issued Interpretive Guidelines to the ADA, which state "other major life activities include, but are not limited to, sitting, standing, lifting and reaching." 29 C.F.R. Pt. 1630, App. § 1630.2(i).

As outlined above, not all impairments are disabilities under the ADA;    only those that "substantially" limit major life activities are covered. The EEOC regulations indicate "substantially limits" means either the individual is unable to perform a major life activity, or, the individual is "[s]ignificantly restricted as to the condition, manner or duration" under which he can perform the major life activity, when compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1). The regulations indicate certain factors are to be considered in connection with the "substantially limited" inquiry: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment;    and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Id. § 1630.2(j)(2).

Defendants argue the substantiality of the limitation caused by a disability should be assessed giving consideration to the impact of mitigating measures, such as auxiliary aids and medications.    Contrary to this position, the EEOC interpretive guidelines state that "[t]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices." 29 C.F.R. Pt.1630, App. § 1630.2(j).    See also id. § 1630.2(h). [FN21]    Of course, although the guidelines do offer "a body of experience and informed judgment to which courts and litigants may properly resort for guidance," Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), they "do not have the force and effect of law and are not accorded that weight in the adjudicatory process." Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995).

The Third Circuit Court of Appeals has not made a pronouncement on the issue of mitigating measures and the circuit courts that have ruled on it are split, although a bare majority have ruled consistent with

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                   Page 7
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

the guidelines. *See, e.g., Doane v. City of Omaha,
115 F.3d 624, 627-628 (8th Cir.1997)* (relying,
without discussion, on the EEOC guidelines and the
other circuits holding consistent with them); *Harris
v. H & W Contracting Co.,* 102 F.3d 516, 520- 521
(11th Cir.1996) (adopting the EEOC guidelines
because they are consistent with the language and
legislative history of the statute); *Holihan v. Lucky
Stores,* 87 F.3d 362, 366 (1966) (applying the EEOC
guidelines without discussion); and *Roth v. Lutheran
General Hospital,* 57 F.3d 1446, 1454 (7th Cir.1995)
(applying EEOC guidelines without discussion). *But
see Sutton v. United Air Lines, Inc.,* 130 F.3d 893,
1997 WL 732520, *5-8 (10th Cir.1997) (adopting the
EEOC guidelines when determining the existence of
an impairment but rejecting the EEOC guidelines
when deciding if the impairment is substantially
limiting because they are inconsistent with the
language of the statute and other portions of the
guidelines); *Gilday v. Mecosta County,* 124 F.3d
760, 767-768 (6th Cir.1997) (rejecting the EEOC
guidelines in a 2-1 decision because they conflict
with the plain language of the statute); *Ellison v.
Softward Spectrum,* 85 F.3d 187, 191 n. 3 (5th
Cir.1996) (declining to address the issue but
discussing the guidelines with disapproval).

*9 The statutory language which partially fuels the
division among the circuits provides that a disability
is "a physical or mental impairment that substantially
limits one or more of the major life activities of [an]
individual." 42 U.S.C. § 12102(2)(A). Because the
language is silent as to mitigating measures, it is
unsurprising the circuits are divided on whether the
EEOC interpretative guidelines on mitigation are
consistent with the statute, *Harris,* 102 F.3d at 521,
and *Doane,* 115 F.3d at 627-628, or in conflict with
the statute, *Sutton,* 130 F.3d 893, 1997 WL 732520 at
*6-8, and *Gilday,* 124 F.3d at 766-768. However,
this Court believes the mitigation guidelines
effectively eliminate the requirement that an
individual be "substantially limit[ed]" in a major life
activity in order to qualify as "disabled" under the
ADA.

If one is able voluntarily to use a mitigating measure
which cures a weakness, for example, if eyeglasses
correct vision to 20-20, can it be said that person is
truly disabled within the meaning of the ADA? I
think not. The simple fact is that an individual with
corrected vision does not suffer from an impairment
which substantially limits a major life activity.
*Accord, Sutton,* 1997 WL 732520 at *8; *but see
Wilson v. Pennsylvania State Police Dept.,* 964
F.Supp. 898, 907-909 (E.D.Pa.1997). Similarly, a

person with defective hearing may, with the
assistance of a hearing aid, have hearing ability
commensurate with that of the general population. It
is my belief that person is not disabled within the
meaning of the ADA because he or she is not
substantially limited in the major life activity of
hearing.

As recognized by the Third Circuit Court of
Appeals, the ADA was intended to protect only those
individuals with serious disabilities. *See Kelly v.
Drexel Univ.,* 94 F.3d 102, 107 (3d Cir.1996) (stating
that "[i]mpairments that result in only mild
limitations are not disabilities" and holding that
plaintiff who walked slowly and used a handrail
when climbing stairs is not substantially limited in
the major life activity of walking). In resolving the
role of mitigating measures vis-a-vis the ADA, courts
must remain faithful to the overarching, noble
purpose stated above. *See Forrisi v. Bowen,* 794
F.2d 931, 934 (4th Cir.1986) ("It would debase th[e]
high purpose [of the disability discrimination
statutes] if the statutory protections available to those
truly handicapped could be claimed by anyone whose
disability was minor and whose relative severity of
impairment was widely shared."); *Gilday,* 124 F.3d
at 767 ("I do not believe that Congress intended the
ADA to protect as 'disabled' all individuals whose life
activities would hypothetically be substantially
limited were they to stop taking medication")
(Kennedy, J., concurring in part and dissenting in
part); H.Rep. 101-485, Pt. 2, 101 Cong., 2d Sess., 52
(May 15, 1990) ("A person with a minor, trivial
impairment ... is not impaired in a major life
activity").

*10 There are potential conceded negatives to the
above conclusions. For example, a chemical
company working with hazardous materials would
not have to provide reasonable accommodation to
people who wear glasses if the protective masks
would not fit over the glasses. Similarly, an
employer would not be required to accommodate a
hearing aid user with a special phone if the hearing
aid lacked a telecoil. While regrettable, these are
problems for Congress, not the courts.

When one moves from medical devices to mitigating
measures such as medication, exercise and nutrition,
however, the problem can become more complex.
For example, a situation may arise in which one
physical or mental impairment precludes an
individual from continuously controlling another
impairment, or in which a mitigating measure itself
creates a disabling condition. However, when a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                       Page 8
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

qualifying impairment that can ordinarily be controlled is not controlled because, for example, a mental illness precludes the person from strictly adhering to a medical regimen, the ADA provides protection. On the other hand, where the "impairment is fully controlled by mitigating measures, and such measures do not themselves substantially limit an individual's major life activity ... the ADA provides no protection." *Gilday,* 124 F.3d at 767 (Kennedy, J., concurring in part and dissenting in part).

In the final analysis "the impact of mitigating measures must be decided on a case-by-case basis. In some cases a person with a 'controlled' medical problem or condition will be completely functional and should be evaluated as such." *Id. at* 768 (Guy, J ., concurring in part and dissenting in part). If, however, a physical or mental condition or mitigating measure prevents an individual from ameliorating a qualifying impairment, the individual will not be left without relief. With this framework, the Court now turns its attention to the four allegedly disabling conditions.

1. Back Sprain

Plaintiff claims his back sprain substantially limited his major life activities of lifting, carrying, stooping, squatting, and twisting. [FN22] There is a dearth of case law on the activities of stooping, twisting, squatting and carrying, but courts have generally been hesitant to find a disability when an individual has a minimal to moderate restriction on lifting. For example, the Ninth, Fourth and Eighth Circuit Courts of Appeal have held that a 25 or more pound limit on lifting does not, as a matter of law, render a person disabled. *See Thompson v. Holy Family Hospital,* 121 F.3d 537, 539-540 (9th Cir.1997); *Williams v. Channel Master Satellite Sys., Inc.,* 101 F.3d 346 (4th Cir.1996), *cert. denied,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997); *Aucutt v. Six Flags Over Mid-America, Inc.,* 85 F.3d 1311 (8th Cir.1996). [FN23]

Other courts have been similarly resistant to finding a disability in cases they perceived as reflecting relatively common or insubstantial back injuries. *See, e.g., Halperin v. Abacus Technology Corporation,* 128 F.3d 191, 200 (4th Cir.1997) (granting summary judgment to a defendant on plaintiff's ADA claim based on a temporary 20 pound restriction on lifting); *Ray v. Glidden Co.,* 85 F.3d 227 (5th Cir.1996) (holding that an employee who could not lift 44-56 pounds continuously throughout the day but could

only do so for one to three and one-half hours in one day was not disabled); *Horth v. General Dynamics Land Systems,* 960 F.Supp. 873, 877-879 (M.D.Pa.1997) (holding that employee whose back injury prevented him from sitting or standing for more than two hours and from continually lifting objects over 20 pounds was not substantially limited in major life activities of walking, lifting, standing, sitting or working); *Kirkendall v. United Parcel Service, Inc.,* 964 F.Supp. 106, 111 (W.D.N.Y.1997) (holding inability to lift more than 30 pounds, to sit for more than three hours at a time, and to engage in certain leisure activities does not constitute a disability); *Kriskovic v. Walmart Stores, Inc.,* 948 F.Supp. 1355, 1363-1365 (E.D.Wis.1996) (inability to lift, push or pull more than 25 pounds did not demonstrate that the plaintiff was foreclosed from a class or broad range of jobs). *But see Frix v. Florida Title Industries,* 970 F.Supp. 1027, 1033-1034 (N.D.Ga.1997) (rejecting this line of cases and holding that a 25 pound lifting limitation, especially when coupled with a limitation on bending and stooping, prevents plaintiff from performing an entire class of jobs, i.e., medium and heavy labor jobs, and is a disability under the ADA); *Brown v. Lankenau Hospital,* 1997 WL 277354, *3-4 (E.D.Pa.1997) (denying defendant's motion for summary judgment and holding that plaintiff's lifting limitation, which had been upgraded from no more than 11-25 pounds to no more than 51-100 pounds could qualify as a disability). [FN24] Consistent with the majority of courts on this issue, this Court decided in *Mondzelewski v. Pathmark,* 976 F.Supp. 277, 280 (D.De.1997), that a restriction on lifting 50 pounds or more and carrying 25 pounds or more was not a substantial limitation on a major life activity.

*11 However, the line regarding back injuries is a fine one and courts have found only somewhat more severe back injuries may qualify as a disability. *See, e.g., Love v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170 (10th Cir.1996) (holding issue of fact existed as to disability of a woman with multiple sclerosis who could not lift more than 15 pounds, and should not often lift less than that, and who also faced limitations on her stooping and bending); *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092 (S.D.Ga.1995) (same, where plaintiff was limited to lifting 10-15 pounds, could only stand for 30 minutes and walk for 3 minutes); *Cheatwood v. Roanoke Industries,* 891 F.Supp. 1528 (N.D.Ala.1995) (accepting plaintiff's statement that he was limited in the major life activities of lifting, where he could not lift more than 5 pounds without pain); *Perez v. Philadelphia Housing Authority,* 677 F.Supp. 357 (E.D.Pa.1987),

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                      Page 9
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

*aff'd,* 841 F.2d 1120 (3d Cir.1988) [FN25] (holding that a woman who suffered a back injury which caused residual pain affecting her "work ... her ability to walk, sit, stand, drive, care for her home and child, and engage in leisure pastimes" was disabled).

A review of these cases reveals that the ambiguity in finding a disability in back injury cases generally begins with lifting restrictions between 15 and 25 pounds. Consistent with this Court's decision in *Whitfield v. Pathmark,* 971 F.Supp. 851 (D.De.1997), this Court believes Testerman's situation falls on the side of the "commonplace" rather than the "severe." Id. at 858. In *Whitfield,* the Court decided the plaintiff's inability to lift more than 20 pounds, to engage in repeated reaching, bending and stooping, or to stand in one place for longer than one hour in a four-hour period, could not defeat defendant's motion for summary judgment on the issue of whether the plaintiff was disabled. *Id.* Similar to Whitfield, Testerman could not lift or carry more than 20 pounds. In addition, any stooping, squatting, or twisting could only be done intermittently. These facts fail to raise a genuine factual dispute as to whether Testerman was substantially limited in the major life activities of lifting, carrying, stooping, squatting or twisting. As a result, the Court will grant summary judgment for Chrysler and will deny summary judgment for Testerman on the issue of whether Testerman's back injury constituted a disability. Because the definition of a "handicapped person" under the DHPEPA mirrors the definition of a "disabled person" under the ADA, the Court's holding applies to Chrysler's motion for summary judgment on Testerman's DHPEPA claim as well.

2. Depression

Voluminous medical records show Testerman was treated for depression during significant periods from 1988 through 1992. He received psychotherapy and utilized anti-depressant medication. In 1992, Testerman was evaluated by several doctors who reported Testerman suffered from depression. These evaluations also indicated a long-history of depression. In 1995, plaintiff was diagnosed with moderate to severe depression. Chrysler has not put forth record evidence that Testerman could have or should have engaged in any activities that would have further mitigated his depression. As a result, the Court will consider Testerman's depression as presented.

**\*12** Plaintiff's depression caused him, among other problems, extreme lethargy and poor motivation, and

affected his ability to interact with others. [FN26] Even more significant are numerous, uncontroverted records reflecting that the depression substantially hindered Testerman's ability to care for himself, specifically to monitor and control his diabetes and to adhere to his treatment for both depression and alcoholism. [FN27] A substantial limitation on Testerman's ability to care for himself brings him squarely within the definition of a disability under the ADA. [FN28]

Numerous courts have found depression constituted a disability when the plaintiff established a substantial limitation resulting from problems similar to those demonstrated by Testerman. *See, e.g.,* *Weigel v. Target Stores,* 122 F.3d 461, 462 (7th Cir.1997); *Office of the Senate Sergeant at Arms v. Office of Senate Fair Employment Practices,* 95 F.3d 1102, 1107 (Fed.Cir.1996); *Guice-Mills v. Derwinski,* 967 F.2d 794, 797 (2d Cir.1992); *Liff v. Secretary of Transportation,* 1994 WL 579912, \*3-4 (D.D.C.1994); *see also Pritchard v. Southern Company Services,* 92 F.3d 1130, 1133-1134 (11th Cir.1996) (finding genuine dispute over whether depression substantially limited ability to work); *Doe v. Region 13 Mental Health-Mental Retardation Commission,* 704 F.2d 1402, 1408 (5th Cir.), *reh'g denied,* 709 F.2d 712 (1983) (finding employee who was depressed and had been hospitalized numerous times for suicide attempts was substantially limited under the Rehabilitation Act).

As discussed earlier, the Court will deny summary judgment for both parties regarding whether Testerman suffered from the impairment of depression at the time of his termination. Although the Court concludes Testerman's depression through 1992 substantially limited a major life activity, the Court is unable to assess the severity or impact of his depression, if any, at the time of termination. As a result, summary judgment will be denied for both parties on the issue of whether Testerman suffered from a disability or a handicap based on depression at the time of his termination.

3. Diabetes

Testerman was diagnosed in early 1988 with Type I diabetes, meaning he produces no insulin of his own and requires insulin injections to survive. His condition was serious enough to require hospitalization twice that year. Chrysler monitored Testerman's blood sugar level on numerous occasions from 1988 through 1993 and sent him home several times due to a high blood sugar level or problems

Not Reported in F.Supp.                                                                                                     Page 10
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

associated with his diabetes, such as fatigue, weakness, nausea, blurred vision, numbness of his extremities and headaches. [FN29] There is evidence in the record, however, that Testerman did not consistently monitor his condition, take his insulin, or otherwise control his diabetes to the greatest degree possible.

Several courts have held that the dangers or problems related to diabetes, if established by a plaintiff, may constitute a disability. *See. e.g., Gilday v. Mecosta County,* 124 F.3d 760, 765 (6th Cir.1997) (finding a genuine dispute over whether plaintiff's fluctuating blood sugar level caused irritability and an inability to get along with others that substantially affected his ability to work); *Riel v. Electronic Data Systems Corp.* 99 F.3d 678, 680-682 (5th Cir.1996) (holding plaintiff had raised a genuine dispute over whether the fatigue resulting from his renal condition and diabetes was the cause of his inability to meet milestone deadlines at work); *Coghlan,* 851 F.Supp. at 814-815 (finding a genuine dispute as to the existence of a disability because plaintiff's diabetes affected the major life activities of eating and sleeping); *Canon v. Clark,* 883 F.Supp. 718, 721 (S.D.Fla.1995) (finding disability based on diabetes); *Sarsycki v. United Parcel Service,* 862 F.Supp. 336, 340 (W.D.Okla.1994) (same); *Davis v. Meese, Ill.* 692 F.Supp. 505, 517 (E.D.Pa.1988) (same).

*13 In light of his condition, Testerman has raised a genuine dispute as to whether he was disabled based on his diabetes at the time of his termination. However, Chrysler has raised a genuine dispute as to whether his diabetes would have been substantially limiting if it had been more diligently treated. As discussed with regard to Testerman's depression, however, Testerman may challenge any evidence Chrysler produces regarding potential mitigation with evidence that Testerman suffered from depression or another mental condition at the time of termination that precluded him from continuously mitigating the effects of the diabetes. In other words, if Testerman establishes by a preponderance of the evidence that he suffered from depression or other mental condition at the time of his termination and was thereby prevented from adhering to prescribed medical treatment for his diabetes, he may not be penalized for any related failure to mitigate the diabetes and his condition must be evaluated in the state presented.

In addition, Testerman raises a genuine dispute over whether or not he was regarded as disabled based on his diabetes. There is evidence that supervisors were aware of complaints by employees and were

independently very frustrated by and critical of Testerman's frequent breaks and occasional absences, which at least partly resulted from his renal problems associated with the diabetes. Such evidence supports a claim that Chrysler regarded Testerman as being substantially limited in his ability to work. There is also evidence, however, that the supervisors, while occasionally annoyed, did not view Testerman as substantially limited in a major life activity. Of course, with respect to how Chrysler regarded Testerman, the potential for greater mitigation is irrelevant.

Summary judgment on whether Testerman was disabled as a result of his diabetes will be denied for both parties.

4. Alcoholism

Testerman has required in-patient treatment for alcoholism at least four times in approximately the last two decades, including the year before he was terminated. He has also been convicted of or pleaded guilty to driving while intoxicated on several occasions, including the year before he was terminated. He has participated on and off in counseling and Alcoholics Anonymous meetings. Chrysler's records reflect at least some of the in-patient treatments and at least one DWI, demonstrating that it was aware of his alcoholism. This awareness is confirmed by deposition testimony of various supervisors. Further, Chrysler imposed a random substance abuse urine test on Testerman as part of his second LCA.

Despite the Court's sensitivity to the destructive ways in which alcoholism may permeate the life of an alcoholic, Testerman has failed to establish that at the time of his termination, he was substantially limited in a major life activity as a result of alcoholism. The Court has found no record evidence to determine whether he was an active alcoholic or recovering, or how, if at all, his current or past alcoholism was substantially limiting him at that time. As a result, the Court need not decide if Testerman could have further mitigated his alcoholism.

