IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                    *    C.A. No. 06-534-MPT
                                  *
              Plaintiff,          *
                                  *
      v.                          *
                                  *
ARAMARK HEALTHCARE                *
SUPPORT SERVICES, INC.;           *
ARAMARK CLINICAL TECHNOLOGY        *
SERVICES, INC.; and ARAMARK       *
MANAGEMENT SERVICES LIMITED        *
PARTNERSHIP,                      *
                                  *
              Defendants.         *

---

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

SCHMITTINGER & RODRIGUEZ, P.A.

BY:  **WILLIAM D. FLETCHER JR., ESQ.**
     Bar I.D. #362
     **NOEL E. PRIMOS, ESQUIRE**
     Bar I.D. #3124
     414 S. State Street
     P.O. Box 497
     Dover, DE   19903
     (302) 674-0140
     Attorneys for Plaintiff

DATED:  October 22, 2007
NEP:pmw

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . .    ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS  .    1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . .    2

STATEMENT OF FACTS . . . . . . . . . . . . . . .    4

ARGUMENT . . . . . . . . . . . . . . . . . . . . .    16
   I.   SUMMARY JUDGMENT STANDARD . . . . . . . .    16
   II.  SUMMARY JUDGMENT SHOULD BE DENIED ON
       PLAINTIFF'S FMLA CLAIM . . . . . . . . .    16
       A.   The McDonnell Douglas Standard . . . .    17
       B.   Retaliation under the FMLA . . . . . .    19
       C.   Defendants retaliated against Plaintiff
           for his exercise of FMLA rights . . .    20
   III. SUMMARY JUDGMENT SHOULD BE DENIED ON
       PLAINTIFF'S AGE DISCRIMINATION CLAIM . . .    26
   IV.  SUMMARY JUDGMENT SHOULD BE DENIED ON
       PLAINTIFF'S HANDICAP DISCRIMINATION CLAIM  .    30
   V.   SUMMARY JUDGMENT SHOULD BE DENIED ON
       PLAINTIFF'S BREACH OF THE COVENANT CLAIM  .    31
   VI.  SUMMARY JUDGMENT SHOULD BE DENIED ON
       PLAINTIFF'S HOSTILE ENVIRONMENT CLAIM . . .    32
   VII. SUMMARY JUDGMENT SHOULD BE DENIED ON
       PLAINTIFF'S SLANDER CLAIM . . . . . . . .    34

CONCLUSION . . . . . . . . . . . . . . . . . . .    35

**TABLE OF AUTHORITIES**

PAGE

**CASES**

Barber v. CSX Distrib. Servs.
   68 F.3d 694 (3d Cir. 1995) . . . . . . . . . . . 29

Bishop v. Wood
   426 U.S. 341 (1976) . . . . . . . . . . . . . . 16

Burch v. WDAF AM/FM
   2002 U.S. Dist. LEXIS 12290
   (E.D. Pa.) at *30 . . . . . . . . . . . . . . . 20

Burlington Northern & Santa Fe Ry. Co. v. White,
   126 S.Ct. 2405 (2006) . . . . . . . . . . . . . 21

Celotex Corp. v. Catrett
   477 U.S. 317 (1986) . . . . . . . . . . . . . . 16

Cifarelli v. Village of Babylon
   93 F.3d 47 (2d Cir. 1996) . . . . . . . . . . . 16

Fuentes v. Perskie
   32 F.3d 759 (3d Cir. 1994) . . . . . . . . . 17-19

Graham v. State Farm Mut. Ins. Co.
   193 F.3d 1274 (11th Cir. 1999) . . . . . . . . 20

Lord v. Souder
   748 A2d 393 (Del. 2000) . . . . . . . . . . . . 32

McCabe v. Sharrett
   12 F.3d 1558 (11th Cir. 1994) . . . . . . . . . 21

McDonnell Douglas Corp. v. Green
   411 U.S. 792 (1973) . . . . . . . . . . . . 17, 26

Moore v. City of Philadelphia,
   461 F.3d 331 (3d Cir. 2006) . . . . . . . . . . 21

O'Connor v. Consolidated Coin Caterers Corp.
   517 U.S. 308 (1996) . . . . . . . . . . . . . . 27

Schliske v. Trans World Entertainment Corp.
   2007 WL 906709 (D. Del.) . . . . . . . . . . . 16

<u>Schofield v. Metropolitan Life Insurance Co.</u>
    2006 WL 2660704 (M.D. Pa.) . . . . . . . . .   23-25

<u>Sempier v. Johnson & Higgins</u>
    45 F.3d 724 (3d Cir.),
    (<u>cert. denied</u>, 515 U.S. 1159 (1995) . . . . . . .   29

<u>Spence v. Funk</u>,
    396 A.2d 967 (Del. 1978) . . . . . . . . . . . . .   34

<u>Steward v. Sears Roebuck & Co.</u>
    231 Fed. Appx. 201 (3d Cir. 2007) . . . . . . . .   28

<u>Thomas v. Town of Hammonton</u>
    351 F.3d 108 (3d Cir. 2003) . . . . . . . . . . .   24

<u>United States v. Diebold</u>
    369 U.S. 654 (1962) . . . . . . . . . . . . . . .   16

<u>Watkins v. Children's Hospital of Philadelphia</u>
    1997 WL 793518 (E.D. Pa.) . . . . . . . . . . .   27

<u>Williams v. Philadelphia Housing Authority</u>
    <u>Police Dept.</u>, 380 F.3d 751 (3d Cir. 2004),
    <u>cert. denied</u>, 544 U.S. 961 (2005) . . . . . . . .   24


