IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                        *      C.A. No. 06-534-MPT
                                      *
              Plaintiff,              *
                                      *
     v.                               *
                                      *
ARAMARK HEALTHCARE                    *
SUPPORT SERVICES, INC.;               *
ARAMARK CLINICAL TECHNOLOGY           *
SERVICES, INC.; and ARAMARK           *
MANAGEMENT SERVICES LIMITED           *
PARTNERSHIP,                          *
                                      *
              Defendants.             *

---

## APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

SCHMITTINGER & RODRIGUEZ, P.A.


BY:   **WILLIAM D. FLETCHER JR., ESQ.**
      Bar I.D. #362
      **NOEL E. PRIMOS, ESQUIRE**
      Bar I.D. #3124
      414 S. State Street
      P.O. Box 497
      Dover, DE   19903
      (302) 674-0140
      Attorneys for Plaintiff

DATED:  October 22, 2007
NEP:pmw

## TABLE OF CONTENTS

PAGE

Correspondence from James W. Valeri,
    Aramark Healthcare Management Services, to
    Delaware Department of Labor dated 2/17/06 . . . . . . . B1

Deposition of J. Miller, 2/5/07 (exerpts) . . . . . . . . B5

Deposition of Jonathan Hill, 2/14/07 (excerpts) . . . . . . . B12

Defendants' Objections and Responses to Plaintiff's
    Second Request for Production of Documents . . . . . . B14

Defendants' Responses to Plaintiff's
    Second Set of Interrogatories . . . . . . . . . . . . B23

Deposition of Daniel Miller, 9/7/07 (excerpts). . . . . . . B30

Affidavit of Ted Lehmann . . . . . . . . . . . . . . . . B38

Affidavit of Gregory Wilson . . . . . . . . . . . . . . . B41

Affidavit of Daniel Miller . . . . . . . . . . . . . . . B44

ARAMARK HEALTHCARE MANAGEMENT SERVICES

FACILITY SERVICES



February 17, 2006

State of Delaware Department of Labor,
  Division of Industrial Affairs
24 N.W. Front Street, Suite 100
Milford, DE 19963-1463

Attn: John J. Adams

VIA FAX AND AIRBORNE EXPRESS

RE:    Charge No.  DDOL 05070308M & EEOC 17CA500461
       Daniel Miller v. ARAMARK Management Services Limited Partnership

Dear Mr. Adams:

On behalf of Respondent, ARAMARK Management Services Limited
Partnership, I hereby submit this Position Statement in response to the above-
captioned case.  As demonstrated below and supported by the attached
documentation, there is no basis for Charging Party's contention that he was
subjected to discrimination on the basis of age and disability.

Please note that this letter and the accompanying documents contain confidential
personnel information and proprietary business information.  We are submitting
this information to the agency with the express understanding that it will be used
by the agency only in connection with its investigation of the above-captioned
charge.  And that it will not be disclosed to anyone outside of the agency without
the written permission of Respondent obtained in advance.

## DESCRIPTION OF RESPONDENT

Respondent provides contract Biomedical Technical Services for the Bayhealth
Medical Center. Respondent employs approximately 8 employees.

1101 MARKET STREET
PHILADELPHIA, PA 19107-2988
800 999 8989  FAX 215 409 4311

B1

John J. Adams
Page Two of Four



## POSITION STATEMENT

**Allegation No. 1 :**  Charging Party states that unlike his (younger under 40 years of age) co-workers he was discriminated against based on age and disability when he was subjected to different terms and conditions of employment.  Specifically, Charging Party states that the Respondent subjected him to harsh disciplinary actions for alleged safety infractions.

**Response to Allegation No. 1:**    Respondent denies subjecting Charging Party to different terms and conditions of employment.  Charging Party along with all the other employees at Bayhealth Medical Center were given a job descriptions along with the standards of performance.  Respondent has EOC policy which all employees are to adhere to prevent discrimination (see attached EOC policy). Charging Party was treated the same as any similarly situated employee for performance expectations as well as safety violations based on the severity of the issue regardless of disability or age.

Charging Party received disciplinary action as follows:
March 4, 2005 – Documented Coaching Discussion – Failure to perform – Incomplete and incorrect information on work orders.
March 14, 2005 – Verbal Counseling – Failure to perform – Incomplete work order request.  At this the work order processed was reviewed again as it had been done in the past.

March 16, 2005 – Memorandum – Performance Expectations – Missing and incomplete work orders.

March 24, 2005 – Documented Counseling Discussion – Safety Violation - Coaching session for the Charging Party's work on a Treadmill.  User ordered optional emergency stop switch that was improperly installed on treadmill according to manufacturers' instructions. If installed, safety devices must be installed in accordance with manufacturers' instructions.  Charging Party failed to install device properly or follow up with user to determine whether this device was truly needed and created a safety risk.

MFG Would NoT commiT To A specific LocaTion

April 5, 2005 – Documented Coaching Discussion – Safety Violation Discipline was for the Charging Party's work on a defibrillator - When Identified that it was defective, left unit in use without tagging the device as defective and not notifying anyone to respond until over 90 minutes later. Device should have been tagged as do not use or removed from the floor.  This incident along with additional work issues relating to critical equipment led to the termination of the charging party.

B2



John J. Adams
Page Three of Four

April 15, 2005 – Termination Discussion – Failure to perform – Final discussion for incomplete work requests and the work orders not properly processed.

**Allegation No. 2:**
Charging Party alleges that based on his age and disability he was denied paid time off (PTO)

**Response to Allegation No. 2:**   Charging Party requested time off during April of 2005, but failed to notify Respondent the nature of the request.  Due to scheduling conflicts, the request was originally denied, but later reversed when Charging Party notified management it was for medical reasons.

**Allegation No. 3:**
Charging Party told me that I was treated differently because of prior disciplinary action.

**Response to Allegation No. 3:**  Respondent denies treating Charging Party differently.  Furthermore, Respondent denies telling Charging Party that he was treated differently due to prior disciplines.

**Allegation No. 4:**
Charging Party states that he was subjected to different terms and conditions of employment when based on his age and disability he made to accept the least desirable work schedules.

**Response to Allegation No. 4:**   Charging Party, along with other employees at the account were required to work the same schedule.  The employees were rotated between campuses on an established rotation schedule. Since inception it was established practice that when someone not on the schedule was to be placed in the rotation that they fall at the end of the rotation. Charging Party's rotation did not require that he work any more in the rotation than the other employees.

**CONCLUSION**

In conclusion, we respectfully submit that Charging Party was not discriminated against by Respondent by any means whatsoever.  Charging was terminated for continued failure to meet performing expectations of Respondent even after being warned for failure to meet standards.

B3

John J. Adams
Page Four of Four



I trust that the above information and accompanying documentation satisfy Commission's request.  Respondent believes that this information supports a finding by the Commission that there is no cause to believe that the Charging Party was subjected to any discrimination.

If you have any questions or if you require any additional information, please do not hesitate to contact me at (215) 238-3078 or Fax (215) 409-4311.

Thank you.

Sincerely,

James W. Valeri
Regional Human
 Resources Manager

Cc: Sent Via Certified Mail to: Daniel Miller
                            4800 Deep Grass Lane
                            Houston, DE 19954

B4

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                    :    CIVIL ACTION
                Plaintiff,        :
                                  :
                                  :
                                  :
        vs.                       :
                                  :
                                  :
                                  :
                                  :
ARAMARK HEALTHCARE SUPPORT        :
SERVICES, INC., et al.,           :
                Defendants.       :    NO. 06-534 (KAJ)

----------

Monday, February 5, 2007

----------


        Deposition of **DANIEL J. MILLER**, taken pursuant to

notice at the law offices of Schmittinger & Rodriguez,

P.A., 414 South State Street, Dover, Delaware, on the

above date, beginning at approximately 10:00 a.m.,

before Charles P. Carmody, Registered Professional

Reporter and Notary Public.


--------------------------------------------
**CHARLES P. CARMODY & ASSOCIATES**
Court Reporting Services
768 North Bethlehem Pike, Suite 107
P.O. Box 525
Ambler, Pennsylvania  19002
(215) 646-2599 * deposition1@comcast.net

B5

DANIEL J. MILLER

Page 10

A.    About ten months.

Q.    **Then after Colonial Pontiac, you went back to Perfect Photo?**

A.    Yes, I believe I went to Perfect Photo at that time.  Now, this is -- well, this is going back almost 40 years.

Q.    **Understood.**

A.    The dates are a little bit foggy, but I'm trying to generalize, you know, exactly, you know, how everything fell together.

But after Colonial -- well, Colonial Pontiac, Philadelphia Manufacturing -- Paper Manufacturers and Perfect Photo, were all right within a two-year period. So, I don't know which one came first, you know, from, you know, in order.

Q.    **Understood.**

**After that, where did you go to work?**

A.    I worked for a time at Toys R Us for a summer.

Q.    **What did you do there?**

A.    Assembly and sales.

After that, I worked for Radio Shack in the electronics capacity as a salesman.  I also worked for Pep Boys in '68, for about six months, as a salesman --

Page 11

part salesman.

I forget to tell you about that one.

Q.    **No problem.**

**Approximately, when did you work at Radio Shack?**

A.    I guess it would have been about when the thing was going on with Nixon.  When was that?  '73, I guess, you know.

The hearings and all that stuff, I remember them being on television the whole time.  That summer, I worked at Radio Shack.