*14 Testerman has, however, established as a matter of law that he had a record of an impairment that substantially limited a major life activity. In *School Board of Nassau County, Florida v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307, reh'g denied, 481 U.S. 1024, 107 S.Ct. 1913, 95 L.Ed.2d 519 (1987), [FN30] the Supreme Court held that a woman

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                          Page 11
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

who had been hospitalized for tuberculosis twenty years before and who had relapsed three times within a few years of her termination had an impairment that substantially limited a major life activity. *Id.* at 281. The Court stated that the fact the disease had been "serious enough to require hospitalization," was "more than sufficient to establish that one or more of her major life activities were substantially limited by her impairment." Id. Although some courts have rejected an interpretation of *Arline* that requires a finding of a disability regardless of number and duration of the hospital stays and the severity of the illness, *see, e.g., Demming v. Housing and Redevelopment Authority,* 66 F.3d 950, 955 (8th Cir.1995); *Taylor v. United States Postal Service,* 946 F.2d 1214, 1217 (6th Cir.1991), courts have generally applied *Arline* to find a disability in cases with factual patterns equal to or less compelling than the evidence presented by Testerman. *See, e.g., Anderson v. University of Wisconsin,* 841 F.2d 737, 740 (7th Cir.1988); *Hunt v. St. Peter School,* 963 F.Supp. 843, 850 (W.D.Mo.1997); *Coghlan,* 851 F.Supp. at 814-815; *Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596, 603 (D.Me.1994); *Desper v. Montgomery Co.,* 727 F.Supp. 959, 963 (E.D.Pa.1990). *See also Despears v. Milwaukee Co.,* 63 F.3d 635, (7th Cir.1995) (holding plaintiff had an impairment that substantially limited a major life activity based on undisputed alcoholism that led to four DWIs).

Even without his record, Testerman would have raised a genuine dispute as to whether he was regarded as having a disability. Chrysler had knowledge of at least some of the in-patient treatments and DWIs. Although a defendant's knowledge of an impairment does not automatically demonstrate the defendant thought the impairment substantially limited a major life activity, *Kelly,* 94 F.3d at 109; *Aucutt,* 85 F.3d at 1319; *Howell,* 959 F.Supp. at 269, this knowledge led Chrysler to impose a substance abuse screening requirement on Testerman in his second LCA. *See Miners v. Cargill Communications,* 113 F.3d 820, 820-823 (8th cir.1997) (on suspicion that plaintiff was an alcoholic, defendant required plaintiff to participate in substance abuse counseling, under penalty of being fired). Such a provision was obviously in recognition of Testerman's alcoholism rather than standard LCA language, as it was missing from his first LCA and Testerman was actually subject to random testing on at least two occasions.

The Court will grant summary judgment for Testerman and deny summary judgment for Chrysler

on the issue of whether Testerman was disabled by reason of his alcoholism. However, summary judgment is granted to Testerman based only on his known record of alcoholism.

B. Fired "because of" his disability

**\*15** Because the Court has concluded Testerman has established or raised a genuine dispute as to whether he was disabled, depending on the disability, and Chrysler has necessarily conceded that plaintiff was qualified, [FN31] the Court must ascertain whether there is a genuine factual dispute over whether Chrysler terminated Testerman because of his disabilities. For the reasons below, the Court concludes that there is.

Stated simply, a reasonable juror could view the occurrences of August 20, 1993 in one of two ways. First, a jury could focus on the fact that Testerman had a history of reprimands for various conduct violations and decide Chrysler had been more than accommodating. Chrysler had given him time off to deal with his alcoholism and related criminal problems, had respected his back restrictions, and had reinstated him twice without any mandate to do so. In addition, although the evidence is conflicting around whether Testerman was always permitted to take breaks and seek medical assistance in response to his diabetically related problems, it is undisputed Chrysler generally responded to these needs, even if the response had occasionally been coupled with criticism or harassment. Finally, in this version of the story, Chrysler's belief that Testerman was on the assembly line at the critical time was genuine and reasonable, even if erroneous. Given his history of violations and the clear language of the last chance agreement, Chrysler's reason for terminating Testerman was legitimate and fair.

Alternatively, a reasonable juror could find ample evidence that Chrysler was tired of dealing with Testerman's health problems. For example, there is record evidence that supervisors were extremely frustrated and annoyed by Testerman's frequent breaks and absences resulting from his diabetes. Co-workers had complained about the breaks and the assembly line was affected. Moreover, after factoring in Chrysler's concern over the alcoholism that had to be monitored, Testerman was believed to be burdensome at best. Then, on August 20, 1993, some cars were sealed poorly. Although supervisors either knew or should have known that Testerman was away from the assembly line at the time, Chrysler saw this as an opportunity to rid itself of

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                    Page 12
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

him.    Given the evidence showing Chrysler's frustration with Testerman's limitations and the contradictory evidence about whether Chrysler actually knew that Testerman was absent from the assembly line at the time the cars were inadequately sealed, a jury could find in favor of Testerman.

Testerman has not, however, raised a genuine factual dispute over whether he was fired because of his depression.  While the existence and severity of his depression or other mental condition, if any, at the time of his termination is still relevant to determining issues surrounding his diabetes, there is insufficient evidence that the depression directly contributed to or caused the termination.    The only evidence Testerman has presented that Chrysler had any awareness of his mental health problems is one entry in Chrysler's medical records in September 1987 that Testerman was receiving psychological services at the Veteran's Administration and deposition testimony by one supervisor who stated:

**\*16** [Testerman] always had a hungry look in his eye.  He did not look like a happy camper.  If I were to look at him and give my opinion, I'd say that guy's depressed.
I don't remember seeing him smile.    In my association with him in a couple years, probably.

* * *

He had several problems communicating and interacting with other employees, to the point where I would call him a loaner [sic].
D.I. 60 at Ex. P, pp. 114-115, 118.

Although this quote arguably raises a genuine dispute as to whether Chrysler thought Testerman's depression substantially limited his ability to communicate and interact with others, it is unnecessary to decide whether such activities constitute a major life activity.  [FN32]    There is simply no evidence in the record that Chrysler fired Testerman because of his depression.  Unlike the words and/or actions of supervisors that demonstrated frustration, criticism, or serious concern about Testerman's diabetes and alcoholism, Testerman has not provided evidence that his termination may have been motivated by anyone's awareness that his ability to get along with others was hindered.

Nevertheless, given the fact that there still exist two reasonable, possible outcomes at trial, summary judgment will be denied for both parties as to Testerman's ADA and DHPEPA claims.

III. Plaintiff's Requests for Attorney's Fees

A.    The    Disability    Status    of    Testerman's Replacements

Although Chrysler may not have made the most diligent efforts in conveying information to Testerman about the disability status of his replacements, Chrysler explained at oral argument its difficulties in obtaining this information.    Without reason to disbelieve Chrysler's explanation, the Court will deny plaintiff's motion for attorney's fees on this issue.

B. Testerman was qualified for the position

Chrysler conceded at oral argument that Testerman was able to perform the essential functions of the sealer position with or without reasonable accommodation and failed to offer any reason for denying this point until then.  In its briefs, Chrysler's defense for its prior position was that Testerman failed to perform the essential functions of his job on the day he was fired.  As Chrysler acknowledged at oral argument, however, this is not the standard by which a plaintiff is deemed qualified or not.  Chrysler's other argument for denying Testerman's ability to perform the essential functions of his job was that, *if* Testerman was claiming he was substantially limited in his major life activity of working, the issue of whether he was qualified must be evaluated.    Testerman did not, however, in his briefs or at oral argument, rely on any limitation on his ability to work as a basis for claiming his disability status.    As a result, this Court will grant reasonable attorney's fees for the costs incurred by Testerman in briefing this limited portion of the case.

CONCLUSION
Chrysler's motion for summary judgment based on the collective bargaining agreement will be denied.  Chrysler's motion for summary judgment as to whether Testerman is a qualified individual with a disability will be denied as to his diabetes, depression and alcoholism but granted as to his back injury, on both the ADA and DHPEPA claims.    Testerman's motion for summary judgment as to his status as a qualified individual with a disability will be granted based on his alcoholism and denied based on all other impairments. Summary judgment will be denied for both parties regarding whether Testerman was terminated because of his alcoholism and/or his diabetes but granted for Chrysler with respect to Testerman's depression. Therefore, Testerman may proceed with both his ADA and DHPEPA claims

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
(Cite as: 1997 WL 820934 (D.Del.))

under the theory that he was terminated because of his diabetes and/or because of his alcoholism. As stated in the opinion, Testerman's inability to raise depression or other mental condition as a basis for the termination does not preclude him from offering evidence of the same to address his ability or inability to mitigate his diabetes. Testerman's motion for attorney's fees as to the disability status of Testerman's replacements will be denied and his motion for attorney's fees as to his ability to perform the essential functions of the job will be granted.

FN1. Chrysler has always abided by these restrictions.

FN2. For purposes of this opinion, the Court need not decide whether the arbitration agreement clearly states that the arbitrator's decision is final and binding and will assume for this opinion only that it is. It should be noted, however, that the language of the CBA is ambiguous. The CBA states: There shall be no appeal from any Appeal Board's decision. Each such decision shall be final and binding on the Union and its members, the employee or employees involved, and the Corporation. *The Union will discourage any attempt of its members, and will not encourage or cooperate with any of its members in any appeal to any Court or Labor Board from a decision of an Appeal Board* (emphasis added). D.I. 56 at 46 (emphasis added). The CBA also states: Any grievance that either (a) is not processed or (b) is disposed of in accordance with this Grievance Procedure shall be considered settled, and such settlement shall be final and binding.... *[O]nly the Union shall have the right to assert and press against the Corporation in an judicial or adjudicatory proceeding any claim or action asserting a violation of the Agreement* (emphasis added). *Id.* at 34.

FN3. Like the CBA in the case at bar, the CBA in *Alexander* specifically stated that the arbitrator's decision was to be "final and binding upon the Company, the Union, and any employee or employees involved." 415 U.S. at 42. In addition, the CBA in *Alexander* incorporated an arbitration clause addressing "differences aris[ing] between the Company and the Union as to the meaning and application of the provisions of this Agreement" and "any trouble aris[ing] in the plant." *Id.* at 40.

FN4. The Court expressed concern that in the collective bargaining context, "the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit." *Id.* at 58, n. 19. As a result, the Court stated that "[i]n no event can the submission to arbitration of a claim under the nondiscrimination clause of a collective-bargaining agreement constitute a binding waiver with respect to an employee's rights under Title VII." 415 U.S. at 52, n .15. This holding was followed by the Court in the two subsequent cases, in which the prior arbitration of claims was held not to preclude judicial review. *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984) (holding plaintiff who arbitrated termination and was allegedly discharged for just cause could pursue 1983 suit); *Barrentine v. Arkansas-Best Freight Sys. Inc.* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (holding plaintiffs could pursue Fair Labor Standards Act suit despite unsuccessful grievance process). Both cases noted the potential conflict of interest between a union and an individual member, the difference between contractual rights under a collective-bargaining agreement and individual statutory rights, and the limited authority and power of arbitrators. *McDonald,* 466 U.S. at 288-292; *Barrentine,* 450 U.S. at 737-746.

FN5. The Court explained:
In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums. 415 U.S. at 49-50.

Not Reported in F.Supp.                                                              Page 14
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

FN6. By submitting a grievance, a union employee "seeks to vindicate his contractual right[s]" under the agreement but does not assert his "independent statutory rights accorded by Congress." *Id.* at 49-50.

FN7. The anti-discrimination clause within the CBA in *Alexander* did not indicate that it covered related statutory claims. It stated: "[T]here shall be no discrimination against any employee on account of race, color, religion, sex, national origin, or ancestry." 415 U.S. at 39.

FN8. The CBA stated that "[t]he arbitrator shall not amend, take away, add to, or change any of the provision of this Agreement, and the arbitrator's decision must be based solely upon an interpretation of the provision of this Agreement." 415 U.S. at 42. *Alexander* recognized that an arbitration clause in a collective bargaining agreement, at least historically, implicates only contractual rights under that agreement. *Id.* at 49.

FN9. The agreement provided for the arbitration of "any controversy ... arising out of [the employee's] employment or termination of employment." 500 U.S. at 23.

FN10. *See supra* note 4 and accompanying text.

FN11. *Martin* was originally decided on June 12, 1997. *Martin v. Dana Corp.,* 114 F.3d 421 (3d Cir.1997). On July 1, 1997, the Third Circuit Court of Appeals vacated that opinion and granted rehearing *en banc.* *Martin v. Dana Corp.,* 114 F.3d 428 (3d Cir.1997). On September 12, 1997, the *en banc* court vacated the order granting rehearing *en banc* and referred the case back to the original panel for rehearing. *Martin v. Dana Corp.,* 124 F.3d 590 (3d Cir.1997). Prior to the *Martin* case, however, the Third Circuit Court of Appeals had held that a grievance settlement was equivalent to an arbitration decision for purposes of the *Alexander/Gilmer* issue and that a grievance settlement by a union did not preclude the employee from subsequently pursuing judicial remedies. *Bolden v. Southeastern Pennsylvania,* 953 F.2d 807, 825-826 (3d Cir.1991) *(en banc), cert. denied* 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992).

FN12. The arbitration provision covered: Any and all claims regarding equal employment opportunity provided for under this Agreement or under any federal, state or local fair employment practice law shall be exclusively addressed by an individual employee or the Union under the grievance and arbitration provisions of this Agreement. No. 96-1746 at 4.

FN13. Even if the Court were to apply the FAA, *see* *Nieves v. Individualized Shirts,* 961 F.Supp. 782, 791 (D.N.J.1997), *Martin* confirms that *Nieves* is correct in its statement that the FAA distinction between *Alexander* and *Gilmer* does not unilaterally control the outcome in these types of cases given the meaningfulness and viability of the other distinctions. *Id.*

FN14. *See supra* notes 3 and 8.

FN15. *See also* *Whitfield v. Pathmark Stores,* 971 F.Supp. 851 (D.Del.1997), in which this Court reviewed language stating that the procedure for grievances and arbitration was the "exclusive method of determining employee grievances or disputes *concerning the interpretation or application of the provision of this Agreement* ." *Id.* at 856. (emphasis added). This Court held the language applicable only to claims relating to the terms of the CBA, i.e., contract claims. *Id.*

FN16. The letter also assigns to the regular arbitration procedures grievances involving "discipline for violation of Section (5) of the Production and Maintenance Agreement or Parts Depot Agreement." D.I. 56 at 50. Although Section (5) is not part of the record, there has been no indication by the defendants that this section in any way relates to discrimination claims, let alone statutory based discrimination claims.

FN17. "It is the policy of Chrysler Corporation and the UAW that the provisions of this Agreement be applied to all employees covered by this Agreement without discrimination because of race,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                Page 15
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

color, religion, age, national origin, handicap or sex, including sexual harassment."

FN18. Other courts in this circuit have decided that similar anti-discrimination provisions do not cover statutory claims. *Glickstein v. Neshaminy School District,* 1997 WL 666961, *5 (E.D.Pa.1997); *Nieves,* 961 F.Supp. *at* 785-786; *Randolph v. Cooper Industries,* 879 F.Supp. 518, 520 (W.D.Pa.1994). Although this Court has previously suggested that a clear and appropriate anti-discrimination policy may be some evidence of an intent to cover statutory discrimination claims, *Whitfield,* 971 F.Supp. at 856, the language of the clause in the case at bar does not qualify.

FN19. These additional pages of the CBA were submitted subsequent to oral argument.

FN20. The Americans with Disabilities Act was passed on July 26, 1990 and was effective July 26, 1992. 42 U.S.C. § § 12101-12111. The CBA was published in November 1990. Prior to the passing of the ADA, most state statutes and contracts referred to "handicapped" individuals, as was true of the federal statute preceding the ADA--the Rehabilitation Act, 29 U.S.C. § § 706, 791-704. The Rehabilitation Act, however, only applied to government employers, recipients of federal financial assistance and federal contractors.

FN21. The guidelines explain that a "diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication." 29 C.F.R. Part 1630, App. § 1630.2(j).

FN22. Chrysler has not argued that Testerman could have or should have mitigated his back sprain in any way. Moreover, the record is devoid of evidence that such mitigation was available. As a result, the Court will consider Testerman's back problem as it was presented to the Court.

FN23. *See also Snow v. Ridgeview Medical Center,* 128 F.3d 1201, 1207 (8th Cir.1997)

(holding that "a general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability").

FN24. The Eastern District of Pennsylvania has stated, however, that "even a medically documented, moderate lifting restriction is not sufficient to withstand summary judgment if the employee cannot demonstrate how the lifting restriction substantially limits his or her ability to engage in the major life activity of working." *Howell v. Sam's Club,* 959 F.Supp. 260, 266 n. 10 (E.D.Pa.1997). In *Howell,* the court held that there was insufficient evidence either of the plaintiff's alleged 25 pound lifting restriction or that the alleged restriction was substantially limiting his ability to work. *Id.* at 266-267.

FN25. This case was decided under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et. seq.,* which is applicable to federal employees. However, the substantive analysis is the same as the analysis of ADA cases. *Antol,* 82 F.3d at 1299.

FN26. The EEOC Compliance Manual lists interacting with others as a major life activity. EEOC Compliance Manual (CCH) 902.3 at 902-15 (1995). However, not all courts have accepted this interpretation of the statute. *See Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 15 (1st Cir.1997) (recognizing depression as an impairment but rejecting ability to get along with others as a major life activity); but see *Gilday,* 124 F.3d at 765 (finding "ability to get along with coworkers" implicated a major life activity). Because the Court finds that Testerman's depression might have substantially limited his ability to care for himself, it need not resolve this issue.

FN27. This discussion aptly reflects that even when an individual has impairments that do not independently substantially limit him, the combination of the impairments may. Legitimately combining interactive impairments to establish a disability is acceptable according to the EEOC guidelines. 29 C.F.R. Pt. 1630, App. § 1630.2(j).

FN28. Testerman also argues that he was

Not Reported in F.Supp.                                                                                                    Page 16
Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307
**(Cite as: 1997 WL 820934 (D.Del.))**

regarded as being disabled by virtue of his depression. It appears the only evidence supporting this contention is that Chrysler had a record of Testerman receiving psychological services in 1987 and one supervisor said he thought Testerman was depressed because he was a loner and had problems communicating and getting along with others. As stated *supra,* note 26, the Court declines to decide unnecessarily whether the supervisor's views of Testerman implicate a major life activity.

FN29. At the time of his discharge, Chrysler had assigned Testerman the following PQX codes: "(i) No climbing--permits ground level or platform work and ordinary stair climbing; * * * (v) Subject to dizziness, fainting or convulsions. Not to operate moving machinery. Not to work near open pits, chemical or fire hazards. Floor level work only." D.I. 60, Ex. T. Although these limitations might be related to his diabetes, Testerman has not established on the current record that these PQX codes are a result of his diabetic condition.

FN30. Although the *Arline* decision was based on the Rehabilitation Act, the definition of a handicapped individual was the same as the definition of a disabled individual, because the ADA "borrowed wholesale the provisions of [the Rehabilitation Act's] section 504 to define what was meant by a 'disability....'" ' *Doe v. Kohn et. al,* 862 F.Supp. 1310, 1322 (E.D.Pa.1994).

FN31. A "qualified" individual is a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

FN32. *See supra* note 26.

Not Reported in F.Supp., 1997 WL 820934 (D.Del.), 11 NDLR P 307

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 1
Not Reported in F.Supp.2d, 2003 WL 21697403 (D.Del.), 26 NDLR P 163
**(Cite as: 2003 WL 21697403 (D.Del.))**

C

United States District Court,
D. Delaware.
Ana WASHINGTON, Plaintiff,
v.
STATE of Delaware/Supreme Court of Delaware,
Defendants.
**No. Civ.A.01-217-JJF.**

July 17, 2003.
Ana M. Washington, pro se.

Gregg E. Wilson, Deputy Attorney General,
Delaware Department of Justice, Wilmington,
Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.