**<u>STATUTES</u>**

19 <u>Del</u>. <u>C</u>. §722  . . . . . . . . . . . . . . . .   31

29 CFR §825.220(c)  . . . . . . . . . . . . . .   20

29 U.S.C. §2615(a) and (b) . . . . . . . . . . .   19

Delaware Discrimination in Employment Act,
    19 <u>Del</u>. <u>C</u>. §710 . . . . . . . . . . . . . . .   26

Delaware Handicapped Persons Employment
    Protection Act, 19 <u>Del</u>. <u>C</u>. §720 . . . . . . . .   27, 31

Family and Medical Leave Act, 29 U.S.C. §2601  . . . . .   1


**<u>OTHER AUTHORITIES</u>**

Fed.R.Civ.P. 56(c) . . . . . . . . . . . . . . .   16

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Daniel Miller ("Miller") filed a Complaint in the Delaware Superior Court against Defendants Aramark Healthcare Support Services, Inc., Aramark Clinical Technology Services, Inc., and Aramark Management Services Limited Partnership (collectively "Defendants"), asserting claims for violation of the Family and Medical Leave Act, 29 U.S.C. §2601, *et seq.* ("the FMLA"), and state law claims for age discrimination, handicap discrimination, breach of the covenant of good faith and fair dealing, and slander. Defendants removed the action to this Court. Following discovery, Defendants filed a Motion for Summary Judgment. This is Plaintiff's Answering Brief in opposition to that Motion.

1

## SUMMARY OF ARGUMENT

1.  This Court may grant summary judgment only if, viewing all facts in a light most favorable to Plaintiff, there is no genuine issue as to any material fact.

2.  Summary judgment should be denied on Plaintiff's FMLA claims because there is ample evidence in the record from which a factfinder could reasonably either disbelieve the employer's articulated legitimate reasons or believe that an invidious reason was more likely than not a motivating or determinative cause of Defendants' actions.

3.  For similar reasons, summary judgment should be denied on Plaintiff's age discrimination claims. Defendants' proffered reasons for terminating Plaintiff represented pretext for invidious discrimination against him.

4.  Summary judgment should be denied on Plaintiff's handicap discrimination claims. Defendants regarded Plaintiff as having a disability and discriminated against him on that basis.

5.  This Court should deny summary judgment to Defendants on Plaintiff's claims for breach of the covenant of good faith and fair dealing. The record shows that Defendants falsified and manipulated Plaintiff's employment records to create fictitious grounds for his termination.

2

6.    Summary judgment should be denied on Plaintiff's hostile environment claims, as the evidence in the record satisfies the requirements for such a claim.

7.    Plaintiff's slander claims should also proceed to trial.  Defendants defamed Plaintiff by maligning him in his business and profession.

## STATEMENT OF FACTS

Until his termination on April 15, 2005, Plaintiff was employed by Defendants at Bayhealth Medical Center ("Bayhealth") as a Biomedical Equipment Technician, or, as designated by Defendants, a Clinical Engineering Technician ("CE Technician").[1]    During Plaintiff's employment by Defendants, Defendants had a contractual relationship with Bayhealth whereby Defendants provided services to Bayhealth regarding the maintenance and repair of biomedical equipment.

Plaintiff was born on February 18, 1951.  He began working in the biomedical equipment field in the mid to late 1970's.  Miller Dep. 13 (B6)[2]

---

[1]  Defendants state at page 1 of their brief that Plaintiff was employed by ARAMARK Management Services Limited Partnership, not by the other two Defendants, ARAMARK Clinical Technology Services, Inc., and ARAMARK Healthcare Support Services, Inc.  However, at page 4 of their brief, Defendants claim that Plaintiff was employed by ARAMARK Clinical Technology Services, Inc., a division of ARAMARK Healthcare Support Services, Inc.  With this confusion by Defendants themselves regarding Plaintiff's employment status, Plaintiff submits that if, as Plaintiff is requesting, summary judgment is denied for substantive reasons, it should be denied for all three Defendants.

[2]  Reference is to page 13 of Plaintiff's deposition, which is included in the Appendix filed herewith at page B6.  To avoid overburdening the Court with excessive paperwork, Plaintiff has cited, where possible, to the Appendix filed with Defendants' Opening Brief, which includes excerpts of certain of the depositions taken in this case.  Where pages of the depositions are cited that were not included in Defendants' Appendix, Plaintiff has included those pages in his own Appendix.

4

In the early 1990's, Plaintiff moved to Delaware and began working at Milford Memorial Hospital in Milford, Delaware ("MMH"). Eventually, following various changes in contractual responsibility and buyouts, Plaintiff became an employee of Defendant in October 2002, when Defendants bought out Plaintiff's former employer. Miller Dep. 45 (A94).[3]

Plaintiff was an excellent employee. The staff of Bayhealth frequently complimented his performance. Ted Lehmann Affidavit ¶4 (B39).[4]

Plaintiff was one of Defendants' oldest employees at Bayhealth. Lehmann Aff. ¶9 (B39). The average age of Defendants' other employees was 10 to 15 years younger than Plaintiff. Affidavit of Gregory Wilson ¶5 (B42).[5]

On July 1, 2004, Defendants placed a new supervisor, Jonathan Hill, over its employees at Bayhealth. Upon his arrival at Bayhealth, Hill felt threatened by Plaintiff, as Plaintiff was more knowledgeable than Hill. Lehmann Aff. ¶6 (B39). Hill was considerably younger than Plaintiff; during

---

[3] Reference is to page A94 of Defendants' Appendix.

[4] Lehmann was employed by Defendants until April 2007 as a radiology engineer at Bayhealth.