After that, I worked for a company called Viz Manufacturing.  V-I-Z, Victor Ivan Zoloff (ph), which was the initials of the owner's name.

Q.    **What was your position there?**

A.    I was an electronic technician, bench repair, RF technician, calibration, final verification of equipment.

And after that, I worked for Barker and Williamson as an RF technician.  Both of them were under -- are government contracts.

Q.    **How long did you work for Viz?**

A.    Viz, approximately a year.

Q.    **Then Barker, what was your job at Barker?**

Page 12

A.    Barker and Williamson, I was an electronic technician, calibration of Army aircraft transceiver systems.

Q.    **How long did you work there?**

A.    Approximately, ten months.

Q.    **Where did you go to work after that?**

A.    After that, I was a jobber for the Yellow Cab Company in Philadelphia.  And that is where you rent a cab for the day, and you pay your rent.  And whatever you make is yours.  And I did that on and off for, I guess, about three or fours months while I was looking for another employment.

Then I found employment with a company called Medcraft Electronics, which I worked for them in Pennsylvania for approximately --

No.  Before Medcraft I worked for a company in Oaks, Pennsylvania.  It was a paper manufacturing products company that had a subcontract to box a fabric softener called Cling Free.

I worked there for -- it was a limited time job of six to eight months until the contract was over. And I worked there until the contract was over.

Then, I went to Medcraft.

Q.    **What was your job at Medcraft?**

Page 13

A.    Medcraft, I was working on bench repair of medical equipment, electronic technician.  That's what I started as.

And I transferred -- that was in Pennsylvania.  In Limerick, Pennsylvania.  I transferred down to Columbia, Maryland because a company called Pittman had bought out Medcraft and they -- all the engineers were transferred -- design engineers were transferred to Columbia, Maryland.

And I transferred down to Columbia, Maryland as a biomedical engineering technician where I prototyped the designs and assembled medical equipment.

Q.    **When did you start working for Medcraft?**

A.    Around 1977-ish.  In that era.  '78, possibly.

Q.    **You transferred down to Columbia?**

A.    Columbia, Maryland, yes.

And I was laid off from there.  And I found a job with Coulter Electronics.

Q.    **When did you begin with Coulter?**

A.    I believe it was '78, or early '79.

Q.    **How long did you work there?**

A.    I worked there approximately ten months. 12 months, maybe.

B6

CHARLES P. CARMODY & ASSOCIATES
(877) 646-2599

64ab629d-312d-4124-8bd5-81ff1b8ad117

**Page 58**

of your jaw where the cancer was located; is that correct?

3 A.    The cancer was within a one centimeter of the
4 bone. And -- and it was early Stage II. And for all
5 practical purposes, it had to be removed because they
6 were unaware of whether it had -- if cancer had gotten
7 into the bone.

8 Q.    So, this was actually in your jaw area?
9 A.    It was in my mouth.
10 Q.    In your mouth, okay.
11 A.    That's initially in my mouth where it was
12 observed.
13 Q.    The plan of action was to extract a portion
14 of your jaw --
15 A.    Sure.
16 Q.    -- and mouth area?
17 A.    Mouth area. Lymph nodes, and remove my --
18 ten inches of my fibula bone and place that in the jaw.
19 Do vascular surgery to feed the tissue there and flap
20 the tissues over the bone.
21     And that was -- that was basically it.
22 Q.    The fibula was a portion of your leg,
23 correct?
24 A.    It's one of the bones in your shins, correct.

**Page 59**

1 Q.    That was for purpose of rebuilding your jaw?
2 A.    Reconstruction, yes.
3 Q.    During the period that you were on leave from
4 August of 2004, through December of 2004, did you have
5 the medical procedure that you referred to?
6 A.    Yes.
7 Q.    It took place during that time period?
8 A.    Yes.
9 Q.    Was that procedure successful in eradicating
10 the cancer in your mouth and jaw area?
11 A.    Removal of the cancer in my mouth, my lower
12 -- lower -- the floor of my mouth also because cancer
13 had spread.
14     It spread to the floor of my mouth, the back
15 of my tongue, and those portions were also removed.
16 Q.    Was the cancer completely removed during that
17 time period?
18 A.    During that time period, yes, the cancer was
19 removed.
20 Q.    Did you require any surgery after your return
21 in December of 2004?
22 A.    I required surgery prior -- a second surgery
23 prior to my return.
24 Q.    Let's focus on after your return.

**Page 60**

1 Q.    Did you require any surgery after you
2 returned to work?
3 A.    No.
4     After December of 2004, no --
5 Q.    Correct.
6 A.    -- I did not require any more surgery.
7 Q.    I'm just trying to understand the time line.
8     So, after your return to work, there was no
9 further surgery required for the condition?
10 A.    No.
11 Q.    Was there any treatment required for the
12 condition after your return to work?
13 A.    There was treatment for a condition that
14 developed prior to my return to work, that was needed.
15 Q.    What was that condition?
16 A.    Infection of the donor site of my leg.
17 Q.    You said, infection of the donor site of your
18 leg?
19 A.    Yes.
20 Q.    After you returned to work, what treatment
21 was required in that regard?
22 A.    It was the ending of a treatment. The
23 treatment had been ongoing since October. And I did
24 see doctors up until, I guess, the beginning -- plastic

**Page 61**

1 surgeons and bacteriologist, medical doctors and stuff
2 for -- to make sure all of that was gone, up until
3 about the first -- maybe the second week of January.
4     And I did ask my doctors, you know, was I
5 healed? And they said, well, you have to go back to
6 your other doctor and find out and stuff like that, the
7 one that did the surgery and stuff.
8 Q.    So after you returned to work, at what
9 frequency were you going to a doctor to address the
10 donor site issue?
11 A.    Frequency, I don't know, but I probably went
12 to the doctor maybe four times in that month.
13 Q.    Were they checkup visits where the doctor
14 inspected the area?
15 A.    Yes, more or less.
16 Q.    Were there any complications during that time
17 period?
18 A.    No.
19 Q.    With the last visits being in January of
20 2005?
21 A.    2005, yes.
22 Q.    Just going back to the period while you were
23 out on leave --
24 A.    The last visits for that procedure of the

DANIEL J. MILLER

Page 62

infectious portion of it. Now with cancer, you still
go to doctors continuously over a period of two or
three, four years, you know.

But that -- that's what I'm trying to say. I
still went to doctors afterwards.

Q.    **Understood.**

**But just focusing on the infection that
related to the donor site, the last time you were going
to a doctor for that specific issue was in January of
2005?**

A.    Yes.

Q.    **Going back to the time period that you were
out, just describe for me in a time line, what
procedures you went through.**

A.    You mean what operations?

Q.    **Yes.**

A.    I was admitted on the 5th of August -- no,
the 6th of August I was admitted, 2004. I was put
under general anesthetic about seven o'clock. And I
came to five days later, Wednesday.

I was told the operation started at
eight o'clock and went on until almost midnight that
night.

And I was placed in an intensive surgical

Page 63

suite for two days. Then I was placed in ICU. Then I
was placed in a private room for ten days.

And the problem was that there was -- the
infection in my leg and my blood count continued to
climb.

And they put me on heavier and heavier --
well, they put me on narcotics, of course, for the pain
and all, but they put me on heavy antibiotics.

And they were afraid that, you know, they
can't let me go home because, you know, we have to have
your white cell count down.

And finally after about eight, nine days, it
started coming down. They said I could go home.

I went home, and I made office visits to his
Dr. Ord, O-R-D, who was the surgeon who performed the
removal of the cancer.

He was -- the removal of the cancer and
probably the bone and the mandible portion of my jaw.
Here to here, you know.

But anyway, I started seeing him. And then
over the next few weeks, I also seen Dr. Hernandez who
was a fellow in the practice, who was the one who
completed the reconstructive surgery.

There were two surgeons involved in that, but

Page 64

I never met the first -- I met the first surgeon only
once, but Hernandez was the one I dealt with. And he
observed that my leg was not healing properly.

And towards the middle, the third week of, I
guess, around September, the third -- second, third
week of September, he told me he wanted me to go to a
wound center because my leg if it doesn't start
healing, they may have to amputate it.

So, at that point, I called Jonathan Hill and
I informed him, you know, that, you know, this is
getting worse and, you know, I won't be coming back as
I planned on the 18th or 19th of October. And that I
probably will have to go in for additional surgery.

And at that point, I started going to the
Christiana Care Wound Center. And they started
attempting to get the wound to close and heal, but it
was found out that there was multiple microbiological
agents in there. Really rare ones.

So, they put me on a regiment of intravenous
-- heavy doses of antibiotics that could only be
administered through IVs.

And I went in for surgery. I had the
surgery. They grafted skin from my -- another portion
of my body and closed the wound by stretching the skin

Page 65

or something in places.

Then I was on these antibiotics on an IV
pole, like three times -- two times an hour
to an hour and a half each time.

Q.    **When was the procedure you referred to where
he reopened the wound?**

A.    Oh, where he closed the wound.

Q.    **Yes.**

A.    That was in October.

Q.    **After that, there are --**

A.    The antibiotics.

Q.    **Regiments?**

A.    Regiments, yes.

Q.    **When are those?**

A.    They were ongoing for at least six weeks.
But I had time in between. And I did come into the
hospital at one time.

Jonathan was giving evaluations or something.
He gave me an evaluation. I think it was in -- towards
the Thanksgiving -- three weeks -- second or third week
of November.