**\*1** Pending before the Court is Defendants' Motion
for Summary Judgment (D.I.52). For the reasons
discussed below, the Court will grant the Motion
(D.I.52).

### BACKGROUND

Plaintiff Ana Washington, an African-American
female, was hired as a Senior Court Clerk by
Defendant Supreme Court of Delaware in October
1995. On December 15, 1999, Plaintiff filed a charge
of disability discrimination against her employer with
the Delaware Department of Labor and the Equal
Employment Opportunity Commission ("EEOC"),
and on January 11, 2000, Plaintiff amended her
charge to add a claim of racial discrimination.

Plaintiff's disability claim stems from an April 8,
1997, ankle injury she suffered at work. Because of
the injury, Plaintiff was out of work for several
weeks. Plaintiff returned to work on light duty for a
period of time and eventually resumed her full duties
as a senior court clerk.

Plaintiff's racial discrimination claim is based on
several incidents. First, Plaintiff received a written
reprimand for failing to properly report her absence
from work on September 16, 1999. Plaintiff contends
the reprimand was unwarranted because she followed
the call off procedure in effect at the time by leaving
a voice-mail message prior to her report time.
Plaintiff filed an internal grievance regarding the

reprimand, and the reprimand was upheld on
December 23, 1999. The reprimand had no effect on
Plaintiff's pay, benefits, or conditions of employment.

Second, Plaintiff received a written reprimand for
events that occurred on January 13 and January 14,
2000. On January 13, 2000, Plaintiff's husband
telephoned Plaintiff's supervisor, Cathy Howard, at
home between 4:00 a.m. and 5:30 a.m. to report that
Plaintiff would not be reporting to work due to
illness. On January 14, 2000, Plaintiff telephoned Ms.
Howard to obtain an attorney bar identification
number, and during the call, Plaintiff refused to
discuss the early morning call by her husband.
Plaintiff stated that she could not discuss the matter
because there were people near her desk and hung up
on her supervisor. Later that day, another court clerk
called Plaintiff to give her the bar number, and
Plaintiff refused to accept it. Plaintiff filed a
grievance over the reprimand, and the grievance
hearing officer upheld the reprimand on the grounds
that calling a supervisor at about 4 a.m. in violation
of known procedures was an act of insubordination,
that refusing to take the bar number as requested was
an act of insubordination, and that hanging up on a
supervisor was a failure to meet workplace standards
of conduct. Again, the reprimand had no effect on
Plaintiff's pay, benefits, or conditions of employment.

Third, Plaintiff contends that on one occasion the
Chief Justice of the Supreme Court of Delaware was
angry and yelled "What is this?" when he discovered
a confidential document left by the copying machine
adjacent to Plaintiff's desk. Finally, Plaintiff contends
that she was excluded from Delaware Supreme Court
functions such as barbecues, picnics, and swearing in
ceremonies, and that she is not listed by name on
memoranda, letterheads, and telephone directories.

**\*2** Plaintiff also contends that she was retaliated
against for having filed a charge of discrimination
with the EEOC. Specifically, Plaintiff contends that
her employer retaliated against her by revoking her
parking privileges. On July 30, 2001, nineteen
months after Plaintiff filed her EEOC charge, Mr.
Adam Golby told Plaintiff that she was no longer
authorized to park in the Administrative Office of the
Courts' parking lot and that she should move her car
before it was towed. Several weeks later, Plaintiff's
parking privileges were restored.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21697403 (D.Del.), 26 NDLR P 163
**(Cite as: 2003 WL 21697403 (D.Del.))**

Page 2

On April 4, 2001, Plaintiff filed the instant lawsuit, and on September 7, 2001, Plaintiff resigned from her position with the Supreme Court of Delaware.

STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of identifying for the court the portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To determine whether there is a genuine issue for trial, the court must decide whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial" and summary judgment is appropriate. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

DISCUSSION

I. Plaintiff's Disability Discrimination Claim

Defendants contend that Plaintiff's disability discrimination claim is barred by the Eleventh Amendment and that Plaintiff's temporary injury is not a disability under the Americans with Disabilities Act ("ADA").

In her Response Brief, Plaintiff admits that "it seems that the conditions was [sic] temporary and very little lingering impairment is present with regard to Plaintiff foot/ankle [sic] problem. Plaintiff had not feed [sic] that her condition qualified for a permanent disability after surgery and recovery." (D.I. 63 at 13).

Temporary impairments or conditions are not covered by the ADA because, by definition, they do not substantially limit a major life activity. Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380 (3d Cir.2002) (citing McDonald v. Pa. Dep't of Public Welfare, Polk Ctr., 62 F.3d 92, 96 (3d Cir.1995)). Based on Plaintiff's admission that her injury is temporary, the

Court concludes that Plaintiff's injury is not covered by the ADA. Accordingly, the Court will grant summary judgment as to Plaintiff's disability discrimination claim.

II. Plaintiff's Racial Discrimination Claim

*3 Plaintiff's racial discrimination claim is based on the two written reprimands she received, the Chief Justice's comment to her, and the fact that she is not listed by name on various Delaware Supreme Court documents.

Defendants contend that Plaintiff's racial discrimination claim must fail because she cannot establish a prima facie case of racial discrimination. Specifically, Defendants contend that Plaintiff cannot demonstrate that she suffered an adverse employment action.

To establish a prima facie case of race discrimination, Plaintiff must show by a preponderance of the evidence that: (1) she is a member of the protected class; (2) she suffered an adverse employment action; and (3) similarly situated members of another race were treated more favorably. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Jones v. School Dist. of Philadelphia, 198 F.3d 403, 411 (3d Cir.1999) (noting that "the elements of a prima facie case depend on the facts of the particular case" and emphasizing that the "relevant question" in a Title VII case is whether a plaintiff "suffered some form of adverse employment action sufficient to evoke the protection of Title VII"); Knott-Ellis v. Delaware Dept. of Correction, 2001 WL 935621 at *3 (D.Del. Aug. 3, 2001). In the instant case, the Court concludes that Plaintiff has not established a prima facie case. Although Plaintiff is an African-American female and thus a member of a protected class, she has not demonstrated that she suffered an adverse employment action.

The United States Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change of benefits." Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Here, Plaintiff's most serious allegation is that she received two written reprimands for not complying with workplace procedures. As a result of the reprimands and other conduct complained of by Plaintiff, she was not fired, denied a promotion, reassigned, or denied any benefits of her employment. Accordingly, the Court

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                     Page 3
Not Reported in F.Supp.2d, 2003 WL 21697403 (D.Del.), 26 NDLR P 163
**(Cite as: 2003 WL 21697403 (D.Del.))**

concludes that Plaintiff was not subjected to an adverse employment action. *Weston v. Pennsylvania,* 251 F.3d 420, 430-31 (3d Cir.2001) (holding that written reprimand that did not affect terms and conditions of employment did not rise to the level of adverse employment action). Because Plaintiff has not made a showing sufficient to establish the existence of an element essential to her case, and on which she bears the burden of proof at trial, the Court will grant summary judgment as to Plaintiff's racial discrimination claim.

III. Plaintiff's Retaliation Claim

Plaintiff contends that she was unlawfully retaliated against for filing a charge of discrimination with the EEOC in January 2000. Plaintiff contends that on July 30, 2001, nineteen months after she filed her EEOC charge, Mr. Golby told Plaintiff that she was no longer authorized to park in a parking lot (the "AOC Lot") utilized by some Delaware Supreme Court employees and that she should move her car before it was towed. As a result, Plaintiff payed to park from July 31, 2001, to September 7, 2001.

**\*4** The facts as developed during discovery established that the AOC Lot is owned by the State of Delaware and is administered by the Administrative Office of the Courts ("AOC"). Employees of the Delaware Supreme Court and other state courts park in the AOC Lot on a space available basis. Parking in the AOC Lot is a courtesy and is not part of any court employee's benefit package. (D.I. 67 at B4). Mr. Golby is an AOC statistician who is assigned the added responsibility of monitoring the use of the AOC Lot. Because the AOC Lot is five blocks from the Delaware Supreme Court, Plaintiff did not use the AOC Lot for several months while recovering from her ankle injury. During Plaintiff's absence, other employees had been given permission to park in the AOC Lot. Consequently, when Plaintiff began parking in the AOC Lot after her recovery, Mr. Golby advised her that she was no longer authorized to park in the AOC lot and that she should move her car before it was towed. Plaintiff complained to her supervisor at the Delaware Supreme Court, who contacted the AOC and arranged for the reinstatement of Plaintiff's parking privileges.

Defendants contend that summary judgment is appropriate as to Plaintiff's retaliation claim because Plaintiff did not suffer an adverse employment action and because there is no causal link between Plaintiff's EEOC complaint and the temporary revocation of Plaintiff's parking privileges.

Plaintiff must prove a prima facie case of retaliation by demonstrating: (1) that she engaged in protected activity; (2) that she suffered an adverse employment action; and (3) that there is a causal link between the protected activity and the adverse employment action. *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997).

The Court concludes that Plaintiff's evidence at this juncture establishes that she engaged in protected activity by filing her EEOC complaint. However, because there is no dispute that parking in the AOC Lot was not a benefit of Plaintiff's employment (D.I. 67 at B4), the Court concludes that Plaintiff's temporary loss of authorization to park in the AOC Lot does not rise to the level of an adverse employment action. *Ellerth,* 524 U.S. at 761. Additionally, even if the loss of parking privileges was an adverse employment action, Plaintiff has not demonstrated a causal link between the loss of parking incident and the filing of her EEOC charge. Mr. Golby was employed by the AOC, and Plaintiff was employed by the Delaware Supreme Court. The evidence in the record establishes that Mr. Golby and his AOC supervisor, Dennis B. Jones, were unaware at the time that they temporarily revoked Plaintiff's parking privileges that Plaintiff had filed an EEOC charge. (D.I. 67 at B2). Because Mr. Golby and Ms. Jones were unaware of Plaintiff's EEOC charge, the Court concludes that their actions were not causally related to Plaintiff's protected activity. Additionally, nineteen months passed between the filing of Plaintiff's EEOC charge and the alleged retaliation, and this lack of temporal proximity provides additional weight to the conclusion that there was no causal link between the two events. Accordingly, the Court will grant summary judgment as to Plaintiff's retaliation claim.

CONCLUSION
**\*5** For the reasons discussed, Defendant's Motion for Summary Judgment will be granted.

An appropriate Order will be entered.

*ORDER*
At Wilmington this 17th day of July 2003, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (D.I.52) is *GRANTED.*

Not Reported in F.Supp.2d, 2003 WL 21697403

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 21697403 (D.Del.), 26 NDLR P 163
**(Cite as: 2003 WL 21697403 (D.Del.))**

(D.Del.), 26 NDLR P 163

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 793518 (E.D.Pa.)
**(Cite as: 1997 WL 793518 (E.D.Pa.))**

Page 1

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Cheryl WATKINS, Plaintiff,
v.
The Children's Hospital of Philadelphia, Defendant.
**No. CIV. A. 97-1510.**

Dec. 3, 1997.

MEMORANDUM

KELLY, J.

*1 The Children's Hospital of Philadelphia ("Children's Hospital"), has filed a motion for Summary Judgment asserting that Cheryl Watkins ("Plaintiff") has failed to establish a prima facie case of disparate treatment in employment pursuant to 42 U.S.C. § 1981. For the reasons that follow, the Defendant's Motion is granted.

I. FACTS.

Plaintiff worked for Children's Hospital as a Senior Nurse's Aide until March 1, 1995. Senior Nurse's Aides are subordinates to Registered Nurses. Typically, patients are assigned to Registered Nurses who give instructions to the Nurse's Aide assigned to their patients. All employees of Children's Hospital, including Registered Nurses and Nurse's Aide's, must comply with standard Rules of Conduct.

Children's Hospital alleges two incidents of misconduct led to Plaintiff's termination. During her shift on February 22, 1997, Plaintiff gave fruit punch to a patient whose doctor had ordered that he be given no liquids other than water ("NPO"). [FN1] Plaintiff also disposed of this patient's stool, rather than retain it for testing, contrary to his doctor's orders. Plaintiff was terminated for these actions, which were characterized as a refusal to follow orders and a refusal to carry out assigned duties, in accordance with the Rules of Conduct.

> FN1. In medical parlance, the correct term is "nothing per os" abbreviated "NPO."

Plaintiff does not deny these incidents occurred but claims no one informed her of the patient's NPO status and claims the patient's stool was of unacceptable quality for testing. Plaintiff contends that while she was terminated for these transgressions, a white Registered Nurse would not have been. Plaintiff alleges that, in fact, she was terminated because she is black. Although the complaint is unclear, Plaintiff's claims amount to an allegation of disparate treatment in employment, in violation of 42 U.S.C. § 1981.

II. STANDARD.

Summary Judgment is proper "if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Children's Hospital, as the moving party, has the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Then, Plaintiff, as the nonmoving party, must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(c). If the court, in viewing all reasonable inferences in favor of the nonmoving party, determines that there is no genuine issue of material fact, then summary judgment is proper. Celotex, 477 U.S. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir.1987).

III. DISCUSSION.

Under the burden shifting framework of McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Plaintiff has the initial burden of establishing a prima facie case of employment discrimination. Marzano v. Computer Science Corp., 91 F.3d 497, 502-03 (3d Cir.1996) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citations omitted)). Should the Court find that Plaintiff has failed to establish her prima facie case, then Summary Judgement in favor of Defendant is proper.

*2 In support of its Motion, Children's Hospital argues that all of Plaintiff's allegations, even if viewed as true, still fail to establish a prima facie case

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 793518 (E.D.Pa.)
**(Cite as: 1997 WL 793518 (E.D.Pa.))**

Page 2

of racial discrimination.    To establish a prima facie case of disparate treatment and to survive the Motion for Summary Judgment, Plaintiff must establish that ( 1 ) she is a member of a protected class;  (2) she was qualified for her position;  (3) despite these qualifications, she was terminated from her position; and (4) she was replaced by someone in a non-protected class, or a similarly situated individual, in a non-protected class, was treated more favorably.

Plaintiff has established the first three elements of her case.    It is the fourth element that the parties dispute.    It is without question that Plaintiff was replaced by a individual in a protected class, therefore, to make out a prima facie case, she must establish that a "similarly situated" individual, in a non-protected class, was treated more favorably than she.

Plaintiff seeks to compare herself, a black Nurse's Aide, with white Registered Nurses.    Children's Hospital claims that Plaintiff has failed to establish that Registered Nurses are "similarly situated" with Nurse's Aides.    Plaintiff contends that because of the racial disparity between the two groups, there are no white Nurse's Aides comparable to Plaintiff, and the only comparison that can be drawn is between white Registered Nurses and black Nurse's Aides.

The legal issue presented is whether Registered Nurses are "similarly situated" with Nurse's Aides for purposes of § 1981 comparison.  "To be deemed 'similarly situated' the individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." ' *Dill v. Runyon*, No. 96-3584, 1997 WL 164275 at *4 (E.D.Pa. Apr.3, 1997) (citing *Anderson v. Haverford College*, 868 F.Supp. 741, 745 (E.D.Pa.1994) (citation omitted)).    The Registered Nurses with whom Plaintiff seeks to be compared do not meet the "similarly situated" standard, therefore, Summary Judgement in Defendant's favor is proper.

There are vast differences between Nurse's Aides and Registered Nurses.    Most importantly, Registered Nurses exercise independent judgment in, and retain direct legal responsibility for, the care of their patients.  (Grossman Decl. at ¶ ¶  2-3, 7.) In contrast, Nurse's Aides do not exercise independent judgment nor can they be held legally responsible for

the care of their patients. (*Id.*) Nurse's Aides assist Registered Nurses by completing the specific tasks assigned to them.  (*Id.* at ¶ ¶  2, 8.) Additionally, Registered Nurses may independently make changes in patient care, while Nurse's Aides cannot. (*Id.* at ¶ 6.) Finally, Registered Nurses are formally educated, trained, and licensed by the state, while Nurse's Aides receive no formal education, training, or licensure. (Id. at ¶ ¶  4-5.)  These "differentiating or mitigating circumstances" distinguish the conduct of Registered Nurses from the conduct of Nurse's Aides and would justify any differential treatment between the two groups.

**\*3**  Even if it is assumed that Nurse's Aides are "similarly situated" with Registered Nurses, Plantiff points to no Registered Nurses comparable with herself for purposes of § 1981 analysis.    Plaintiff was terminated for two reasons;  first, a refusal to follow orders, and second, a refusal to carry out assigned duties.    Under these circumstances, Plaintiff must compare herself to a white Registered Nurse who refused to follow orders, and refused to carry out assigned duties, but was not terminated.  Plaintiff has failed to make this showing.

Plaintiff points out six incidents of misconduct by Registered Nurses which she alleges are comparable to her own.    Plaintiff is incorrect, however, because each incident she alleges involved a single violation of the Rules of Conduct.  Plaintiff violated the Rules twice.

Under the Rules of Conduct, "subsequent violations of a related nature" require imposition of the "next higher step in the discipline pattern" (e.g., suspension up to termination).    Six Registered Nurses who violated Rules of Conduct once, are not "similarly situated" with a Nurse's Aide who violated the Rules of Conduct twice.    Thus, Plaintiff has failed to establish a prima facie case of race discrimination in employment and Summary Judgment in favor of Children's Hospital is appropriate.

An Order follows.

ORDER
AND NOW, this 3rd day of December, 1997, upon consideration of Defendant's Motion for Summary Judgment, and Plaintiff's response thereto, it is hereby ORDERED that said Motion is GRANTED.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.                                                            Page 3
Not Reported in F.Supp., 1997 WL 793518 (E.D.Pa.)
**(Cite as: 1997 WL 793518 (E.D.Pa.))**

 Not Reported in F.Supp., 1997 WL 793518
(E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

<u>Miller v. Aramark Healthcare Support Services, Inc. et al</u>
Docket No.: 06534

# Unreported Cases – Part 3

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2007 WL 575677 (M.D.Pa.), 100 Fair Empl.Prac.Cas. (BNA) 777
**(Cite as: 2007 WL 575677 (M.D.Pa.))**

United States District Court,
M.D. Pennsylvania.
Samuel CLAYTON, Jr., M.D., Plaintiff,
v.
PENNSYLVANIA DEPARTMENT OF PUBLIC
WELFARE, by and through their agent Estelle
RICHMAN, Secretary Department of Public Welfare,
at Harrisburg State Hospital
by and through their agent, Dr. Ann Shemo, Medical
Director, PA Department of
Public Welfare, Harrisburg State Hospital,
Defendants.
**No. 4:CV 05-0768.**

Feb. 20, 2007.

Robert S. Mirin, Law Offices of Robert S. Mirin,
Harrisburg, PA, for Plaintiff.

Michael L. Harvey, Office of Attorney General,
Harrisburg, PA, for Defendants.

*MEMORANDUM*

JOHN E. JONES III, United States District Judge.

## THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:

*1 Pending before the Court is Defendants',
Pennsylvania Department of Public Welfare, Estelle
Richman and Dr. Ann Shemo, Motion for Summary
Judgment ("the Motion") (doc. 36) filed on October
6, 2006.

For the following reasons, the Motion (doc. 36) will
be granted.

*PROCEDURAL HISTORY:*

Plaintiff Samuel Clayton, Jr., M.D.("Plaintiff" or
"Clayton") commenced this action by filing a
complaint (doc. 1) on April 15, 2005. Thereafter on
April 22, 2005, Plaintiff filed an amended complaint
(doc. 3), to which Defendant filed an answer (doc.
16) on July 6, 2005.