[5] Wilson was another biomedical equipment technician, or CE Technician, employed by Defendants at Bayhealth until June 2005. Wilson Aff. ¶1 (B41).

the period that he supervised Plaintiff from July 2004 to April 2005, Hill was 38. Hill Dep. 4 (B13). During the period that Hill supervised Plaintiff, he unfairly targeted Plaintiff. Wilson Aff. ¶3 (B41). Because the work of the CE Technicians was highly technical and highly creative, this made it easier for Hill to criticize the work of those employees whom he wanted to criticize. Wilson Aff. ¶6 (B42).

According to Defendants, Hill was brought in to improve the performance of Defendants' unit at Bayhealth. Defendants' Opening Brief at 5. However, it is important to note that there were no performance problems with Milford Memorial Hospital, where Plaintiff was based. In fact, while Bayhealth as a whole was at 27 or 28 percent completion during the relevant period prior to Hill's arrival, Milford Memorial was at 87 percent completion. Miller Dep. 104 (A124).

**Plaintiff's Medical Leave and Initial Return to Work**

In June 2004, prior to Hill's arrival, Plaintiff had been diagnosed with stage 2 cancer, specifically squamous cell carcinoma. Miller Dep. 56 (A97). Plaintiff went out on medical leave starting August 6, 2004. Portions of the floor of Plaintiff's mouth and of his tongue had to be removed because the cancer had spread there, and part of Plaintiff's jaw had to be replaced with bone taken from his leg. Miller

6

Dep. 57-59 (A98 to A100).    Thereafter, the donor site in Plaintiff's leg became infected.    Miller Dep. 60 (B7). Plaintiff had a second surgery on his leg to address the infection in October 2004.    Miller Dep. 64-65 (B8). Plaintiff called Hill to tell him that he would not be coming back as planned.    Miller Dep. 64 (B8).    As a result, Plaintiff did not return from medical leave until December 10, 2004.

When Plaintiff returned to work, he was still using a cane to walk and still experiencing pain in his jaw.    Miller Dep. 67, 68 (B9).    Hill's unfair treatment of Plaintiff increased markedly upon Plaintiff's return to work from medical leave.    Lehmann Aff. ¶7 (B39).    Hill treated Plaintiff unfairly for two primary reasons, his age and his inability to function fully immediately after his return from medical leave.    Lehmann Aff. ¶8 (B39).

When Plaintiff initially returned to work, due to difficulty that he was still experiencing walking, he was on light duty and "bench work" in the shop for approximately one month.    Miller Dep. 105, 106 (A125, A126).    However, other employees were not required to bring the equipment to Plaintiff, since Plaintiff worked on equipment that was "backed up" in the shop.    Miller Dep. 106 (A126).

7

Hill began treating Plaintiff more unfairly by running him all over the hospital and assigning him tasks that other employees could have performed. Lehmann Aff. ¶10 (B39). Plaintiff was overburdened with work but received no assistance. Miller Dep. 134, 135 (A147, A148).

During the period that Plaintiff was out on medical leave, Hill had instituted a new rotation system whereby employees would rotate between the MMH and Kent General Campuses. Shortly after Plaintiff returned from medical leave, the first rotation ended, and Hill then scheduled Plaintiff to rotate to MMH a full seven months later, that is, approximately September 2005. Apparently, MMH was a preferred rotation, particularly for Plaintiff, for whom that work location was much closer to his home. Miller Dep. 108 (A128). When Plaintiff questioned Hill regarding why he was put at the end of the second rotation, Hill stated that it was the policy, when someone returned from being out on leave, to put that person at the end of the rotation. Miller Dep. 108-109 (A128, A129). However, this was not contained in any written policy.

### Discipline is imposed upon Plaintiff for alleged documentation issues

On March 4, 2005, and March 16, 2005, Plaintiff was disciplined for alleged inaccurate and incomplete documentation. (A194-A201). However, incomplete and

8

inaccurate documentation was a problem throughout the department, and it was unfair for Hill to target Plaintiff for this problem.   Lehmann Aff. ¶13 (B40); Wilson Aff. ¶8 (B42).

Prior to receiving the disciplinary document regarding alleged incomplete and inaccurate documentation dated March 4, 2005, (A194-A199), Plaintiff had observed Sharon Money, the administrative assistant for Defendants' department at Bayhealth, returning incomplete work order forms to Bill McClement, a junior technician who was approximately 25 years old, and to Sterling Townsend, an intermediate level technician who was approximately 27 years old, requesting that they be completed prior to her submitting them.   No disciplinary action was ever taken towards McClement or Townsend for failure to complete documentation.   In addition, John Ritterhoff, a senior technician who is also significantly younger than Plaintiff[6] would routinely turn in incomplete documentation, and Ms. Money, his sister-in-law, would return them to him for him to complete prior to her submission of the documentation to Hill.   See Plaintiff's Affidavit and attachment (B44-B46).   Ritterhoff was not disciplined for his failure to complete documentation.

_____

6  Ritterhoff was 45 years old at the time of Plaintiff's termination.  Defendants' Objections and Responses to Plaintiff's Second Request for Production of Documents at 6 (B19).

Defendants claim that Plaintiff failed to complete documentation after being specifically instructed regarding how to do so during the competency testing in January 2005. However, the documentation system was a new system with which Plaintiff (along with other employees) was unfamiliar, and the training that Plaintiff received during the competency testing was extremely cursory, and involved Hill's flashing through memories and screens for 10 to 15 minutes. Miller Dep. 145 (A153). Only two or three questions on the competency test itself addressed the new documentation system. Miller Dep. 146 (A154). Moreover, while other employees had been counseled regarding documentation problems, Miller was the first employee to be written up regarding this issue. Miller Dep. 143 (B10).