And I said, you know, that I informed my
doctors that, you know, I wanted to get back to work.
I was eager to get back to work.

DANIEL J. MILLER

Page 66

And they were hesitant for a while. And they said, okay, what type of work are you doing? And I said, well, I'd be sitting at a bench repairing equipment.

And they said, okay, we'll let you go back to work. And I'm still on the regiment of, you know, drugs, but I don't think I was on the IVs any longer. I was just doing pills at this time, for antibiotics.

Q. So by the time you go back to work, the IV antibiotics had terminated?

A. Yes.

Q. So from a procedure standpoint when you returned to work, the only thing that you're doing at that point, is taking oral medication; is that correct?

A. I was taking oral medication, but I may have still been taking a nightly dose. I don't recall.

When you brought that up, I don't recall if they cut me back to one antibiotic at night. Because something in my mind says there was something else that was going on at nights.

Q. But that was just an oral medication, correct?

It was a pill you would take?

A. I was given pills, but I'd have to look at

Page 67

the documents now to recall whether I was completely off the intravenous -- I mean, I had intravenous two times a day, but I know I was only -- I was taken off one of them, because one of them would have had to have been in the morning. I was in work, you know.

But I may have still had one at night. I'm not -- I don't recall if there was still one at night.

Q. Do you know the period when you were taken off the intravenous antibiotics?

A. I'd have to research, you know.

Q. By the end of January, were you off them?

A. I was off them -- I'm sure I was off them by Christmas. I was on pills by Christmas, yes. The third week of December.

She was still doing tests and -- of my blood up until -- I remember them being done around Christmas. They were still doing blood tests on me.

Q. At the time you had come back to work, the December 10th of 2004 time frame, what impacts of the procedures that you had were you still experiencing at that time?

A. I was still using a cane to walk, because my legs were still sore. I stopped using the cane after a certain period. I forget what period that was.

Page 68

And I was still having pain in my jaw. I was -- at this point, I had been on heavy medications and -- at the hospital and at home. Percocet probably, things like that at home.

And I didn't want to be in the hospital on the Percocet or, you know, heavy medication. So, I was in the habit of taking aspirins a lot.

So, I put aspirin in the Percocet bottle, and just keep it in my drawer. And I took non-buffered aspirins.

And of course I was a little nauseous at times.

Q. The aspirins that you took, were they able to address the pain that you had?

A. Depended on the quantity I took.

Q. For what period did you have to take aspirin to address the pain in your jaw?

A. I took aspirin, Aleve, Advil. I took multiple different, you know, over-the-counter painkillers.

I took that up until even, you know, into April.

Q. That's April of '05?

A. Yes.

Page 69

Q. After April of '05, did the pain in your jaw subside?

A. The discomfort in the jaw subsided, yes.

Q. You had referenced the fact that when you came back to work, you were using a cane?

A. I used a cane when I came back to work, at times. I think I only used it a few days though.

I used it when I came back from my interview, I remember. And I think I only used it for a very short period, a day or two, you know, because dragging a cane around is -- getting in and out of the car, you know, dragging the cane around, I just didn't want it around me any more. I felt like I was an invalid.

Q. After a couple of days, were you able to walk without the cane?

A. Yes.

I was able to walk without the cane, but the cane took the load off the leg, you know.

Q. Once you stopped using the cane after a couple of days, were you able to walk around?

A. I was able to move about, yes. I couldn't run, dance, or do anything of that nature.

Q. Understood.

But you were able to get around, correct?

CHARLES P. CARMODY & ASSOCIATES
(877) 646-2599

64ab629d-312d-4124-8bd5-81ff1b8ad117

1  Q.    Then there's the signature of Mr. Hill at the
2  bottom of that page, and your signature to the left of
3  it; is that accurate?
4  A.    Yes.
5  Q.    Is this at least one of the disciplines that
6  you're referring to?
7  A.    Yes.
8  Q.    Is there anything about this discipline that
9  you felt was inaccurate or unfair in any way?
10  A.    Obviously, this is -- I signed this only as a
11  coaching document.  And I did express at the time, that
12  -- if you look at the warranty date on it, right, the
13  warranty date is 10/15.
14  Q.    Which page are you --
15  A.    The third page.
16  Q.    So at the bottom it says, A 00037 on the
17  bottom of it?
18  A.    Right.
19        Now he has circled, installation date.
20  Additional comments on the same page, change asset
21  biomed from CTS, right?
22        That means the asset tag was changed.
23  Warranty started 10/5/01 and ended 10/5/06.  There is
24  no possible way of me pulling out an installation date

1  five years earlier, because I wasn't up there at that
2  time.  That's why that was probably left blank.
3        And the tier level is most likely why I
4  signed the document since I felt that was my fault.  I
5  should have filled that part in.
6  Q.    Did you express any disagreement to Mr. Hill,
7  about the warning?
8  A.    I did express disagreement with it, but I
9  expressed disagreement -- well, I signed this because I
10  was under the understanding that everybody was getting
11  treated the same.
12        And I didn't want to rock the boat or
13  anything, because other people were pulled in for
14  disciplinary problems.  And from what I understand, I
15  was the first one that was to be written up.
16        And there were incidents with other people
17  previously to my returning to work, that they told me,
18  I know, I've never been written up.
19        I asked a few of them.  So, I considered I
20  was the first one to get -- get written up for it, but
21  I did not know at this time.
22        We had a newer system, and I did not know he
23  wanted that tier level filled in.
24        (Whereupon, a discussion was held

1  off the record.)
2  BY MR. DELANY:
3  Q.    Doesn't the page you were referring to with A
4  00037 on the bottom of it, reflect an equipment
5  exchange?
6  A.    Yes.
7  Q.    Wouldn't the installation date then be the
8  date that you did the exchange?
9  A.    Not necessarily.  It could have sat in the
10  shop for a day or two, but it would be close to it,
11  yes.
12        (Whereupon, a discussion was held
13  off the record.)
14  BY MR. DELANY:
15  Q.    Other than it maybe sitting in the shop for a
16  couple days, it was under your control, correct?
17        You inventoried it on February 28th of '05,
18  correct?
19  A.    Yes.
20  Q.    So as of that date, you would have had --
21  A.    An installation date of whenever I delivered
22  it.
23  Q.    You did not fill that in, correct?
24  A.    Yes.

1  Q.    So, it was not completed correctly; you'll
2  agree with that?
3  A.    Yes, I agree with that.
4        (Whereupon, a discussion was held
5  off the record.)
6  BY MR. DELANY:
7  Q.    If you go with me to A 0039, the areas that
8  are circled all indicate areas that should have been
9  filled in, correct?
10  A.    I don't understand the question.
11        This is -- you must understand I was trained
12  on a totally different system.  I was trained on ISAM
13  (ph), which was a system by Premier.
14        And when Jonathan Hill came to work for a
15  Premier account, which was Bayhealth, he brought this
16  system in that he was trained in.
17        And I received -- the training I received was
18  a very short period by Mr. Hill, for a matter of ten to
19  15 minutes flashing through memories and screens and
20  stuff.
21        The training I received from Aramark, was a
22  half a day at Bayhealth, and a whole -- and a half a
23  day down at Charlotte, North Carolina in their format
24  for their program.

DANIEL J. MILLER

did you do?

A.    I started taking my time.  The other
3  technicians had six months of -- they all had problems
4  with the system at one point or another, but -- I guess
5  I had problems with it too.
6          And I would muff my way through it trying to
7  figure it out.
8  Q.    What do you --
9  A.    This part -- this screen looks like something
10  I can work with.  This menu, let me try this.  Let me
11  try that.
12  Q.    **Did you ever indicate to anybody that you**
13  **were unable to do it and didn't think you were doing it**
14  **correctly?**
15  A.    I felt I was doing it correctly.
16  Q.    **You'll agree that Mr. Hill indicated to you**
17  **that he didn't think you were doing it correctly; isn't**
18  **that right?**
19  A.    He felt I wasn't doing it correctly at this
20  point, at this memo here.
21  Q.    **Do you recall an incident relating to the**
22  **install of a stress machine?**
23  A.    Yes.
24          (Whereupon, a discussion was held

1          off the record.)
2          (Whereupon, Exhibit Miller-9 was
3      marked for identification.)
4  BY MR. DELANY:
5  Q.    **Do you remember a guy by the name of Lenny**
6  **being there from GE, doing the install?**
7  A.    Yes.
8  Q.    **What do you recall of the incident?**
9  A.    This was one of two simultaneous ongoing
10  incidents that day.  There was also a gentleman from
11  Kendall, who had a blood warmer.
12          And I was told -- earlier in the week I had
13  made an appointment.  I was told that the install would
14  take place on a Tuesday.
15          Then at two o'clock on Tuesday, I was told,
16  no, it's going to be on Wednesday or Thursday.  I
17  forget, but it was changed.
18          And the day of the install at one o'clock,
19  Sharon Money came over to me.  I was about to go
20  upstairs to do the install.
21          Sharon Money came over to me and said, we
22  have an urgent -- ASAP you have to go up to the OR.
23  There's a gentlemen up there with a blood warmer for a
24  bypass machine that has to be checked in.  You got to