In Count I of the complaint, Plaintiff claims that he
was discriminated against on the basis of his race in
violation of 42 U.S.C. § 1981. In Count II of the
complaint, Plaintiff claims he was discriminated
against on the basis of his race as well as retaliated

against for his complaints of discriminatory treatment
in violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C. § 2001 et seq. In Count III of the
complaint, Plaintiff claims he was discriminated and
retaliated against in violation of the Pennsylvania
Human Relations Act, 43 Pa.C.S. § 951 et seq. In
Count IV of the complaint, Plaintiff claims that he
was retaliated against as a consequence of his internal
and EEOC complaints, in violation of § 1981. In the
prayer for relief, Plaintiff seeks judgment for back
pay, lost compensation, attorney fees and monetary
relief, plus costs and interest.

Following the close of discovery, the Defendants
filed the instant Motion, which was fully briefed by
the parties. The Motion is therefore ripe for our
review.

*STANDARD OF REVIEW:*

Summary judgment is appropriate if "there is no
genuine issue as to any material fact and ... the
moving party is entitled to judgment as a matter of
law." Fed. R. Civ., P. 56(c); *see also* *Turner v.
Schering-Plough Corp.,* 901 F.2d 335, 340 (3d
Cir.1990). The party moving for summary judgment
bears the burden of showing "there is no genuine
issue for trial." *Young v. Quinlan,* 960 F.2d 351,357
(3d Cir.1992). Summary judgment should not be
granted when there is a disagreement about the facts
or the proper inferences which a fact finder could
draw from them. *See* *Peterson v. Lehigh Valley Dist.
Council,* 676 F.2d 81, 84 (3d Cir.1982).

Initially, the moving party has a burden of
demonstrating the absence of a genuine issue of
material fact. *Celotex Corporation v. Catrett,* 477
U.S. 317, 323 (1986). This may be met by the
moving party pointing out to the court that there is an
absence of evidence to support an essential element
as to which the non-moving party will bear the
burden of proof at trial. *Id.* at 325.

Federal Rule of Civil Procedure 56 provides that,
where such a motion is made and properly supported,
the non-moving party must then show by affidavits,
pleadings, depositions, answers to interrogatories,
and admissions on file, that there is a genuine issue
for trial. Fed.R.Civ.P. 56(e). The United States
Supreme Court has commented that this requirement
is tantamount to the non-moving party making a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor. *Celotex Corp.,* 477 U.S. at 322-23.

**\*2** It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact." *Pastore v. Bell Tel. Co. of Pa.,* 24 F.3d 508, 511 (3d Cir.1994) (citation omitted). However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* 507 U.S. 912 (1993) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)(emphasis in original). "As to materiality, the substantive law will identify which facts are material." *Id.* at 248. A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

**FACTUAL BACKGROUND:**

This is an action brought by a former employee of the Pennsylvania Department of Public Welfare claiming that he was discriminated against because of his race and retaliated against for filing a PHRC complaint. Plaintiff is an African-American physician who was employed part-time from 1985 until his retirement on September 26, 2003 at Harrisburg State Hospital, a mental health facility operated by the Department. Defendant Pennsylvania Department of Public Welfare is an agency of the Commonwealth of Pennsylvania that was responsible for the operation of the Harrisburg State Hospital at all times relevant to the instant action. Defendant Estelle Richman is and has been the Secretary of Public Welfare since 2003. Dr. Ann Shemo was the Medical Director at Harrisburg State Hospital from March 2000 until September 2004. She supervised Plaintiff from March 2000 until he retired in September 2003. (Rec.Doc.37, ¶¶ 1-4). The hospital closed on June 30, 2006.

Plaintiff filed a charge with the Pennsylvania Human Relations Commission on February 14, 2001. In that charge, he complains that the hospital changed his work schedule. On March 6, 2001, Plaintiff filed an amended charge with the EEOC. In that charge, he complained that he did not receive certain bonuses; that he received less on-call time than other physicians; that the hospital threatened to furlough him; that the hospital placed his mailbox in an isolated place and that his work schedule had changed. (Rec.Doc.37, ¶¶ 4-6). Defendants allege that the Plaintiff never instructed the EEOC to cross-file the amended charge with the PHRC, and there is no evidence that the claims were ever cross-filed. (Rec.Doc. 37, ¶ 7).

Our recitation of the facts will now turn to a summary of various incidents relevant to our analysis which Plaintiff alleges were discriminatory.

*On-Call Time Allocation*

**\*3** Defendants allege that since at least the mid 1980's, on-call time for physicians at Harrisburg State Hospital was prorated based on the number of hours worked by the physicians. (Rec.Doc.37, ¶ 8). Plaintiff denies this allegation entirely. Plaintiff alleges that from 1985 through 1999 there was an "institutional inability to obtain voluntary 'on call' coverage from time to time. Thus initially (1985-1997) 'on call' demands were made on a 'voluntary' basis" and the parttime/full-time status had nothing to do with the process. Plaintiff further alleges that he was not "invited" to participate in the process. (Rec.Doc.53, ¶ 9).

Defendants allege that Clayton began to receive on-call hours in July 1997, but about after a month after he began on-call, his hours began to decrease. (Rec.Doc. 37, ¶¶ 9, 11-12). Defendants allege that on-call time was briefly equalized between full-time and part-time physicians from August 23, 1999 to October 1999, after which it was reduced to 50% for part time doctors. (Rec.Doc.37, ¶ 14). Dr. Davis and Dr. Nwokeji tried to accommodate Dr. Clayton's desire for more on-call time, but the physicians' union opposed the accommodation on the ground that a greater share of the on-call hours should go to the full-time physicians. (Rec.Doc.37, ¶ 15). Defendants allege that thereafter, the hospital reinstated the earlier policy of prorating on-call time based on whether the employee was full or part-time. (Rec.Doc.37, ¶ 17).

*Furlough*

In June 2000, Plaintiff was advised that he would be "bumped" out of his position by another physician as

Not Reported in F.Supp.2d                                                                                Page 3
Not Reported in F.Supp.2d, 2007 WL 575677 (M.D.Pa.), 100 Fair Empl.Prac.Cas. (BNA) 777
**(Cite as: 2007 WL 575677 (M.D.Pa.))**

a result of a furlough. At the last minute, he was advised that he would not be furloughed, and two other physicians, neither of whom were African-American, were furloughed. (Rec.Doc.37, ¶¶ 19-22).

*Mailbox Location*

On July 25, 2000, Plaintiff's mailbox was moved to an isolated area for about a month. The mailbox was moved due to a theft of mail in the Eaton Building, where his mailbox had been previously located. Plaintiff was displeased that his mailbox had not been moved to the Petry Building, where other doctors' mailboxes were located. After Plaintiff returned from an extended leave, he discovered that all of the medical doctors' mailboxes had been moved to the Administrative Building, where his new mailbox location was. (Rec.Doc.37, ¶¶ 25-28).

*Change in Work Schedule*

In the summer of 2000, the Health Care Financing Administration determined that Harrisburg State Hospital no longer met the requirements for participation as a provider in the Medicare program. In response, the hospital management decided to implement a standardized hospital-wide program schedule, effective September 18, 2000. Under the new schedule Plaintiff and other physicians were required to schedule their work between specified hours from 7:30 a.m. and 4:30 p.m. The new schedule applied to all medical and psychiatric doctors, as well as social workers and management employees, including personnel staff. (Rec.Doc.37, ¶¶ 29-35).

*Missing Desk*

*4 Early in October 2001, Plaintiff discovered that one of the desks in his office was missing. He later received a note that it had been removed to be restored and that it would not be returned to him. Plaintiff talked to Dr. Montecalvo and was able to get the desk back. Plaintiff testified that he had no evidence that the incident was racially motivated beyond his assertion that it was disrespectful. (Rec.Doc.37, ¶¶ 41-45).

*Office Location*

In the fall of 2001, Superintendent Bruce Darney decided to move all of the physicians offices into the Vista Dome Building. The building had just been air-conditioned and Darney, for management purposes,

wanted all the physicians in the same building. When the doctors were moved, Plaintiff was originally assigned to share Room 217 with Phillip Grem, another part-time doctor. An accommodation was made, however, to allow Dr. Grem to share the room with his wife, Judy Grem, who was also on the staff. Plaintiff testified that Dr. Shemo told him that he could then have Room 207, which was a larger room, but then changed her mind and told him to take a room on the third floor. Dr. Shemo testified that Room 207 had been allocated to psychiatric physicians, and she was not at liberty to give the room to Plaintiff. Ultimately, Dr. Venbrux, a full-time Asian physician, from Thailand, was assigned Room 207. Other physicians who were not African-American were also assigned to the third floor and were not given Room 207, including a white physician and two Asian physicians. (Rec.Doc.37, ¶¶ 46-52).

*Board Certification Bonus, Fiscal Year 1999-2000*

To be eligible for a specialty board certification payment, Management Directive 535.2 Amended required a doctor to be board certified by June 30 of a given year. Under the directive, a doctor must submit evidence of his certification before June 30. Plaintiff did not sit for the examination to become board certified until July 2000, and did not receive a bonus for 1999- 2000 fiscal year.

*Step Cash Payments*

On January 6, 2001, Plaintiff became eligible for a step cash payment. Plaintiff received a step cash payment in that year, however he did not receive one in January 2002 or January 2003. The record was reviewed and an inputting error made on January 29, 2002 was discovered that had prevented the payment from being made. Both payments were subsequently made on September 26, 2003. (Rec.Doc.37, ¶¶ 58-60).

*Grievances*

On February 21, 2003, Plaintiff filed a grievance with the Department. Barbara Casey, the designee of the Chief Executive Officer of the Hospital responded on March 12, 2003. Plaintiff filed another grievance on March 25, 2003. The Chief Medical Officer of the Hospital responded to the grievance on April 10, 2003. (Rec.Doc.37, ¶¶ 63-68)

**DISCUSSION:**

*I. Proper Parties*

*A. Defendants Richman and Shemo*

The Defendants argue that Defendants Richman and Shemo may not be held liable under Title VII. The Defendants further argue that Defendant Richman had no personal involvement in any alleged violation of Section 1981 or the PHRA, and therefore cannot be held liable under those statutes. In the brief in opposition to the Motion, Plaintiff concedes that Defendant Richman should be dismissed as a party to this action due to her lack of personal involvement in the claimed discriminatory action in this litigation. Accordingly, Defendant Richman shall be dismissed as a party.

**\*5** Turning to Dr. Shemo, Defendants allege that she cannot be held liable for an alleged Title VII violation. Both parties concede that in general individual employees may not be held liable for discrimination under Title VII. *See Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1077-78 (3d Cir.1996)("we are persuaded that Congress did not intend to hold individual employees liable under Title VII").

However, in his brief, Plaintiff cites a Tenth Circuit case for the proposition that an employee personally involved in discrimination could be held liable under Title VII. *See Allen v. Denver Public School Bd.,* 928 F.2d 978 (10th Cir.1991). Our reading of this case indicates that it plainly does *not* stand for the proposition which Plaintiff argues. *Allen* does not hold that individuals may be sued under Title VII, but rather that individual employees may be held liable under 42 U.S.C. § 1981.

The precedent in the Third Circuit is clear: individual employees cannot be held liable for discrimination under Title VII. *See Kachmar v. Sungard Data Systems, Inc.,* 109 F.3d 173, 184 (3d Cir.1997). Accordingly, Plaintiff's Title VII claim against Defendant Shemo shall be dismissed.

*B. Defendants Pennsylvania Department of Public Welfare and Harrisburg State Hospital*

Defendants argue that the named state entities, Pennsylvania Department of Public Welfare and Harrisburg State Hospital, should be dismissed from Plaintiff's § 1981 brought pursuant to 42 U.S.C. § 1983 and PHRA claims, based on Eleventh Amendment immunity. [FN1]

FN1. Pursuant to 71 Pa. Con. Stat. § 61, the Department of Public Welfare is a political subdivision of the Commonwealth. As previously referenced, the Department is responsible for the operation of Harrisburg State Hospital.

Pursuant to the Eleventh Amendment to the United States Constitution, the States are generally immune from suits instituted against them by citizens. *See* U.S. Const. amend. XI. However, a State can waive its immunity, *see Alden v. Maine,* 527 U.S. 706, 755 (1999), or Congress may abrogate a States' immunity, so long as it "both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." *Bd. of Trs. of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 363 (2001).

Defendants argue that Plaintiff's § 1981 claims against it should be dismissed because the Commonwealth has not waived its immunity and Congress has not abrogated Eleventh Amendment immunity for § 1981 claims. The Supreme Court has squarely held that 42 U.S.C. § 1983 does not "override States' Eleventh Amendment immunity." *Quern v. Jordan,* 440 U.S. 332, 342 (1979). Furthermore, "neither a State or nor its officials acting in their official capacities are 'persons' under § 1983" and therefore States and state officials are immune from § 1983 liability. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1988).

Precedent makes clear that Congress has not abrogated Eleventh Amendment immunity for States or state officials who are sued for alleged § 1981 violations. Accordingly, because the Department and the Harrisburg State Hospital are subdivisions of the Commonwealth of Pennsylvania, they are entitled to immunity under the Eleventh Amendment to the United States Constitution and Plaintiff's § 1981 claims against those entities will be dismissed.

**\*6** Pennsylvania courts have ruled that the PHRA waives the Commonwealth's sovereign immunity, thus allowing the Commonwealth to be sued under that statute in *state* court. *See Mansfield State College v. Kovich,* 46 Pa.Cmwlth. 339 (1979). However, pursuant to 42 Pa. Cons.Stat. § 8521(b), the Commonwealth has specifically withheld its consent to federal suit. The Supreme Court has instructed that "[t]he test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one ... Thus in order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the

State's intention to subject itself to suit in *federal court.*" *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 241 (emphasis in original).

It is therefore evident that the Commonwealth retains its immunity from suit in federal court on PHRA claims, and accordingly, the Plaintiff's PHRA claims against the Department and Harrisburg State Hospital will also be dismissed.

*II. Failure to Exhaust*

*Title VII Claims*

Defendants argue that Plaintiff's Title VII claims of loss of bonuses and constructive discharge are outside the scope of his administrative charge, and are, therefore, barred.

Before filing a suit claiming violations of Title VII, a plaintiff must exhaust his administrative remedies by filing a timely discrimination charge with the EEOC. *Robinson v. Dalton,* 107 F.3d 1018, 1020 (3d Cir.1997). A plaintiff's Title VII claims are, thereafter, limited to claims that are within the scope of the original administrative charge. *See Antol v. Perry,* 82 F.3d 1291, 1295 (3d Cir.1996). Exhaustion of administrative remedies promotes voluntary compliance without litigation and gives notice to the charged party. *See Reddinger v. Hosp. Cent. Servs., Inc.,* 4 F.Supp.2d 405, 409 (E.D.Pa.1998).

The test for determining whether a claimant has exhausted administrative remedies is "whether the acts alleged in the subsequent suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Antol,* 82 F.3d at 1295. The determination "turns on whether there is a close nexus between the facts supporting each claim or whether additional charges made in the judicial complaint may fairly be considered explanations of the original charge or growing out of it." *Galvis v. HGO Servs.,* 49 F.Supp.2d 445, 448-449 (E.D.Pa.1999). This test applies to new acts which occurred during the pendency of the proceedings before the Commission. *Anjelino v. New York Times, Co.,* 200 F.3d 73, 94 (3d Cir.1999).

At the outset, we note that Plaintiff's March 6, 2001 EEOC charge specifically referenced the fact that Plaintiff had not received bonuses in the past. While Plaintiff may have alleged for the first time in his amended complaint in this proceeding that he did not get a bonus for being Board Certified for Fiscal Year 1999-2000 or that he was denied step cash payments

for 2002 and 2003, we find that these allegations, inasmuch as they all relate to not receiving a type of payment, may be considered "growing out of" what was initially charged in the EEOC complaint and decline to dismiss them on failure to exhaust grounds.

\*7 Noting that a constructive discharge claim based upon hostile work environment must go beyond a standard hostile work environment claim, we also must take into consideration that Plaintiff proceeded in a *pro se* capacity when he filed his initial and amended charges and we are inclined to construe the charges liberally. We accordingly cannot find with certainty at this juncture that Plaintiff is foreclosed from asserting a constructive discharge claim based upon hostile work environment before this Court due to exhaustion grounds. We shall analyze the merits of these claims later in this Memorandum.

*PHRA Claims*

Defendants argue that Plaintiff failed to present all but one of his state law claims under the PHRC to the state commission: Defendants concede that Plaintiff's change in work schedule claim was properly raised and therefore exhausted.

"To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination. If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA." *Woodson v. Scott Paper Co.,* 109 F.3d 913, 925 (3d Cir.1997)(citing 43 Pa. Cons.Stat. § § 959(a), 962), *cert. denied,* 522 U.S. 914 (1997). A plaintiff may satisfy his or her filing requirement under the PHRA if the EEOC transmits the claim to the PHRC. *Id.* at 926 n. 12.

As noted, the sole charge Plaintiff brought before the PHRC was his claim of a change to his work schedule. Defendants argue that the remainder of claims that were asserted before the EEOC in the amended charge were never filed with the PHRC because the Plaintiff never instructed the EEOC to cross file the claims, and there is no evidence that the claims were ever cross-filed. Defendants argue that Plaintiff's failure to fully present his state law claims to the PHRC precludes him from asserting them now.

Defendants further argue that despite the existence of a worksharing agreement between the PHRC and the EEOC, Plaintiff's filing of the amended charge with the EEOC does not satisfy the state exhaustion

Not Reported in F.Supp.2d                                                                                        Page 6
Not Reported in F.Supp.2d, 2007 WL 575677 (M.D.Pa.), 100 Fair Empl.Prac.Cas. (BNA) 777
**(Cite as: 2007 WL 575677 (M.D.Pa.))**

requirement. The Third Circuit reasoned in *Woodson,* [T]he worksharing agreement allows a plaintiff to proceed in court under Title VII without first filing with the PHRC. That, however, does not mean that a plaintiff can initiate PHRC proceedings as required by the PHRA merely by filing with the EEOC. Whether a plaintiff has initiated PHRC proceedings under the PHRA is a state law issue. The worksharing agreement says nothing about whether a plaintiff has invoked PHRC procedures if the PHRC has never received his or her claim, nor could it, given that the Pennsylvania Supreme Court held in *Fye v. Central Transportation Inc.,* 487 Pa. 137 (1979) that EEOC procedures are not a sufficient surrogate for PHRC remedies. 109 F.3d at 926-27.

Plaintiff does not dispute outright that he did not cross-file his amended EEOC charge with the PHRC. Instead, he argues that "the documentation from the EEOC reflects Dr. Clayton's efforts at filing more comprehensive charges. For example, the March 16, 2001 notification from Maria Tomasso, EEOC District Director, acknowledges requests of dual filing of the charges in question with the EEOC and the Pa HRC ..." (Rec.Doc.53, ¶ 7).

*8 However, our reading of the March 16, 2001 notification indicates that the EEOC had received the initial complaint filed with the PHRC, but does not, in any way, indicate that the EEOC had or was going to cross-file the amended charge of March 6, 2001 with the PHRC. That the initial PHRC charge was filed with the EEOC does not mean that the amended EEOC charge was, as a matter of course, filed with the PHRC. In fact, the lack of documentation indicates that no such cross-filing ever occurred.