### Discipline re: Installation of treadmill

On March 24, 2005, Plaintiff was disciplined for an incident that had occurred on February 24, 2005. The incident involved the installation of a stress machine/ treadmill. At the time of the installation, which was handled by a manufacturer representative, Plaintiff was also having to deal with an issue with a blood warmer for a bypass machine in the operating room. Miller Dep. 155-156 (B11). Ultimately, an emergency stop switch was installed on the vertical rail, which was exactly how the switch had been

10

installed on the other stress machine/treadmill located at
Bayhealth.  Miller Dep. 160, 163 (A160, A162).  It was Hill's
position, however, that this was a safety issue, and Hill
wanted the switch moved.  Miller Dep. 161 (A161).  However,
Hill admitted to Plaintiff that, when he called the
manufacturer, the manufacturer would not commit to an
appropriate location for the switch.  Id.

When Hill issued a disciplinary document to Plaintiff
for this incident on March 24, 2005, which Plaintiff refused
to sign, Plaintiff pointed out to Hill that Sterling Townsend
had not been charged with a safety violation, even though he
had supervised the installation of the emergency switch in
the exact same location on the other stress machine/treadmill
located at Kent General.  However, Hill dismissed this
concern.  Attachment to Plaintiff's Aff. (B46).

### Hill denies Plaintiff requested leave

Plaintiff requested time off in early April for a
doctor's appointment.  While Plaintiff did not necessarily
inform Hill that he needed the time for a doctor's
appointment, he was not required to do so, as employees were
not required to obtain prior approval for paid time off,
i.e., they were not required to inform their supervisors of
the reason for a requested time off.  Lehmann Aff. at ¶14
(B40); Miller Dep. 116 (A134).  Hill initially told Plaintiff

11

that he would not be allowed to take the time off, however, for disciplinary reasons. Miller Dep. 115 (A133). Subsequently, Plaintiff spoke to Hill's supervisor, Tom Cuthbertson, who gave Plaintiff the time off that he needed for the doctor's appointment. Miller Dep. 118-119 (A135-A136).

### Discipline for incident involving defibrillator

In early April 2005, Plaintiff was doing preventive maintenance inspections and found a defibrillator with a problem. He went to the charge nurse, who informed him that he was not allowed to take the defibrillator from the floor without replacing it. Miller Dep. 164 (A163). Plaintiff did not attempt to repair the equipment at the location or tag it, because he planned to remove it as soon as he found a replacement. Miller Dep. 165 (A164). The equipment was left on the floor for only half an hour while Plaintiff looked for a replacement. Id. During three months of inspections rounds as instituted by Hill, no one had found the problem with the defibrillator until Plaintiff had found it. Miller Dep. 165-166 (A164-A165).

Plaintiff searched the hospital and was unable to find a replacement defibrillator. Miller Dep. 165 (A164). Plaintiff had a conversation with Ritterhoff and explained that the charge nurse was unwilling to give up the

12

defibrillator and was with a patient.  Ritterhoff suggested that Plaintiff call the manufacturer and order a replacement. While Plaintiff and Ritterhoff were having this discussion, Hill ran out the door and came back with the defibrillator, saying, "That's how you do it.  You just take it."  Miller Dep. 166 (A165).  After Plaintiff ordered the defibrillator from the manufacturer, he left for the day, as he had a doctor's appointment.  Miller Dep. 166 (A165).

Subsequently, Hill issued a disciplinary document to Plaintiff, which Plaintiff refused to sign.  Hill also testified at his deposition that, when he removed the defibrillator, he allegedly discovered a quarter-inch gap in the back of the device, allegedly representing a shock hazard.  Hill Dep. 58-59 (A58-A59). [7]   However, Plaintiff never saw this gap, either before or after the incident. Plaintiff's Aff. ¶3 (B44).  Moreover, while Hill mentioned a gap in "the top and bottom case" (not in the back of the device) in the disciplinary document, he did not indicate that it represented a shock hazard.  (A206)

### Hill's termination meeting with Plaintiff

On April 15, 2005, Hill met with Plaintiff and informed him that he was being terminated.  Neither in the meeting

---

[7]  Contrary to the indication at page 15 of Defendants' brief, Plaintiff did not testify in support of this allegation.

13

with Plaintiff nor in the written memorandum that Hill wrote to his supervisor memorializing the reasons for the termination were the treadmill incident or the defibrillator incident mentioned as reasons for the termination. Miller Dep. 168 (A166); Termination Memo (A208-A209); Plaintiff's Aff. ¶4 (B44-B45). In addition, there was no reference to "safety" issues. _Id._ It was not until Plaintiff filed a discrimination claim with the Delaware Department of Labor ("DDOL") that Defendants alleged that the defibrillator incident "along with additional work issues relating to critical equipment led to the termination of the charging party." Defendants' Position Statement dated February 17, 2006, at 2 (last paragraph) (B2).

### John Ritterhoff

As mentioned *supra*, at least three co-workers who were younger than Plaintiff were not disciplined for similar infractions regarding documentation, and one of these younger co-workers was not disciplined for allegedly placing a stop switch on a treadmill/stress machine. One of these younger employers was John Ritterhoff, who was 45 years old at the time of Plaintiff's termination.

John Ritterhoff was extremely deficient in his performance, including the keeping of accurate and complete documentation. Wilson Aff. ¶9 (B42); Lehmann Aff. ¶11 (B39).

14

Ritterhoff's documentation was backed up for 18 to 24 months. Wilson Aff. ¶9 (B42). He frequently filled out documentation improperly or left it incomplete. Id. Orders for equipment were fouled up due to his incompetence. Id. His work area was extremely messy, which contributed to holding up the processing of documentation. Id.

Ritterhoff was counseled regarding his disorganized and messy work area, but he never received substantive discipline when the problem remained uncorrected. This problem continued at least until the end of Lehmann's employment in April 2007. Lehmann Aff. ¶11 (B39-B40). Plaintiff completed his work, while Ritterhoff did not. Wilson Aff. ¶11 (B43).