1  bring him down here.
2          So, I went up to that department, picked that
3  gentleman up and brought him down to the shop.
4          And I began to, you know, set him up with
5  what he needed to do, his installation.  And he
6  started, you know, unpacking the stuff.
7          And I went upstairs to the treadmill.  And
8  Lenny Bloom -- I had already had the treadmill set up.
9  I mean, the central -- the control station had set up.
10  And I think he had used housekeeping to move the
11  treadmill into the room and things like that.
12          And I stayed there for any -- anything I
13  could help him with for a few minutes.  And I told him
14  I had another -- I had another incoming inspection
15  going on down in the shop.
16          So, he wanted me to help him move that
17  treadmill, pick that treadmill up and move it.  And I
18  said, no, I wouldn't help him because it is the policy
19  that a salesman, his commission is made on his sale of
20  the treadmill.  And he's supposed to bring an engineer
21  from the company, to help him install it.
22          And many salesmen get around this by trying
23  to get the biomed department personnel to do that work,
24  so they won't have to pay a hundred, 125, $175 an hour

1  for the engineer to be there.
2          And he asked me if I had some software.  And
3  I said, yes, I'll go look for it.  There was a similar
4  treadmill set up in the other room.  The exact same
5  treadmill, matter of fact, except for one difference.
6  It had a different computer system on it.
7          And I went down.  And I asked John Ritterhoff
8  where was the software for the system.  And he said,
9  it's in that room, which was at that time a parts room.
10  It was like a scrap room, more or less.
11          And I searched in there for about ten
12  minutes.  I couldn't find it.  And I was explaining to
13  one of the technicians that the treadmill, you know,
14  the guy wanted me to help him move the treadmill.
15          And at that point, Jonathan Hill came out of
16  his office and said, there's nothing to moving a
17  treadmill.  You just pick up the far end and tilt it up
18  and move it around.
19          And I said to Jonathan, I said, you know, I
20  know how to move a treadmill.
21          And I wasn't able to locate the software for
22  the gentleman.  I went back up -- and then I went over
23  to the -- I went back upstairs and I told him I didn't
24  have the software.

64ab629d-312d-4124-8bd5-81ff1b8ad117

Page 194

1  Q.    What problems did you identify?
   A.    People being hired that weren't qualified to
3  do the job, according to my list. And they said,
4  well, we'll check into it.
5  Q.    Whose list?
6  A.    That previous exhibit you showed earlier.
7  Exhibit Number 5. The biomedical training and stuff.
8  Q.    Did you complain that Mr. Hill was
9  unqualified to do his job?
10 A.    No.
11        They asked me if he was qualified, and I
12 said, yes. I said, he's certified by a society.
13 Q.    Did you claim that there were PMs that were
14 not being completed in a timely fashion?
15 A.    No.
16 Q.    So, the only thing you said was that there
17 were people that were being hired there, that were not
18 qualified?
19 A.    Right.
20 Q.    You didn't say anything beyond that?
21 A.    Not to my knowledge, no.
22        I've never seen a transcript of, you know,
23 what I said to them. But that's what I remember from
24 the conversation.

Page 195

1  Q.    You indicated earlier that after you returned
2  to work, you had experienced headaches or other stress?
3  A.    Yes.
4  Q.    Describe that for me.
5        What were you referring to?
6  A.    Throbbing headaches.
7  Q.    But what are you contending that that was a
8  result from?
9  A.    The stress.
10        And I also had stomach pains towards the end
11 of the days. If felt like acid indigestion. And that
12 was common.
13        I also had sleepless nights.
14 Q.    Are you claiming that that was from the
15 stress of the job?
16 A.    Yes, because I just lay awake and think of
17 what's he going to do to me next, you know. How do I
18 keep my job. I want to keep my job.
19 Q.    Who --
20 A.    I'm referring to the person in charge of the
21 department that was targeting me.
22 Q.    Mr. Hill?
23 A.    Yes.
24 Q.    While you were employed by Aramark, did you

Page 196

1  seek any treatment for any stress or any stress-related
2  conditions?
3  A.    I don't recall if I had seen doctors during
4  that period. I seen a cancer doctor that I know of. I
5  seen my skin doctor I know of.
6        And I -- I don't recall -- I probably Seen my
7  family physician, but I can't recall that, you know. I
8  see him a lot.
9  Q.    Do you have any specific recollection of
10 seeing any of those individuals while you were employed
11 by Aramark --
12 A.    Yes.
13 Q.    -- related to the condition of stress?
14 A.    I would have to review my records or my bills
15 to see if I had seen them at that time. I don't recall
16 at this time.
17 Q.    How about after you terminated employment?
18        Have you treated with anyone for stress or
19 anxiety?
20 A.    Shortly after or -- I mentioned the anxiety
21 to -- anxiety to a doctor, yes. One of my doctors.
22 Q.    Which doctor?
23 A.    I believe it was Dr. Gergis (ph).
24 Q.    Have you had any prescriptions for any stress

Page 197

1  or any anxiety-related conditions?
2  A.    Yes.
3  Q.    What prescriptions?
4  A.    Xanax.
5  Q.    What was that prescribed?
6  A.    I don't recall when it was prescribed.
7  Q.    Approximately?
8  A.    Approximately, I don't recall.
9        It's, you know, there if I want it, if I need
10 it.
11 Q.    Were you terminated in April of '05?
12 A.    Terminated, what?
13 Q.    Employment.
14 A.    April of '05, yes.
15 Q.    In relation to that date, do you know when
16 the Xanax was prescribed to you?
17 A.    I cannot recall, no.
18 Q.    Is it possible that it was prescribed before
19 your termination?
20 A.    Possibly prescribed before, during, or after.
21 I'm not sure.
22 Q.    Did you have any anxiety related to whether
23 or not you would have a recurrence of your cancer
24 condition?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                          )
    Plaintiff,                       )
                           )
       v.                               )  C.A. No.
                           )   06-534
ARAMARK HEALTHCARE SUPPORT SERVICES, )
INC., a domestic corporation, and    )
ARAMARK CLINICAL TECHNOLOGY SERVICES,)
INC., a domestic corporation, and    )
ARAMARK MANAGEMENT SERVICES LIMITED  )
PARTNERSHIP,                         )
    Defendants.                      )

               Deposition of **JONATHAN HILL**, taken
before Cheryl A. Anthony, Court Reporter, in the offices
of Schmittinger & Rodriguez, 414 South State Street,
Dover Delaware, on Wednesday, February 14, 2007,
beginning at 10:00 a.m.

APPEARANCES:

        SCHMITTINGER & RODRIGUEZ
        BY:  NOEL E. PRIMOS, ESQUIRE
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        MORGAN, LEWIS & BOCKUS
        BY:  WILLIAM DELANY, ESQUIRE
        1701 Market Street
        Philadelphia, Pennsylvania  19103
        Attorney for Defendants.

ALSO PRESENT:
        MS. LINDSEY O'NEAL, Paralegal,
        Schmittinger & Rodriguez.


      **ORIGINAL RETAINED BY NOEL E. PRIMOS, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

B12

4

1    administration from the University of Phoenix, and I

2    received that in 2004.

3          Q.    Any other degrees?

4          A.    Not degrees; I have three certifications

5    that I received from the field.

6          Q.    And what are those in?

7          A.    I have a certification in biomedical

8    equipment technology, which I received in 1995.    I

9    received a certification for laboratory equipment

10   specialist in 1997, and I received a certified radiology

11   equipment specialist in 2001.    All three of those are

12   from the International Certification Commission.

13         Q.    What is your date of birth, Mr. Hill?

14         A.    My date of birth is May 30, 1966.

15         Q.    And I assume you graduated from high school?

16         A.    That is correct.

17         Q.    What was that year?

18         A.    I graduated from Greeley West High School in

19   1984.

20         Q.    Where is that located?

21         A.    Greeley, Colorado.

22         Q.    And after your graduation from high school,

23   can you recount for me your employment history after

24   that time?

B13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                                  *
                                                *
            Plaintiff,                          *
                                                *
    v.                                          *
                                                *       C.A. No. 06-534 MPT
ARAMARK HEALTHCARE SUPPORT                      *
SERVICES, INC., a domestic corporation, and    *
ARAMARK CLINICAL TECHNOLOGY                     *
SERVICES, INC., a domestic corporation, and    *
ARAMARK MANAGEMENT SERVICES                     *
LIMITED PARTNERSHIP,                            *
                                                *
            Defendants.                         *

### DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Fed. R. Civ. P. 26 and 34, Defendants ARAMARK Healthcare Support Services, Inc., ARAMARK Clinical Technology Services, Inc., and ARAMARK Management Services Limited Partnership (collectively "Defendants"), by and through their attorneys, hereby provide the following objections and responses to Plaintiff's Second Request for Production of Documents. The responses set forth below reflect the present knowledge of Defendants and the results of their investigation to date. Defendants reserve the right to supplement or amend these responses as may be necessary or appropriate in the future in accordance with Fed. R. Civ. P. 26.