Inasmuch as Plaintiff simply failed to exhaust any claims, other than his change in work schedule, before the PHRC, all of Plaintiff's other claims under the PHRA are barred based upon failure to exhaust and shall be dismissed.

*III. Individual Discrimination Claims*

*Existence of Adverse Employment Action*

In order to establish claims for retaliation or discrimination under Title VII, § 1981 or the PHRA, an essential element for the plaintiff to establish is that he was subject to an adverse employment action. *See Jones v. School Dist. of Philadelphia,* 198 F.3d 403-410-412 (3d Cir.1999). [FN2] In a discrimination case, the Supreme Court has defined

an adverse employment action as "[a] tangible employment action constitut[ing] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits ... A tangible employment action in most cases inflicts direct economic harm." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761-62 (1998). The Third Circuit has defined an adverse employment action under Title VII as an "action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions or privileges of employment.' " *Storey v. Burns Int'l Sec. Servs.,* 390 F.3d 760, 764 (3d Cir.2004)(quoting *Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir.2001)).

> FN2. To establish a prima facie claim of employment discrimination, a plaintiff must demonstrate that: (1) he is a member of a protected class, (2) that he was subject to an adverse employment action, and (3) that similarly situated members of other racial classes were treated more favorably. *See Jones,* 198 F.3d at 410-412.

To establish an adverse employment action for a retaliation claim, a plaintiff must show that a "reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Moore v. City of Philadelphia,* 461 F.3d 331, 341 (3d Cir.2006)(quoting *Burlington Northern & Santa Fe Railway Co. v. White,* 126 S.Ct. 2405, 2415 (2006)). It is essential to a retaliation claim that Plaintiff establish a causal link between the protected activity and the subsequent adverse employment action. *Moore,* 461 F.3d at 342.

It their brief, the Defendants discuss each of the incidents of alleged discrimination separately. We shall analyze the merits of Defendants' arguments in turn. [FN3]

> FN3. In his brief, Plaintiff argues that piecemeal analysis of each claim is an inappropriate way to analyze a hostile environment claim. We agree. However, in this section of the Memorandum we are not analyzing Plaintiff's hostile work environment claim, but are analyzing his § 1981 discrimination claims. Plaintiff's hostile work environment claim will be analyzed at a later point in this

Not Reported in F.Supp.2d                                                                                              Page 7
Not Reported in F.Supp.2d, 2007 WL 575677 (M.D.Pa.), 100 Fair Empl.Prac.Cas. (BNA) 777
**(Cite as: 2007 WL 575677 (M.D.Pa.))**

Memorandum.

*Allocation of On-Call Time*

On this claim, Defendants argue that Plaintiff cannot meet the third prong of his prima facie case: that similarly situated members of other racial classes were treated more favorably than he was. Defendants cite the deposition testimony of Dr. Davis, a white part-time physician to support their argument. Dr. Davis testified that he had never received equal on-call time to the full-time physicians and that on-call time was allocated on a prorated basis.

**\*9** Plaintiff argues that Dr. Davis's testimony is not a full or accurate reflection of the on-call practices at the hospital. Particularly, Plaintiff disputes that on-call time was always doled out on a prorated basis. However, a review of the facts indicates that Plaintiff's failure to receive on-call time equal to a full-time physician was not based upon racial discrimination, but was due to Plaintiff's status as a part-time physician. Put another way, Plaintiff's bald conclusion regarding the allocation of on-call time is wholly unsupported by the record. It seems entirely logical to the Court, and well within the province of the Hospital, to reward full-time doctors with a larger number of on-call hours. There is nothing discriminatory about this system, and furthermore, it was apparently applied equally to other part-time physicians who were not African American.

Plaintiff has not established that the Defendants on-call allocation system discriminated against him based upon his race and summary judgment will be granted in favor of the Defendants on this claim.

*Threatened Furlough*

Plaintiff alleges that he was discriminated against by being threatened with a furlough. At the last minute, however, he was advised that he would not be furloughed. Defendants argue that this claim must fail for two reasons: first because Plaintiff was not, in fact, furloughed, and second because two other physicians, neither of whom were African-American, were furloughed instead.

We agree with the Defendants' argument that Plaintiff did not suffer an adverse employment action merely by being told he was going to be furloughed, which he ultimately was not. In no way can we construe the possibility of furlough to be an adverse employment action. Moreover, in light of the fact that other individuals who were not African-American

were furloughed in Plaintiff's place, Plaintiff's discrimination claim with regard to this incident fails. Summary judgment will be entered in favor of the Defendants with respect to this claim because Plaintiff suffered no adverse employment action.

*Change in Work Schedule*

Plaintiff alleges that changes in his work schedule were due either to discrimination or retaliation for his complaining about on-call allocation and Dr. Shemo. (Rec. Doc. 3 at ¶¶ 34, 45). Defendants argue that the changed work schedule was predicated on the fact that in the summer of 2000, it was determined that Harrisburg State Hospital no longer met the requirements for participating as a Medicare provider and as a result, hospital management decided to implement a standardized hospital-wide program schedule.

Defendants submit that under the new schedule, Plaintiff and other physicians were required to schedule their work between 7:30 a .m to 4:30 p.m., although Plaintiff testified at his deposition that the hours were 8 a.m. to 4 p.m. The new schedule applied to all medical and psychiatric doctors at the hospital and also applied to all social workers and management employees including personnel staff. (Rec.Doc.37, ¶¶ 29-36). Based upon these factual assertions, which Plaintiff does not dispute, it is clear that Plaintiff cannot show that similarly situated members of other racial classes were treated more favorably than he was, or that there was any discriminatory or retaliatory motive in instituting this hospital wide policy. [FN4] Accordingly, summary judgment will be granted in favor of the Defendants on this claim.

FN4. We take this opportunity to note that Plaintiff's submission entitled "Plaintiff's Response to Defendant's Statement of Undisputed Material Facts" (doc. 53) is *not* an appropriate submission to the Court. Plaintiff does not properly admit or deny the Defendants' factual averments, but injects misplaced argument within a document that is designed for *factual* averments. In effect, Plaintiff's misplaced arguments and failure to admit or deny facts to the Court has rendered this submission a practical nullity inasmuch as it is entirely unhelpful and forces the Court to divine whether Plaintiff admits or denies certain facts.

*Location of Mailbox/Removal of Desk/Desired*

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2007 WL 575677 (M.D.Pa.), 100 Fair Empl.Prac.Cas. (BNA) 777
**(Cite as: 2007 WL 575677 (M.D.Pa.))**

*Office Location*

   **\*10** Plaintiff alleges that he was discriminated and/or retaliated against becuase his mailbox was moved to a remote location, his desk was removed from his office without notice and he was not given the desired office he wanted. We find that none of these claims constitute adverse employment actions.

   As previously noted, Plaintiff's mailbox was moved from the Eaton Building to the Administrative Building following the theft of mail from the Eaton Building. At a point in time after Plaintiff's mailbox was moved to the Administrative Building, all of the other doctor's mailboxes were moved there as well. Plaintiff's desk was taken from his office to be refinished and then given to another physician without notice to him. Plaintiff ultimately received the desk back and there is no indication that the removal of the desk injured Plaintiff in any way. Plaintiff's room assignment in the Vista Dome building was clearly the subject of some juggling. Originally he had been assigned to share Room 217 with part-time physician Phillip Grem. An accommodation was made, however, to allow Dr. Grem to share the room with his wife Judy Grem, who was also on the Hospital staff. According to Plaintiff, Dr. Shemo then told him he could have Room 207, but then changed her mind and told him to take a room on the third floor. Dr. Venbrux, a full-time physician who is Asian, from Thailand, was ultimately assigned to Room 207. Although the room Plaintiff was finally assigned to was not as large as Room 207, there is no showing that it was insufficient for him to carry out his duties.

   None of these incidents qualifies in any way as an adverse employment action. Rather, it appears to us that Plaintiff seeks to elevate rather *de minimis* administrative decisions with which he disagreed to the status of measures that caused him real and cognizable harm. Plaintiff's terms of employment were not altered because of these incidents and he suffered no resulting economic harm. Accordingly, Plaintiff's claims of discrimination regarding these incidents fail as a matter of law and summary judgment will be entered in favor of Defendants.

*Denial of Bonus for Board Certification FY 1999-2000*

   Plaintiff alleges that he was wrongfully denied a bonus for his Board certification for fiscal year July 1, 1999-June 30, 2000. Defendant argues that Plaintiff passed the exam in July, 2000, thereby rendering him ineligible for a 1999-2000 fiscal year bonus.

   Defendant submits that the policy, according to Management Directive 535.2 Amended, a doctor must be board certified by June 30 of a given year to be eligible for a specialty board certification payment. Under the directive, a doctor must submit evidence of his certification before *June 30th.* Plaintiff admits that he did not sit for the examination until *July 2000,* therefore he did not and could not have submitted the necessary documents before June 30, 2000.

   Plaintiff essentially argues that because he received his certification on July 14, 2000, the Hospital should have retroactively given him a bonus because the submission dates were a "*de minimus* issue." (Rec. Doc. 53 at 18). Plaintiff submits that "[w]hile the policy does suggest that evidence of certification needs to be mechanically submitted sometime between June 15 and June 30 of a particular fiscal year, no language deals with late submission and other language in the policy suggests that submission of certification may result in pro-ration of entitlement." (Rec. Doc. 53 at 18).

   **\*11** Despite Plaintiff's creative argument to the contrary, it is apparent that Dr. Clayton was ineligible for the certification payment for fiscal year 1999-2000 because he took the test and received the certification *after* the close of the fiscal year. The fact that the directive does not provide for late submission of documents indicates to us that late submissions were clearly not accepted for this type of payment. Accordingly, we cannot find that Plaintiff's failure to receive this bonus was an adverse employment action, because it was a result of his own making. Accordingly, summary judgment will be granted in favor of the Defendant on Plaintiff's claim for discrimination and/or retaliation based upon his failure to receive the aforementioned bonus.

*Untimely Receipt of Cash Payments for 2002 and 2003*

   Plaintiff did not receive year-end bonuses for 2002 and 2003. He was ultimately paid these bonuses, albeit late. Defendants allege that the late payment was made due to an error, but was in no way motivated by racial animus or a desire to retaliate.

   Defendant submits that an inputting error in the bookkeeping system was made on January 29, 2002, which prevented the payment from being made to

Not Reported in F.Supp.2d                                                                                                                        Page 9
Not Reported in F.Supp.2d, 2007 WL 575677 (M.D.Pa.), 100 Fair Empl.Prac.Cas. (BNA) 777
**(Cite as: 2007 WL 575677 (M.D.Pa.))**

Plaintiff. Both payments were subsequently made to Plaintiff on September 26, 2003. Plaintiff alleges that the compensation was not paid to him until he had resigned from employment, and essentially that it was only paid to him because had resigned and complained.

However, as his allegations in this regard relate to the proper basis of a discrimination or retaliation claim, it appears that Plaintiff did not suffer from an adverse employment action because he was ultimately compensated, albeit in an untimely fashion. Moreover, Plaintiff provides no evidence, once again other than his bald conclusion, in support of his claim that the late payment was the result of discrimination or retaliation. Accordingly, we shall grant summary judgment in favor of the Defendants on this claim for discrimination and/or retaliation.

*Failure to Respond to Grievances*

Finally, Plaintiff claims that the Defendants discriminated against him for failing to respond to two grievances Plaintiff filed against Defendant Shemo.

Plaintiff filed his first grievance on February 21, 2003. Barbara Casey, as the Chief Executive Officer's designee responded to the grievance on March 12, 2003. Plaintiff submitted a second grievance on march 25, 2003. The Chief Medical Officer responded to that grievance on April 10, 2003. The Commonwealth responded to union appeals of the grievances. The union then elected not to take these matters to arbitration. (Rec. Doc. 38 at 42).

It is apparent that the hospital management responded to the grievances and Plaintiff's claim of discrimination and/or retaliation with regard to this incident has no merit. Summary judgment on this ground shall be granted in favor of the Defendant on this claim.

*IV. Hostile Work Environment and Constructive Discharge Claim Hostile Work Environment*

**\*12** In order to establish a hostile work environment claim under Title VII, Plaintiff must show that (1) he suffered intentional discrimination because of his race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d

Cir.1996). A plaintiff must show that the discrimination would have detrimentally affected a reasonable person of the same race in his position. *Aman,* 85 F.3d at 1081. In considering whether the objective test is met, the court should "consider all the circumstances," including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23 (1993); *see also Abramson v. William Patterson College of New Jersey,* 260 F.3d 265, 280 (3d Cir.2001).

In support of this claim, Plaintiff asserts that: 1) he was denied equal on-call time in October 1999; 2) he was told he would be furloughed as of June 23, 2000(although he ultimately was not); 3) his mailbox was moved in July 2000; 4) his work schedule was changed in September, 2000; 5) his desk temporarily taken from him in October 2001; 6) he did not receive the office he desired in the Vista Dome building in November 2001; 7) in February and March 2003 he was dissatisfied with the grievance responses from the Hospital management; and 8) he learned did not receive his step cash payments in September 2003.

Defendants argue that Plaintiff's hostile work environment claim must necessarily fail because Plaintiff has not proven that the alleged discriminatory conduct was pervasive or regular. Defendants argue further that there is no evidence that any of the alleged incidents were racially motivated.

We agree with the Defendants' submitted argument. A review of the timeline of these incidents alone demonstrates that they occurred rather sporadically over a period of years. The first act with which Plaintiff took issue, the allocation of on-time call, occurred in 1997 and 1999. The next acts, the potential furlough, moved mailbox and change in work schedule occurred in 2000. In 2001, Plaintiff complains of a temporarily missing desk and that he did not receive desired office space. Finally, in 2003 Plaintiff asserts that he was dissatisfied by the grievance system and was denied step cash payments, which he ultimately received. The incidents did not persist at a level that is the hallmark of a hostile work environment. The Defendant was not subjected to a constant barrage of threats or remarks, nor is there any indication that his race was a contributing factor in *any* of the conduct to which he takes offense. *See*

Not Reported in F.Supp.2d                                                                                              Page 10
Not Reported in F.Supp.2d, 2007 WL 575677 (M.D.Pa.), 100 Fair Empl.Prac.Cas. (BNA) 777
**(Cite as: 2007 WL 575677 (M.D.Pa.))**

*Hanani v. N.J. Dep't of Envtl. Prot.*, 2006 U.S.App. LEXIS 27960, *22 (3d Cir.2006)(An Egyptian-born employee did not establish that the alleged discriminatory conduct was severe or pervasive to establish a claim for hostile work environment). Furthermore, the Defendant was not threatened or humiliated in a physical or emotional manner, and there is absolutely no showing that Plaintiff's work performance was interfered with based upon the alleged incidents.

**\*13** Accordingly, because we find that the Plaintiff cannot establish that the alleged incidents were severe or pervasive, or that the incidents were objectively detrimental to a reasonable person similarly situated to Plaintiff, or to Plaintiff himself, we shall grant summary judgment in favor of the Defendants on Plaintiff's hostile work environment claims.

*Constructive Discharge Claim*

To sustain a constructive discharge claim, a plaintiff must prove that his employer knowingly engaged in conduct which foreseeably resulted in working conditions so intolerable or unpleasant that a reasonable person in the employee's position would resign. *See Durham Life Ins. Co. v. Evans*, 165 F.3d 139, 155 (3d Cir.1999); *Aman, 85 F.3d at 1085*. Summary judgment is appropriate if a trier of fact could not reasonably conclude that a reasonable person in the plaintiff's shoes would have felt compelled to resign. *Hopson v. Dollar Bank*, 994 F.Supp. 332, 340 (W.D.Pa.1997).

As discussed above, Plaintiff has not established that he was subjected to a hostile work environment, and as a necessary corollary, he cannot establish that his working conditions were so intolerable or unpleasant that he was forced to resign. The incidents Plaintiff complains of were not pervasive, but were dispersed throughout a period of years. Furthermore, Plaintiff does not show that *any* of the alleged conduct was directed at him based upon his race.

Plaintiff simply has not borne his burden of establishing a constructive discharge claim, and accordingly, summary judgment will be entered against him on this claim.

*V. Statute of Limitations*

Even assuming *arguendo* that Plaintiff's discrimination claims contained any merit, for the reasons that follow a majority of the claims necessarily fail because they are barred by the applicable statute of limitations.

*Title VII Claim of Discrimination Based on On-Call Policy*

Defendants allege that Plaintiff's Title VII claim of discrimination by Defendants' policy for the allocation of on-call is barred by the statute of limitations.

The limitations period for a Title VII claim begins to run, under federal law, "when the plaintiff knows or reasonably should know that the discriminatory act has occurred." *Uohemeng v. Delaware State College*, 643 F.Supp. 1575, 1580 (D.Del.1986)(quoting *McWilliams v. Escambia County School Board*, 658 F.3d 326, 330 (5th Cir.1981)). In a deferral state, such as Pennsylvania, a plaintiff is required to file a Title VII or ADEA charge of discrimination with the EEOC within 300 days of the alleged unlawful practice. *See* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(2); *see also Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir.2000).

Defendants allege that Plaintiff's limitation period for his on-call claims began to run in August or September 1997, when Plaintiff was aware that his on-call time was being reduced. Defendants argue that because Plaintiff's charge was not filed with the EEOC until March 2001, and his § 1981 claim was not filed until April 2005, both claims were initiated long after the expiration of the statutory period. Defendants further argue that even if we determine that Plaintiff's claim of discrimination regarding on-call time allocation accrued in October 1999, when, after a brief period beginning August 23, 1999, the on-call time was equalized, Plaintiff's percentage was again reduced to 50 per cent, it is barred by the applicable limitations period, because in that case the Title VII period would have expired in June 2000.

**\*14** Plaintiff admits that he alleged some conduct falling outside the applicable 300-day federal tolling time frame. Plaintiff argues, however, that the continuing violation theory is applicable to this Title VII claim, and therefore the claim is not time-barred. Under the continuing violation theory, a plaintiff may pursue claims for discriminatory conduct that is time-barred if he or she can demonstrate that the act is part of an ongoing practice or pattern of discrimination by the defendant. *See Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481 (3d Cir.1997). When determining whether there is a continuing pattern of discrimination, the Third Circuit has held that a court

Not Reported in F.Supp.2d, 2007 WL 575677 (M.D.Pa.), 100 Fair Empl.Prac.Cas. (BNA) 777
**(Cite as: 2007 WL 575677 (M.D.Pa.))**

should consider the subject matter, frequency and permanence of the discrimination:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate.

*Rush,* 113 F.3d at 482 (citation omitted).

Taking the record as a whole, we do not find that Plaintiff has proffered enough evidence to establish a continuing violation theory. Plaintiff attempts to conflate what he considers to be discrimination in on-call time allocation with other isolated incidents for which he is aggrieved, including the moving of his mailbox, temporary removal of his desk, and failure to receive desired office space. Other than the fact that Plaintiff was offended by these incidents, we can find no obvious link or commonality connecting them to a degree where a pattern is discernable. Furthermore, the incidents which Plaintiff alleges to be discriminatory in nature did not occur in a regular fashion, but were isolated incidents scattered throughout a period of years. There is plainly no showing that the incidents were systematic or occurred with even the slightest degree of frequency. We simply do not find that Plaintiff can avail himself of the continuing violation theory with regard to his Title VII claim for discrimination in on-call time allotment.