Ritterhoff appears to have documented his own hours of work in a faulty manner, as he is listed as working more than 100 percent of his hours on several occasions. Miller Dep. II at 7-8 (B31-B32).[8]

In February 2005, Miller and Ritterhoff were unfairly assigned differing amounts of work. Miller Dep. II 11 (B33). Ritterhoff frequently recorded longer amounts of time than work tasks would normally take. Miller Dep. II 25 (B34); 28 (B35); 33 (B36); 36 (B37).

---

[8] Reference is to the second deposition of Plaintiff taken on September 7, 2007.

15

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD.

A court may enter summary judgment only if there is no genuine issue as to any material fact.  Fed.R.Civ.P. 56(c) In making this determination, the Court is to view all facts in the light most favorable to the non-moving party.  <u>United States v. Diebold</u>, 369 U.S. 654, 655 (1962).  For purposes of the motion, the non-moving party's version of the facts must be accepted, and all disputed matters must be resolved in his or her favor.  <u>Bishop v. Wood</u>, 426 U.S. 341 (1976).

The party moving for summary judgment has the burden of identifying evidence demonstrating the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  In determining whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences against the moving party.  <u>Cifarelli v. Village of Babylon</u>, 93 F.3d 47, 51 (2d Cir. 1996).

### II.   SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S FMLA CLAIM.

Plaintiff alleges that Defendants retaliated against him because of his use of FMLA leave.  As Defendants have correctly noted, an FMLA retaliation claim is analyzed according to the same standard as Title VII claims.  <u>Schliske v. Trans World Entertainment Corp.</u>, 2007 WL 906709 (D. Del.).

16

**A.    The McDonnell Douglas Standard**

The standard for Title VII claims, of course, is set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Under this standard, the plaintiff bears the initial burden of showing a *prima facie* case of discrimination or retaliation as applicable.  <u>Id.</u> at 802.  The burden then shifts to the defendant/employer to articulate a legitimate, non-discriminatory reason for the adverse employment action taken against the plaintiff.  <u>Id.</u>  The plaintiff must then show that the defendant/employer's stated reason for the adverse employment action was pretextual.  <u>Id.</u> at 804.

In <u>Fuentes v. Perskie</u>, 32 F.3d 759 (3d Cir. 1994), the Third Circuit explained further the showing of pretext by a plaintiff in a discrimination or retaliation case.  Once the burden of production shifts back to the plaintiff to show pretext, the plaintiff must prove not that the illegitimate factor (*i.e.*, discrimination or retaliation) was the sole reason for the defendant's decision, but that it was a determinative factor in the adverse employment decision.  <u>Id.</u> at 764.  In order to defeat summary judgment where the defendant answers the plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its actions, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably

17

either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id.

Because the factfinder may infer from a combination of the plaintiff's *prima facie* case and its own rejection of the defendant's proffered non-discriminatory reasons that the defendant unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, a plaintiff who has made out a *prima facie* case may defeat a motion for summary judgment by either "(i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Accordingly, at the summary judgment stage, if the plaintiff has pointed to evidence sufficient to discredit the defendant's proffered reasons, the plaintiff need not also come forward with additional evidence of discrimination beyond his *prima facie* case. Id.

In order to avoid summary judgment, the plaintiff's evidence rebutting the defendant's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered reasons was either a post *hoc*

18

fabrication or otherwise did not actually motivate the adverse employment action.  Id.  However, it is not necessary for the plaintiff to cast doubt on **each** proffered reason, but rather if the defendant "proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder" because "the fact-finder's rejection of some of the defendant's proffered reasons may impede the employer's credibility enough so that a factfinder may rationally disbelieve the remaining proffered reasons . . . ."  Id.  at n.7.  In casting doubt on the defendant's proffered reasons, the plaintiff

> must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the [defendant's] proffered legitimate reasons for its actions that a factfinder *could* rationally find them 'unworthy of credence' . . . and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'

Id.  at 765 (citations omitted, emphasis in original).

**B.    Retaliation under the FMLA**

The FMLA makes it unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA.  29 U.S.C. §2615(a) and (b).  Federal regulations

interpret this statute as, *inter alia*, "prohibiting an employer from discriminating against employees or prospective employees who have used FMLA leave." 29 CFR §825.220(c). *E.g.*, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions. . . ." Id.

In order to establish a *prima facie* claim of retaliation under the FMLA, a plaintiff "must show that he engaged in a statutorily protected activity; that he suffered an adverse employment action; and a causal connection between the adverse employment action and the exercise of his rights under the [FMLA]." Burch v. WDAF AM/FM, 2002 U.S. Dist. LEXIS 12290 (E.D. Pa.) at *30. One way of establishing a causal connection between an employee's taking of leave and an adverse employment action is close temporal proximity between the two actions. Id. at *32.

In an FMLA retaliation case, "adverse employment actions" can include "undeserved negative job evaluations, demotions, disadvantageous transfers, or toleration of harassment. . . ." Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1283 (11th Cir. 1999). In analogous employment retaliation contexts, the term "adverse employment action" has been defined to include "refusals to hire, refusals to promote, and reprimands." McCabe v. Sharrett, 12 F.3d 1558,

1563 (11th Cir. 1994).  Moreover, with the recent decision of
the United States Supreme Court in <u>Burlington Northern &</u>
<u>Santa Fe Ry. Co. v. White</u>, 126 S.Ct. 2405 (2006), the concept
of an "adverse employment action" for purposes of Title VII
retaliation, as opposed to Title VII discrimination, has been
broadened to include actions that do not affect the terms and
conditions of employment, but rather would merely have been
severe enough to dissuade an employee from participating in
the protected activity.  <u>See</u> <u>Moore v. City of Philadelphia</u>,
461 F.3d 331, 341 (3d Cir. 2006) (<u>citing</u> <u>Burlington</u>).