### GENERAL OBJECTIONS

1.      Defendants object to the Requests to the extent they seek the disclosure of information that is subject to one or more privileges or protections from disclosure, including, but not limited to:  the attorney-client privilege, the self-investigation privilege, the attorney work product doctrine, or any other privilege or protections available under applicable law.  In preparing their responses to these Requests, Defendants have assumed that the Requests are

B14

MEI 6243760v.1

limited in time such that they do not seek attorney-client or attorney work product material generated after the commencement of litigation. Accordingly, Defendants will not identify such material on any privilege log generated in this matter.

2.    Defendants object generally to Plaintiff's Requests on the grounds that they are overbroad in time and in scope, unduly burdensome, seek documents or information that is not reasonably calculated to lead to the production of admissible evidence and/or seek documents or information that is not relevant to the claims or defenses of any party to this action.

3.    Defendants object to any Request that seeks documents or information relating to any facility, entity, department, or work unit other than the facilities, entities, departments, or work units in which Plaintiff was employed.

4.    Defendants object to Plaintiff's Requests to the extent that they seek to impose burdens or obligations on Defendants beyond those required or permitted by the applicable provisions of the Federal Rules of Civil Procedure or by the Court's scheduling order. Defendants will respond to Plaintiff's Requests in accordance with the Federal Rules of Civil Produce and in accordance with the Court's scheduling order.

5.    Defendants object to Plaintiff's Requests to the extent that they seek to impose upon Defendants obligations to provide responses with respect to information or documents that are not in Defendants' possession, custody and/or control.

6.    Defendants object to Plaintiff's Requests to the extent that they seek documents or information that is already in the possession of Plaintiff, or that is equally available to Plaintiff as to Defendants.

7.    Defendants object to producing documents or providing information regarding any trade secret, proprietary information or other confidential research, development, technical,

*B15*

personnel, or commercial information, and shareholder information. Such information, to the extent it is otherwise non-privileged and relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence, will be produced only upon execution of a mutually acceptable confidentiality stipulation.

8.    Defendants object to Plaintiff's Requests to the extent that they seek information or documents concerning events that occurred more than 300 days before Plaintiff filed his charge of discrimination with the Delaware Department of Labor and/or the Equal Employment Opportunity Commission.

9.    Defendants submit these responses without conceding the relevance or materiality of the subject matter of any Request, and without prejudice to their right to object to further discovery, to object to the admissibility at trial of any document requested, or to object to any other proceeding in this action.

10.    Defendants object to Plaintiff's Requests to the extent that they are vague and/or ambiguous.

11.    Defendants incorporate these objections into each and every response below to the extent applicable. Defendants also reserve the right to raise objections at trial regarding the admissibility of any of the information that they provide or agree to provide.

12.    The responses below set forth Defendants' present knowledge and information based on their investigation to date, which is continuing. Defendants reserve the right to supplement or amend these responses as may be necessary or appropriate in the future.

B16

3

## SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS
(In addition to all applicable General Objections set forth above)

1.    **The complete packet of papers that Jonathan Hill required Plaintiff to sign and/or review upon Plaintiff's termination.**

**RESPONSE:**

Defendants will produce copies of work orders 6964, 7045, 7099, 7103, 7106 and 7124, which Jonathan Hill reviewed with Plaintiff on April 15, 2005 (documents Bates-labeled A00798 to A00809). Defendants also refer Plaintiff to the Letter Agreement, which Mr. Hill handed to Plaintiff during their discussion on April 15, 2005, which was previously produced to Plaintiff (document Bates-labeled A00001 to A00005).

2.    **Complete logs of the personal computer/s Plaintiff used while employed at Aramark, from March 18, 2005 through April 15, 2005, to include log-in activity of all user, the documents and/or databases that were accessed at each time of user log-in and by whom the aforementioned was accessed, and the date, time and specifics of each alteration that was made to every documents or database and by whom the aforementioned was altered.**

**RESPONSE:**

Defendants object to Request No. 2 on the grounds that it is overbroad in scope, unduly burdensome and seeks information that is not reasonably calculated to lead to the production of admissible evidence and/or seeks information that is not relevant to the claims or defenses of any party to this action.

Subject to these specific objections and Defendants' general objections asserted above, and without waiver thereof, after reasonable investigation, there are no responsive documents in Defendants' possession, custody or control.

B17

3.    **Any and all documents in John Ritterhoff's personnel file relating to write-ups or warnings for having a messy work space.**

**RESPONSE:**

Defendants object to Request No. 3 on the grounds that it seeks information that is not reasonably calculated to lead to the production of admissible evidence and/or seeks information that is not relevant to the claims or defenses of any party to this action. Defendants further object to this Request on the ground that it seeks confidential information regarding individuals not party to this action.

Subject to these specific objections and Defendants' general objections asserted above, and without waiver thereof, Defendants will produce a copy of a Memorandum from Jonathan Hill to John Ritterhoff, dated February 5, 2005, re. "Competency Remediation Letter" (document Bates-labeled A00810).

4.    **Any and all documents in John Ritterhoff's personnel file relating to write-ups or warnings for having backed up paperwork and/or incomplete paperwork.**

**RESPONSE:**

Defendants object to Request No. 4 on the grounds that it seeks information that is not reasonably calculated to lead to the production of admissible evidence and/or seeks information that is not relevant to the claims or defenses of any party to this action. Defendants further object to this Request on the ground that it seeks confidential information regarding individuals not party to this action.

Subject to these specific objections and Defendants' general objections asserted above, and without waiver thereof, after reasonable investigation, there are no responsive documents in Defendants' possession, custody or control.

B18

5.      **Any and all performance evaluations, disciplinary warnings or write-ups in John Ritterhoff's personnel file other than what has been requested in Questions 3 and 4.**

**RESPONSE:**

Defendants object to Request No. 5 on the grounds that it is overbroad in time and in scope, and seeks information that is not reasonably calculated to lead to the production of admissible evidence and/or seeks information that is not relevant to the claims or defenses of any party to this action.  Defendants further object to this Request on the ground that it seeks confidential information regarding individuals not party to this action.

Subject to these specific objections and Defendants' general objections asserted above, and without waiver thereof, Defendants will produce a copy of a John Ritterhoff's Competency Assessment, dated January 25, 2005 and April 23, 2005; Mr. Ritterhoff's performance evaluation, dated November 11, 2004; Mr. Ritterhoff's performance evaluation, dated March 31, 2004; and a Memorandum from Jonathan Hill to Mr. Ritterhoff, dated February 5, 2005, re. "Competency Remediation Letter" (documents Bates-labeled A00810 to A00829).

6.      **Please state the date of birth of John Ritterhoff.**

**RESPONSE:**

Defendants object to Request No. 6 on the grounds that it seeks information that is not reasonably calculated to lead to the production of admissible evidence and/or seeks information that is not relevant to the claims or defenses of any party to this action.

Subject to this specific objection and Defendants' general objections asserted above, and without waiver thereof, Defendants respond by stating that John Ritterhoff's date of birth is June 29, 1959.

B19

Dated:  March 15, 2007

Michael P. Kelly (D.E. Bar I.D. 2295)
Christopher A. Selzer (D.E. Bar I.D. 4305)
MCCARTER & ENGLISH, LLP
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE 19801
Tel. 302.984.6301/6392

William J. Delany (admitted *pro hac vice*)
Anne E. Martinez  (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel. 215.963.5066/5718

Attorneys for Defendant

B20

## CERTIFICATE OF SERVICE

I, Christopher A. Selzer, hereby certify that I caused to be served a true and correct copy of the Defendants Objections and Responses to Plaintiff's Second Request for Production of Documents via first class mail, on this 15th day of March, 2007, on:

> William D. Fletcher, Jr.
> Noel E. Primos
> SCHMITTINGER & RODRIGUEZ, P.A.
> 414 South State Street
> P.O. Box 497
> Dover, DE 19901

Attorneys for Plaintiff

Christopher A. Selzer

B21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                                          :

        Plaintiff,                                     :

                               :

        v.                                                  :

                               :          C.A. No. 06-534 (MPT)

                               :

ARAMARK HEALTHCARE SUPPORT                               :
SERVICES, INC., a domestic corporation,                  :
and ARAMARK CLINICAL TECHNOLOGY                          :
SERVICES, INC., a domestic corporation, and              :
ARAMARK MANAGEMENT SERVICES                              :
LIMITED PARTNERSHIP,                                     :
                               :

        Defendants.                                    :

## NOTICE OF SERVICE

       I, Christopher A. Selzer, hereby certify that a true and correct copy of Defendants'

Objections and Responses to Plaintiff's Second Request for Production of Documents was

served by first class mail on this 15th day of March, 2007, upon the following counsel of record:

        William D. Fletcher, Jr., Esquire
        Schmittinger & Rodriguez, P.A.
        414 South State Street
        P. O. Box 497
        Dover, DE  19901

           McCARTER & ENGLISH, LLP

           /s/ Christopher A. Selzer

           _____
           Michael P. Kelly (DE ID #2295)
           Christopher A. Selzer (DE ID# 4305)
           919 North Market Street, Suite #1800
           P. O. Box 111
           Wilmington, DE  19899
           (302) 984-6300

           Attorney for Defendants,
           Aramark Healthcare Support Services, Inc.,
           Aramark Clinical Technology Services, Inc.,
           and Aramark Management Services Limited
           Partnership

B22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                          *
                                        *
            Plaintiff,                  *
                                        *
      v.                                *
                                        *    C.A. No. 06-534 MPT
ARAMARK HEALTHCARE SUPPORT              *
SERVICES, INC., a domestic corporation, and  *
ARAMARK CLINICAL TECHNOLOGY             *
SERVICES, INC., a domestic corporation, and  *
ARAMARK MANAGEMENT SERVICES             *
LIMITED PARTNERSHIP,                    *
                                        *
            Defendants.                 *

## DEFENDANTS' RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 26 and 33, Defendants ARAMARK Healthcare Support

Services, Inc., ARAMARK Clinical Technology Services, Inc., and ARAMARK Management

Services Limited Partnership (collectively "Defendants"), by and through their attorneys, hereby

provide the following objections and responses to Plaintiff's Second Set of Interrogatories. The

responses set forth below reflect the present knowledge of Defendants and the results of their

investigation to date. Defendants reserve the right to supplement or amend these responses as

may be necessary or appropriate in the future in accordance with Fed. R. Civ. P. 26.