Therefore, as Defendants submit, even using the *later* of the two dates when Plaintiff was aggrieved over on-call allocation as a measuring stick, the statute of limitations would have run in June of 2000. Accordingly, because Plaintiff's claim was not made until 2001, it is barred by the statute of limitations and summary judgment will be entered in favor of the Defendant.

### *§ 1981 Claims*

The original version of the statute presently codified at 42 U.S.C. § 1981 was enacted as § 1 of the Civil Rights Act of 1866. It was amended in minor respects in 1870 and recodified in 1874, but its basic coverage

did not change prior to 1991. Initially the statute served to protect the rights of blacks Americans to "make and enforce contracts" with the same freedom and ability as white Americans. However, in 1991, Congress amended the statute defining the term "make and enforce contracts" to include the "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Therefore, after the 1991 amendments were added, § 1981 had, in essence, more "teeth" and provided more causes of action to individuals subjected to various forms of racial discrimination. *See Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 372- 373 (2004).

**\*15** However, in December 1990, Congress enacted 28 U.S.C. § 1658, which created a four year catch-all statute of limitations for federal civil actions. In *Jones,* the Supreme Court held that § 1658 applied to § 1981 claims. Accordingly, § 1981 claims are subject to a four year statute of limitations. [FN5]

> FN5. Prior to the 1991 amendments to § 1981, the statute of limitations applied to § 1981 claims was borrowed from the statute of limitations for personal injury actions in the state where the alleged violations occurred. The Pennsylvania statute of limitations for personal injury actions is 2 years from the date of accrual.

Defendants argue that each of the ten incidents of discrimination alleged by Plaintiff in his amended complaint are barred by the statute of limitations applied to § 1981 claims brought via § 1983. The Defendants, however, relied on the two year statute of limitation that was effective prior to *Jones.* Our review of the claims indicates that some, but not all, are barred by the four year statute of limitations applied to federal civil actions pursuant to § 1658.

This action was commenced by Plaintiff on April 15, 2005. Accordingly, all claims accruing prior to April 15, 2001 are time-barred. Plaintiff was "threatened" with furlough in June 2000, and therefore the limitations period ran in June 2004 on this claim. Plaintiff's work schedule was changed pursuant to a policy effective September 18, 2000, and accordingly the limitations period on this claim ran in September 2004. Plaintiff discovered that he did not receive a bonus for fiscal year 1999-2000 in July 2000, therefore the statute of limitations on this claim ran in July 2004. Finally, Plaintiff's mailbox was moved to the Administrative Building on July 25, 2000, and

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                      Page 12
Not Reported in F.Supp.2d, 2007 WL 575677 (M.D.Pa.), 100 Fair Empl.Prac.Cas. (BNA) 777
**(Cite as: 2007 WL 575677 (M.D.Pa.))**

this claim therefore became time-barred on July 25, 2004.

Plaintiff's remaining claims: that his desk was removed without notice from his office in October 2001, he did not receive the office he desired in the Vista Dome building in November 2001, that he was denied step cash payments for 2002 and 2003, and that he was dissatisfied by the grievance process in 2003 are not barred by the four year statute of limitations pursuant to § 1658. However, Plaintiff's discrimination claims for these incidents necessarily fail for the reasons described hereinabove.

### CONCLUSION:

Accordingly, for the detailed reasons set forth in this Memorandum, we shall grant the Defendant's Motion for Summary Judgment. An appropriate Order shall issue.

Not Reported in F.Supp.2d, 2007 WL 575677 (M.D.Pa.), 100 Fair Empl.Prac.Cas. (BNA) 777

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1996 WL 32139 (E.D.Pa.)
**(Cite as: 1996 WL 32139 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Francis SOSKY, Plaintiff,
v.
INTERNATIONAL MILL SERVICE, INC. and
William Maloney, Defendants.
**No. CIV. A. 94-2833.**

Jan. 25, 1996.

MEMORANDUM

REED, J.

**\*1** Plaintiff Francis Sosky brings this age discrimination in employment action against defendants International Mill Service, Inc. ("IMS") and William Maloney alleging that defendants discriminated against him on account of his age in violation of the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons.Stat. Ann. § § 951-963, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § § 621-634. Specifically, plaintiff asserts that defendants terminated him because of his age, exposed him to a hostile work environment because of his age, and retaliated against him for complaining about the age discriminatory treatment he was allegedly experiencing. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331.

Currently before the Court is the motion by defendants for summary judgment. (Document No. 16) For the following reasons, the motion will be granted.

I. FACTUAL BACKGROUND

The following facts are based on the evidence of record viewed in the light most favorable to plaintiff as the nonmoving party, as required when considering a motion for summary judgment. *See Sempier v. Johnson & Higgins,* 45 F.3d 724, 727 (3d Cir.), *cert. denied,* 115 S.Ct. 2611 (1995).

Sosky began his association with IMS when he joined Codesco, an IMS affiliate, in 1974 as an Inventory Manager. He eventually became a General Accounting Manager at Codesco, and then in

1979 joined IMS proper as the Account Manager for North America. Over the next decade Sosky continued to work for IMS and received various promotions, eventually becoming Director, Treasury Services. During this time period he generally received excellent performance evaluations, although he was demoted once in 1985.

In February 1992 defendant William Maloney joined IMS as Vice President of Finance, which made him the direct supervisor of Sosky. The first indication in the record of the coming problems between Maloney and Sosky occurred in August of 1992. On August 3, 1992, Maloney met with Sosky to discuss a memorandum Maloney was going to issue concerning a reorganization of the Finance Department. In the course of this discussion, Maloney commented that "it's time to give the young a chance" because "the company needs to get some enthusiasm and drive," and that Sosky should be able to help some newly promoted employees as he had "been around for a bunch of years." Sosky Dep. at 73-75, 80. In a memorandum Sosky wrote at the time about this conversation, Sosky relates that Maloney attempted to retract his "young" statement several times later in the conversation. Memorandum from Sosky to files of 8/3/92. [FN1] In addition, although Sosky's title was changed to Director, Management Accounting and he was given a salary grade increase, his actual salary was not increased, unlike the salaries of three other, younger persons who were promoted at the same time. Sosky did, however, initially view the new position as a good opportunity for himself.

> FN1. Defendants have challenged the admissibility of various handwritten memoranda written by plaintiff. For the reasons discussed below, this Court concludes that summary judgment should be granted for defendants even assuming that these memoranda could be properly considered. This Court therefore declines to resolve this evidentiary question.

**\*2** Over the next several months there were various exchanges between Maloney and Sosky which Maloney considered merely joking but Sosky considered embarrassing and humiliating. These included Maloney telling a representative of the parent company for IMS on August 10, 1992 that

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 32139 (E.D.Pa.)
**(Cite as: 1996 WL 32139 (E.D.Pa.))**

Page 2

Sosky needed 45 minutes warning before a meeting because he might be "out jogging or changing his oil," Maloney telling Sosky on August 11, 1992 "who gives a fuck" in relation to a work-related matter, Maloney commenting to Sosky on August 14, 1992 in the presence of some of Sosky's subordinates "how many birthdays do you have?" after Sosky had requested days off for the birthdays of two family members and himself, and Maloney telling Sosky on August 28, 1992 that he should not talk to people in the halls. Sosky Dep. at 95-96, 99, 102-03, 110. In addition, on October 28, 1992 Maloney yelled at Sosky "Wake up, Frank!" during a luncheon even though Sosky was not dozing off, and, after receiving a request from Sosky to take end of year vacation days, Maloney wrote on the request "are you going into semi retirement?"    Sosky Dep. at 126; memorandum from Sosky to Maloney of 11/3/92. During the same time period Maloney also commented about another employee that she "has been here a zillion years and can't change her work style." Sosky Dep. at 86.

Also beginning in August of 1992, Maloney started communicating to Sosky his concerns over various alleged performance problems.    In August 5, 1992, after commenting that Sosky should know better because he had been around IMS either for "quite a few years" or "for a number of years," Maloney told Sosky that he was going to "kick your ass." Sosky Dep. at 81, 86.    Then in a memorandum dated September 11, 1992 Maloney indicated that he was not satisfied with Sosky's performance in certain respects, including having open areas in connection with the McGraw project, failing to make progress with the "Green Book" for the management group, "*gross* " shortcomings in the drafts of policies for which Sosky was responsible, and a need to gain better understanding of the department's goal with regard to IMS response procedure.    Maloney also transferred insurance management duties away from Sosky to Paul Bochnak, then age 41, in August of 1992, and had younger subordinates of Sosky attend management meetings from which Sosky was excluded.

Concerned about his repeated problems with Maloney, Sosky talked with Ken McArthur and Rosemary McHenry, both part of the IMS Human Relations Department, in October of 1992.    While Sosky complained to McArthur and McHenry of the unfair treatment that he asserted he was receiving at the hands of Maloney, Sosky did not suggest that this treatment was the result of age discrimination. McArthur communicated to Maloney the fact that

Sosky had complained to him, and Maloney subsequently criticized Sosky for taking their alleged problems to the Human Relations Department.

In January of 1993 one of Sosky's subordinates, Sandy Farkosh, resigned, leaving an important gap in the staff of the Finance Department.    Maloney asked Sosky if he could fill that gap for several months; although there is a dispute about the exact exchange that occurred, Sosky acknowledges that he told Maloney that he could not cover the responsibilities of Farkosh's position while also covering his own. Maloney then made a further reorganization of the Finance Department which resulted in Sosky's position being eliminated.    At the time that he made this reorganization, Maloney prepared a memorandum detailing his various criticisms of Sosky's performance.    This memorandum concluded:

**\*3** When Sandy Farkosh resigned I decided that due to the critical nature of the analysis group I would like the analysts to report directly to me.    In addition, I have serious concerns about the accounts payable and billing area. Under Frank [Sosky] I have been unable to get close to the underlying issues and staff.

In view of Frank's problems and my concern about the critical areas mentioned above I have decided to terminate Frank and eliminate his position.

Memorandum from Maloney to file of 1/22/93, at 3-4.    When his position was eliminated, Sosky was 51 years old.

## II. DISCUSSION

Under Federal Rule of Civil Procedure 56(c), "[s]ummary judgment is appropriate only when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law." Sempier, 45 F.3d at 727.    For a dispute to be "genuine," the evidence must be such that a reasonable factfinder could return a verdict for the nonmoving party, and for a fact to be "material" it must be one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).    When, as here, "the moving party ... does not bear the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the non-moving party's ... evidence is insufficient to carry its burden of persuasion at trial." Sempier, 45 F.3d at 727.    The nonmoving party must produce evidence to support its position, and may not rest on conclusory allegations or bare assertions alone. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990).    As the PHRA utilizes the same

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1996 WL 32139 (E.D.Pa.)
**(Cite as: 1996 WL 32139 (E.D.Pa.))**

analytical framework as the ADEA, plaintiff's federal and state claims will be discussed together. *See Pennsylvania State Police v. Pennsylvania Human Relations Comm'n*, 542 A.2d 595, 599 (Pa.Commw.Ct.1988) (noting that Pennsylvania courts have adopted the federal *McDonnell Douglas* analytical model for use in employment discrimination claims made pursuant to the PHRA); *Chmill v. City of Pittsburgh*, 412 A.2d 860, 871 (Pa.1980) (stating that the PHRA, while an independent state statute, should be construed in light of principles of fair employment law which have emerged from federal anti-discrimination statutes).

A. *Termination*

A plaintiff can sustain an age discrimination claim by either presenting direct evidence of discrimination or by using circumstantial evidence that meets the requirements given in the *McDonnell Douglas* line of cases. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095-96 n. 4 (3d Cir.1995). Plaintiff here argues that he has presented direct evidence of age discrimination in connection with his termination. Defendants respond that plaintiff has failed to produce direct or circumstantial evidence that would allow a reasonable factfinder to conclude that defendants discriminated against plaintiff because of his age when they decided to eliminate his position.

1. Direct Evidence

*\*4* A direct evidence or "mixed motives" case of employment discrimination exists when "the evidence the plaintiff produces is so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case [as is necessary in a circumstantial evidence case] to shift the burden of production." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994); *accord Starceski*, 54 F.3d at 1096 (quoting this passage with approval). Justice O'Connor has provided further guidance on the type of evidence needed to make out a direct evidence case:

[S]tray remarks in the workplace, while perhaps probative of [a discriminatory animus], cannot justify requiring the employer to prove that its [employment] decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard.... What is required is ... direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching

their decision.
*Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring) (citation omitted); *accord Starceski*, 54 F.3d at 1096 (quoting this passage with approval).

To support his argument that he has presented direct evidence of age discrimination, plaintiff points to the various allegedly agist comments by Maloney, including the "young should be given a chance" comment, the "enthusiasm and drive" comment, the "years" comments, the "birthdays" comment, the "Wake up, Frank!" comment, the "semi-retirement" comment, and the "zillions of years" comment. *See* Sosky Dep. at 73-75, 80, 81, 86, 88, 102-03, 126; memoranda from Sosky to files of 8/3/92, 8/5/92, 8/17/92, 10/28/92; memorandum from Sosky to Maloney of 11/3/92. In addition, plaintiff argues that the other negative comments made by Maloney and described in the factual background section above, while not related to age on their face, were the result of an intent to discriminate on the basis of age. *See* Sosky Dep. at 95 ("45 minutes" comment), 99 ("Who gives a fuck?" comment), 110 (talking in hall comment); memoranda from Sosky to files of 8/10/92, 8/11/92, 8/28/92 (discussing these three comments). Finally, plaintiff points to the fact that in 1990, a document relating to evaluations stated that the president of IMS, Tom Cochran, was interested in knowing the age of employees, and the fact that in 1991 an evaluation form was created which included a space for the evaluated employee's date of birth. *See* Sosky Dep. at 41-42; appendix to response by plaintiff to motion for summary judgment ("appendix of plaintiff"), Exhibits 4, 39.

This Court concludes that this evidence does not constitute direct evidence that plaintiff was terminated as the result of age discrimination. First, the comments that do not relate to age on their face cannot by their very nature constitute direct evidence of age discrimination. And second, Maloney's comments which could possibly be construed as agist were made months before plaintiff was terminated [FN2] and, at most, reflect Maloney's knowledge of plaintiff's age and years of experience with IMS and so are insufficient to constitute direct evidence of age discrimination. *See, e.g., Armbruster*, 32 F.3d at 780-81 (notations of ages of employees did not constitute direct evidence of age discrimination); *Virapen v. Eli Lilly, S.A.*, 793 F.Supp. 36, 39 (D. Puerto Rico 1992) (statement that plaintiff oldest of three employees at a meeting not probative, by itself, of age discrimination), *aff'd without op.*, 66 F.3d 307 (1st Cir.1995). More importantly, plaintiff has failed to

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 32139 (E.D.Pa.)
**(Cite as: 1996 WL 32139 (E.D.Pa.))**

Page 4

demonstrate how these comments, the 1990 document, or the 1991 evaluation form were so strongly linked to the decision to eliminate his position that they could constitute direct evidence that discriminatory animus lay behind the decision to terminate plaintiff. As a result, this Court concludes that plaintiff has failed to produce direct evidence of age discrimination in connection with his termination.

> FN2. Plaintiff asserts in his various briefs that the decision to eliminate his position was made months prior to January 1993, possibly as early as August 1992. Plaintiff points to no evidence to support this assertion, and the uncontradicted evidence is that the unexpected resignation of Farkosh was the catalyst for the January 1993 reorganization that resulted in plaintiff's position being eliminated. *See* Maloney Dep. at 100, 244; memorandum from Maloney to file of 1/22/93. As a result, this Court concludes that the uncontradicted evidence demonstrates that the decision to eliminate plaintiff's position was not made before January 1993. Plaintiff also argues that the January 1993 reorganization was somehow linked to the August 1992 reorganization, but again fails to point to any evidence to support this position.

**2. Circumstantial Evidence**

**\*5** Absent direct evidence of discrimination, a plaintiff may still prevail on her claim by following the circumstantial evidence path laid down by *McDonnell Douglas Corp.* and its progeny. *See* St. Mary's Honor Ctr. v. Hicks, 113 S.Ct. 2742 (1993); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981); McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973); Starceski, 54 F.3d at 1095-96 n. 4. Under this line of cases, a plaintiff must first establish a prima facie case of unlawful discrimination. By establishing a prima facie case, a plaintiff eliminates the most common nondiscriminatory reasons for the adverse employment action and creates a presumption of discrimination. *Burdine,* 450 U.S. at 253-54. Once a prima facie case has been established, the defendant must produce some evidence that supports " 'a legitimate, nondiscriminatory reason' " for the employer's action. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994) (quoting McDonnell Douglas, 411 U.S. at 802). If this evidence is produced, the plaintiff may survive a motion for summary judgment

only if she or he points to "some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes,* 32 F.3d at 764; *accord* Waldron v. SI. Indus., Inc., 56 F.3d 491, 495 (3d Cir.1995). [FN3]

> FN3. Defendants argue that *Waldron* and, implicitly, *Fuentes,* were incorrectly decided. Specifically, defendants argue that a plaintiff must produce sufficient evidence at the summary judgment stage to prove both that the employer's proffered reason for his termination is false and that discrimination was the real reason for the termination. They base this argument on the Supreme Court's holding that a plaintiff must ultimately prove both of these elements at trial. *See* St. Mary's Honor Ctr., 113 S.Ct. at 2749. Whatever merit there may be to this argument in the abstract, this Court is bound by decisions of the Court of Appeals for the Third Circuit, and both *Waldron* and *Fuentes* explicitly discussed and rejected the interpretation of *St. Mary's* that defendants now assert. *See* Waldron, 56 F.3d at 495; Fuentes, 32 F.3d at 764 ("[t]hus, if the plaintiff has pointed to evidence sufficiently [sic] to discredit the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case").

**a. *Prima Facie* Case**

The exact requirements for establishing a prima facie case depend on the factual circumstances of each case. *McDonnell Douglas,* 411 U.S. at 802 n. 13. In the context of a job elimination, a plaintiff may show a prima facie case by producing evidence that (1) she belongs to the protected class; (2) she was qualified for the position she occupied; (3) the position she occupied was eliminated; and (4) other, similarly situated workers not in the protected class were retained and the duties of the plaintiff were subsumed by persons not in the protected class. *Torre v. Casio, Inc.,* 42 F.3d 825, 830-31 (3d Cir.1994). With regard to age discrimination claims, the fourth factor is met as long as the other workers that were retained and/or subsumed the plaintiff's duties were significantly younger than the plaintiff even if these

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 32139 (E.D.Pa.)
(Cite as: 1996 WL 32139 (E.D.Pa.))

other workers were also within the class protected by the ADEA, that is even if these other workers were older than forty when the job elimination occurred. *See Barber v. CSX Distrib. Serv.*, 68 F.3d 694, 699 (3d Cir.1995) (holding that an age difference of as little as eight years is sufficient for the purposes of establishing a prima facie case of age discrimination, even if the younger person is within the class protected by the ADEA).

It is undisputed that plaintiff belonged to the class protected by the ADEA at the time of his termination, that plaintiff was qualified for his position, and that his position was eliminated. Defendants argue, however, that plaintiff has failed to produce evidence satisfying the fourth element of the prima facie case, as plaintiff has failed to demonstrate that other, similarly situated younger employees were retained when plaintiff's position was eliminated.