**C.    Defendants retaliated against Plaintiff for his exercise
of FMLA rights**

In this case, there was close temporal proximity between
Plaintiff's taking of leave and adverse employment actions
taken against him, including reprimands and other
disciplinary actions, overburdening him with work, and other
unfair treatment.  In their brief, Defendants argue that the
time frame to be considered is that between the point when
Plaintiff's FMLA leave began in August 2004 and the date of
his termination in April 2005.  However, the relevant time
period is that between Plaintiff's return from leave on
December 10, 2004, and the disciplinary actions and other
unfair treatment -- a much shorter time period.

According to Lehmann, Hill's unfair treatment of
Plaintiff markedly increased following Plaintiff's return

from medical leave.  Lehmann Aff. ¶7 (B39).  Following
Plaintiff's return from medical leave, Hill treated him
unfairly by running him all over the hospital and assigning
tasks to him that other employees could have performed.
Lehmann Aff. ¶10 (B39).  Moreover, when Plaintiff returned
from medical leave, he learned that he had been placed at the
end of the rotation and therefore would not be able to work
at MMH until the latter part of 2005 because, according to
Hill, those who returned from leave were placed at the end of
a rotation.  Thus, there is a clear inference that those who
were required to use extended periods of leave were punished
in this way through a non-written "policy" that was
manufactured by Hill.

    As noted *supra*, Plaintiff has identified at least three
younger employees who were treated differently than he with
regard to disciplinary action -- Bill McClement, Sterling
Townsend, and John Ritterhoff.  It is also the case that none
of these employees had used extended periods of FMLA leave
during Hill's supervision of them and Plaintiff.  See
Plaintiff's Aff. ¶5 (B45).  McClement, Townsend, and
Ritterhoff all had incomplete documentation handed back to
them so that they could complete it rather than being
disciplined.  Townsend, like Plaintiff, installed a stop
switch on a treadmill/stress machine that Hill determined to

be a safety violation, but Plaintiff was disciplined and Townsend was not.  Ritterhoff was allowed to continue with glaring employment deficiencies that were never addressed by discipline -- including 18 to 24-month documentation backups, erroneous equipment orders, and a disorganized work area -- while Plaintiff was disciplined for much more minor infractions.  Wilson Aff. ¶9 (B42).

Plaintiff has demonstrated a sufficient temporal proximity between his use of FMLA leave and the adverse employment actions against him to make out a *prima facie* case.  Defendants' proffered reasons for the adverse employment actions against Plaintiff -- namely, the disciplinary actions ultimately leading to termination -- have been set forth by Defendants in the record.  However, these proffered reasons are so riddled with "weaknesses, implausibilities, inconsistencies, incoherences, and contradictions" that a factfinder could easily disbelieve Defendants' proffered reasons and/or believe that an invidious reason (*i.e.*, retaliation) was more likely than not a motivating or determinative cause of Defendants' actions.

Defendants cite to <u>Schofield v. Metropolitan Life Insurance Co.</u>, 2006 WL 2660704 (M.D. Pa.), wherein the Court held that in order for temporal proximity to support a finding of causal connection between the taking of leave and

23

the adverse employment decision in an FMLA case, the alleged retaliatory action must normally occur within days of the protected activity. See Schofield at *6. However, in so holding, the Schofield court noted the decision in Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751 (3d Cir. 2004), cert. denied, 544 U.S. 961 (2005), which held that "where 'the temporal proximity is not so close as to be unduly suggestive' . . . 'timing plus other evidence may be an appropriate test.'" Williams, 380 F.3d at 760 (quoting Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003)). In this case, in addition to the period of several weeks between Plaintiff's return from medical leave and the beginning of the adverse employment actions, including refusing to let Plaintiff rotate to Milford and overburdening Plaintiff with work at Kent General, there is other evidence of the causal connection between the taking of FMLA leave and the adverse employment decisions, including Lehmann's testimony that the unfair treatment increased upon Plaintiff's return from medical leave; Hill's placing Plaintiff at the end of the rotation list and explicitly telling Plaintiff that this policy was applied only against people who were returning from leave; and Lehmann's testimony that Hill was treating Plaintiff unfairly not only because of

24

his age but also because of his inability to function fully immediately after his return from medical leave.[9]

For example, if inaccurate and/or incomplete documentation was such an important issue to Defendants, why was Plaintiff the only employee in the department targeted and disciplined for alleged infractions?  Lehmann Aff. ¶13 (B40); Wilson Aff. ¶8 (B42); Attachment to Plaintiff's Aff. (B46).  Regarding the treadmill incident, since Hill admitted to Plaintiff that the manufacturer would not commit to a standard location for the stop switch, why was Plaintiff disciplined, and why was Sterling Townsend, who had not taken extended FMLA leave, not disciplined for placing a stop switch in the same location?  Miller Dep. 161 (A161); Attachment to Plaintiff's Aff. (B46).  If Hill's discipline of Plaintiff for the defibrillator incident was legitimate, why did Hill refuse to take into account the fact that the charge nurse would not consent to Miller's taking the defibrillator off the floor; the fact that, when Hill took the defibrillator off the floor, Plaintiff was trying to deal with the situation by finding a replacement defibrillator and/or contacting the manufacturer; and the fact that

---

[9] The <u>Schofield</u> Court properly recognized that the relevant time period in measuring temporal proximity is the period between the time the employee **returns** from medical leave and the alleged retaliatory action. <u>Schofield</u>, *supra*, at *6.