## GENERAL OBJECTIONS

1.    Defendants object to the Interrogatories to the extent they seek the disclosure of

information that is subject to one or more privileges or protections from disclosure, including,

but not limited to:  the attorney-client privilege, the self-investigation privilege, the attorney

work product doctrine, or any other privilege or protections available under applicable law. In

preparing their responses to these Interrogatories, Defendants have assumed that the

B23

Interrogatories are limited in time such that they do not seek attorney-client or attorney work product material generated after the commencement of litigation. Accordingly, Defendants will not identify such material on any privilege log generated in this matter.

2.      Defendants object generally to Plaintiff's Interrogatories on the grounds that they are overbroad in time and in scope, unduly burdensome, seek information that is not reasonably calculated to lead to the production of admissible evidence and/or seek information that is not relevant to the claims or defenses of any party to this action.

3.      Defendants object to any Interrogatory that seeks information relating to any facility, entity, department, or work unit other than the facilities, entities, departments, or work units in which Plaintiff was employed.

4.      Defendants object to Plaintiff's Interrogatories to the extent that they seek to impose burdens or obligations on Defendants beyond those required or permitted by the applicable provisions of the Federal Rules of Civil Procedure or by the Court's scheduling order. Defendants will respond to Plaintiff's Interrogatories in accordance with the Federal Rules of Civil Produce and in accordance with the Court's scheduling order.

5.      Defendants object to Plaintiff's Interrogatories to the extent that they seek to impose upon Defendants obligations to provide responses with respect to information or documents that are not in Defendants' possession, custody and/or control.

6.      Defendants object to Plaintiff's Interrogatories to the extent that they seek information that is already in the possession of Plaintiff, or that is equally available to Plaintiff as to Defendants.

7.      Defendants object to providing information regarding any trade secret, proprietary information or other confidential research, development, technical, personnel, or commercial

B24

information, and shareholder information. Such information, to the extent it is otherwise non-privileged and relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence, will be produced only upon execution of a mutually acceptable confidentiality stipulation.

8.      Defendants object to Plaintiff's Interrogatories to the extent that they seek information concerning events that occurred more than 300 days before Plaintiff filed his charge of discrimination with the Delaware Department of Labor and/or the Equal Employment Opportunity Commission.

9.      Defendants submit these responses without conceding the relevance or materiality of the subject matter of any Interrogatory, and without prejudice to their right to object to further discovery, to object to the admissibility at trial of any document requested, or to object to any other proceeding in this action.

10.      Defendants object to Plaintiff's Interrogatories to the extent that they are vague and/or ambiguous.

11.      Defendants incorporate these objections into each and every response below to the extent applicable. Defendants also reserve the right to raise objections at trial regarding the admissibility of any of the information that they provide or agree to provide.

12.      The responses below set forth Defendants' present knowledge and information based on their investigation to date, which is continuing. Defendants reserve the right to supplement or amend these responses as may be necessary or appropriate in the future.

B25

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES
(In addition to all applicable General Objections set forth above)

1.    **State Robert Kunzig's date of birth.**

**ANSWER:**

Defendants object to Interrogatory No. 1 on the grounds that it seeks information that is not reasonably calculated to lead to the production of admissible evidence and/or seeks information that is not relevant to the claims or defenses of any party to this action.

Subject to this specific objection and Defendants' general objections asserted above, and without waiver thereof, Defendants respond by stating that Robert Kunzig's date of birth is December 2, 1957.

Dated:

Michael P. Kelly (D.E. Bar I.D. 2295)
Christopher A. Selzer (D.E. Bar I.D. 4305)
MCCARTER & ENGLISH, LLP
Citizens Bank Building
919 N. Market Street, 18th Floor
Wilmington, DE 19801
Tel. 302.984.6301/6392

William J. Delany (admitted *pro hac vice*)
Anne E. Martinez  (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Tel. 215.963.5066/5718

Attorneys for Defendant

B26

4

## VERIFICATION

I, Jonathan Hill, hereby verify under penalty of perjury that I am employed by

ARAMARK Clinical Technology Services as a Front Line Manager, and that the factual

statements set forth in the Defendants' Objections and Responses to Plaintiff's Second Set of

Interrogatories are true and correct based upon knowledge and information provided to and/or

obtained by me in the performance of my duties.

Jonathan Hill

3/20/07
Dated

B27

## CERTIFICATE OF SERVICE

I, Christopher A. Selzer, hereby certify that I caused to be served a true and

correct copy of the Defendants' Objections and Responses to Plaintiff's Second Set of

Interrogatories via first class mail, on this 20th day of March, 2007, on:

> William D. Fletcher, Jr.
> Noel E. Primos
> SCHMITTINGER & RODRIGUEZ, P.A.
> 414 South State Street
> P.O. Box 497
> Dover, DE 19901
>
> Attorneys for Plaintiff

Christopher A. Selzer

B28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                              :

        Plaintiff,                       :

        v.                               :

                                           :        C.A. No. 06-534 (MPT)

ARAMARK HEALTHCARE SUPPORT             :
SERVICES, INC., a domestic corporation,     :
and ARAMARK CLINICAL TECHNOLOGY         :
SERVICES, INC., a domestic corporation, and  :
ARAMARK MANAGEMENT SERVICES             :
LIMITED PARTNERSHIP,                        :

        Defendants.                    :

## NOTICE OF SERVICE

       I, Christopher A. Selzer, hereby certify that a true and correct copy of Defendants'

Responses to Plaintiff's Second Set of Interrogatories was served by first class mail on this 26th

day of March, 2007, upon the following counsel of record:

                    William D. Fletcher, Jr., Esquire
                    Schmittinger & Rodriguez, P.A.
                    414 South State Street
                    P. O. Box 497
                    Dover, DE  19901

                       McCARTER & ENGLISH, LLP

                       /s/ Christopher A. Selzer

                       _____
                       Michael P. Kelly (DE ID #2295)
                       Christopher A. Selzer (DE ID# 4305)
                       919 North Market Street, Suite #1800
                       P. O. Box 111
                       Wilmington, DE  19899
                       (302) 984-6300

                       Attorney for Defendants,
                       Aramark Healthcare Support Services, Inc.,
                       Aramark Clinical Technology Services, Inc.,
                       and Aramark Management Services Limited
                       Partnership

B29

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                    :

    Plaintiff,                    :

                         :

    v.                    : C.A. No. 06-534 (MPT)

                         :

ARAMARK HEALTHCARE SUPPORT:

SERVICES, INC., a domestic:

corporation, and ARAMARK  :

CLINICAL TECHNOLOGY        :

SERVICES, INC., a domestic:

corporation, and ARAMARK  :

MANAGEMENT SERVICES        :

LIMITED PARTNERSHIP,       :

    Defendants.                   :


               Deposition of DANIEL MILLER taken pursuant to
notice before Gloria M. D'Amore, Registered Professional
Reporter, in the law offices of Schmittinger & Rodriguez,
P.A., 4602 Highway One, Corestates Building, Rehoboth Beach,
Delaware, on Friday, September 7, 2007, beginning at
approximately 2:30 p.m., there being present:

APPEARANCES:


           SCHMITTINGER & RODRIGUEZ, P.A.

        BY:  NOEL E. PRIMOS, ESQUIRE

           414 South State Street

           Dover, Delaware 19901

           Attorney for Plaintiff


B30  COPY

1        Q.    That's Miller 3.

2        A.    Okay.

3        Q.    Miller 4 -- and I'm just laying all this out in

4 front so you know what's in front of you.

5              Okay?

6        A.    Yes.

7        Q.    And Miller 4 is the preventative maintenances for

8 Mr. Ritterhoff for the period March 1, 2005 through March 14,

9 2005.  And it's just the preventative maintenances?

10       A.    Yes.

11       Q.    And then, finally, Exhibit 5 are the preventative

12 maintenances for Mr. Ritterhoff for the period March 23rd

13 through March 31, 2005.

14             Okay?

15       A.    Yes.

16       Q.    Now, I just want to start with Miller Exhibit No.

17 3, which is that compilation report from the computer system?

18       A.    Yes.

19       Q.    Do you have any basis to contend that any of the

20 recorded time entries on this report are incorrect?