**\*6** A review of the evidence of record reveals that the position held by plaintiff was the only one eliminated in the January 1993 reorganization and that it is arguable that there were no other employees "similarly situated" to plaintiff as plaintiff held a unique position. *See* reply by defendants at 4; reply by defendants to sur reply by plaintiff at 1. This does not end our analysis, however, despite the arguments of defendants to the contrary. If a plaintiff is in a unique position which is eliminated, that plaintiff must still have some way of making out a prima facie case; otherwise, the ADEA could not reach an employer who eliminates a unique position because of the age of the employee holding that position. Mindful of the flexibility of the prima facie case elements, this Court concludes that an employee who occupies a unique position that is eliminated may meet the fourth element of a prima facie case by demonstrating that the remaining responsibilities of that position were transferred to persons significantly younger that the employee. *See Torre*, 42 F.3d at 830-31 (reformulating the fourth element of the prima facie case in light of the circumstances of that case); *Duvall v. Polymer Corp.*, Civ. A. No. 93-3801, 1995 WL 581910, at *6 (E.D.Pa. Oct. 2, 1995) (modifying prima facie case so that it could be satisfied if a plaintiff can show that her younger subordinates were retained and received some of her former duties). [FN4]

> FN4. Defendants argue that this modification of the fourth element is incorrect as it would render the prima facie case the same for reduction in force and termination cases; in support of their

position, defendants rely upon *Solt v. Alpo Petfoods, Inc.*, 837 F.Supp. 681, 685 (E.D.Pa.1993) (rejecting argument by plaintiff whose position was eliminated that she was effectively "replaced" by younger persons), *aff'd without op.*, 30 F.3d 1488 (3d Cir.1994). *Solt* is distinguishable from the instant case, as the plaintiff in *Solt* did not occupy a unique position and indeed it was uncontradicted in that case that several similarly situated, younger employees had their positions eliminated in the same reduction in force that affected plaintiff. *Id* While defendants are correct that the analysis now adopted by this Court would merge the prima facie case elements for termination and reduction in force cases, this merger does not mean that the entire *McDonnell Douglas* analysis would be the same for termination and reduction in force cases. Specifically, unlike a plaintiff in a termination case a plaintiff who held a unique position that was eliminated cannot succeed at the pretext stage by attacking the qualifications of the persons who assumed whatever of the plaintiff's duties remained after the reduction in force. Instead, the latter plaintiff must attack the reason for the elimination itself or present other evidence of discrimination in order to prevail.

In the instant case, it is uncontradicted that the responsibilities of plaintiff that remained after his position was eliminated were all transferred to persons significantly younger than plaintiff, who was 51 in January 1993. *See* appendix of plaintiff, Exhibit 1 at 10 (listing the birth date for plaintiff as 8/7/41) The supervisory responsibilities of plaintiff and the responsibility of plaintiff to develop analytical capabilities were transferred to Maloney, who turned 42 in January 1993. Response of defendant to first set of interrogatories of plaintiff ("response to interrogatories"), no. 82; appendix of plaintiff, Exhibit 1 at 6 (listing the birth date for Maloney as 1/2/51). And the customer assessment responsibilities of plaintiff were transferred to Credit Manager Renie Bralic, who was 38 in January 1993. Response to interrogatories, no. 82 (stating that these responsibilities were transferred to the Credit Manager); memorandum from Maloney to all employees of 1/25/93 (identifying Renie Bralic as the Credit Manager); appendix of plaintiff, Exhibit 1 at 1 (listing birth date for Bralic as 2/3/54). This Court concludes, therefore, that plaintiff has produced evidence sufficient to show that his responsibilities

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 32139 (E.D.Pa.)
(Cite as: 1996 WL 32139 (E.D.Pa.))

Page 6

were assumed by persons significantly younger than himself and so has satisfied the remaining element of his prima facie case of age discrimination.

*b. Pretext*

Plaintiff does not dispute that defendants have met their burden of producing evidence of a legitimate, nondiscriminatory reason for the elimination of plaintiff's position. Specifically, defendants have produced evidence that the resignation Sandy Farkosh led Maloney to reorganize the Finance Department such that people that previously had reported to plaintiff would now report to Maloney, eliminating the need for the position held by plaintiff. *See* Maloney Dep. at 100, 244. In order to undermine this legitimate, nondiscriminatory reason, plaintiff must, at the summary judgment stage, "*either* (i) discredit [ ] the [employer's] proffered reasons, either circumstantially or directly, or (ii) adduc[e] evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes,* 32 F.2d at 764. In other words:

> **\*7** In order to survive a summary judgment motion once the defendant has produced evidence of a legitimate, nondiscriminatory reason for an employment decision, a plaintiff who claims invidious discrimination but lacks overt evidence of discriminatory animus must point to evidence tending to show the defendant's explanation is pretextual since the inference arising from a *prima facie* case no longer exists.
> *Armbruster,* 32 F.3d at 782.

Plaintiff does not dispute that his position was unnecessary given the reorganization of the Finance Department. Plaintiff argues, however, that the reorganization itself was a cover for age discrimination. He argues that, reading the evidence in the light most favorable to him, the elimination of his position was actually based on his allegedly poor performance. And he further argues that there are genuine issues of material fact regarding whether his performance was indeed poor.

Plaintiff is partially correct. The evidence of record, viewed in the light most favorable to plaintiff, shows that his allegedly poor performance was an important part of the decision to reorganize the Finance Department in such a way as to make his position unnecessary. *See* memorandum from Maloney to file of 1/22/93 ("[i]n view of Frank [Sosky]'s problems and my concern about the critical areas

mentioned above I have decided to terminated Frank and eliminate his position"); Sosky Dep. at 72 (noting that McArthur told him that "performance made it easier to terminate your position"). And while it is true that the allegedly poor performance was only one of the factors that led to the January 1993 reorganization, the other factor being the resignation of Farkosh and the subsequent need to cover her responsibilities, this Court concludes that if plaintiff can "demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in the asserted criticisms of his performance such that "a reasonable factfinder *could* rationally find them unworthy of credence" then plaintiff has in turn undermined the stated reasons for the reorganization sufficiently to survive summary judgment. *Fuentes,* 32 F.3d at 765 (citation omitted). Unfortunately for plaintiff, however, a review of the evidence of record reveals that plaintiff has failed to meet this burden.

In the memorandum written at the time of the January 1993 reorganization, Maloney listed thirteen areas in which he considered plaintiff's performance to be poor. Memorandum from Maloney to file of 1/22/93. Many of the performance failures cited by Maloney are undisputed by plaintiff. *See* Sosky Dep. at 169-70 (plaintiff conceding that he did not perform or get involved to the extent he could or should have in the McGraw project); Sosky Dep. at 184 (plaintiff conceding that he never determined what financial reports could be eliminated); Sosky Aff. ¶ ¶ 4-5 (same); Sosky Dep. at 254, 256 (plaintiff conceding that he was unable to determine for Maloney whether a new purchase order reporting receiving system would lead to staff reductions); Maloney Dep. at 96-98 (Maloney made substantial edits to the draft policy manual); Sosky Aff. ¶ 6 (without characterizing edits, noting that edits were made); appendix to response by plaintiff to motion for summary judgment ("appendix of plaintiff"), Exhibit 36 (draft policy manual with Maloney's extensive edits); Sosky Dep. at 253 (plaintiff contesting statement by Maloney that he made no efforts to remedy delays in audit reports, but not contesting that audit reports continued to be late despite his efforts); *see also* response by plaintiff to motion for summary judgment at 36-39 & Appendix A (challenging the various alleged performance failures, but failing to address Maloney's criticisms with regard to the Kress warranty issue and not contesting that plaintiff failed to continue to submit daily activity reports to Maloney). It is true that the evidence of record viewed in the light most favorable to plaintiff reveals that Maloney was mistaken with

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 32139 (E.D.Pa.)
(Cite as: 1996 WL 32139 (E.D.Pa.))

Page 7

regard to some of his criticisms. *See* Sosky Dep. at 219-21, 223-24 (challenging Maloney's assertion that the FAS 106 project was technically difficult or inappropriate to assign to Flora Klein); Sosky Dep. at 173 (contrary to Maloney's assertion, plaintiff recalls Maloney taking personal responsibility for the Green Book graphs instead of assigning them to plaintiff); Hughes Dep. at 32 (same); Sosky Aff. ¶ 2 (stating that contrary to Maloney's assertion, plaintiff was never given responsibility for the Green Book executive summaries); Sosky Dep. at 250 (stating that Maloney told him that the ADP project should be dropped); Mclain Dep. at 11 (stating that ADP decided to drop the proposed project with IMS); Sosky Aff. ¶ 3 (stating that contrary to Maloney's assertion, he never told Maloney that a certain accounting task could not be done); Hughes Dep. at 61 (same); Sosky Dep. at 245 (stating that the Gary project did not initially involve paperflow reduction, contrary to Maloney's assertion); Sosky Aff. ¶ 7 (same); Bochnak Dep. at 57 (professing no memory of reviewing much less commenting negatively on a memorandum from Sosky regarding the Chaparral Lease, contrary to the assertion by Maloney). But Maloney's mistakes in some of these areas, as well as the disagreement by plaintiff with some of Maloney's subjective evaluations of his performance, are not enough to allow a reasonable factfinder to infer that the stated reason for the elimination of plaintiff's position was a pretext for age discrimination. *See Fuentes, 32 F.3d at 765* ("[t]o discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shred, prudent, or competent").

**\*8** In an attempt to shore up his attack of the legitimate reasons for the elimination of his position, plaintiff also points to his excellent performance evaluation history, the reference to age in a 1990 human resources document, the use of birth of date on the evaluation forms created in 1991, the poor performance of younger employees who still retained their positions, the lack of increase in his salary in the August 1992 reorganization, and the allegedly agist comments of Maloney. Having carefully reviewed the record, this Court concludes that to the degree that these allegations are supported in their record they do not, even when combined with the errors in Maloney's evaluation of plaintiff's performance, "demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in the stated reason for the elimination of plaintiff

position such that "a reasonable factfinder *could* rationally find [it] unworthy of credence." *Fuentes, 32 F.3d at 765* (citation omitted). The past performance evaluations of plaintiff are of little weight not only because plaintiff's supervisor changed in 1992 but also because his position and responsibilities changed significantly in August 1992. *See* Maloney Dep. at (describing August 1992 new position for plaintiff); memorandum from Maloney to all IMS employees of 8/3/92 (same); McArthur Dep. at 27 (stating that expectations for performance in Finance Department were raised by Maloney); *see also Billet v. CIGNA Corp., 940 F.2d 812, 826 (3d Cir.1991)* ("prior good evaluations alone cannot establish that later, unsatisfactory evaluations are pretextual"). The references to age in the 1990 document cannot be connected to the 1993 termination decision as there is no evidence that Maloney, who joined IMS in 1992, ever saw this document. The date of birth blank also cannot be connected to the January 1993 decision, as it is undisputed that Maloney never filled in the birth date blank on the evaluation forms he completed. *See* Maloney Dep. at 82-83. And while Maloney was certainly critical of other, younger employees without terminating them, plaintiff's situation is distinguishable from their situations as it is undisputed that his position was eliminated at least in part because of the shuffling of responsibilities in the wake of the resignation of his subordinate Farkosh; there is no evidence that a similar situation existed for the other, younger employees. *See* memorandum from Maloney to file of 1/22/93; Maloney Dep. at 110, 242. The lack of a salary increase in August 1992 remains unexplained, [FN5] but the other, younger employees who received salary increases in August 1992 were not in positions similar to plaintiff so there is little evidentiary value to this lack with regard to the claim by plaintiff of age discrimination in his termination five months later. And finally, this Court concludes that the various "agist" comments that have already been discussed are not only too stray and too remote from the decision to eliminate plaintiff's position as to constitute direct evidence of age discrimination, they are also too stray and too remote from the decision to support a reasonable indirect inference of age discrimination. [FN6] *See, e.g., Armendariz v. Pinkerton Tobacco Co., 58 F.3d 144, 153 (5th Cir.1995)* (holding that comments by decisionmaker to another employee that she was "getting old" and "losing her memory" were too remote and vague to be probative of age discrimination against plaintiff), *cert. denied,* 65 U.S.L.W. 3349 (U.S. Jan. 8, 1996) (No. 95-702); *Duvall, 1995 WL 581910, at \*10* (repeated "young

Not Reported in F.Supp.                                                                                    Page 8
Not Reported in F.Supp., 1996 WL 32139 (E.D.Pa.)
**(Cite as: 1996 WL 32139 (E.D.Pa.))**

turks" comment by decisionmaker lacked sufficient nexus with decision to eliminate plaintiff's position to defeat motion for summary judgment); *Perry v. Prudential-Bache Securities, Inc.,* 738 F.Supp. 843, 851, 853 n. 5 (D.N.J.1989) (holding that "new blood" and "new leadership" comments by decisionmaker, as well as joking comments regarding the age of plaintiff were insufficient to discredit the legitimate reasons put forward for the termination of plaintiff), *aff'd without op.,* 904 F.2d 696 (3d Cir.), *cert. denied,* 498 U.S. 598 (1990).

> FN5. The attempt by defendants to explain this lack of salary increase was not supported by citation to the record and, under any conditions, plaintiff has produced evidence refuting the stated reason.

> FN6. Indeed, several of the comments which plaintiff asserts are blatantly agist are undisputedly not so. Specifically, the "birthdays" comment was made in the undisputed context of plaintiff taking days off to celebrate the birthdays of various family members, so the only reasonable interpretation of Maloney's comment is that it was a criticism of plaintiff for taking days off, not that it was an attack on plaintiff because of his age. *See* Sosky Dep. at 102-03; Maloney Dep. at 103-04. In addition, the "wake up, Frank" comment, without more, is not clearly agist and indeed plaintiff at the time the comment was made did not identify it as an agist comment. *See* Sosky Dep. at 128-29. And the "years" comments were made in the context of either noting plaintiff's ability to help more inexperienced employees or noting that he should be performing his job better, not in a context that would allow a reasonable inference that Maloney considered plaintiff's many years of service to be a negative. *See* Sosky Dep. at 80-81.

**\*9** Having carefully reviewed the evidence of record and the various arguments by plaintiff, this Court concludes that plaintiff has failed to produce sufficient evidence so as to allow a reasonable factfinder to determine that the stated reason for the elimination of plaintiff's position was mere pretext even if plaintiff's allegedly poor performance played a role in that decision. As a result, the motion for summary judgment will be granted as to the claim by plaintiff of age discrimination in connection with his termination and the elimination of his position.

*B. Hostile Work Environment*

With regard to claims of a hostile work environment, the Supreme Court has stated that:

> [M]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview.... But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.

*Harris v. Forklift Sys., Inc.,* 114 S.Ct. 367, 370-71 (1993) (citations omitted). The Court of Appeals for the Third Circuit has stated that the following five elements must be met in order to establish a sexually hostile work environment:

> (1) the employees suffered intentional discrimination because of their sex, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*Spain v. Gallegos,* 26 F.3d 439, 447 (3d Cir.1994). While *Harris* and *Spain* involved sexually hostile work environment claims brought pursuant to Title VII, the parties have assumed and this Court agrees with their assumption that these legal standards are transferrable to the ADEA context. *See Young v. Will County Dep't of Public Aid,* 882 F.2d 290, 294 (7th Cir.1989) (adopting Title VII sexual harassment standards in the context of an age hostile work environment claim).

Plaintiff points to the various comments already discussed as constituting the hostile work environment that he allegedly experienced from August 1992 to January 1993. Having reviewed these comments, this Court concludes that many of these comments do not on their face relate to plaintiff's age, and the remaining comments are too few and too indirect to demonstrate either pervasive and regular discrimination or that a reasonable person of the same age as plaintiff and in plaintiff's position

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 32139 (E.D.Pa.)
**(Cite as: 1996 WL 32139 (E.D.Pa.))**

Page 9

would have been detrimentally affected by these comments. Indeed, this alleged "hostile work environment" was so subtle that plaintiff did not realize that he had been the subject of age discrimination as opposed to unexplained unfair treatment until he was actually terminated. *See* Sosky Dep. at 69-72. This Court concludes, therefore, that plaintiff has failed to come forward with sufficient evidence to allow a reasonable factfinder to infer that he was subjected to a hostile work environment because of his age. As a result, the motion for summary judgment will be granted with respect to the claims by plaintiff of a hostile work environment based on his age.

*C. Retaliation*

**\*10** The ADEA provides that "[i]t shall be unlawful for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section." 29 U.S.C. § 623(d). The PHRA similarly provides that "[i]t shall be an unlawful discriminatory practice ... (d) [f]or any ... employer ... to discriminate in any manner against any individual because such individual has opposed any practice forbidden by [the PHRA]." 43 Pa. Cons.Stat. Ann. § 955. In order for a plaintiff to make out a prima facie case of retaliation in the context of an employment discrimination claim he must demonstrate: "(1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the protected conduct and the adverse action." *Barber,* 68 F.3d at 701.

It is true that plaintiff complained of his allegedly unfair treatment at the hands of Maloney to McArthur and McHenry in the IMS Human Relations Department, that McArthur told Maloney about the complaints of plaintiff, and that Maloney was critical of the fact that plaintiff had gone to McArthur. *See* Maloney Dep. at 173-74. But it is also undisputed that plaintiff never mentioned age discrimination to McArthur or McHenry. Sosky Dep. at 287. Plaintiff, without citing any legal authority to this effect, asks this Court to conclude that merely complaining generally about unfair treatment is protected by the ADEA and PHRA if notice of those complaints reaches the person who is allegedly engaging in age discrimination. Unfortunately for plaintiff, the Court of Appeals for the Third Circuit recently addressed this exact argument and declined to make this extension. *Barber,* 68 F.3d at 701-02. The motion for summary judgment will therefore be

granted as to the claims by plaintiff of retaliation.

III. CONCLUSION

For the foregoing reasons, the motion by defendants for summary judgment will be granted as to all of the claims by plaintiff.

An appropriate Order follows.

ORDER

AND NOW, this 24th day of January, 1996, upon consideration of the motion by defendants International Mill Service, Inc. and William Maloney for summary judgment (Document No. 16), the various responses by plaintiff Francis Sosky thereto, the various replies by defendants in further support of their motion, and the pleadings, depositions, answers to interrogatories, admissions on file, affidavits, and other discovery of record, having found that there are no genuine issues of material fact and that defendants are entitled to judgment in their favor as a matter of law for the reasons set forth in the foregoing memorandum, it is hereby ORDERED that the motion for summary judgment is GRANTED.

JUDGMENT IS HEREBY ENTERED in favor of defendants International Mill Service, Inc. and William Maloney and against plaintiff Francis Sosky.

This is a FINAL JUDGMENT on all claims.

Not Reported in F.Supp., 1996 WL 32139 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

<u>Citation # 1</u>
**1998 US Dist Lexis 2391**

🕐 Cited , As of Sep 30 , 2007

THOMAS COOPER, Plaintiff vs. BINNEY & SMITH, INC., Defendant

CIVIL ACTION NO. 96-6230

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1998 U.S. Dist. LEXIS 2391

February 25, 1998, Decided
February 26, 1998, Filed

**DISPOSITION: [*1]** Defendant's motion for summary judgment granted and judgment entered in favor of the defendant.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Plaintiff employee brought suit against defendant employer under 42 U.S.C.S. § 2000e-2(a), part of Title VII of the Civil Rights Act of 1964, as well as 42 U.S.C.S. § 1983, claiming that he was treated less favorably than his white coworkers. The employer filed a motion for summary judgment.