Plaintiff did **not** leave the hospital with the defibrillator on the floor (though Defendants have erroneously alleged in their brief that he did)?  Finally, if safety issues were such an integral part of the basis for Plaintiff's termination, why were these issues not mentioned in the termination meeting, and why was the termination memorandum silent about the alleged "safety" issues and about the treadmill and the defibrillator?  Why were these "safety" issues brought up as a basis for termination only after Plaintiff had filed his discrimination claim with the DDOL?

In short, there are numerous "implausibilities, inconsistencies, incoherences, [and] contradictions" in Defendants' proffered explanations for Plaintiff's termination.  These would provide a factfinder an ample basis to disbelieve Defendants' proffered reasons and to believe that those reasons were a post *hoc* fabrication or otherwise did not actually motivate the termination decision.

### III. SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S AGE DISCRIMINATION CLAIM.

As Defendants properly recognize, Plaintiff's age discrimination claims under the Delaware Discrimination in Employment Act ("DDEA"), 19 <u>Del</u>. <u>C</u>. §710 <u>et</u> <u>seq.</u>, are also analyzed under the <u>McDonnell Douglas</u> burden-shifting analysis, as are Plaintiff's handicap discrimination claims

26

brought under the Delaware Handicapped Persons Employment
Protection Act ("DHPEPA"), 19 <u>Del</u>. <u>C</u>. §720 <u>et seq.</u> Moreover,
Defendants have appropriately noted that a plaintiff may
state a *prima facie* case of age discrimination by showing
that (1) he is a member of the protected class; (2) he is
qualified for the position at issue; (3) he suffered an
adverse employment action; and (4) there is adequate evidence
to create an inference of unlawful discrimination, and that
the fourth prong may be satisfied by showing that the
employer treated the plaintiff less favorably than similarly-
situated employees outside the protected class. <u>See</u> <u>O'Connor</u>
<u>v. Consolidated Coin Caterers Corp.</u>, 517 U.S. 308, 312
(1996); <u>Watkins v. Children's Hospital of Philadelphia</u>, 1997
WL 793518 (E.D. Pa.). Then, under the <u>McDonnell Douglas</u>
standard, once the Plaintiff puts forth a *prima facie* case
and the Defendant articulates a legitimate nondiscriminatory
reason for the actions, Plaintiff must show that the
articulated reasons are pretextual.

Plaintiff has set forth a *prima facie* case of age
discrimination. At the time of his termination, he was 54.
He was qualified for the position, as attested by, *e.g.*,
Lehmann's Affidavit as well as Defendants' admission that
Plaintiff had one of the highest scores in the competency
testing. Defendants' Brief at 7 n.5. Plaintiff suffered an

27

adverse employment action, *i.e.*, the series of disciplinary actions leading up to his termination. Finally, Plaintiff was treated less favorably than similarly-situated employees outside the protected class, namely, McClement, Townsend, and Ritterhoff, who were not disciplined for having inaccurate and incomplete paperwork, while Plaintiff was, and who, with respect to Townsend, experienced preferential treatment with respect to the treadmill issue.[10] In addition, Plaintiff was also replaced by a younger employee, Robert Kunzig, who was 47 at the time he replaced Plaintiff. <u>See</u> Defendants' Responses to Plaintiff's Second Set of Interrogatories at 4 (B26).

The fact that Ritterhoff and Kunzig are relatively closer in age to Plaintiff does not negate an inference of age discrimination. The Third Circuit recently refused to draw a "bright line" test regarding a minimum age difference for purposes of the satisfaction of a *prima facie* case, holding that a 6.75 year average age difference between the Plaintiff and the comparators did not lead to the conclusion that a *prima facie* case had not been made out. <u>Steward v. Sears Roebuck & Co.</u>, 231 Fed. Appx. 201 (3d Cir. 2007). <u>See</u>

---

[10] As noted *supra*, Miller was disciplined for placing the stop switch in an alleged "unsafe" location, even though Townsend placed a stop switch in the same location but was not disciplined for doing so. Attachment to Plaintiff's Affidavit (B46).

28

also, <u>Barber v. CSX Distrib. Servs.</u>, 68 F.3d 694, 699 (3d Cir. 1995) (eight year difference between Plaintiff and comparator could support finding that comparator was "sufficiently younger" than Plaintiff to permit inference of age discrimination); <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 729-30 (3d Cir.), <u>cert. denied</u>, 515 U.S. 1159 (1995) (combined difference in age between Plaintiff and co-workers who were, respectively, four years younger and ten years younger than Plaintiff, was sufficient to satisfy fourth prong of *prima facie* case by raising inference of age discrimination.)

We have also seen that the legitimate non-discriminatory reasons proffered by Defendants are comprised of the disciplinary actions leading to his termination and the alleged factual bases for those. However, for the reasons set forth in the preceding section, Plaintiff has shown that these reasons are pretextual, *i.e.*, that they are so riddled with weaknesses, implausibilities, inconsistencies, incoherences, and contradictions that a reasonable factfinder could disbelieve them and could believe that invidious discriminatory reasons were more likely than not a motivating or determinative cause of Defendants' actions. These include, again, the fact that Plaintiff was targeted for alleged documentation problems when these problems were

29

widespread throughout the department, and younger employees were not disciplined; that Plaintiff was disciplined for the treadmill incident, but the manufacturer refused to recommend a location for the stop switch and a younger employee, Townsend, was not disciplined for the same conduct; that Plaintiff was disciplined for the defibrillator incident, though Plaintiff worked to find a replacement and did not leave the hospital with the defibrillator left on the floor; and that the termination documentation does not mention the alleged "safety" issues or the treadmill or defibrillator incidents.  In addition, a jury could conclude from other facts that age was more likely a motivation for the adverse employment actions than the proffered reasons, including the fact that Hill himself was significantly younger than Plaintiff (38 as opposed to Plaintiff's age of 54); that the other employees in the department were an average of 10 to 15 years younger than Plaintiff (Wilson Aff. ¶5 (B42)); that Miller, as one of the oldest employees in the department, was targeted by Hill; and that Lehmann has testified that age was a motivating factor in Hill's actions against Plaintiff.