21       A.    Yes.

22       Q.    And what's your basis for that?

23       A.    It states here that somebody worked 104 percent of

24 his hours.  105 percent of his hours.  103 percent of his

25 hours.  And 103 percent of his hours.  And that would be John

Page 8

1 Ritterhoff. And it also states on several occasions, there

2 was a perfect score of 100 percent. Seven times there was a

3 perfect score of 100 percent. And that was for John

4 Ritterhoff's documentation.

5          For my documentation, there was only one time that

6 it was a perfect score of 100 percent. That is when I was

7 absent. And, I believe, Mr. Hill entered me as having worked

8 whatever he claims our work period would be,

9 seven-and-a-half, seven hours, eight hours, I'm not sure. I

10 don't recall.

11     Q.    Are you referring to the date 3/8/05 sick?

12     A.    Yes.

13     Q.    And Mr. Ritterhoff is 105 percent of his hours?

14     A.    Yes.

15     Q.    Are you familiar with the fact that the expected

16 number of hours in a week was 450?

17     A.    No.

18     Q.    I'm sorry. Excuse me. Yeah. It's not per week.

19 It's per day.

20          Are you familiar with the fact that the expected

21 number of hours or minutes per day is 450?

22     A.    I never calculated them.

23     Q.    Were you aware that was what was considered a full

24 day for time purposes?

25     A.    I'm not aware minutes per day of calculations.

1    Q.    The best thing you can do is, you'll see at the

2 bottom, remember we went through before, we put a Bates

3 number on them.  Just refer to that Bates number.

4    A.    Okay.

5    Q.    And my question is going to stand for each of these

6 as to why you believe a particular document supports

7 contention that Mr. Ritterhoff was treated more favorably

8 than you.  Just identify for me the document number and then

9 specify why you believe it supports such a contention?

10    A.    Well, can I make a statement on all of the

11 documents first?

12    Q.    I certainly can't prevent that.

13    A.    Okay.  On the whole, I feel that I was unfairly

14 treated because we were both assigned the same assignment for

15 that month of preventative maintenance and inspections of

16 medical equipment at the hospital.

17          And I was told at the beginning, this is the first

18 time I was to do this type of a procedure since I came from

19 another hospital, to turn over all my previous month's

20 repairs to the next person.  And that I was to do only

21 preventative maintenance and any repairs associated with

22 them.

23          And the unfairness I find is that the volume I did,

24 compared to the volume that John Ritterhoff did is -- what's

25 the word I'm looking for -- unequal.

Page 25

1    A.    Yes.

2    Q.    Okay.  So, we started with the first document of

3 Miller 4.

4          What other documents in Miller 4 do you contend

5 support any contention that you were treated less favorably

6 than Mr. Ritterhoff?

7          Mr. Miller, let me strike that question and ask you

8 another question first.

9          You were never disciplined by Mr. Hill for the

10 amount of time that it took you to perform preventative

11 maintenances.

12         Correct?

13   A.    No.

14   Q.    That's accurate?  He never disciplined you for

15 that.

16         Correct?

17   A.    For the amount of time?

18   Q.    Right.

19   A.    Not that I recall.  No.

20         I have a problem with 1137.

21   Q.    Okay.

22   A.    The amount of time that Mr. Ritterhoff took to do

23 this inspection.  The inspection involves simulating a

24 warming device for a patient.  And it says, Verified

25 operation, function and alarms.  Calibrated temperature.

Page 28

1          Correct?

2          MR. PRIMOS:  Objection.  Asked and answered.

3          MR. DELANY:  If I asked already, I apologize, but I
4 just want to confirm.

5          MR. PRIMOS:  You can answer, Mr. Miller.

6          THE WITNESS:  No.  I wasn't.

7 BY MR. DELANY:

8      Q.    What is the next document that you believe supports
9 the contention that you were treated less favorably than
10 Mr. Ritterhoff?

11     A.    I have a problem with the Document 1142, which is a
12 preventative maintenance by John Ritterhoff on a centrifuge.
13 The time it took him was an hour to test the lid lock, the
14 alarms, check the speed at which it's standardly set and a
15 timer test of five minutes.  The leakage test, electrical
16 safety leakage test of approximately a minute to two minutes,
17 he put down an hour.

18          Now, there could be extra time in, of course,
19 entering the data or locating the unit.  That should be
20 normally about a 40-minute job.

21     Q.    So, it's normally a 40-minute job with the
22 possibility of more time for entering data and locating the
23 unit?

24     A.    If he wasn't aware of it.

25     Q.    Do you agree with the manner in which

1    A.    No.

2    Q.    Would it cause the seal to break?

3    A.    Which seal?

4    Q.    The lid seal.

5    A.    No.  No.

6    Q.    What is the purpose of the pin, then?

7    A.    To support the lid when it's open.  Support the

8 hinge when it's open.

9    Q.    Just going back, then, when you performed the

10 centrifuge preventative maintenance, it generally takes you

11 45 minutes.

12          Correct?

13    A.    On the centrifuge.  Yes.  To locate the centrifuge,

14 to enter the data and to go through my tests all take --

15 accumulatively takes 45 minutes.

16    Q.    So, you are taking issue with Mr. Ritterhoff in

17 that it took him 15 minutes more than you?

18    A.    Yes.

19    Q.    What else in Miller Exhibit No. 4 do you contend

20 supports any contention that Mr. Ritterhoff was treated more

21 favorably than you?

22          MR. PRIMOS:  What exhibit are we looking at?

23          MR. DELANY:  Miller 4.

24          THE WITNESS:  I contend next 1146, 1151, 1153,

25 1155, 1156, 1158, 1159, 1160, 1163, 1166.

Page 36

1    A.    Yes.    He was treated more favorably than me.    And

2 time associated with his preventative maintenance inspections

3 was exaggerated.

4    Q.    All right.    You indicated that you are not sure

5 whether he performed all of the preventative maintenances.

6          What is the basis for your statement?    I had asked

7 you, were you there when he performed any of these.    And you

8 responded that you weren't sure that he performed all of

9 them.    I believe that's what you said.

10    A.    Yes.    I'm referring to the very last one.    I'm

11 referring to 1160 where it's not even a preventative

12 maintenance.    He put down three hours for sitting with the

13 repairman on a repair of a converter someplace in the

14 building on fiberoptic equipment that the shop has no

15 equipment to work on.    So, they had to bring somebody in to

16 do it.    And he put down three hours there.

17    Q.    Were you there when he was performing that work?

18    A.    No.    He wasn't performing it.    It was a service

19 organization.    Philips was performing the work.

20    Q.    Were you there with Mr. Ritterhoff while Philip was

21 performing the work?

22    A.    No.

23    Q.    Excuse me.    I said Philip.

24          Is Philip a person?

25    A.    Philips it is.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DANIEL MILLER, | * | C.A. No.  06-534-MPT |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| ARAMARK HEALTHCARE SUPPORT | * | |
| SERVICES, INC., ARAMARK CLINICAL | * | |
| TECHNOLOGY SERVICES, INC., and | * | |
| ARAMARK MANAGEMENT SERVICES | * | |
| LIMITED PARTNERSHIP, | * | |
| | * | |
| Defendants. | * | |

| | |
|---|---|
| STATE OF DELAWARE | * |
| | * |
| COUNTY OF KENT | * |

### AFFIDAVIT OF TED LEHMANN

COMES NOW, Ted Lehmann, who being of sound mind, doth depose and say as follows:

1.    I was employed by Defendant Aramark from approximately July 3, 2000, until April 13, 2007.  My employment with Defendant in the State of Delaware began in approximately 2002.

2.    During the period of my employment with Defendant Aramark, I had extensive opportunity to work with Plaintiff Daniel Miller.  In addition, during the latter period of my employment with Defendant Aramark, i.e., from July 2004 until the end of my employment, my immediate supervisor was Jonathan Hill.

3.    I was employed by Defendant Aramark as a radiology engineer in connection with Defendant Aramark's contractual arrangement with Bayhealth Medical System.

4.   During the period that I worked with Mr. Miller, I never heard a single complaint by staff of Bayhealth regarding Mr. Miller's performance.   In fact, I heard many compliments about Mr. Miller by staff of Bayhealth.

5.   Mr. Miller was an excellent employee.

6.   Upon his arrival at Bayhealth in 2004, Mr. Hill felt threatened by Mr. Miller, as Mr. Miller was more knowledgeable than Mr. Hill.

7.   Mr. Hill's unfair treatment of Mr. Miller began immediately after Mr. Hill's arrival at Bayhealth in the summer of 2004, but Mr. Hill's unfair treatment of Mr. Miller markedly increased following Mr. Miller's return from medical leave in late 2004 and early 2005.

8.   Mr. Hill treated Mr. Miller unfairly for two primary reasons:   Mr. Miller's age and his inability to function fully immediately after his return from medical leave.

9.   Mr. Miller was one of the oldest employees of Defendant at Bayhealth.

10.   After Mr. Miller's return from medical leave, Mr. Hill treated Mr. Miller unfairly by running him all over the hospital and assigning tasks to him that other employees could have performed.

11.   Mr. Miller's performance was superior to that of John Ritterhoff.   One of Mr. Ritterhoff's shortcomings was that he would start on too many jobs at one time.   In addition, Mr. Ritterhoff had an extremely messy and disorganized work area.   Mr. Ritterhoff was counseled concerning his work area but never

B39

received substantive discipline when the problem remained uncorrected. Mr. Ritterhoff continued to have a messy and disorganized work area until at least the date that my employment ended in April 2007.