**OVERVIEW:** The court granted the employer's motion for summary judgment, first holding that the employee could not state a § 1983 claim because he had not established that the employer was an instrumentality of the state. Turing to the Title VII claim, the court stated that the employee had not established a prima facie case of racial discrimination based on denial of overtime opportunities and a hostile work environment. Noting that the employee had worked overtime and had declined opportunities to work additional overtime, the court stated that the employee had established nothing more than that he might have occasionally been passed over for the opportunity to accept or decline overtime hours. As for his more generalized complaints of a hostile work environment, the court stated, the employee had not produced any evidence from which a reasonable inference could be drawn that a supervisor scrutinized him more closely because of his race. Moreover, the court stated, the employee testified to only one instance of actual discipline during his employment and had not put forth any evidence to suggest that white co-workers who made mistakes were treated differently.

**OUTCOME:** In an employee's case alleging discrimination under Title VII of the Civil Rights Act of 1964 as well as § 1983, the court granted the employer's summary judgment motion.

**CORE TERMS:** summary judgment, overtime, supervisor, deposition, genuine, material facts, detrimentally, subjected, co-worker, warning, race discrimination, prima facie case, factfinder, employment discrimination, legal standards, evidence to support, reasonable inferences, reasonable person, sufficient to support, pervasive, discovery, opposing, movant, discriminatory conduct, retaliation, purported, warned, racial discrimination, work environment, essential elements

**LexisNexis® Headnotes**

Civil Rights Law > Section 1983 Actions > Elements > Color of State Law > General Overview
Civil Rights Law > Section 1983 Actions > Scope

HN1 ⬚ In order to establish defendants' liability under 42 U.S.C.S. § 1983, plaintiff is required to allege and prove, at a minimum, the two essential elements of a § 1983 civil rights claim, i.e., 1) deprivation of rights secured by the Constitution or laws of the United States, (2) by persons acting under color of state law. Plaintiff

must, therefore, demonstrate that the defendants violated protected rights and that their actions were fairly attributable to the state.

Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > Summary Judgment > Opposition > General Overview
Civil Procedure > Summary Judgment > Standards > General Overview

Summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, i.e., one upon which a reasonable factfinder could base a verdict for the nonmoving party and one which is essential to establishing the claim. HN2 The court is not permitted, when considering a motion for summary judgment, to weigh the evidence or to make determinations as to the credibility thereof. Its sole function, with respect to the facts, is to determine whether there are any disputed issues and, if there are, to determine whether they are both genuine and material. The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well.

Civil Procedure > Summary Judgment > Evidence
Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > Summary Judgment > Opposition > General Overview

In order to obtain a summary judgment, the proponent of the motion has the initial burden of identifying, from the sources enumerated in Fed. R. Civ. P. 56, evidence which demonstrates the absence of a genuine issue of material fact. When confronted by a properly supported motion for summary judgment, the opposing party is required to produce, from the same sources, some contrary evidence which could support a favorable verdict. Thus, the mere existence of some evidence in support of the non-moving party will not HN3 be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on the issue. Additionally, where the non-movant, usually the plaintiff, bears the burden of proof on the issue which is the subject of the summary judgment motion and is confronted by the defendant's argument that the facts established through the discovery process do not support the claim, that party must identify evidence of record sufficient to establish every element essential to the claim.

Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > Summary Judgment > Opposition > General Overview
Civil Procedure > Summary Judgment > Standards > Materiality

To defeat summary judgment, the party opposing the motion may not rest upon mere denials of the facts identified by the movant as supportive of its position, nor upon the vague and amorphous argument that the record somewhere contains facts sufficient to support its claims. Instead, the party resisting the motion for summary judgment is required to identify, specifically, the evidence of record which supports the claim and HN4 upon which a verdict in its favor may be based. If the movant succeeds in demonstrating that there are no genuine issues of material fact in dispute, the court must then be satisfied that the moving party is entitled to judgment as a matter of law. Obviously, it will avail the proponent of summary judgment nothing if the undisputed facts, considered in light of the legal standards applicable to the claim, do not support a judgment in its favor.

Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview
Labor & Employment Law > Affirmative Action > General Overview
Labor & Employment Law > Discrimination > General Overview

The burden-shifting analysis established in McDonnell Douglas is the appropriate analysis for summary judgment motions in cases alleging violations of Title VII of the Civil Rights Act of 1964 based upon racial HN5 discrimination. Thus, to properly evaluate defendant's summary judgment motion, the court must first determine whether plaintiff has adduced sufficient evidence to support a prima facie case, i.e., (1) that he is a member of a protected class; (2) that he was qualified for the position in issue; (3) that he was subjected to an adverse employment action; (4) that employees not in the protected class were treated more favorably. If plaintiff succeeds in properly articulating a prima facie case, defendant must then come forward

with evidence which would permit the factfinder to conclude that there was a legitimate, nondiscriminatory reason for its unfavorable action. At that point, plaintiff must produce evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Labor & Employment Law > Discrimination > Disparate Treatment > Employment Practices > General Overview
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Racial Discrimination > Proof > Burdens of Proof > Employee Burdens

HN6 To the extent that plaintiff asserts a claim for employment discrimination resulting from an intimidating or offensive work environment, plaintiff must show that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.

**COUNSEL:** For THOMAS COOPER, PLAINTIFF: ALLEN R. WASHINGTON, CHAUNCEY HARRIS, PHILA, PA USA.

For BINNEY AND SMITH, DEFENDANT: JULIA E. VAUGHTERS, MORGAN, LEWIS & BOCKIUS, PHILA, PA USA.

**JUDGES:** E. Mac Troutman, S.J.

**OPINION BY:** E. Mac Troutman

**OPINION**


**MEMORANDUM**

Plaintiff Thomas Cooper has been employed by defendant Binney & Smith, a wholly owned subsidiary of Hallmark Cards, Inc., since 1978. During his tenure at Binney, where he has worked as a floor laborer and forklift operator, plaintiff received one documented disciplinary warning, was never denied requested shift changes and was never terminated. Nevertheless, Cooper alleges that he has faced pervasive racial discrimination and harassment during his employment, including threatening conduct, closer scrutiny of his work habits than white employees received, and denial of opportunities for overtime. Consequently, plaintiff filed complaints with the Pennsylvania Human Relations Commission (PHRC) in 1985 and with the EEOC in 1995. When the EEOC dismissed plaintiff's most recent charge in June, 1996, he commenced this action pursuant to Title **[*2]** VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). [1]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[1] In his complaint, plaintiff also cited 42 U.S.C. § 1983 as a basis for his claims. Plaintiff has not, however, either alleged or established any facts to support a § 1983 claim. Indeed, in his brief in opposition to defendant's motion for summary judgment, he has not even attempted to argue that the circumstances underlying his claims constitute a violation of § 1983.

HN1 In order to establish defendants' liability under § 1983, plaintiff is required to allege and prove, at a minimum, the two essential elements of a § 1983 civil rights claim, i.e., 1) deprivation of rights secured by the Constitution or laws of the United States, (2) by persons acting under color of state law. *Piazza v. Major League Baseball*, 831 F. Supp. 420 (E.D. Pa. 1993). Plaintiff must, therefore, demonstrate that the defendants violated protected rights and that their actions were "fairly attributable" to the state. *McKeesport Hospital v. Accreditation Council*, 24 F.3d 519, 523 (3rd Cir. 1994)(Citation omitted)

Since plaintiff has made no effort establish either of these essential elements and since there is absolutely nothing

in the record which suggests that defendant is an instrumentality of the state, and, therefore, could possibly be liable for a violation of rights protected from government intrusion, we conclude that plaintiff's § 1983 "claim" was included in his complaint as mere boilerplate and will not further discuss the substantive legal standards applicable to a § 1983 claim.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

 **[*3]** Upon thorough review of the record produced by defendant in support of its pending motion for summary judgment, the Court concludes that plaintiff has failed to come forward with evidence to either establish an adverse employment action, a basic element of a claim for employment discrimination, or to demonstrate that there are material issues of fact in dispute with respect to whether he was subjected to race discrimination in employment. ² The purported incidents of discriminatory conduct cited by plaintiff in his deposition testimony amount to nothing more than speculation based upon subjective feelings. There are no reasonable inferences possible from the record which suggest that plaintiff was treated less favorably than white employees or that he was threatened or harassed by his supervisors at work, or outside of work, by agents acting on behalf of Binney. Moreover, even if a cognizable Title VII claim could be based upon any of the alleged problems that plaintiff related in his deposition testimony, many such incidents occurred so long ago that any potential claims arising therefrom are clearly time-barred, or plaintiff's testimony was so vague with respect to when such alleged **[*4]** incidents occurred that it is impossible to determine whether they would be presently actionable. Summary judgment in favor of defendant is appropriate, therefore, on all of plaintiff's claims.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

2 The Court is forced to rely entirely upon the record produced by defendant since plaintiff produced none of the evidentiary materials enumerated in Fed. R. Civ. P. 56(c) to support his claims and to oppose the motion for summary judgment.

Despite ample opportunity for discovery, it appears-that plaintiff served no interrogatories until after expiration of the discovery period, and never served document production requests or noticed depositions at all. Consequently, the only evidence available in support of his claims would necessarily be found in plaintiff's own deposition. He has not, however, even attempted to argue that his testimony constitutes evidence sufficient to support his claims or to identify a dispute over material facts essential to his claims.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*Applicable Legal Standards*

1. Summary Judgment

*HN2* Summary **[*5]** judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P 56(c).

To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable factfinder could base a verdict for the nonmoving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The Court is not permitted, when considering a motion for summary judgment, to weigh the evidence or to make determinations as to the credibility thereof. Our sole function, with respect to the facts, is to determine whether there are any disputed issues and, if there are, to determine whether they are both genuine and material. *Id.*

The Court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Tigg Corp. v. Dow Corning Corp*, 822 F.2d 358 (3d Cir. 1987).

*HN3* In order to obtain a summary judgment, the proponent of the motion has the initial burden **[*6]** of identifying, from the sources enumerated in Rule 56, evidence which demonstrates the absence of a genuine issue of material fact. When confronted by a properly supported motion for summary judgment, the opposing party is

required to produce, from the same sources, some contrary evidence which could support a favorable verdict. Thus,

> The mere existence of some evidence in support of the non-moving party will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on the issue.

*Petrucelli v. Bohringer and Ratzinger*, 46 F.3d 1298, 1308 (3rd Cir. 1995).

Additionally, where the non-movant, usually the plaintiff, bears the burden of proof on the issue which is the subject of the summary judgment motion and is confronted by the defendant's argument that the facts established through the discovery process do not support the claim, that party must identify evidence of record sufficient to establish every element essential to the claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). *Equimark Commercial Finance Co. v. C.I.T.* **[*7]** *Financial Services Corp.*, 812 F.2d 141 (3d Cir. 1987).

*HN4* To defeat summary judgment, the party opposing the motion may not rest upon mere denials of the facts identified by the movant as supportive of its position, nor upon the vague and amorphous argument that the record somewhere contains facts sufficient to support its claims. *Childers v. Joseph*, 842 F.2d 689 (3d Cir. 1987). Instead, the party resisting the motion for summary judgment is required to identify, specifically, the evidence of record which supports the claim and upon which a verdict in its favor may be based. *Id.*

If the movant succeeds in demonstrating that there are no genuine issues of material fact in dispute, the Court must then be satisfied that the moving party is entitled to judgment as a matter of law. Obviously, it will avail the proponent of summary judgment nothing if the undisputed facts, considered in light of the legal standards applicable to the claim, do not support a judgment in its favor.

2. Title VII

*HN5* The burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and more recently refined in *St. Mary's Honor Center* **[*8]** *v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993), is the appropriate analysis for summary judgment motions in cases alleging violations of Title VII based upon racial discrimination. Thus, to properly evaluate defendant's summary judgment motion, the Court must first determine whether plaintiff has adduced sufficient evidence to support a prima facie case, *i.e.*, (1) that he is a member of a protected class, in this case, a racial minority; (2) that he was qualified for the position in issue; (3) that he was subjected to an adverse employment action; (4) that employees not in the protected class were treated more favorably. *See, Josey v. Hollingsworth*, 996 F.2d 632 (3rd Cir. 1993).

If plaintiff succeeds in properly articulating a prima facie case, defendant must then come forward with evidence which would permit the factfinder to conclude that there was a legitimate, nondiscriminatory reason for its unfavorable action. *Id.* At that point, plaintiff must produce "evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory **[*9]** reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3rd Cir. 1994).

*HN6* To the extent that plaintiff asserts a claim for employment discrimination resulting from an intimidating or offensive work environment,

> Plaintiff must show that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3rd Cir. 1996).

Thus, in order to defeat summary judgment in this case, plaintiff must first adduce sufficient evidence to establish a prima facie case of race discrimination. In particular, he must at least raise a genuine issue of material fact with respect to whether he suffered any adverse action resulting from disparate treatment, including whether he was subjected to a hostile work environment. Since we conclude that plaintiff has not done so, and, therefore, that **[*10]** he cannot establish the ultimate issue in the case, *i.e.*, that the employer unlawfully discriminated against him, the burden of production in this case does not shift to the employer. Rather, summary judgment is appropriate based upon plaintiff's failure to produce any creditable evidence that he was subjected to adverse employment conditions sufficient to support a claim of race discrimination.

*Discussion*

Plaintiff's claims of adverse employment conditions rest upon the specific allegation that he was, on several occasions, denied the opportunity for overtime hours and upon more generalized complaints that he was harassed by white supervisors and co-workers. At his deposition, however, plaintiff was unable to support his claims by anything more than his own belief that he was the target of racially motivated remarks and/or conduct intended to disadvantage or harass him because of his race. ³

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

3 Our discussion of plaintiff's claims of race discrimination likewise encompasses his purported claim for retaliation based upon his 1986 PHRC complaint and his 1995 EEOC complaint, since plaintiff appears to contend that the allegedly discriminatory conduct that he describes in his deposition had the dual purpose of harassing him because of his race and because of his prior complaints.

The purported retaliation claims add nothing to the viability of this action. In the first instance, retaliation arising from the 1986 complaint, even if plaintiff could now prove that it occurred, is long barred by the statute of limitations. In addition, as noted, plaintiff has consistently failed to establish when alleged instances of discriminatory conduct allegedly occurred. Consequently, it is difficult to determine whether alleged discrimination of more recent vintage occurred before or after plaintiff's 1995 EEOC complaint. Finally, plaintiff has failed to establish that supervisors who allegedly discriminated against him were aware that he had made a complaint or of the incidents upon which such complaint was based.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[*11]** With respect to his claim that he was denied overtime, *e.g.*, plaintiff could not state, initially, how many times he was allegedly denied overtime or when such incidents occurred. (*See*, Plaintiff's Deposition, Exh. C to Defendant's Motion for Summary Judgment, (Doc. # 8), at 55). Although plaintiff stated that he "knew" of at least two occasions when someone with less seniority than he was given the opportunity for overtime, he actually testified that unspecified co-workers had told him that others had worked when he has not asked to do so. (*Id.*) Moreover, when plaintiff did testify, specifically, that he had been denied overtime in February, 1997, he also testified that he had worked 70 hours of overtime in the month prior to his May, 1997, deposition, and that he had declined opportunities for additional hours. (*Id.* at 158--159). In essence, when pressed by defendant's counsel concerning overtime, plaintiff stated that he would like to be given the option of taking overtime whenever it is available, but he does not intend to accept all the overtime that might be available. (*Id.* at 161).

Plaintiff's testimony in this regard establishes nothing more than that **[*12]** he might occasionally have been passed over for the opportunity to accept or decline overtime hours. Plaintiff could not state how often such incidents might have occurred within the period for which he can make a discrimination claim. In addition, plaintiff did not testify that those with less seniority who were purportedly given the overtime opportunities he was denied were white, or even that he has any basis for believing that the conduct of the supervisors who allegedly failed to offer him overtime was intentional rather than the result of mistakes or inadvertent oversights.

With respect to plaintiff's more generalized complaints of a hostile work environment, he first cites several incidents dating to April and October, 1986. In the first instance, liability on plaintiff's current complaint cannot be based upon anything that occurred so long ago, and, therefore, need not be discussed in detail. Moreover, plaintiff has not and cannot produce any evidence, other than his own speculation, that such incidents were actually

directed toward him, were perpetrated for the purpose of harassing him or retaliating against him for filing his 1986 PHRC complaint, or that anyone connected **[*13]** to defendant played any part in them.

Plaintiff's claims of more recent discrimination are similarly insubstantial. Plaintiff stated, *e.g.*, that a former supervisor was known for making racial remarks. (*Id.* at 38). Plaintiff also testified, however, that he had never heard such slurs himself, but had been told of the supervisor's language by other employees. (*Id.*) Plaintiff also stated that the same supervisor would speak to him about talking to other employees for a short period of time while permitting white employees to talk among themselves or look at magazines for much longer periods. (*Id.* at 37, 45). Again, however, plaintiff could not state how often that occurred, or even that he was regularly, rather than occasionally, reprimanded. In addition, plaintiff provided no evidence from which a reasonable inference can be drawn that the supervisor scrutinized him more closely because of his race rather than for other reasons, such as personal animosity arising from factors other than plaintiff's race. Finally, there is no evidence that plaintiff was adversely affected by the supervisor's comments, much less that a reasonable person of the same race in the same position **[*14]** would be detrimentally affected by the conduct of which plaintiff complains.

Plaintiff testified to only one instance of actual discipline during his employment at Binney, a documented verbal warning for failing to date orders and documents. (*Id.* at 86). Although he does not deny that he did, indeed, make the mistake for which he was warned, plaintiff believes that the warning was racially motivated because he was the only black in the Receiving and Distribution Department, and a white co-worker told him that she made mistakes every day that the supervisor called to her attention. (*Id.* at 87). When questioned as to whether that employee or other white employees were given verbal warnings, plaintiff could not positively state that they were not warned, only that he was unaware of anyone else having received a warning.

Once again, plaintiff's testimony in this regard falls far short of evidence of an adverse employment action. In the first instance, it is unclear from the record when the incident occurred. Second, there is no evidence to support plaintiff's suspicion that white co-workers who made mistakes were treated differently. Plaintiff simply does not know that white **[*15]** co-workers were not warned for repeated mistakes, and he has provided no documents suggesting that he or other black employees were subjected to more frequent formal discipline than white employees.

*Conclusion*

It is quite clear that plaintiff has suffered no adverse employment action with quantifiable or even tangible effects, such as loss of compensation or position. Moreover, the perceived slights that plaintiff contends amount to pervasive employment discrimination do not rise to the level of racial harassment in the workplace. During more than nineteen years of employment, plaintiff can pinpoint only a few concrete instances of treatment that even he considers evidence of discrimination, and those are so subjective that no reasonable factfinder could conclude that the events plaintiff described would detrimentally affect a reasonable person of the same race in the same position. Indeed, plaintiff provided no evidence that he himself had been detrimentally affected, in terms of describing manifestations of either physical or mental distress resulting from the purportedly discriminatory treatment of which he complains. Plaintiff's failure to oppose defendant's motion for summary **[*16]** judgment with sufficient evidence to support a prima facie case of race discrimination under Title VII requires that defendant's motion be granted and that judgment be entered in favor of the defendant.

### ORDER

And now, this 25th day of February, 1998, upon consideration of defendant's Motion for Summary Judgment, (Doc. # 8), and plaintiff's response thereto, **IT IS HEREBY ORDERED** that the motion is **GRANTED.**

**IT IS FURTHER ORDERED** that judgment is entered in favor of the defendant, Binney & Smith, Inc., and against the plaintiff.

**IT IS FURTHER ORDERED** that the Clerk shall mark the above-captioned action CLOSED for statistical purposes.

E. Mac Troutman

S.J.