**IV. SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S HANDICAP DISCRIMINATION CLAIM.**

Defendants contend that Plaintiff cannot make out a *prima facie* case of handicap discrimination because he cannot

30

prove that he "has a physical or mental impairment which substantially limits one or more life activity," specifically because the physical impairments that Plaintiff experienced following his cancer surgery, i.e., his speech impediment and difficulty walking, were to a certain extent temporary. However, the definition of "handicapped person" in the DHPEPA includes an individual who "is regarded as having such an impairment." 19 Del. C. §722.  In this case, it is apparent that Defendants, through Hill, regarded Plaintiff as having a disability.  Again, Lehmann has testified that Hill treated Plaintiff unfairly, in part, because of his inability to function fully immediately after his return from medical leave.  Lehmann Aff. ¶8 (B39).  Hill regarded Plaintiff as unable to perform the duties of his job because of his condition which, though temporary, was regarded by Hill as a disability -- specifically, Hill regarded Plaintiff as unable to communicate and walk.  Moreover, Hill's statements, "out with the weak, in with the strong," and "only the strong survive" indicate his disdain for employees, such as Plaintiff, who were dealing with physical limitations. Wilson Aff. ¶4 (B41-B42).

**V.  SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S BREACH OF THE COVENANT CLAIM.**

Defendants correctly cite Delaware law as holding that a

31

plaintiff may not assert a claim for breach of the covenant of good faith and fair dealing solely on the basis of discrimination.   However, that is not the basis for Plaintiff's breach of the covenant claims.

In <u>Lord v. Souder</u>, 748 A2d 393 (Del. 2000), the Delaware Supreme Court held that a claim for breach of the covenant of good faith and fair dealing must fall into one of four defined categories.   <u>Id.</u> at 400.   Plaintiff's claims do, in fact, fall into one of these four categories, namely, "where the employer falsified or manipulated employment records to create fictitious grounds for termination."   <u>Id.</u>

In this case, this is exactly what Defendants' agent, Hill, did.   For example, with regard to the disciplinary document concerning the treadmill/stress machine, Hill falsely stated that the device "has a safety feature not being installed properly," even though Hill admitted to Plaintiff verbally that the manufacturer would not commit to a proper location for the stop switch.   Disciplinary document (A202); Miller Dep. 161 (A161).   The termination memorandum indicates that incomplete and inaccurate documentation constitutes "unacceptable work," even though such behavior was not considered unacceptable work for younger employees. (A208).   Accordingly, Plaintiff should be permitted to

32

proceed with his breach of the covenant of good faith and fair dealing claim.

**VI. SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S HOSTILE ENVIRONMENT CLAIM.**

Contrary to Defendants' assertions, Plaintiff, for purposes of summary judgment, has satisfied the five elements of a hostile environment claim.

(1) Plaintiff has shown that he suffered intentional discrimination because of his membership in certain protected classifications. As Lehmann has testified, Plaintiff was treated unfairly due to his age and his inability to function fully upon return from medical leave (*i.e.*, being regarded as having a disability). Hill's statements, "out with the weak, in with the strong," and "only the strong survive" show his discriminatory animus toward those who are old or physically weak. Moreover, Plaintiff, as one of the oldest employees in the department and significantly older than most of his co-workers, experienced differential treatment on the basis of his age.

(2) Plaintiff experienced pervasive and regular discrimination. From the time he returned from medical leave, he was targeted, treated unfairly, and overburdened with work. Lehmann Aff. ¶10 (B39).

33

(3)   The discrimination detrimentally affected Plaintiff.  For example, he complained that the work was too much for him.  Miller Dep. 110 (A130).  He was not given assistance even though he was overburdened with work.  Miller Dep. 135 (A148).  He was isolated by other employees in the department, who would whisper about him and look at him.  Miller Dep. 179 (A175).  He experienced headaches, stomach pain, and sleeplessness due to stress and would lie awake "and think of what's [Hill] going to do to me next. . . ."  Miller Dep. 195 (B11a).

(4)   A jury could easily conclude that this type of discrimination would detrimentally affect a person in the same protected classification.

(5)   *Respondeat superior* liability is present, since Hill was acting as Defendants' agent, and acted as Plaintiff's only supervisor and issued all of his discipline.

## VII. SUMMARY JUDGMENT SHOULD BE DENIED ON PLAINTIFF'S SLANDER CLAIM.

The evidence in the record shows that Defendants maligned Plaintiff in his trade and profession.  Under Delaware law, this is one of the four categories of slander, known as "slander per se," that is actionable without proof of special damages.  Spence v. Funk, 396 A.2d 967, 970 (Del. 1978).

34

Sharon Money told others that Plaintiff acted like he was drunk and was pitiful as a technician.  Hill stated at the time of Plaintiff's termination that his abilities were those of a technician with five years of experience, not 25 years experience.  Though Plaintiff admittedly does not have first-hand knowledge of Money's statements, these facts constitute evidence of slander, and Plaintiff should be permitted to proceed to trial with this claim.

**CONCLUSION**

For the reasons provided in this brief, Defendants' Motion for Summary Judgment should be denied, and Plaintiff should be permitted to present his claims to a jury.

Respectfully submitted,

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____
WILLIAM D. FLETCHER, JR.
Bar I.D. #362

BY: _____
NOEL E. PRIMOS, ESQUIRE
Bar I.D. #3124
414 S. State Street
P.O. Box 497
Dover, DE   19903
(302) 674-0140
Attorneys for Plaintiff

DATED: 10-22-07
NEP:pmw

36