12.   I believe that Mr. Hill targeted Mr. Miller between the time that Mr. Miller returned from his medical leave and the time of Mr. Miller's termination.

13.   During the period that Mr. Hill was supervising Mr. Miller, documentation, and specifically incomplete paperwork, was a problem throughout the Department, i.e., employees throughout the Department were submitting incomplete paperwork. Therefore, any discipline of Mr. Miller by Mr. Hill regarding this issue represented an unfair targeting of Mr. Miller by Mr. Hill.

14.   I am aware that, during the period of Mr. Miller's employment by Defendant Aramark, there was no need for an employee to obtain prior approval for paid time off.


FURTHER, AFFIANT SAITH NOT.


_____
TED LEHMANN


SWORN TO AND SUBSCRIBED before me this 15th day of October, 2007.


_____
Notary Public
My commission

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                  *    C.A. No.  06-534-MPT
                             *
         Plaintiff,        *
                             *
   v.                      *
                             *
ARAMARK HEALTHCARE SUPPORT   *
SERVICES, INC., ARAMARK CLINICAL  *
TECHNOLOGY SERVICES, INC., and   *
ARAMARK MANAGEMENT SERVICES    *
LIMITED PARTNERSHIP,         *
                             *
        Defendants.       *

STATE OF DELAWARE    *
                      *
COUNTY OF KENT      *

## AFFIDAVIT OF GREGORY WILSON

COMES NOW, Gregory Wilson, who being of sound mind, doth depose and say as follows:

1.    I was employed by Defendant Aramark as a biomedical technician, or Clinical Engineering ("CE") Technician, at the Bayhealth Medical System campuses in Dover and Milford until I resigned in June 2005.  This was the same position held by Plaintiff Daniel Miller until his termination in April 2005.

2.    At the present time, I continue to work at the Bayhealth Medical Center campus in Dover, but I am employed directly by Bayhealth Medical System.

3.    I believe that, during the period of time that Jonathan Hill was supervising Mr. Miller, Mr. Hill was unfairly targeting Mr. Miller.

4.    During the period of his supervision of Mr. Miller, Mr. Hill would make comments referring to the employment environment

B41

at Aramark, such as "Out with the weak, in with the strong," and "Only the strong survive."

5.    The average age of the employees in the Department was ten to fifteen years younger than Mr. Miller.

6.    The work of a CE Technician was highly technical, highly documented, and required creativity, which made it easy for Mr. Hill to criticize the work of those employees whom he wished to criticize.

7.    During the period that he was supervised by Mr. Hill, Mr. Miller met all the job requirements of his position.

8.    Mr. Hill targeted Mr. Miller for having incomplete and/or inaccurate documentation relating to inspections of incoming equipment, even though other people in the Department also had incomplete and/or inaccurate documentation.

9.    The performance of another employee in the department, John Ritterhoff, was extremely deficient, including the following:

        (a)   His documentation was backed up for up to eighteen to twenty-four months;

        (b)   Mr. Ritterhoff frequently filled out documentation improperly and/or left documentation incomplete;

        (c)   Orders for equipment were fouled up due to Mr. Ritterhoff's incompetence;

        (d)   Mr. Ritterhoff's work area was always extremely messy, and this contributed to holding up the processing of documentation, as orders remained on Mr. Ritterhoff's desk for long periods of time.

B42

10. Mr. Ritterhoff was an unmotivated and disorganized employee.

11. Mr. Miller completed his work, while Mr. Ritterhoff did not.

12. This deficient performance by Mr. Ritterhoff, including his deficient completion of documentation, continued throughout the period that I was employed simultaneously with Mr. Ritterhoff, and was still occurring when I resigned in June 2005.

13. Mr. Hill created new requirements to target or highlight certain people, and he specifically used these new requirements to put Mr. Miller in a bad light and Mr. Ritterhoff in a good light.

14. After Mr. Miller was fired, his replacement was Robert Kunzig, who was completely unqualified for the position and had no training or background for the position.

FURTHER AFFIANT SAITH NOT.

_Gregory P. Wilson_
GREGORY WILSON

SWORN TO AND SUBSCRIBED before me this _17th_ day of October, 2007.

_Connie J. de Young_
Notary Public
My commission

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DANIEL MILLER,                    *    C.A. No.  06-534-MPT
                                  *
          Plaintiff,              *
                                  *
     v.                           *
                                  *
ARAMARK HEALTHCARE SUPPORT        *
SERVICES, INC., ARAMARK CLINICAL  *
TECHNOLOGY SERVICES, INC., and    *
ARAMARK MANAGEMENT SERVICES       *
LIMITED PARTNERSHIP,              *
                                  *
          Defendants.             *

STATE OF DELAWARE      *
                       *
COUNTY OF KENT         *

### AFFIDAVIT OF DANIEL MILLER

COMES NOW, Daniel Miller, who being of sound mind, doth depose and say as follows:

1.    I am the Plaintiff in the above-captioned action.

2.    The attached "Position Statement and Allegations," which I submitted to the Delaware Department of Labor on April 3, 2006, is true and accurate to the best of my knowledge, information and belief.

3.    With respect to the incident involving a defibrillator, concerning which a written disciplinary document was issued to me on April 5, 2005, which I refused to sign, I never observed the "gap" in the "top and bottom case" referenced in the document.

4.    During the termination meeting that Jonathan Hill held with me on April 15, 2005, I do not recall any mention being made of the incident involving the treadmill/stress machine (disciplinary document issued March 24, 2005) or the incident

B44

involving the defibrillator, nor do I recall any mention being made of alleged "safety" issues or concerns.

    5.    I was the only Aramark employee at Bayhealth Medical Center who took extended FMLA leave from the time that Jonathan Hill started as supervisor on July 1, 2004, until my termination on April 15, 2005.

    FURTHER AFFIANT SAITH NOT.

_Daniel Miller_
DANIEL MILLER

    SWORN TO AND SUBSCRIBED before me this 19th day of October, 2007.

Notary Public
My commission expires:

NOEL E. PRIMOS
Delaware Attorney at Law with
Power to act as Notary Public
per 29 Del. C. § 4323 (a) (3)

B45

# POSITION STATEMENT AND ALLEGATIONS  #/

Charging party states other younger workers were given no disciplinary documentations when having performed the same action for which the charging party was disciplined. Descriptions as follows:

March 4, 2004 Failure to Perform – submitting incomplete and incorrect information on work forms (initial inspections forms for new equipment)

Prior to receiving the disciplinary document of March 4, 2005, I visually observed Sharon Money (department administrative assistant) returning incomplete work order forms to Bill McClemment (junior technician approximately 25 years old) and the same or similar documents to Sterling Townsend (intermediate level technician approximately 27 years old) requesting they be completed prior to her submitting. NO INTERVENTIONAL DISCIPLINARY ACTION was ever taken towards these individuals for committing the same offence I was charged with on March 4, 2005. In addition Sterling Townsend was never charged with a SAFETY VIOLATION for performing and initial inspection on the exact model cardiac stress system he had performed an initial inspection on while the GE Healthcare personnel setup and having the emergency safety switch installed in the exact location it had been placed on the system I installed on February 24, 2005. I brought the matter to Mr. Hill's attention at the time of my documented disciplinary session of March 24,2005 his response was that was not the issue at this time and he demanded I also relocate the switch on the other system to the location he believed was appropriate, since he informed me the manufacture (GE healthcare) would not commit to a specific area due to possible legal issues. Another words Sterling Townsend was not reprimanded.

John Ritterhoff (senior technician, my rank also at this time) would turn incomplete paper inspections forms, only to have them returned to him for completion by his sister-in-law, Sharon Money for completion prior to her submitting them to the Mr. Hill.

In a conversation with Steve Mc Vickers (x-ray imaging engineer of the department) I explained I was disciplined for not completing a submitted form when the information was not available. He agreed some info for example Purchase price, date of order purchase order # OEM, ship date, etc is only in hospital receiving dept. and sometimes months after the fact not possible to track down. He mentioned he submits forms completed with all available information only to receive them back from the manager with post-it notes attached in the managers handwriting and the manager never pursued any action against him and produced the exact type form I was persecuted about. SEE ATTACHED COPY

2006 APR -3 P 12: 54

STATE OF DELAWARE
MILFORD OFFICE
INDUSTRIAL AFFAIRS
DEPARTMENT OF LABOR

B46                                        A00499

CERTIFICATE OF SERVICE

I hereby certify that I have caused copies of the following:

**APPENDIX TO PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

to be served upon:    MICHAEL P. KELLY, ESQUIRE
                      CHRISTOPHER A. SELZER, ESQUIRE
                      McCarter & English, LLP
                      919 N. Market Street, Suite 1800
                      P.O. Box 111
                      Wilmington, DE   19899

by electronic service on ___October 22___, 2007.


                            SCHMITTINGER & RODRIGUEZ, P.A.

                            BY:_____
                              NOEL E. PRIMOS, ESQUIRE
                              Bar I.D. #3124
                              414 S. State Street
                              P.O. Box 497
                              Dover, DE   19903
                              (302) 674-0140
                              Attorneys for Plaintiff

DATED: 10-22-07
NEP:pmw